**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

| | |
|---|---|
| IN RE: AFLIBERCEPT PATENT LITIGATION<br><br>**THIS DOCUMENT RELATES TO:**<br>*Regeneron Pharmaceuticals, Inc. v. Amgen Inc.*,<br>Case No. 1:24-cv-39-TSK<br>Case No. 1:25-cv-74-TSK | MDL No. 1-24-md-3103-TSK |

# AMGEN INC.'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................... ii

I. INTRODUCTION ..................... 1

II. APPLICABLE LAW ..................... 4

III. ARGUMENT ..................... 6

A. Amgen's Proposed Construction Aligns with the Intrinsic Record. ..................... 6

1. The Claims and Specification Confirm that the Formulation, as a Whole, Must Be Suitable for Intravitreal Administration. ..................... 6

2. The Claims and Specification Confirm That "Suitable for Intravitreal Administration" Requires Features Appropriate for Intravitreal Administration. ..................... 8

B. Additional Intrinsic Evidence, *i.e.*, Statements Made by Regeneron in U.S. Patent Office Post-Grant Proceedings, Supports Amgen's Construction. ..................... 12

C. Regeneron Has Consistently and Repeatedly Argued That "Suitable for Intravitreal Administration" Means the Formulation Must Have Features Making it Appropriate for Intravitreal Administration. ..................... 14

1. Regeneron's Arguments from the *Mylan* Case Support Amgen's Construction. ..................... 14

2. Regeneron's Arguments from Other Aflibercept-Related Patent Proceedings Support Amgen's Construction. ..................... 17

D. Excluding All "Functional Requirements," as Regeneron Proposes, Is Inconsistent with a Significant Body of Prior Case Law on Analogous Terms. ..................... 20

IV. CONCLUSION ..................... 21

## TABLE OF AUTHORITIES

### Cases

*Acumed LLC v. Stryker Corp.*,
483 F.3d 800 (Fed. Cir. 2007) .......... 11

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
340 F.3d 1298 (Fed. Cir. 2003) .......... 10

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) .......... 4, 5

*Aventis Pharms. Inc. v. Impax Labs., Inc.*,
No. 02-cv-1322, 2011 WL 94188 (D.N.J. Jan. 11, 2011) .......... 21

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017) .......... 3, 5, 13, 16

*Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*,
133 F. Supp. 3d 692 (D.N.J. 2015) .......... 5

*Biacore v. Thermo Bioanalysis Corp.*,
79 F. Supp. 2d 422, 457 (D. Del. 1999),
*aff'd*, 30 Fed. Appx. 994 (Fed. Cir. 2002) .......... 21

*Centripetal Networks, LLC v. Cisco Sys., Inc.*,
No. 24-cv-2097, 2026 WL 1162800 (Fed. Cir. Apr. 29, 2026) .......... 13

*E.I. du Pont de Nemours & Co. v. Unifrax I LLC*,
921 F.3d 1060 (Fed. Cir. 2019) .......... 4, 12

*Eon Corp. IP Holdings v. Silver Spring Networks*,
815 F.3d 1314 (Fed. Cir. 2016) .......... 11

*Epos Techs. Ltd. v. Pegasus Tecs. Ltd.*,
766 F.3d 1338 (Fed. Cir. 2014) .......... 10

*Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*,
No. 13-cv-4513, 2014 WL 4802426 (N.D. Cal. Sept. 26, 2014) .......... 5

*Ferring B.V. v. Serenity Pharms., LLC*,
No. 17-cv-9922, 2020 WL 1164700 (S.D.N.Y. Mar. 11, 2020) .......... 6

*Gillette Co. v. Energizer Holdings, Inc.*,
405 F.3d 1367 (Fed. Cir. 2005) .......... 4, 5, 17

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
452 F.3d 1312 (Fed. Cir. 2006) .......... 10

*Impax Labs., Inc. v. Lannett Holdings, Inc.*,
No. 14-cv-984, 2015 WL 7737309 (D. Del. Dec. 1, 2015) .......... 3, 13, 20

*Kyowa Hakka Bio, Co., Ltd. v. Ajinomoto Co., Inc.*,
No. 17-cv-313, 2020 WL 3403207 (D. Del. June 19, 2020) .......... 6, 17

*Merck & Co. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) .......... 9

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......... 4, 8

*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*,
714 F. Supp. 3d 652 (N.D.W. Va. 2024) .......... 15, 16

*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*,
No. 22-cv-61, 2023 WL 11891335 (N.D.W. Va. Apr. 19, 2023) .......... 20

*Samesurf, Inc. v. Intuit, Inc.*,
No. 22-cv-412, 2025 WL 1287805 (S.D. Cal. May 2, 2025) .......... 13

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) .......... 10

*SightSound Techs., LLC v. Apple Inc.*,
809 F.3d 1307 (Fed. Cir. 2015) .......... 4

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) .......... 9

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) .......... 4

*Voice Tech Corp. v. Unified Patents, LLC*,
110 F.4th 1331 (Fed. Cir. 2024) .......... 11

# I. INTRODUCTION

The parties dispute the construction of one claim term of U.S. Patent No. 12,331,099 ("the '099 Patent"): "wherein the liquid ophthalmic formulation is suitable for intravitreal administration." This term appears in, and is critical for understanding, every asserted claim of the '099 Patent—the title of which is "VEGF Antagonist Formulations *Suitable for Intravitreal Administration*." Ex. 1 ('099 Patent) at 1:1-3 (emphasis added.)

Amgen's proposed construction is: "wherein the liquid ophthalmic formulation, as a whole, has features making it appropriate for intravitreal administration." There are two basic elements to Amgen's construction. First, the term means the "whole" formulation—and not just its constituent components—must be suitable for intravitreal administration. Thus, even if the formulation components individually are considered suitable for intravitreal administration, the term requires that the pharmaceutical formulation resulting from the combination of those components and their concentrations is suitable for intravitreal administration. As explained in the Joint Claim Construction and Pre-Hearing Statement, the parties appear to agree on the first aspect of Amgen's construction.[1] ECF No. 929.

Second, "suitable for intravitreal administration" means the formulation "has features making it appropriate for intravitreal administration." That is, the formulation has or exhibits

---

[1] Regeneron appears to agree the term applies to the formulation "as a whole," but during the Federal Circuit appeal of the *Mylan* case, Regeneron's counsel argued the term required that the formulation "contains components that can be used intravitreally and nothing more." Ex. 2 at 44:23-45:1 (*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, No. 24-2002, Oral Hearing Tr. (Fed. Cir. Feb. 7, 2025).

The "*Mylan* case" as used herein refers to *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, No. 22-cv-61 (N.D.W. Va.) and its appeal.

features that make it appropriate for administration (*i.e.*, injection) into the vitreous humor.[2] Amgen's construction is consistent with the ordinary and customary meaning of the term, the specification, other intrinsic evidence, and indeed the very purpose of the invention. *E.g.*, Ex. 1[3] ('099 Patent) at Field of the Invention, 1:55-62 ("The present invention is directed to pharmaceutical formulations *suitable for intravitreal administration*…") (emphasis added).

Regeneron offers no construction. Instead, it asks the Court to apply the term's "plain and ordinary meaning." If Regeneron truly agrees the term carries its plain and ordinary meaning to a skilled artisan, consistent with Amgen's construction, then there may not be a dispute. But it has become apparent from the parties' pre-briefing discussions that Regeneron in fact is advocating a construction that is far different from the term's plain and ordinary meaning. Regeneron apparently will argue that the term should be construed to exclude any "functional requirements." ECF No. 929 at 4 (Regeneron arguing that the plain and ordinary meaning of the term "requires only that the composition may be administered intravitreally and ***does not impose any functional requirements such as stability***") (emphasis added); Ex. 3 (D. Berl Email to J. Labbe dated 7/28/26).

Regeneron has not explained how the disputed term "does not impose any functional requirements." ECF No. 929 at 4. Regeneron's construction excluding ***any*** functional requirements, however, is not only contrary to the term's "plain and ordinary meaning," but also inconsistent with Regeneron's previous arguments and witness testimony in other proceedings that

[2] There does not appear to be any dispute that "intravitreal administration" means administration into the part of the eye known as the vitreous humor (located between the lens at the front of the eye and the retina in the back of the eye).

[3] Exhibits 1-13 refer to the Exhibits attached to the Declaration of Brett A. Postal, and Exhibits A-C refer to the Exhibits attached to the Declaration of Trevor Crosse.

an intravitreal formulation must have features to ensure the formulation can function as a formulation for intravitreal administration.

For example, in an Inter Partes Review ("IPR") post-grant proceeding before the U.S. Patent Office ("Patent Office") involving the related U.S. Patent No. 11,084,865 ("the '865 Patent"), which shares the same specification and also uses the disputed term in its claims, Regeneron argued that the claims were not anticipated by prior art U.S. Patent No. 10,406,226 ("Dix") because, among other things, the formulations in Dix were not "suitable for intravitreal administration." Ex. 4 at 12, 30, 32-38 (*Fresenius Kabi SwissBioSim GmbH v. Regeneron Pharms., Inc.*, IPR2025-01268, Patent Owner's Preliminary Response (P.T.A.B. Oct. 23, 2025)). Regeneron urged the Patent Office to follow precedent that found "the analogous term 'pharmaceutical formulation suitable for intranasal administration'" requires that "the formulations '***must possess features making them appropriate for intranasal use.***'" *Id.* at 34 (quoting *Impax Labs., Inc. v. Lannett Holdings, Inc.*, No. 14-cv-984, 2015 WL 7737309, at *3 (D. Del. Dec. 1, 2015)) (emphasis added). Because Regeneron's statements to the PTO are part of the prosecution history of the related '865 Patent, they are intrinsic evidence for claim construction of the '099 Patent. *See, e.g.*, *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360-61 (Fed. Cir. 2017).

And in a U.K. proceeding involving a foreign counterpart to the '099 Patent, Regeneron argued to the Patents Court that a formulation suitable for intravitreal administration has features making it suitable for intravitreal administration—arguing for features such as "an osmolality close to or within the range of the vitreous, has a pH that is tolerated in the eye, and is non-viscous enough to be capable of being injected." Ex. C at ¶ 102 (*Formycon AG v. Regeneron Pharms., Inc.*, HP-2024-000015 and HP-2024-000036, Regeneron and Bayer's Trial Skeleton Argument (High Court of Justice Business and Property Courts of England and Wales, Intellectual Property

List (ChD), Patents Court June 29, 2025)). Regeneron's statements are relevant here as admissions against interest. *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) ("This blatant admission by this same defendant before the [European Patent Office] clearly supports this court's holding . . . ."); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1312-13 (Fed. Cir. 2014) (finding Federal Circuit precedent "provide[s] ample support for holding [patentee] to the statements made during Japanese prosecution").

Amgen respectfully asks the Court to adopt Amgen's proposed construction, which adheres to the term's ordinary and customary meaning and is supported by the intrinsic and extrinsic evidence, and the case law.

## II. APPLICABLE LAW

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotations and citation omitted). The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art ("POSA") at the time of the invention. *Id.* at 1312-13. "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms" and "the context in which a term is used in the asserted claim can be highly instructive." *Id.* at 1314. Together with the claim language, "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"[F]amilial patents [*i.e.*, patents stemming from a common priority application] inform the construction of a claim term and are appropriately treated as intrinsic evidence." *E.I. du Pont de Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1070 (Fed. Cir. 2019) (cleaned up); *see also SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015) ("Where multiple

patents derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents.") (internal quotation and citation omitted). Statements to the Patent Office in IPRs are considered part of the prosecution history and are intrinsic evidence for claim construction. *See, e.g.*, *Aylus Networks, Inc.*, 856 F.3d at 1360-61 ("Because an IPR proceeding involves reexamination of an earlier administrative grant of a patent, it follows that statements made by a patent owner during an IPR proceeding can be considered during claim construction[.]"); *Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*, No. 13-cv-4513, 2014 WL 4802426, at *4 (N.D. Cal. Sept. 26, 2014) ("The IPR proceedings will also add to the '536 Patent's prosecution history," which is "an important part of the intrinsic record relevant to claim construction."). This "ensure[s] that claims are not argued one way in order to maintain their patentability and in a different way against accused infringers." *Aylus Networks, Inc.*, 856 F.3d at 1360.

Statements made by patentees to foreign patent authorities about counterparts to U.S. patents also are relevant to claim construction (when those statements are not unique to issues of foreign law), because they relate to the same invention. *See Gillette Co.*, 405 F.3d at 1374 (concluding that an "admission by this same defendant before the [European Patent Office] clearly support[ed]" the court's construction); *Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 133 F. Supp. 3d 692, 704 (D.N.J. 2015) (holding patentee to "its statements during the European prosecution" for claim construction). Courts routinely consider statements that patentees make in foreign proceedings when ruling on U.S. counterparts, especially those concerning factual or technical issues (such as those at issue here), because such statements can amount to admissions. *See, e.g.*, *Apple Inc. v. Motorola, Inc.*, 757 F.3d at 1312-13 ("Statements made by Motorola during prosecution of a related Japanese patent further support this construction. . . . The principles

illustrated in these decisions provide ample support for holding Motorola to the statements made during Japanese prosecution."); *Kyowa Hakka Bio, Co., Ltd. v. Ajinomoto Co., Inc.*, No. 17-cv-313, 2020 WL 3403207, at *9 (D. Del. June 19, 2020) (construing a claim term, in part, based on statement from plaintiff's expert on a claim term in "foreign patent proceedings" because it "did not involve any issue unique to foreign patent law, but rather was a response to a technical question regarding what a specific term meant in the context of the same patent specification"); *Ferring B.V. v. Serenity Pharms., LLC*, No. 17-cv-9922, 2020 WL 1164700, at *5 (S.D.N.Y. Mar. 11, 2020) (finding patentee's arguments in a European proceeding "would be relevant as an admission against interest").

## III. ARGUMENT

| **Claim Term** | **Regeneron's Proposed Construction** | **Amgen's Proposed Construction** |
|---|---|---|
| "wherein the liquid ophthalmic formulation is suitable for intravitreal administration" | "plain and ordinary meaning: wherein the liquid ophthalmic formulation is suitable for intravitreal administration" | "wherein the liquid ophthalmic formulation, as a whole, has features making it appropriate for intravitreal administration" |

### A. Amgen's Proposed Construction Aligns with the Intrinsic Record.

#### 1. The Claims and Specification Confirm that the Formulation, as a Whole, Must Be Suitable for Intravitreal Administration.

The plain language of the '099 Patent claims establishes that the formulation, as a whole, must be suitable for intravitreal administration. Claim 1 is representative:

> **1**. A liquid ophthalmic formulation comprising:
> 40 mg/ml of a glycosylated vascular endothelial growth factor (VEGF) antagonist fusion protein comprising amino acids 27-457 of SEQ ID NO: 4;
> water;
> an organic co-solvent comprising polysorbate; and
> a stabilizing agent,
> wherein the liquid ophthalmic formulation has a pH of between 5.8 to 7.0,
> wherein the liquid ophthalmic formulation is suitable for intravitreal administration,
> wherein 90% or more of the weight of the VEGF antagonist fusion protein is not present as an aggregate, and
> wherein the VEGF antagonist fusion protein is at least 95% free of protein contaminants.

The claim starts with a preamble ("A liquid ophthalmic formulation comprising"), then lists the constituent components that are required in the formulation (*i.e.*, aflibercept, water, organic co-solvent, and stabilizing agent), and ends with four different "wherein" clauses. The "wherein" clauses establish additional features that the claimed formulation must have—namely, a pH within a certain range, limitations on the amount of aggregates and contaminants, and, relevant here, the formulation must be "suitable for intravitreal administration."

The disputed term is "wherein *the liquid ophthalmic formulation* is suitable for intravitreal administration." The antecedent basis for "the liquid ophthalmic formulation" is the preamble. In other words, "the liquid ophthalmic formulation" referred to in the term in dispute is the entire formulation comprising the components listed in the claim. Had the term been intended to refer to the individual components themselves, as opposed to the entire formulation, it might read something like: "wherein the *components of the liquid ophthalmic formulation* are suitable for intravitreal administration."

Other language in the claim supports this interpretation. Claim 1 also includes the term "wherein the liquid ophthalmic formulation has a pH of between 5.8 to 7.0." Like the term in dispute, this pH term refers to "the liquid ophthalmic formulation" as a whole. That is because

except for water, the individual components do not have a pH—pH is commonly understood as a characteristic of a formulation composition as a whole. *See, e.g.*, Ex. 1 ('099 Patent), 3:53-54 ("the pH of **the formulation** is about 6.2 to about 6.3.") (emphasis added).

The specification further confirms that the formulation, as a whole, must be suitable for intravitreal administration. Every recitation of "suitable for intravitreal administration" in the specification refers to the whole formulation. *Id.* at Title ("VEGF antagonist *formulations* suitable for intravitreal administration"); *id.* at Abstract, 1:55-56 ("The present invention is directed to pharmaceutical *formulations* suitable for intravitreal administration…"); *id.* at 5:32-34 ("The invention further features ophthalmic *formulations* provided in a pre-filled syringe or vial, particularly *suitable for intravitreal administration*.") (emphases added). Consistent with this, the specification never discusses "suitable for intravitreal administration" in the context of only the individual components of the formulation being suitable for intravitreal administration. Thus, Amgen's proposed construction is supported by the specification.

Because Amgen's proposed construction is supported by the claims and the specification, the Court should reject any attempt by Regeneron to expand this term to require only that individual components of the formulation are "suitable for intravitreal administration."

**2. The Claims and Specification Confirm That "Suitable for Intravitreal Administration" Requires Features Appropriate for Intravitreal Administration.**

A POSA would have understood the ordinary and customary meaning of "suitable for intravitreal administration" to be that the claimed formulation must have features that make it appropriate for intravitreal administration. Because the parties do not dispute the meaning of "intravitreal administration," the dispute centers on the meaning of the word "suitable," a common English word having an accepted meaning. *Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent

even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.”). Neither the specification nor other intrinsic evidence ascribes any special meaning to “suitable”; it is used in its commonly understood manner.

The claim language supports this understanding. While the claims recite “liquid ophthalmic formulations” (i) comprising certain types of excipients (*e.g.*, “an organic co-solvent”) or specific excipients (*e.g.*, “polysorbate 80”), and (ii) possessing certain properties related to pH, purity, or stability, each claim *further recites* in the body of the claim that the liquid ophthalmic formulation is “suitable for intravitreal administration.” This separate claim limitation must be construed to have meaning. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (“A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.”).

Indeed, in this case it is particularly crucial to give the claim language meaning because the specification repeatedly emphasizes the importance of the formulation being appropriate for intravitreal administration. For example, the Title of the patent is “VEGF antagonist formulations *suitable for intravitreal administration*.” Ex. 1 (’099 Patent), Title (emphasis added). The very first sentence of the abstract emphasizes that “[o]phthalmic formulations of a vascular endothelial growth factor (VEGF)-specific fusion protein antagonist are provided *suitable for intravitreal administration*.” *Id.* at Abstract (emphasis added). The patent specifically defines “[t]he present invention” as “directed to pharmaceutical formulations *suitable for intravitreal administration*.” *Id.* at 1:55-56 (emphasis added); *see, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (“When a patent thus describes the features of the ‘present invention’ as a whole, this description limits the scope of the invention.”) (citing *Honeywell Int’l,*

*Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318-19 (Fed. Cir. 2006)); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001).

The ordinary and customary meaning of "suitable for intravitreal administration" is that the claimed formulations have features appropriate for intravitreal administration. For example, a formulation that causes serious injury to the eye would not likely be suitable for intravitreal administration.

The '099 Patent further discloses that formulations of the invention can be "provided in a pre-filled syringe … suitable for intravitreal administration." Ex. 1 ('099 Patent), 5:33-34. The narrow needle used with a syringe for intravitreal injection mandates that the formulation have appropriate properties to ensure administration from the needle to a patient's eye. For example, the viscosity of a formulation (*e.g.*, a viscosity akin to maple syrup) may make it unsuitable for intravitreal administration through the narrow needle of a pre-filled syringe. *See* Section III.C. *infra*. Regeneron's allegation that "suitable for intravitreal administration" does not "impose any functional requirements" would exclude at least this preferred pre-filled syringe embodiment disclosed in the specification. *See Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014) ("'A claim construction that excludes a preferred embodiment . . . is rarely, if ever correct and would require highly persuasive evidentiary support.'") (quoting *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003)).

The specification further identifies other features of formulations, such as turbidity. Every Example includes data on turbidity (which refers to the cloudiness of the formulation). *See, e.g.*, Ex. 1 ('099 Patent) at 8:35-12:25 (Examples, Tables 1-6). Regeneron presented testimony in the *Mylan* case about turbidity and asserted that "[the formation of particles] was an exceptionally bad thing. It's bad in any formulation; **but for the eye, it's very bad.**" Ex. 5 at 1689:14-1690:3

(*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, No. 22-cv-61, Trial Tr. Vol. 7 (ECF No. 566) (N.D.W. Va. June 21, 2023)) (emphasis added). The specification's repeated reference to formulations "suitable for intravitreal administration" confirms that this phrase includes functional requirements that distinguish the claimed formulations from others that might be appropriate for other forms of administration—*e.g.*, oral, topical, or intravenous administration—but do not have features appropriate for intravitreal administration.

To be clear, Amgen is not asking this Court to import specific properties (*e.g.*, specific osmolality, viscosity, turbidity, or any other, requirements) into its claim construction. It would be neither appropriate nor practical for the Court to do so during claim construction. Regeneron chose to define the claimed formulations as "suitable for intravitreal administration," rather than spelling out of all of the characteristics of a formulation that a POSA would assess in determining suitability for intravitreal administration. If the parties dispute whether any particular formulation is "suitable for intravitreal administration," those issues can be resolved by the fact-finder on an appropriate evidentiary record. At claim construction, it is sufficient to resolve the present dispute between the parties. *Voice Tech Corp. v. Unified Patents, LLC*, 110 F.4th 1331, 1341 (Fed. Cir. 2024) ("We need only construe claim terms that are in controversy, and only to the extent necessary to resolve the controversy."). In other words, the Court need not resolve every bit of ambiguity and identify every property that may be relevant to the suitability of a formulation for intravitreal administration in order to provide a sound construction. *See, e.g.*, *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("[A] sound claim construction need not always purge every shred of ambiguity. The resolution of some line-drawing problems … is properly left to the trier of fact."); *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) ("Of course, a court need not attempt the impossible task of resolving all questions of meaning with

absolute, univocal finality. Such an endeavor could proceed ad infinitum, as every word—whether a claim term itself, or the words a court uses to construe a claim term—is susceptible to further definition, elucidation, and explanation."). Amgen highlights the examples presented in this submission to show that Regeneron has previously acknowledged that a formulation, as a whole, must have features allowing it to function appropriately for the intended purpose of intravitreal administration.

**B. Additional Intrinsic Evidence, *i.e.*, Statements Made by Regeneron in U.S. Patent Office Post-Grant Proceedings, Supports Amgen's Construction.**

After the *Mylan* case, several third parties challenged the validity of the '865 Patent in IPR proceedings before the Patent Trial and Appeal Board, which is part of the Patent Office. Regeneron's statements to the Patent Office in those IPRs are part of the prosecution history of the '865 Patent, and thus part of the intrinsic record for claim construction of the related '099 Patent. *See Aylus Networks, Inc.*, 856 F.3d at 1360-61; *E.I. du Pont de Nemours & Co.*, 921 F.3d at 1070.

Particularly relevant is an IPR filed by Fresenius Kabi ("Fresenius"). Fresenius asserted that the term "suitable for intravitreal administration" in the claims of the '865 Patent was not limiting, and thus, was not relevant to whether the claimed invention was patentable over the prior art. Ex. 6 at 25 (*Fresenius Kabi SwissBioSim GmbH v. Regeneron Pharms., Inc.*, IPR2025-01268, Petition for *Inter Partes* Review (Paper 2) (P.T.A.B. July 14, 2025)). In making this argument, Fresenius relied on Regeneron's statement during the *Mylan* appeal that the term "merely refers to a set of ingredients that a POSA would recognize as capable of being injected into the eye." *Id.*; *see supra* fn. 1.

In response, Regeneron pointed out that this Court had already addressed this issue and found that the term was limiting and would be understood by a POSA. Ex. 4 at 33 (*Fresenius Kabi*, IPR2025-01268, Patent Owner's Preliminary Response) ("With respect to indefiniteness, the

District Court concluded that 'suitable for intravitreal administration' was not indefinite and, therefore, that a POSA could understand with 'reasonable certainty' what this term means in the claims."). Regeneron further took the position that the term means that a formulation must have features making it appropriate for intravitreal administration. Regeneron relied on another court's ruling that "held the **analogous term** 'pharmaceutical formulation suitable for intranasal administration' to be limiting because it 'does more than state an intended use for the formulations' by instructing that the formulations 'must possess **features making them appropriate for** intranasal use.'" *Id.* at 34 (quoting *Impax Labs., Inc.*, 2015 WL 7737309, at *3) (emphasis added). That is, in construing the same language at issue here, Regeneron argued that "suitable" for a particular type of administration has the same meaning that Amgen's construction gives the term.

Regeneron also argued that formulations "suitable for intravitreal administration" have features that distinguish formulations of the invention from those that are not. For example, Regeneron argued that "[t]he evidence from the District Court trial uniformly establishes that such high-osmolarity formulations are not ophthalmic formulations suitable for intravitreal injection." *Id.* at 40. Regeneron should not now be permitted to retreat from this position. *See Aylus Networks, Inc.*, 856 F.3d at 1360; *Centripetal Networks, LLC v. Cisco Sys., Inc.*, No. 24-cv-2097, 2026 WL 1162800, at *6 (Fed. Cir. Apr. 29, 2026) (preventing patent owner from retreating from the claim scope it advocated for in an IPR, and finding that "[h]ere, Centripetal's statements in the IPR proceeding define the scope of the asserted claims …"); *Samesurf, Inc. v. Intuit, Inc.*, No. 22-cv-412, 2025 WL 1287805, at *7 (S.D. Cal. May 2, 2025) ("In the above [IPR proceeding] statements, Samesurf clearly, unmistakably, and repeatedly stated that the synchronized browsing session is administered by the synchronization server. As such, the Court will adopt a claim construction for

this claim term that incorporates the requirement that the synchronized browsing session is administered by the synchronization server.").

The intrinsic record thus confirms that Amgen's proposed construction, which requires that the formulation has features making it appropriate for intravitreal administration, is correct.

### C. Regeneron Has Consistently and Repeatedly Argued That "Suitable for Intravitreal Administration" Means the Formulation Must Have Features Making it Appropriate for Intravitreal Administration.

Before this present dispute arose, Regeneron repeatedly emphasized before this Court, and in many others around the world, that being "suitable for intravitreal administration," in the context of this patent disclosure, means that the formulation must have certain features appropriate for intravitreal administration.

#### 1. Regeneron's Arguments from the *Mylan* Case Support Amgen's Construction.

When previously defending against Mylan's obviousness and anticipation arguments in this Court, Regeneron touted the difficulties in developing a formulation suitable for intravitreal administration, highlighting a whole host of features that it said a formulation should have to make it appropriate for intravitreal administration.

For example, Regeneron argued that the viscosity of the formulation (*i.e.*, the formulation's resistance to flow) is important to whether it is suitable for intravitreal administration. Ex. 7 at 10 (*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, No. 22-cv-61-TSK, Regeneron's Responsive Post-Trial Brief Addressing Validity (ECF No. 589) (N.D.W. Va. July 24, 2023)) ("**Viscosity is undisputedly problematic for intravitreal injections**, because it leads to 'very long injection times' and **can make the formulation unusable**.") (emphases added).

In the *Mylan* case, Regeneron's expert testified that a formulation's viscosity would bear on whether it could function as a formulation for intravitreal administration. *Id.* Regeneron's expert, Dr. Trout, testified that "if it's too viscous, you won't even be able to use it." Ex. 8 at

2066:17-21 (*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, No. 22-cv-61, Trial Tr. Vol. 9 (ECF No. 569) (N.D.W. Va. June 23, 2023)) ("[F]or intravitreal administration, which these references don't teach, we have a very thin-bore needle. High viscosity means potentially very long injection times, which I think we all don't want in the eye."). The Court relied on that testimony, finding: "Dr. Trout, along with Dr. Furfine and Dr. Graham, explained that high viscosity would be especially problematic for intravitreal injections because it leads to 'very long injection times' and **even can make the formulation unusable**…." *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 714 F. Supp. 3d 652, 743 (N.D.W. Va. 2024) (citations omitted and emphasis added) (concluding in relevant part that "increase[d] viscosity" "would have been particularly problematic for a formulation for intravitreal injection").

Regeneron also argued that the formulation must be injectable through a small-bore needle without forming particles to ensure that formulation does not cause issues when injected into the eye of the patient. Ex. 9 at ¶ 49 (*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, No. 22-cv-61-TSK, Regeneron's Proposed Findings of Fact and Conclusions of Law (ECF No. 590) (N.D.W. Va. July 24, 2023)) ("Preventing aflibercept from aggregating and coming out of solution is especially important in the context of intravitreal injections. Intravitreal injections use narrow needles, which lead to shear stress and enhanced risk of protein aggregation. Forcing protein solutions through a narrow-bore needle creates shear stress, which can cause a protein to aggregate and come out of solution.") (citations omitted).

Two inventors of the '099 Patent, Dr. Graham and Dr. Furfine, testified that the shear stress associated with injecting a formulation through a small needle can cause protein to fall out of solution, forming unacceptable particles. Ex. 5 at 1688:2-1689:23 (*Regeneron Pharms.*, No. 22-cv-61, Trial Tr. Vol. 7) (explaining that "shear [is] an issue when it comes to the handling of

formulations" because it "caused the formulation to form particles," which "show up as turbidity" and eventually aggregate until they "fall[] out of solution and become[] something that you can see by your naked eye"); *see also* Ex. 10 at 470:19-471:4, 476:2-477:8 (*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, No. 22-cv-61, Trial Tr. Vol. 2 (ECF No. 559) (N.D.W. Va. June 13, 2023)). Dr. Graham further testified that a formulation that could not withstand shear stress would not be suitable or appropriate for intravitreal administration. *See* Ex. 5 at 1689:24-1690:3 (*Regeneron Pharms.*, No. 22-cv-61, Trial Tr. Vol. 7) ("[The formation of particles] was an exceptionally bad thing. It's bad in any formulation; **but for the eye, it's very bad.**") (emphasis added). Regeneron's expert, Dr. Trout, likewise testified that the formulation must not form particles when administered through a needle for injection. Ex. 11 at 572:24-573:2 (*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, No. 22-cv-61, Trial Tr. Vol. 3 (ECF No. 560) (N.D.W. Va. June 14, 2023)) ("[W]e don't want the needle clogged [by particulates] while doctors or any doctor is giving an injection.").

Regeneron further argued that ophthalmic formulations suitable for intravitreal injection must have an appropriate osmolality. *See, e.g.*, *Regeneron Pharms.*, 714 F. Supp. 3d at 681-82 (citing an earlier Regeneron patent that disclosed drugs that "[p]referably" "would be administered 'directly to the eye,' including through 'intravitreal injections'" and which "would have 'ophthalmically compatible pH and osmolality'") (citations omitted); Ex. 4 at 40 (*Fresenius Kabi*, IPR2025-01268, Patent Owner's Preliminary Response). According to Regeneron, formulations with a high osmolarity can be dangerous if administered intravitreally, potentially causing retinal detachment. *See* Ex. 4 at 38 ("[W]ith 'higher osmolarity, there was a risk, a very high risk, for retinal detachment.'") (citation omitted). Having overcome Mylan's invalidity challenges based on statements like this, Regeneron should not now be allowed to retreat from them. *Aylus Networks, Inc.*, 856 F.3d at 1360 (holding that claims must be consistently construed to "ensure

that claims are not argued one way in order to maintain their patentability and in a different way against accused infringers").

2. Regeneron's Arguments from Other Aflibercept-Related Patent Proceedings Support Amgen's Construction.

The *Mylan* case and Fresenius IPR are not the only times that Regeneron has argued that the term "suitable for intravitreal administration" requires certain features. Indeed, Regeneron and its representatives have argued that this exact term (when appearing in foreign counterparts of the '099 Patent) requires a formulation having features appropriate for intravitreal administration, in at least three other court proceedings that Amgen is aware of.[4] Regeneron cannot retreat from its prior statements, which support Amgen's construction. *Gillette Co.*, 405 F.3d at 1374 (concluding that an "admission by this same defendant before the [European Patent Office] clearly support[ed]" the court's construction); *Kyowa Hakka Bio, Co., Ltd.*, No. 17-cv-313, 2020 WL 3403207, at *9 (construing a claim term, in part, based on "blatant admissions" from Plaintiff's expert from "foreign patent proceedings" that "did not involve any issue unique to foreign patent law").

For instance, in Canadian patent litigation proceedings, Regeneron argued that a formulation suitable for intravitreal injection had to have an appropriate viscosity and tonicity (a feature related to osmolarity and osmolality). Regeneron's expert spoke to the "unique challenges" presented by intravitreal administration compared to other forms of administration, including "higher viscosity resulting in potentially higher shear stress and aggregate formation" which "can present a problem because needles used for intravitreal injections have a small gauge as compared

[4] Amgen has requested, but Regeneron has refused to produce, litigation documents from foreign aflibercept-related patent proceedings where Regeneron is a party. The materials cited in this brief all had to be obtained by Amgen itself through public dockets and other means. Amgen has moved to compel Regeneron to produce such discovery; that motion is pending. ECF No. 738. Amgen reserves the right to rely on additional documents and statements as they become available.

to, for example, needles used for intravenous administration." *See* Ex. 12 at ¶ 20 (*Regeneron Pharms., Inc. v. Amgen Canada Inc.*, No. T-2137-23, Responding Validity Report of Dr. Douglas Kline (Fed. Ct. CA Apr. 10, 2025)) ("A viscous solution may have difficulty being pushed through a small gauge needle and can create added stress on the protein and lead to stability problems."); *id.* at ¶ 183 ("Viscosity (informally referred to as the thickness of the liquid formulation) can affect the protein as it is drawn into the needle and administered to a patient…. The final formulation needs to pass through the thin annulus of the needle without damaging the protein by shear stress."). Regeneron's expert, in distinguishing the claimed invention over a prior art reference, testified that a prior art formulation with a tonicity "roughly 2.5 times greater than the tonicity of the physiological fluids in the eye" would not "disclose, let alone enable, an ophthalmic formulation suitable for intravitreal injection." *Id.* at ¶¶ 116-17.

In a U.K. proceeding involving a foreign counterpart, Regeneron argued that a formulation for intravitreal injection had to have a variety of features, including an appropriate osmolality, pH, viscosity, and tonicity. For example, in its pre-trial submission to that tribunal, Regeneron asserted that, "[i]n respect of **suitability for intravitreal administration**," a formulation "suitable for intravitreal administration" would have "an osmolality close to or within the range of the vitreous," have "a pH that is tolerated in the eye," and would be "non-viscous enough to be capable of being injected." Ex. C at ¶ 102 (*Formycon AG v. Regeneron Pharms., Inc.*, HP-2024-000015 and HP-2024-000036, Regeneron and Bayer's Trial Skeleton Argument (High Court of Justice Business and Property Courts of England and Wales, Intellectual Property List (ChD), Patents Court June 29, 2025)) (original emphasis).

Regeneron offered expert testimony that the requirements for "intravitreal administration," including that "narrow gauge needles were used for intravitreal administration," "meant that the

formulation had to have a low enough viscosity that it could be injected through a narrow gauge needle." Ex. A at ¶ 5.32 (*Formycon AG v. Regeneron Pharms., Inc.*, HP-2024-000015 and HP-2024-000036, First Expert Report of Professor Hovhannes John Gukasyan (High Court of Justice Business and Property Courts of England and Wales, Intellectual Property List (ChD), Patents Court April 7, 2025)); *see also* Ex. B at ¶ 3.20 (*Formycon AG v. Regeneron Pharms., Inc.*, HP-2024-000015 and HP-2024-000036, Second Expert Report of Professor Hovhannes John Gukasyan (High Court of Justice Business and Property Courts of England and Wales, Intellectual Property List (ChD), Patents Court May 12, 2025)) ("It is important that a formulation intended for intravitreal administration is not too viscous [because] the formulation should be able to be injected via a fine needle (e.g. 30 gauge) without undue force[].").

Regeneron offered further expert testimony that "[i]njecting formulations with an osmolarity far from [the osmolality range of the vitreous] could cause retinal degeneration and detachment." Ex. A at ¶ 5.36 (First Guksayan Report). As summed up by Regeneron's expert, formulations that are "suitable for intravitreal administration" would have features making it appropriate for intravitreal administration, including a formulation "safe for administration into the eye," having a "tonicity of the formulation [that] was close to or within the range of the vitreous fluid in the eye," and having "the pH of the formulation [] sufficiently close to that of the vitreous so as to not irritate the eye." *Id.* at ¶ 7.7; Ex. B at ¶ 6.4 (Second Guksayan Report) (agreeing that "properties identified by [Formycon's expert]," including viscosity, were "relevant to the suitability of a formulation for intravitreal administration").

In yet another proceeding involving a foreign counterpart, in Switzerland, Regeneron once again argued that a formulation would need to have certain features to make it suitable for intravitreal administration, for example, an appropriate viscosity. Ex. 13 at 66 ¶ 60 (Machine

translation of Federal Patent Court [FPC] July 17, 2026, S2025_003 (Switz.) (*Regeneron Pharms., Inc. v. Sandoz Pharms. AG*)) (citing statements from report of Regeneron's expert: "There is a particularly strong need for lower viscosity in intravitreal administration given the use of a thin injection needle.").

Depending upon the exigencies of the moment, Regeneron has highlighted various features that a formulation must possess to be suitable for intravitreal administration. Again, Amgen's construction does not seek to read any specific properties into the claims, but as Regeneron has acknowledged, a formulation must have the appropriate properties to function for intravitreal administration.

**D. Excluding All "Functional Requirements," as Regeneron Proposes, Is Inconsistent with a Significant Body of Prior Case Law on Analogous Terms.**

Nowhere in Regeneron's construction or in prior correspondence has Regeneron explained what the term "suitable for intravitreal administration" means, if the term was read to exclude any functional requirements. *See, e.g.*, *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, No. 22-cv-61, 2023 WL 11891335, at *3 (N.D.W. Va. Apr. 19, 2023) (Regeneron "cannot avoid defining its own claim terms by asserting that its claims have a plain meaning[.]"). Whatever meaning Regeneron intends to argue that the term should have, it is clear that the term cannot simply be read out of the claims. As Regeneron itself argued in an IPR challenging the related '865 Patent, "the court in *Impax Labs. Inc. v. Lannett Holdings, Inc.*, 2015 WL 7737309, at *3 (D. Del. Dec. 1, 2015), held the analogous term 'pharmaceutical formulation suitable for intranasal administration' to be limiting because it 'does more than state an intended use for the formulations' by instructing that **the formulations 'must possess features making them appropriate for intranasal use**.'" Ex. 4 at 34 (*Fresenius Kabi*, IPR2025-01268, Patent Owner's Preliminary Response) (emphasis added).

Other case law is in accord. In the context of the claim term "suitable antiadherent," the District of New Jersey recognized that the term "suitable" was limiting and rejected attempts to read the word "suitable" out of the claims. *Aventis Pharms. Inc. v. Impax Labs., Inc.*, No. 02-cv-1322, 2011 WL 94188, at *4 (D.N.J. Jan. 11, 2011) ("[T]he word 'suitable' does act as a limit on the term. The ordinary meaning of the term 'suitable antiadherent' shows that not every antiadherent or even every pharmacologically acceptable antiadherent meets the requirements; that antiadherent must also be 'suitable.'"). Given the claims of the '099 Patent separately recite a "liquid ophthalmic formulation," the term "suitable" must further limit the claims. In particular, the claimed formulation must have features making the formulation suitable for intravitreal administration. *See id.*

Similarly, in *Biacore v. Thermo Bioanalysis Corp.*, the term "suitable for use in a biosensor" was found to be limiting. 79 F. Supp. 2d 422, 457 (D. Del. 1999), *aff'd*, 30 Fed. Appx. 994 (Fed. Cir. 2002). The court noted that "[i]t is only under the conditions imposed by the phrase 'suitable for use in a biosensor' that the elements of the claims perform the functions by which they are defined.'" *Id*. Likewise, it is only under the conditions imposed by the term "suitable for intravitreal administration" that the elements of the claims perform the function by which it is defined. *See id.*

Thus, courts have repeatedly confirmed that a claim term reciting "suitable" is limiting and imparts additional requirements on claim scope, consistent with Amgen's construction.

## IV. CONCLUSION

For the reasons above, Amgen respectfully requests that the Court adopt Amgen's construction of "wherein the liquid ophthalmic formulation is suitable for intravitreal administration" as "wherein the liquid ophthalmic formulation, as a whole, has features making it appropriate for intravitreal administration."

August 19, 2026

Respectfully submitted,

**AMGEN INC.**

/s/ John R. Labbe

John R. Labbe (PHV)
Kevin M. Flowers (PHV)
Thomas Burns (PHV)
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
6300 Willis Tower
Chicago, IL 60606
(312) 474-6300

Stuart A. McMillan [WVSB #6352]
smcmillan@bowlesrice.com
BOWLES RICE LLP
600 Quarrier Street
Charleston, West Virginia 25301
(304) 347-1110

Kaitlyn N. McKitrick [WVSB #12782]
kmckitrick@bowlesrice.com
BOWLES RICE LLP
125 Granville Square
Morgantown, West Virginia 26505
(304) 285-2500

E. Anthony Figg (PHV)
Joseph A. Hynds (PHV)
Jennifer Nock (PHV)
Brett A. Postal (PHV)
ROTHWELL, FIGG, ERNST, & MANBECK, P.C.
901 New York Avenue, NW
Suite 900 East
Washington, D.C. 20001
(202) 783-6040

Jesse M. Weiss (PHV)
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
jweiss@cravath.com

Wendy Whiteford (PHV)
Eric Agovino (PHV)
Chanson Chang (PHV)
Pauline Pelletier (PHV)
Gregory Bonifield (PHV)
AMGEN INC.
One Amgen Center Drive
Thousand Oaks, CA 91320
(805) 447-1000

*Attorneys for Defendant Amgen Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2026, I caused a true and correct copy of the foregoing Opening Claim Construction Brief to be filed and served on all counsel of record via the Court's ECF system, along with the Declaration of Brett A. Postal with Exhibits 1-13 and the Declaration of Trevor Crosse with Exhibits A-C.

/s/ John R. Labbe
John R. Labbe