# EXHIBIT 2

Planet Depos
We Make It Happen™

# Transcript of Oral Argument

**Case:** Regeneron -v- Mylan

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.

Court of Appeals for the Federal Circuit

Job No.: 585226
Pages: 1 - 69
Transcribed by: Christian Naaden

2

PROCEEDINGS
JUDGE 1: The next case for argument is 24-2002, Regeneron Pharmaceuticals v. Mylan.
FEMALE 2: Good morning, Your Honor. May I please report the Amazaki [ph] for Biocon Mylan defendant's appellant? May I proceed?
JUDGE 1: Yes, please. Good morning.
FEMALE 2: Thank you. Thank you. The district court's infringement validity and remedy judgments for the Bio- --
JUDGE 2: Counsel, let me ask you a housekeeping question.
FEMALE 2: Sure.
JUDGE 2: Page 7 of your lieu brief --
FEMALE 2: Yes.
JUDGE 2: -- there's a chart. I'd like you to turn to it.
FEMALE 2: Yes.
JUDGE 2: Uh, the chart shows that Lucentis says anti-VEGF rends this amount of money. Right?
FEMALE 2: Yes. [Inaudible].
JUDGE 2: It then shows that both the YESA- -- YESAFILI and Eylea have anti-VEGF Aflibercept.

3

FEMALE 2: Correct.
JUDGE 2: Right? On the same page you say the AsoPha -- DropGenetics prior art anti-VEGF intravitreal form- -- formulation Lucentis not Regeneron's?
FEMALE 2: Correct.
JUDGE 2: Is that correct?
FEMALE 2: Yes. So the -- we -- the -- we're differentiating between the active ingredient, which is the anti-VEGF and the formulation that you actually carry the drug in, which is the formulation. So all of the formulation ingredients are all of the ones that are under the anti-VEGF drug descriptor.
So histidine is the same for Lucentis and ours [ph], trehalose is the same for Lucentis and ours, polysorbate is the same for Lucentis and ours and then water. So all -- so those five -- those ingredients, they're under anti-VEGF. Those are the formulation ingredients. So the drug is the anti-VEGF compound.
So Lucentis is the anti-VEGF drug compound then VISMED and the Espholi and Eylea have the anti-drug -- the anti-VEGF drug called the Aflibercept. However, if you look at the

4

formulation ingredients -- and that's what the 865 Pad was about, it's directed to pharmaceutical formulations -- our pharmaceutical formulation is actually different from the commercially marketed product.
We use a histidine buffer, they use sodium phosphate buffer. We use trehalose as a -- a sugar stabilizer, --
JUDGE 2: Mm-hmm
FEMALE 2: -- they use sucrose, polysorbate, yes, in water, obviously, those are all the same, but Regeneron also adds a salt that's called sodium chloride. So they are not identical formulations.
JUDGE 1: Okay. There are a lot of issues in this case and we've --
FEMALE 2: Correct.
JUDGE 1: -- got a 300-page district court opinion.
FEMALE 2: We do.
JUDGE 1: So it's kind of hard to tackle and -- but let -- so let me just ask you some scattered questions.
FEMALE 2: Sure.
JUDGE 1: I mean, my question is about

5

obviousness and then about anticipation.
FEMALE 2: Okay.
JUDGE 1: But what obviousness combination are you appealing? Is it Dixalone [ph] or is it Frazier, and Gutter, whatever the other one is?
FEMALE 2: Yeah, both. So there were -- there were two issues. So first we said that -- that the claims were obvious in view of Dixalone because Dix is the one that basically has Eylea formulation and really the only difference is the dose amount in terms of a range where it says -- what Regeneron calls its species.
Then we also had what we are referring to as the description of Aflibercept that were in the prior art, which was the frazion [ph] reference in combination with what we're calling the Lucentis prior art and that's comprised of two main references, one of which is the drill reference, the other of which is called the shans [ph[ reference.
But both of those references we're essentially discussing this -- this type of Lucentis formulation here where it's an intravitreal formulation, it was actually used in the eye and, you know, had the -- the anti-VEGF

6

drugs in it. So one of the --
MALE 2: How do you pronounce that anti-VEGF drug [inaudible]?
FEMALE 2: So Ranibizumad is --
MALE 2: Can we just all it the R drug?
FEMALE 2: We can absolutely call it the R drug and then the other one, the A drug, is Aflibercept.
MALE 2: Aflibercept.
FEMALE 2: Yeah.
MALE 2: And that's an important one. We should say Aflibercept.
JUDGE 1: Well, let me take -- take you back to the list --
FEMALE 2: Sure.
JUDGE 1: -- up to the anticipation.
FEMALE 2: Sure.
JUDGE 1: I mean, the two issues that are not disturbing to me but that raised some questions are this criticality and the anticipation of 40 vs. 10 to 50 --
FEMALE 2: Correct.
JUDGE 1: -- and then the teaching away with the district court bond. So what is your view of our case law and what it compels with respect to

7

that?
FEMALE 2: Sure. And I think you see that in cases such as ClearValue --
JUDGE 1: Yeah. It's hard though, because we have -- I don't think we found the case. You've got cases with one range and the other probably [inaudible] has--
FEMALE 2: Right.
JUDGE 1: -- one range and the Pam [ph] has another. You've got one where the prior art has one and the other -- but I -- I haven't found a case, which is our case, which is the prior art has the range and the patent has just one.
FEMALE 2: Right. Well, I -- I think that one of the close ones that would come up with be the Purdue Pharma v. Epic. In that instance had a situation where it -- it's similar to what Regeneron is arguing here in the sense here that you had a broad description for the drug compound to be -- that was prior art that was for analgesic treating pain.
And then this report said it was anticipatory to have a formulation that was directed to opioids and opioids and analgesics. And the reason why is because opioids were obviously

8

anal- -- were -- were known and established to those who weren't very skilled in the art, in -- in the background knowledge as drugs that were used as analgesics to treat pain.
And in that instance you didn't even have the prior art reference mentioning opioids specifically but again, it was understood in the sense of what does a person of ordinary skill in the art when they see the reference actually understand it to be not just reaching in terms of specific examples but also what is the nature of the enabling disclosure.
And I think that's one of the [inaudible] where the district court fell down here, because the district court was very much focused on, well, you don't have an example that was actually put to intravitreal use in Dix.
The problem with that though is if -- and -- and, Your Honor, to get to your point in terms of the chart on Page 7, if we were to look at the Eylea formulation and we look at the formulations that are in the examples in Dix, you have those identical ingredients there and instances and the same amounts.
So the only distinction in terms of what

9

was there was a drug amount 10 to 50 versus they had limited their claims here to 40. And when you have an enabling disclosure, and in fact, when the 865 patent itself says that not only that particular drug range in Dix but an even broader range from 1 to 100 is also going to work to give you these stable --
JUDGE 2: I'm sorry to interrupt. I'm a little confused. I would have expected you to have said the word criticality by now.
FEMALE 2: Sure.
JUDGE 2: And you didn't say it so and now --
FEMALE 2: Well, and that's what I --
JUDGE 2: -- we- -- went off on Purdue Pharma and then went to some other territory, and my understanding was the focus of your briefing was -- if it was the patent on the [inaudible] to show that the 40mg per milliliter formulation was critical.
FEMALE 2: Right. Because that gets to the genus species issues when to --
JUDGE 2: And -- and -- and then obviously, the district court found otherwise and now we have to sort out what does our range case

10

law really say --
FEMALE 2: Right.
JUDGE 2: -- and -- and demand in terms of making an anticipation case.
FEMALE 2: Right. And -- and you're exactly right Judge [inaudible]. I think the district -- this is where the reas- -- one of the reasons why the district court went astray as well, to me when you're looking at criticality issues, you're looking at what is claimed as compared to --
JUDGE 2: Well, the first question is --
FEMALE 2: -- what is the next prior art range.
JUDGE 2: -- the first -- first question is before we try to assess what does criticality mean is do we even look to criticality in the first place.
FEMALE 2: Right.
JUDGE 2: And so, the district court said no. In this context, we don't because there's a case called Atofina that says you just look at something as a genus. And then if I concluded that the genus was too big then I don't have to go any further, there's no anticipation.
FEMALE 2: Right. But I think that if you

11

look at subsequent cases though that had been interpreted and applied at [inaudible] such as the ClearValue Polymers case, the -- the critical issue that -- in terms of why were we concerned that that genus and Atofina was so big is because it was not actually describing and enabling what came later in the claim species so much so that hit actually did operate in a different way, and I think that in the ClearValue case they make that clear that when they are discussing Atofina they said yeah but in Atofina, that species that was selected fundamentally worked in a different way. So that's news.
JUDGE 2: A- -- and just getting getting to just both initial question cases like, I don't know, INEOS and ClearValue, etc., there seem to be a claimed range inside of a broader prior art range. Right?
FEMALE 2: Sure.
JUDGE 2: And here we have not a claimed range but a claimed point. And then the question is well, when we look at INEOS or ClearVa- -- Value or anything else I can get my hands on, I don't see that specific fact pattern.
A prior art range and then a claimed point

12

inside of that range, do we think about that fact pattern the same or differently from the claimed range inside of a prior art range?
FEMALE 2: Right. And that's why we went back to some of the -- the early -- you know, the earlier classic cases such as Peter and Rusheg [ph]. And I think there again, when you look at what those clients are talking about when they're saying, you know, it -- it really gets back to, and I think the crazies was, was it really described for purposes of Section 102B.
So I think here when you have a situation where we have with Dix and with the formulations here, you have the same ingredients, the same drug involve, and you've got a range of 10 to 50 to select this [inaudible] so to speak.
JUDGE 2: You're -- you're -- you're -- you're getting back to the facts. I -- I'm -- I'm --
FEMALE 2: Well, the -- but pri- --
JUDGE 2: -- I'm -- I'm thinking about the law.
FEMALE 2: Right. But I think from the legal perspective, I think you make the -- you -- you just get back to what was described in the

nabel [ph]. So for example, you know, do we have any blaze marks that sufficiently direct a person of ordinary skill of the art towards a particular issue.

That -- yeah, maybe if you've got a genus that's got, you know, 10 billion compound possibilities in it and now I'm going to select the single compound species. Maybe that's not going to be good enough.

However, if you've had a situation where you've already got an existing range and he district court here actually made findings that, you know, you -- that a -- that a person of ordinary skill in the art would certainly be able to make the full scope of what's within this range, and it's the composition and you haven't articulated any new use or any particular way in which this composition will be used [inaudible].

JUDGE 2: But if it's not that specific number the patient has a possibility of blindness.

FEMALE 2: No. See, that's -- that's one of the issues with the district court actually got the test wrong because when you're going to talk about criticality, it has to be criticality against what the prior art range was. So show me the 40 the



species somehow performs differently than 10 to 50.

And he didn't make that finding. He said, "Oh, well let me look at how it's go- -- how I think it might compare based on how a Ranibizumad drug compare and how a Ranibizumad drug perform [inaudible].

JUDGE 2: Isn't also your view that the burden is placed on the wrong side in terms of establishing criticality?

FEMALE 2: Yeah, I think Regeneron had to first come forward with some type of demonstration that there was criticality and moreover, to get to your point, tied to some teaching in their specification that -- so that the public is actually getting the benefit of a quid pro qual [ph].

JUDGE 2: Well, let's assume for the moment that we don't have to believe that expressed disclosure and specification.

FEMALE 2: Okay.

JUDGE 2: But I am trying to understand what in your view should Regeneron have done to establish criticality?

FEMALE 2: I think Regeneron should have shown that there was something unique and special



about 40 that worked better or differently as compared to --

JUDGE 2: Can you give me an example? I mean, I -- I --

FEMALE 2: -- everything else in the range of 10 to 50. So -- and -- and I could --

JUDGE 2: When you say better -- I -- I am just trying to get an understanding what you think.

FEMALE 2: Sure. One -- one that meets this court's standards, for example, a difference of degree and not in kind or a new established utility or something that actually a person of [inaudible] skilled art wouldn't have been enabled to do with this composition that they already had in Dix. And that's where I think we get to the fundamental problem here is that particularly once the district court said that these claims that --

JUDGE 2: Getting to some of the other issues on 102, it seems --

FEMALE 2: Sure.

JUDGE 2: -- like the district court identified other reasons for why there is a lack of anticipation with the [inaudible] reference aside from this 40 and 50 business.

FEMALE 2: Sure. Well, the only other one



that he really focused on is he said, 'Well, I don't see that you have an actual example of 40 mg per milligrams per ML being put through intravitreal use in Dix.

However, -- and -- and you said that -- that -- that when Dix was talking about use of VEGF fusion protein that that wasn't specific enough to get you to Sequence I.D. No. 4 that's like [inaudible] in the faint [ph].

The problem; however, is that when you -- is -- is that that is a very myopic view. It's not actually looking at the specification as a whole, because in the specification as a whole, number of Dix's examples use Sequence I.D. No. 4.

In the preferences that Dix expressed for his preferences for the VEGF antagonist. He said, "I prefer, you know, more prefera- -- preferably Sequence I.D. Numbers 2 and 4 more preferably Sequece I.D. Number 4. Well, that's a laze [ph] mark to that. So if -- if --

JUDGE 1: You want to check if that was a test or anything? Do you know what it was?

MALE 3: I don't [inaudible].

JUDGE 1: Okay. Why don't you just go ask Lathea [ph].

JUDGE 2: Let's pretend that's a false alarm. What about --
JUDGE 1: Did he say it was okay?
MALE 3: She's -- she's checking.
JUDGE 1: Okay. Thank you. Go ahead.
JUDGE 2: What about the 98 percent stability limitation? I think there was a finding that [inaudible] even if Dix discloses the 40 mg [inaudible] there is -- there is nothing in Dix that necessarily leads to that particular formulation that would get you this particular -- particularized stability of limitation on the client [inaudible].
FEMALE 2: Sure. And I think there again, the district court was not focused on Dels Dix [ph] having enabling disclosure. And here again, that's why I think the ClearValue Polymers case, you know, is quite relevant because in Clear- -- in that case they had the 150 or less, they only had an example of 60 to 70 but nevertheless, 50 was sufficiently enabled. Here, Dix had a 25 mgs.
MALE 3: [Inaudible].
JUDGE 1: We're good?
FEMALE 3: Yes.
JUDGE 1: Thank you.



FEMALE 2: Dix had an ex- -- a specific example with Aflibercept, all the same ingredients as Elyea that was 98 percent stable or more at 25 mg per ML. He had another one at 50 mg per ML also more than 98 percent stable. So there again is where I get into so okay --
JUDGE 2: So did you have, I don't now, expert testimony or somebody say, yes, definitely, you can take it to the bank if you did a 40 mg version of Dix, you would get the 98 percent stability?
FEMALE 2: Yes. And in fact, how do we know that you actually do get 98 percent stability? Because that's what the Eylea formulation is, it's got all of those ingredients.
JUDGE 2: Well, I -- I agree with that but we're -- we're -- we're look -- working backwards with a Dix --
FEMALE 2: Right.
JUDGE 2: -- formulation, a Dix disclosure and then trying to figure out whether Dix discloses this claimed embodiment. And at least on this 98 percent number if there's something you can show me in the record where there's testimony evidence, something.



I mean, I -- I thought I saw something where an expert said maybe most likely you would get 98 percent but then to me that doesn't quite tie things off for a -- a true anticipation.
FEMALE 2: Right. Well, but I guess the issue is, Your Honor, again, these are formulation claims.
And Regeneron to justify enablement they - - and the district court made findings, I'll have to a specific page, where he said, well, you know once you have a stable example to follow and you have an ingredient list, then of course, you can make all of these other formulations stable because that's just the routine experimentation.
And furthermore, even in the 865 patent itself, it concedes that -- and this at Column 2, lines 53 to 57 -- they say that an even broader set of stable liquid formulations are going to have 40 to 50, which includes Dix's number and area going to be able to be the stable looking formulations of the invention.
It actually does happen, and [inaudible] these prior art references are also under this court case while presumed enabling for the full scope of what they disclosed. Regeneron is the one



-- is the party that should have had the burden to come forward to say well, if -- if somehow there's a way in which you practice this, that does not actually lead to stability, but they couldn't do that here because the very argument that they made to justify enablement is that once you've got an example to follow and they use 40 and 50 mg examples, here Dix has 25 and 50 mg examples, then you are sure you have enough to get your stable formulation. So if it's --
JUDGE 2: I just want to make it clear right now I'm not worried about 112 considerations or anything like that.
FEMALE 2: Okay.
JUDGE 2: I'm only concerned about [inaudible] 102 and whether this one reference has everything that's in the claim and that's all I need to know, why should I feel comfortable in flipping the district court for making an unreasonable finding that Dix does not disclose the 98 percent limitation, even if it discloses the 30 mg of milliliter limit.
FEMALE 2: Right. Because Dix actually made the 50 mg formulation 98 percent stable. He made a less concentrated version 98 percent stable.

And this court has never held that you have to have an actual practice example in the specification in order to anticipate. You needed the enabling disclosure.

That's the critical issue, and Dix gave the person of ordinary skill in the art the enabling disclosure for 40. And if I may, I would - - if I -- if can talk, I don't know if [inaudible].

JUDGE 1: I -- I want -- I want to take it back to criticality. Did you have something else on the screen?

FEMALE 2: No, no, go ahead.

JUDGE 1: I -- I just have one quick question.

FEMALE 2: I -- I just know I'm in my -- my time, Your Honor. So I --

JUDGE 1: No. I -- I know. No.

FEMALE 2: Yeah.

JUDGE 1: We'll still be here.

JUDGE 2: We're going to be here a while.

FEMALE 2: Okay.

JUDGE 1: Did -- back to criticality --

FEMALE 2: Right.

JUDGE 1: And then I'll discuss with your friend why I think the district court's findings



may have put the burden -- wrong burden and ask the wrong question. But did Regeneron put up any evidence to show criticality?

FEMALE 2: Within the range of what was already disclosed by Dix, no. All of the criticality evidence and this is reflected in the district court's findings, was focused on, well, here is how Aflibercept performs relative to Ranibizumad because of this inflammation risk. And because of that, that -- that to me is exactly the problem here, is that these are composition claims.

The district court construed the claims that's suitable for intravitreal administration. It only meant you need to have, Judge Wall [ph], the - - the list of ingredients on Claim 7 that had previously been used in intravitreal formulations or in an another example. We have that in Dix.

So if -- if we look at this court's cases, usually when you're assessing criticality, it's -- is this -- are seeing some unusual property as compared to the genus? And that's what we don't have here. We don't have any evidence showing that 40 mg for ML within the scope of the 865 claims is always going to out perform the Dix formulations and they're not going to get there.



JUDGE 2: And 8 -- and -- 8159 district court makes a finding that this 40 mg per ML limitations hit some kind of sweet spot maximizing [inaudible] life of the Aflibercept and the [inaudible] at the same time minimizing toxicity stability concerns.

FEMALE 2: Right. And --

JUDGE 2: And so the question in my mind is, is that enough to show this something -- this establishes that this particular volume 40 is critical to the operability of this drug product.

FEMALE 2: Right. It's not, Your Honor, because first, if you actually go look at the citations that the district court offered to cite it, those citations don't actually say that. Second, because Regeneron here is trying to say there's something special about 40, well, you're going to get those same results if you're at 41, you're going to get those same results if you're at 39.

JUDGE 2: How do we know that?

FEMALE 2: Well, we know that because there is -- there -- the -- the --

JUDGE 2: What's the testimony to that effect to that effect?



FEMALE 2: Well, because the testimony --

JUDGE 2: That's Mr. Trout [ph], no?

FEMALE 2: Sure. The testimony here is that in -- in all -- all that he say -- all the district court is saying is they chose the 40 mg concentration to minimize -- to maximize the half life of Aflibercept in the eye.

Well, Aflibercept, that's the molecule and then that was already known in the prior art that half life had already been established. That's in the [Holesh ?] publication. So the -- the more potenc- -- the higher potency of Aflibercept and its expected half life in the eye, that was already background knowledge to one our very skilled in the art.

So when it comes to them minimizing toxicity and stability concerns, this is where I get to, and to Judge [inaudible], your point, is that Regeneron never came forward to say there's anything different.

They don't say it in their own specification there's anything different about 40. The -- the test- -- I can certainly get you the testimony where the named inventors and Dr. Trout all agreed that in the spec- -- in the 865 patent

specification, they say nothing about the -- these formu- -- this -- these formulations are going to have a better half life if there's some kind of superior technology or outcome that's going to result from this as against the broader range that was dis- -- you know, originally disclosed and planned and then the specification itself that it admits it's going be a stable intravitreal formulation suitable for injection.

And furthermore, none of those particular elements actually made their way into the claims. So if we're going to look at the scope of what has actually been claimed here, these particular efficacy elements are not there, and Regeneron in their briefing ad- -- was quite adamant that these claims should not be construed as requiring anyone or any composition to meet any efficacy standards.

I think if we were to go back to this court's recent decision Janson Betheva [ph], which we cited in our brief, 97F4. I'm not sure what pin cite is.

You know, this court was very clear that when it comes to doing these types of comparative analysis if it involves an element that's not actually in the claims, you should be very



concerned -- you -- you -- you shouldn't be considering that as somehow establishing unaccepted results or anything along those lines.

JUDGE 1: Okay. We will restore some rebuttal time [inaudible].

FEMALE 2: Your Honor, I did want to emphasize as well if I could, I don't know, on the non-infringement issue.

JUDGE 1: No. We're not going to. We don't have time.

FEMALE 2: Okay. Okay.

JUDGE 1: We -- we haven't [inaudible] for that, no. We're running out of time.

FEMALE 2: That's fine. Thank you, Your Honor.

JUDGE 1: Good morning.

MR. TRASK: Good morning. May it please the Court. Andrew Trask for Regeneron. My friend on the other side focused her remarks on 102 and -- and briefly on 103, so I'll do the same unless the court has other questions.

JUDGE 1: Can we start on 102?

MR. TRASK: Yes.

JUDGE 1: And can we start on criticality?

MR. TRASK: Yes.



JUDGE 1: You -- I think -- tell me if I'm wrong, district court said you don't need to show criticality because of the size. We [inaudible]. So let me first ask you about the size.

Two different -- even if we read Atofina is -- is -- is our court has not subsequently read it, but in any event, the size is different and it's much larger in Atofina than it is here. So I don't know how slum dunk, full stop, the size there dictates the size here.

The other question I had about size so you can respond together, is that your expert talked about, yeah, there are a million things in this because we're down to the tenth and the hundredths but there was no -- but there was no -- nothing I could find in the records you can show me where that's the way -- those are the kinds of calculations are used with respect to these drugs.

I mean, it seems to me as in Atofina we had degrees of 100, 200 dig- -- integers and not, you know, e- -- expanding the scope into the hundredths or even the thousands, then you can have millions no matter what the scope. So if you could respond to that first step before we get to criticality.



MR. TRASK: Yes, Your Honor. Happy to. So on the size of the genus here there is two important considerations. One is that there was testimony from both sides experts that this was not a small range, so we have the testi- --

JUDGE 1: Well, not a small -- where does that get us? Not a small range.

MR. TRASK: Right. So that -- part of -- part of the analysis here is as -- as the [inaudible] case explained, the perspective of the person of our very skill in the art and how they would view the size of the range is an important consideration in these overlapping ranges cases. And so, that's where that testimony goes is to that factor under the Azrem [ph] case in this case.

Both sides experts acknowledge this was a large range. Dr. Raveno [ph], Mylan's expert pointed out that it encompassed digits to the tenths and hundredths place, which the district court found that encompassed hundreds or potentially thousands of discreet values.

JUDGE 2: So both experts agreed to that?

MR. TRASK: The --

JUDGE 2: You look at the range? You don't just look at whole numbers but you go all the way

down to the tenths or even the hundredths?

MR. TRASK: Dr. Raveno, Mylan's expert, testified on cross examination that range -- range encompass not just whole values but also digits to the tenths and the hundredths place. This is at -- the district court acknowledges -- made its findings at A157. Dr. Raveno's testimony was at A9496 through 99 and that precise point, Your Honor.

And then, Dr. Trout, Regeneron's expert, also testified expressly that this was not a small range in the eyes of the [inaudible] that said A10448. So -- so that goes to the size of the range, but there's an even more fundamental issue here that distinguishes this case from some of the other overlapping ranges cases of this court.

So in the -- in the Atofina case, the ClearValue case, the Aldrin case and others, the difference between the prior art and the claims invention was the identity of the range. Right? There was -- in -- in Atofina it was a range of degrees Celsius disclosed and a range of de- -- degrees Celsius claimed.

ClearValue with a PPM range disclosed, a PPM range claimed and so on. Here, there's a



different scenario. There's agreement by the experts that the range in the prior art of 10 to 50 mg to milliliter was not specific to the claimed protein, it was not [inaudible] as a range of 10 to 50 mg per milliliter of Aflibercept. It was disclosed as a range of a genus of fu- -- of fusion proteins. This is --

JUDGE 2: Genus of what, two?

MR. TRASK: More than two, Your Honor. So, Mylan's own expert agreed with this point. He testified it was a classic protein, sets at A9497.

And what the Dix reference says expressly at A12593 is that it is a -- this 10 to 50 range corresponds to a genus of "VEGF specifically fusion proteins," and there were two proteins called out specifically by their amino acid sequence -- sequences in the Dix specification. But there are other proteins within this class of fusion proteins that apply to this range.

JUDGE 2: How do we know that?

MR. TRASK: Dr. Raveno testified to it at A9496 through 99. And Dr. Trout testified to the same at 10 -- sorry, A10449.

JUDGE 2: Well, what did they say? Did they say it was four fusion proteins, 14, 400,



4,000?

MR. TRASK: The -- the upper bound on the number of fusion proteins encompassed by this class was not the subject of precise of testimony, but the testimony was clear and it was agreed by both sides and the district court found at A157 --

JUDGE 1: Can you -- 157?

MR. TRASK: Yeah. That -- that the 10 to 50 range in the prior art was not linked to Aflibercept -- Aflibercept specialty. And because of that, what we have here a genus on top of a genus. So we have a genus of fusion proteins and a genus of concentrations of fusion proteins. And so this is unlike --

JUDGE 2: But the D- -- I'm just confused because the Dix reference only called out to species, right?

MR. TRASK: The -- the disclosure said the -- the Dix reference the -- apologies -- the -- the passage of the Dix reference that we're referring to here is at Column 2, Lines 21 to 23. And this disclosure of the 10 to -- 10 to 50 range refers to this genus of fusion proteins, and it describes how they're made up.

They have receptor regions, they have a



constant region, so it's describing this genus as more than just the two discreet disclosed amino acid sequences but rather this genus of -- of proteins that contain these different structural features.

So that's clear from the Dix reference. It was agreed upon by the -- by the -- both experts on both sides and it was found by the district court without -- we would submit clear error. So this is -- this is a different scenario from the other overlapping range cases where you have the same parameter in the prior art and in the claim range.

JUDGE 2: But if we were to just put that to the side for a moment then if we would have read INEOS and ClearValue and especially the way they explained the meaning of Atofina, then would you agree that putting this one factor to the side that when we have something like this 40 mg per milliliter inside the range in the prior art of 10 to 50, then it's incumbent upon the patent owner to show or demonstrate some kind of criticality?

MR. TRASK: So I acknowledge that those cases involve criticality in the context of overlapping ranges, of course. Criticality was not required here, as the district court correctly

33

found for several reasons. One, there were other --
JUDGE 2: I -- let --
MR. TRASK: Yes.
JUDGE 2: -- I'm just trying to understand our case law.
MR. TRASK: Yes.
JUDGE 2: That- -- that's what our case law calls for.
MR. TRASK: That's --
JUDGE 2: Right?
MR. TRASK: -- so what the ca- -- case law calls for, and I think what you're referring to, Judge, Chen [ph], is that upon a showing of prima facie anticipation, the burden shifts to the patentee to show criticality. So the threshold question is, did --
JUDGE 2: If the range overlaps with the prior art range then it's incumbent upon the patent owner to show criticality for its claimed branch. Is that --
MR. TRASK: But --
JUDGE 2: Is that a correct understanding our case law?
MR. TRASK: -- that -- that's not my reading of the case law precisely. I think it --

34

JUDGE 2: Okay then, what is it?
MR. TRASK: It's -- if there's a prima facie case of anticipation, it's not simply the case of whether the range is overlapped but as Azrem explained, for example, what is the size of the genus in the eyes or the posep [ph]. That's a - - that's an important consideration as the court precedent says.
And so the -- the question of whether that threshold has been crossed and whether a prima facie anticipation case has been made out -- needs to consider the size of the range, the -- you know, whether there's an overlapping genus as we discussed a moment ago. All of those factor into whether a prima facie anticipate --
JUDGE 2: The genus for -- for ClearValue talk about the size of the prior art range? It's --
MR. TRASK: I don't -- yeah, ClearValue talked about the relative size of the prior art genus. I -- I'm sorry, the -- I think -- I -- I don't know the answer to that question off the top of my head, Your Honor, but --
JUDGE 2: I mean, I -- I --
MR. TRASK: The -- the ortherem [ph] case certainly discusses that as a factor in -- in

35

deciding whether the burden shifts to the -- to the patentee. And -- and all of -- you know, as -- as I think, Your Honor pointed out early --
JUDGE 2: So I -- as I understand your argument, you've got roadblocks that's setting up before we have to worry about criticality. One is we're dealing with, as you would call it, a class of VEGF antagonists and two, the size of the prior art ra- -- range is just too big.
MR. TRASK: That's -- that's right. There's also -- there's no -- but I -- I would say those are the main -- those are the main considerations. That's right.
JUDGE 1: Okay. But don't the [inaudible] could also say even if there were criticality and go a -- go ahead and -- and analyze criticality?
MR. TRASK: That's correct, Judge [inaudible]. So --
JUDGE 1: Okay.
MR. TRASK: -- we -- we stand by the district court's finding that there was no need to show criticality, but even if there were a need to find criticality, the district court made a ample findings on the record here regarding criticality. So --

36

JUDGE 2: It seems peculiar though to try to do a comparison with the claimed embodiment against this [inaudible], you know, for teaching the way and unexpected results because as I understood, I mean, there's not a lot of case law on criticality but it seems like the thrust of the thinking of -- for criticality is comparing what you've claimed against other embodiments that come within the prior art range.
MR. TRASK: So the district court didn't li- --
JUDGE 2: And so that's the type of apples to apples analysis you have to do another apples to analysis comparing your drug to some other drug.
MR. TRASK: So there was no dispute here that the Gadrell [ph] reference, which is the one that discloses the R drug, was the closes prior art here.
And so, in our view, it was appropriate for the district court court to draw upon those comparisons. But there were also comparisons that were specific to Aflibercept. So I would direct Your Honor's attention to the the courts findings at A159.
These are the findings of criticality that

37

I think Judge Chen, you pointed to earlier and the district court's opinion.

JUDGE 2: I didn't really see a comparison between here is why 40 is special.

MR. TRASK: Right.

JUDGE 2: Because look what happens when you do 45 or 35.

MR. TRASK: Right. Let- -- let me address that because I do think that there's a -- a -- a -- a direct linkage between the claims of 40 mg per milliliter and the critical- -- criticality findings on Page A159.

And so, the district court on A159 cited several witnesses testimony.

JUDGE 1: Well, first she says no record evidence shows that these desirable benefits of the claimed invention would have obtain at other concentrations between 10 and 40. Right? That's what she says in the middle of 159.

MR. TRASK: That's correct, Your Honor.

JUDGE 1: And accordingly, even antici- -- an- -- anticipation were required we're showing criticality. Undisputed evidence at trial demonstrates that the 40 concentration is critical to the benefits. Is that the right standard?

38

Firstly, I think she put the burden on -- let me just throw this out -- she put -- arguably, she put the burden on them, not on you. Is that right?

And the inquiry doesn't seem to me, is whether the 40 mg concentration is desirable but whether it's critical to the operability of the claimed invention. In other words, the claimed invention is critical only if it can be shown that the claimed invention only works for 40 mg and not for others.

So I don't understand how her analysis of the evidence jives with what I understand to be the criti- -- criticality analysis.

MR. TRASK: Understood, Your Honor. Let me explain that. So on that same page and in fact, the sentence before the one that Your Honor just quoted, the district court Judge Kleeh found that the testimony at trial demonstrated that the inventors specifically chose the 40 mg per milliliter concentration to maximize the half life of Aflibercept in the eye while minimizing toxicity and stability concerns.

And what the district court is citing there are -- is the testimony of the two of the inventors of the 865 patent, Dr. Furfine and Dr.

39

Graham.

And what that test- -- what that cited testimony says is -- first of all, Dr. Furfine, this is at A9075, said that if you double the concentration of Aflibercept, you get an extra half life. So -- so the concentration of Aflibercept and the formulation is tied directly to the --

JUDGE 2: Everybody knew that though, right?

MR. TRASK: That's not right. That -- that -- the district --

JUDGE 2: Everybody knew that if you increase the concentration you're going to improve the half life.

MR. TRASK: That's -- that's not -- there's no finding to that effect. That's [inaudible] and that assume some kind of a constant, like a linear increase in pharmacogenetics of which there was no -- no finding if that would have been the case here.

Thi- -- this was found by the district court to be a key insight of the inventors in developing this formulation. So --

JUDGE 2: When you say key insight, what is the key insight particular? Not that drive up

40

concentration would drive up half life if it's a coordination.

MR. TRASK: The -- the finding was that the -- the concentration is directly tied to the half life such -- such as if you double the concentration you get an extra half life coupled with the additional testimony cited by Dr. Kle- -- excuse, cited by Judge Kleeh that -- on that same page of Dr. Graham.

Dr. Graham testified that the propensity for aggregation is -- and this is -- sorry, this is at A10040 -- that the pro- -- propensity for aggregation of Aflibercept, increases as the square of the concentration. And so, aggregation as well, which was acknowledged by experts at trial from both sides was a extremely phenomenon for this drug, --

JUDGE 2: Mm-hmm.

MR. TRASK: -- which is injected into the eyeball. And so, what the inventors found was that the -- the propensity for aggregation increases the square of the concentration, again, supporting Judge Kleeh's finding that they minimize toxicity and stability concerns by using this particular concentration. And so --

41

JUDGE 2: I guess the question I -- that still remains is that the prior art room, which is 10 to 50, you've claimed 40, and I -- and I don't see anything in the record that indicates here is why 40 did something different and therefore, critical to the operability of our clean drug -- drug product compared to other things that are not prior art knowledge. And I thought that that is the nature of the criticality analysis.
I mean, can we agree on that, that we have to look at the performance of the operability of the claimed embodiment against other things that are in the prior art range?
MR. TRASK: I think that's a fair characterization of the criticality inquiry. Azrem, for example, says ask whether the claimed value is central to the invention. I think the -- and -- and whether the invention would operate differently at various points within the range.
JUDGE 2: Okay. So that -- I think that's what I'm wondering if whether there's a gap in this record or in this case when it comes to the analysis on criticality.
MR. TRASK: So I don't think there's a gap, Your Honor, for -- for a couple of reasons.

42

One is the testimony concerning the precise concentration, selected by the inventors as found by the District Board in A159, which balance the -- the half life with concerns regarding safety and efficacy as well as the district court's findings regarding unexpected results.
And so, these findings are at A198 and the district court found that the 40 mg per milliliter of Aflibercept claimed and all of the asserted claims, had three critical and unexpected properties, safety, efficacy, and durability.
And the court went on to explain how it was that this 40 mg per milliliter concentration was surprisingly comparable with respect to safety and efficacy compared to the closest prior art, with [inaudible] gentic, Lucentis -- sorry could draw reference and also had durability to be do, dose half as frequency.
As, as Your Honors can imagine, getting an injection into the eyeball is not a pleasant experience for patients, and so this was a revolutionary advance that this report found to have to dose patients only half as often.
So, that finding as well I think supports the district court's finding of criticality because

43

it shows that the 40 mg per milliliter concentration claimed and all of the asserted claims is critical to the invention and distinguished the invention from the closest prior art, which the parties agreed was the draw reference of which -- which referenced the -- the R drug that Your Honor mentioned.
So the -- the other thing I point out is that the -- the testimony from Dr. Furfine, one of the inventors that connected the concentration 40 mg per milliliter with the half life of Aflibercept was unrebutted.
The district court found that A200 and there was no challenge by Mylan to that -- to that finding a trial and certainly unappeal. And so, there's -- there's multiple ways in which the district court found criticality, but connections with Aflibercept itself with -- through the testimony of Dr. Furfine and Dr. Graham as well as to the comparisons of the closest prior art in the [inaudible].
JUDGE 2: You're getting away from the Dixlanta two, you're not relying on the preamble, are you? Of the -- for use in intra- -- intravitreal administration compared to the cancer

44

treatment that was disclosed [inaudible]?
MR. TRASK: The preamble was never a basis to distinguish the prior art.
JUDGE 2: I saw the district court in part relied on that, and then I saw that the record does not.
MR. TRASK: I don't -- I don't think that's right. I mean, it -- it's only try that's --
JUDGE 2: When you say that's not right, which part is not right?
MR. TRASK: Oh, yes. I don't view the -- I don't read the district court's decision as relying upon the -- the preambles.
JUDGE 2: Okay. I just got those words from his opinion then [inaudible].
JUDGE 1: Can I ask you one other --
MR. TRASK: Okay. I don't -- I'm not sure, Your Honor, which passage [inaudible] that you're referring to, but -- but there was no dispute by the parties that there was no efficacy limitation built into the suitable for intravitreal term.
It was never a term that -- that either party had proposed to construe. And so, there's unrebutted testimony by Dr. Trout that what that limitation means is contains components that can be

45

used intravitreally and nothing more.
JUDGE 2: What about 98 percent? Are do I -- how are we supposed to think about that? The other side you heard say essentially the 98 percent would be there in Dix but you use the 40 mg per milliliter because all the examples that other concentration levels got [inaudible] 98 percent. And I don't know, 98 percent is what the FDA want so 98 percent is really n- -- not very meaningful here.
MR. TRASK: So t- -- two responses to that, Your Honor. One is, I think you put your finger on it when -- when you asked my friend on the other side about the testimony that best supported the notion that there would be 98 percent and 40 [inaudible] from the Dix reference. And you pointed out that the most the expert said is it would be most likely. That's in A10526.
JUDGE 2: That is your expert, right?
MR. TRASK: That's our expert, correct. He acknowledged that it would be --
JUDGE 2: Their expert offered no -- no testimony on that fact. And then what it seems to be on appeal is that they're arguing almost kind of an inherency type -- type analysis, but certainly,

46

that was not a theory that was from below and there's no evidence to support that necessarily there would have been 98 percent negative confirmation in -- in one of the Dix formulations.
JUDGE 2: Frankly, what impressed me was how often Raveno and Trout agreed with each other, which his usual [inaudible].
MR. TRASK: It -- it is refreshing perhaps. I -- I agree with you, Your Honor. The -- the other point I want to make in response to Judge Chen's question --
JUDGE 2: You know some lawyers have, like, 40 disagreements.
MR. TRASK: Well, I -- I -- I can't help that. There were a lot of issues raised in the opening brief. On the point about 98 percent being a known FDA requirement I think is an -- it is an important point to -- to flag.
Mylan made this argument at -- at Page 24 of their reply brief, they said, "98 percent native confirmation was known FDA stability requirement." In support of statement, they cite Dr. Graham. And I encourage Your Honors to look at that testimony. This is at A10102303. Dr. Graham said precisely the opposite of Mylan represented there. Dr. Graham

47

said that 98 percent native confirmation was "not an obligate requirement" for -- for [inaudible].
JUDGE 2: What volume are you in?
MR. TRASK: This is, sorry, A10102, which is long and [inaudible].
JUDGE 2: We've been talking about Dix 102, just curious. Dix 103 -- your reliance on 103C1, it couldn't be conclusive yet, right, if we were to conclude that there was a problem with criticality because the district court never made an assessment on whether 865 is entitled to an earlier provision application final [inaudible].
MR. TRASK: So --
JUDGE 2: Is that right?
MR. TRASK: -- so I think part of the reason that -- that Dix was not a -- a focus of Mylan's --
JUDGE 2: I -- I am just trying to get to the bottom of something.
MR. TRASK: Yeah.
JUDGE 2: I just need to know for housekeeping.
MR. TRASK: Sure. So -- so our -- our view is that Dix is not a proper reference under 103 by virtue of the fact.

48

JUDGE 2: Right, but this report did not [inaudible] assessment on --
MR. TRASK: The district court did not --
JUDGE 2: -- whether the patent is entitled to provisional priority [inaudible].
MR. TRASK: -- the district court did not make that finding. That's right, Your Honor.
JUDGE 2: [Inaudible].
MR. TRASK: Yeah. And so, if -- if the court decides that it can't reach that question as a result then -- then it wouldn't -- wouldn't reach the 103C question but our -- our view is that Dix - - there's --
JUDGE 2: I mean, I -- I could just keep asking questions. I don't know.
JUDGE 1: Well, do I get to teaching away because I'm sorry, I'm thinking about too many things at one point, so maybe this is redundant --
JUDGE 2: Yeah, okay.
JUDGE 1: -- but I want to get to the teaching away argument.
MR. TRASK: Yes, Your Honor.
JUDGE 1: And it seems to me the district court relied heavily on Dr. Trout's analysis of the Scudro [ph] reference. But I don't see anywhere in

the record where he explains what a reference about [inaudible] --
MR. TRASK: Yeah.
JUDGE 1: -- formulation is indicative of how the A formulation will be paid. And I only see discussions about A is more potent than R. But did your expert provide anything additional as to why R and A would behave similarly. I mean, this is just an odd kind of teaching away when you're not direct -- directing me to what -- what we're talking about. Right?
MR. TRASK: Sure. Well, I -- I -- I -- I --
JUDGE 1: So how do you get there?
MR. TRASK: Sure. So it was undisputed at the trial that this reference is the subject of teach away, the Godrell reference was the closest prior art. The district court found that at A197. And the only thing that Mylan cites to support -- they -- they -- they claimed unappeal on Page 36 of their reply brief but they disputed that contention.
The only thing they cite is their proposed order -- proposed trial order to the district court, which of course, is not evidence at A11698.



And so, there is no evidence of record that could draw as not closest prior art and it was not a position that Mylan ever advanced below. So -- so there's --
JUDGE 2: I guess the -- to put a final point on it, the -- the -- your theory of teaching away, the district court's theory of teaching away is that Aflibercept and the R drug are essentially interchanged role and the R drug stands as a proxy for what [inaudible] would think about Aflibercept.
And yet, I don't see the basis for that premise that these two things are interchanged or -- or one is this affair substitute for the other. Where is the bridge for that kind of thinking that allows to do -- assume that whatever that might be bad about the R drug necessarily is also going to be equally bad if not worse for Aflibercept.
MR. TRASK: Sure. So the district court's teach away findings are at A174 to 77, and there were a number of findings there of relevance. But to your -- to Your Honor's point, both of these drugs, the R drug and Aflibercept, FDA drug, has the [inaudible] mechanism of action where they bind the [inaudible] in the retina to --
JUDGE 2: Okay. This -- this is you



talking and that's helpful but --
MR. TRASK: Sure.
JUDGE 2: -- I -- I need something in the district court's findings and rationale analysis that I can focus on and -- and see okay, oh, they're -- no, that's a fair fact finding that I can get behind versus, oh, there's a hole in the analysis that leaves me wanting and I can't just rely on an attorney argument today trying to talk it away.
MR. TRASK: Sure. I mean -- so I think -- focusing on the -- the -- the pages that I just referenced, the A174 to 177, it was -- it seemed to be understood through the eyes of the poser that these two molecules had simil- -- had the same mechanis- -- mechanism of action and the performance of one would be indicative of the performance of the other.
So for example, a A175, the district court found that because of Aflibercept was much more --
JUDGE 1: Where are you on the page?
MR. TRASK: Sure. This is A175.
JUDGE 1: Yeah. I'm there but --
MR. TRASK: And on the -- it's the second beginning of the paragraph there. It says,



"Moreover, it was undisputed that Aflibercept --
JUDGE 1: Yeah.
MR. TRASK: -- was much more potent than Ranibizumad. Because of its higher potency, less Aflibercept is needed to inhibit the same amount of VEGF as compared to Ranibizumad."
And then a little further down it says, "Doctor tried to explain that the poser would have been motivated to use the concentration of Aflibercept lower than the 10 milligrams of milliliter of Ranibizumad in view of Aflibercept's higher potency." And so, Dr. --
JUDGE 2: That's not quite teaching away. That is more like about how perhaps [inaudible] just to be motivated to crank up the concentration up to 40 milligrams for -- that -- that's -- that -- that's not saying it's a really bad idea to use Aflibercept of 40 milligrams per milliliter.
JUDGE 1: And just to tag onto that, I -- I -- I can't recall any other cases on teaching away where one as relying on something different because maybe there's some similarity to them say this teaches away even though it's different for this. Do you know of any cases that have done that?
MR. TRASK: Well, I -- I don't -- I'm not

sure I know exactly this particular scenario but -- but this is not a different -- these are not two different disclosures in the sense that they're both was -- these are the two leading VEGF antagonist at the time.

They were both in development at the time, and the evidence is that the poser was looking at the development of Ranibizumad, the R drug, in order to inform how to go about developing Aflibercept, the -- the A drug.

And so, these are drugs that had the same mechanism action, and the undisputed testimony at trial through Dr. Trout over pages of the district court's findings is that the performance of Ranibizumad informed in poser how one would expect Aflibercept to perform because they had the identical mechanism of action, and so there was a finding that this --

JUDGE 2: And where is that finding? Same mechanism of action and then next [inaudible] because they have the same mechanism of action we would certainly think of Aflibercept in the same way that we would think of the R drug.

MR. TRASK: I might need a moment to run - -



JUDGE 2: Okay.

MR. TRASK: -- locate that. But I would say that the -- the -- all of the testimony that I can affirm to is -- is based upon the understanding, which is undisputed that the performance of the R drug in- -- inform the -- the poser's expectations regarding Aflibercept. Right?

That -- that was the -- the understanding that -- on which Dr. Trout was -- was testifying is that --

JUDGE 1: Did -- did the dis- -- I'm looking at that page with the district court, I'm not -- is there anything the district court -- did the district court make a finding like that? I mean, she says the comparison she has that you called out, which is that Aflibercept is more potent than the R drug but the -- you know -- okay --

MR. TRASK: Phoning a friend here. It's -- so the -- another -- another finding here is at A187, which compares Ranibizumad and fusion proteins like Aflibercept.

JUDGE 1: What heading is this under?

MR. TRASK: This is in the, in the context of -- this is the invalidity analysis for



[inaudible].

JUDGE 1: Okay.

MR. TRASK: And the discussion here on A187 talks about the poser wouldn't expect that a different protein with have the same native confirmation. The higher re- -- required concentration of Aflibercept compared to Ranibizumad undermine any reasonable expectation of success.

So again, comparing these two drugs of the same mechanism of actions, both VEGF antagonist and comparing their -- and -- and contrasting the expectation of that.

JUDGE 2: This -- this -- this -- this seems to -- if I'm not, if I'm not mistaken, kind of work against what your position is.

Your -- your position for purposes of teaching away is to tell us that these two drugs area very, very, very close cousins. This passage seem to say just because you would get some line of stability in one doesn't necessarily mean you'll get that same stability in the other.

MR. TRASK: So there -- there's no -- there was no contrary testimony on -- on this point that the two drugs have the same mechanism for



action and would have performed similarly but the - - the poser would have understood that the cause of the severe inflammation exhibited by Lucentis at 40 mg per milliliter you would expect that Aflibercept with need a far lower concentration in order to achieve the max -- in order to achieve a beneficial therapeutic effect with a -- with a lower amount of --

JUDGE 2: So what are your backup arguments on this, right, like, --

MR. TRASK: We do. We do, Your Honor.

JUDGE 2: -- is there some problem with the teaching away analysis yet there's, I don't know, half a dozen [inaudible] that have been identified.

MR. TRASK: That's exactly right. There's -- the Aflibercept sequence is not disclosed in the Fraser and Lucentis combination. The -- like [inaudible] Aflibercept is not disclosed in that combination.

JUDGE 2: Neither reference has Aflibercept?

MR. TRASK: No, I'm talking about the Fraser and Lucentis combination. So --

JUDGE 2: Right.

57

MR. TRASK: Yeah.
JUDGE 2: Neither reference has Aflibercept?
MR. TRASK: In -- in Fraser and Lucentis - - I'm sorry the -- the Fraser dis- -- discloses what's called the VGEF Trap R102, it does not disclose Aflibercept, it does not disclose the amino acid sequence of Aflibercept. That's right.
And Lucentis, of course, was about their Ranibizumad drug. There's no disclosure of, like, conciliated Aflibercept, there's no motivation to conciliate Aflibercept. This court found last week in a related appeal involving Samsung the --
JUDGE 2: How come we didn't get a 28 J [inaudible]?
JUDGE 1: Oh, yes, that's -- well, that's goes to the next case though because we --
JUDGE 2: No, it counts here too.
MR. TRASK: Sure.
JUDGE 1: No, but it counts more on the last case.
MR. TRASK: Yeah, I -- I will -- I will take responsibility for that. I -- we -- we weren't sure if the --
JUDGE 1: Well, the other side as well, we

58

shouldn't have gotten something --
MR. TRASK: -- we -- we weren't sure if the -- we should presume that the court was aware of the decision in -- in the same consolidated appeal. Perhaps we should have just submitted the 28 J letter [inaudible].
JUDGE 1: Well, that's a fair assumption but that doesn't answer the next question of the reason we have 28 J letters was to explain the relevance of that opinion to what the case is, the case we haven't gone to yet. And we're talk more about that in the [inaudible].
MR. TRASK: Okay. Yeah, yeah. But -- but there -- to -- to your -- to Your Honors point, there are a number of differences with respect to the reasonable expectation of success, the motivation, as well as the Aflibercept sequence that differentiate the prior art from the -- from the claim they mentioned here.
The -- the last point I'll raise is that the -- you -- you started, Judge Krause [ph], by asking my friend on the other side what obvious discombinations they're running here, and I heard that they're run- -- that they're ru- -- maintaining the Fraser and Lucentis and the Dix

59

references.
In their briefing they combined those -- those teachings. This is -- this is at A6 -- I believe it's at Page 69 of their briefing.
JUDGE 2: Did you say in your rhetoric that they didn't raise that to the trial judge?
MR. TRASK: They -- no, they -- that's not right, Judge Wallach. They -- we objected to the trial judge -- in front of the trial judge to the combination because it wasn't disclosed. The district -- district court precluded Mylan from the lying on that combination. This is a A167 to 168. And yet, their opening brief argues these references together as if it's a proper combination. And so, I just wanted to make sure the court was aware of that point.
JUDGE 1: Objection -- mm-hmm. Thank you.
MR. TRASK: Thank you very much, Your Honors.
JUDGE 1: Okay. Trying to keep things even if necessary on my calculations, which may be wrong, but I think you went eight over and he went 18 over, so that gives you plus 10 but we hope you don't need it.
FEMALE 2: I will try not to use it all if

60

I don't have to, Your Honor. Couple things I'd like to point out.
First, if the tenth -- if the tenths and hundredths apply from the perspective of a person of ordinary skill in the art to 10 to 50, then it also applies to 40. So then you've got a range versus a range as opposed to a point within a range. In addition, I do want to point out that my co- --
JUDGE 1: Did -- but you -- you agreed with your friend that your -- your -- your expert conceded that?
FEMALE 2: Well, what he said is numerically, 10 to 50, well, can include tenths and hundredths. That's not necessarily the same thing.
I don't think is a person of ordinary skill in the art would concede all of those to be the same, but nonetheless, if a person of ordinary skill in the art is going to see a number 10 to 50 and see tenths and hundredths and then they're going to see a number 40, then that also means you see tenths and hundredths, and that's a range.
When it comes to the -- you know, what Dix says about this class of VEGF antagonist, and that I think is actually where the Samsung decision that

this court recently issued, would in fact be relevant here.

So one of the things that my colleague argued is that well, Dix doesn't actually tell you about the full sequence that we've got claimed in Claim 1.

Well, here is what Dix does do, Dix in its examples, always uses sequence I.D. Number 4. Dix in the specification, has a clear preference for Sequence I.D. Number 4. And if we go to Dix, this is in A12595, under the heading, VEGF antagonist, so he's talking about the fusion proteins. Column 5 Lines 30 to 42, he specifically says, "Here's what the VEGF antagonists are, it includes fusion proteins in a prefered embodiment. The VEGF antagonist is the fusion protein of two of four more preferably Sequence I.D. Number 4."

And then further on then -- then the next couple lines, this is the same thing that the Samsung decision decided was going to be written description support for Regeneron for its claims in the 865 patent relating to the sequence in like consolation patterns.

Dix has these same identical language under the same heading because Dix and the 865



patent -- I'm reading almost verbatim on this -- it then says, "In a specifically embodiment, fusion protein comprises amino acids 257 to 457 of Sequence I.D. Number 4 and is [inaudible] a at ASN residues 62, 94, 149, and 122 and [inaudible]. That is the single sequence that is claimed in Claim 1 of the 865 patent here.

So Dix if -- this is where the district court went wrong, because the district court only focused on just that one description of Column 2 that say, here is what the embodiment is for 10 to 50 milligrams, but then he ignored where the specification then expands on what it means to be a VEGF fusion protein of the invention.

So I think in this court's claims what we're talking about is something arranged as in the claim when we -- we clearly have an interrelated teaching, here's the fusion proteins, here's the ones that I prefer, here is what I most prefer. So the district court was -- went wrong by not looking at that particular thing go say, oh, Aflibercept is something that Dix is specifically contemplating.

Similarly, if we then go to Dix's examples, the 226 patent, Example 1 -- so Dix, this is A12596, Example 1, what does Dix have there? And



now let's go to the 865 patent Example 1. What are the ingredients?

They -- they're titled the same, stability of a 15 mg per ML. Now, the 865 patent says it's VEGF trap with -- with formulation. Dix just says liquid formulation of VEGF trap. What's contained in it? 10 millimi- -- 10 millimoles of phosphate and Dix's, 10 millimoles of phosphate a nd the 865 patent.

15 milli- -- millimoles of NACL, also 15 millimoles of NACL in the 865 patent. Then we've got .1 percent polysorbate 20.

JUDGE 2: Just so I can clarify, which specific issue is what you're talking about driving at?

FEMALE 2: Right. This gets to the idea of -- my colleague from Regeneron was saying that somehow there's other elements that were missing from the Dix formulations that didn't get you to the complete claim, and particularly the stability on it.

Well, as you go down -- as you march through these -- you then get to Table 1 in Dix, Table 1 in the 865 patent. You've got the same visual appearance turbidity PH and stability data,



all above 98 percent.

So you've got the i- -- the near identical ingredients, and both Dix's 15 mg Example 1, that meets each and every element of Claim 1 or Claim 4 and all the other asserted claims here. It just doesn't have the number 40 in it.

You go to the 865 patent, yes, they've got a 15 mg example, same stability numbers as in Dix. They got a 40 mg number, same stability results in Dix, then you look at the Dix 25 mg per ML, so he dropped the concentration. And that's in Column 12. And guess what, he uses those same formulation ingredients, gets the same stability outcome. So --

JUDGE 1: Do you have expert testimony on this?

FEMALE 2: Yes.

JUDGE 1: And where is that?

FEMALE 2: That -- it -- it is -- it is [inaudible]. Let me pull out some of those. I apologize, Your Honor. I -- I will get you those. I know -- I know we had the -- the citations in there where they basic -- where we basically did go back and forth between matching each of these up. So --

JUDGE 1: Okay. Can I -- you have anything?

FEMALE 2: Yeah. Couple other points, Your Honor, that I did want to make.
JUDGE 1: They -- one -- just one quick point as I -- I -- it was so long ago that I don't remember but I know your friend said something about [inaudible] brief and a citation to one of the experts and that your description of what he said was the ex- -- exact opposite I think your friend said of what he actually said. Do you have a response to that/
FEMALE 2: Right. I -- I -- I -- I did not get a chance to check it.
JUDGE 1: Okay.
FEMALE 2: If we did then, you know, obviously, we would --
JUDGE 1: Okay.
FEMALE 2: -- we would withdraw that or see if there -- there was an error in sight and there's a additional citation that needs to be made. But on a certain level, I don't think it's actually relevant because Dix already achieved 98 percent stability.
He teaches it, he talks about it, he specifically teaches one of ordinary skill in the art how to get there. So you don't even need to



look at FDA's motivations to get you there. He already got you there.
So once -- so there again, that's where I get to -- the ena- -- what is the enabling disclosure? In addition, Your Honor, I did want to point out, we did dispute below that this Ranibizumad med drug was in fact the closest prior art.
Now, I know my colleagues from Regeneron said, well, you just talked about that in your briefing. That's because our whole point was, it's not legally relevant. The -- the --
JUDGE 1: Well, did you ever say it's not legally relevant?
FEMALE 2: Yes.
JUDGE 1: Did you tell that to the district court? Was that in our report?
FEMALE 2: Yes, that was in our proposed findings of fact conclusions and law that the court had submitted that -- that -- that the closest prior art was going to be the Dix formulation.
And -- and it was not going to be Ranibizumad. And I think the Jensen Betova [ph] case that was -- I decided that we cited in our brief, also bears this out, is that you're not



supposed to be looking at what's happening with another drug to say, is -- is this, you know -- to say this is how it's going to behave for hours.
And then, additionally, I also wanted to point out that when it comes to this issue of criticality, we do know from Dix that the desirable benefit of stability was actually achieved, not only for the lower concentration but for even high concentrations, 50 mg, 75, 100 mg ML.
So under Amed v. Baxter 471 at 3rd & 1368. The fact that they may have found even if we assumed from the district court's findings, we may have found some additional property that we think is beneficial, that doesn't change the fact.
Even -- and I think Amed even said even if you put it in your claims, that still doesn't change the fact that when these are composition claims and the compositions are achieving the same outcomes, the same utilities, they're -- there are just isn't any difference there, and there isn't -- there is no anticipation.
And I think that INEOS likewise rejected the idea that you can start having these little change of inferences to also get to criticality to somehow support the claim. All right. Thank you



very much, Your Honor.
JUDGE 1: We thank you [inaudible]. We thank both sides. The case is submitted.

CERTIFICATE OF TRANSCRIBER

I, Chris Naaden, a transcriber, hereby declare under penalty of perjury that to the best of my ability from the audio recordings and supporting information; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome, the above 68 pages contain a full, true and correct transcription of the tape-recording that I received regarding the event listed on the caption on page 1.

I further declare that I have no interest in the event of the action.

May 20, 2025
Chris Naaden

(585226, Oral Testimony in re: Regeneron Pharmaceuticals v. Mylan, 2-7-25)

**A**

**a449**
30:23
**a6**
59:3
**ability**
69:4
**able**
13:14, 19:20
**about**
4:2, 4:25, 5:1, 12:1, 12:8, 12:21, 13:24, 15:1, 16:6, 17:2, 17:6, 20:12, 20:15, 23:17, 24:22, 25:1, 27:4, 27:11, 27:13, 34:17, 34:19, 35:6, 45:2, 45:3, 45:14, 46:16, 47:6, 48:17, 49:1, 49:6, 49:11, 50:10, 50:16, 52:14, 53:9, 55:4, 56:23, 57:9, 58:12, 60:24, 61:5, 61:12, 62:16, 63:14, 65:6, 65:23, 66:10
**above**
64:1, 69:8
**absolutely**
6:6
**accordingly**
37:21
**achieve**
56:6
**achieved**
65:21, 67:7
**achieving**
67:18
**acid**
30:16, 32:3, 57:8
**acids**
62:3
**acknowledge**
28:16, 32:22
**acknowledged**
40:15, 45:21
**acknowledges**
29:6
**action**
50:23, 51:16, 53:12, 53:17, 53:20, 53:21, 56:1, 69:14
**actions**
55:11
**active**
3:9
**actual**
16:2, 21:2
**actually**
3:11, 4:4, 5:24, 8:9, 8:16, 11:6, 11:7, 13:12, 13:22, 14:15, 15:12, 16:12, 18:13, 19:22, 20:4, 20:23, 23:13, 23:15, 25:11, 25:13, 25:25, 60:25, 61:4, 65:9, 65:21, 67:7
**ad**
25:15
**adamant**
25:15
**addition**
60:8, 66:5
**additional**
40:7, 49:7, 65:19, 67:13
**additionally**
67:4
**address**
37:8
**adds**
4:12
**administration**
22:13, 43:25
**admits**
25:8
**advance**
42:22
**advanced**
50:3
**affair**
50:13
**affirm**
54:4
**aflibercept**
2:25, 3:25, 5:14, 6:8, 6:9, 6:12, 18:2, 22:8, 23:4, 24:7, 24:8, 24:12, 30:5, 31:10, 36:22, 38:21, 39:5, 39:6, 40:13, 42:9, 43:11, 43:18, 50:8, 50:10, 50:17, 50:22, 51:20, 52:1, 52:5, 52:10, 52:18, 53:10, 53:16, 53:22, 54:7, 54:16, 54:22, 55:7, 56:4, 56:17, 56:19, 56:22, 57:3, 57:7, 57:8, 57:11, 57:12, 58:17, 62:21
**aflibercept's**
52:11
**again**
8:7, 12:7, 17:14, 17:16, 18:5, 19:6, 40:22, 55:10, 66:3
**against**
13:24, 25:5, 36:3, 36:8, 41:12, 55:16
**aggregation**
40:11, 40:13, 40:14, 40:21
**ago**
34:14, 65:4
**agree**
18:16, 32:17, 41:10, 46:9
**agreed**
24:25, 28:22, 30:10, 31:5, 32:7, 43:5, 46:6, 60:10
**agreement**
30:1
**ahead**
17:5, 21:12, 35:16
**alarm**
17:2
**aldrin**
29:18
**all**
3:12, 3:13, 3:18, 4:12, 6:5, 18:2, 18:15, 19:13, 20:17, 22:5, 24:4, 24:25, 28:25, 34:14, 35:2, 39:3, 42:9, 43:2, 45:6, 54:3, 59:25, 60:17, 64:1, 64:5, 67:25
**allows**
50:15
**almost**
45:24, 62:1
**along**
26:3
**already**
13:11, 15:14, 22:5, 24:9, 24:10, 24:13, 65:21, 66:2
**also**
4:12, 5:13,




Petitioner Fresenius Ex. 1008, 0020

8:11, 9:6, 14:7, 18:4, 19:23, 29:4, 29:11, 35:11, 35:15, 36:21, 42:17, 50:16, 60:6, 60:21, 63:10, 66:25, 67:4, 67:24
**always**
22:24, 61:8
**amazaki**
2:5
**amed**
67:10, 67:15
**amino**
30:16, 32:2, 57:8, 62:3
**amount**
2:20, 5:11, 9:1, 52:5, 56:7
**amounts**
8:24
**ample**
35:23
**anal**
8:1
**analgesic**
7:20
**analgesics**
7:24, 8:4
**analysis**
25:24, 28:9, 36:13, 36:14, 38:11, 38:13, 41:9, 41:23, 45:25, 48:24, 51:4, 51:8, 54:25, 56:13
**analyze**
35:16
**andrew**
26:18
**another**
7:10, 18:4, 22:17, 36:13, 54:20, 67:2
**answer**
34:21, 58:8
**antagonist**
16:16, 53:5, 55:11, 60:24, 61:11, 61:16
**antagonists**
35:8, 61:14
**anti**
3:20, 6:2
**anti-drug**
3:24
**anti-vegf**
2:20, 2:24, 3:3, 3:10, 3:14, 3:19, 3:22, 3:24, 5:25
**antici**
37:21
**anticipate**
21:3, 34:15
**anticipation**
5:1, 6:16, 6:20, 10:4, 10:24, 15:23, 19:4, 33:14, 34:3, 34:11, 37:22, 67:21
**anticipatory**
7:23
**any**
10:23, 13:2, 13:17, 22:2, 22:22, 25:17, 27:7, 52:20, 52:24, 55:8, 67:20, 69:6
**anyone**
25:16
**anything**
11:23, 16:22, 20:13, 24:20, 24:22, 26:3, 41:4, 49:7, 54:13, 64:25
**anywhere**
48:25
**apologies**
31:19
**apologize**
64:20
**appeal**
45:24, 57:13, 58:5
**appealing**
5:4
**appeals**
1:12
**appearance**
63:25
**appellant**
2:6
**apples**
36:12, 36:13
**application**
47:12
**applied**
11:2
**applies**
60:6
**apply**
30:19, 60:4
**appropriate**
36:19
**area**
19:19, 55:19
**arguably**
38:2
**argued**
61:4
**argues**
59:13
**arguing**
7:18, 45:24
**argument**
2:2, 20:5, 35:5, 46:19, 48:21, 51:9
**arguments**
56:10
**arranged**
62:16
**art**
3:3, 5:15, 5:17, 7:10, 7:12, 7:20, 8:2, 8:6, 8:9, 10:12, 11:17, 11:25, 12:3, 13:3, 13:14, 13:25, 15:13, 19:23, 21:6, 24:9, 24:15, 28:11, 29:19, 30:2, 31:9, 32:12, 32:19, 33:18, 34:17, 34:19, 35:9, 36:9, 36:17, 41:2, 41:8, 41:13, 42:15, 43:5, 43:20, 44:3, 49:18, 50:2, 58:18, 60:5, 60:17, 60:19, 65:25, 66:8, 66:21
**articulated**
13:17
**aside**
15:23
**asked**
45:13
**asking**
48:15, 58:22
**asn**
62:4
**asopha**
3:3
**asserted**
42:9, 43:2, 64:5
**assess**
10:15
**assessing**
22:19
**assessment**
47:11, 48:2
**assume**
14:17, 39:17, 50:15
**assumed**
67:12
**assumption**
58:7
**astray**
10:8

**atofina**
10:21, 11:5, 11:10, 11:11, 27:5, 27:8, 27:19, 29:17, 29:21, 32:16
**attention**
36:23
**attorney**
51:9
**audio**
69:4
**aware**
58:3, 59:16
**away**
6:23, 43:22, 48:16, 48:21, 49:9, 49:17, 50:7, 50:19, 51:10, 52:13, 52:21, 52:23, 55:18, 56:13
**azrem**
28:15, 34:5, 41:15

B

**back**
6:14, 12:5, 12:9, 12:18, 12:25, 21:10, 21:22, 25:18, 64:22
**background**
8:3, 24:14
**backup**
56:9
**backwards**
18:17
**bad**
50:16, 50:17, 52:17
**balance**
42:3
**bank**
18:9
**based**
14:4, 54:4
**basic**
64:22
**basically**
5:9, 64:22
**basis**
44:2, 50:11
**baxter**
67:10
**bears**
66:25
**because**
5:9, 7:4, 7:25, 8:14, 9:21, 10:20, 11:5, 13:23, 16:13, 17:18, 18:14, 19:13, 20:5, 20:23, 22:9, 22:10, 23:13, 23:16, 23:22, 24:1, 27:3, 27:14, 31:10, 31:16, 36:4, 37:6, 37:9, 42:25, 45:6, 47:10, 48:17, 51:20, 52:4, 52:22, 53:16, 53:21, 55:20, 57:17, 59:10, 61:25, 62:9, 65:21, 66:11
**been**
11:1, 15:13, 22:16, 24:10, 25:13, 34:10, 34:11, 39:20, 46:3, 47:6, 52:9, 56:14
**before**
10:15, 27:24, 35:6, 38:16
**beginning**
51:25
**behave**
49:8, 67:3
**behind**
51:7
**being**
16:3, 46:16
**believe**
14:18, 59:4
**below**
46:1, 50:3, 66:6
**beneficial**
56:6, 67:14
**benefit**
14:15, 67:7
**benefits**
37:16, 37:25
**best**
45:14, 69:3
**betheva**
25:19
**betova**
66:23
**better**
15:1, 15:7, 25:3
**between**
3:9, 29:19, 37:4, 37:10, 37:18, 64:23
**big**
10:23, 11:5, 35:9
**billion**
13:6
**bind**
50:23
**bio**
2:10
**biocon**
2:5
**blaze**
13:2
**blindness**
13:20
**board**
42:3
**bond**
6:24
**both**
2:23, 5:6, 5:21, 11:15, 28:4, 28:16, 28:22, 31:5, 32:7, 32:8, 40:16, 50:21, 53:4, 53:6, 55:11, 64:3, 68:3
**bottom**
47:19
**bound**
31:2
**branch**
33:19
**bridge**
50:14
**brief**
2:14, 25:20, 46:16, 46:20, 49:21, 59:13, 65:6, 66:25
**briefing**
9:17, 25:15, 59:2, 59:4, 66:11
**briefly**
26:20
**broad**
7:19
**broader**
9:5, 11:17, 19:17, 25:5
**buffer**
4:6, 4:7
**built**
44:21
**burden**
14:8, 20:1, 22:1, 33:14, 35:1, 38:1, 38:3
**business**
15:24

C

**c1**
47:8
**ca**
33:11
**calculations**
27:18, 59:21

**call**
6:6, 35:7
**called**
3:24, 4:13, 5:19, 10:21, 30:15, 31:16, 54:16, 57:6
**calling**
5:16
**calls**
5:12, 33:8, 33:12
**came**
11:6, 24:19
**can't**
46:14, 48:10, 51:8, 52:20
**cancer**
43:25
**caption**
69:11
**carry**
3:11
**case**
2:2, 4:16, 6:25, 7:5, 7:12, 9:25, 10:4, 10:21, 11:3, 11:9, 17:17, 17:18, 19:24, 28:10, 28:15, 29:15, 29:17, 29:18, 33:5, 33:7, 33:11, 33:23, 33:25, 34:3, 34:4, 34:11, 34:24, 36:5, 39:20, 41:22, 57:17, 57:21, 58:10, 58:11, 66:24, 68:3, 69:7
**cases**
7:3, 7:6, 11:1, 11:15, 12:6, 22:18, 28:13, 29:16, 32:11, 32:23, 52:20, 52:24
**cause**
56:2
**celsius**
29:22, 29:23
**central**
41:17
**certain**
65:20
**certainly**
13:14, 24:23, 34:25, 43:15, 45:25, 53:22
**certificate**
69:1
**challenge**
43:14
**chance**
65:12
**change**
67:14, 67:17, 67:24
**characterization**
41:15
**chart**
2:16, 2:19, 8:20
**check**
16:21, 65:12
**checking**
17:4
**chen**
33:13, 37:1
**chen's**
46:11
**chloride**
4:13
**chose**
24:5, 38:19
**chris**
69:2, 69:18
**christian**
1:25
**circuit**
1:12
**citation**
65:6, 65:19
**citations**
23:14, 23:15, 64:21
**cite**
23:14, 25:21, 46:22, 49:23
**cited**
25:20, 37:13, 39:2, 40:7, 40:8, 66:24
**cites**
49:19
**citing**
38:23
**claim**
11:7, 20:17, 22:15, 32:12, 58:19, 61:6, 62:6, 62:17, 63:20, 64:4, 67:25
**claimed**
10:10, 11:17, 11:20, 11:21, 11:25, 12:2, 18:22, 25:13, 29:23, 29:25, 30:3, 33:19, 36:2, 36:8, 37:17, 38:7, 38:9, 41:3, 41:12, 41:16, 42:9, 43:2, 49:20, 61:5, 62:6
**claims**
5:8, 9:2, 15:17, 19:7, 22:11, 22:12, 22:23, 25:11, 25:16, 25:25, 29:19, 37:10, 42:10, 43:3, 61:21, 62:15, 64:5, 67:16, 67:18
**clarify**
63:13
**class**
30:18, 31:3, 35:7, 60:24
**classic**
12:6, 30:11
**clean**
41:6
**clear**
11:9, 17:18, 20:11, 25:22, 31:5, 32:6, 32:9, 61:9
**clearly**
62:17
**clearva**
11:22
**clearvalue**
7:3, 11:3, 11:9, 11:16, 17:17, 29:18, 29:24, 32:15, 34:16, 34:18
**client**
17:13
**clients**
12:8
**close**
7:15, 55:19
**closes**
36:17
**closest**
42:15, 43:4, 43:20, 49:17, 50:2, 66:7, 66:20
**colleague**
61:3, 63:17
**colleagues**
66:9
**column**
19:16, 31:21, 61:12, 62:10, 64:11
**combination**
5:3, 5:16, 56:18, 56:20, 56:24, 59:10, 59:12, 59:15
**combined**
59:2

**come**
7:15, 14:11, 20:2, 36:8, 57:14
**comes**
24:16, 25:23, 41:22, 60:23, 67:5
**comfortable**
20:18
**commercially**
4:4
**comparable**
42:14
**comparative**
25:23
**compare**
14:4, 14:5
**compared**
10:10, 15:2, 22:21, 41:7, 42:15, 43:25, 52:6, 55:7
**compares**
54:21
**comparing**
36:7, 36:14, 55:10, 55:12
**comparison**
36:2, 37:3, 54:15
**comparisons**
36:21, 43:20
**compels**
6:25
**complete**
63:20
**components**
44:25
**composition**
13:16, 13:18, 15:14, 22:11, 25:17, 67:17
**compositions**
67:18
**compound**
3:21, 3:22, 7:19, 13:6, 13:8
**comprised**
5:17
**comprises**
62:3
**concede**
60:17
**conceded**
60:12
**concedes**
19:16
**concentrated**
20:25
**concentration**
24:6, 37:24, 38:5, 38:20, 39:5, 39:6, 39:13, 40:1, 40:4, 40:6, 40:14, 40:22, 40:25, 42:2, 42:13, 43:2, 43:10, 45:7, 52:9, 52:15, 55:7, 56:5, 64:11, 67:8
**concentrations**
31:13, 37:18, 67:9
**concerned**
11:4, 20:15, 26:1
**concerning**
42:1
**concerns**
23:6, 24:17, 38:22, 40:24, 42:4
**conciliate**
57:12
**conciliated**
57:11
**conclude**
47:9
**concluded**
10:22
**conclusions**
66:19
**conclusive**
47:8
**confirmation**
46:4, 46:21, 47:1, 55:6
**confused**
9:9, 31:15
**connected**
43:10
**connections**
43:17
**consider**
34:12
**consideration**
28:13, 34:7
**considerations**
20:12, 28:3, 35:13
**considering**
26:2
**consolation**
61:23
**consolidated**
58:4
**constant**
32:1, 39:18
**construe**
44:23
**construed**
22:12, 25:16
**contain**
32:4, 69:9
**contained**
63:6
**contains**
44:25
**contemplating**
62:22
**contention**
49:22
**context**
10:20, 32:23, 54:24
**contrary**
55:24
**contrasting**
55:12
**coordination**
40:2
**correct**
3:1, 3:6, 3:7, 4:17, 6:22, 33:22, 35:17, 37:20, 45:20, 69:9
**correctly**
32:25
**corresponds**
30:14
**could**
15:6, 26:7, 27:16, 27:23, 35:15, 42:16, 48:14, 50:1
**couldn't**
47:8
**couldn’t**
20:4
**counsel**
2:11, 69:5
**counts**
57:18, 57:20
**couple**
41:25, 60:1, 61:19, 65:1
**coupled**
40:6
**course**
19:12, 32:24, 49:25, 57:9
**court**
1:12, 4:18, 6:24, 8:14, 8:15, 9:24, 10:8, 10:19, 13:12, 13:22, 15:17, 15:21, 17:15, 19:9, 19:24, 20:19, 21:1, 22:12, 23:2, 23:14, 24:5, 25:22, 26:18, 26:21, 27:2, 27:6, 28:20, 29:6, 29:16, 31:6, 32:8, 32:25, 34:7, 35:23, 36:10, 36:20,



Petitioner Fresenius Ex. 1008, 0024

37:13, 38:17, 38:23, 39:22, 42:8, 42:12, 43:13, 43:17, 44:4, 47:10, 48:3, 48:6, 48:10, 48:24, 49:18, 49:25, 51:19, 54:12, 54:13, 54:14, 57:12, 58:3, 59:11, 59:16, 61:1, 62:9, 62:20, 66:17, 66:19
**court's**
2:9, 15:10, 21:25, 22:7, 22:18, 25:19, 35:21, 37:2, 42:5, 42:25, 44:12, 50:7, 50:18, 51:4, 53:14, 62:15, 67:12
**courts**
36:23
**cousins**
55:19
**crank**
52:15
**crazies**
12:10
**criti**
38:13
**critical**
9:20, 11:3, 21:5, 23:11, 37:11, 37:24, 38:6, 38:8, 41:6, 42:10, 43:3
**criticality**
6:20, 9:10, 10:9, 10:15, 10:16, 13:24, 14:9, 14:12, 14:23, 21:10, 21:22, 22:3, 22:6, 22:19, 26:24, 27:3, 27:25, 32:21, 32:23, 32:24, 33:15, 33:19, 35:6, 35:15, 35:16, 35:22, 35:23, 35:24, 36:6, 36:7, 36:25, 37:11, 37:23, 38:13, 41:9, 41:15, 41:23, 42:25, 43:17, 47:10, 67:6, 67:24
**cross**
29:3
**crossed**
34:10
**curious**
47:7

**D**

**d**
31:15
**data**
63:25
**de**
29:22
**dealing**
35:7
**decided**
61:20, 66:24
**decides**
48:10
**deciding**
35:1
**decision**
25:19, 44:12, 58:4, 60:25, 61:20
**declare**
69:2, 69:13
**defendant's**
2:6
**definitely**
18:8
**degree**
15:11
**degrees**
27:20, 29:22, 29:23
**dels**
17:15
**demand**
10:3
**demonstrate**
32:21
**demonstrated**
38:18
**demonstrates**
37:24
**demonstration**
14:11
**described**
12:10, 12:25
**describes**
31:23
**describing**
11:6, 32:1
**description**
5:14, 7:19, 61:21, 62:10, 65:7
**descriptor**
3:14
**desirable**
37:16, 38:5, 67:6
**developing**
39:23, 53:9
**development**
53:6, 53:8
**dictates**
27:10
**difference**
5:10, 15:10, 29:19, 67:20
**differences**
58:15
**different**
4:4, 11:8, 11:12, 24:20, 24:22, 27:5, 27:7, 30:1, 32:4, 32:10, 41:5, 52:21, 52:23, 53:2, 53:3, 55:5
**differentiate**
58:18
**differentiating**
3:9
**differently**
12:2, 14:1, 15:1, 41:18
**dig**
27:20
**digits**
28:18, 29:4
**direct**
13:2, 36:22, 37:10, 49:9
**directed**
4:2, 7:24
**directing**
49:10
**directly**
39:7, 40:4
**dis**
25:6, 54:11, 57:5
**disagreements**
46:13
**disclose**
20:20, 57:7
**disclosed**
19:25, 22:5, 25:6, 29:22, 29:24, 30:6, 32:2, 44:1, 56:17, 56:19, 59:10
**discloses**
17:8, 18:21, 20:21, 36:17, 57:5
**disclosure**
8:12, 9:3, 14:19, 17:16, 18:20, 21:4, 21:7, 31:18, 31:22, 57:10,

66:5
**disclosures**
53:3
**discombinations**
58:23
**discreet**
28:21, 32:2
**discuss**
21:24
**discussed**
34:14
**discusses**
34:25
**discussing**
5:22, 11:10
**discussion**
55:3
**discussions**
49:6
**dispute**
36:15, 44:19, 66:6
**disputed**
49:21
**distinction**
8:25
**distinguish**
44:3
**distinguished**
43:4
**distinguishes**
29:15
**district**
2:9, 4:18, 6:24, 8:14, 8:15, 9:24, 10:7, 10:8, 10:19, 13:12, 13:22, 15:17, 15:21, 17:15, 19:9, 20:19, 21:25, 22:7, 22:12, 23:1, 23:14, 24:5, 27:2, 28:19, 29:6, 31:6, 32:8, 32:25, 35:21, 35:23, 36:10, 36:20, 37:2, 37:13, 38:17, 38:23, 39:11, 39:21, 42:3, 42:5, 42:8, 42:25, 43:13, 43:17, 44:4, 44:12, 47:10, 48:3, 48:6, 48:23, 49:18, 49:24, 50:7, 50:18, 51:4, 51:19, 53:13, 54:12, 54:13, 54:14, 59:11, 62:8, 62:9, 62:20, 66:17, 67:12
**disturbing**
6:19
**dix**
5:9, 8:17, 8:22, 9:5, 12:13, 15:15, 16:4, 16:6, 16:15, 17:8, 17:9, 17:15, 17:21, 18:1, 18:10, 18:18, 18:20, 18:21, 20:8, 20:20, 20:23, 21:5, 22:5, 22:17, 22:24, 30:12, 30:17, 31:16, 31:19, 31:20, 32:6, 45:5, 45:16, 46:4, 47:6, 47:7, 47:16, 47:24, 48:12, 58:25, 60:23, 61:4, 61:7, 61:8, 61:10, 61:24, 61:25, 62:8, 62:22, 62:24, 62:25, 63:5, 63:19, 63:23, 64:8, 64:10, 65:21, 66:21, 67:6
**dix's**
16:14, 19:19, 62:23, 63:8, 64:3
**dixalone**
5:4, 5:8
**dixlanta**
43:23
**doctor**
52:8
**doing**
25:23
**done**
14:22, 52:24
**dose**
5:11, 42:18, 42:23
**double**
39:4, 40:5
**down**
8:14, 27:14, 29:1, 52:7, 63:22
**dozen**
56:14
**dr**
24:24, 28:17, 29:2, 29:7, 29:10, 30:21, 30:22, 38:25, 39:3, 40:7, 40:9, 40:10, 43:9, 43:19, 44:24, 46:22, 46:24, 46:25, 48:24, 52:12, 53:13, 54:9
**draw**
36:20, 42:17, 43:5, 50:2
**drill**
5:18
**drive**
39:25, 40:1
**driving**
63:14
**dropgenetics**
3:3
**dropped**
64:11
**drug**
3:11, 3:14, 3:20, 3:22, 3:24, 6:3, 6:5, 6:7, 7:19, 9:1, 9:5, 12:14, 14:5, 23:11, 36:14, 36:17, 40:17, 41:6, 41:7, 43:7, 50:8, 50:9, 50:16, 50:22, 53:8, 53:10, 53:23, 54:6, 54:17, 57:10, 66:7, 67:2
**drugs**
6:1, 8:3, 27:18, 50:22, 53:11, 55:10, 55:18, 55:25
**dunk**
27:9
**durability**
42:11, 42:17

**E**

**e**
27:21
**each**
46:6, 64:4, 64:23
**earlier**
12:6, 37:1, 47:12
**early**
12:5, 35:3
**effect**
23:25, 39:16, 56:7
**efficacy**
25:14, 25:17, 42:5, 42:11, 42:15, 44:20

**eight**
59:22
**either**
44:22
**element**
25:24, 64:4
**elements**
25:11, 25:14, 63:18
**else**
11:23, 15:5, 21:10
**elyea**
18:3
**embodiment**
18:22, 36:2, 41:12, 61:15, 62:2, 62:11
**embodiments**
36:8
**emphasize**
26:7
**employed**
69:6
**ena**
66:4
**enabled**
15:13, 17:21
**enablement**
19:8, 20:6
**enabling**
8:12, 9:3, 11:6, 17:16, 19:24, 21:3, 21:7, 66:4
**encompass**
29:4
**encompassed**
28:18, 28:20, 31:3
**encourage**
46:23
**enough**
13:9, 16:7, 20:9, 23:9
**entitled**
47:11, 48:5
**epic**
7:16
**equally**
50:17
**error**
32:9, 65:18
**especially**
32:15
**espholi**
3:23
**essentially**
5:22, 45:4, 50:8
**establish**
14:23
**established**
8:1, 15:11, 24:10
**establishes**
23:10
**establishing**
14:9, 26:2
**etc**
11:16
**even**
8:5, 9:5, 10:16, 17:8, 19:15, 19:17, 20:21, 27:5, 27:22, 29:1, 29:14, 35:15, 35:22, 37:21, 52:23, 59:20, 65:25, 67:8, 67:11, 67:15
**event**
27:7, 69:11, 69:14
**ever**
50:3, 66:13
**every**
64:4
**everybody**
39:8, 39:12
**everything**
15:5, 20:17
**evidence**
18:24, 22:3, 22:6, 22:22, 37:16, 37:23, 38:12, 46:2, 49:25, 50:1, 53:7
**ex**
18:1, 65:8
**exact**
65:8
**exactly**
10:6, 22:10, 53:1, 56:16
**examination**
29:3
**example**
8:16, 13:1, 15:3, 15:10, 16:2, 17:19, 18:2, 19:11, 20:7, 21:2, 22:17, 34:5, 41:16, 51:19, 62:24, 62:25, 63:1, 64:3, 64:8
**examples**
8:11, 8:22, 16:14, 20:8, 45:6, 61:8, 62:24
**excuse**
40:8
**exhibited**
56:3
**existing**
13:11
**expanding**
27:21
**expands**
62:13
**expect**
53:15, 55:4, 56:4
**expectation**
55:8, 55:13, 58:16
**expectations**
54:7
**expected**
9:9, 24:13
**experience**
42:21
**experimentation**
19:14
**expert**
18:8, 19:2, 27:12, 28:17, 29:2, 29:10, 30:10, 45:17, 45:19, 45:20, 45:22, 49:7, 60:11, 64:14
**experts**
28:4, 28:16, 28:22, 30:2, 32:7, 40:15, 65:7
**explain**
38:15, 42:12, 52:8, 58:9
**explained**
28:10, 32:16, 34:5
**explains**
49:1
**expressed**
14:18, 16:15
**expressly**
29:11, 30:12
**extra**
39:5, 40:6
**extremely**
40:16
**eye**
5:25, 24:7, 24:13, 38:21
**eyeball**
40:20, 42:20
**eyes**
29:12, 34:6, 51:14
**eylea**
2:24, 3:23, 5:9, 8:21, 18:14

**F**

**f4**
25:20
**facie**
33:14, 34:3,

34:11, 34:15
**fact**
9:3, 11:24, 12:1, 18:12, 38:15, 45:23, 47:25, 51:6, 61:1, 66:7, 66:19, 67:11, 67:14, 67:17
**factor**
28:15, 32:17, 34:14, 34:25
**facts**
12:18
**faint**
16:9
**fair**
41:14, 51:6, 58:7
**false**
17:1
**far**
56:5
**fda**
45:8, 46:17, 46:21, 50:22
**fda's**
66:1
**features**
32:5
**federal**
1:12
**feel**
20:18
**fell**
8:14
**female**
2:4, 2:8, 2:13, 2:15, 2:18, 2:22, 3:1, 3:6, 3:8, 4:10, 4:17, 4:20, 4:24, 5:2, 5:6, 6:4, 6:6, 6:10, 6:15, 6:17, 6:22, 7:2, 7:8, 7:14, 9:11, 9:14, 9:21, 10:2, 10:5, 10:12, 10:18, 10:25, 11:19, 12:4, 12:20, 12:23, 13:21, 14:10, 14:20, 14:24, 15:5, 15:9, 15:20, 15:25, 17:14, 17:24, 18:1, 18:12, 18:19, 19:5, 20:14, 20:23, 21:12, 21:15, 21:18, 21:21, 21:23, 22:4, 23:7, 23:12, 23:22, 24:1, 24:3, 26:6, 26:11, 26:14, 59:25, 60:13, 63:16, 64:16, 64:18, 65:1, 65:11, 65:14, 65:17, 66:15, 66:18
**figure**
18:21
**final**
47:12, 50:5
**financial**
69:7
**find**
27:16, 35:23
**finding**
14:2, 17:7, 20:20, 23:2, 35:21, 39:16, 39:20, 40:3, 40:23, 42:24, 42:25, 43:15, 48:7, 51:6, 53:18, 53:19, 54:14, 54:20
**findings**
13:12, 19:9, 21:25, 22:7, 29:7, 35:24, 36:23, 36:25, 37:12, 42:5, 42:7, 50:19, 50:20, 51:4, 53:14, 66:19, 67:12
**fine**
26:14
**finger**
45:13
**first**
5:7, 10:11, 10:14, 10:16, 14:11, 23:13, 27:4, 27:24, 37:15, 39:3, 60:3
**firstly**
38:1
**five**
3:18
**flag**
46:18
**flipping**
20:19
**focus**
9:17, 47:16, 51:5
**focused**
8:15, 16:1, 17:15, 22:7, 26:19, 62:10
**focusing**
51:12
**follow**
19:11, 20:7
**form**
3:4
**formu**
25:2
**formulation**
3:4, 3:11, 3:12, 3:20, 4:1, 4:3, 5:10, 5:23, 5:24, 7:23, 8:21, 9:19, 17:11, 18:14, 18:20, 19:6, 20:10, 20:24, 25:9, 39:7, 39:23, 49:4, 49:5, 63:5, 63:6, 64:12, 66:21
**formulations**
4:3, 4:14, 8:21, 12:13, 19:13, 19:18, 19:20, 22:16, 22:24, 25:2, 46:4, 63:19
**forth**
64:23
**forward**
14:11, 20:2, 24:19
**found**
7:5, 7:11, 9:24, 28:20, 31:6, 32:8, 33:1, 38:17, 39:21, 40:20, 42:2, 42:8, 42:22, 43:13, 43:17, 49:18, 51:20, 57:12, 67:11, 67:13
**four**
30:25, 61:16
**frankly**
46:5
**fraser**
56:18, 56:24, 57:4, 57:5, 58:25
**frazier**
5:5
**frazion**
5:15
**frequency**
42:18
**friend**
21:25, 26:18, 45:13, 54:19, 58:22, 60:11, 65:5, 65:9
**front**
59:9

**fu**
30:6
**full**
13:15, 19:24, 27:9, 61:5, 69:9
**fundamental**
15:16, 29:14
**fundamentally**
11:12
**furfine**
38:25, 39:3, 43:9, 43:19
**further**
10:24, 52:7, 61:18, 69:13
**furthermore**
19:15, 25:10
**fusion**
16:7, 30:6, 30:14, 30:18, 30:25, 31:3, 31:12, 31:13, 31:23, 54:21, 61:12, 61:14, 61:16, 62:2, 62:14, 62:18

**G**

**gadrell**
36:16
**gap**
41:21, 41:25
**gave**
21:5
**gentic**
42:16
**genus**
9:22, 10:22, 10:23, 11:5, 13:5, 22:21, 28:2, 30:6, 30:8, 30:14, 31:11, 31:12, 31:13, 31:23, 32:1, 32:3, 34:6, 34:13, 34:16, 34:20
**getting**
11:14, 12:18, 14:15, 15:18, 42:19, 43:22
**give**
9:6, 15:3
**gives**
59:23
**go**
10:23, 14:3, 16:24, 17:5, 21:12, 23:13, 25:18, 28:25, 35:16, 53:9, 61:10, 62:21, 62:23, 63:1, 63:22, 64:7, 64:22
**godrell**
49:17
**goes**
28:14, 29:13, 57:17
**going**
9:6, 13:7, 13:8, 13:23, 19:18, 19:19, 21:20, 22:24, 22:25, 23:18, 23:19, 25:2, 25:4, 25:8, 25:12, 26:9, 39:13, 50:16, 60:19, 60:21, 61:20, 66:21, 66:22, 67:3
**gone**
58:11
**good**
2:4, 2:7, 13:9, 17:23, 26:16, 26:17
**gotten**
58:1
**graham**
39:1, 40:9, 40:10, 43:19, 46:22, 46:24, 46:25
**guess**
19:5, 41:1, 50:5, 64:12
**gutter**
5:5

**H**

**half**
24:6, 24:10, 24:13, 25:3, 38:20, 39:5, 39:14, 40:1, 40:5, 40:6, 42:4, 42:18, 42:23, 43:11, 56:14
**hands**
11:23
**happen**
19:22
**happening**
67:1
**happens**
37:6
**happy**
28:1
**hard**
4:21, 7:4
**has-**
7:7
**head**
34:22
**heading**
54:23, 61:11, 61:25
**heard**
45:4, 58:23
**heavily**
48:24
**held**
21:1
**help**
46:14
**helpful**
51:1
**here**
5:23, 7:18, 8:14, 9:2, 11:20, 12:12, 12:14, 13:12, 15:16, 17:16, 17:21, 20:5, 20:8, 21:19, 21:20, 22:8, 22:11, 22:22, 23:16, 24:3, 25:13, 27:8, 27:10, 28:2, 28:9, 29:15, 29:25, 31:11, 31:21, 32:25, 35:24, 36:15, 36:18, 37:4, 39:20, 41:4, 45:10, 54:19, 54:20, 55:3, 57:18, 58:19, 58:23, 61:2, 61:7, 62:7, 62:11, 62:19, 64:5
**here's**
61:13, 62:18
**hereby**
69:2
**high**
67:8
**higher**
24:12, 52:4, 52:12, 55:6
**histidine**
3:15, 4:6
**hit**
11:7, 23:3
**hole**
51:7
**holesh**
24:11
**honor**
2:4, 8:19, 19:6, 21:16, 23:12, 26:6, 26:15, 28:1, 29:9, 30:9, 34:22, 35:3, 37:20, 38:14, 38:16, 41:25, 43:7, 44:18,

45:12, 46:9, 48:7, 48:22, 56:11, 60:1, 64:20, 65:2, 66:5, 68:1
**honor's**
36:23, 50:21
**honors**
42:19, 46:23, 58:14, 59:19
**hope**
59:23
**hours**
67:3
**housekeeping**
2:12, 47:22
**however**
3:25, 13:10, 16:5, 16:10
**hundreds**
28:20
**hundredths**
27:14, 27:22, 28:19, 29:1, 29:5, 60:4, 60:15, 60:20, 60:22

**I**

**idea**
52:17, 63:16, 67:23
**identical**
4:13, 8:23, 53:17, 61:24, 64:2
**identified**
15:22, 56:15
**identity**
29:20
**ignored**
62:12
**imagine**
42:19
**important**
6:11, 28:3, 28:12, 34:7, 46:18
**impressed**
46:5
**improve**
39:13
**inc**
1:9, 1:10
**include**
60:14
**includes**
19:19, 61:14
**increase**
39:13, 39:18
**increases**
40:13, 40:21
**incumbent**
32:20, 33:18
**indicates**
41:4
**indicative**
49:4, 51:17
**ineos**
11:16, 11:22, 32:15, 67:22
**inferences**
67:24
**inflammation**
22:9, 56:3
**inform**
53:9, 54:6
**information**
69:5
**informed**
53:15
**infringement**
2:9
**ingredient**
3:10, 19:12
**ingredients**
3:13, 3:19, 3:20, 4:1, 8:23, 12:14, 18:2, 18:15, 22:15, 63:2, 64:3, 64:13
**inherency**
45:25
**inhibit**
52:5
**initial**
11:15
**injected**
40:19
**injection**
25:9, 42:20
**inquiry**
38:4, 41:15
**inside**
11:17, 12:1, 12:3, 32:19
**insight**
39:22, 39:24, 39:25
**instance**
7:16, 8:5
**instances**
8:23
**integers**
27:20
**interchanged**
50:9, 50:12
**interest**
69:7, 69:13
**interpreted**
11:2
**interrelated**
62:17
**interrupt**
9:8
**intra**
43:24
**intravitreal**
3:4, 5:24, 8:17, 16:4, 22:13, 22:16, 25:8, 43:25, 44:21
**intravitreally**
45:1
**invalidity**
54:25
**invention**
19:21, 29:20, 37:17, 38:7, 38:8, 38:9, 41:17, 41:18, 43:3, 43:4, 62:14
**inventors**
24:24, 38:19, 38:25, 39:22, 40:20, 42:2, 43:10
**involve**
12:15, 32:23
**involves**
25:24
**involving**
57:13
**issue**
11:3, 13:4, 19:6, 21:5, 26:8, 29:14, 63:14, 67:5
**issued**
61:1
**issues**
4:15, 5:7, 6:18, 9:22, 10:9, 13:22, 15:19, 46:15
**itself**
9:4, 19:16, 25:7, 43:18

**J**

**janson**
25:19
**jensen**
66:23
**jives**
38:12
**job**
1:23
**judgments**
2:10
**justify**
19:8, 20:6

**K**

**keep**
48:14, 59:20
**key**
39:22, 39:24, 39:25

**kind**
4:21, 15:11, 23:3, 25:3, 32:21, 39:17, 45:24, 49:9, 50:14, 55:15
**kinds**
27:17
**kle**
40:7
**kleeh**
38:17, 40:8
**kleeh's**
40:23
**knew**
39:8, 39:12
**know**
5:25, 11:16, 12:5, 12:9, 13:1, 13:6, 13:13, 16:17, 16:22, 17:17, 18:13, 19:10, 20:18, 21:8, 21:15, 21:17, 23:21, 23:22, 25:6, 25:22, 26:7, 27:9, 27:21, 30:20, 34:12, 34:21, 35:2, 36:3, 45:8, 46:12, 47:21, 48:15, 52:24, 53:1, 54:17, 56:14, 60:23, 64:21, 65:5, 65:14, 66:9, 67:2, 67:6
**knowledge**
8:3, 24:14, 41:8
**known**
8:1, 24:9, 46:17, 46:21
**krause**
58:21

**L**

**lack**
15:22
**language**
61:24
**large**
28:17
**larger**
27:8
**last**
57:12, 57:21, 58:20
**later**
11:6
**lathea**
16:25
**law**
6:25, 10:1, 12:22, 33:5, 33:8, 33:11, 33:23, 33:25, 36:5, 66:19
**lawyers**
46:12
**laze**
16:19
**lead**
20:4
**leading**
53:4
**leads**
17:10
**least**
18:22
**leaves**
51:8
**legal**
12:24
**legally**
66:12, 66:14
**less**
17:19, 20:25, 52:4
**let's**
14:17, 17:1, 63:1
**letter**
58:6
**letters**
58:9
**level**
65:20
**levels**
45:7
**li**
36:11
**lieu**
2:14
**life**
23:4, 24:7, 24:10, 24:13, 25:3, 38:20, 39:6, 39:14, 40:1, 40:5, 40:6, 42:4, 43:11
**likely**
19:2, 45:18
**likewise**
67:22
**limit**
20:22
**limitation**
17:7, 17:12, 20:21, 44:20, 44:25
**limitations**
23:3
**limited**
9:2
**line**
55:20
**linear**
39:18
**lines**
19:17, 26:3, 31:21, 61:13, 61:19
**linkage**
37:10
**linked**
31:9
**liquid**
19:18, 63:6
**list**
6:14, 19:12, 22:15
**listed**
69:11
**little**
9:9, 52:7, 67:23
**locate**
54:2
**long**
47:5, 65:4
**look**
3:25, 8:20, 8:21, 10:16, 10:21, 11:1, 11:22, 12:7, 14:3, 18:17, 22:18, 23:13, 25:12, 28:24, 28:25, 37:6, 41:11, 46:23, 64:10, 66:1
**looking**
10:9, 10:10, 16:12, 19:20, 53:7, 54:12, 62:20, 67:1
**lot**
4:15, 36:5, 46:15
**lower**
52:10, 56:5, 56:7, 67:8
**lucentis**
2:20, 3:4, 3:15, 3:16, 3:17, 3:22, 5:16, 5:23, 42:16, 56:3, 56:18, 56:24, 57:4, 57:9, 58:25
**lying**
59:12

**M**

**made**
13:12, 19:9, 20:5, 20:24, 20:25, 25:11, 29:6, 31:24, 34:11, 35:23, 46:19, 47:10, 65:20

**main**
5:17, 35:12
**maintaining**
58:25
**make**
11:9, 12:24, 13:15, 14:2, 19:13, 20:11, 46:10, 48:7, 54:14, 59:15, 65:2
**makes**
23:2
**making**
10:4, 20:19
**male**
6:2, 6:5, 6:9, 6:11, 16:23, 17:4, 17:22
**many**
48:17
**march**
63:22
**mark**
16:20
**marketed**
4:4
**marks**
13:2
**matching**
64:23
**matter**
27:23
**max**
56:6
**maximize**
24:6, 38:20
**maximizing**
23:3
**maybe**
13:5, 13:8, 19:2, 48:18, 52:22
**mean**
4:25, 6:18, 10:16, 15:4, 19:1, 27:19, 34:23, 36:5, 41:10, 44:8, 48:14, 49:8, 51:11, 54:15, 55:21
**meaning**
32:16
**meaningful**
45:9
**means**
44:25, 60:21, 62:13
**meant**
22:14
**mechanis**
51:16
**mechanism**
50:23, 51:16, 53:12, 53:17, 53:20, 53:21, 55:11, 55:25
**med**
66:7
**meet**
25:17
**meets**
15:9, 64:4
**mentioned**
43:7, 58:19
**mentioning**
8:6
**mg**
9:19, 16:2, 17:8, 18:4, 18:9, 20:7, 20:8, 20:22, 20:24, 22:23, 23:2, 24:5, 30:3, 30:5, 32:18, 37:10, 38:5, 38:9, 38:19, 42:8, 42:13, 43:1, 43:11, 45:5, 56:4, 63:4, 64:3, 64:8, 64:9, 64:10, 67:9
**mgs**
17:21
**middle**
37:19
**might**
14:4, 50:15, 53:24
**milli**
63:10
**milligrams**
16:3, 52:10, 52:16, 52:18, 62:12
**milliliter**
9:19, 20:22, 30:3, 30:5, 32:19, 37:11, 38:20, 42:8, 42:13, 43:1, 43:11, 45:6, 52:11, 52:18, 56:4
**millimi**
63:7
**millimoles**
63:7, 63:8, 63:10, 63:11
**million**
27:13
**millions**
27:23
**mind**
23:8
**minimize**
24:6, 40:23
**minimizing**
23:5, 24:16, 38:21
**missing**
63:18
**mistaken**
55:15
**ml**
16:3, 18:4, 22:23, 23:2, 63:4, 64:10, 67:9
**mm-hmm**
4:9, 40:18, 59:17
**molecule**
24:8
**molecules**
51:15
**moment**
14:18, 32:14, 34:14, 53:24
**money**
2:20
**more**
16:17, 16:18, 18:3, 18:5, 24:11, 29:14, 30:9, 32:2, 45:1, 49:6, 51:20, 52:3, 52:14, 54:16, 57:20, 58:11, 61:17
**moreover**
14:12, 52:1
**morning**
2:4, 2:7, 26:16, 26:17
**most**
19:2, 45:17, 45:18, 62:19
**motivated**
52:9, 52:15
**motivation**
57:11, 58:17
**motivations**
66:1
**much**
8:15, 11:7, 27:8, 51:20, 52:3, 59:18, 68:1
**multiple**
43:16
**mylan**
1:10, 2:3, 2:5, 43:14, 46:19, 46:25, 49:19, 50:3, 59:11, 69:21
**mylan's**
28:17, 29:2,

30:10, 47:17
**myopic**
16:11

**N**

**n**
45:9
**naaden**
1:25, 69:2, 69:18
**nabel**
13:1
**nacl**
63:10, 63:11
**named**
24:24
**native**
46:20, 47:1, 55:5
**nature**
8:11, 41:9
**nd**
63:8
**near**
64:2
**necessarily**
17:10, 46:2, 50:16, 55:21, 60:15
**necessary**
59:21
**need**
20:18, 22:14, 27:2, 35:21, 35:22, 47:21, 51:3, 53:24, 56:5, 59:24, 65:25
**needed**
21:3, 52:5
**needs**
34:11, 65:19
**negative**
46:3
**neither**
56:21, 57:2, 69:5
**never**
21:1, 24:19, 44:2, 44:22, 47:10
**nevertheless**
17:20
**new**
13:17, 15:11
**news**
11:13
**next**
2:2, 10:12, 53:20, 57:17, 58:8, 61:18
**non-infringement**
26:8
**none**
25:10
**nonetheless**
60:18
**nothing**
17:9, 25:1, 27:15, 45:1
**notion**
45:15
**number**
13:20, 16:13, 16:19, 18:23, 19:19, 31:3, 50:20, 58:15, 60:19, 60:21, 61:8, 61:10, 61:17, 62:4, 64:6, 64:9
**numbers**
16:18, 28:25, 64:8
**numerically**
60:14

**O**

**objected**
59:8
**objection**
59:17
**obligate**
47:2
**obtain**
37:17
**obvious**
5:8, 58:22
**obviously**
4:11, 7:25, 9:24, 65:15
**obviousness**
5:1, 5:3
**odd**
49:9
**offered**
23:14, 45:22
**often**
42:23, 46:6
**oh**
14:3, 44:11, 51:5, 51:7, 57:16, 62:21
**okay**
4:15, 5:2, 14:20, 16:24, 17:3, 17:5, 18:6, 20:14, 21:21, 26:4, 26:11, 34:1, 35:14, 35:19, 41:20, 44:14, 44:17, 48:19, 50:25, 51:5, 54:1, 54:17, 55:2, 58:13, 59:20, 64:24, 65:13, 65:16
**once**
15:16, 19:11, 20:6, 66:3
**one**
5:5, 5:9, 5:18, 6:1, 6:7, 6:11, 7:6, 7:9, 7:10, 7:11, 7:13, 7:15, 8:13, 10:7, 13:21, 15:9, 15:25, 18:4, 19:25, 20:16, 21:13, 24:14, 28:3, 32:17, 33:1, 35:6, 36:16, 38:16, 42:1, 43:9, 44:16, 45:12, 46:4, 48:18, 50:13, 51:17, 52:21, 53:15, 55:21, 61:3, 62:10, 65:3, 65:6, 65:24
**ones**
3:13, 7:15, 62:19
**only**
5:10, 8:25, 9:4, 15:25, 17:19, 20:15, 22:14, 31:16, 38:8, 38:9, 42:23, 44:8, 49:5, 49:19, 49:23, 62:9, 67:8
**opening**
46:16, 59:13
**operability**
23:11, 38:6, 41:6, 41:11
**operate**
11:8, 41:18
**opinion**
4:19, 37:2, 44:15, 58:10
**opioids**
7:24, 7:25, 8:6
**opposed**
60:7
**opposite**
46:25, 65:8
**oral**
69:20
**order**
21:3, 49:24, 53:9, 56:5, 56:6
**ordinary**
8:8, 13:3, 13:14, 21:6, 60:5, 60:16, 60:18, 65:24
**originally**
25:6

**ortherem**
34:24
**other**
5:5, 5:19, 6:7, 7:6, 7:11, 9:16, 15:18, 15:22, 15:25, 19:13, 26:19, 26:21, 27:11, 29:16, 30:18, 32:10, 33:1, 36:8, 36:14, 37:17, 38:7, 41:7, 41:12, 43:8, 44:16, 45:4, 45:6, 45:14, 46:6, 46:10, 50:13, 51:18, 52:20, 55:22, 57:25, 58:22, 63:18, 64:5, 65:1
**others**
29:18, 38:10
**otherwise**
9:24, 69:8
**out**
9:25, 18:21, 22:24, 26:13, 28:18, 30:15, 31:16, 34:11, 35:3, 38:2, 43:8, 45:17, 54:16, 60:2, 60:8, 64:19, 66:6, 66:25, 67:5
**outcome**
25:4, 64:13, 69:8
**outcomes**
67:19
**over**
53:13, 59:22, 59:23
**overlapped**
34:4
**overlapping**
28:13, 29:16, 32:11, 32:24, 34:13
**overlaps**
33:17
**own**
24:21, 30:10
**owner**
32:20, 33:19

**P**

**pad**
4:2
**page**
2:14, 3:2, 4:18, 8:20, 19:10, 37:12, 38:15, 40:9, 46:19, 49:20, 51:21, 54:12, 59:4, 69:11
**pages**
1:24, 51:12, 53:13, 69:8
**paid**
49:5
**pain**
7:21, 8:4
**pam**
7:9
**paragraph**
51:25
**parameter**
32:12
**part**
28:8, 28:9, 44:4, 44:10, 47:15
**particular**
9:5, 13:3, 13:17, 17:10, 17:11, 23:10, 25:10, 25:13, 39:25, 40:24, 53:1, 62:21
**particularized**
17:12
**particularly**
15:16, 63:20
**parties**
43:5, 44:20, 69:6
**party**
20:1, 44:23
**passage**
31:20, 44:18, 55:19
**patent**
7:13, 9:4, 9:18, 19:15, 24:25, 32:20, 33:18, 38:25, 48:4, 61:22, 62:1, 62:7, 62:24, 63:1, 63:4, 63:9, 63:11, 63:24, 64:7
**patentee**
33:15, 35:2
**patient**
13:20
**patients**
42:21, 42:23
**pattern**
11:24, 12:2
**patterns**
61:23
**peculiar**
36:1
**penalty**
69:3
**percent**
17:6, 18:3, 18:5, 18:10, 18:13, 18:23, 19:3, 20:21, 20:24, 20:25, 45:2, 45:4, 45:7, 45:8, 45:9, 45:15, 46:3, 46:16, 46:20, 47:1, 63:12, 64:1, 65:22
**perform**
14:5, 22:24, 53:16
**performance**
41:11, 51:17, 51:18, 53:14, 54:6
**performed**
56:1
**performs**
14:1, 22:8
**perhaps**
46:9, 52:14, 58:5
**perjury**
69:3
**person**
8:8, 13:2, 13:13, 15:12, 21:6, 28:11, 60:4, 60:16, 60:18
**perspective**
12:24, 28:10, 60:4
**peter**
12:6
**ph**
2:5, 3:16, 5:4, 5:15, 5:19, 7:9, 12:7, 13:1, 14:16, 16:9, 16:19, 16:25, 17:15, 22:14, 24:2, 25:19, 28:15, 28:17, 33:13, 34:6, 34:24, 36:16, 48:25, 58:21, 63:25, 66:23
**pharma**
7:16, 9:16
**pharmaceutical**
4:2, 4:3
**pharmaceuticals**
1:9, 1:10, 2:3, 69:21
**pharmacogenetics**
39:19
**phenomenon**
40:16

**phoning** 54:19
**phosphate** 4:7, 63:7, 63:8
**pin** 25:20
**place** 10:17, 28:19, 29:5
**placed** 14:8
**planned** 25:7
**pleasant** 42:20
**please** 2:5, 2:7, 26:17
**plus** 59:23
**point** 8:19, 11:21, 11:25, 14:13, 24:18, 29:8, 30:10, 43:8, 46:10, 46:16, 46:18, 48:18, 50:6, 50:21, 55:24, 58:14, 58:20, 59:16, 60:2, 60:7, 60:8, 65:4, 66:6, 66:11, 67:5
**pointed** 28:18, 35:3, 37:1, 45:17
**points** 41:19, 65:1
**polymers** 11:3, 17:17
**polysorbate** 3:17, 4:11, 63:12
**posep** 34:6
**poser** 51:14, 52:8, 53:7, 53:15, 55:4, 56:2
**poser's** 54:7
**position** 50:3, 55:16, 55:17
**possibilities** 13:7
**possibility** 13:20
**potenc** 24:12
**potency** 24:12, 52:4, 52:12
**potent** 49:6, 52:3, 54:17
**potentially** 28:21
**ppm** 29:24, 29:25
**practice** 20:3, 21:2
**preamble** 43:23, 44:2
**preambles** 44:13
**precedent** 34:8
**precise** 29:8, 31:4, 42:1
**precisely** 33:25, 46:24
**precluded** 59:11
**prefer** 16:17, 62:19
**prefera** 16:17
**preferably** 16:17, 16:18, 61:17
**prefered** 61:15
**preference** 61:9
**preferences** 16:15, 16:16
**premise** 50:12
**presume** 58:3
**presumed** 19:24
**pretend** 17:1
**previously** 22:16
**pri** 12:20
**prima** 33:13, 34:2, 34:10, 34:15
**prior** 3:3, 5:15, 5:17, 7:10, 7:12, 7:20, 8:6, 10:12, 11:17, 11:25, 12:3, 13:25, 19:23, 24:9, 29:19, 30:2, 31:9, 32:12, 32:19, 33:18, 34:17, 34:19, 35:8, 36:9, 36:17, 41:2, 41:8, 41:13, 42:15, 43:4, 43:20, 44:3, 49:18, 50:2, 58:18, 66:7, 66:21
**priority** 48:5
**pro** 14:15, 40:12
**probably** 7:6
**problem** 8:18, 15:16, 16:10, 22:11, 47:9, 56:12
**proceed** 2:6
**product** 4:5, 23:11, 41:7
**pronounce** 6:2
**propensity** 40:10, 40:12, 40:21
**proper** 47:24, 59:14
**properties** 42:11
**property** 22:20, 67:13
**proposed** 44:23, 49:23, 49:24, 66:18
**protein** 16:7, 30:4, 30:11, 55:5, 61:16, 62:3, 62:14
**proteins** 30:7, 30:15, 30:18, 30:25, 31:3, 31:12, 31:13, 31:23, 32:4, 54:22, 61:12, 61:15, 62:18
**provide** 49:7
**provision** 47:12
**provisional** 48:5
**proxy** 50:9
**public** 14:14
**publication** 24:11
**pull** 64:19
**purdue** 7:16, 9:15
**purposes** 12:11, 55:17

**put**
8:16, 16:3, 22:1, 22:2, 32:13, 38:1, 38:2, 45:12, 50:5, 67:16
**putting**
32:17
**Q**
**qual**
14:15
**question**
2:12, 4:25, 10:11, 10:14, 11:15, 11:21, 21:14, 22:2, 23:8, 27:11, 33:16, 34:9, 34:21, 41:1, 46:11, 48:10, 48:12, 58:8
**questions**
4:23, 6:19, 26:21, 48:15
**quick**
21:13, 65:3
**quid**
14:15
**quite**
17:18, 19:3, 25:15, 52:13
**quoted**
38:17
**R**
**ra**
35:9
**raise**
58:20, 59:6
**raised**
6:19, 46:15
**range**
5:11, 7:6, 7:9, 7:13, 9:5, 9:6, 9:25, 10:13, 11:17, 11:18, 11:21, 11:25, 12:1, 12:3, 12:15, 13:11, 13:15, 13:25, 15:5, 22:4, 25:5, 28:5, 28:7, 28:12, 28:17, 28:24, 29:3, 29:12, 29:14, 29:20, 29:21, 29:22, 29:24, 29:25, 30:2, 30:4, 30:6, 30:13, 30:19, 31:9, 31:22, 32:11, 32:12, 32:19, 33:17, 33:18, 34:4, 34:12, 34:17, 35:9, 36:9, 41:13, 41:19, 60:6, 60:7, 60:8, 60:22
**ranges**
28:13, 29:16, 32:24
**ranibizumad**
6:4, 14:4, 14:5, 22:9, 52:4, 52:6, 52:11, 53:8, 53:15, 54:21, 55:8, 57:10, 66:7, 66:23
**rather**
32:3
**rationale**
51:4
**raveno**
28:17, 29:2, 30:21, 46:6
**raveno's**
29:7
**reach**
48:10, 48:11
**reaching**
8:10
**read**
27:5, 27:6, 32:14, 44:12
**reading**
33:25, 62:1
**really**
5:10, 10:1, 12:9, 12:10, 16:1, 37:3, 45:9, 52:17
**reas**
10:7
**reason**
7:25, 47:16, 58:9
**reasonable**
55:8, 58:16
**reasons**
10:8, 15:22, 33:1, 41:25
**rebuttal**
26:5
**recall**
52:20
**received**
69:10
**recent**
25:19
**recently**
61:1
**receptor**
31:25
**record**
18:24, 35:24, 37:15, 41:4, 41:22, 44:5, 49:1, 50:1
**recordings**
69:4
**records**
27:16
**redundant**
48:18
**reference**
5:15, 5:18, 5:20, 8:6, 8:9, 15:23, 20:16, 30:12, 31:16, 31:19, 31:20, 32:6, 36:16, 42:17, 43:6, 45:16, 47:24, 48:25, 49:1, 49:16, 49:17, 56:21, 57:2
**referenced**
43:6, 51:13
**references**
5:18, 5:21, 19:23, 59:1, 59:14
**referring**
5:13, 31:20, 33:12, 44:19
**refers**
31:22
**reflected**
22:6
**refreshing**
46:8
**regarding**
35:24, 42:4, 42:6, 54:7, 69:10
**regeneron**
1:9, 2:3, 4:12, 5:12, 7:18, 14:10, 14:22, 14:24, 19:8, 19:25, 22:2, 23:16, 24:19, 25:14, 26:18, 61:21, 63:17, 66:9, 69:20
**regeneron's**
3:5, 29:10
**region**
32:1
**regions**
31:25
**rejected**
67:22
**related**
57:13, 69:6
**relating**
61:22
**relative**
22:8, 34:19

**relevance**
50:20, 58:10
**relevant**
17:18, 61:2, 65:21, 66:12, 66:14
**reliance**
47:7
**relied**
44:5, 48:24
**rely**
51:9
**relying**
43:23, 44:12, 52:21
**remains**
41:2
**remarks**
26:19
**remedy**
2:9
**remember**
65:5
**rends**
2:20
**reply**
46:20, 49:21
**report**
2:5, 7:22, 42:22, 48:1, 66:17
**represented**
46:25
**required**
32:25, 37:22, 55:6
**requirement**
46:17, 46:21, 47:2
**requiring**
25:16
**residues**
62:5
**respect**
6:25, 27:18, 42:14, 58:15
**respond**
27:12, 27:24
**response**
46:10, 65:10
**responses**
45:11
**responsibility**
57:23
**restore**
26:4
**result**
25:5, 48:11
**results**
23:18, 23:19, 26:3, 36:4, 42:6, 64:9
**retina**
50:24
**revolutionary**
42:22
**rhetoric**
59:5
**right**
2:21, 3:2, 7:8, 7:14, 9:21, 10:2, 10:5, 10:6, 10:18, 10:25, 11:18, 12:4, 12:23, 18:19, 19:5, 20:12, 20:23, 21:23, 23:7, 23:12, 28:8, 29:20, 31:17, 33:10, 35:10, 35:13, 37:5, 37:8, 37:18, 37:25, 38:3, 39:9, 39:10, 44:8, 44:9, 44:10, 45:19, 47:8, 47:14, 48:1, 48:7, 49:11, 54:7, 56:10, 56:16, 56:25, 57:8, 59:8, 63:16, 65:11, 67:25
**risk**
22:9
**roadblocks**
35:5
**role**
50:9
**room**
41:2
**routine**
19:14
**ru**
58:24
**run**
53:24, 58:24
**running**
26:13, 58:23
**rusheg**
12:6

S

**safety**
42:4, 42:11, 42:14
**said**
5:7, 7:22, 9:10, 10:19, 11:10, 14:2, 15:17, 16:1, 16:5, 16:16, 19:2, 19:10, 27:2, 29:12, 31:18, 39:4, 45:17, 46:20, 46:24, 47:1, 60:13, 65:5, 65:8, 65:9, 66:10, 67:15
**salt**
4:12
**same**
3:2, 3:15, 3:16, 3:17, 4:12, 8:24, 12:2, 12:14, 18:2, 23:5, 23:18, 23:19, 26:20, 30:23, 32:11, 38:15, 40:8, 51:15, 52:5, 53:11, 53:19, 53:21, 53:22, 55:5, 55:11, 55:22, 55:25, 58:4, 60:15, 60:18, 61:19, 61:24, 61:25, 63:3, 63:24, 64:8, 64:9, 64:12, 64:13, 67:18, 67:19
**samsung**
57:13, 60:25, 61:20
**saw**
19:1, 44:4, 44:5
**say**
3:2, 6:12, 9:12, 10:1, 15:7, 17:3, 18:8, 19:17, 20:2, 23:15, 23:16, 24:4, 24:19, 24:21, 25:1, 30:24, 30:25, 35:11, 35:15, 39:24, 44:9, 45:4, 52:22, 54:3, 55:20, 59:5, 62:11, 62:21, 66:13, 67:2, 67:3
**saying**
12:9, 24:5, 52:17, 63:17
**says**
2:20, 5:11, 9:4, 10:21, 30:12, 34:8, 37:15, 37:19, 39:3, 41:16, 51:25, 52:7, 54:15, 60:24, 61:13, 62:2, 63:4, 63:5
**scattered**
4:23

**scenario**
30:1, 32:10, 53:1
**scope**
13:15, 19:25, 22:23, 25:12, 27:21, 27:23
**screen**
21:11
**scudro**
48:25
**second**
23:16, 51:24
**section**
12:11
**see**
7:2, 8:9, 11:23, 13:21, 16:2, 37:3, 41:4, 48:25, 49:5, 50:11, 51:5, 60:19, 60:20, 60:21, 60:22, 65:18
**seeing**
22:20
**seem**
11:16, 38:4, 55:20
**seemed**
51:13
**seems**
15:19, 27:19, 36:1, 36:6, 45:23, 48:23, 55:15
**select**
12:16, 13:7
**selected**
11:11, 42:2
**sense**
7:18, 8:8, 53:3
**sentence**
38:16
**sequece**
16:19
**sequence**
16:8, 16:14, 16:18, 30:16, 56:17, 57:8, 58:17, 61:5, 61:8, 61:10, 61:17, 61:22, 62:4, 62:6
**sequences**
30:17, 32:3
**set**
19:17
**sets**
30:11
**setting**
35:5
**several**
33:1, 37:14
**severe**
56:3
**shans**
5:19
**shifts**
33:14, 35:1
**should**
6:12, 14:22, 14:24, 20:1, 20:18, 25:16, 25:25, 58:3, 58:5
**shouldn't**
26:1, 58:1
**show**
9:18, 13:25, 18:23, 22:3, 23:9, 27:2, 27:16, 32:21, 33:15, 33:19, 35:22
**showing**
22:22, 33:13, 37:22
**shown**
14:25, 38:8
**shows**
2:19, 2:23, 37:16, 43:1
**side**
14:8, 26:19, 32:14, 32:17, 45:4, 45:14, 57:25, 58:22
**sides**
28:4, 28:16, 31:6, 32:8, 40:16, 68:3
**sight**
65:18
**signature-5tmlq**
69:15
**simil**
51:15
**similar**
7:17
**similarity**
52:22
**similarly**
49:8, 56:1, 62:23
**simply**
34:3
**single**
13:8, 62:6
**situation**
7:17, 12:12, 13:10
**size**
27:3, 27:4, 27:7, 27:9, 27:10, 27:11, 28:2, 28:12, 29:13, 34:5, 34:12, 34:17, 34:19, 35:8
**skill**
8:8, 13:3, 13:14, 21:6, 28:11, 60:5, 60:17, 60:19, 65:24
**skilled**
8:2, 15:13, 24:14
**slum**
27:9
**small**
28:5, 28:6, 28:7, 29:11
**sodium**
4:6, 4:13
**some**
4:22, 6:19, 9:16, 12:5, 14:11, 14:13, 15:18, 22:20, 23:3, 25:3, 26:4, 29:15, 32:21, 36:14, 39:17, 46:12, 52:22, 55:20, 56:12, 64:19, 67:13
**somebody**
18:8
**somehow**
14:1, 20:2, 26:2, 63:18, 67:25
**something**
10:22, 14:25, 15:12, 18:23, 18:25, 19:1, 21:10, 23:9, 23:17, 32:18, 41:5, 47:19, 51:3, 52:21, 58:1, 62:16, 62:22, 65:5
**sorry**
9:8, 30:23, 34:20, 40:11, 42:16, 47:4, 48:17, 57:5
**sort**
9:25
**speak**
12:16
**spec**
24:25
**special**
14:25, 23:17, 37:4
**specialty**
31:10
**species**
5:12, 9:22,

11:7, 11:11, 13:8, 14:1, 31:17
**specific**
8:11, 11:24, 13:19, 16:7, 18:1, 19:10, 30:3, 36:22, 63:14
**specifically**
8:7, 30:14, 30:16, 38:19, 61:13, 62:2, 62:22, 65:24
**specification**
14:14, 14:19, 16:12, 16:13, 21:2, 24:22, 25:1, 25:7, 30:17, 61:9, 62:13
**spot**
23:3
**square**
40:13, 40:22
**stability**
17:7, 17:12, 18:11, 18:13, 20:4, 23:6, 24:17, 38:22, 40:24, 46:21, 55:21, 55:22, 63:3, 63:20, 63:25, 64:8, 64:9, 64:13, 65:22, 67:7
**stabilizer**
4:8
**stable**
9:7, 18:3, 18:5, 19:11, 19:13, 19:18, 19:20, 20:9, 20:24, 20:25, 25:8
**stand**
35:20
**standard**
37:25
**standards**
15:10, 25:17
**stands**
50:9
**start**
26:22, 26:24, 67:23
**started**
58:21
**statement**
46:22
**step**
27:24
**still**
21:19, 41:2, 67:16
**stop**
27:9
**structural**
32:4
**subject**
31:4, 49:16
**submit**
32:9
**submitted**
58:5, 66:20, 68:3
**subsequent**
11:1
**subsequently**
27:6
**substitute**
50:13
**success**
55:9, 58:16
**sucrose**
4:10
**sufficiently**
13:2, 17:20
**sugar**
4:7
**suitable**
22:13, 25:9, 44:21
**superior**
25:4
**support**
46:2, 46:22, 49:19, 61:21, 67:25
**supported**
45:15
**supporting**
40:22, 69:4
**supports**
42:24
**supposed**
45:3, 67:1
**sure**
2:13, 4:24, 6:15, 6:17, 7:2, 9:11, 11:19, 15:9, 15:20, 15:25, 17:14, 20:9, 24:3, 25:20, 44:17, 47:23, 49:12, 49:15, 50:18, 51:2, 51:11, 51:22, 53:1, 57:19, 57:24, 58:2, 59:15
**surprisingly**
42:14
**sweet**
23:3

**T**

**t**
45:11
**table**
63:23, 63:24
**tackle**
4:21
**tag**
52:19
**take**
6:13, 18:9, 21:9, 57:23
**talk**
13:23, 21:8, 34:17, 51:9, 58:11
**talked**
27:12, 34:19, 66:10
**talking**
12:8, 16:6, 47:6, 49:10, 51:1, 56:23, 61:12, 62:16, 63:14
**talks**
55:4, 65:23
**tape-recording**
69:10
**teach**
49:17, 50:19
**teaches**
52:23, 65:23, 65:24
**teaching**
6:23, 14:13, 36:3, 48:16, 48:21, 49:9, 50:6, 50:7, 52:13, 52:20, 55:18, 56:13, 62:18
**teachings**
59:3
**technology**
25:4
**tell**
27:1, 55:18, 61:4, 66:16
**tenth**
27:14, 60:3
**tenths**
28:19, 29:1, 29:5, 60:3, 60:14, 60:20, 60:22
**term**
44:21, 44:22
**terms**
5:11, 8:10, 8:19, 8:25, 10:3, 11:4, 14:8
**territory**
9:16
**test**
13:23, 16:22, 24:23, 39:2

**testi**
28:5
**testified**
29:3, 29:11, 30:11, 30:21, 30:22, 40:10
**testifying**
54:9
**testimony**
18:8, 18:24, 23:24, 24:1, 24:3, 24:24, 28:4, 28:14, 29:7, 31:4, 31:5, 37:14, 38:18, 38:24, 39:3, 40:7, 42:1, 43:9, 43:19, 44:24, 45:14, 45:23, 46:23, 53:12, 54:3, 55:24, 64:14, 69:20
**thank**
2:8, 17:5, 17:25, 26:14, 59:17, 59:18, 67:25, 68:2, 68:3
**theory**
46:1, 50:6, 50:7
**therapeutic**
56:7
**therefore**
41:5
**thi**
39:21
**thing**
43:8, 49:19, 49:23, 60:15, 61:19, 62:21
**things**
19:4, 27:13, 41:7, 41:12, 48:18, 50:12, 59:20, 60:1, 61:3
**think**
7:2, 7:5, 7:14, 8:13, 10:6, 10:25, 11:8, 12:1, 12:7, 12:10, 12:12, 12:23, 12:24, 14:4, 14:10, 14:24, 15:8, 15:15, 17:7, 17:14, 17:17, 21:25, 25:18, 27:1, 33:12, 33:25, 34:20, 35:3, 37:1, 37:9, 38:1, 41:14, 41:17, 41:20, 41:24, 42:24, 44:7, 45:3, 45:12, 46:17, 47:15, 50:10, 51:11, 53:22, 53:23, 59:22, 60:16, 60:25, 62:15, 65:8, 65:20, 66:23, 67:13, 67:15, 67:22
**thinking**
12:21, 36:7, 48:17, 50:14
**thought**
19:1, 41:8
**thousands**
27:22, 28:21
**three**
42:10
**threshold**
33:15, 34:10
**through**
16:3, 29:8, 30:22, 43:18, 51:14, 53:13, 63:23
**throw**
38:2
**thrust**
36:6
**tie**
19:4
**tied**
14:13, 39:7, 40:4
**time**
21:16, 23:5, 26:5, 26:10, 26:13, 53:5, 53:6
**titled**
63:3
**today**
51:9
**together**
27:12, 59:14
**top**
31:11, 34:21
**towards**
13:3
**toxicity**
23:5, 24:17, 38:21, 40:23
**transcribed**
1:25
**transcriber**
69:1, 69:2
**transcription**
69:9
**trap**
57:6, 63:5, 63:6
**trask**
26:17, 26:18, 26:23, 26:25, 28:1, 28:8, 28:23, 29:2, 30:9, 30:21, 31:2, 31:8, 31:18, 32:22, 33:3, 33:6, 33:9, 33:11, 33:21, 33:24, 34:2, 34:18, 34:24, 35:10, 35:17, 35:20, 36:10, 36:15, 37:5, 37:8, 37:20, 38:14, 39:10, 39:15, 40:3, 40:19, 41:14, 41:24, 44:2, 44:7, 44:11, 44:17, 45:11, 45:20, 46:8, 46:14, 47:4, 47:13, 47:15, 47:20, 47:23, 48:3, 48:6, 48:9, 48:22, 49:3, 49:12, 49:15, 50:18, 51:2, 51:11, 51:22, 51:24, 52:3, 52:25, 53:24, 54:2, 54:19, 54:24, 55:3, 55:23, 56:11, 56:16, 56:23, 57:1, 57:4, 57:19, 57:22, 58:2, 58:13, 59:7, 59:18
**treat**
8:4
**treating**
7:21
**treatment**
44:1
**trehalose**
3:16, 4:7
**trial**
37:23, 38:18, 40:15, 43:15, 49:16, 49:24, 53:13, 59:6, 59:9
**tried**
52:8
**trout**
24:2, 24:24, 29:10, 30:22, 44:24, 46:6, 53:13, 54:9
**trout's**
48:24



Petitioner Fresenius Ex. 1008, 0040

**true**
19:4, 69:9
**try**
10:15, 36:1, 44:8, 59:25
**trying**
14:21, 15:8, 18:21, 23:16, 33:4, 47:18, 51:9, 59:20
**turbidity**
63:25
**turn**
2:17
**two**
5:7, 5:17, 6:18, 27:5, 28:2, 30:8, 30:9, 30:15, 32:2, 35:8, 38:24, 43:23, 45:11, 50:12, 51:15, 53:2, 53:4, 55:10, 55:18, 55:25, 61:16
**type**
5:22, 14:11, 36:12, 45:25
**types**
25:23

**U**

**uh**
2:19
**unaccepted**
26:2
**unappeal**
43:15, 49:20
**under**
3:13, 3:19, 19:23, 28:15, 47:24, 54:23, 61:11, 61:25, 67:10, 69:3
**undermine**
55:8
**understand**
8:10, 14:21, 33:4, 35:4, 38:11, 38:12
**understanding**
9:17, 15:8, 33:22, 54:5, 54:8
**understood**
8:7, 36:5, 38:14, 51:14, 56:2
**undisputed**
37:23, 49:15, 52:1, 53:12, 54:5
**unexpected**
36:4, 42:6, 42:10
**unique**
14:25
**unless**
26:20
**unlike**
31:14
**unreasonable**
20:20
**unrebutted**
43:12, 44:24
**unusual**
22:20
**upper**
31:2
**use**
4:6, 4:7, 4:10, 8:17, 13:17, 16:4, 16:6, 16:14, 20:7, 43:24, 45:5, 52:9, 52:17, 59:25
**uses**
61:8, 64:12
**using**
40:24
**usual**
46:7
**usually**
22:19
**utilities**
67:19
**utility**
15:12

**V**

**validity**
2:9
**value**
11:22, 41:16
**values**
28:21, 29:4
**various**
41:19
**vegf**
3:21, 6:3, 16:6, 16:16, 30:14, 35:8, 52:6, 53:4, 55:11, 60:24, 61:11, 61:14, 61:15, 62:14, 63:5, 63:6
**verbatim**
62:1
**version**
18:10, 20:25
**versus**
9:1, 51:7, 60:7
**vgef**
57:6
**view**
5:8, 6:24, 14:7, 14:22, 16:11, 28:12, 36:19, 44:11, 47:23, 48:12, 52:11
**virtue**
47:25
**vismed**
3:23
**visual**
63:25
**volume**
23:10, 47:3
**vs**
6:20

**W**

**wall**
22:14
**wallach**
59:8
**want**
16:21, 20:11, 21:9, 26:6, 45:8, 46:10, 48:20, 60:8, 65:2, 66:5
**wanted**
59:15, 67:4
**wanting**
51:8
**water**
3:18, 4:11
**way**
11:8, 11:12, 13:17, 20:3, 25:11, 27:17, 28:25, 32:15, 36:4, 53:23
**ways**
43:16
**we'll**
21:19
**we're**
3:9, 5:16, 5:21, 17:23, 18:17, 21:20, 25:12, 26:9, 26:13, 27:14, 31:20, 35:7, 37:22, 49:10, 58:11, 62:16
**we've**
4:16, 47:6, 61:5, 63:11
**week**
57:12
**went**
9:15, 9:16, 10:8, 12:4, 42:12, 59:22, 62:9, 62:20
**weren't**
8:2, 57:23, 58:2
**whatever**
5:5, 50:15

**whether**
18:21, 20:16, 34:4, 34:9, 34:10, 34:13, 34:15, 35:1, 38:5, 38:6, 41:16, 41:18, 41:21, 47:11, 48:4
**whole**
16:12, 16:13, 28:25, 29:4, 66:11
**withdraw**
65:17
**within**
13:15, 22:4, 22:23, 30:18, 36:9, 41:19, 60:7
**without**
32:9
**witnesses**
37:14
**wondering**
41:21
**word**
9:10
**words**
38:7, 44:14
**work**
9:6, 55:16
**worked**
11:12, 15:1
**working**
18:17
**works**
38:9
**worried**
20:12
**worry**
35:6
**worse**
50:17
**wouldn't**
15:13, 48:11, 55:4
**written**
61:20
**wrong**
13:23, 14:8, 22:1, 22:2, 27:2, 59:22, 62:9, 62:20

**Y**

**yeah**
5:6, 6:10, 7:4, 11:10, 13:5, 14:10, 21:18, 27:13, 31:8, 34:18, 47:20, 48:9, 48:19, 49:3, 51:23, 52:2, 57:1, 57:22, 58:13, 65:1
**yesa**
2:24
**yesafili**
2:24

**.**

**.1**
63:12

**1**

**1**
2:2, 2:7, 4:15, 4:18, 4:21, 4:25, 5:3, 6:13, 6:16, 6:18, 6:23, 7:4, 7:9, 16:21, 16:24, 17:3, 17:5, 17:23, 17:25, 21:9, 21:13, 21:17, 21:19, 21:22, 21:24, 26:4, 26:9, 26:12, 26:16, 26:22, 26:24, 27:1, 28:6, 31:7, 35:14, 35:19, 37:15, 37:21, 44:16, 48:16, 48:20, 48:23, 49:4, 49:14, 51:21, 51:23, 52:2, 52:19, 54:11, 54:23, 55:2, 57:16, 57:20, 57:25, 58:7, 59:17, 59:20, 60:10, 64:14, 64:17, 64:24, 65:3, 65:13, 65:16, 66:13, 66:16, 68:2
**10**
6:21, 9:1, 12:15, 13:6, 14:1, 15:6, 30:2, 30:4, 30:13, 30:23, 31:8, 31:22, 32:19, 37:18, 41:3, 52:10, 59:23, 60:5, 60:14, 60:19, 62:11, 63:7, 63:8
**100**
9:6, 27:20, 67:9
**10040**
40:12
**10102**
47:4
**10102303**
46:24
**102**
12:11, 15:19, 20:16, 26:19, 26:22, 47:7, 57:6
**103**
26:20, 47:7, 47:8, 47:24, 48:12
**10448**
29:13
**10449**
30:23
**10526**
45:18
**112**
20:12
**11698**
49:25
**12**
64:11
**122**
62:5
**12593**
30:13
**12595**
61:11
**12596**
62:25
**1368**
67:10
**14**
30:25
**149**
62:5
**15**
63:4, 63:10, 64:3, 64:8
**150**
17:19
**157**
29:7, 31:6, 31:7
**159**
36:24, 37:12, 37:13, 37:19, 42:3
**167**
59:12
**168**
59:12
**174**
50:19, 51:13
**175**
51:19, 51:22
**177**
51:13
**18**
59:23
**187**
54:21, 55:4

**197**
49:18
**198**
42:7

**2**

**2-7**
69:21
**20**
63:12, 69:17
**200**
27:20, 43:13
**2002**
2:3
**2025**
69:17
**21**
31:21
**226**
62:24
**23**
31:21
**24**
2:3, 46:19
**25**
17:21, 18:3, 20:8, 64:10, 69:17, 69:21
**257**
62:3
**28**
57:14, 58:6, 58:9

**3**

**3**
16:23, 17:4, 17:22, 17:24
**30**
20:21, 61:13
**300**
4:18
**35**
37:7
**36**
49:20
**39**
23:20
**3rd**
67:10

**4**

**4,000**
31:1
**40**
6:20, 9:2, 9:19, 13:25, 15:1, 15:24, 16:2, 17:8, 18:9, 19:18, 20:7, 21:7, 22:23, 23:2, 23:10, 23:17, 24:5, 24:22, 32:18, 37:4, 37:10, 37:18, 37:24, 38:5, 38:9, 38:19, 41:3, 41:5, 42:8, 42:13, 43:1, 43:10, 45:5, 45:16, 46:13, 52:16, 52:18, 56:3, 60:6, 60:21, 64:6, 64:9
**400**
30:25
**41**
23:18
**42**
61:13
**45**
37:7
**457**
62:3
**471**
67:10

**5**

**50**
6:21, 9:1, 12:15, 14:1, 15:6, 15:24, 17:20, 18:4, 19:19, 20:7, 20:8, 20:24, 30:2, 30:5, 30:13, 31:9, 31:22, 32:20, 41:3, 60:5, 60:14, 60:19, 62:12, 67:9
**53**
19:17
**57**
19:17
**585226**
1:23, 69:20

**6**

**60**
17:20
**62**
62:5
**68**
69:8
**69**
1:24, 59:4

**7**

**70**
17:20
**75**
67:9
**77**
50:19

**8**

**8159**
23:1
**865**
4:1, 9:4, 19:15, 22:23, 24:25, 38:25, 47:11, 61:22, 61:25, 62:7, 63:1, 63:4, 63:8, 63:11, 63:24, 64:7

**9**

**9075**
39:4
**94**
62:5
**9496**
29:8, 30:22
**9497**
30:11
**97**
25:20
**98**
17:6, 18:3, 18:5, 18:10, 18:13, 18:22, 19:3, 20:21, 20:24, 20:25, 45:2, 45:4, 45:7, 45:8, 45:9, 45:15, 46:3, 46:16, 46:20, 47:1, 64:1, 65:21
**99**
29:8, 30:22