# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF WEST VIRGINIA

Regeneron Pharmaceuticals, Inc.

Plaintiff,

VS. CIVIL ACTION NO.

1:22-cv-61

Mylan Pharmaceuticals, Inc., and

Biocon Biologics, Volume 7

Defendants.

- - -

Proceedings had in the bench trial of the above-styled action on June 21, 2023, before Honorable Thomas S. Kleeh District Judge, at Clarksburg, West Virginia.

- - -

APPEARANCES:

On behalf of the Plaintiff:

David I. Berl
Ellen E. Oberwetter
Arthur J. Argall, III
Kathryn S. Kayali
Andrew V. Trask
Williams & Connolly, LLP
680 Maine Avenue, SW
Washington, D.C. 20024
202.434.5000

Andrew E. Goldsmith
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M. Street NW, Suite 400
Washington, DC 20036
202.326.7945

APPEARANCES CONTINUED ON NEXT PAGE

On behalf of the Plaintiff, continued:

Steven Robert Ruby
Carey, Douglas, Kessler & Ruby, PLLC
797 Virginia Street, East, Suite 901
Charleston, WV 25301
304.345.1234

Petra Scamborova
Regeneron Pharmaceuticals, Inc.
777 Old Saw Mill River Road
Tarrytown, NY 10591-6717
914.847.7611

On behalf of the Defendant:

Deanne M. Mazzochi
William A. Rakoczy
Heinz J. Salmen
Eric R. Hunt
Lauren M. Lesko
Neil B. McLaughlin
Lawrence Scott Beall
Katie A. Boda
Rakoczy, Molino, Mazzochi & Siwik, LLP
6 W. Hubbard Street, Suite 500
Chicago, IL 60654
312.527.2157

Gordon H. Copland
William J. O'Brien
Steptoe & Johnson
400 White Oaks Blvd.
Bridgeport, WV 26330
304.933.8162

Proceedings recorded utilizing realtime translation. Transcript produced by computer-aided transcription.

over here to your left.

**KENNETH S. GRAHAM, PhD, PLAINTIFF'S WITNESS,** SWORN

THE COURT: Anticipating a request to approach and distribute, so granted.

MR. TRASK: Thank you, Your Honor.

MR. RAKOCZY: William Rakoczy from Mylan and Biocon. I'd like to get an objection on the record before this witness begins, if I may.

THE COURT: Why don't we distribute materials, and then when it's a little calmer and quieter, Mr. Rakoczy, the floor will be yours again.

Mr. Rakoczy, sir.

MR. RAKOCZY: Yes, Your Honor. We object to any testimony or proffered exhibits from this witness on invention date. This goes back to our motion in limine.

THE COURT: Good thing I waited for calm and still, Mr. Rakoczy.

MR. RAKOCZY: We object to any testimony or proffered exhibits from this witness on invention date. This goes back to our Motion in Limine Number 5, which I believe is in the compilation of documents at Docket Number 449. This also goes back to our interrogatories to Regeneron.

Interrogatory Number 10 asks for detailed information on the alleged conception and reduction to practice of the invention. We asked for Regeneron to identify with

Q. How so?

A. So as the formulation protein concentration goes up, the solutions become a little bit more viscous and you increase the viscosity. That will increase the shear stress.

Q. What is viscosity, Dr. Graham?

A. All right. So this is -- the definition is the resistance of a solution to flow. What that means --

THE COURT: To what, Doctor? I'm sorry.

THE WITNESS: To flow.

So what it means is if you take, like, a bottle of water, you go to pour it. Water is 1 centipoise. It starts immediately. You stop; it stops immediately. Take honey, go to pour it, it takes a little while for the honey to start going. Go to stop it, it takes a little while for the honey to stop. Low viscosity/high viscosity.

BY MR. TRASK:

Q. Why is shear an issue when it comes to the handling of formulations?

A. In the case of aflibercept, work that I did identified that shear stress or shear caused the formulation to form particles.

Q. And what's the process by which particles are formed?

A. So this is one of those things that it's kind of like a spectrum of what you deal with. You have the individual molecules in solution. You know, sometimes a couple slam

together. Sometimes a couple more slam together. When you get to the point you get enough of them stuck together, it falls out of solution and you get a visible particle.

Q. Is this related to the concept of aggregation?

A. It is.

Q. And so what happens when proteins aggregate?

A. So if I'm talking about aflibercept, aflibercept exists as what we call a native dimer. It's two of the same protein strands that are hooked together. So if you take two of those native dimers and they come together, that starts to form aggregates or high molecular weight species.

Usually what happens first is you'll get to maybe four or eight of these things come together. They stay in solution. And then if it gets bigger, you know, you'll start getting some of these things that show up as turbidity. So if you look at smoke, smoke is particles. Do you see individual smoke particles? No. You see the mass of them, but you can't see one. So turbidity is the whole bunch of these little things that are coming out now that you can't see individually but you see as a group.

And then the next step -- or the next step can be these things come together. And then it falls out of solution and becomes something that you can see by your naked eye.

Q. From your perspective as a formulator, was the formation of particles in an intravitreal formulation a bad

thing?

A. It was an exceptionally bad thing. It's bad in any formulation; but for the eye, it's very bad.

Q. Can you explain why that is.

A. So I think the eye being a closed system, whatever you put in tends to stay in. You know, one aspect is there's a drain in the back of the eye called the trabecular network. And these particles have a chance to, if they move into that area, plug the drain.

What happens when you plug the drain in the back of the eye is you raise the pressure. And this is what happens in glaucoma. So you can cause blindness.

MR. RAKOCZY: Objection, Your Honor. Again, the witness has not been qualified as an expert in this area.

THE COURT: Understood. Sustained. The Court will disregard that testimony.

Next question, Counsel.

BY MR. TRASK:

Q. I think you touched on this a moment ago, but was the possibility of particle formation in an aflibercept formulation just a theoretical concern to you?

A. No.

Q. Why not?

A. So we had gotten -- I don't know -- a year, year and a half in to a clinical trial. And all of a sudden our

CERTIFICATE

I, Cindy L. Knecht, Registered Professional Reporter and Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action on June 21, 2023, as reported by me in stenotypy.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 21st day of June 2023.

/s/Cindy L. Knecht
_____________________________
Cindy L. Knecht, RMR/CRR
Official reporter, United States
District Court for the Northern
District of West Virginia