# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

REGENERON PHARMACEUTICALS, INC.,

*Plaintiff*,

v.

MYLAN PHARMACEUTICALS INC. and BIOCON BIOLOGICS, INC.,

*Defendants*.

Civil Action No. 1:22-cv-00061-TSK

**CONFIDENTIAL**
**FILED UNDER SEAL**

# REGENERON'S RESPONSIVE POST-TRIAL BRIEF ADDRESSING VALIDITY OF THE ASSERTED PATENTS

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iv

PRODUCT PATENT ..... 2

I. Dix '226 Does Not Anticipate the Claims ..... 2

II. Defendants' Prior Art Combinations Do Not Render the Claims Obvious ..... 4

A. Defendants are limited to their disclosed combinations. ..... 4

B. Fraser and Lucentis ..... 5

1. The prior art taught away from a 40 mg/ml aflibercept concentration. ..... 5

2. The art did not motivate using a protein the size of aflibercept. ..... 7

3. Fraser and Lucentis fail to teach other limitations. ..... 8

C. Fraser and Liu. ..... 10

D. Dix '226. ..... 12

E. Objective Evidence of Nonobviousness ..... 13

III. The Product Patent Claims Are Not Invalid Under Section 112 ..... 15

TREATMENT PATENTS ..... 18

IV. The Treatment Claims Are Novel and Nonobvious. ..... 18

A. The DME Claims are novel and nonobvious. ..... 18

1. The Regeneron Press Release does not anticipate the DME Claims. ..... 18

2. The DME Claims are nonobvious. ..... 20

B. The DR Claim is novel and nonobvious. ..... 23

1. The Regeneron Press Release does not anticipate the DR Claim. ..... 23

2. The DR Claim is nonobvious. ..... 24

C. The Angiogenic Eye Disorder Claim is novel and nonobvious. ..... 24

1. Dixon does not anticipate the Angiogenic Eye Disorder Claim. ..... 24

2. The Angiogenic Eye Disorder Claim is nonobvious. ..... 25

D. Objective evidence confirms the nonobviousness of the Treatment Claims. ....... 27

V. The Treatment Claims Are Valid Under Section 112. ........................................ 27

A. The Angiogenic Eye Disorder Claim is enabled and described. ......................... 27

B. The DME and DR Claims are enabled and sufficiently described. ..................... 29

C. The Treatment Claims are not indefinite. .......................................................... 30

Defendants' brief reads as if trial never happened, clinging to theories discredited by Regeneron's and Defendants' witnesses alike. For the Product Patent, they ignore the trial record in arguing, for example, that the inventors simply swapped aflibercept into a prior ranibizumab formulation. Not so. Rather than following Genentech, the inventors blazed a new trail, using a much larger protein (aflibercept) expected to be less suitable for retinal treatment and a much higher concentration (40 mg/ml) that, per the prior art, would cause inflammation, instability, and potential immunogenicity. The POSA would not have arrived at the invention. Tr. 2040:10-2043:2, 2045:8-11 (Trout). The POSA would have used a molecule optimized for intravitreal administration, like ranibizumab, and would have used a far lower concentration—10 mg/ml or less—to avoid the discouraging "moderate to severe inflammation" linked to higher VEGF antagonist concentrations. PTX-1839 (Gaudreault) at 2. That is not conjecture; it is precisely the path that Genentech, the leading company in the field, followed in developing ranibizumab at a concentration of 10 mg/ml. PTX-701 (Ferrara 2006) at 1; DTX-726 (Shams) at 32.

The trial record likewise refuted Defendants' notion that the aflibercept protein is solely responsible for Eylea's properties. Dkt. 576 (Defs. Opening Br. ("Br.")) 1, 27. Eylea's *combination* of components, including its high aflibercept concentration and excipients, generates its unexpectedly beneficial properties—safety, efficacy, and the game-changing potential for extended dosing. Tr. 2085:11-19, 2086:3-5, 2170:5-21 (Trout); Tr. 473:2-15 (Furfine); Tr. 125:2-126:16 (Yancopoulos); PTX-1155 at 4.

Defendants' kitchen-sink attack on the Treatment Patents fares no better. The cited prior art, alone or in combination, fails to disclose either a five-loading- dose regimen (required by the DME and DR Claims) or an extended, fixed dosing regimen using an isotonic aflibercept solution (required by the Angiogenic Eye Disorder Claim). Defendants cannot rewrite the law of inherent

anticipation to plug these holes in the prior art. Nor can they carry their heavy burden of proving the claimed methods obvious. Time and again, Defendants' obviousness analysis violates binding precedent—applying incorrect standards, addressing the wrong questions, ignoring the POSA's motivations and expectations, and considering claims piecemeal rather than as a whole. Defendants' remaining invalidity arguments suffer from similarly grave legal errors and often ignore the trial record and the Treatment Patents themselves.

## PRODUCT PATENT

Defendants' scattershot arguments come nowhere close to meeting their burden of proving invalidity "by clear and convincing evidence." *Microsoft v. i4i P'ship*, 564 U.S. 91, 95 (2011).

### I. Dix '226 Does Not Anticipate the Claims

Anticipation poses high hurdles—i.e., clear and convincing proof that (1) a single prior art reference discloses *every* claim limitation, (2) as arranged in the claim. *Net MoneyIN v. Verisign*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). Defendants' argument that Dix '226 anticipates fails to clear those hurdles.[1] Each asserted claim requires 40 mg/ml aflibercept, which Defendants' expert conceded is absent from the Dix examples. Tr. 1133:16-20 (Rabinow). Defendants rely on Dix's range of "10-50 mg/ml of the fusion protein," DTX-13 at 4 (2:21-23), but their expert agreed that range does not expressly disclose 40 mg/ml and is directed to multiple compounds, not just aflibercept. Tr. 1133:25-1134:3, 1136:8-13 (Rabinow).[2]

The disclosure of a "genus"—such as a numerical range—does not anticipate a claim to a

[1] Because Dix '226 does not anticipate the claims, the Court need not address entitlement to a priority date earlier than the June 16, 2006 provisional application filing date. Regeneron's Proposed Findings of Fact and Conclusions of Law ("FFCL") ¶¶ 84-89.

[2] As "Background," Defendants assert that Dix disclosed a "40 mg/ml embodiment." Br. 4. Not so. Dix references "a 40 mg/ml *pre-lyophilized solution*" that is reconstituted to "80 mg/ml." DTX-13 at 5 (3:60-62). This substance is "a manufacturing intermediate" not intended for injection; it does not contain aflibercept, and it does not exhibit 98% native conformation. Tr. 2077:1-2079:1 (Trout); FFCL ¶¶ 88-89.

"species"—such as a number within that range—unless only a "very small genus" is disclosed. *Atofina v. Great Lakes*, 441 F.3d 991, 999 (Fed. Cir. 2006); *Janssen v. Watson*, 2012 WL 3990221, at *6-10 (D.N.J. Sept. 11, 2012) (prior art dosage range of ".02-0.05 mg" did not anticipate a specific dose of "0.025 mg."); *Eli Lilly v. Univ. of Wash.*, 334 F.3d 1264, 1270 (Fed. Cir. 2003); *Bristol-Myers v. Ben Venue*, 246 F.3d 1368, 1380 (Fed. Cir. 2001). Defendants do not even argue that the five-fold range of 10-50 mg/ml is "very small." *Atofina*, 441 F.3d at 999. In Dr. Rabinow's view, this range encompasses thousands of discrete concentrations between 10 and 50 (like 28 mg/ml, 37.2 mg/ml, and 49.35 mg/ml). Tr. 1134:9-19; *Atofina*, 441 F.3d at 999 ("temperature range of over 100 degrees is not a small genus"); Tr. 2072:16-17 (Trout). The experts also agreed Dix's range encompasses multiple "VEGF-specific fusion protein antagonist[s]," Tr. 1135:25-1138:9 (Rabinow); Tr. 2073:13-2074:4 (Trout), further enlarging the genus and foreclosing anticipation. *UCB v. Actavis*, 65 F.4th 679, 688 (Fed. Cir. 2023); *Atofina*, 441 F.3d at 999.

Defendants erroneously argue (Br. 22) that Regeneron must show the claimed 40 mg/mL concentration is "critical." Criticality is a factor only where a disclosed range "overlap[s]" with a "claimed range." *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1338 (Fed. Cir. 2020). The Product Patent claims a specific concentration—40 mg/ml—not a "claimed range," and the Federal Circuit has held that such "discrete points" are not a range. *UCB*, 65 F.4th at 687-88. Criticality is thus irrelevant here, as shown by the many cases addressing similar facts that did not consider criticality. *E.g.*, *Janssen*, 2012 WL 3990221, at *6-10 (addressing indistinguishable facts, did not consider criticality); *Eli Lilly*, 334 F.3d at 1271; *Ben Venue*, 246 F.3d at 380. Regardless, Regeneron demonstrated criticality of 40 mg/ml, as explained below regarding objective evidence.

Dix does not disclose any 40 mg/ml aflibercept formulation, much less an ophthalmic formulation meeting the 98% native conformation limitation, *see* Tr. 1124:9-11, 1124:25-1125:16

(Rabinow), so Defendants assert anticipation by baselessly conjuring 40 mg/ml from the range of 10-50 and cobbling together disparate disclosures of the other claim limitations from Dix. Br. 22. But to anticipate, the prior-art reference must disclose each element "arranged as in the claim." *Net MoneyIN*, 545 F.3d at 1371. Defendants' "mechanistic dissection and recombination" of Dix '226 is precisely the "hindsight anticipation" relying on "the guidance of [a patentee's] disclosures" that precedent forbids. *In re Ruschig*, 343 F.2d 965, 974 (C.C.P.A. 1965); *Net MoneyIn*, 545 F.3d at 1371.

## II. Defendants' Prior Art Combinations Do Not Render the Claims Obvious

Defendants argue obviousness over three sets of references: (1) Fraser (DTX-729) and "Lucentis," i.e., Gaudreault (PTX-1839) and Shams (DTX-726); (2) Fraser and Liu (DTX-730); and (3) Dix '226 (DTX-13) alone. Br. 24-26. None discloses or suggests the claimed 40 mg/ml glycosylated aflibercept ophthalmic formulation with a buffer, stabilizing agent, and polysorbate 20, that achieves 98% native conformation. The closest art, Gaudreault, undisputedly *taught away* from using 40 mg/ml because it caused moderate to severe inflammation without additional benefit. PTX-1839 at 2. Defying the prior art, Eylea unexpectedly became the first intravitreal product that could be dosed half as frequently as ranibizumab with equivalent safety and efficacy. PTX-1155 at 4; *see Genetics Inst. v. Novartis*, 655 F.3d 1291, 1307-08 (Fed. Cir. 2011).

### A. Defendants are limited to their disclosed combinations.

Defendants' brief addresses purported "prior art to the Asserted Patents," Br. 2-7, much of which was not properly disclosed by Defendants' experts. *See id.* 4-7 (citing DTX-4957; DTX-216). The Court should reject Defendants' attempt to reprise a tactic they tried—and failed—to deploy at trial. Hoping to plug the gaps in their obviousness theories, Defendants sought to rely on reference combinations never disclosed in discovery. The Court properly excluded Defendants' new theories. Tr. 796:14-797:6 (precluding Fraser, Dix, Lucentis, and Liu combination); Tr.

1045:23-1048:7, Tr. 1075:17-22 (precluding Lucentis and Liu); *see* Dkt. 529, 540. Defendants nevertheless seek to vitiate the Court's clear direction that "any invitation to the Court to make that connection will not occur based on the failure to disclose . . . the specific prior art . . . or the reasons that the prior art makes the inventions obvious." Tr. 1047:20-1048:2. A post-trial brief is not the place for new "prior art" references, theories, and combinations, and the Court again should reject Defendants' attempts to circumvent their disclosure obligations.

### B. Fraser and Lucentis

Defendants mischaracterize Fraser and Lucentis and offer no reason for the POSA to make the claimed formulations. Br. 24. Defendants' assertion that aflibercept had "already been used in humans to treat eye diseases" is entirely unsupported by the evidence they cite. *Id.* The evidence at trial debunked their assertion that the POSA would swap out ranibizumab for aflibercept. And the Federal Circuit has rejected the fallacy "that a skilled artisan would always be motivated to try later generation compounds in an old composition." *Apotex v. Wyeth*, 657 F. App'x 998, 1003 (Fed. Cir. 2016) (addressing *Senju*). Rather, obviousness depends on the specific facts and prior art, *id.*, which here point decisively against combining the prior art to make the claimed composition. Even assuming (incorrectly) the POSA would replace ranibizumab with the (unnamed) VEGF Trap from Fraser (DTX-729 at 2), Fraser taught only 24.3 mg/ml—not 40 mg/ml. And Gaudreault taught *against* using 40 mg/ml in the eye, which alone forecloses obviousness. *AstraZeneca v. Mylan Pharm. Inc.*, 19 F.4th 1325, 1336 (Fed. Cir. 2021).

#### 1. The prior art taught away from a 40 mg/ml aflibercept concentration.

No prior art disclosed the claimed 40 mg/ml aflibercept. Fraser described 24.3 mg/ml of a VEGF Trap R1R2 in an IV study on monkeys' ovaries, DTX-729 at 2; Shams taught intravitreal injection in humans of 6 and 10 mg/ml ranibizumab, DTX-726 at 32, which Genentech used in Lucentis; and Gaudreault taught 10 and 40 mg/ml ranibizumab, PTX-1839 at 2.

The undisputed testimony was that the *only* prior-art disclosure of 40 mg/ml, in Gaudreault, taught away from using it. A reference teaches away if a POSA "upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken in the claim." *AstraZeneca*, 19 F.4th at 1337. Gaudreault evaluated 40 mg/ml ranibizumab intravitreally and found that it caused "moderate to severe" inflammation that persisted for a week. PTX-1839 at 2-3. These data taught the POSA to avoid using 40 mg/ml aflibercept because of inflammation, instability, and immunogenicity. Tr. 2040:10-2041:10, 2041:22-2043:2, 2045:8-11 (Trout); PTX-1839 at 7. Dr. Trout explained that "40 mg/ml is problematic from an immune response standpoint" because the inflammation "lasted two to eight days." Tr. 2041:1-5; Tr. 468:1-470:7 (Furfine) (Gaudreault's 40 mg/ml formulation caused "substantial and concerning" and "unacceptable" inflammation). In contrast, the lower 10 mg/ml formulation did not cause such inflammation. Tr. 2040:12-19 (Trout); PTX-1839 at 2. Crucially, Dr. Rabinow *offered no contrary opinion* about the inflammation in Gaudreault, which is Defendants' *only* disclosure of a 40 mg/ml VEGF antagonist ophthalmic formulation. Dr. Trout's unrebutted testimony compels a finding that Gaudreault teaches away from using 40 mg/ml, which "on its own is sufficient to . . . sustain nonobviousness." *AstraZeneca*, 19 F.4th at 1336; *Imperium IP v. Samsung Elecs.*, 757 F. App'x 974, 978-79 (Fed. Cir. 2019).

Further, aflibercept is at least twenty times more potent than ranibizumab, Tr. 2042:13-17 (Trout); Tr. 114:1-25 (Yancopoulos); Br. 24, meaning far less aflibercept achieves the same VEGF inhibition. That difference, coupled with Gaudreault's disclosure that 10 mg/ml of ranibizumab resulted in "maximum inhibition of VEGF," PTX-1839 at 7, would have motivated the POSA to use *less* than 10 mg/ml aflibercept, Tr. 2042:18-2043:2 (Trout). Dr. Rabinow again offered no contrary testimony, foreclosing any notion that the POSA would use 40 mg/ml aflibercept.

Relying on Avery's disclosure of bevacizumab, Defendants suggest the POSA would use a higher concentration for a larger molecule like aflibercept. Br. 26. The Court should exclude this new, undisclosed opinion. *Infra* II.B.2. In any event, Avery used only 25 mg/ml bevacizumab, DTX 2264 at 2, Tr. 1033:10-16 (Rabinow); it never suggests using a higher concentration, let alone aflibercept (which it does not mention) at 40 mg/ml. Nor does Avery deem bevacizumab at 25 mg/ml safe, acknowledging that "[h]ow the intravitreal safety profile of bevacizumab will compare with that of ranibizumab . . . is uncertain" and that bevacizumab poses a higher "risk of systemic toxicity when compared with ranibizumab." DTX-2264 at 6, 8. Thus Avery, which did not address 40 mg/ml or aflibercept and did not even demonstrate safety of 25 mg/ml of bevacizumab, does not affect Gaudreault's teach-away, and fails to motivate using 40 mg/ml of aflibercept.[3]

**2. The art did not motivate using a protein the size of aflibercept.**

Defendants' combination of Fraser and Lucentis (Br. 24) requires replacing Lucentis's 48-kDa ranibizumab with aflibercept, a 115-kDa protein, in an ophthalmic formulation suitable for intravitreal injection. Defendants' argument is driven by impermissible hindsight. Fraser studied monkeys' ovarian function; it never references intravitreal or ophthalmic application. DTX-729 at 1-2; Tr. 1102:5-1103:3 (Rabinow). The Lucentis art did not mention aflibercept at all.

Gaudreault taught that "penetration of ranibizumab into the retina is critical for its clinical use." PTX-1839 at 1, 6; Tr. 2026:2-2028:24, 2035:3-8 (Trout); PDX-9.005-6. Gaudreault reflected the contemporaneous understanding that proteins larger than "76.5" kDa had less retinal

[3] Defendants also complain (Br. 27) that the patent "provides no additional motivation to overcome" the prior art problems regarding high concentrations, citing *Merck*. But the patent is not prior art; it is irrelevant to the POSA's motivation and whether the *prior art* taught away from the invention. Defendants' cited portions of *Merck* have nothing to do with teaching away or motivation. 395 F.3d at 1373-74. A patent need not identify deviations from the prior art, as the obviousness analysis forecloses the hindsight of reading prior art through the lens of the patent. *Sanofi-Aventis v. Dr. Reddy's Labs.*, 933 F.3d 1367, 1375 (Fed. Cir. 2019).

penetration. PTX-1842 at 1 (Jackson); Tr. 2028:25-2031:3 (Trout); PTX-576 at 8 (Ghate) (retina's "internal limiting membrane" was "impermeable to" "molecules > 70 kDa"). The POSA would therefore use a smaller protein like ranibizumab or Regeneron's mini-Trap (46 kDa) intravitreally, not aflibercept. Tr. 2035:3-2036:24 (Trout); PTX-1757 (Daly) ¶ 48 ("mini-trap" had "optimized characteristics for local/intra-vitreal delivery"). Lucentis thus taught to use a small molecule, not a large one like aflibercept. *See Adidas AG v. Nike Inc.*, 963 F.3d 1355, 1359 (Fed. Cir. 2020).

Unable to dispute the literature's express teachings, Tr. 1190:6-13, Dr. Rabinow concocted a new theory that Avery's bevacizumab teachings made size irrelevant, Tr. 1086:1-7. The Court should exclude this new argument. *Supra* II.B.1; Tr. 996:16-997:1. Regardless, the theory that Avery "debunked" the art discussed above is meritless. Br. 26. Dr. Ferrara, who discovered VEGF and developed bevacizumab and ranibizumab, Tr. 449:7-11 (Furfine), considered Avery, deemed its findings "difficult to compare" with more rigorous studies of drugs like ranibizumab, and noted the "difficulty of interpreting early clinical results." PTX-701 at 8; Tr. 2037:23-2038:8 (Trout). And unlike Avery's silence as to VEGF Trap, Ferrara criticized VEGF Trap's "limited efficacy" upon intravitreal administration, which "may be due, at least in part, to the existence of a barrier to the transretinal penetration of large molecules such as the VEGF-trap." PTX-701 at 4.

Thus, the evidence refutes any notion that Avery had "overcome" the established scientific consensus. Br. 26. Ferrara 2006 taught using smaller proteins like ranibizumab, Tr. 2038:9-15 (Trout)—as Genentech did in developing ranibizumab (not the larger bevacizumab) for intravitreal use. Dr. Rabinow's only response was to accuse Dr. Ferrara, a Lasker Prize winner for his discovery of VEGF, of publishing scientific inaccuracies out of bias. Tr. 1185:2-1187:4.

**3. Fraser and Lucentis fail to teach other limitations.**

Defendants' Lucentis/Fraser combination does not teach several other limitations of the asserted claims, and each such omission independently defeats obviousness.

*First*, neither Fraser nor Lucentis identifies the claimed aflibercept amino acid sequence. Fraser discloses "VEGF $Trap_{R1R2}$" but identifies no sequence. DTX-729 at 2. Dr. Trout explained that various prior art VEGF $Trap_{R1R2}$ proteins had different sequences, and Defendants provided no reason to choose the sequence now known as aflibercept. Tr. 2018:7-2022:16; PDX-9.003.

*Second*, Fraser and Lucentis do not teach the claimed *glycosylated* aflibercept. Lucentis is *not* glycosylated, DTX-726, 31:24, and Fraser is silent on glycosylation. Dr. Rabinow posited that glycosylation of aflibercept was "inherent," Tr. 1044:13-19, but he offered no supportive reasoning, much less a basis to meet the high burden on inherency that aflibercept "necessarily" is glycosylated. *PAR Pharm. v. TWI Pharm.*, 773 F.3d 1186, 1194-95 (Fed. Cir. 2014). Proteins may be glycosylated or, like ranibizumab and the mini-Trap, not glycosylated. PTX-1757 (Daly) ¶ 48; Tr. 181:9-12 (Yancopoulos); Tr. 2023:9-2025:23 (Trout).

Further, Dr. Trout explained that the POSA would not have used glycosylated aflibercept, because glycosylation increases size and thus decreases retinal penetration. Tr. 2022:20-2023:2, 2028:16-24, 2035:3-2036:24; *see supra* II.B.2.a. Dr. Rabinow did not dispute this testimony.

*Third*, none of the references in Defendants' combination discloses any protein with the claimed 98% native conformation after 2 months at 5°C. Neither Fraser nor Lucentis teaches *any* level of native conformation. Defendants bear the burden to show both a motivation to combine references and "a reasonable expectation of success" in doing so. *Endo Pharm. v. Actavis*, 922 F.3d 1365, 1377-78 (Fed. Cir. 2019). Dr. Rabinow brushed that aside, and in a previously undisclosed opinion theorized that any clinical-trial formulation is stable. Tr. 1031:7-1032:22; FFCL ¶¶ 112, 393-94. But Dr. Trout explained that a protein could be stable enough for clinical trials and not have 98% native conformation. Tr. 2049:10-17. And even assuming the POSA believed the Lucentis formulations had 98% native conformation, the POSA would not expect that

substituting aflibercept for ranibizumab—at a four-fold higher concentration—would yield the same stability, given their different structures and concentrations. Tr. 2049:21-2050:21 (Trout) (fusion proteins expected to be less stable); Tr. 1156:17-24 (Rabinow) (agreeing that "different proteins have different propensities for aggregation"); PTX-1556 (Wang 2005) at 7, 9 ("Increasing protein concentration generally increases protein aggregation."); *see* Tr. 470:8-14 (Furfine).

### C. Fraser and Liu.

Defendants' combination of Fraser and Liu is even further afield, as neither reference teaches *anything* about ophthalmic formulations of any protein, let alone the claimed formulations with 40 mg/ml aflibercept, the other recited ingredients, or 98% native conformation. Tr. 1149:25-1151:24 (Rabinow) (Liu did not disclose intravitreal administration, despite contemplating a "kitchen sink" of administration methods); *supra* II.B (discussing Fraser).

***The POSA would not have been motivated to combine Fraser and Liu***. Defendants' sole basis to combine Fraser and Liu is that Fraser's ovarian study in monkeys used a "concentration higher than Lucentis," so the POSA would consult Liu to "optimize" Fraser's formulation. Br. 25. That non sequitur finds no support even in the cited testimony of Dr. Rabinow. *Id.* Fundamentally, neither reference provides any motivation to use aflibercept intravitreally. As Dr. Trout explained, the POSA would not consult Fraser's study on ovarian function using IV administration of a VEGF Trap and combine it with Liu, which "doesn't have anything to do with aflibercept or anything related," to make ophthalmic formulations of aflibercept. Tr. 2060:23-2061:2, 2062:20-25.

Regardless, the POSA who looked to Liu would use a lower protein concentration. Liu taught that "[a]ntibodies tend to form viscous solutions at high concentration" and that sugars increase viscosity. DTX-730 ¶ 6. Viscosity is undisputedly problematic for intravitreal injections, because it leads to "very long injection times" and can make the formulation unusable. Tr. 573:3-8, 2066:2-21 (Trout); Tr. 1687:23-1688:21 (Graham). Thus, Liu taught against increasing Fraser's

protein concentration. Dr. Rabinow never addressed Liu's viscosity teaching; this unrebutted evidence precludes obviousness. *Imperium*, 757 F. App'x at 978.

***Fraser and Liu do not teach aflibercept or glycosylation.*** Neither reference teaches the claimed glycosylated sequence, *supra* II.B.3; Tr. 1151:22-24 (Rabinow); Tr. 2063:1-18 (Trout).

***No aflibercept concentration is disclosed.*** Defendants cite *E.I. DuPont v. Synvina*, 904 F.3d 996, 1006 (Fed. Cir. 2015), where the prior art disclosed a range encompassing the value claimed in the patent. Here, neither reference discloses *any range* of aflibercept concentration. Overlapping range cases apply "when the only difference from the prior art is a difference in the range or value of a particular variable." *In re Kumar*, 418 F.3d 1361, 1366 (Fed. Cir. 2005). The cases do not apply where, as here, the art recites a range for variables like Liu's concentrations of proteins unrelated to VEGF, not for the "particular variable" claimed (aflibercept concentration). DTX-730 ¶¶ 279-80; Tr. 2065:7-22. *Pharmacyclics LLC v. Alvogen, Inc.*, 2022 WL 16943006, at *9 (Fed. Cir. Nov. 15, 2022) (not applying range law due to "additional differences between the prior art and claim"); *Teva Pharm. v. Corcept Therapeutics*, 18 F.4th 1377, 1382-83 (Fed. Cir. 2021); *ModernaTx v. Arbutus Biopharma*, 18 F.4th 1364, 1374 (Fed. Cir. 2021). And even if applicable, a presumption of obviousness based on optimizing within a range is negated by "teaching away, unexpected results, or other pertinent evidence of nonobviousness." *DuPont*, 904 F.3d at 1006; *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015). Gaudreault's teach-away and other objective evidence rebut any presumption here. *Supra* II.B.3; *infra* II.E.

***Liu does not teach the 98% native conformation limitation or provide a reasonable expectation of success in achieving it.*** Defendants rely on Liu for 98% native conformation, but Liu taught nothing about aflibercept or any other fusion protein. Dr. Rabinow acknowledged that Liu described antibodies, not fusion proteins, and did not disclose stability data for aflibercept or

any VEGF antagonist. Tr. 1152:20-1154:23. Crucially, the experts agreed that "different proteins have different propensities for aggregation." Tr. 1155:25-1156:2 (Rabinow); Tr. 2068:5-2069:7 (Trout). Dr. Rabinow agreed that "[j]ust because one protein has a given native conformation at a specific condition, the [POSA] *wouldn't expect* that a different protein will have the same native conformation at that condition." Tr. 1156:20-24. And Dr. Trout explained, without rebuttal, that the POSA would expect fusion proteins like aflibercept to be *less* stable than antibodies, because fusion proteins are "Frankenstein molecule[s]" that did not evolve like antibodies to possess inherent stability. Tr. 2068:18-2069:7; Br. 4-5. The record thus refutes any reasonable expectation of success of achieving 98% native conformation. *Endo*, 922 F.3d at 1373.

### D. Dix '226.

***Dix '226 may not be considered for obviousness.*** Because both Dix '226 and the Product Patent were commonly owned or "subject to an obligation of assignment," Dix "shall not preclude patentability" under 35 U.S.C. § 103(c)(1), *see* Dkt. 428-1. Both patents are undisputedly assigned to and owned by Regeneron, PTX-2; DTX-13, and Dr. Furfine offered uncontested testimony that "[a]ll employees of Regeneron were required to assign their inventions to the company. That was a condition of your employment." Tr. 447:15-25; Tr. 1126:20-1127:14 (Rabinow). Defendants' only response is a puzzling and baseless assertion, relegated to a footnote, that the Product Patent and Dix '226 are not "commonly owned." Br. 25 n.7. But the front pages of both certified patents unambiguously identify Regeneron as the assignee, which has never changed. PTX-2; DTX-13.[4]

***Dix '226 does not render the claims obvious***. Even if Dix qualified as prior art, it does not render the claims obvious. Dix undisputedly did not teach ophthalmic formulation or

[4] The 10-K and agreement Defendants cite state that "sanofi-aventis will share co-promotion rights and profits on sales" for oncology, which has nothing to do with ownership of Regeneron's patents and thus is irrelevant to § 103(c). DTX-4956 at 3-4; DTX-4986 at 10.

Date: July 24, 2023

CAREY DOUGLAS KESSLER & RUBY, PLLC

*/s/ Steven R. Ruby*

Steven R. Ruby (WVSB No. 10752)
David R. Pogue (WVSB No. 10806)
707 Virginia Street East
901 Chase Tower (25301)
P.O. Box 913
Charleston, West Virginia 25323
(304) 345-1234
sruby@cdkrlaw.com
drpogue@cdkrlaw.com

*Attorneys for Plaintiff Regeneron Pharmaceuticals, Inc.*

*Of Counsel*:

David I. Berl (admitted *PHV*)
Ellen E. Oberwetter (admitted *PHV*)
Thomas S. Fletcher (admitted *PHV*)
Andrew V. Trask (admitted *PHV*)
Teagan J. Gregory (admitted *PHV*)
Shaun P. Mahaffy (admitted *PHV*)
Sean M. Douglass (admitted *PHV*)
Kathryn S. Kayali (admitted *PHV*)
Arthur J. Argall III (admitted *PHV*)
Adam Pan (admitted *PHV*)
Nicholas Jordan (admitted *PHV*)
Haylee Bernal Anderson (admitted *PHV*)
Renee Griffin (admitted *PHV*)
Rebecca Carter (admitted *PHV*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000
dberl@wc.com
eoberwetter@wc.com
tfletcher@wc.com
atrask@wc.com
tgregory@wc.com
smahaffy@wc.com
sdouglass@wc.com
kkayali@wc.com
aargall@wc.com
apan@wc.com
njordan@wc.com
handerson@wc.com
rgriffin@wc.com
rebeccacarter@wc.com

Andrew E. Goldsmith (admitted *PHV*)
Evan T. Leo (admitted *PHV*)
Jacob E. Hartman (admitted *PHV*)
Grace W. Knofczynski (admitted *PHV*)
Mary Charlotte Y. Carroll (admitted *PHV*)
Sven E. Henningson (admitted *PHV*)
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
TEL: (202) 326-7900
agoldsmith@kellogghansen.com
eleo@kellogghansen.com
jhartman@kellogghansen.com
gknofczynski@kellogghansen.com
mcarroll@kellogghansen.com
shenningson@kellogghansen.com

*Attorneys for Plaintiff Regeneron Pharmaceuticals, Inc.*