# EXHIBIT 10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF WEST VIRGINIA

Regeneron Pharmaceuticals, Inc.

Plaintiff,

VS. CIVIL ACTION NO.

1:22-cv-61

Mylan Pharmaceuticals, Inc., and Volume 2

Biocon Biologics,

Defendants.

\- - -

Proceedings had in the bench trial of the above-styled action on June 13, 2023, before Honorable Thomas S. Kleeh District Judge, at Clarksburg, West Virginia.

\- - -

APPEARANCES:

On behalf of the Plaintiff:

David I. Berl
Ellen E. Oberwetter
Kathryn S. Kayali
Williams & Connolly, LLP
680 Maine Avenue, SW
Washington, D.C. 20024
202.434.5000

APPEARANCES CONTINUED ON NEXT PAGE

On behalf of the Plaintiff, continued:

Steven Robert Ruby
Carey, Douglas, Kessler & Ruby, PLLC
797 Virginia Street, East, Suite 901
Charleston, WV 25301
304.345.1234

Petra Scamborova
Regeneron Pharmaceuticals, Inc.
777 Old Saw Mill River Road
Tarrytown, NY 10591-6717
914.847.7611

On behalf of the Defendant:

Deanne M. Mazzochi
William A. Rakoczy
Lauren M. Lesko
Rakoczy, Molino, Mazzochi & Siwik, LLP
6 W. Hubbard Street, Suite 500
Chicago, IL 60654
312.527.2157

Gordon H. Copland
William J. O'Brien
Steptoe & Johnson
400 White Oaks Blvd.
Bridgeport, WV 26330
304.933.8162

Proceedings recorded utilizing realtime translation.
Transcript produced by computer-aided transcription.

THE COURT: Understood. The Court will continue to hold that issue in abeyance until posttrial briefing. For purposes of our trial record, the Court will presumably receive them as we go. They were produced in discovery, as counsel indicated. I realize there's a looming issue with respect to how specific those discovery responses may be. And we'll take that up I'm sure in posttrial briefing in the Court's ultimate order.

MR. BERL: In case it wasn't clear to Your Honor, we disagree with virtually everything that Mr. Salmen just said.

THE COURT: I assumed as much, Mr. Berl. I know what happens when you assume, but I feel safe doing that here.

With the -- I came to change of shift in a coal mine, but with that, Mr. Berl, plaintiff may now call its next witness.

MR. BERL: Thank you, Your Honor. Plaintiffs call Dr. Eric Furfine.

**ERIC FURFINE, PhD, PLAINTIFF'S WITNESS, SWORN**

MR. BERL: Your Honor, may I approach with exhibits and demonstratives?

THE COURT: You may.

Thank you, Counsel. You may proceed.

MR. BERL: Thank you, Your Honor.

DIRECT EXAMINATION

discovery almost everything we do is a yin and a yang. There's a benefit to be gotten from having a lot of something, and there's also a downside to be had of those things. And you have to find that balance of safety versus risk, efficacy versus adverse effects. And, you know, the higher you go, the higher the chances you're going to get an adverse effect that may dampen the benefit that you get.

Q. What about stability in formulation?

A. Higher concentration formulations with proteins in particular are much more challenging to do.

Q. What happens when it's challenging? What happens with high concentrations sometimes?

A. High-concentration formulations of proteins often aggregate and precipitate out of solution and cause particles.

Q. Is that a problem?

A. That's a big problem, and it's probably more of a problem for an eye drug than it is for a regular drug.

Q. Why is that a problem for an eye drug?

A. So there's three big reasons why particles are a problem for an eye drug. These are probably somewhat obvious, but one is, if you put particles in the eye, you can imagine obscuring your vision. And, in fact, that can happen.

The other thing is you can induce inflammation, which, in fact, we see inflammation here. We don't know that it was particles, but it very well could have been.

And the third thing is you can stimulate an immune response to the drug that you've injected. And if you get an immune response to the drug, you can end up neutralizing the drug so it doesn't work anymore.

Q. And when you said we --

THE COURT: I'm sorry. What do you mean when you say "immune response," Doctor?

THE WITNESS: So what happens -- immune response can be a number of things; so it's a good question. So a lot of times you get an antibody response, like to COVID. And if you make antibodies to COVID, you clear the COVID. If you make antibodies to your drug, you clear your drug.

THE COURT: Understood.

Sorry, Mr. Berl.

MR. BERL: Thank you. We're all here to help you understand. Doesn't matter if anyone else does.

BY MR. BERL:

Q. You said in your answer we see inflammation here. I just want the record to be clear. When you said there's inflammation here, were you referring to the Gaudreault reference on the screen, Exhibit 1839?

A. Yes.

Q. Now, let's go back with that in mind to the rabbit PK study that you had mentioned, which is PTX 3257, and the results at page 100. We looked at this paragraph before. I'd

now like to ask you about the language further down in this paragraph about how long the protein can be present in the tissue.

Can you explain what result you obtained in your study?

A. Yes. So as you can see here, the drug was present in the tissue for at least through 28 days. And, again, this is a yin and a yang situation. If you have a lot of drug around for a long time, there's a chance it could have an adverse effect. But if you have a drug around for a long time, it could be having efficacy for that time.

I was a little bit more on the optimist side of things in this case, but nonetheless one has a concern that you can have a problem with it, and you need to do further testing to sort that out.

Q. To be clear, Dr. Furfine, did you expect to obtain this result in the pharmacokinetic study in the rabbits of the protein being present in the tissue for up to 672 hours?

A. No, we did not expect this.

Q. Is that a high number or a low number?

A. It's a high number. This was, roughly speaking, about twice as good as ranibizumab, and that was encouraging to us.

Q. And just again so the record's clear, was this public at the time?

And so that's what we did. We started over.

Q. Are there considerations that are relevant for intravitreal formulations that are less important for intravenous or subcutaneous formulations?

A. Absolutely. One big one, and maybe one of the biggest ones, was that there's a stress that happens in intravitreal formulations that wouldn't happen in systemic formulations.

So when you do an injection in the eye, you can imagine you want to use the smallest needle you can because who wants a big needle in their eye?

THE COURT: That is well established.

THE WITNESS: See, I don't have to do too many more studies on that. It's already known.

So what you do is you use these really narrow-bore needles. It's a very thin hull. What happens is, when you force solutions, protein solutions especially, through a narrow-bore needle, you create what's called shear stress. It's like a pressure, and that creates a stress that can cause a protein to come out of solution.

So you need to add agents into your formulation, ingredients that stabilize the solution and keep the drug in solution under these kinds of stressful situations. That would not happen for IV and SC.

THE COURT: When you say "in solution," I assume you

mean still floating in the carrying liquid, for lack of any scientific term.

THE WITNESS: That's exactly right. That's perfectly scientific.

And what happens here, in fact, is if you don't survive shear stress, you see particles that are clearly -- by definition, a particle is not in solution. So, in fact, it's black and white. They're either in solution or they're not.

THE COURT: And in this form, again, because we're using a needle and a syringe, particles might be attached to the syringe itself or --

THE WITNESS: No. The manufacturer of syringe needles and the like has them clear of, really, any detectable particles. And so if you saw particles after shooting the drug through it, it would be solely the result of the protein coming out of the solution.

MR. BERL: I think what Your Honor -- what the Court may have been asking is do the particles get stuck in the needle? Is what you're asking, Your Honor?

THE COURT: Yeah. You're talking about shear stress which I'm envisioning sort of three lanes of traffic merging as one, right?

THE WITNESS: That's right. That's right. That's right.

THE COURT: You have all that there. So when that

occurs and that buildup occurs, if the protein falls out of solution, where does it go? Where do the particles exist?

THE WITNESS: So most -- it's a great question. So most of the time they actually don't clog the needle, but they could. If you had a severe enough response, you could actually clog the needle.

What usually happens is you shoot them into the eye, and that's where you get your trouble.

THE COURT: Okay.

BY MR. BERL:

Q. Do you ever want to shoot a particle into the eye, Doctor?

A. No, no, you don't.

THE COURT: Again, I believe that also has been well established.

BY MR. BERL:

Q. Now, let's take a look at the same page further down, 262 in Exhibit 81.

Was the ITV-1 formulation that you said you started with, was that ultimately a formulation that met your needs for intravitreal administration?

A. No. In fact, it was problematic in this very stability test that we were just referring to. It did not withstand shear stress to the degree that we wanted it to and had a second problem that it didn't stand up -- withstand heat

CERTIFICATE

I, Cindy L. Knecht, Registered Professional Reporter and Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action on June 13, 2023, as reported by me in stenotypy.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 13th day of June 2023.

/s/Cindy L. Knecht
______________________________
Cindy L. Knecht, RMR/CRR
Official reporter, United States
District Court for the Northern
District of West Virginia