# EXHIBIT 13

Federal Patent Court
Federal Patent **Court**
Federal Patent Court
Federal Patent Court

S2025_003

# Judgment of 17 July 2026

Composition

President Mark Dr iur. Schweizer (Presiding), Judge Dr sc. nat. ETH Tobias Bremi (Rapporteur), Judge Dr chem. Michael Kaufmann Chief Registrar MLaw Sven Bucher

Parties to the proceedings

1. Regeneron **Pharmaceuticals, Inc.,** 77 Old Saw Mill River Road, Tarrytown, NY 10591-6707, USA,
2. Bayer HealthCare LLC, 100 Bayer Boulevard, Whippany, NJ 07981-0915, USA,
3. Bayer Consumer Care AG, Peter Merian-Strasse 84, 4052 Basel,

all represented by Dr Simon Holzer, lawyer, and Louisa Galbraith, MLaw, both with legal advice on patent matters from Dr Ulrike Ciesla, Dr nat., Dipl. Chem., all of MLL Legal AG, Schiffbaustrasse 2, P.O. Box 1765, 8031 Zurich,

Plaintiffs v

1. Sandoz Group AG, Centralbahnstrasse 4, 4054 Basel,
2. Sandoz AG, Centralbahnstrasse 4, 4054 Basel,
3. **Sandoz Pharmaceuticals AG,** Suurstoffi 14, 6343 Rotkreuz,

all represented by Dr Andri Hess, lawyer, and Julian Schwaller, lawyer (lic. iur.), both of Homburger AG, Prime Tower, Hardstrasse 201, 8005 Zurich,

Defendants

Subject

Interim measures; Aflibercept

Computer Translation

S2025_003

**The Federal Patent Court considers:**

1.

By writ of claim dated 25 November 2025, the claimants made the following submissions:

'1. Respondents 1, 2 and 3 shall be prohibited, on pain of a disciplinary fine of CHF 1,000 per day pursuant to Article 343(1)(c) of the Swiss Code of Civil Procedure (ZPO), and at least CHF 5,000 pursuant to Article 343( 1(b) of the ZPO, as well as a penalty (fine) for their executives under Article 292 of the Swiss Criminal Code (StGB), from manufacturing, storing, offering, selling, distributing, importing, exporting, marketing or otherwise placing on the market, as well as possessing for these purposes, and/or inciting and/or assisting third parties with regard to and/or facilitating the manufacturing, storing, offering, selling, distributing, importing, exporting, marketing or otherwise placing on the market, as well as possessing for those purposes, in Switzerland, an ophthalmic formulation comprising:

- 40 mg/ml of aflibercept,
- 0.03 % polysorbate 20,
- 10 mM histidine, and
- 213 mM trehalose,

having a pH of 5.8 to 7.0,

wherein the formulation is suitable for injection into the vitreous cavity of the human eye,

in particular a pharmaceutical formulation such as that authorised by Swissmedic under marketing authorisation numbers 62397 (vials) and 62393 (pre-filled syringes).

2. Respondents 1 and 2 shall be prohibited, on pain of a disciplinary fine of CHF 1,000 per day pursuant to Article 343(1)(c) of the Swiss Code of Civil Procedure (ZPO), and at least CHF 5,000 pursuant to Article 343( 1(b) of the ZPO, as well as a penalty (fine) for their executives pursuant to Article 292 of the Swiss Criminal Code (StGB), from manufacturing, storing, offering, selling, distributing, importing, exporting, marketing or otherwise placing on the market, as well as possessing for these purposes, and/or inciting and/or assisting third parties with regard to and/or facilitating the manufacturing, storing, offering, selling, distributing, importing, exporting, marketing or otherwise placing on the market, as well as possessing for those purposes, in Austria, Belgium, Bulgaria, the Czech Republic,



Computer Translation

S2025_003

Denmark, Finland, France, Greece, Hungary, Ireland, Italy, the Netherlands,

Computer Translation

Poland, Portugal, Romania, Slovakia, Slovenia, Spain, and Sweden, an ophthalmic formulation comprising:

– 40 mg/ml of aflibercept,

– 0.03% polysorbate 20,

– 10 mM histidine, and

– 213 mM trehalose,

having a pH of 5.8 to

7.0,

wherein the formulation is suitable for injection into the vitreous cavity of the human eye,

in particular a pharmaceutical formulation such as that authorised by the European Medicines Agency (EMA) with the EMA marketing authorisation numbers 62397 (vials) and 62393 (pre-filled syringes).

3. Respondents 1, 2 and 3 shall be prohibited, on pain of a disciplinary fine of CHF 1,000 per day pursuant to Article 343(1)(c) of the Swiss Code of Civil Procedure (ZPO), and at least CHF 5,000 pursuant to Article 343( 1(b) of the ZPO, as well as a penalty (fine) for their executives pursuant to Article 292 of the Swiss Criminal Code (StGB), from manufacturing, storing, offering, selling, distributing, importing, exporting, marketing or otherwise placing on the market, as well as possessing for these purposes, and/or inciting and/or assisting third parties with regard to and/or facilitating the manufacturing, storing, offering, selling, distributing, importing, exporting, marketing or otherwise placing on the market, as well as possessing for those purposes, in Switzerland, a lyophilisable ophthalmic formulation comprising:

– 40 mg/ml of aflibercept,

– 0.03 % polysorbate 20,

– 10 mM histidine, and

– 213 mM trehalose,

having a pH of 5.8 to

7.0,

wherein the formulation can be reconstituted (if lyophilised) and is suitable for injection into the vitreous cavity of the human eye.

4. Respondents 1 and 2 shall be prohibited, on pain of a disciplinary fine of CHF 1,000 per day pursuant to Article 343(1)(c) of the Swiss Code of Civil



Computer Translation

Procedure (ZPO), and at least CHF 5,000 pursuant to Article 343( 1(b) of the ZPO, as well as a penalty (fine) for its executives under Article 292 of the Swiss Criminal Code (StGB), from manufacturing, storing, offering, selling, distributing, im-

Computer Translation

port, export, market or otherwise place on the market, as well as possessing for these purposes, and/or inciting and/or assisting third parties with respect to and/or facilitating the manufacture, storage, offering, sale, distribution, import, export, marketing or otherwise placing on the market, as well as possessing for those purposes, in Austria, Belgium, Bulgaria, the Czech Republic, Denmark, Finland, France, Greece, Hungary, Ireland, Italy, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, and Sweden, a lyophilisable ophthalmic formulation comprising:

- 40 mg/ml of aflibercept,
- 0.03% polysorbate 20,
- 10 mM histidine, and
- 213 mM trehalose,

having a pH of 5.8 to

7.0,

wherein the formulation can be reconstituted (if lyophilised) and is suitable for injection into the vitreous cavity of the human eye.

5. All costs and fees, including the expenses of the assisting patent attorney, are to be borne by the Respondents on a joint and several basis."

2.

On 19 December 2025, the Defendants filed their defence with the following legal submissions:

«1. The application for a preliminary injunction shall be dismissed.

2. In the alternative, should the Court grant an interim injunction, such injunction shall be subject to the Plaintiffs, jointly and severally, providing security as follows:

   (i) CHF 20 million for an injunction relating to Switzerland (Plaintiffs' Prayers for Relief Nos. 1 and 3); and

   (ii) CHF 10 million per country for a cross-border injunction concerning the 19 European countries identified in the Plaintiffs' Prayers for Relief Nos. 2 and 4, totalling CHF 190 million if injunctions are issued for all 19 countries.

3. The Plaintiffs shall be ordered, jointly and severally, to bear the costs of



Computer Translation

these proceedings and to compensate each of the Defendants for the costs

Computer Translation

and expenses of their legal representation, plus VAT where applicable (including, in particular, in the case of Plaintiff 3).

4. The Plaintiffs shall be ordered, jointly and severally, to fully reimburse the Defendants for the legal fees, costs and expenses incurred in connection with legal advice obtained in relation to Austria, Belgium, Bulgaria, the Czech Republic, Denmark, Finland, France, Greece, Hungary, Ireland, Italy, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden and the Netherlands."

3.
On 16 January 2026, the Plaintiffs submitted their response to the Defendants' reply, with their legal claims remaining unchanged. The defendants responded to this in a submission dated 17 February 2026. Further submissions from the claimants were made on 5 March 2026 and 15 April 2026; those from the defendants were made in a submission dated 27 March
2026.

4.
By letter dated 28 April 2026, the parties were sent the specialist judge's opinion of 27 April 2026, drawn up by Specialist Judge Tobias Bremi, for their comments. The parties each submitted their comments in submissions dated 20 May 2026.

5.
The oral hearing took place on 3 June 2026 in St Gallen.

**Procedural**

Plaintiffs 1 and 2 are companies with their registered offices in the United States of America. Plaintiff 3 is a public limited company with its registered office in Basel. Defendants 1–3 are public limited companies with their registered offices in Basel and Rotkreuz (Defendant 3), respectively. The case involves international elements.

The claimants allege infringement of several national divisions of the European patent EP 2 364 691 and seek an injunction in Switzerland, Austria, Belgium, Bulgaria, the Czech Republic, Denmark, Finland, France, Greece, Hungary, Ireland, Italy, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain and Sweden. The international jurisdiction of the Swiss courts arises



Computer Translation

for civil and commercial proceedings brought against defendants domiciled in Switzerland from Article 2(1) of the Convention on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters (LugÜ, SR 0.275.12) and Article 109(2) of the Swiss Private International Law Act (IPRG), respectively. As the plaintiffs are seeking the granting of interim measures, the territorial international jurisdiction of the court seised also derives from Article 31 of the LugÜ.

The Federal Patent Court has exclusive jurisdiction over infringement actions relating to patents and the ordering of interim measures within the scope of its jurisdiction over infringement actions within Switzerland (Article 26(1)(a) and (b) of the Federal Patent Court Act (PatGG)). The Federal Patent Court therefore has both subject-matter and territorial jurisdiction.

7.
Infringement of foreign intellectual property rights may also be asserted at the court of the registered office. Article 22(4) of the Lugano Convention, which provides for the exclusive jurisdiction of the courts of the State in whose territory the registration was effected in respect of actions concerning the registration or validity of patents, does not preclude jurisdiction based on Article 31 of the Lugano Convention.[1] In a recent judgment of February 2025, the ECJ confirmed this in so far as, even in ordinary proceedings, a court having jurisdiction over an infringement action does not lose its jurisdiction if a defence of patent invalidity is raised.[2] The defendants do not, therefore, contest the territorial and subject-matter jurisdiction of the court seised.

8.
Intellectual property rights are governed by the law of the State in which protection of the intellectual property is sought *(lex causae,* Art. 110(1) IPRG). The right to an injunction for territories outside Switzerland and Liechtenstein is to be assessed in accordance with the country-of-protection principle under foreign law,[3] although in the case of interim measures

---

[1] ECJ, Judgment C-616/10 of 12 July 2012 — 'Solvay v Honeywell' on the parallel provision in Regulation No 44/2001; relevant to the Lugano Convention by virtue of Article 1(1) of Protocol 2 to the Lugano Convention.
[2] ECJ, Judgment C-339/22 of 25 February 2025 — 'BSH v Electrolux'.
[3] BK ZPO-DOMENIG/GÜNGERICH, Art. 261, note 22; HUBER/JUTZELER, in: Sutter-Somm/Lötscher/Leuenberger/Seiler (eds.), Commentary on the Swiss Code of Civil Procedure (ZPO), 4th ed. Zurich 2025, Art. 261, para. 46; BSK IPRG-



Computer Translation

JEGHER/KUNZ, Art. 110, para. 17.

Computer Translation

it is sufficient if the foreign law is substantiated.[4] In so far as the claimed injunction is based on an alleged infringement of the national parts of a European patent, Article 69 EPC for determining the scope of protection of European patents and the associated Protocol on the Interpretation of Article 69 of the European Patent Convention (SR 0.232.142.25) are applicable. Against this background, it must be assumed that a patent infringement in the individual member states of the EPC will ultimately be decided in the same way.' In interim proceedings, where both the claim for an injunction and the application of foreign law need only be prima facie established, the prima facieor not prima facie established infringement of the Swiss part of the European patent, as a result of the uniform interpretation of the scope of protection of European patents in the EPC states, means that the other asserted parts of the same European patent at issue are, in principle, also prima facie infringed or not infringed, as the case may be.

Procedural issues, such as the grounds for an order or the urgency of the matter, are governed by the law of the place where the court is situated (*lex* fori).[6]

9.
The language of the proceedings is German (Article 36 of the Patents Act (PatGG)). The parties have agreed to use English as the language of the proceedings (Article 36(3) of the Patents Act (PatGG)).

**Standing to sue of Plaintiffs** 2 and 3

10.
The defendants contest the standing of Plaintiffs 2 and 3 to bring proceedings. They argue that standing is inextricably linked to the exclusive right of the exclusive licensee. In the present case, Plaintiff 2 granted Plaintiff 3 an exclusive licence to place Eyleao on the market. Plaintiff 3, in turn, had granted an exclusive licence for the placing on the market in Switzerland to Bayer (Schweiz) AG, Zurich, which is not a party to the present proceedings. The

---

[4] STAEHELIN, in: Staehelin/Grolimund (eds.), Civil Procedure Law, 4th edition 2024, § 22, para. 46; BSK IPRG-MACHLER-ERNE/WOLF-METTIER, Art. 16, note 26.
[5] See also Munich Regional Court I, judgment 7 O 16055/24 of 25 September 2025, para. 138.
^ BSK ZPO-SPRECHER, pre-Art. 261–269, note 20.



Computer Translation

Plaintiffs 2 and 3 would thus have waived their right to enforce the licensed intellectual property right in Switzerland, meaning they are not entitled to bring the present action under Art. 75(1) of the Patents Act. In the alternative, the defendants argue that Plaintiffs 2 and 3 are entitled only to bring an action for an injunction concerning the offering for sale and sale, as they had been granted a licence only for those acts.

The claimants dispute this legal view and contend that what matters is whether the legal position of claimants 2 and 3 is jeopardised by the defendants' conduct. Furthermore, export, for example, presupposes offering or selling, meaning that legal action may also be brought against the more extensive acts of placing the product on the market.

11.
Pursuant to section 75(1) of the Patents Act, the exclusive licensee is entitled, irrespective of whether the licence is entered in the register, to bring an action under section 72 or 73 of the Patents Act, provided that this has not been expressly excluded in the licence agreement. Under the transitional provision in Section 145(2) of the Patents Act, Section 75 applies only to licence agreements concluded or confirmed after 1 July 2008. The licence agreements in question were all concluded or confirmed after 1 July 2008, meaning that Section 75 of the Patents Act applies.

There is a dispute in legal scholarship as to whether Article 75 of the PatG creates a right to sue on behalf of another or grants the licensee a *sui generis* right of action. In the case of the right to sue on behalf of another, the licensee asserts a third party's right (that of the patent proprietor) in their own name, whereas in the case of a *sui generis* right of action, they exercise their own right in their own name.[8] Insofar as Article 75 of the PatG grants an independent right of action, the patent proprietor and the exclusive licensee retain independent rights of action alongside one another.*

In the Explanatory Memorandum on the amendment to the Patents Act and on the Federal Resolution approving the Patent Law Treaty and the Implementing Regulations of 23 November 2005, the legislature stated that licensees 'may assert their legitimate interests against third parties...'

---

[7] SHK PatG-DORIGO, Art. 75 N 12 ff., with numerous references.
CR PI-LBI-CHERPILLOD, Art. 74 N 4.
^ SHK PatG-DORIGO, Art. 75 N 14.

Computer Translation

furthermore, the proprietor of the intellectual property right is to be able to bring an action alongside the exclusive licensee 'if he has his own interest worthy of protection'.[10] The fact that the licensee can assert his interests through legal action and that the patent proprietor retains the right to bring an action alongside the licensee suggests the existence of an independent right of action *sui generis* [11]

As far as can be ascertained, the issue has not yet been clarified by the Supreme Court. In its judgment HG.2012.95 of 30 November 2016, the Commercial Court of St. Gallen commented on the licensee's right to bring an action under the analogous provision in copyright law, Section 62(3) of the Copyright Act (URG), and expressed its support for an independent right of action. This right exists not only in the relationship between the licensor and the exclusive licensee, but also between the exclusive licensee and the exclusive sub-licensee, because the respective interests are comparable.[12] In its judgment S2019 002 of 15 August 2019, the Federal Patent Court followed this ruling and likewise assumed that the exclusive licensee has an independent right of action, which the licensee may, in principle, assert alongside the licensor or any exclusive sub-licensee.[13]

12.
The arguments put forward by the defendants give no cause to depart from this case law. They are based in particular on the following passages in the Explanatory Memorandum: *'[The licensee] therefore* often *has a vital interest in taking action against the infringer. In this regard, the exclusive licensee's interest is the greatest, as an exclusive licence confers a legal position that* is *very close* to *that of the right* holder'"[14] and *"The idea of granting all licensees the right to bring an action was ruled out during the parliamentary deliberations on the Designs Act: This was intended to counter the risk of a conflict arising amongst the licensees as to who could assert the infringement; furthermore, the legal position of ordinary licensees is not as comparable to that of the patent holder as is the case with the exclusive licensee. It has become apparent that there is uncertainty as to whether*

[10] BBI 2006 1 ff., 41, 127.
[11] This is also the view of recent scholarship; see SHK PatG-DORIGO, Art. 75 N 14 et seq., with further references.
[12] Federal Supreme Court of St Gallen, judgment HG.2012.95-HGK of 30 November 2016, para. III.1. d. bb.
[13] Federal Patent Court, judgment S2019_002 of 15 August 2019, para. 6.
[14] BBI 2006 1, 126.



Computer Translation

*‘Exclusivity relates not only to the granting of the licence but also to the right to use. It is therefore necessary, in the interests of legal certainty, to clarify the term “exclusive licensee”. An exclusive licence entitles the holder to use the intellectual property right to the exclusion of all other persons, including the intellectual property right holder’.* [1] ’

Although not referred to by the defendants, the two sentences immediately following are nonetheless important for understanding the message: *‘Apart from* [the exclusive licensee]*, the proprietor of the intellectual property right may only bring an action if he has a legitimate interest of his own, for example, the infringement of his claim to licence fees. This clarification is consistent with the legal situation in other European countries and, in particular, with the intention expressed in the parliamentary debates; for even where the intellectual property right holder retains the right to use the invention alongside the licensee, there remains a risk of conflict as to who may assert the infringement’.* [16]

The defendants do not dispute that the patent holder has an independent right of action alongside the licensee who holds the exclusive right of use, provided that the patent holder asserts a legitimate interest. However, they appear to infer from the passage in the explanatory memorandum which they have cited that the right of action is inseparably linked to the exclusive right of use. In their view, there is only one right to bring an action, which is transferred in each case together with the right of use to the exclusive (sub-)licensee.

The conclusion that the exclusive licensee’s independent right to bring an action is inextricably linked to the exclusive right of use and is transferred with it to the next (sub-)licensee is not implied in the explanatory memorandum. Rather, the aforementioned passage in the explanatory memorandum makes it clear that an independent right of action on the part of the licensee exists only in the case of an exclusive licence, but not in the case of a simple or sole licence. This interpretation is underpinned, on the one hand, by the reference to other European countries, namely German patent law.[17] According to the general understanding of Section 15 of the German Patent Act, a

[15] BBl 2006 1, 127.
[16] BBl 2006 1, 127.
1’ BBl 2006 1, 127.

Computer Translation

simple or sole licensee is also not entitled to bring an action.[18] On the other hand, the clarification that only the exclusive licensee and, alongside him, only the proprietor of the intellectual property right with a legitimate interest are entitled to bring an action would be meaningless if it did not also make it clear that the simple and sole licensees are not entitled to bring an action.[1] ^ The fact that the licensee's right to bring an action presupposes an exclusive licence does not imply that the right to bring an action is transferred to the exclusive sub-licensee together with the exclusive right of use, as the relationship between the exclusive licensee and the exclusive sub-licensee may involve similar interests to those between the patent proprietor and the exclusive licensee.[20] The exclusive licensee with a legitimate interest therefore retains an independent right to bring proceedings alongside the exclusive sub-licensee.

13.
Under the licence and cooperation agreement dated 18 October 2006, Plaintiff 1 granted Plaintiff 2 an exclusive licence ("co-exclusive") to manufacture, have manufactured, use, develop, import and export Plaintiff 1's products outside the United States of America, as well as an exclusive licence to offer or sell Plaintiff 1's products outside the United States of America (**"2006 Agreement",** Clause 4.1). Plaintiffs 1 and 2 supplemented this agreement with the Amendment Agreement dated 7 May 2012. Pursuant to Clause 4.3 of the 2006 Agreement, Plaintiff 2 is entitled to grant sub-licences. This clause was clarified by an agreement dated 16 July 2025 to the effect that Plaintiff 2 may grant sub-licences to group companies of the Bayer Group without the consent of Plaintiff 1.

By a licence agreement dated 1 April 2012, Plaintiff 2 granted Plaintiff 3 a licence, in return for payment, to manufacture, use, import, offer for sale and sell Eylea outside the United States of America (Clause 2.1). By an amendment agreement dated
18 July 2025, Plaintiff 2 granted Plaintiff 3 an exclusive licence to the extent specified above and conferred upon it the right to enforce the licensed intellectual property right against third parties.

[1] Benkard PatG/DEICHFUSS/TOCHTERMANN, § 15 N 90.
1^ BBl 2006 1, 127.
[20] HGer SG, Judgment HG.2012.95-HGK of 30 November 2016, para. III. 1. d. ibid.

Computer Translation

The claimant 3 granted Bayer (Schweiz) AG (not a party to these proceedings) a paid, exclusive licence under a licence and distribution agreement dated 16 December 2016 to manufacture, market, distribute and sell Eyleao in Switzerland and Liechtenstein. By an amendment agreement with effect from 16 July 2025, Plaintiff 3 granted Bayer (Schweiz) AG the right to enforce the licensed intellectual property right against third parties in Switzerland and Liechtenstein.

14.
Plaintiffs 2 and 3 are exclusive (sub-)licensees of Plaintiff 1, with the authority to offer or sell Eyleao outside the United States of America. Alongside Plaintiff 1 as the patent proprietor and Bayer (Schweiz) AG as the ultimate exclusive sub-licensee, they are, in principle, independently entitled to bring an action. However, they are not exempt from proving a legal interest in the proceedings even if they are granted the right to enforce the licensed intellectual property right against third parties.[21]

The claimants argue that the legal position of Claimants 2 and 3 is jeopardised by the defendants' conduct, which is why they have a legitimate interest in bringing the action. The defendants do not dispute the legitimate interest in bringing the action, but rather the right to bring the action as such.

Plaintiffs 2 and 3 are therefore, in principle, entitled to bring the action. It remains to be clarified whether their right to bring the action covers only the prohibition on offering for sale and selling, or the full scope of the claims for an injunction.

15.
The right to bring proceedings is vested solely in that exclusive licensee within whose licence scope the infringement falls, whereby the scope of the licence may be limited in terms of territory, time or subject matter.[22] In other words, the right to bring proceedings is bound, in terms of territory, time and subject matter, to the scope of the licence. Consequently,

[21] Federal Patent Court, Judgment S2019_002 of 15 August 2019, para. 7.
[22] BBl 2006 1, 127.

Computer Translation

outside the scope of the exclusive licence, only the patent proprietor or other exclusive licensees are entitled to bring an action.[23]

In terms of subject matter, it is undisputed that Plaintiff 2's exclusive licence covers only the offering for sale and sale of Eyleao products. Territorially, the licence extends to all countries except the United States of America. In so far as the defendants' acts of use going beyond offering and selling are not directed at patent-free use under Section 9 of the Patents Act or exclusively at offering or selling in the United States of America — which the defendants do not claim — all acts covered by claims 1–4 are capable of hindering or jeopardising the acts falling within the material scope of the exclusive licence within the territorial scope of that licence. The acts covered by claims 1–4 therefore affect the subject-matter of Plaintiff 2's exclusive licence, meaning that she is also entitled to bring an action in respect of acts of use going beyond mere offering and selling. The same applies to Plaintiff 3.

Plaintiffs 2 and 3 are therefore fully entitled to bring proceedings.

16.
With regard to Belgium, Greece, Ireland, Poland and the Czech Republic, the defendants
defendants further argue that, under the applicable law in each case, the licensee's right to bring proceedings requires that the licence have been registered in the relevant patent register, which has not been done. In France, Finland, the Netherlands, Romania, Slovenia and Slovakia, the licensee's action also requires the express consent of the patent proprietor. In view of the outcome of the proceedings, these questions may be left open, in particular whether the right to bring proceedings is determined exclusively by the *lex causae*.

2 3 SHK PatG-DORIGO, Art. 75 N 35.



Computer Translation

**Locus standi of Defendants** 1 and 2

17.
The party against whom a claim is directed is the party with substantive liability.[24]

The plaintiffs' claims seek an injunction and are based on Article 66 of the PatG. Under that provision, a person may be held liable under civil and criminal law if they commit an act referred to in subparagraphs (a) to (c), or incite, assist or facilitate the commission of such an act.

In the present case, the focus is on acts of use under Article 66(a) of the PatG, which, under Article 8 of the PatG, are reserved exclusively for the patent proprietor.[25] Under Article 8(2) of the PatG, acts of use include, in particular, the manufacture, storage, offering for sale, placing on the market, import, export and transit, as well as possession for these purposes.

An 'offer' within the meaning of Article 8(2) of the PatG does not require a legally binding offer within the meaning of Article 3 et seq. of the Swiss Code of Obligations;[26] a mere invitation to make an offer is sufficient.[2] Any statement which, in good faith, can be understood to mean that the offeror is prepared to place the offered product on the market is sufficient.[28] Actual readiness or ability to deliver is irrelevant if the offer is capable of influencing the market behaviour of the addressee to the detriment of the patent proprietor.[2] According to the case law of the Federal Patent Court, it is sufficient for potential customers to be made aware that the market launch of a generic product is imminent.[30]

18.
The defendants contest the standing to be sued of Defendants 1 and 2, on the grounds that they did not commit any alleged acts of infringement. Defendant 1 is, they argue, a pure holding company and does not engage in operational activities.

---

2 4 BGE 123 III 220 E. 4a.

2 ' SHK PatG-HESS-BLUMER/BAECHLER, Art. 66 N 4.

26 BLUM/PEDRAZZINI, Art. 8, para. 17; CALAME, in: von Büren/David (eds.), SIWR IV, Patent Law and Know-how, including Genetic Engineering, Software and Plant Variety Protection, p. 436; SHK PatG-HESS-BLUMER, Art. 8, para. 86.

2 7 BLUM/PEDRAZZINI, Art. 8, para. 17.

2 BLUM/PEDRAZZINI, Art. 8, para. 17; CALAME, op. cit., p. 437; HEINRICH, PatG/EPÜ, 3rd ed. Bern 2018, Art. 8 n. 6; SHK PatG-HESS-BLUMER, Art. 8 n. 86.

2 * SHK PatG-HESS-BLUMER, Art. 8, para. 86.

30 Federal Patent Court, Judgment S214 003 of 31 March 2014, para. 4; Federal Patent Court, Judgment



Computer Translation

S2019_006 of 21 March 2019, para. 7.

Computer Translation

The parent company's reporting on the activities and achievements of its subsidiaries does not constitute patent infringement. Furthermore, Defendant 2 does not hold any marketing authorisations for Afqliro and has not, moreover, committed any acts of patent infringement. Insofar as Defendant 2 was involved in a consignment from Switzerland to Belgium, this concerned a consignment of the active ingredient aflibercept, which was already off-patent (or, more precisely, no longer subject to an ESZ) at the time of delivery. The plaintiffs dispute this view and allege acts of infringement by Defendants 1 and 2.

It is not disputed that Defendant 3 is responsible for the sale and promotion of Afqlir@ in Switzerland.

19.
It is undisputed between the parties that **Defendant** 1 is the parent company of the Sandoz Group. The plaintiffs argue that Defendant 1, as the parent company, controls the other group companies and instructs them to carry out acts of use. For example, in a press release dated 30 October 2025, a presentation dated 30 October 2025 and a press release dated 24 November 2025, Defendant 1 announced the market launch of Afqlir@ in the fourth quarter of 2025. Furthermore, in a press release dated 15 November 2025, Defendant 1 announced that Sandoz had received marketing authorisation for Afqlir@ from the European Commission and reported the granting of marketing authorisation as a strategic milestone in its annual report. Defendant 1 thus takes the view that nothing now stands in the way of the commercialisation of Afqlir@ following the expiry of the SPC for the active ingredient aflibercept. It thereby demonstrates that the commercialisation of Afqlir@ is of strategic interest to the Group and that it supervises and coordinates the market launch by the Group companies. In particular, Defendant 1 controls the timing of when Afqlir@ is marketed, offered and advertised. Defendant 1 bears the Group's strategic responsibility and is thus directly committing acts of patent infringement.

According to the defendants, Defendant 1 is a pure holding company with no operational activities and no employees. The members of the board of directors are in a contractual relationship with Defendant 1 and are employed by Defendant 2. Strategic decisions are taken by Defendant 2 and the other group companies, which are subject to the management

Computer Translation

of Sandoz. Defendant 1 does not control or manage the commercialisation of Afqliro in Switzerland and Europe, as each local group company decides for itself which medicines it wishes to sell. Furthermore, it cannot be inferred from the press releases, which Defendant 1 is obliged to issue under Article 53 of the SIX Listing Regulations, that it is responsible for the market entry communicated therein.

20.
According to Article 1, the SIX Listing Regulations aim to ensure transparency for investors regarding the quality of issuers and the characteristics of securities. This objective stems from Article 1(2) of the Financial Market Infrastructure Act (FinfraG; SR 958.1), which aims, amongst other things, to ensure the transparency of securities and derivatives markets. Under Article 53(1) of the SIX Listing Rules, the issuer is obliged to inform the market of price-sensitive facts that have occurred within the scope of its activities. This ad hoc disclosure is intended to ensure that issuers inform the public of significant events (Article 1 of the Directive on Ad Hoc Disclosure). Accordingly, every ad hoc announcement must be published on the issuer's own website (Article 9 of the Directive on Ad Hoc Disclosure).

Given their intended purpose, the primary recipients of ad hoc announcements are investors. However, it must not be overlooked that ad hoc announcements are not only addressed to investors, but are intended for the general public. The audience therefore inevitably includes, in addition to investors, other individuals who are not interested in trading in the issuer's securities, but for whom the information contained in the ad hoc announcements may nevertheless be relevant to their business. Ad hoc announcements thus have an impact beyond merely informing investors, in a way that is likely to influence the market in which the issuer operates.

An announcement by a parent company that a generic medicine has entered the market, or is about to do so, contains the information that at least one group company is prepared to accept commercial enquiries regarding the generic medicine in question and to place it on the market. Potential customers may thus be induced to postpone orders for the original product in order to order the cheaper generic as soon as it becomes available

Computer Translation

.3[1] Even if the ad hoc announcement is purely informative and not intended for marketing purposes, it has an advertising effect because it draws potential customers' attention to the launch of the generic medicine. It is therefore irrelevant whether the parent company making the announcement is itself operationally active and manufactures or markets the generic medicines itself. As potential customers are familiar with the group's operating subsidiaries in specific countries, they know whom to contact in order to order the announced generic medicines. In this way, the parent company's announcement may influence the market behaviour of market participants to the detriment of the patent holder.

21.
In the present case, Defendant 1 announced in an ad hoc announcement dated 30 October 2025 that the market launch of Afqlir@ was planned for the fourth quarter of 2025. In an ad hoc announcement dated 24 November 2025, Defendant 1 announced that Afqlir@ had been launched in the United Kingdom on the same day and that Afqlir@ was due to be launched in other key markets such as Germany and France, followed by further market launches in 2026. Defendant 1 has thus publicly announced that the market launch of Afqlir@ in Europe is imminent. This announcement may lead potential customers to postpone ordering the original product in order to order the cheaper generic version as soon as it becomes available.

The claimants have demonstrated a prima facie case that the announcements made by Defendant 1 on 30 October 2025 and 24 November 2025, prior to the expiry of the contested patent, infringe their rights, provided that the contested patent is valid and has been infringed. Defendant 1 therefore has standing to be sued.

22.
As regards Defendant 2's standing to be sued, the claimants argue that it is the global headquarters of the Sandoz Group. It is also responsible for the content on the website www.sandoz.com, where Defendant 1's notices were published. Furthermore, it supplied aflibercept from Switzerland to Belgium and is the proprietor of the trade mark rights to the trade mark 'Afqlir@'. The defendants counter that Defendant 2 does not hold a marketing authorisation for the placing on the market of 'Afqlir@', neither a Swiss nor a European one. Moreover, the four deliveries contained pure aflibercept and no

^1 Federal Patent Court, Judgment S2019 006 of 21 March 2019, para. 7.



Computer Translation

formulation as specified in the patent. Furthermore, they argue that no specific patent infringement can be inferred either from responsibility for the content on the website or from ownership of the trade mark rights for Afqliro.

23.
The defendants do not dispute that Defendant 2 is responsible for the content on the website www.sandoz.com, nor do they dispute that the ad hoc announcements were published on that website. Since announcements publicly referring to the imminent market launch constitute acts that are presumed to infringe the patent (see E. 20 et seq.), and given that it is established that Defendant 2 published Defendant 1's announcements of 30 October 2025 and 24 November 2025 on its website, Defendant 2 also has a credible passive standing.

24.
It is undisputed that Defendant 2 is the proprietor of the trade mark rights to the trade mark AFQLIR for pharmaceutical products in Switzerland and the EU (Community trade mark). Whilst it is true that ownership of a trade mark does not in itself indicate the offering, etc., of a patent-infringing embodiment, this does not apply without restriction in the highly regulated pharmaceutical industry. The defendant's generic version of Eylea was authorised in Switzerland and Europe under the name Afqlir@. It may only be placed on the market under the name Afqliro and in the authorised formulation (for Switzerland: Article 9(1) of the Medicines Act, SR 821.21, and Article 12(1) in conjunction with Annex 1, point 1(a) of the Medicines Authorisation Ordinance, SR 812.212.22), and the formulation described in the publicly available authorisation documents infringes the patent, according to the plaintiffs' submission. At the same time, no other pharmaceutical products may be marketed under the Afqliro brand in order to avoid misleading doctors and patients (Article 9(4) of the Medicines Ordinance, SR 812.212.21).[32]

This means that third parties, including companies within the Sandoz Group, may not market any pharmaceutical products

[32] Similarly, for the EU centralised authorisation procedure, see Article 6(1) of Regulation (EC) No 726/2004 in conjunction with Article 8(3)(b) of Directive 2001/83/EC and Article 9 (4)(d) in conjunction with Article 12(1) of Regulation (EC) No 726/2004 in conjunction with the EMA Guideline on the acceptability of names for human medicinal products processed through the centralised procedure, as amended on 6 December 2021, section 4.1.1.



Computer Translation

may offer medicinal products under the name Afqliro, but at the same time must offer the authorised Afqliro formulation under the name Afqliro if they wish to place it on the market. The use of the 'Afqliro' trade mark held by Defendant 2 is therefore a *conditio sine qua non* for placing the allegedly patent-infringing 'Afqliro' formulation on the market. It is neither alleged nor plausible that the national subsidiaries of the Sandoz Group are marketing 'Afqliro' without the consent of the trade mark proprietor.

Defendant 2 is therefore at least aiding and abetting the alleged patent infringements committed by the Sandoz Group's national subsidiaries by permitting those companies to use the designation 'Afqli', to which it, as the trade mark proprietor, is exclusively entitled.

**Consideration of allegedly belated allegations**

25.
In summary proceedings, neither party may rely on the court ordering a second exchange of pleadings or an oral hearing following a single hearing.33 In this respect, the parties have no right to comment on the matter twice. In principle, the case is closed after a single submission. If the court orders a second exchange of written submissions or summons the parties to an oral hearing, the parties have the opportunity to comment on the matter twice without restriction.[35] In the interests of legal certainty, the courts should in such cases clearly state whether they are, by way of exception, ordering a second exchange of written submissions or whether they are merely granting the right of reply.[36]

The restriction to a single exchange of written submissions does not alter the fact that, pursuant to Article 6(1) of the ECHR and Article 29(1) and (2) of the Federal Constitution, the parties are entitled to comment on every submission made by the opposing party, irrespective of whether such a submission is new and

[33] Federal Supreme Court, Judgment 4A 273/2012 of 30 October 2012, para. 3.2, unpublished in: BGE
138 III 620.
[34] BGE 150 III 209, para. 3.4; BGE 144 III 117, para. 2.2.
3' BGE 146 III 237, para. 3.1.
^^ Federal Supreme Court, Judgment 5A 84/2021 of 17 February 2022, para. 3.1.1.

Computer Translation

contains significant points.3' However, such a statement made within the framework of the unconditional right of reply must not contain any new evidence.[3]

Irrespective of whether a second exchange of pleadings has been ordered, a party may, however, even in summary proceedings, respond to new evidence with new allegations and evidence in response to new evidence which the opposing party has (admissibly) put forward in its latest pleading.[3] * The prerequisite for this is that the new allegations or evidence from the opposing party are the cause of the submission of new evidence, i.e. they prompted the submission of the new evidence and, from a technical or thematic point of view, are to be regarded as a response to the opposing party's new evidence.[40]

Once the case file has been closed, new facts and evidence may only be taken into account subject to the conditions set out in Article 229 of the Code of Civil Procedure (ZPO).[41]

New allegations and facts, the emergence of which depends on the will of the parties (so-called 'potestative new evidence'), are admissible if, despite reasonable diligence within the meaning of Article 229(2)(b) of the Code of Civil Procedure, they could not have been raised previously.[42]

26.
In the present proceedings, the President did not order a second exchange of pleadings, but set a deadline for the plaintiffs to comment on new allegations and evidence in the response to the application and to submit new evidence. In the summons to the oral hearing, he also drew the parties' attention to the fact that the hearing served exclusively to safeguard the right to be heard or the right of reply, as well as to allow for a response to the specialist judge's opinion.

The case file was therefore closed following the first exchange of written submissions.

27.
The defendants argue, amongst other things, that the plaintiffs submitted the Cepter Reports and the Physiolution Report out of time.

---

[37] BGE 144 III 117 para. 2.1.
[3] BGE 144 III 117 para. 2.2.
3^ Left open in BGE 144 III 117 para. 2.3.
[40] By analogy with BGE 146 III 55 para. 2.5.2 — 'flow sensor'.



Computer Translation

[41] BGE 150 III 209 para. 3.4.
[42] BGE 146 III 416 para. 5.

Computer Translation

The other allegedly belated claims and evidence are not relevant to the decision, which is why the question of whether they were raised in good time can be left open.

**Failure to take the Cepter Reports into account**

28.
The plaintiffs are of the view that the Cepter Reports, which were first submitted with the response to the defendant's reply to the response to the statement of defence – that is, with the plaintiffs' third written submission – were submitted in good time, as the plaintiffs had demonstrated that they had exercised due diligence in attempting to obtain Afqlir@ for analysis. Once it became apparent that Afqlir@ could not be obtained within a reasonable timeframe, the claimants had immediately arranged for a replica formulation to be analysed. Given the 14-month relative time limit, they had been obliged to act swiftly and could not be expected to have taken every theoretically possible step under all circumstances to submit the evidence in good time. The Cepter Reports should therefore be taken into account. The defendants dispute the relevance of the Cepter Reports, as the plaintiffs could have submitted them at the time of the application for interim measures.

29.
The **Cepter Reports** are different versions of a report produced by the analytical laboratory CEPTER Biopartners, LLC, Nutley, NJ, USA, and based on an Afqlir@-Replika formulation. The first two versions of the Cepter Report were submitted to the proceedings by the claimants with their third submission, the statement of 5 March 2026; the third, updated version was submitted with the fourth statement of 15 April 2026. In the first Cepter Report, the lyophilised Replika formulation was reconstituted immediately ('T-0 analysis'); in the second Cepter Report, it was reconstituted after half a month and after one month; and in the third Cepter Report, after one and a half months. The Replika formulation analysed in the Cepter Reports is based on information from the European Public Assessment Report (EPAR) of the European Medicines Agency (EMA) dated 19 September 2024, issued as part of the centralised authorisation procedure for Afqlir@ **('EMA Report'),** which was published on 20 January 2025. The first Cepter Report is undated; however, it is clear from the report that the analytical laboratory received aflibercept for the replica formulation on 28 January 2026, thawed it on 29 January 2026, and

Computer Translation

replica formulation was lyophilised and reconstituted on 2 February 2026.

The Cepter Reports were only produced after the closure of the case; however, the production of these reports depended on the plaintiffs' discretion, meaning that, as discretionary new evidence, they are only admissible if, despite exercising reasonable care, they could not have been introduced into the proceedings at an earlier stage. This is not the case here.

Anyone applying for an interim injunction on the basis of an alleged patent infringement must not only allege the patent infringement with sufficient substance in the application for the injunction, but must also, given the closure of the case following a single statement, substantiate it with evidence. Consequently, a diligent applicant must submit infringement analyses that can reasonably be provided with the application for interim measures, whereby both the urgency of the matter and the technical and factual difficulties involved in such an analysis may influence its reasonableness. In the present case, the EPAR for Afqlir@, published on 20 January 2025, disclosed the composition of its formulation on page 21. The precise manufacturing process of the aflibercept biosimilar in Afqlir@, with code SOK583, was not publicly available; nor does the EPAR for Afqlir@ itself provide more than a general description in the section 'Description of manufacturing process and process controls'. However, the decision to use aflibercept from Eyleao, which was already available on the market (see below), could have been taken as early as the publication of the EMA report. The claimants had therefore, since 20 January 2025 – and thus around 10 months before the application was submitted – had all the information required to manufacture and analyse this replica formulation. As stated in the first Cepter Report, the T-0 analysis took four working days (28–30 January and 2 February 2026) to produce, lyophilise and reconstitute the replica formulation. The claimants submitted the present application for interim measures on 25 November 2026, i.e. one day after Defendant 1 announced that Afqlir@ had been launched in the United Kingdom. In the present case, the claimants must have anticipated, at the latest from the date of Defendant 1's notification of 30 October 2026, that the defendants would launch Afqlir@ in the final quarter of 2026. From the date of that notification, there was still sufficient time to manufacture, freeze-dry and reconstitute the replica formulation and, at the very least, to submit the T-0 analysis in good time with the application for interim relief on 25 November 2026. Since the T-0 analysis could have been carried out and submitted with reasonable



Computer Translation

care, the first Cepter Report is therefore deemed to be late. The second and third reports supplement this late first report and are thus also late and inadmissible.

**Consideration of the Physiolution Report**

30.

The claimants argue that, once Afqlir@ had been included in the German Lauer Tariff and was therefore available in Germany, they had commissioned a supplier (referred to as ‘Product Procurer’ in Annex No. 171 to the claimant’s statement of 5 March 2026 and in the claimant’s statement of 15 April 2026 as ‘Supplier’) to procure Afqlir@ in Germany. At the beginning of December 2025, the supplier had assumed that it would be able to procure Afqlir@ within five weeks. At the end of December 2025, he had stated that delivery could take place no earlier than three weeks after the order was placed. After the order had been placed on 13 January 2026, the supplier informed the claimants on 27 January 2026 that Afqlir@ had been withdrawn from the market in Europe. Following this, an attempt was made to procure Afqlir@ in Canada and Australia, which was also unsuccessful. Subsequently, after Afqlir@ had been included in the FOPH’s list of specialised medicines, the claimants attempted in mid-February 2026 to place an order with Defendant 3 via a Swiss wholesaler (referred to as a ‘wholesaler’ in the claimant’s statement of 5 March 2026). However, this order was
12 March 2026. It was not until 14 and
17 March 2026 that it was possible, through private contacts, to procure a total of 15 ‘pre-filled syringes’ of Afqlir@. The Physiolution Report was then drawn up and submitted without delay.

The defendants counter that Afqlir@ was available on the Swiss market. Afqlir@ was sold in Switzerland in December 2025, January and February 2026, and Defendant 3 fulfilled several orders between 11 February and 16 March 2026. The defendants did not actively prevent the claimants from purchasing Afqlir@. The claimants could have prepared and submitted the Physiolution Report earlier had they exercised reasonable care; as it was submitted with the fourth pleading in the case, it was certainly late.

Computer Translation

31.
The **Physiolution Report** is an analysis report by the laboratory Physiolution Polska sp. z o.o., Wrocław, Poland, dated 30 March 2026, in which Afqliro was examined. The Physiolution Report was only produced after the closure of the case file; however, the production of this report depended on the plaintiffs' discretion, meaning that, as a discretionary new evidence, it is only to be taken into account if it could not have been submitted earlier despite the exercise of reasonable care. In the present case, the report is to be taken into account.

As mentioned (para. 29), a diligent claimant submits infringement analyses that can reasonably be produced at the time of filing the application for interim measures, although both the time pressure and the technical and factual difficulties involved in such an analysis may affect the ability to produce it in good time. The patent proprietor cannot in every case be expected to wait to file an application for interim measures until she has obtained and analysed the product alleged to infringe the patent. This would shift the point in time from which an application for interim measures can be filed from the point at which market entry is imminent to the point at which market entry has already taken place. This would effectively undermine the right to seek interim measures where an infringement is merely feared (Art. 261(1)(a) of the Swiss Code of Civil Procedure).

In the present case, the claimants have credibly demonstrated that, following the submission of the application, they undertook several serious and continuous attempts to procure Afqliro as quickly as possible. With one exception, they cannot be held responsible for the failure of these attempts to procure the product. Following the successful procurement of Afqliro, they had it analysed without delay and immediately introduced the results into the present proceedings, thereby fulfilling their duty of care.

The Physiolution Report has therefore been submitted in good time and must be taken into account.

**Foreign proceedings**

32.
In its judgment C/09/675547 / HA ZA 24-972 of 1 October 2025, the District Court of The Hague, in parallel proceedings between Plaintiff 1 and Samsung Bioepis NL B.V., ruled that the Dutch part of the contested



Computer Translation

patent

Computer Translation

as valid and issued a provisional injunction against Samsung Bioepis NL B.V. prohibiting it from marketing the biosimilar OpuviZO. A person skilled in the art would understand, on the basis of their technical knowledge, that the amino acid disclosed in 'SEQ ID NO:4' was expressed and modified, meaning that the claimed amino acid sequence, consisting of amino acids 27–457 of 'SEQ ID NO:4' and glycosylated at the aspartic acid residues 62, 94, 149, 222 and 308, is disclosed directly and unambiguously in the original application. The sole point of contention in the infringement case was whether the Opu-vizO• formulation is suitable for freeze-drying and reconstitutability, which the court affirmed (Opu-vizO contained sodium phosphate as a buffer).

33.
The German Federal Patent Court also held, in its judgment 3 Ni 15/23 (EP) of 26 June 2025 between Plaintiff 1 and Samsung Bioepis NL B.V., that the German part of EP 2 364 691, in a limited form, was valid. Plaintiff 1 limited claims 1 and 6 to the use of the formulation of a VEGF antagonist for intravitreal administration ('for use in intravitreal administration'). The court considered, in particular, that the amino acid sequence of 'SEQ ID NO:4' consisted of the signal sequence comprising amino acids 1–26, the coding region comprising amino acids 27–457, and amino acid 458 at the C-terminus. Since amino acids 1–27 and 458 had no influence on the antagonistic effect, the claimed amino acid sequence was disclosed in the original application.

On the basis of the limited claim 6 of the German part of the contested patent, Plaintiff 1 applied to the Regional Court of Munich I for a provisional injunction against Hexal Aktiengesellschaft and Sandoz Deutschland GmbH. By judgment 7 O 15541/25 of 8 January 2026, the court granted the application and prohibited the defendants named therein from placing Afqlir@ on the market, using it, possessing it or importing it. In particular, the court concluded that the pH values disclosed in the patent specified a tolerance range and that there were no indications that a deviation of 0.1 in the pH value would fall outside the scope of protection. Consequently, it held that the patent had been infringed to the letter, with the exception of feature 6.2 (features 6.3a and 6.3b in the present proceedings). With regard to feature 6.2, it affirmed equivalent infringement, since a histidine buffer has the same properties as the claimed sodium phosphate buffer and histidine as a buffer could also be discovered by routine experiments without an inventive step, particularly as the only protein formulation tested at the



Computer Translation

priority date

Computer Translation

formulation for intravitreal injection, Lucentiso, also used histidine, and the person skilled in the art would infer from the patent that what mattered was not the specific buffer but its function as a buffer.

By order 6 U 180/26 of 10 February 2026, the Munich Higher Regional Court provisionally suspended enforcement of the judgment of the Munich I Regional Court on the grounds that the infringement of features 6 and 6.6 had presumably not been sufficiently substantiated. By order 6 U 180/26, the Munich Higher Regional Court pointed out to Plaintiff 1 that the matter was unlikely to be urgent, whereupon Plaintiff 1 withdrew its application for an interim injunction.

34.
The Vienna Commercial Court dismissed, by order 20 Cg 87/25k — 17 of 27 April 2026, an application by the claimants for a precautionary injunction against the Austrian Sandoz GmbH, based on claims 1 and 6 of the Austrian part of EP 2 364 691. The court ruled that it would not have been obvious to a person skilled in the art to replace sodium phosphate with histidine. Furthermore, the patent did not indicate that histidine was an equivalent buffer. Finally, formulations of protein-containing medicinal products are complex, and it is well known to a person skilled in the art that the individual components are not, as a rule, interchangeable at will, but rather that their effects within the formulation are coordinated and interact with one another.

35.
In the Belgian parallel proceedings between Plaintiff 1 and BV Celltrion Healthcare Belgium, the Dutch-speaking Ondernemingsrechtbank Brussel ruled in summary proceedings, by decision C/25/00034 of 8 January 2026, that the biosimilar Eydenzelto did not infringe claim 1 of the Belgian part of the contested patent on an equivalent basis. Thus, Claimant 1 had not demonstrated that histidine fulfilled the buffering function in the same way and with the same result as sodium phosphate.

36.
In the parallel UK proceedings [2025] EWHC 2527 (Pat), Case No: HP-2024-000015 between Formycon AG v Klinge Biopharma GmbH and Plaintiffs 1 and 2, the High Court of Justice held that the UK part of the contested patent was valid. ‘Comprise’ means that at least amino acids 27–457 must be present, and



Computer Translation

this minimum, together with the glycosylation pattern, is clearly disclosed in the priority application and the original application. The priority is therefore valid and the patent has not been invalidly amended. The court ruled out an equivalent infringement of claim 5 by Formycon's generic product because it used a histidine buffer instead of a sodium phosphate buffer, and because histidine stabilises the pH differently from a phosphate buffer, and the person skilled in the art would not understand how the substituted feature could have the same effect as the claimed feature. With regard to the Klinge Biopharma generic, which, amongst other things, omits sodium chloride and uses more sucrose instead, the court also answered the first question of the Actavis test in the negative.

37.
No opposition was filed against the grant of EP 2 364 691. However, three patent law firms filed oppositions against the grant of European patent EP 2 944 306, which stems from the same divisional application as EP 2 364 691. On 26 November 2024 (written decision of 13 January 2025), the patent was revoked by the Opposition Division of the EPO on the grounds of inadmissible amendments. There was no indication in the original application that the designation 'SEQ ID NO:4' was to be mentally replaced by a sequence *consisting* of amino acids 27–457 of SEQ ID NO:4, with additional glycosylation at the asparagine residues 62, 94, 149, 222 and 308. A person skilled in the art would understand the reference 'SEQ ID NO:4' to mean the full amino acid sequence 1–458. The patent proprietor has lodged an appeal. The appeal proceedings are pending and the oral hearing is scheduled for October 2026, meaning that the Opposition Division's decision of 26 November 2024 is not yet final.

**Technical background and the patent in dispute**

38.
The term 'macular degeneration' encompasses a group of diseases of the retina of the eye that affect the macula lutea ('yellow spot'). By far the most common form of macular degeneration is exudative (or wet) age-related macular degeneration (wAMD, from 'wet age-related macular degeneration'). Various eye diseases, including wet AMD, are associated with pathological neovascularisation and fluid leakage from the blood vessels, which can result in thickening and oedema of the retina. This is thought to contribute to the loss of vision. 'Vas-

Computer Translation

cular endothelial growth factor' (VEGF) is a family of naturally occurring growth factors in the blood vessel system that stimulate the formation of new blood vessels; a process known as angiogenesis. VEGF inhibitors can prevent pathological neovascularisation and the associated vascular permeability. The contested patent discloses fusion proteins which act as VEGF inhibitors (para. [0046]).

The invention of the Streit patent aims to provide a pharmaceutical formulation suitable for intravitreal administration which contains VEGF inhibitors (para. [0001]). In the background section of the Streit patent, WO 2006/104852 (hereinafter 'WO 852') is cited, amongst others, as prior art, which discloses VEGF antagonist formulations (para. [0005]). The contested patent explains that the safe handling and administration of protein-containing formulations present a major challenge. Proteins exhibit unique chemical and physical properties that give rise to stability problems: there are a multitude of degradation pathways for proteins, resulting in both chemical and physical instability. Chemical instability includes deamination, aggregation, cleavage of the peptide backbone and oxidation of methionine residues. Physical instability encompasses numerous phenomena, including, for example, aggregation and/or precipitation (para. [0041]).

The contested patent claims the provision of stable formulations of a VEGF-specific fusion protein antagonist (paragraphs [0006]–[0027], claim 1), lyophilisable formulations (paragraphs [0028]–[0034], claim 6), as well as corresponding methods and syringes (paragraphs [0036]–[0037], claims 10 and 11). In the examples, various formulations are analysed with regard to stability, turbidity, optical appearance, etc., with a VEGF inhibitor according to SEQ ID NO:4 being used in each case. It is not this VEGF inhibitor according to SEQ ID NO:4, but one consisting of amino acids 27–457 of this SEQ ID NO:4 and having glycosylations on the asparagines at positions 62, 94, 149, 222 and 308 (numbering according to SEQ ID NO:4) is designated by the International Non-proprietary Name (INN) aflibercept.

The Bayer Group markets a formulation covered by patent under the brand name Eyleao in Switzerland and numerous other European countries; this formulation is authorised, amongst other things, for the treatment of wet age-related macular degeneration. The substance contained in Eyleao



Computer Translation

active ingredient active ingredient Aflibercept was in the
Switzerland until on
22 November 2025 by a supplementary protection certificate (SPC C01183353/01).

39.
The patent in dispute is EP 2 364 691 B1, or rather its parts in Belgium, Bulgaria, Denmark, Finland, France, Greece, Ireland, Italy, the Netherlands, Austria, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, Switzerland, the Czech Republic and Hungary. The contested patent is based on international application WO 2007/149334 (hereinafter **'the international application')**, which was filed on 14 June 2007 and claims the priority of US application US60/814,484 (hereinafter 'the priority application' or 'P1'), filed on 16 June 2006. The international application was filed in the name of Plaintiff 1, whilst the priority application was filed in the name of the inventors named in the international publication.

The patent in dispute is not the direct regional phase arising from the international application. The direct EP regional phase arising from the international application was EP 2 029 103, which constitutes the parent application for the patent in dispute (hereinafter **the 'parent application').** The patent in dispute is therefore a divisional application of this parent application.

The parent application was deemed to have been withdrawn in 2020. The patent in dispute is one of three divisional applications arising from the parent application; in addition to the patent in dispute, there is also the aforementioned EP 2 944 306 (granted, revoked by the Opposition Division, appeal pending) and EP 3 753 548, the latter being a pending application and divisional application arising from EP 2 944 306, and thus a grandchild application of the parent application.

40.
Claim 1 of the contested patent reads as follows in the authoritative English version, in accordance with the defendant's detailed analysis of the features:

1.1 An ophthalmic formulation of a vascular endothelial growth factor (VEGF) antagonist, comprising:

1.2 (a) 1–100 mg/ml of a VEGF antagonist consisting of amino acids 27–457 of SEQ ID No: 4, which is glycosylated at Asn residues 62, 94, 149, 222 and 308;

Computer Translation

| | |
|---|---|
| 1.3 .a | (b) 0.01–5% of |
| 1.3.b | one or more organic co-solvents, which are one or more of polysorbate, polyethylene glycol (PEG) and propylene glycol; |
| 1.4.a | (c) 30–150 mM of |
| 1.4.b | a tonicity agent selected from sodium chloride or potassium chloride; |
| 1.5.a | (d) 5–40 mM of |
| 1.5.b | sodium phosphate buffer; and |
| 1.6.a | (e) 1.0–7.5% of |
| 1.6.b | a stabilising agent selected from the group consisting of sucrose, sorbitol, glycerol, trehalose and mannitol, |
| 1.7 | pH between approximately 5.8 and 7.0, |
| 1.8 | wherein the formulation is suitable for intravitreal administration. |

The further independent claim 6 of the contested patent reads as follows, according to the defendant's more detailed analysis of the features:

| | |
|---|---|
| 6.1 | A lyophilisable formulation of a vascular endothelial growth factor (VEGF) antagonist, comprising |
| 6.2 | (a) 5–50 mg/ml of the VEGF antagonist, preferably 5 mg/ml, 10 mg/ml, 20 mg/ml or 40 mg/ml, consisting of amino acids 27–457 of SEQ ID No: 4, which is glycosylated at Asn residues 62, 94, 149, 222 and 308; |
| 6.3a | (b) 5–25 mM |
| 6.3b | of sodium phosphate buffer, |
| 6.4a | pH approximately 5.8–7.0; |
| 6.4b | (c) 0.01–0.15% of |
| 6.4b | an organic co-solvent, selected from the group consisting of polysorbate, polyethylene glycol (PEG), propylene glycol, and a combination thereof; and |
| 6.5a | (d) 1–10% of |
| 6.5b | a stabilising agent selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol; g |
| 6.5c | 20–150 mM of |
| 6.5d | a tonicity agent, preferably sodium chloride; |
| 6.5e | gt 1–10% of |
| 6.5f | the stabilising agent and |
| 6.5g | 20–150 mM of the tonicity agent, |

Computer Translation

6.6 wherein the formulation can be reconstituted so that it is suitable for intravitreal administration.

**Person skilled in the art**

41.

The knowledge and skills of the person skilled in the art must be determined in two stages: first, the relevant technical field for the invention under assessment must be identified; secondly, the level and scope of the skills and knowledge of a person skilled in the relevant technical field must be determined. The relevant technical field is determined by the technical field in which the problem solved by the invention
lies 43

The Federal Supreme Court describes the skills and knowledge of the person skilled in the art as follows: the averagely well-trained person skilled in the art, on whom the assessment of inventive step is based, is 'neither an expert in the relevant technical field nor a specialist with outstanding knowledge. He need not have an overview of the entire state of the art, but must possess sound knowledge and skills, a good education and sufficient experience, and thus be well equipped for the technical field in question'. What the hypothetical person skilled in the art lacks is any capacity for associative or intuitive thinking.[45]

Where a task spans several technical fields, the hypothetical person skilled in the art may be formed from a team of experts from different specialist fields.[46]

42.

Although the claimants repeatedly refer to the person skilled in the art, they do not define the person skilled in the art in the application for interim relief.

The defendants define the person skilled in the art as a team comprising at least (i) a medical expert in the field of ophthalmology

---

[43] Federal Patent Court, Judgment S2017 001 of 1 June 2017, para. 4.4.
[44] BGE 120 II 71, para. 2.
[45] BGE 120 II 312, para. 4b — 'cigarette d'un diamètre inférieur'; CR-PI-LBI-SCHEUCHZER, Art. 1 N 122.
[46] BGE 120 II 71, para. 2 — 'disposable nappy'; Federal Patent Court, judgment S2017_001 of
1 June 2017, para. 4.4.



Computer Translation

and (ii) a specialist in pharmaceutical formulations with a university degree and several years' practical experience in the development of formulations, including the development of protein formulations.

The plaintiffs argue that they regard the person skilled in the art primarily as a formulator, but do not raise any specific objections to the defendant's definition. They consider the definition of the person skilled in the art to be 'not decisive for the outcome of the proceedings'.

The defendant's definition appears appropriate to the task at hand. Only the non-exhaustive list of team members ('at least') is unconvincing, as it does not rule out the possibility that the team comprises any number of additional members with any level of qualification.

This judgement is therefore based on a hypothetical person skilled in the art, who is a team comprising (i) a medical expert in the field of ophthalmology and (ii) a specialist in pharmaceutical formulations with a university degree and several years' practical experience in the development of formulations, including the development of protein formulations, which also requires a basic knowledge of biochemistry.

**General technical knowledge**

43.
General technical knowledge is defined as the knowledge available to the person skilled in the art by virtue of their training and professional experience.[4] * Knowledge derived from textbooks in the technical field of the person skilled in the art normally forms part of general technical knowledge.[4] Scientific publications or the disclosure contained in patent applications or patent specifications, on the other hand, do not normally form part of general technical knowledge.[4] Only when

---

[47] See T 1727/14 of 13 December 2018; similarly T 766/91 of 29 September 1993, E. 8.2 ('knowledge which an experienced person skilled in the art should possess').
[4] Federal Patent Court, Judgment O2018_008 of 2 February 2021, para. 17 — 'Tiotropium COPD
inhalation capsules".
4^ Federal Patent Court, Judgment O2019_007 of 19 November 2021, para. 34 — 'sequence by synthesis'.

Computer Translation

If a technical teaching has found its way into textbooks or general reference works, it may be assumed that it forms part of general technical knowledge. Scientific publications or the disclosure contained in patent applications or patent specifications may, in exceptional cases, be regarded as forming part of general technical knowledge if a technical field is so new that it has not yet been included in textbooks, or if a series of publications consistently demonstrates that a technology was generally known.’[0]

General technical knowledge must be substantiated and, in the event of a dispute, proven.’[1]

44.
A person skilled in the art knows that the pH of the vitreous humour is approximately 7.4 and that the pH of a formulation to be administered intravitreally should not deviate too greatly from 7.4. The pH range acceptable for intravitreal administration is very narrow compared with other parenteral routes of administration, e.g. intravenous administration, where the medicinal product is absorbed into the bloodstream and rapidly diluted in a large volume of blood, because the vitreous humour has only a small volume of approximately 4.5 ml per eye and the gel-like substance is not rapidly replaced.

Those skilled in the art are aware that the development of liquid formulations of protein active substances is difficult because most proteins, as natural physiological molecules, are chemically and physically unstable outside the human or animal body. The behaviour of proteins in liquids is difficult to predict; for example, even the alteration of a single amino acid in a protein can significantly alter its aggregation behaviour in a specific liquid environment (as demonstrated by the review article by Wang, ‘Instability, stabilisation, and formulation of liquid protein pharmaceuticals’, Int. J. of Pharmaceutics 1999, pp. 129–188 (‘Wang 1999’, p. 137, left-hand column; p. 138, left-hand column; acknowledged as general technical knowledge in the claimant’s statement of 5 March 2026).

Computer Translation

---

50 Federal Patent Court, Judgment O2019_007 of 19 November 2021, para. 34, referring to
T 772/89 of 18 October 1991, para. 3.3; T 1347/11 of 29 October 2013, para. 4; Federal Patent Court, judgment S2021_005 of 15 December 2021, para. 16 — ‘Deferasirox’.

’1 Federal Patent Court, judgment O2013_033 of 30 January 2014, para. 31; Federal Supreme Court, judgment 4A 142/2014 of 2 October 2014,

para. 5 — ‘couronne dentée II’.

Computer Translation

In particular, the effect of salts on protein stability is complex. Salts can stabilise, destabilise or have no effect at all on protein stability, depending on the type and concentration of the salt, the nature of the ionic interactions and the charged amino acid residues in the proteins (Wang 1999, p. 148).

Complex molecules such as aflibercept are particularly prone to aggregation at higher concentrations (acknowledged in the response to the objection dated 19 December 2025).

Those skilled in the art are familiar with the concept of the signal sequence in newly synthesised proteins intended for secretion or incorporation into membranes. Such proteins possess a short peptide sequence at their N-terminus (also known as the amino terminus). In eukaryotic cells, this sequence directs the protein to the endoplasmic reticulum; in prokaryotic cells, it directs it to the plasma membrane, where it is cleaved off as part of the protein's maturation process. Günther Blobel, who first described this in the 1970s, was awarded the Nobel Prize in Medicine in 1999 for this work.

Those familiar with the subject know that C-terminal lysine or arginine residues are frequently absent from cell-surface proteins or secreted proteins – which, based on their gene sequence, would be expected to contain these residues – because they are removed from these proteins by carboxypeptidases (as demonstrated by the review article by Harris, 'Processing of C-terminal lysine and arginine residues of proteins isolated from mammalian cell culture', *Journal of Chromatography A*, 1995, pp. 129–134; Skidgel, 'Structure and function of mammalian zinc carboxypeptidases', in: Hooper (ed.), *Zinc Metalloproteases In Health And Disease*, 1st ed. 1996,
pp. 241–273). With regard to the post-translational cleavage of signal sequences, the 'von Heijne (-3, -1) rule', which defines the cleavage sites of signal peptidases, was common knowledge (Von Heijne, 'Patterns of Amino Acids near Signal-Sequence Cleavage Sites', Eur. J. Biochem. 1983, 133, pp. 17–21; Von Heijne, 'A new method for predicting signal sequence cleavage sites', Nucl. Acids Res. 1986, pp. 4683–4690).

Those skilled in the art know that, in the technical field of protein production, 'translation' refers to the translation of mRNA into protein, and that 'post-translational modification' refers to the further modification of the protein that has been formed. Two such 'post-translational modifications' in such mammalian cell expression systems were generally



Computer Translation

common knowledge: a) the post-translational cleavage of the signal sequence by signal peptidase, and b) post-translational glycosylation (outlined in red in the following figure from Bonin-Debs et al. 2004).




*Figure 1. Illustration from Bonin-Debs et al., 'Development of secreted proteins as biotherapeutic agents', Expert Opin. Biol. Ther. 2004, pp. 551–558 (frame added by the court).*

**Interpretation of the asserted patent claims**

45.
Patent claims must be read in accordance with the principles of good faith,[52] i.e. the willingness to understand the claim and to give it a reasonable technical meaning.[53] In doing so, the patent claim must, as a matter of principle, be considered as a whole.[54] Where, even after interpretation taking into account the description and drawings, no credible technical teaching can be derived from a claim, the patent proprietor bears the consequences of the incorrect, incomplete or contradictory definition of the claimed subject-matter.[55]

'2 BGE 107 II 366 E. 2 — 'Reclining furniture frame'.
53 The established case law of the EPO Boards of Appeal uses the expression 'with a mind willing to understand', e.g. T 190/99 of 6 March 2001, para. 2.4.
54 BGE 107 II 366, para. 2 — 'Frame for reclining furniture'.
5' See T 1018/02 of 9 December 2003, para. 3.8; BGE 147 III 337, para. 6.1 — 'Lumen peak'; Judgment 4A_581/2020 of 26 March 2021, para. 3 — 'Peer-to-peer protocol'.

Computer Translation

Patent claims must be interpreted from the perspective of the person skilled in the art, in the light of the description and the drawings (Art. 51(3) PatG). General technical knowledge, as the so-called 'liquid state of the art', also serves as a means of interpretation.[56] Unless the patent specification defines a term differently, the usual understanding in the relevant technical field must be assumed.

'Patent claims must be interpreted functionally; that is to say, a feature should be understood in such a way that it can fulfil the intended purpose.'* The claim should be read in such a way that the examples of implementation set out in the patent are covered to the letter; on the other hand, the wording of the claim must not be restricted to the examples of implementation if it covers further embodiments.'[8] Where case law refers to the 'broadest possible interpretation' of claim features, the feature understood in this way must always be capable of fulfilling its purpose within the scope of the invention. In other words, the claim is in principle not to be interpreted strictly according to its wording, but neither is it to be interpreted in such a way as to cover embodiments which do not achieve the effect of the invention.[60]

The history of the patent's creation or the grant procedure is not decisive for the interpretation of the patent claims.[61]

**Interpretation of 'suitable for freeze-drying and reconstitutable'**

46.
According to features 6.1 and 6.6, the formulation containing a VEGF antagonist must be 'lyophilisable' and, after freeze-drying, 'can be reconstituted so that it is suitable for intravitreal administration'.

The defendants, 'following a thorough, renewed examination of the contested patent', argue for the first time in their response to the specialist judge's opinion that

^^ Federal Supreme Court, Judgment 4A 541/2013 of 2 June 2014, para. 4.2.1 — 'Joint tape'.
^' BRUNNER, The scope of protection of European patents from a Swiss perspective — a late harvest, sic! 1998, 348 ff., 354.
^ Federal Patent Court, Judgment O2013_008 of 25 August 2015, para. 4.2 — 'electrostatic powder spray gun'.
'* Federal Patent Court, Judgment O2013_008 of 25 August 2015, para. 4.2 — 'electrostatic powder spray gun'.
[60] Federal Patent Court, judgement 02016 009 of 18 December 2018, E. 25 —
'Flow sensor'; Federal Patent Court, judgment S2018_007 of 2 May 2019, para. 14 — 'Tooling device'.



Computer Translation

^1 BGE 143 III 666, para. 4.3 — ‘Pemetrexed II’.

Computer Translation

They argue that features 6.1 and 6.6 do not merely require suitability for freeze-drying, but rather a purpose of freeze-drying; that is to say, claim 6 is limited to the use of the formulation for freeze-drying. In this regard, they refer to the description, which distinguishes between liquid and freeze-dried formulations, and specifically to paragraph [0052], which states: 'Lyophilizable formulations are typically first prepared as liquids, then frozen and lyophilised'. It follows from this that, according to the contested patent, a lyophilisable formulation is a formulation that is actually freeze-dried.

Claim 6, according to its wording, requires a 'lyophilizable' formulation. 'Lyophilizable' can be translated as 'suitable for freeze-drying' or 'suitable for freeze-drying'. According to the wording, it is therefore sufficient for the formulation to be objectively *suitable* for being freeze-dried (and subsequently reconstituted).

The defendant's references to the description do not alter this clear wording. It is correct that the description of the contested patent distinguishes between 'suitable for freeze-drying' and 'freeze-dried'. The term 'freeze-dried' is defined as the state of a substance that has been subjected to a drying process such as lyophilisation, in which at least 90 per cent of the moisture has been removed (para. [0045]). The distinction between 'suitable for freeze-drying' and 'freeze-dried' runs throughout the entire description. For instance, paragraph [0052] refers to formulations suitable for freeze-drying which 'typically' — that is, in actual use — would first be frozen and then freeze-dried. Paragraph [0054], on the other hand, refers to 'freeze-dried' formulations. This makes sense, as that section deals with the conditions under which such formulations can be stored. These conditions differ for a freeze-dried formulation (in powder form) from those for a liquid formulation that is suitable for freeze-drying. In any case, it does not follow from the description that 'suitable for freeze-drying' means anything other than 'suitable for being freeze-dried'.

According to feature 6.6, the formulation can be reconstituted so that it is suitable for intravitreal administration. According to the contested patent, the freeze-dried formulation is generally reconstituted with sterile water suitable for injection. In one embodiment, the reconstitution fluid is bacteriostatic water (para. [0034]). The phrase 'can be reconstituted'

Computer Translation

refers to a formulation that has actually been freeze-dried, from which at least 90 per cent of the moisture has been removed, and not to a liquid formulation capable of freeze-drying. However, through the wording 'can be reconstituted', the wording of the claim makes it clear here too that suitability for reconstitution is sufficient.

Once freeze-dried, the formulation must be capable of being reconstituted in such a way that it is suitable for intravitreal administration. The contested patent describes how turbidity, protein yield as a percentage and purity of the reconstituted formulation are measured to determine whether a freeze-dried formulation has been successfully reconstituted (para. [0059]). A formulation is considered 'reconstitutable' if it successfully passes the tests described in the contested patent. Further requirements, arising, for example, from regulatory approval procedures, need not be met.

**Interpretation of 'pH approximately 5.8–7.0'**

47.
Claims 1.7 and 6.4a require that the formulation according to the patent has a pH value of 'approximately 5.8–7.0'. The parties are in dispute here on two points: (i) at what temperature the pH value is to be measured; (ii) how 'approximately' is to be understood.

The defendants point out that, according to the European Pharmacopoeia, the pH value is to be measured at a temperature of 20°C to 25°C. Furthermore, they argue that the pH value is decisive for the formulation's suitability for intravitreal administration, and that administration does not take place at storage temperature.

The claimants point out that the contested patent always measures the pH value at storage temperature (around 5°C). The contested patent essentially concerns the storage stability of the formulation; therefore, the pH value during storage at 5°C is decisive.

It is well known to those skilled in the art that the pH value can be temperature-dependent (e.g. when using a histidine buffer; this is not disputed). If, in these circumstances, the contested patent considers the pH value at a temperature other than the room temperature specified in the European Pharmacopoeia to be decisive, this would have to be expressly stated. It is not sufficient for the examples to measure the pH at the storage temperature. The consistent wording of examples



Computer Translation

1–6 concerning non-lyophilised formulations does not allow the unequivocal conclusion that the pH was measured at 5°C: '...which were stored at 5°C ...and samples tested...'. Samples were therefore taken from the containers stored at 5°C, and the pH and all other properties, such as the percentage recovery from the VGEF trap and OD405nm, were measured on these samples. It is not disclosed that the samples were also kept at 5°C during all these measurements. The corresponding wording in Examples 7–8 concerning lyophilised formulations is 'Samples were stored at 5°C and tested...'. The 'samples' were the lyophilised samples; they were reconstituted for 'testing'. The measurements were only carried out on the reconstituted samples. Here, too, it is not disclosed that the reconstitution and, in particular, the subsequent measurements were also carried out at 5°C. It is also true that the pH value is an important parameter for suitability for intravitreal administration, and at the time of administration, the temperature of the formulation is approximately room temperature.

The pH of the formulation must therefore be measured at room temperature (20°C to 25°C).

48.
The claimants argue that the use of the term 'approximately' suggests to a person skilled in the art that this involves more than mere measurement inaccuracies and that the values therefore do not have to be adhered to exactly. If falling below and/or exceeding the pH range of 5.8–7.0 beyond the usual margin of error were critical, the contested patent would not have chosen the term 'approximately'. Even if, *for the sake of argument*, one were to regard the value of 'approximately 6.2–
6.3' mentioned in paragraph [0012] were to be regarded as 'optimal', even for the 'optimal' value a tolerance of +0.1 would result. Furthermore, in the examples set out in paragraphs [0011] to [0014], fluctuations of 0.1 pH units are expressly provided for, even for the specific or optimal formulations claimed therein. This confirms to the person skilled in the art that such deviations are unproblematic under the contested patent and are covered by the literal meaning of the claims.

The defendants contend that, in all the preferred embodiments and in the examples of the contested patent, the pH value lies within the range of 6.2 to 6.3 and that the patent specification discloses that the measurement accuracy for the pH value is to one decimal place, which



Computer Translation

is why

Computer Translation

the maximum rounding error, in accordance with the ‘Deferasirox’ case law, would result in a range of 5.75 to 7.04. The defendants also emphasise that, according to general technical knowledge, sodium phosphate buffers have a known usable pH range of 6.0 to 8.2 and that the person skilled in the art would therefore recognise that the lower limit of 5.8 in feature 1.7 is a critical limit. ‘Approximately’ in the context of the claimed range means that the claimed range lies outside the preferred range of 6.2 to 6.3, but still within the broader range of 5.8 to 7.0 as set out in feature 1.7.

The word ‘approximately’ preceding the claimed range cannot simply be ignored. However, it is also not possible to provide a comprehensible justification as to which range outside the expressly stated range (with rounding error) is still covered by the literal meaning as a result of the qualification as ‘approximately’. The +/- 0.1 pH units cited by the claimants are arbitrary.

In the Court’s view, however, the person skilled in the art recognises from the qualification of a numerical range as ‘approximately’ that the patent holder has not waived protection for an equally effective and discoverable embodiment (unlike where the description specifies a preferred range that lies within a broader claimed range which is not qualified by ‘approximately’[62] ). The wording, on the other hand, is to be understood in the same way as if the addition ‘approximately’ were absent; for, in the absence of a clear definition in the description or other unambiguous indications, it is not possible to determine without arbitrariness the extent to which the wording is broadened by the addition of ‘approximately’.

A ‘pH of between approximately 5.8 and 7.0’ within the meaning of features 1.7 and 6.4a is therefore to be understood as meaning that the feature is fulfilled according to the literal meaning if the pH value, measured at room temperature, lies between 5.75 and 7.04, and it is in principle possible to fulfil the feature that is not satisfied to the letter by equivalent means.

62 BPatGer, Judgment O2021_004, O2021_005 of 20 April 2023, para. 80 — ‘Deferasirox’



Computer Translation

**Legal validity of priority**

49.
Any person who has duly filed an application for a patent for an invention in a contracting state of the Paris Convention for the Protection of Industrial Property (PCIP, SR 0.232.02), or their legal successor, enjoys a right of priority for the filing of the same invention in the other contracting states for a period of twelve months (Art. 4A (1) in conjunction with Art. 4C(1) of the Paris Convention, Art. 17(1) of the Swiss Patent Act, Art. 87(1) of the EPC).

The right of priority may be claimed by the first applicant or by the person who has acquired the right of the first applicant to file an application for the same invention for patent protection in Switzerland (Art. 18(2) PatG; Article 4A of the Patent Convention (German official text in accordance with Article 29(1)(b) of the Patent Convention) and the German version of Article 87(1) of the EPC refer to the
the 'successor in title' to the first applicant. The French version of Article 4A(1) of the Paris Convention (authentic pursuant to Article 29(1)(a) of the Paris Convention and, in the event of a discrepancy between the different language versions, authoritative pursuant to Article 29(1)(c) of the Paris Convention) and the French version of Article 87(1) of the EPC refer to the 'son ayant cause'. The right of priority is a right independent of the right to the patent or the patent application, which may be assigned separately. As the right of priority is not mentioned in Article 33(2a) of the Patents Act, it may also be assigned without the need to observe the written form.[63]

The fundamental assessment of whether a patent claim is entitled to the priority date of a priority document is — as regards the requirement of the 'same invention' — identical to the assessment of whether an amendment to an application satisfies the requirement of Article 123(2) EPC. This means that, in this respect, the claimed priority date is valid only if the subject-matter of the patent claim can be derived directly and unambiguously from the disclosure of the invention in the priority document, whereby features which, although not

[63] Federal Supreme Court, Judgment 4A_233/2024 of 26 September 2024, para. 4.5 — 'Apixaban'.



Computer Translation

[64] Article 17(1) of the Swiss Patents Act refers to the 'same' invention, whilst Article 87(1) of the EPC refers to 'the same' invention. No substantive difference can be discerned between the two.

Computer Translation

explicitly mentioned, but is implicitly covered by the content for a person skilled in the art
.6 '

The recognition of the priority claim in the patent grant proceedings does not exempt the patent proprietor, in the event of legal proceedings, from proving the existence of the priority right (Article 20(1) of the PatG).^^ The requirements for proving the transfer of the priority right need not be stringent where the original and subsequent applicants are in agreement and only a third party invokes formal defects.[67]

50.
In their application, the claimants argue that the applicants for the priority application US60/814,484 (Eric Furfine, Daniel Dix, Kenneth S. Graham and Kelly Frye) had validly and in good time assigned the right to claim priority from that application to Claimant 1. The defendants do not subsequently dispute the valid and timely transfer of the priority right; it must therefore be assumed that the applicant for the contested patent and the 'parent patent' EP 2 029 103 is entitled to claim the priority of US60/814,484 from
16 June 2006 ('formal priority').

51.
By contrast, the defendants dispute that the contested patent claims the same invention as that disclosed in the priority application ('substantive priority'). The disclosure of P1 relates to a VEGF antagonist having the entire amino acid sequence of SEQ ID NO:4, whereas claims 1 and 6 of EP 691 relate to formulations of a VEGF antagonist consisting only of a modified portion of the amino acid sequence of SEQ ID NO:4, namely amino acids 27–457 of SEQ ID NO:4, which are glycosylated at Asn residues 62, 94, 149, 222 and 308. The sole disclosure of such a VEGF antagonist is found in paragraph [0030] of P1. This paragraph does not contain any direct and unambiguous disclosure of the VEGF antagonist claimed in claims 1 and 6 of the contested patent. Paragraph [0030] mentions a fusion protein which 'comprises' amino acids 27–457 of SEQ ID NO:4 and is glycosylated at Asn residues 62, 94, 149, 222 and 308. Thus, this fusion protein

[65] Decision of the Enlarged Board of Appeal of the EPO G 2/98 of 31 May 2001.
[66] Federal Patent Court, judgment O2022_007 of 5 March 2023, para. 29 — 'Apixaban'.
^' Federal Court, judgment 4A 233/2024 of 26 September 2024, para. 6 — 'Apixaban'.



Computer Translation

protein contains further amino acids. However, claims 1 and 6 of EP 691 claimed a VEGF antagonist ‘consisting of amino acids 27–457 of SEQ ID NO:4’, which excludes further amino acids. The contested patent could only claim priority from P1 if the person skilled in the art were to recognise that, in the examples, the protein with SEQ ID NO:4 could be replaced by the fusion protein consisting exclusively of amino acids 27–457 of SEQ ID NO:4 and glycosylated at Asn residues 62, 94, 149, 222 and 308. This is not the case. The defendants refer to the written grounds of 13 January 2025 for the decision by which the Board of Appeal of the EPO revoked the grant of divisional application EP 306.

The claimants refer to the disclosure in paragraphs [0001], [0007], [0030] and in claims 7–14 of the priority application, which directly and unambiguously disclose the invention. The claimants argue that the term ‘comprises’ in paragraph [0030] indicates that the entire fusion protein may be greater than or equal to, and thus comprises a fusion protein as a VEGF antagonist ‘consisting of amino acids 27–457 of SEQ ID NO: 4, which is glycosylated at Asn residues 62, 94, 149, 222 and 308”. According to general technical knowledge, amino acids 1–26 would be recognised as a signal sequence and thus as unnecessary, and not as a component of the mature protein in the formulation. Furthermore, the person skilled in the art would recognise the C-terminal lysine as a residue to be cleaved off and thus also as unnecessary and not a component of the mature protein in the formulation. Consequently, the person skilled in the art would interpret the specific embodiment of paragraph [0030] as disclosing a stable formulation of aflibercept in its mature, glycosylated and cleaved form. This protein consists of amino acids 27–457 of SEQ ID NO:4 and is glycosylated at the aforementioned residues.

52.
The parties agree that the disclosure in paragraph [0007] of the priority application is close to the invention, but disagree as to whether it discloses the invention directly and unambiguously. Paragraph [0007] of the priority application reads:

> The stable liquid ophthalmic formulation of the invention comprises 1–100 mg/ml of a VEGF-specific fusion protein antagonist, 0.01–5% of one or more organic co-solvents, 30–150 mM of one or more tonicity agents, 540 mM of

Computer Translation

a buffering agent, and optionally, 1.0–7.5% of a stabilising agent, at a pH of between approximately 5.8 and 7.0. In one or more specific embodiments, the organic co-solvent may be polysorbate, for example, polysorbate 20 or polysorbate 80, polyethylene glycol (PEG), for example, PEG 3350, or propylene glycol, or a combination thereof; the tonicity agent may be, for example, sodium chloride or potassium chloride; the stabilising agent may be sucrose, sorbitol, glycerol, trehalose, or mannitol; and the buffering agent may be, for example, phosphate buffer.

The proportions of the individual components according to claim 1 are disclosed in paragraph [0007], and for each of these components, the preferred embodiment according to paragraph [0007] of the priority application corresponds to the properties of the respective component in granted claim 1. No selection is required to arrive at these features of the claimed subject-matter on the basis of the disclosure in paragraph [0007] of the priority document.

The claimed buffer agent is not simply a phosphate buffer as literally mentioned in paragraph [0007], but specifically a /Vatriom phosphate buffer. This does not constitute a specific selection, as the use of a sodium phosphate buffer is disclosed in the claims of the priority application wherever a phosphate buffer is specified in more detail. It is therefore directly and unambiguously disclosed that the phosphate buffer is, as a rule and preferably, a sodium phosphate buffer.

The suitability of the formulation for intravitreal administration is the main objective of the invention as stated in paragraph [0001] of the priority application. Consequently, this too does not constitute a selection, but rather a direct and unambiguous disclosure in the context of what is disclosed in paragraph [0007] of the priority application.

53.
What is not described in detail in paragraph [0007] of the priority application is the specific choice of a particular VEGF antagonist, as claimed in claims 1.2 and 6.2 respectively. In this context, it should be noted that the preferred embodiments disclosed in paragraphs [0008]–[0012] of the priority document always contain the VEGF antagonist with the complete SEQ ID NO:4, insofar as the VEGF antagonist is described in detail.

Computer Translation

Paragraph [0030] of the priority application discloses various embodiments of the VEGF antagonist and states that, in a specific embodiment, a glycosylated version is used. Paragraph [0030] of the priority application reads as follows:

> A VEGF antagonist is a compound capable of blocking or inhibiting the biological action of vascular endothelial growth factor (VEGF), and includes fusion proteins capable of trapping VEGF. In a preferred embodiment, the VEGF antagonist is the fusion protein of SEQ ID NO:2 or 4; more preferably, SEQ ID NO:4. In specific embodiments, the VEGF antagonist is expressed in a mammalian cell line such as a CHO cell and may be post-translationally modified. In a specific embodiment, the fusion protein comprises amino acids 27–457 of SEQ ID NO:4 and is glycosylated at Asn residues 62, 94, 149, 222 and 308. Preferably, the VEGF antagonist is a dimer composed of two fusion proteins of SEQ ID NO:4

In the granted claim, the VEGF antagonist is defined as 'consisting of' the aforementioned amino acids 27–457 of SEQ ID NO:4 with the corresponding glycosylation, whereas in para. [0030] of the priority application, it is disclosed that the fusion protein 'comprises' the amino acids 27–457 of SEQ ID NO:4.

54.
Linguistically and in patent law, there is a significant difference between the expression *'consisting of'* a specific set of elements and *'comprising'* that set of elements.

'Consisting of' defines the subject-matter in such a way that it is exhaustively defined by the specified number of elements and contains no further elements, whereas 'comprising' means that the subject-matter contains the specified number of elements but may also contain further, unspecified elements. The former is therefore a closed formulation, whilst the latter is an open formulation
68

As already mentioned, the claimants assert that the wording 'comprises the amino acids 27–457' means that these amino acids must be present, but that the wording suggests that the entire fusion protein must be greater than or equal to these amino acids

[6] Case law of the EPO Boards of Appeal, e.g. Decision T 0044/20 of 13 January 2023, para. 2.2.



Computer Translation

and thus also encompasses a fusion protein 'consisting of' amino acids 27–457.

Even if this may be formally correct, at first glance there is no direct and unambiguous disclosure in paragraph [0030] of the priority application for the wording 'consisting of' in claim 1.2. Paragraph [0030] of the priority application lists the two specific sequences SEQ ID NO:2 and SEQ ID NO:4 as alternatives, which are also expressly listed in the sequence list of the priority document. Furthermore, paragraph [0030] of the priority application contains the statement that, according to a specific embodiment, the fusion protein *comprises* amino acids 27–457 of SEQ ID NO:4 and is glycosylated. The priority document does not expressly state that amino acids outside this range have no functional significance, have lesser functional significance, or could be omitted entirely.

Furthermore, the priority document focuses on VEGF antagonists that are identical to SEQ ID NO:4. All examples utilise this specific sequence. The general part of the description also focuses on this sequence, SEQ ID NO:4.

However, when considering the sequence lists, a clear indication emerges for the person skilled in the art. Both sequences, SEQ ID NO:2 and SEQ ID NO:4, have the same length of 458 amino acids and contain the same amino acid, Lys, at position 458. When comparing SEQ ID NO:2 and SEQ ID NO:4, it is immediately apparent to a person skilled in the art that amino acids 1–26 are identical in both sequences and that the variation between the sequences only begins at amino acid 27.

Thus, when considering the specific sequences of the priority application, there is direct and clear evidence that amino acids 1–26 in fact constitute merely a signal sequence and may be omitted.

Paragraph [0030] of the priority application also discloses that 'In specific embodiments, the VEGF antagonist is expressed in a mammalian cell line such as a CHO cell and *may be modified post-translationally'.* Two such 'post-translational modifications' in such mammalian cell expression systems are just as much a matter of common technical knowledge as the rule regarding signal peptidase cleavage sites (front, p. 44). The section of SEQ ID NO: 4 expressly mentioned in



Computer Translation

paragraph [0030] of the priority application explicitly mentioned site in SEQ ID NO: 4 follows this rule:

```
<210> 4
<211> 458
<212> PRT
<213> Artificial Sequence

<220>
<223> Synthetic

<400> 4
Met Val Ser Tyr Trp Asp Thr Gly Val Leu Leu Cys Ala Leu Leu Ser
 1               5                   10                  15
Cys Leu Leu Leu Thr Gly Ser Ser Ser Gly Ser Asp Thr Gly Arg Pro
            20                  25                  30
Phe Val Glu Met Tyr Ser Glu Ile Pro Glu Ile Ile His Met Thr Glu
        35                  40                  45
```

Namely:

- Position 26 (-1 before the cleavage site) is Gly;
- position 24 (-3 before the cleavage site) is Ser; and
- Pro is absent from positions 24 to 28.

The skilled person would therefore have had to recognise, on the basis of their general technical knowledge, that the site ‘27’ is a cleavage site for post-translational cleavage by signal peptidase and that the phrase ‘modified post-translationally’ in paragraph [0030] must refer to the cleavage by signal peptidase of the amino acid sequence preceding this site. Furthermore, it is plausibly part of general technical knowledge that C-terminal amino acids are frequently cleaved (above, E. 44), and since amino acid 458 is a Lys amino acid which, according to paragraph [0030] of the priority application, is not one of the absolutely essential amino acids, the person skilled in the art is given a specific indication that this also applies in the present case. This, too, is an example of a ‘post-translational modification’ as described in paragraph [0030]; Harris et al. 1995 refer to the removal of C-terminal Lys or Arg residues as ‘post-translational processing’.

Consequently, the specific embodiment set out in paragraph [0030] of the priority application provides the person skilled in the art with a direct and unambiguous disclosure also for a corresponding fusion protein *consisting* solely of amino acids 27–457. On the one hand, the wording of paragraph [0030] of the priority application is a clear indication that the decisive amino acids are amino acids 27–457 and that, in the specific case of these glycosylations, the others may also differ or be omitted. On the other hand, the N-terminal residues 1–26 are recognised as signal sequences and are not essential,

Computer Translation

so that they are normally cleaved out of the preprotein; the same applies to the C-terminal residue 458.

Consequently, the disclosure that the fusion protein *comprises* amino acids 27–457 of SEQ ID No: 4 may, in this specific case and by way of exception, be regarded as a direct and unambiguous disclosure of the term ‘consisting of’ these amino acids as used in the granted claim.

Overall, therefore, the disclosure in paragraph [0030] of the priority application is understood by a person skilled in the art to disclose not only any protein comprising the amino acids 27–457 of SEQ ID NO:4 and further amino acids 1–26 which differ from those in SEQ ID NO:4, but also solely that sequence of amino acids 27–457 of SEQ ID NO:4 which consists exclusively of these amino acids with glycosylation at the aspartic acid residues 62, 94, 149, 222 and 308.

Claim 1 therefore claims the priority of US 60/814,484 dated
16 June 2006.

55.
As regards the substantive priority of claim 6, the same applies to the VEGF antagonist and its suitability for intravitreal administration; however, with regard to the lower limit of the concentration range for the VEGF antagonist, the following must be taken into account:

In connection with the explanation of judgment 3 Ni 15/23 (EP) of the German Federal Patent Court of 26 June 2025 in the response to the application, the defendants contend that, according to the priority application, the lower limit of the concentration range for the VEGF antagonist is 10 mg/ml and not 5 mg/ml, as claimed in claim 6, and that the priority application does not disclose the formulation variants requiring the presence of 20 to 150 mM of an osmotic agent, preferably sodium chloride. Although the priority application discloses the presence of sodium chloride in the lyophilisable formulation, only concentrations of 20 mM and 67.5 mM are described in this context. A range of 20–150 mM, as specified in claim 6, cannot be derived from the priority application.

The defendants contend in this regard that paragraph [0007] refers merely to a stable *liquid* ophthalmic formulation and, accordingly, not to a freeze-dried



Computer Translation

formulation, as claimed in claim 6. In particular, the proportion of the VGAF antagonist in claim 6, which differs from that in claim 1, is not disclosed in paragraph [0007] of the priority application.

This is correct and is not disputed by the claimants. In the priority application, the formulations suitable for freeze-drying are discussed from paragraph [0013] onwards, and there, as in the claims of the priority application (see claims 15 et seq.), a smaller and different range of 10–50 mg/ml for the VGAF antagonist (which, in particular, does not correspond to the range of 5–50 mg/ml specified in claim 6) is disclosed than the range of 1–100 mg/ml specified in paragraph [0007]. Furthermore, the lower limit of 5 mg/ml in claim 6 (range of 5–50 mg/ml) for the VGAF antagonist is not disclosed in the priority application.

Claim 6 cannot therefore validly claim priority from the US application, as it does not cover the same invention. The relevant date for claim 6 is therefore the filing date of 14 June 2007.

**Admissibility of the amendments**

56.
Under Article 26(1)(c) of the Patents Act, the court shall, upon application, declare the patent invalid if the subject-matter of the patent extends beyond the content of the patent application in the version relevant to the filing date. This transposed the ground for invalidity under Article 138(1)(c) of the EPC 2000 into national law.[6]

These two provisions, in turn — in so far as the European grant procedure is concerned — are linked to Article 123(2) of the EPC, which restricts the admissibility of amendments during the application procedure. Accordingly, the European patent application and the European patent may not be amended in such a way that their subject-matter goes beyond the content of the application as originally filed (see also Article 58(2) of the Patents Act). The purpose of this provision is to prevent the patent proprietor from improving their position by claiming protection for subject-matter not disclosed in the original application. The applicant is not permitted to incorporate subsequent amendments or further developments into the application

^^ BGE 146 III 177 E. 2.1.1 — ‘Oxycodone and Naloxone IV’.

Computer Translation

and thereby obtain a right of protection which is assessed against the state of the art at the time of filing. It is also pointed out that this prohibition on amendments serves the purpose of legal certainty: the public should not be taken by surprise by patent claims which could not have been anticipated on the basis of the version originally filed.*0

In this context, the 'subject-matter of the patent' is not to be understood as the 'scope of protection' under Article 69 EPC, as determined by the patent claims. Rather, it refers to the 'subject-matter' within the meaning of Article 123(2) EPC, i.e. including the entire disclosure in the description and the drawings. According to the case law of the Boards of Appeal of the European Patent Office (EPO), this provision permits an amendment after filing only to the extent that a person skilled in the art can, on the basis of the application documents as a whole in their originally filed version and by drawing on general technical knowledge — objectively and with reference to the filing date — immediately and unambiguously deduce the subject-matter. This test is referred to as the 'gold standard'.[71]

57.
In their response to the application, the defendants refer, in the section on inadmissible amendments, to the opposition proceedings concerning EP 306 and to the fact that the Opposition Division, in its decision of
26 November 2024. Furthermore, the defendants acknowledge that the original application for the patent in dispute, WO 2007/149334, largely corresponds to the priority application. The defendants go on to argue, by analogy and with reference to the allegedly missing priority claim, that the granted claims have been inadmissibly amended. The plaintiffs dispute this, and the defendants refute it at length.

Both parties put forward the same arguments regarding the alleged invalidity of the priority claim and the allegedly inadmissible amendments. In fact, paragraph [0030] of the priority application, discussed above in connection with the validity of the priority, essentially corresponds to paragraph [0045] of the international application, and the remainder of the disclosure required as a basis for the granted claims is contained in the filed application in the

[70] BGE 146 III 177 E. 2.1.1 and 2.1.2 — 'Oxycodone and Naloxone IV'.
'1 BGE 146 III 177 E. 2.1.3 with references — 'Oxycodone and Naloxone IV'.

Computer Translation

essentially identical to the priority application. Reference may therefore be made to the above comments on the validity of the priority claim.

Only with regard to the lower limit of the VEGF antagonist of 5 mg/ml, as claimed in claim 6, is there, in contrast to the priority application, a direct and unambiguous disclosure in the international application in connection with a formulation suitable for freeze-drying comprising the constituents claimed in claim 6 (paragraph [0027] of WO 2007/149334 A2). Consequently, claim 6 has not been inadmissibly amended (but does not validly claim priority from P1).

The claims 1 and 6 as asserted have therefore not been amended in such a way that their subject-matter extends beyond the content of the application as originally filed.

**Novelty**

58.

An invention must be new in relation to the entire state of the art (Section 1(1), Section 7(1) of the Patents Act). The state of the art comprises everything which, prior to the filing date or the priority date, has been made available to the public by means of a written or oral description, by use, or in any other manner (Section 7(2) of the Patents Act).

An invention is only deemed not to be novel if all the features of the invention were disclosed in a single prior art document before the relevant date. [2]

The disclosure content of a prior art document must be determined from the perspective of the relevant person skilled in the art. In doing so, the knowledge and skills of the person skilled in the art on the relevant date (filing date or priority date) of the invention under examination must be taken as a basis.’ [3]

Only that which is immediately and unambiguously apparent to the person skilled in the art from the prior art is deemed to be disclosed. This also includes information which, although not expressly stated in the prior art, is implicitly disclosed when taking into account the knowledge and skills of the person skilled in the art

[72] BGE 133 III 229 para. 4.1 — ‘crystalline citalopram base’; Federal Patent Court, judgment
O2016_001 of 4 July 2019, para. 30 — ‘ceramic injection material’. ’[3]
BGE 144 III 337 para. 2.2.2 — ‘Fulvestrant II’.



Computer Translation

are necessary, but not what the person skilled in the art would naturally add to the implicit disclosure.'[4]

A prior art device which possesses all the structural (physical) features mentioned in the patent claim anticipates the subject-matter of the patent claim to the detriment of novelty if the prior art device is suitable for the purpose specified in the claim. '

A specific feature is not anticipated by a generic disclosure.'[6]

59.
In the event that the asserted claims 1 and 6 validly claim the priority of P1, the defendants allege a lack of novelty of the teachings of these claims in relation to WO 852. If priority is validly claimed, WO 852 constitutes prior art within the meaning of Article 54(3) EPC/Article 7(3) PatG, i.e. it is to be taken into account only in relation to novelty.

The defendants refer specifically to claim 6 of WO 852 and, regarding the choice of VEGF antagonist, to paragraph [0026]. Claims 1 and 6 of the contested patent merely require that the formulation be suitable for intravitreal administration. Since WO 852 discloses an aflibercept formulation which exhibits all the features of the claimed formulation, the aflibercept formulation of WO 852 must be suitable for intravitreal administration. This was confirmed by the Munich Regional Court in its judgment 7 O 16055/24 of 25 September 2025.

The plaintiffs counter that WO 852 discloses neither formulations suitable for intravitreal administration nor the claimed sodium phosphate buffer. Furthermore, the plaintiffs emphasise that the areas of overlap are insufficient to establish a lack of novelty.

---

[74] SHK PatG-DETKEN, Art. 7 N 116 et seq.
[75] Federal Patent Court, Judgment O2018_017 dated 31 January 2020, E. 35 — 'Reinforcement element'.
[76] BPatGer, Judgment O2023_012 of 12 February 2025, para. 63 with further references — 'Avalanche avalanche victim locator'.



Computer Translation

60.
Dependent claim 6 of WO 852 refers to claim 1 and discloses a pharmaceutical formulation containing a VEGF antagonist and certain quantities of excipients (see the table shown below). WO 852 does not expressly disclose that this formulation is suitable for intravitreal administration. The aim of WO 852 is the treatment of cancer with VEGF antagonists (paragraph [0002]). Given the intended use, a person skilled in the art would assume that the formulations are intended for intravenous or subcutaneous administration (see also paragraph [0045] of WO 852).

| WO 2006/104852 A2 (Exhibit 21, claim 6) | EP 691, claim 1 | EP 691, claim 6 |
|---|---|---|
| 10-50 mg/ml VEGF-specific fusion protein | 1-100 mg/ml VEGF antagonist (aflibercept) | 5-50 mg/ml VEGF antagonist (aflibercept) |
| 1-10 mM Phosphate | 5-40 mM Sodium phosphate | 5-25 mM Sodium phosphate |
| 5-30% Sucrose | 1-7.5% Sucrose or trehalose | 1-10% Sucrose or trehalose |
| 0.05-0.10% Polysorbate | 0.01-5% Polysorbate | 0.01-0.15% Polysorbate |
| 25-100 mM NaCl | 30-150 mM NaCl or KCl | (20-150mM NaCl) |
| pH 6-6.5 | pH 5.8-7.0 | pH 5.8-7.0 |
| 1-10 mM Citrate | "comprising", i.e., presence of 1-10 mM Citrate is not excluded | "comprising", i.e., presence of 1-10 mM Citrate is not excluded |

*Figure 2. Comparison of claim 6 of WO 852 with claims 1 and 6 of the contested patent (submitted by the defendants)*

The decisive factor is whether the formulation according to claim 6 of WO 852 is, despite the lack of an explicit disclosure of the route of administration, nevertheless objectively suitable for intravitreal administration, as this is sufficient to anticipate the subject-matter of claim 1 of the contested patent in a manner prejudicial to its novelty.

The person skilled in the art knows that, in the case of formulations for intravitreal administration, it is particularly important that they are (approximately) isoosmolar (see above, para. 44). The examples in WO 852 are not unambiguously suitable for intravitreal administration in the eyes of the person skilled in the art, as they are not isoosmolar with the vitreous humour (undisputed). The judgement of the Munich Regional Court of 8 January 2026, cited by the defendants, simply found the formulations of WO 852 to be suitable for this purpose without providing any technical justification (‘D10 is suitable for intravitreal administration

Computer Translation

, but is not intended for that purpose'). It is undisputed in the present proceedings that a formulation suitable for intravitreal administration must have a low viscosity, because the needles used for intravitreal administration are very thin (see also the report by Prof. Crommelin: 'In practice, it is common to use an injection needle with a gauge number of 30 or higher for intravitreal administration. This corresponds to an inner needle diameter of just 0.1–0.15 millimetres or even thinner' and 'There is a particularly strong need for lower viscosity in intravitreal administration given the use of a thin injection needle'). Nor is this viscosity restriction disclosed in the intravenous or subcutaneous formulations of WO 852 (paragraphs [0045], [0047]). In order to arrive at a formulation as claimed, which is suitable for intravitreal administration, the person skilled in the art must select, from the ranges disclosed in claim 6, the upper disclosed amount of phosphate buffer and the lower disclosed amount of sugar. A formulation clearly suitable for intravitreal administration is therefore disclosed only through a specific, multiple selection process, and not directly and unambiguously. The formulation according to claim 6 of WO 852 therefore does not deprive the formulations according to claims 1 and 6 of the contested patent of novelty.

Furthermore, unlike the priority application and the original application for the contested patent, WO 852 does not specifically disclose a 'sodium phosphate buffer'. It merely discloses phosphate buffers in general (e.g. paragraph [0005]). However, the generic disclosure (in this case: phosphate buffers) does not pre-empt the specific feature (in this case: sodium phosphate buffers).

The subject-matter of claims 1 and 6 of the contested patent is therefore novel in relation to WO 852.

**Inventive step**

61.
Anything that follows naturally from the state of the art is not a patentable invention (Art. 1(2) of the Patents Act). In order to 'rule out an impermissible ex post analysis', the Federal Supreme Court requires a transparent method of assessment.[77]

Computer Translation

”Federal Supreme Court, Judgment 4C.52/2005 of 18 May 2005, para. 2.3 — ‘Plastic wall plugs’.

Computer Translation

This requires, at a minimum, the identification of the invention, the state of the art, and the relevant person skilled in the art and their knowledge and skills.'

When assessing inventive step, the Federal Patent Court applies the problem-solution approach developed by the European Patent Office (EPO). * The problem-solution approach is divided into three phases: i) identification of the 'most obvious prior art', ii) determination of the 'objective technical problem' to be solved, and iii) examination of whether, in view of the most obvious prior art and the objective technical problem, the claimed invention would have been obvious to a person skilled in the art. [0]

62.
The defendants argue that there is a lack of inventive step based exclusively on WO 852. Since claim 1 of the contested patent validly claims priority from P1, WO 852 is to be taken into account for claim 1 only in relation to novelty. There is therefore no conclusive challenge to the inventive step for claim 1.

As regards the lack of inventive step in claim 6, the defendants confine themselves to asserting that 'As set out, the formulation according to claim 6 of WO 852 is suitable for intravitreal administration, as it is largely identical to the formulation suitable for intravitreal administration according to claims 1 and 6 of EP 691. Furthermore, in Example 4 of WO 852, which is an embodiment falling under claim 6 of WO 852, 'an isoosmolar solution for intravenous administration' is obtained. The person skilled in the art has reason to assume that such an isoosmolar solution is also suitable for intravitreal administration, and to investigate this with a reasonable prospect of success.' (German translation by the court).

These sweeping assertions do not permit the application of the problem-solution approach. Since the defendants bear the burden of proving that the contested patent lacks legal validity, it is already

[7] Federal Supreme Court, loc. cit.
7* Federal Patent Court, Judgment O2013 008 of 25 August 2015, para. 4.4 — 'electrostatic powder spray gun'; Judgment S2017_001 of 1 June 2017, E. 4.6 'Valsartan/amlodipine combination product'; Judgment O2015_011 of 29 August 2017, E. 4.5.1 — 'Fulvestrant'.
[0] Guidelines for Examination at the EPO, November 2019 edition, G-VII, 5.



Computer Translation

in the absence of a substantiated challenge, it must be assumed that claim 6 involves an inventive step.

63.
On the merits of the case, it should first be noted that there is no evidence on the record that the VEGF trap comprising amino acids 27–457 of SEQ ID No:4 of the contested patent and with glycosylations at positions 62, 94, 149, 222 and 308 was described *in any formulation* for intravitreal use prior to the filing date of the contested patent. WO 852, specifically cited by the defendants, is discussed below in this regard. WO 325, cited by the claimants in the context of equivalence and by the defendants in the context of the formal objection, on the one hand provides a general definition of its 'VEGF antagonists', without mentioning the VEGF trap of the contested patent, in which ranimizumab is preferred, and, on the other hand, examines in the examples the intravitreal administration of the LucentiSO formulation of ranimizumab. US 234, also cited by the defendants in the context of the Formstein objection, discloses the VEGF trap of the contested patent in paragraph [0013], but in paragraph [0050] refers only to 'intraocular', apparently meaning solid inserts or eye drops (paragraph [0052]). The defendants also appear to acknowledge in their response to the statement of defence that US 234 does not disclose any intravitreal administration of aflibercept. Contrary to the response to the interim measures, US 234 does not, in paragraphs [0015], [0040] and [0043], describe the treatment of age-related diseases such as macular degeneration or diabetic retinopathy specifically with aflibercept. Paragraph [0015] mentions a 'VGEF mini-trap' as suitable for intravitreal administration; this is a 'VEGF trap composed of two fusion polypeptides having at least one truncated multimerising component' (paragraph [0009]). Paragraph [0043] also discloses the use of 'VEGF mini-traps'.

Whilst WO 852 may disclose the VEGF trap of the contested patent as such in paragraph [0026], it does not disclose the intravitreal administration of its VEGF traps. As this involves a very specific method of administration and it is not apparent from the file why there is sufficient incentive to consider a formulation according to claim 6 of WO 852 for this specific and delicate method of administration, claim 6 of the contested patent is likely to involve an inventive step.

Computer Translation

For the purposes of these interim proceedings, it must therefore be assumed that the asserted claims 1 and 6 of the contested patent are valid. This is consistent with the assessment reached by the German Federal Patent Court in its judgment 7 O 16055/24 of 26 June 2025 (albeit with a claim limited to intravitreal administration) and by the High Court of Justice of England and Wales, judgment [2025] EWHC 2527(Pat) of 8 October 2025.

**Summary of legal validity**

64.
In summary, the asserted claim 1 validly claims the priority of P1, has not been inadmissibly amended and is novel. A lack of inventive step has not been conclusively alleged. Although the asserted claim 6 does not validly claim priority from P1, it has likewise not been improperly amended, is novel and is likely to involve an inventive step. For the purposes of these interim proceedings, it must therefore be assumed that the asserted claims are valid.

**Infringement**

65.
The claimants allege infringement of claims 1 and 6 of the contested patent by the product 'Afqlir@' marketed by the defendants. With regard to claim 1, it is alleged that all features are literally embodied, with the exception of features 1.4 (30–150 mM sodium or potassium chloride) and 1.5 (5–40 mM sodium phosphate buffer), for which infringement by equivalent means is asserted. With regard to claim 6, it is alleged that all features are realised literally, with the exception of feature 6.3 (5–25 mM sodium phosphate buffer), for which infringement by equivalent means is alleged.

The defendants dispute that Afqliro• embodies feature 1.7 of claim 1, or features 6.4a (pH value approximately 5.8–7.0), 6.1 (suitable for freeze-drying) and 6.6 (reconstitutable) of claim 6, to the letter. Furthermore, they dispute that Afqliro fulfils the teachings of claims 1 and 6 by equivalent means.

Computer Translation

**Literal fulfilment of the pH value of approximately 5.8–7.0**

66.
The claimants acknowledge that Afqliro's marketing authorisation documents specify a pH value of 5.7 for the formulation, which lies outside the claimed range of 5.8 to 7.0 and is due to a rounding error. Nevertheless, it is claimed that Afqliro fulfils this feature to the letter, namely because i) there are always variations between individual batches and it is therefore highly likely that there are batches with a pH above 5.8; (ii) the pH value is to be measured at the storage temperature of around 5°C, at which point it falls within the claimed range; and (iii) measurements of Afqlir@ formulations available on the market show that their pH value is 5.78 and thus within the rounding margin of the claimed range.

Argument (ii) is not convincing, as the feature, as explained in E. 47, is to be understood as meaning that the pH value must lie within the specified range at room temperature. Measurements of the pH value at 5 °C are therefore not relevant.

67.
What is decisive is the pH value of the product available on the market. According to the plaintiffs' allegations, Afqlir@ is manufactured in Belgium. For the remaining countries in respect of which an injunction is sought, patent infringement is alleged on the basis of the (impending) placing on the market of the ready-to-use Afqlir@ formulation, and not its manufacture. The claimants bear the burden of proving that the pH value of the ready-to-use product falls within the range claimed.

The Physiolution laboratory commissioned by the claimants received all 15 'pre-filled syringes' from Afqli, which they had purchased in Germany (see also E. 30 above). The Physiolution Report dated 30 March 2026 lists the codes of these 15 'pre-filled syringes' and their respective batch numbers on page 2. According to this report, the formulations of three of these 'pre-filled syringes' – with codes SN'103, SN'530 and SN'571 – were each measured three times at approximately 23°C. The measurements on SN'571 at an average temperature of 22.6°C yielded an average pH of 5.79; the measurements on SN'103 at an average temperature of 22.7°C yielded an average pH of 5.81, and the measurements on SN'530 at an average temperature of 23.1°C yielded an average pH of 5.74. The average pH value of 5.78 was calculated as the average of all measurements across all three samples



Computer Translation

and was measured at an average temperature of 22.8°C. This overall average pH value is above the lower limit of 5.75, above which, in accordance with standard rounding practice, it would have to be rounded up to 5.8, thereby reaching the lower limit of the ranges specified in features 1.7 and 6.4a.

In the court's view, however, the claimants have not succeeded in demonstrating credibly that the pH value of the Afqliro formulation available on the market is in fact above 5.75.

The three samples SN'103, SN'530 and SN'571, whose pH values were measured at around 23°C, all originated from the same batch VRWSS, subgroup D (undisputed). Given the samples used, therefore, no pH variations exceeding the measurement error of the pH meter should occur. As set out above, the measurement temperatures varied from 22.6°C to 23.1°C, i.e. by +0.5°C. The claimants and their expert, Prof. Crommelin, cite the temperature dependence of the histidine buffer from Afqlir@, whereby a reduction from 20°C to 10°C is said to result in a pKa change of +0.02, in accordance with a dpKa/dT value of -0.02/°C. Due to the aforementioned temperature increase of +0.5°C, the pH value is likely to change by only around -0.01 units. However, the pH values reported by Physiolution range from 5.74 to 5.81, as the defendants note in their statement of 20 May 2026, i.e. a variation of 0.07 pH units. Furthermore, the pH of the VRWSSD batch after manufacture was 5.707, at a temperature of 23.8°C. A reduction in temperature to 22.6°C would, given the same dpKa/dT value of -0.02/°C, cause the pH of this batch to rise to a maximum of approximately 5.74. However, the SN'571 sample, measured at an average temperature of 22.6°C, exhibited an average pH of 5.79.

Furthermore, the observed trend of 'pH as a function of measurement temperature' is not one of 'increasing pH as the measurement temperature decreases', as the claimants and their expert, Prof. Crommelin, themselves argue. These inconsistencies cast doubt on the reliability of the measurements.

Physiolution did not apply the standard method set out in Ph. Eur. 2.2.3. The Pharmacopoeia's standard method requires the electrode to be immersed in the sample, which generally necessitates at least several millilitres of sample material. The Physiolution report, however, states that 'approximately 100 pL of the sample was applied to



Computer Translation

the surface of the glass membrane', rather than immersing the electrode in a sufficient volume of the solution. According to the defendant, Physiolution merely carried out a 'surface drop measurement', whereby the electrode used, VWR International 662-1775, is not a microelectrode and has not been validated for surface drop measurements.

In the circumstances, given the very small volume of the sample, its buffer capacity is not credibly sufficient to keep the influence of the glass membrane on the sample's pH at a negligible level: the glass membrane of the glass electrode requires a sufficient quantity of $H^-$ ions in the sample in order to become sufficiently polarised. If the sample to be measured cannot provide sufficient H* for this polarisation due to insufficient buffer capacity and/or too small a volume, the result is a measured pH that is not sufficiently acidic – i.e. too high – as determined by the glass electrode. Furthermore, in droplet measurements, there is no guarantee that the reference electrode is in contact, and evaporation and $CO_2$ absorption additionally distort the measurements when the sample volume is so small. Whilst this may not be attributable to any malicious intent, but rather to the fact that Physiolution had too little sample liquid available, However, this does not alter the fact that the court does not regard the measurement results as credible. Physiolution would have
, for example, have measured a standard solution with a known exact pH value using the same measurement method, in order to demonstrate that the method used produces reliable values.

68.
As regards the plaintiffs' claims concerning batch-to-batch variability, these are mere speculation. Both parties note that NaOH and HCl are also used in Afqli. However, adding NaOH and HCl simultaneously would be nonsensical, contrary to the response to the objection: they would neutralise each other rather than form a buffer pair. From the EPAR for Afqli:

Other ingredients are: polysorbate 20 (E 432), L-histidine, L-histidine monohydrochloride monohydrate, trehalose dihydrate, sodium hydroxide and hydrochloric acid (for pH adjustment) and water for injections.

*Figure 3: Extract from p. 10 of the* European *Public Assessment Report for Afqli dated 19 September 2024.*

The inclusion of the two components, NaOH and HCl, in the Afqlir@ formulation suggests that any pH variability between

Computer Translation

the individual batches is not tolerated but is actively corrected: if the pH in a batch is higher than 5.7, HCl is added to lower the pH to 5.7; if the pH of the batch is lower than 5.7, NaOH is added to raise the pH to 5.7.

The defendants have submitted the analyses of the two batches, VRWSSD and VRH75E. These are not batches specifically selected by the defendants, but rather the batches from which the samples analysed by Physiolution were taken. The analyses show that the pH value must have been below 5.75, as the actual measured value is stated to three decimal places. If the measured value were 5.75 or higher, it would have to be rounded up to 5.8 in accordance with standard rounding conventions. The value of 5.7 stated in the 'Certificate of Analysis' therefore proves that the values actually measured were below 5.75. The claimants may now assert that there are other batches whose pH value was above 5.75, but in the absence of any evidence to support this, this assertion has not been substantiated. It is also pure speculation that the pH value of the ready-to-use product is supposed to be lower than the pH value of the production batch.

Claims 1.7 and 6.4a specify *'approximately'* 5.8 as the lower limit. However, in the Court's view, the word 'approximately' is not to be considered in the context of a literal infringement (see paragraph 48 above).

A literal infringement of feature 1.7 or 6.4a has therefore not been substantiated, even taking the Physiolution report into account.

**Literal fulfilment of the requirements of 'lyophilizable' and 'can be reconstituted'**

69.
Claim 6 requires, amongst other things, that the formulation containing a VEGF antagonist is suitable for freeze-drying (feature 6.1) and can be reconstituted (feature 6.6), i.e. that it can be reconstituted after freeze-drying in such a way that it is suitable for intravitreal administration (feature 6.6, 'the formulation can be reconstituted so it is suitable for intravitreal administration').

The claimants assert, inter alia, with reference to the Physiolution Report, that the contested embodiment fulfils features 6.1



Computer Translation

and 6.6 of claim 6 to the letter. The Physiolution Report shows that AfqIirO• fulfils all the criteria for suitability for freeze-drying and reconstitutability set out in the patent. It is irrelevant whether regulatory authorities impose further requirements.

The defendants argue that the plaintiffs failed to allege in a timely manner that features 6.1 and 6.6 were fulfilled to the letter. The application for interim relief merely alleged that the individual components of Afqliro were suitable for freeze-drying. The freeze-drying suitability of the formulation as such was not alleged. Nothing at all was said regarding reconstitutability.

On the merits, the defendants dispute that Afqlir@ fulfils the literal requirements of features 6.1 and 6.6. Afqlir@ is neither intended for nor suitable for freeze-drying. What is decisive is not whether the individual components can be freeze-dried, but whether the formulation as such can be freeze-dried and subsequently reconstituted in such a way that it is suitable for intravitreal administration. Freeze-drying frequently leads to considerable instability of the proteins. The product information for Afqlir@ expressly states that Afqlir@ must not be frozen. The tests described in the contested patent cannot guarantee that the reconstituted solution is suitable for intravitreal administration. The analyses carried out by Physiolution are not conclusive. 50 pL of Afqlir@ was diluted with 450 pL of a solution containing 10 mM phosphate buffer and 500 mM NaCl, pH 7.0, which alters its properties. The Physiolution Report also shows that the reconstituted formulation exhibits a higher proportion of high-molecular-weight protein aggregates. For visual inspection, Physiolution uses a method developed in-house that has not been validated. The turbidity measurement at 405 nm used by Physiolution is not recognised as a method for quantifying invisible particles and lacks the necessary sensitivity to detect clinically relevant particle populations. A solution could contain thousands of invisible particles (protein aggregates in the range of 2–25 pm) and still exhibit a low optical density (OD) at 405 nm. The reported results showed a doubling of the optical density. Physiolution had compared the protein content before freeze-drying and after reconstitution. In such a comparison, an actual protein yield of over 100 per cent is physically impossible — no protein can be formed during freeze-drying. The data in Table-



Computer Translation

The values reported by Ie 2 on p. 38, ranging from 101.1% to 107.21%, are therefore implausible and suggest that the measurements are unreliable. The increased A280 value following freeze-drying could be explained by light scattering contributions from invisible aggregates or particles that had formed during the freeze-drying process. Therefore, what is referred to in the Physiolution Report as
'104.40 per cent yield' may in fact reflect a combination of the following factors: (a) a yield of native monomer of less than 100 per cent, and (b) an artificially elevated A280 value due to scattering caused by newly formed aggregates, which means that the actual yield of monomeric protein is unknown but is likely to be below 100 per cent.

70.
It should be noted at the outset that the claimants asserted the literal fulfilment of features 6.1 and 6.6 in good time. The Federal Supreme Court holds that a general reference in a subheading (there: '3. Alternatively: No legal validity of EP 556 due to lack of novelty in light of the Basycon Flyer 2005') suffices as an assertion of the relevant facts. [1] In the present case, the heading on p. 46 of the application for interim relief reads '6. Realisation of the subject-matter of claim 6 by Afqlir@' and the associated subheading 'Features 6.1 and 6.7'. Accordingly, in accordance with the Federal Supreme Court's standard, it has been sufficiently alleged in law that Afqlir@ realises features 6.1 and 6.6 (in the breakdown of features used by the plaintiffs, feature 6.7 corresponds to feature 6.6 according to the breakdown used here).

71.
The measurement of the turbidity of the reconstituted formulation as optical density at a wavelength of 405 nm corresponds to the test prescribed by the contested patent (para. [0059]); any further requirements need not be met (see above, E. 46). According to these measurements, the reconstituted formulation showed no turbidity.

As described in the contested patent, Physiolution measured the aggregation and degradation of the VEGF inhibitor using SEC-HPLC ('size-exclusion chromatography—high-performance liquid chromatography'). The measurements show that the proportion of non-aggregated, non-degraded aflibercept after freeze-drying and re-

[1] Federal Supreme Court, Judgment 4A 421/2022 of 11 April 2023, para. 3.3 — 'connecting element'.



Computer Translation

reconstruction has hardly changed compared with the solution prior to freeze-drying.

The defendant's argument that the product information for **Afqliro** expressly states that Afqliro must not be frozen does not preclude the possibility that Afqliro is suitable for freeze-drying. Freezing and freeze-drying are not the same thing. A prohibition on freezing, as in the case of Afqlir@, is also found in the prescribing information for Eyleao ('Special storage instructions'). However, the contested patent tested the lyophilisation of aflibercept formulations according to the patent in Examples 7 and 8, with the formulation in Example 8—containing 2.5% sucrose as a stabiliser—being similar to Eyleao. The results of these examples show that the NaCl content can vary between 20 and 67.5 mM without impairing lyophilisability. Freezing, as understood in the art, means freezing the entire formulation, including the water it contains, for a prolonged period. By contrast, freeze-drying involves brief freezing followed by thawing under vacuum to allow the frozen water to sublimate. The prohibition on freezing is therefore not a valid indicator of non-freeze-dryability.

The results of the UV/Vis spectroscopy carried out by Physiolution show that the percentage recovery rate — i.e. the proportion of aflibercept in the solution after freeze-drying and reconstitution compared with the proportion previously present in the liquid formulation — remained essentially unchanged. The values exceeding 100% are attributable to measurement inaccuracy; the patent in dispute itself reports protein recovery of up to 113%; furthermore, the average of all measurements according to the patent in dispute is in some cases above 100% (Table 2).

Furthermore, in addition to the measurements set out in the contested patent, Physiolution measured the binding affinity of the VEGF inhibitor after reconstitution and reported that this amounted to approximately 97% of the value prior to freeze-drying.

In the case of the dilution and modification claimed by the defendants using 450 pL of solution containing 10 mM phosphate buffer and 500 mM NaCl, pH 7.0, as claimed by the defendants, this constitutes the unavoidable provision of a mobile phase for the use of SE-HPLC as an analytical method, and the reported analysis was carried out promptly.

Computer Translation

Souillac et al. 2005 used 100 mM sodium phosphate, 200 mM NaCl, pH 7.2 as the mobile phase in SEC-HPLC of a fusion protein to determine the ‘oligomerisation state’ in the soluble fraction of this fusion protein. Fast et al. (2009) used 100 mM sodium phosphate, 300 mM NaCl, 0.1 g/L $NaN_3$, pH 7 as the mobile phase in SEC-HPLC to investigate the aggregation reaction of the fusion protein abatacept, whereby the soluble fraction of the reaction mixture was analysed at regular intervals. Whether the sample to be chromatographed had already been diluted in the mobile phase in the Physiosolution Report and in these publications is irrelevant: SEC-HPLC using this mobile phase results in a much greater dilution of the protein and any aggregates it may contain in this mobile phase than an initial dilution of the protein sample to be chromatographed could ever achieve.

Section 3.1.2 of the 1999 paper by Wang, submitted by the defendants, discusses the reversibility of protein aggregation. It mentions only urea as a reversibilising agent, and only in cases where the aggregation itself is reversible in the first place. The plaintiffs' objection that, in Physiolution, the dilution of the protein sample to be chromatographed in a mobile phase containing NaCl would promote the reverse reaction of aggregates back to monomeric protein or otherwise alter the protein does not therefore appear to be substantiated by the legitimate state of the art. SE-HPLC is also used in the contested patent; without specifying what is used as the mobile and stationary phases (e.g. paragraph [0059]). It is therefore not credible that the measurements cannot be relied upon.

The Physiolution Report of 30 March 2026 therefore credibly demonstrates that Afqli is suitable for freeze-drying and can be reconstituted after freeze-drying in such a way that it is suitable for intravitreal administration.

**Summary of the literal breach**

72.
It should be noted that the literal fulfilment of all features of the asserted claim 1, with the exception of features 1.4 (tonic agent), 1.5 (sodium phosphate buffer) and feature 1.7 (pH value), remained undisputed. The literal fulfilment of features 1.4,

Computer Translation

1.5 and 1.7 was neither asserted by the claimants nor (in the case of feature 1.7) substantiated by them.

With regard to the asserted claim 6, the fulfilment of all features except feature 6.3 (sodium phosphate buffer) and feature 6.4a (pH value) remained undisputed or (in the case of features 6.1 and 6.6) was substantiated.

For the features not fulfilled to the letter, fulfilment by equivalent means must be examined below.

**Infringement by equivalent means**

73.
The scope of protection of the patent is determined by the patent claims (Art. 51(2) PatG / Art. 69(1) EPC). The Protocol on the Interpretation of Article 69 of the EPC (SR 0.232.142.25) states that, when determining the scope of protection of a European patent, due account must be taken of elements which are equivalents of the elements mentioned in the patent claims. Article 66(a) of the Patents Act stipulates that not only copies but also imitations of patented inventions are deemed to constitute unauthorised use of the invention, whereby 'use by equivalent means' is meant.[82]

Whether there is an infringement by equivalent means is determined by the following three questions, of which the first two must be answered in the affirmative and the last in the negative for an infringement to exist: [3]

1. Does the modified feature, in combination with the other technical features of the patent claim, objectively fulfil the same function as the claimed feature?[84]

2. Is the equivalent effect obvious to a person skilled in the art, viewed objectively and taking into account the teaching of the patent, when the features are interchanged? '

[2] BGE 143 III 666, para. 4.5 — 'Pemetrexed'.
[3] Federal Patent Court, Judgment O2015_018 of 15 June 2018, para. 60 — 'instrument
d'écriture'; judgment S2018 006 of 8 February 2019, para. 34 — 'Spiral spring'.
[4] BGE 143 III 666 para. 5.3.3 — 'Pemetrexed'; Federal Patent Court, judgment S2013 001 of
21 March 2013, Headnote; Judgment O2014_002 of 25 January 2016, para. 6.5.2.3 —



Computer Translation

'Urinal valve'.

Federal Patent Court, Judgment O2014_002 of 25 January 2016, para. 6.5.2.4 — 'Urinal valve'.

Computer Translation

3. If, on an objective reading of the patent specification, the person skilled in the art concludes that the patent proprietor has formulated the claim — for whatever reasons — so narrowly that it does not claim protection for an equally effective and discoverable embodiment? [6]

Regarding the scope of the effects of the feature claimed literally, which must be achieved by the substituted feature, the Federal Supreme Court held that 'the modified embodiment [must] achieve all those effects which, in the mind of a person skilled in the art, are intended to be achieved by the individual technical features of the patent claim, both individually and in combination'. Despite the somewhat ambiguous wording, which might suggest that what matters is the effects of the technical teaching as a whole rather than the effects of the substituted feature, this cannot be seen, in view of the reference to German doctrine and case law—which clearly focus on the effect of the substituted feature— this cannot be regarded as a departure from the principle that it is precisely the effects of the substituted feature that must be achieved.[8] *

There is no case law in Switzerland – nor, as far as can be ascertained, any doctrine – on how to proceed where an infringing embodiment does not literally fulfil several features of the asserted claim, but does so by equivalent means. In the court's view, in cases where the several substituted features are interrelated, it is not appropriate to apply the three-part test from BGE 143 III 666 'Pemetrexed' separately to each individual feature that is not realised literally. A consideration of each feature in isolation leads to the overall differences between the allegedly infringing embodiment and the claimed invention being given insufficient weight, because in answering each individual question, it is assumed that all other features are realised literally. Correctly, in the case of an embodiment which allegedly fulfils several interrelated features by equivalent means, the set of questions must be applied to the entirety of the features not fulfilled to the letter.

---

[6] BGE 143 III 666 para. 5.5.1 — 'Pemetrexed'; Federal Patent Court, judgment O2015_018 of
15 June 2018, para. 60 — 'instrument d'écriture'.

[7] BGE 146 III 666 para. 5.3.3. — 'Pemetrexed', with reference to MEIER-BECK, 'Purposive Construction or Equivalence?', GRUR Int. 2005, 796 ff., 800 (emphasis added)

Federal Court of Justice (BGH), judgment X ZR 113/11 of 17 July 2012 — 'Pallet container III'.

^ Federal Patent Court, judgment O2021_004, O2021_005 of 20 April 2023, para. 73 —
'Deferasirox'.

**Objective equivalence**

74.
The defendants dispute the objective equivalence of ionic salts such as the claimed sodium or potassium chloride and neutral sugars such as trehalose, and of phosphate and histidine buffers.

The claimants point out that, according to the contested patent, the specific types of ions, the charge density, interactions with the protein surface or downstream effects on colloidal behaviour are not decisive.

Afqlir@ has been authorised both in Switzerland (Swissmedic Nos. 70126 and 70127) and in the EU as a biosimilar to the reference product Eyleao. It is therefore established in the present case that Afqlir@ is therapeutically effective, safe, stable in storage and suitable for intravitreal administration (see, in particular, pages 17 and 20 of the EMA report regarding storage stability). The substituted features therefore, together with the features realised in accordance with the literal meaning, are objectively equivalent to features 1.4, 1.5 and 1.7, and 6.3b and 6.4a respectively. The specific mechanism of action is irrelevant in this regard. Incidentally, before the Munich Regional Court, the counter-defendants there (who are not the same as the defendants in this case) did not dispute the objective equivalence (Judgment 7 O 16055/24 of the Munich Regional Court of 23 October 2025, para. 75).

**Findability**

75.
In accordance with the second question under the Pemetrexed triad, it must be examined whether, from an objective point of view and taking into account the teaching of the patent, the same effect of the claimed feature and the substituted feature is obvious to a person skilled in the art. Where several features are alleged to be realised equivalently, the question relates to the totality of the effects of the totality of the substituted means (ibid., para. 73). According to the 'Urinalventil' case law of the Federal Patent Court, this question must be answered with knowledge of the substitute means, even though it must be conceded to the defendants that the Federal Supreme Court has, to date,

Computer Translation

had no opportunity to comment expressly on this practice
p. [90]

As explained above in the section on general technical knowledge, as emphasised by the claimants themselves and as described in the contested patent (para. [0041]), proteins have complex structures, and without experimental tests and data relating to a specific protein, it is difficult to predict how that protein will behave when combined with specific excipients under specific conditions. Determining a stabilising formulation for a protein therefore requires extensive research. In particular, the effect of salts on protein stability is complex. Salts can stabilise, destabilise or have no effect at all on proteins, depending on the type and concentration of the salt, the nature of the ionic interactions and the charged amino acid residues in the proteins (Wang 1999, p. 148).

Although the contested patent claims protein formulations that are allegedly stable, safe and therapeutically effective (with this having been experimentally demonstrated only for a selection of all formulations falling under claims 1 and 6), However, it is not explained why — and on the basis of which properties and interactions — the specified excipients, in the claimed quantities and in this combination, would be suitable for providing a stable formulation specifically for aflibercept. The plaintiffs' argument that the situation of a person skilled in the art, who knows that a formulation according to the patent containing aflibercept is therapeutically effective, safe, can be administered intravitreally and is stable in storage, is fundamentally different from that of a person skilled in the art who is unaware of any such formulation, because the latter cannot take the formulation according to the patent as a starting point, does not alter the fact that the equivalent effect cannot be found in the present case.

For discoverability is only established if the person skilled in the art, having knowledge of the teaching of the patent and against the background of their general technical knowledge, has a reasonable expectation that the embodiment with the substituted elements has the same effect as an embodiment according to the claims

[^0] The wording of the question has never previously been relevant to the outcome; in BGE 142 III 772 — 'Urinal valve', BGE 143 III 666 — 'Pemetrexed' and judgment 4A_273/2023 of 25 September 2023 — 'Deferasirox', the equivalence was itself ascertainable *ex ante*.

Computer Translation

formulation. In the present case, the person skilled in the art could not have expected that a protein formulation suitable for intravitreal administration, which, like AfqlirO•

- not an inorganic sodium phosphate buffer, which at a pH in the range of approximately 5.7 to 5.8 exists almost exclusively as negatively monovalent and only to a very small extent as negatively divalent phosphate— but rather an organic histidine buffer, which at a pH in the range of 5.7 to 5.8 is present as a mixture of the positive cation and the neutral zwitterion, thereby forming a completely different ionic environment for the protein;

- contains no sodium chloride or potassium chloride (as required by claim 1), i.e. no separate metal salt that is dissociated under the conditions
  i.e. one that provides an ionic charge, as a tonicity agent, but rather this function is to be fulfilled simultaneously by the neutral trehalose, the stabilising agent also required in the claim; consequently, a completely different ionic environment for the protein is formed here as well; and

- it has a pH of 5.704 rather than at least 5.75

has the same effects, particularly with regard to storage stability, as a formulation in accordance with the patent. In particular, the replacement of the phosphate buffer with histidine in the case of claim 1, combined with the absence of the dissociated metal salt as a separate osmotic agent, leads, according to the knowledge of a person skilled in the art, to such a significant change in the ionic environment for the protein that they could not have expected, and it is not obvious to them, that such a formulationwould provide the same effects as a formulation in accordance with the claims. This also distinguishes the present case from that assessed by the Federal Supreme Court in BGE 143 III 666 — 'Pemetrexed', where the person skilled in the art was to expect the same effect from pemetrexed diacid as from the pemetrexed disodium specified in the patent. In the present case, the person skilled in the art has no reasonable expectation that the modified formulation, which differs from the claimed formulation in several closely interrelated features, will have the same effect as the claimed formulation. In these circumstances, the same effect cannot be deemed to be obvious even on *ex* post analysis. Where the person skilled in the art must carry out experiments without a reasonable expectation of success in order to



Computer Translation

establish the equivalence

Computer Translation

effect, this effect is not *obvious,* as required by the second question of equivalence. If a different standard were applied here, the second question would lose all practical application. [1]

The second question, and consequently the realisation of features 1.4, 1.5 and 1.7 or 6.3 and 6.4a by equivalent means, must therefore be answered in the negative.

76.
In the absence of any prima facie evidence that the defendants' distribution etc. of 'Afqlir@' infringes the scope of protection of the contested patent, the application for interim relief must therefore be dismissed.

**Costs and compensation**

77.
Costs are to be apportioned in accordance with the outcome of the proceedings (Art. 106
zPo).

Based on a value in dispute of CHF 5 million, the decision fee is to be set at CHF 50,000 (Art. 1 and 2 KR-PatGer) and imposed on the plaintiffs as the unsuccessful party (Art. 106(1) ZPO). The decision fee shall be deducted from the plaintiffs' advance payment. The shortfall of CHF 25,000 shall be claimed from the plaintiffs (Art. 111(1) ZPO).

The compensation for professional legal representation, to be determined in accordance with the scale of fees, is also to be set at CHF 50,000 (Art. 4 and 5 KR-PatGer).

78.
The unsuccessful party must also reimburse the successful party for its necessary expenses (Art. 32 PatGG in conjunction with Art. 3(a) KR-PatGer; corresponds to Art. 95(3)(a) ZPO). Costs of party-appointed experts may form part of the necessary expenses to be reimbursed, provided they were incurred directly in connection with the proceedings and



Computer Translation

^1 See High Court of Justice of England and Wales, judgment [2025] EWHC 2527(Pat) of 8 October 2025, para. 437 et seq.

Computer Translation

are necessary for proper substantiation. [2] In this regard, however, due
*3

The defendants claim necessary expenses amounting to CHF 263,910.38. They do not seek reimbursement for the costs of the necessary assistance provided by a patent attorney in the present proceedings, but rather reimbursement for the costs of legal advice regarding the legal situation in countries outside Switzerland and Liechtenstein for which an injunction was sought. The plaintiffs dispute the necessity of this amount, arguing that the legal opinions on the foreign legal systems were not entirely necessary, particularly as they also addressed issues already covered by Swiss law. The defendants disagree and contend that the legal opinions were necessary, as the question of equivalent infringement is assessed differently in each country.

The claimants sought an injunction covering 20 countries and submitted a legal opinion on the national law of each country except Switzerland and Liechtenstein. In order to be able to contest this on substantive grounds, it was, in principle, expedient for the defendants to also obtain party-commissioned expert opinions on foreign law.

However, since infringement of the scope of protection of a European patent is assessed in the same way in all contracting states to the EPC (see above, para. 8), party-commissioned legal opinions on foreign law are not necessary insofar as they relate to infringement of the scope of protection. On the other hand, it may be necessary to obtain information on national law regarding other legal issues, such as standing to sue.

The invoices submitted by the defendants do not allow for a breakdown of the costs on a time-and-material basis between advice on whether there is an infringement of the scope of protection and advice on other legal issues, such as the licencees' standing to sue. These are summary invoices which merely state a total amount for legal advice, in some cases with expenses shown separately.

---

*2 SUTER/VON HOLZEN in: Sutter-Somm/Lötscher/Leuenberger/Seiler (eds.), Commentary on the Swiss Code of Civil Procedure (ZPO), 4th ed. Zurich 2025, Art. 95 N 33 with further references.
^3 Federal Supreme Court, Judgment 6B_888/2021 of 24 November 2022, para. 3.2, referring to BGE 141 IV 369, para. 6.2.



Computer Translation

In principle, this would allow for no reimbursement of necessary expenses to be awarded simply on the grounds of a lack of substantiation. The Federal Patent Court has, however, held that it would be unfair to award no reimbursement at all for necessary expenses where, although their amount has not been substantiated, it is evident that they amount to at least the tariff-based remuneration of a professional representative. [4]

In the present case, it is evident that the legal opinions on the respective national laws in Belgium, Bulgaria, the Czech Republic, Denmark, Finland, France, Greece, Ireland, Italy, the Netherlands, Austria, Poland, Portugal, Sweden, Slovakia, Slovenia, Spain and Hungary cost more than CHF 50,000, even if the costs of assessing the infringement of the scope of protection are excluded. The claimants must therefore reimburse the defendant CHF 50,000 as compensation for necessary expenses.

**The Federal Patent Court finds:**

1. The application for interim measures is dismissed in its entirety.

2. The decision fee is set at CHF 50,000.

3. The court costs are to be borne by the claimants and deducted from the advance on costs they have paid. The shortfall of CHF 25,000 is to be recovered from the claimants.

4. The claimants are ordered to pay the defendant legal costs of CHF 100,000.

5. Written notification to the parties, enclosing the minutes of the oral hearing, and to the Swiss Federal Institute of Intellectual Property (once the judgment has become final), in each case against acknowledgement of receipt.

Computer Translation

[4] Federal Patent Court, Judgment S2024_011 of 18 December 2024, para. 26 — 'Security system for cash dispensers'.

**Information on appeals:**

An appeal in civil matters may be lodged against this decision within 30 days of service with the Federal Supreme Court, 1000 Lausanne 14 (Art. 72 et seq., 90 et seq. and 100 of the Federal Supreme Court Act of 17 June 2005 [BGG, SR 173.110]). The time limit is deemed to have been met if the appeal is lodged with the Federal Supreme Court or handed over to Swiss Post or a Swiss diplomatic or consular mission for transmission to the Federal Supreme Court no later than the last day of the time limit (Art. 48(1) BGG). The appeal must be drafted in an official language and must contain the claims, the grounds for the appeal with an indication of the evidence, and the signature. The contested decision and the evidence, insofar as they are in the appellant's possession, must be enclosed (see Art. 42 BGG).

St. Gallen, 17 July 2026

On behalf of the Federal Patent Court

| President | Chief Registrar |
| --- | --- |
| Dr iur. Mark Schweizer | MLaw Sven Bucher |

Dated: 20 July 2026

Computer Translation