# EXHIBIT A

**First Expert Report of Professor Hovhannes John Gukasyan**
**7 April 2025**
**Filed on behalf of the Defendants**
**Exhibits HJG-1-7**

**Claim No: HP-2024-000015**
**and HP-2024-000036**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**INTELLECTUAL PROPERTY LIST (ChD)**
**PATENTS COURT**
**B E T W E E N:**

**(1) FORMYCON AG**

(A corporation incorporated under the laws of the Federal Republic of Germany)

**(2) KLINGE BIOPHARMA GMBH**

(A corporation incorporated under the laws of the Federal Republic of Germany)

Claimants in HP-2024-000015
(the "Formycon & Klinge Proceedings")

**SAMSUNG BIOEPIS UK LIMITED**

Claimant in HP-2024-000036
(the "Samsung Bioepis Proceedings")

– and –

**(1) REGENERON PHARMACEUTICALS, INC.**

(a company incorporated under the laws of the State of New York)

**(2) BAYER HEALTHCARE LLC**

(a company incorporated under the laws of the State of Delaware)

Defendants

---

**FIRST EXPERT REPORT OF PROFESSOR HOVHANNES JOHN GUKASYAN**

---

I, Hovhannes John Gukasyan, of 7824 E San Luis Dr, Orange CA, 92869, will say as follows:

## 1. INTRODUCTION

1.1 I am an Associate Professor at the University of Southern California ("**USC**") School of Pharmacy. I have spent around 18 years working in the pharmaceutical industry supporting approximately 80 drug discovery and development programs across three different pharmaceutical companies (Anadys Pharmaceuticals, Pfizer and Allergan). As the founder and President of MGC Associates LLC, I continue to support a wide variety of pharmaceutical companies in these areas on a consultancy basis.

1.2 One of my principal areas of specialism is pharmaceutical formulation development. I have developed a range of pharmaceutical formulations including topical, oral and injectable forms, for both small molecule and biologic drugs. While at Pfizer between 2005 and 2017, I helped develop ophthalmic formulations for a number of drugs, some of which made it to market including Diquas® and Vyzulta®. These are topical treatments for dry eye disease and the reduction of intraocular pressure in patients with glaucoma, respectively. I also worked on a number of intravitreal formulations for products which were not commercialized, such as the small molecule vascular endothelial growth factor receptor ("**VEGFR**") inhibitors PF-337210 and SU-14813. As an academic, I have been involved in teaching related to formulation development since around 2003, first at USC (initially as an Adjunct Assistant Professor before becoming an Associate Professor in 2021) and later also as an Adjunct Professor at KGI Riggs School of Applied Life Sciences. I have also been involved in academic research related to formulation development since around 2021.

1.3 I outline my qualifications and experience in more detail below and attach my CV including a list of my publications as **Exhibit HJG-1**.

## 2. MATERIALS AND INSTRUCTIONS

2.1 I have been asked by Allen Overy Shearman Sterling LLP ("**A&O Shearman**"), the solicitors acting for the Defendants ("**Regeneron**" and "**Bayer**"), to act as an expert witness in these proceedings and to provide this report, which I understand will be relied on by the Defendants

in these proceedings. I am being compensated for my time in preparing and giving my evidence, but it has been made clear to me that my compensation does not in any way depend on the evidence I give, nor on the result of the litigation.

2.2 I have been asked to prepare this report on the basis of what was known as of 16 June 2006 (the "**Priority Date**") and this is what I have done except where expressly stated otherwise.

2.3 In preparing this report I had discussions with A&O Shearman via video call and in person.

2.4 For the purpose of preparing this report, I was first asked to explain my background and experience and then to consider the common general knowledge of a formulation scientist tasked with developing an ophthalmic protein formulation for intra-ocular administration as at the Priority Date.

2.5 I was then provided with a copy of Nguyen *et al*., Results of a Phase I, Dose Escalation, Safety, Tolerability, and Bioactivity Study of Intravitreous VEGF Trap in Patients With Neovascular Age Related Macular Degeneration, Investigative Ophthalmology & Visual Science May 2006, Vol.47, 2144 (the "**Nguyen Abstract**") and was asked to consider this document from the perspective of a formulation scientist in light of their common general knowledge as at the Priority Date. I understand that the Nguyen Abstract is no longer relied upon as prior art by the Claimants in this case.

2.6 I was then provided with a copy of WO 2006/104852 A2 ("**Dix**") and WO 2006/088650 A2 ("**Wiegand**"). I was asked to consider each separately and explain what a formulation scientist would understand to be disclosed by each document considered in light of their common general knowledge at the Priority Date. I understand that Wiegand is no longer relied upon as prior art by the Claimants.

2.7 Following this, I was then shown and asked to consider US patent No. US 60/814,484 (the "**Priority Document**") and provide my views as to what a formulation scientist would understand to be disclosed by the document. I was then provided with a copy of the Priority

Document, European Patent (UK) No. 2 364 691 B1 ("**EP 691**") and European Patent (UK) No. 2 944 306 B1 ("**EP 306**"), (together, the "**Patents**") which share the same filing date (14 June 2007) and Priority Date. I was then asked to provide my views on (i) the identity of the skilled person or team which would have a practical interest in putting into effect the technical subject matter of the Patents, and (ii) on the disclosure of the Priority Document and the Patents from the perspective of a formulation scientist.

2.8 I was then shown PCT/US2007/014085 (the "**Application as Filed**") and asked to give my views on what the formulation scientist would understand to be disclosed by this document in light of their common general knowledge at the Priority Date.

2.9 I was then shown US 2006/0030529 A1 ("**US 529**") and asked to give my views on what the formulation scientist would understand to be disclosed by this document in light of their common general knowledge at the Priority Date. Following this, I was asked to consider, on the assumption that they were part of a team looking to develop a drug for intravitreal administration, what steps the formulation scientist would take at the Priority Date in light of US 529 and input from other members of that team (as set out in section 6 of my report below). I understand from A&O Shearman that I was shown this document after I was shown the Patents because the Claimants introduced this document at a later stage. In reviewing this document, I was asked and sought to exclude my knowledge of the Patents (and the other documents listed above) in forming views on its disclosure, since I understand that any views on what was or was not obvious must be formed in a way which is free from any hindsight.

2.10 I understand from A&O Shearman that Carpmaels & Ransford LLP ("**Carpmaels**") are instructed by the Defendants on the issue of any amendment of EP 691 and EP 306. I have been provided with a copy of the proposed claim amendments to EP 691 and EP 306. Carpmaels have explained to me that the patentee has filed an application to amend the claims of EP 691 and EP 306. Further, A&O Shearman explained to me that the claims of the Patents at issue in this case are claims 3 (as dependent on claims 2 and 1), 5 (as dependent on claim 1), and 11 (as dependent on claims 3 or 5) of EP 691 as amended, claim 5 (as dependent on claims 4 and 1) of

EP 306 as granted, and claim 2 (as dependant on claim 1) of EP 306 as proposed to be conditionally amended. I address these in the section of this report on the Patents.

2.11 After I had formed my own views on the common general knowledge and on the documents listed above, and during the preparation of my own report, A&O Shearman informed me of the views of the other members of the skilled team as relevant to the matters that I was addressing in my report. Thereafter, I was provided with and read near final drafts of the reports of Professor Robin Leatherbarrow, Dr Keith Ward and Professor Laurent Kodjikian. I refer to the final versions of those reports where relevant below.

2.12 A&O Shearman have explained to me my duties to the Court. In preparing this report, A&O Shearman have also provided me with, and I have read, a copy of Part 35 of the Civil Procedure Rules relating to an expert's duties and the related practice direction entitled "Experts and Assessors" and the related Guidance for the Instruction of Experts in Civil Claims. I have also been provided with and read paragraphs 99 to 114 of the judgment of Arnold J. in *MedImmune v Novartis* [2011] EWHC 1669 (Pat) and paragraphs 13 to 27 of the judgment of Birss J. in *Synthon v Teva* [2015] EWHC 1395 (Pat).

2.13 I understand that, in providing my opinion to the Court in this written report, any subsequent written reports and orally at trial, my duty as an expert witness is to the Court and not to the Defendants. I understand that it is my duty to help the Court on matters within my own expertise, and that this duty overrides any obligation to the person(s) from whom I have received instructions and by whom I am paid. I confirm that in preparing this report I have complied with the duties of an expert and that I shall continue to do so in any subsequent reports I prepare (as well as in any oral evidence I may give at trial).

2.14 This is my third role as an expert witness in patent litigation. I have previously acted as an expert witness and testified at trial in the Federal Court of Canada in the following case: Regents of the University of California and TearLab Corporation v. I-MED Pharma Inc, Court File No. T-300-16. I also acted as an expert witness on another matter related to a nasal spray for dry-eye

syndrome, but I understand that this case is ongoing and the details of my involvement remain confidential.

2.15 Prior to my role as an expert witness in these proceedings I have had no relationship with any of the parties to this litigation.

2.16 I have no financial interest in the outcome of this litigation.

## 3. QUALIFICATIONS AND EXPERIENCE

***Education***

3.1 I obtained a Bachelor' s Degree in Chemistry (and minor in Biology) from the USC in 1999. I also obtained a PhD in Pharmaceutical Sciences from the same university in 2004. My PhD thesis addressed ophthalmic electro-physiology and transport, with a focus on oxidative stress during disease and endogenous antioxidants.

***Industry experience***

3.2 From 2003 (and overlapping with the end of my PhD) to 2005 I worked as a Bioanalytical Scientist in the Drug Metabolism and Pharmacokinetics group at Anadys Pharmaceuticals. During my employment, I helped develop various preclinical formulations for hepatitis C treatments, including intravenous formulations for therapeutic proteins and modified release oral tablets for small molecule drugs.

3.3 From 2005 to 2017 I worked at Pfizer Inc, first as a Senior Scientist, before being promoted to Senior Principal Scientist in 2010. During my employment, I worked on the design and development of pharmaceutical formulations for around 60 drug projects. Approximately 15 of these formulation projects were for therapeutic proteins, with the others being for small molecule drugs. Between 2005 and 2012 the formulation projects were mainly topical and injectable (including intravitreal) forms of ophthalmic drugs. In 2009 Pfizer made the decision to begin phasing out its ophthalmology program. This meant that by 2012 I had largely stopped working on ophthalmic formulation development and instead worked mainly on oral,

intravenous, subcutaneous and intramuscular dosage forms for drugs in other therapeutic areas such as oncology and infectious disease.

3.4 From 2017 to 2020 I worked as an Associate Director at Allergan (which became part of AbbVie in 2020). My role was to oversee a group of six junior scientists that were working on formulation development of both proteins and small molecules. Around 80% of the formulation projects were for topical or injectable (including intravitreal) forms of ophthalmic drugs, with the remainder being in other therapeutic areas such as neurodegenerative disease.

3.5 In 2020 I founded MGC Associates LLC which provides consultancy services in the formulation aspects of drug discovery, development and regulatory filings. I primarily consult for ophthalmology companies developing both small molecule and protein drugs, including Iolyx Therapeutics and Azura Ophthalmics, however I also consult for clients in other therapeutic areas such as oncology.

***Academic and research experience***

3.6 Alongside my work in industry, I have had a number of academic and research responsibilities. I have worked at the USC School of Pharmacy since 2003, first as a lecturer and then as Adjunct Assistant Professor from around 2012. In 2021 I took up a full-time position as Associate Professor and continue to hold this role. My primary academic responsibility at USC has been undergraduate education, focusing on biopharmaceutical sciences, pharmacology and drug development.

3.7 Since 2015 I have also worked as an Adjunct Professor at KGI Riggs School of Applied Life Sciences, where I teach courses on biopharmaceuticals and support graduate students in completing work placements at pharmaceutical companies.

3.8 The central themes of my research at USC include molecular drug delivery and targeting, rational design of prodrugs, transmembrane transporters and ocular therapeutics. Since 2021 I have received a number of private research grants, including one from Boehringer Ingelheim related to the development of topical and injectable ophthalmic drugs.

3.9 I am a member of a number of professional organizations including the Association for Research in Vision and Ophthalmology, American Association of Pharmaceutical Scientists, American Chemical Society, and the Tear Film & Ocular Surface Society. I am also a reviewer of a number of journals, such as Investigative Ophthalmology and Visual Science, Life Sciences, Neuroscience Methods, Clinical and Experimental Ophthalmology, Biochemical Pharmacology, and Ocular Pharmacology and Therapeutics. I am a (co-)author of more than 40 peer-reviewed papers, and am the (co)-inventor of eight patents in the field of ophthalmic drug formulations.

## 4. THE SKILLED PERSON AND SKILLED TEAM

4.1 The concept of the “skilled person” and “skilled team” have been explained to me by A&O Shearman. I understand that the skilled team has a practical interest in putting into effect the technical subject matter of the Patents and that it can consist of team members with differing specialities that would typically be combined in that area. I understand that the skilled person reads the specification of the Patents with the common general knowledge of the ordinary skilled person in the relevant field but is unimaginative and has no inventive capacity. I address what I understand by the term common general knowledge at paragraph 5.2 below.

4.2 The Patents are in my view directed to stable formulations of the claimed VEGF antagonist, amino acids 27-457 of SEQ ID NO:4 which is glycosylated at Asn residues 62, 94, 149, 222 and 308, which are suitable for intravitreal administration. I therefore believe that the skilled team would include within it a formulation scientist with interest in the development of formulations of drugs for ophthalmic use and when I refer to the “**Formulation Scientist**” I am referring to this individual. The Formulation Scientist will rely on other members of the team including a protein engineer (“**Protein Engineer**”), an individual with expertise in the field of ocular pharmacokinetics and pharmacodynamics (“**Ocular PK/PD Scientist**”) and a clinician (“**Clinical Ophthalmologist**”) and I have indicated in my report when that would be. When considering safety and tolerability issues of the excipients being tested, the input of a toxicologist may have been needed.

4.3 The Formulation Scientist's role in the skilled team would be to try to develop a stable, sterile and safe formulation of the therapeutic dose of the drug, that is suitable for its intended route of administration. They would be responsible for requesting from the Protein Engineer and then assessing information on the physical and chemical characteristics of the drug and considering the impact of these on the formulation design. They would also be responsible for assessing any requirements specific to particular routes of administration and seeking to design a formulation compatible with the desired route of administration. It would also be their role to perform and interpret the analytical tests which would assess whether or not their proposed formulations were stable.

4.4 Although I consider that I have the skill-set and expertise of the Formulation Scientist, it has been made clear to me that what is important is not my own personal views on the issues addressed in this report but those of the Formulation Scientist. It has also been made clear to me that what are important are the views of the skilled person as at the Priority Date, 16 June 2006.

4.5 A&O Shearman have explained to me that I need to avoid hindsight in considering the knowledge of the Formulation Scientist at the Priority Date. In order to adopt the perspective of the Formulation Scientist at the Priority Date, I reflected back on what I was doing around this date. At the time I was working as a Senior Scientist at Pfizer in their ophthalmology team, developing formulations for drug candidates under development for a variety of ophthalmic diseases. I started working at Pfizer in January 2005 and I remember my early years working at Pfizer well. I also consulted textbooks and review articles that the skilled person would have had access to and relied on at that time, which I refer to in this Report.

## 5. THE COMMON GENERAL KNOWLEDGE

5.1 I have been asked to comment on those matters which were within the 'common general knowledge' ("**CGK**") of the Formulation Scientist as at the Priority Date.

5.2 I understand from A&O Shearman that the CGK is information that is generally known and generally regarded as a good basis for further action by the bulk of those engaged in the field,

i.e. information that would have been both generally known and accepted by the skilled person in the field at the Priority Date. I understand that it includes all the material in the field the skilled person is working on which the skilled person knows exists, to which they would refer as a matter of course if they cannot remember it and which they understand is generally regarded as sufficiently reliable to use as a foundation for further work or in putting into effect the technical subject matter of the Patents. However, I appreciate that the mere fact that something was presented at a conference or written about in the literature does not necessarily mean that it is CGK.

5.3 In this part of my report, I discuss the technical background that I consider would have been in the CGK of the Formulation Scientist at the Priority Date.

5.4 There are several textbooks and manuals which the Formulation Scientist would have been aware of and used commonly in formulation development, for example the US Pharmacopeia and the Handbook of Pharmaceutical Excipients. In addition, the Formulation Scientist would maintain an up to date awareness of literature that describes formulation science first-hand.

5.5 At the Priority Date there were a limited number of companies or academic institutions working in the field of ocular formulations. Other than Pfizer, there were, for example, Alcon, Allergan, Novartis, Genentech, and pSivida. Since it was early days in ocular formulation development, companies tended not to publish their work developing formulations, or at least not contemporaneously. Pfizer only permitted us to submit for publishing our work in developing an intravitreal formulation for PF-337210 in 2010, around five years after the work itself began, as by this time Pfizer had decided to shift its strategic focus away from ophthalmology. We therefore had to carry out a significant amount of preparation and testing to assess the suitability of excipients and their effect on stability when we developed our intravitreal formulations at Pfizer at the Priority Date. I believe my experiences at the time studying excipient suitability would have reflected those of the Formulation Scientist.

***Protein physical and chemical instability***

5.6 A key objective in protein formulation development is to stabilize the protein so that it remains safe and effective following manufacture, transportation, storage, and administration. If it cannot be provided in a form that remains stable, even the most efficacious protein therapeutic will fail to make a viable drug product.

5.7 A protein intended for therapeutic use needs to remain stable for the period from manufacture until its administration, allowing for a reasonable period during which the product is stored prior to administration. At the Priority Date the Formulation Scientist developing an ophthalmic formulation for intravitreal use intended (ultimately) for commercial sale, would have been aiming for stability of at least 24 months. A shorter period would require more frequent supply to the end users of the drug product. At the Priority Date commercialized drug products tended to have a shelf life of this period of time. For example, Avastin (set out at paragraph 5.97 below) and various insulin products were liquid formulations of proteins with a shelf-life of 24 months. If only shorter periods of stability are achieved with the initial formulations, there may then have to be several rounds of manufacturing and formulation campaigns to attempt to develop a formulation with longer term stability, with the consequential costs associated with this.

5.8 A formulation for a phase 1 clinical trial only requires stability for a matter of months. Ideally this would be for around 6 months or so to allow for a single batch to be used for a whole trial but in some cases this would not be achieved (for example I am aware of an extreme case where the formulation used in a phase 1 study had a stability of less than a day). Although long-term stability would not strictly be required for a formulation used in a phase 1 clinical trial, the Formulation Scientist would aim from the outset to develop a formulation that would have the potential to be used as a commercial formulation, i.e. with stability for at least 24 months. This is because, if a change in formulation is required between the different stages of clinical trials and the commercial formulation, further testing (in some cases clinical) is needed to show that the two formulations are bioequivalent and safe, which would involve significant additional time and expense. Having to develop a new formulation would set the skilled team back in

time, because they would need to try to reach a new formulation and then conduct the necessary tests for stability (including the 'real time' long-term tests), safety and suitability for intravitreal administration. In addition, if it were to be the case that the Formulation Scientist is not able to reach a long-term stable formulation at the required dose of the drug for commercial use, then it will have been a waste of time and money to have progressed the drug through clinical trials.

5.9 Therefore, the Formulation Scientist would have the goal of obtaining a long-term stable formulation from the start of the clinical trials. Stability studies to test the long-term stability of the formulation used in the phase 1 clinical trial would typically be run in parallel to the clinical trial itself. In some cases, particular commercial pressures would mean that a shorter goal was targeted, e.g. stability for 6 months or a year, but this is rare.

5.10 In comparison to small molecules, proteins are complex macromolecules comprising primary, secondary, tertiary and quaternary structures. Achieving long-term stability is generally more challenging for proteins than for small molecules because proteins usually have more stability issues due to their larger size and increased structural complexity. This is particularly the case in aqueous solutions, where there are a number of reactions and interactions which can occur between the protein and water molecules. The below table from a contemporaneous review by Akers *et al*. ("**Akers 2002**")[1] compares the stability of proteins versus small molecules and highlights the challenges of formulating a protein as compared to a small molecule:

**Table II**
Protein versus Small Molecule Comparison from a Stability Standpoint[a]

| Protein | Small molecule |
|---|---|
| Many potential reactive sites | Few reactive sites |
| Many ionizable sites | Few ionizable sites |
| Buffer effect usually a unique acid/base catalysis | Buffer effect usually general acid/base catalysis |
| Secondary/tertiary/quarternary structure | Lacks "higher order" structure |
| Disperse (colloidal) aqueous systems | Single and continuous phase in solution |
| Temperature effects can be discontinuous (denaturation) | Temperature effects are continuous |
| Readily supports microbial growth | |

**Figure 1.** Table II from Akers 2002.

[1] Akers, Michael J., Vasu Vasudevan, and Mary Stickelmeyer. "Formulation development of protein dosage forms." Development and manufacture of protein pharmaceuticals (2002): 47-127 (**Exhibit HJG-2**), page 50.

5.11 Protein instability issues can be divided into two major categories: those caused by physical instability and those caused by chemical instability. The following would be known to the Formulation Scientist who would have a good structural biology foundation, but to the extent they did not know this information, it would be provided to them by the Protein Engineer.

5.12 Physical instability arises as a result of non-covalent changes that disrupt the structure of the protein. These instabilities include:

(a) Aggregation: this is the clumping together of protein molecules and occurs when exposed hydrophobic residues in one protein interact with exposed hydrophobic residues on an adjacent protein. This can occur even when the protein is in its natural folded state (in which the majority of the hydrophobic residues are buried within the protein structure). However, proteins in solution do not exist in a single state, but in an equilibrium between the folded and unfolded and/or partially unfolded state. In the partially unfolded state hydrophobic residues normally buried within the protein can become exposed to the solution. In this state, there is a thermodynamic drive for the exposed hydrophobic residues on the protein to associate with each other causing the proteins to multimerize into an aggregate.

(b) Precipitation: this is where the protein comes out of solution. One example of when this can occur is when, as a consequence of aggregation, the aggregates are of a sufficiently large size that they fall out of solution. Another example is where chemical changes alter the solubility of the protein and where this results in the protein becoming less soluble, it can lead to precipitation.

(c) Adsorption: this is where the proteins associate with the surface of the container. This can occur, for example, if the surface of the container is hydrophobic. If hydrophobic residues on the surface of the protein (either naturally or exposed through partial unfolding) come into contact with the hydrophobic residues on the surface of the

container, it can result in the protein adhering to the surface of the container and coming out of solution.

5.13 Chemical instabilities can result from the following chemical reactions which occur in the presence of water, dependent on pH, which lead to changes in the protein's chemical structure:

(a) Deamidation – the amide functional group on the side chain of asparagine and glutamine amino acid residues is lost, resulting in the formation of aspartic acid or glutamic acid, respectively.

(b) Oxidation / loss of electrons – functional groups on amino acid side chains, especially those that contain sulfur or nitrogen atoms, can react with oxidizing agents to lose electrons. For example, cysteine and methionine can be oxidized to sulfenic acid and methionine sulfoxide respectively. In addition, the formation of an intra or intermolecular disulfide bond between two cysteine residues is also an oxidation reaction. The oxidation of the methionine residue can change its polarity, from hydrophobic to hydrophilic. This change in the structure and polarity of the methionine side chain can impact on the structure of the protein, leading it to become more unstable and increasing the rate of aggregation, multimerization and/or precipitation of the protein.

(c) Hydrolysis of peptide bonds / fragmentation – the peptide bonds between amino acid residues in the protein backbone can break.

(d) Reduction of disulfide bonds – a disulfide bridge is a bond between two cysteine residues on the protein backbone which results in the folding of the protein and contributes towards its secondary structure and the protein's functionality. These can break, unfolding the protein.

(e) Isomerization – the side chain of aspartic acid can undergo rearrangement via a cyclic intermediate from aspartate to isoaspartate. The empirical formula of the aspartic acid does not change even though its structure does.

(f) De-glycosylation – certain amino acid residues such as asparagine can be glycosylated (contain covalently bound sugar residues) in their amide sign chain. These sugar residues can be detached by hydrolysis.

5.14 The functionality of a protein drug is linked to its structure and the above structural changes can risk a loss of activity. These chemical reactions can also lead to physical instabilities if the chemical changes destabilize the folded protein structure. For example, a chemical change to an amino acid side chain can lead to partial unfolding of the protein which can in turn lead to hydrophobic residues becoming exposed to solution. This can increase the rate of aggregation or adsorption of the protein, and/or reduce its solubility, leading to precipitation.

5.15 Due to the complex nature of proteins, which consist of a large number of reactive chemical groups and fragile three-dimensional structures, it is very difficult to find a set of conditions under which all physical and chemical instabilities are minimized, and the structure is stable. This challenge was recognized and reflected in several contemporaneous reviews of protein formulation.[2] The Formulation Scientist must assess the various possible risks and issues with the protein in question and try to reach a formulation that avoids or minimizes them through the available methods, which include managing the environmental conditions, and the excipients added to the formulation.

***Stability requirements***

5.16 In order to obtain regulatory approval for a therapeutic product, the protein needs to satisfy certain guidelines which include requirements to conduct certain stability studies and meet certain acceptance criteria. The International Council for Harmonization (ICH) issued

[2] Akers 2002 and Wang, Wei. "Instability, stabilization, and formulation of liquid protein pharmaceuticals." International journal of pharmaceutics 185.2 (1999): 129-188 (**Wang 1999**) (**Exhibit HJG-3**).

guidelines on stability testing of biological products which were adopted by a number of regulatory agencies, including the US Food and Drug Administration (FDA) and European Medicines Agency (EMA).[3] These guidelines specify that a stability-indicating profile of the drug product should be provided with the regulatory submissions. This would include:

(a) Potency studies which would measure the biological activity of the drug product.

(b) Purity and molecular characterization, including size, charge and hydrophobicity to monitor for the occurrence of degradation products over the intended use period. Methods which can be used include electrophoresis (e.g. SDS page), high resolution chromatography (e.g. gel filtration or affinity chromatography) and peptide mapping.

(c) Other product characteristics including visual appearance (including color, opacity and/or visual particulates), pH and, in the case of powders and lyophilized products, moisture content.

5.17 Certain excipients and/or the container itself might negatively affect the stability of the product. As a result, the product should be monitored in an environment that is consistent with its final intended presentation. The products should also be checked to ensure they are sterile.

5.18 While these guidelines did not specify specific test protocols and particular thresholds, in general the Formulation Scientist would at a minimum want to see less than 10% degradation of the active over the full period of the shelf-life of the product. In the majority of cases, the target would be less than 5% degradation.

***Liquid and lyophilized formulations***

5.19 Therapeutic proteins can be formulated in a liquid or lyophilized dosage form. In liquid formulations the protein is dissolved in a liquid solvent (typically water). Liquid formulations were preferred due to the convenience of manufacturing and use. However, a number of stability issues associated with proteins arise as a consequence of interactions with water and a

[3] ICH Q5C Stability testing of biotechnological/biological products - Scientific guideline.

therapeutic protein may not be stable enough to be handled as a liquid formulation for the required period. Therefore, lyophilized formulations, also known as freeze-dried formulations, were also considered as an alternative approach.

5.20 Lyophilized formulations are created by removing water from the protein solution under low temperature and pressure, leaving a dry powder that must be reconstituted with a suitable diluent before administration. This process generally enhances the stability of the formulation and therefore allows for longer storage times, as the rate of protein degradation is reduced while the formulation is in powder form. Therefore, a number of proteins were lyophilized in order to maintain their stability long-term. Table IV of Akers 2002 shows that out of 36 U.S. marketed protein dosage forms approved by the FDA through 2000, 18 were in stored in lyophilized form.[4] However, the Formulation Scientist would be aware that, although lyophilization could achieve good long-term stability, the reconstitution step was considered an additional procedural step, there were stability issues associated with the lyophilization and reconstitution process itself, and lyophilization was also an expensive procedure to carry out as compared to manufacturing liquid formulations.

5.21 I have personal experience of what I describe above, as I worked on a number of projects where we developed lyophilized formulations instead of liquid formulations. In relation to intravitreal treatments for wet age-related macular degeneration ("**Wet AMD**"), between 2008 and 2010 I worked on formulations for an epidermal growth factor receptor (EGFR) monoclonal antibody, and also a bispecific antibody targeting platelet-derived growth factor receptor (PDGFR) and VEGFR. These antibodies showed significant instability in initial stability studies as a liquid in saline solution. We did not think these instabilities could be overcome through the use of excipients and therefore developed a lyophilized formulation. To my knowledge these drugs were never commercialized, and this work was not published.

[4] Akers 2002, pages 54-59.

***Influence of concentration of protein on formulation task***

5.22 In general, the more concentrated the protein is in solution, the greater the rate at which both physical and chemical instabilities will occur.[5] For example, the more concentrated the protein is in solution, the greater the probability that an exposed hydrophobic residue on a protein will encounter another exposed hydrophobic residue and associate (rather than refolding into the native state). As a result, aggregation and adsorption is a concentration dependent phenomenon – the higher the concentration of protein in the solution, the greater the rate and extent to which they occur. When clumped together as part of an aggregate, this will reduce the therapeutic activity of the protein as the accessibility of the binding sites are lost. These aggregation products may also be immunogenic (i.e. they may themselves produce an immune response).[6]

5.23 In addition, the protein concentration will also change the viscosity of the solution, with the solution generally becoming more viscous as protein concentration increases, which is generally undesirable for proteins intended to be administered intravitreally and therefore through a small gauge needle. A higher viscosity would increase the shear stress on the protein when injected into the vitreous, potentially resulting in aggregate formation. In addition, if the formulation becomes too viscous it may not be possible to inject it through a small gauge needle.

5.24 The Formulation Scientist would therefore expect that higher concentrations of protein in solution would be more difficult to formulate than lower concentrations. From their knowledge of authorized protein formulations, the Formulation Scientist would know that proteins for which successful liquid protein formulations had been approved typically had concentrations of no higher than around 25 mg/ml (with rare exceptions, such as Humira (adalimumab) which had a concentration of 50 mg/ml) and the range for concentrations of liquid formulations of proteins, e.g. antibodies, was around 0.5 mg/ml to 25 mg/ml (see for example Table 1 of a 2007 review paper by Wei Wang *et al.*[7] which, though published after the Priority Date, contains information which would have been known to the Formulation Scientist at this general level

[5] Wang 1999, pages 152-153.
[6] Wang 1999, page 137.
[7] Wang, Wei *et al.* "Antibody structure, instability, and formulation." Journal of pharmaceutical sciences 96.1 (2007): 1-26, pages 2-4.

with respect to the concentrations of the proteins in authorized formulations). A protein at a concentration above this concentration range would be considered high and therefore a significant challenge to formulate. However, the Formulation Scientist would also recognize that each protein is different, and some might be more challenging to formulate at higher concentrations than others, depending on their intrinsic properties and behavior in solution. This might explain why there were cases of proteins like Humira that could be formulated as a liquid at higher concentrations than the typical range.

***Influence of pH on protein formulations***

5.25 Proteins have ionizable groups present on the following amino acid side chains that are able to accept or donate hydrogen ions to water: aspartic acid, glutamic acid, histidine, lysine, and arginine. Aspartic acid and glutamic acid are acidic, and histidine, lysine, and arginine are basic. In addition, I understand from reading the report of Professor Leatherbarrow (at paragraph 5.38) that the Protein Engineer would know that the sugars attached to the glycosylated residues of a protein can include sialic acid residues which carry a charge. The propensity of these ionizable groups to accept or lose hydrogen ions depends on the pH of the surrounding solution. Therefore, the pH level of a solution affects the charge of a protein by changing the number of positive and negative charges on the protein's surface.

5.26 At low pH values (acidic conditions), where there are a greater amount of hydrogen ions in solution, proteins tend to have a positive charge because the ionizable groups on histidine, lysine, and arginine are protonated and the aspartic acid and glutamic acid amino acid side chains would be neutral. As the pH increases and becomes more basic, aspartic acid and glutamic acid gradually lose protons and histidine, lysine, and arginine become neutral, meaning the protein becomes increasingly negatively charged.

5.27 At a specific pH known as the isoelectric point ("**pI**") of the protein, the protein carries no net charge because the number of positive and negative charges on the molecule is balanced. The physical stability of a protein at different pHs is influenced by its specific pI. At pHs far from the pI of a protein, electrostatic repulsions between like charges in the protein increase, resulting

in a tendency to unfold. On the other hand, a pH too close to the pI can increase the propensity for aggregation and reduce the solubility of the protein, since there is less repulsive charge to keep proteins apart and fewer charged residues to interact with the hydrogen and hydroxyl ions in the water. The pI varies between proteins as it depends on the specific number and type of these five amino acids a protein has (and, as the Protein Engineer would know, the number of sialic acid residues attached through glycosylation). This variation means that different proteins have different levels of stability and solubility at different pHs. The need to find a pH which struck a balance between solubility and stability was well recognized. While the optimal pH for protein solubility and stability would need to be determined experimentally and was not always possible to achieve, as a general rule a pH which is around 0.5 to 1 unit away from the isoelectric point was generally considered to provide a balance between solubility and physical stability.[8]

5.28 Additionally, the pH of the solution can affect differently the rate of the different chemical reactions, which can lead to degradation of the protein. For example, Figure 1 of Akers 2002 (reproduced below) shows that peptide cleavage reactions and Asp transpeptidations occur fastest at acidic pHs, whereas deamidation and various oxidation reactions (other than methionine oxidation which can occur at both basic and acidic pH) occur faster at basic pHs:




**Figure 1.** Protein reactions as a function of pH. Figure courtesy of Dr. Lee Kirsch.

**Figure 2.** Figure 1 from Akers 2002.

[8] Wang 1999, page 146-147 and 175.

5.29 Given each protein has a unique structure with a different composition of amino acid residues, one protein will have a different susceptibility to chemical degradation compared to another protein at a given pH. Therefore, the pH of the formulation will impact one protein's stability and solubility differently to another. It is therefore a complex balance to find the right pH to minimize all of the different reactions and stability and solubility issues associated with any particular protein, which might each favor using a different pH.

***Intravitreal administration***

5.30 In addition to needing to maintain the stability of the protein, when developing their formulation the Formulation Scientist must consider the intended method and route of administration, which can impose limits on the conditions and excipients that can be used. In the case of products intended for intravitreal administration, this requires that the product must be suitable for injection directly into the vitreous of the eye, which is the part of the eye located between the lens and the retina.

5.31 The Formulation Scientist would know that limited volumes of 50 µl to 100 µl can be injected intravitreally, otherwise there could be a dangerous rise in intraocular pressure. If the pressure increases above a certain level, blood supply to the optic nerve and retina can be blocked, causing severe damage. I understand from reading the report of Professor Kodjikian (at paragraph 5.53) that the Clinical Ophthalmologist would request a maximum of 90 µl where the product is being administered with regular (e.g. monthly) and repeated injections, based on knowledge that this was done safely with Macugen (set out at paragraph 5.94 below).

5.32 In addition, narrow gauge needles were used for intravitreal administration. This meant that the formulation had to have a low enough viscosity that it could be injected through a narrow gauge needle. In contrast, wider gauge needles could be used for other routes of administration such as intravenous injection.

5.33 The Formulation Scientist would have understood that the standard for approval of formulations intended for intravitreal use were very stringent. A formulation containing a protein which has

undergone some chemical or physical degradation including the formation of aggregates can trigger adverse events and these can cause serious safety issues in the eye such as visual impairment. For example, intraocular administration requires there be less than 50 particles greater than 10 µm per ml (120 times fewer than the 6,000 in parenteral[9] drug products more generally) and less than 5 particles greater than 25 µm per ml (also 120 times fewer than the 600 in in parenteral drug products more generally).[10]

5.34 The volume of the vitreous is comparatively small and, in contrast to formulations administered systemically for which the excipient would be diluted into the circulation, even small concentrations of excipients within the formulation could be too high when administered intravitreally and damage the retina.

5.35 In 2006 there was comparatively little information available on excipients and the concentrations of those excipients which could be safely administered into the vitreous. The excipients used, and their amounts, would therefore also need to be tested and established to be suitable for intravitreal administration, increasing the work required for the Formulation Scientist to develop a formulation for intravitreal administration.

5.36 The osmolality and pH of the formulation must also be compatible with the eye. Osmolality indicates the concentration of all the particles (solutes) dissolved in a solution. The osmolality range of the vitreous was known to be around 290-320 mOsm/kg.[11] Injecting formulations with an osmolality far from this could cause retinal degeneration and detachment.

5.37 It was known that the biological pH of the vitreous was 7.0-7.5 and that this would have been a safe pH for a formulation for intravitreal use.[12] In addition, in light of Macugen (discussed at paragraph 5.94 below), the Formulation Scientist would have known a pH of 6-7 could also be used for a drug administered regularly. This was also supported by the off-label use of Avastin

[9] Parenteral drug products are those that are administered other than by mouth.
[10] US Pharmacopeia (2005) - <USP 788> and <USP 789>.
[11] Chirila, T.V., Hong, Y. (1998). The Vitreous Humor. In: Black, J., Hastings, G. (eds) Handbook of Biomaterial Properties. Springer, Boston (**Chirila 1998**).
[12] Chirila 1998.

(discussed at paragraph 5.97 below), which has a pH of 6.2 (although that was less reliable data as the suitability of the pH of the Avastin formulation for intravitreal administration was not supported though a clinical trial). The safety and suitability of regular administration of formulations with pHs outside of the pH range of 6-7.5 was not known and therefore the Formulation Scientist would not have known if that was a viable option for a formulation intended for intravitreal use without testing it, which the skilled team would do first in an animal model study and then subsequently in clinical studies in humans. Also, unlike blood, which has essentially an unlimited buffering capacity which can easily maintain a physiological pH range of 7.3-7.5, physiological fluids in the eye were known not to have an unlimited buffering capacity. Consequently, the pH of the formulation can significantly affect the pH in the eye, potentially causing adverse effects if this pH were not acceptable, such as photoreceptor disruption or cellular shock.

5.38 An example of the challenges of balancing stability and suitability for intravitreal administration is the development of an intravitreal formulation of PF-337210, a small molecule VEGFR tyrosine kinase inhibitor. This was a project which I started working on from when I joined Pfizer in January 2005. While we were able to achieve formulations that were suitable for clinical testing and that were stable for at least a year, we did not reach a commercial formulation of PF-337210. We encountered difficulties developing a formulation which met this requirement and had to extend the development timelines significantly beyond what was originally planned due to lack of knowledge on intravitreal formulations and difficulty identifying excipients that both stabilized the product and were suitable for intravitreal administration. PF-337210 was abandoned for commercial reasons, as part of Pfizer's shift away from ophthalmology.

5.39 The initial animal model efficacy studies for intravitreal administration of PF-337210 used a low pH formulation (pH 3) which was stable and soluble and showed good efficacy results. However, further studies on safety showed retinal degeneration and it was believed this was caused by the low pH of the formulation. As a result, further formulation development was

needed and we investigated both whether it was feasible to develop a stable formulation of PF-337210 at close to neutral pH, and whether low pH formulations could be tolerated by the eye. Although we tested dozens of formulations over a period of around five years, we did not identify a formulation which both stabilized PF-337210 and was suitable for intravitreal administration (did not cause ocular side effects).

5.40 There were also practical challenges involved with sourcing excipients that were of suitable quality for injection into the eye. Excipients that were commercially available at the time were not specifically designed for use in the eye and contained significantly more impurities than those available today. This could cause problems in an intravitreal setting due to the increased sensitivity of ocular tissues to contaminants. For this reason, we tested the excipients separately in animal models, in order to determine whether any adverse reactions were associated with the excipients themselves or any impurities.

***Formulation development***

5.41 In the course of developing a formulation for a particular protein, the Formulation Scientist will need to understand and identify the potential instability issues that will impact the protein.

5.42 A protein's amino acid sequence can be assessed to identify the isoelectric point (pI), potential physical instability risks and also 'soft-spots' where the chemical reactions which I have discussed above are more likely to occur.

5.43 The Formulation Scientist will also study the solubility and stability of the protein in water at different pHs and temperatures. pH can be adjusted by adding concentrated hydrochloric acid (a strong acid) or sodium hydroxide (a strong base). The temperatures tested are usually at controlled room temperature/ambient (20-25 °C), accelerated temperatures (37 $^{O}$C) and refrigerated temperatures (2-8 °C).

5.44 The Formulation Scientist has the volume of administration (within the clinical restraints), physical conditions (such as pH and temperature), state (such as liquid or lyophilized) and excipients at their disposal which they can use as 'tools' in their formulation project. The

selection of these parameters depends on the structure of the specific protein and the results of the solubility and stability studies. When formulating a protein for the first time, the Formulation Scientist would expect the impact of any one of these parameters on the stability of the formulation to depend on the precise combination of other parameters used, since the effect of a particular 'tool' can be impacted by the presence or absence of another. I discuss those that are relevant for a formulation for intravitreal administration below.

5.45 The Formulation Scientist can also input on the dose that is selected. Although decisions on dose would normally fall within the remit of the Clinical Ophthalmologist and/or Ocular PK/PD Scientist, where there was a choice between one or more doses that were equally desirable from a clinical perspective, the Formulation Scientist would recommend to the skilled team to use a lower dose. This is because for the same volume of administration the formulation can have a lower concentration. As noted at paragraph 5.22 above, this would reduce the risk of increased aggregation and other instabilities and also potential viscosity issues that arise from higher protein concentrations.

*Volume of administration*

5.46 For a given dose of a protein which the Formulation Scientist is asked to formulate, there is some flexibility in the volume of administration. As mentioned at paragraph 5.31 above, the permissible range for regular injections was considered to be 50 µl up to 90 µl.

5.47 A lower volume of administration results in an increased concentration of protein. As mentioned at paragraph 5.22 above, an increased protein concentration will lead to increased rates and levels of protein aggregation and other instabilities and also viscosity issues. I have read Professor Kodjikian's report and understand from paragraph 5.54 that within the range of 50 µl to 90 µl the Clinical Ophthalmologist, while they might have a general preference to keep volumes low, they would not have a strong preference for any particular volume within this range. Therefore when consulted, a Formulation Scientist would recommend, particularly with a challenging protein, that the skilled team should formulate at the upper end of the clinically permissible range of volume of administration for intravitreal administration.

*pH*

5.48 As I explained at paragraph 5.28 above, the pH of the solution can affect the rate of different chemical reactions. The pH of the formulation can therefore be varied to influence the stability of the formulation while maintaining adequate solubility. However, the pH must also be tolerable to the human eye. If the Formulation Scientist were intending to use a formulation which was outside the pH range of 6-7.5 known to be safe for regular administration to the eye, additional experimentation would be required to test whether a pH not previously tested in the eye would lead to ocular toxicity or irritation. The potential stability benefits of formulating a protein at an unknown pH would therefore need to be weighed against the additional experimentation required to assess whether it is suitable for clinical use.

*Temperature*

5.49 Controlling temperature can also affect the rate at which physical and chemical instabilities accumulate and storing at a low temperature was often used to extend the potential storage period for therapeutic proteins. Ideally the temperature conditions for stability of the protein are ambient (20-25 °C) or refrigerated (2-8 °C) but with challenging proteins frozen (-20 °C) conditions could be a possibility.

*Excipients*

5.50 Excipients are substances that can be included in the formulation to aid the stability and the suitability for the intended administration route of the therapeutic protein. They are divided into different classes depending on their function in the formulation. A single excipient can fall into several classes and have several different functions. The effect an excipient will have in a formulation can also be dependent on its concentration.

5.51 Since different proteins display different levels of stability, the type, amount and combination of excipient functionalities which may achieve a stable formulation will depend on the specific protein, as well as the pH, temperature, and concentration of protein in the formulation.

5.52 The Formulation Scientist would expect that, for any given excipient, there was not necessarily a precise amount which would be required to improve the stability of the protein in the formulation, but there might be a range of concentrations over which a beneficial effect could be achieved. However, on the other hand, the Formulation Scientist would also be aware that the effect of one excipient, and the amount required to achieve an effect, can be dependent on or influenced by the presence of other excipients within the formulation or changes in conditions. This interdependency adds a layer of complication to using excipients to improve the stability of proteins.

5.53 The Formulation Scientist would test the quality of excipients because unexpected impurities may introduce unnecessary complications in the stability profile that is determined during formulation development and testing. Depending on the historical use as a pharmaceutical ingredient, several different pharmaceutical grades are available including U.S. Pharmacopeia and European Pharmacopeia. The Formulation Scientist would consider the pharmaceutical grade materials as a primary resource, but the quality provided may not be good enough in the case of use in the eye as I discussed at paragraph 5.40 above.

5.54 With respect to a formulation intended for use intravitreally, the Formulation Scientist would consider that the following functional classes of excipients were available to them as possibilities for use in their formulation:

<u>Buffers</u>

5.55 A buffer included in a formulation can be used to set the pH to the desired target pH and to maintain it. The choice of buffer is influenced by the desired pH of the formulation, which would not be known and would need to be determined as explained at paragraphs 5.25 to 5.29 above. Akers 2002 includes a table setting out the typical buffers used in protein formulations, their pKa values (and where a buffer has multiple pKa values, the most commonly used one for

protein formulation is given), and the range of pH over which that buffer is typically used and this table is reproduced below.[13]

**Table V**
Buffers Used in Protein Formulations

| Buffer system | $pK_a$ | pH range of use |
|---|---|---|
| Acetate | 4.76 | 2.5–6.5 |
| Citrate | 3.14, 4.8, 5.2 | 2.5–6.0 |
| Glutamate | 9.67($pK_{a3}$) | 8.2–10.2 |
| Glycinate | 2.4,9.8 | 6.5–7.5 |
| Histidine | 1.8, 6.0, 9.2 | 6.2–7.8 |
| Lactate | 3.8 | 3.0–6.0 |
| Maleate | 1.92, 6.23 | 2.5–5.0 |
| Phosphate | 7.2 ($pK_{a2}$) | 6.0–8.2 |
| Succinate | 4.2, 5.64 | 4.8–6.3 |
| Tartrate | 2.93, 4.23 | 3.0–5.0 |
| Tris | 6.2 ($pK_b$ 7.8) | 6.8–7.7 |

**Figure 3.** Table V from Akers 2002.

5.56 Buffers consist of a mixture of one or more acid(s) and their conjugate base(s). For example, citric acid buffer consists of citric acid (a weak acid) and monosodium and disodium citrate (the conjugate bases).

5.57 The ability of a buffer to maintain a particular pH is determined by the ratio of the concentrations of the weak acid and its conjugate base components in the buffer and the pKa of the buffer. The pKa is an intrinsic property of a buffer reflecting the equilibrium pH between the acid and base components in the buffer. In other words, the pKa is the negative log (to base 10) of the acid dissociation constant of a buffer. Knowing the pKa of the buffer, the ratio of weak acid and conjugate base can also be used to set the pH of the formulation using the Henderson-Hasselbalch equation.

5.58 Phosphate buffer can consist of phosphoric acid ($H_3PO_4$), dihydrogen phosphate ($H_2PO_4^-$, otherwise known as phosphate monobasic), hydrogen phosphate ($HPO_4^{2-}$, otherwise known as phosphate dibasic), and phosphate ($PO_4^{3-}$, otherwise known as phosphate tribasic). The phosphate buffer also will include a counter-ion, most typically sodium. For this reason, there

[13] We now know that the buffer pH range of histidine is broader and can include down to pH 5.5

are three pKa values associated with a phosphate buffer: 2.15, 7.20, and 12.35, and the target pH will drive the choice of the combination of which phosphate components to use in a formulation. For example, if the target pH for the formulation is within the range 6 to 7.5, the phosphate buffer that is used will consist of the dihydrogen phosphate and hydrogen phosphate components with a pKa of 7.20. In this phosphate buffer, the weak acid is the dihydrogen phosphate and the weak base is the hydrogen phosphate. It is this combination of phosphate buffer which is most commonly used in protein formulation (and this is why only this pKa is shown in Figure 3 above).

5.59 The buffer maintains the target pH by preventing changes in pH which can affect protein stability. pH is a measure of the concentration of hydrogen ions ($H^+$) in a solution[14] and buffers work by releasing or capturing hydrogen ions, which helps maintain a consistent pH level. Over time and because of chemical degradation reactions, a protein can release small amounts of $H^+$ into the formulation. $H^+$ can also be introduced from extrinsic factors such as air. The conjugate base component of the buffer will react with the $H^+$ by capturing it to remove it from solution to maintain the pH. Conversely, over time a protein can also release bases such as ammonia which react with water to form basic ions (OH-) which are then introduced into the formulation. The weak acid component of the buffer will react with these basic ions by releasing H+ to neutralize them to maintain the pH.

5.60 A buffer's capacity refers to the amount of acid or base the buffer can neutralize before the pH falls outside the target pH range of the formulation. The buffering capacity of a buffer in a formulation depends on the proximity of the pH of the formulation to the pKa of the buffer and the concentration of the buffer. The closer the pKa of the buffer to the target pH of the formulation, the better its buffering capacity. The greater the concentration of the buffer in the formulation, the more molecules available to neutralize the acidic or basic ions and therefore the better its buffering capacity.

[14] pH is the negative log to base 10 of the hydrogen ion concentration.

5.61 Where a buffer is added to a formulation, the amount of buffer to add to a formulation would typically be measured experimentally by selecting for example three or four concentrations of buffer (separated by a factor of two for example) and measuring pH over time. Given the importance of pH on stability and solubility, it was standard to err on the side of caution when making this decision and use a slight excess amount of buffer to ensure that a stable pH is maintained.

5.62 On the other hand, high concentrations of buffer increase the risk that the buffer might have other impacts on the formulation. For example, in certain cases it has been shown that the choice of buffer can affect deamidation rates.[15] In general, these effects are not commonly observed and/or even if observed, can be minimized by identifying a concentration which is sufficient to buffer the formulation without causing chemical instability.

5.63 The pH of the formulation can either be set by adding a buffer, as described above in paragraph 5.57, or by titrating the formulation with an acid or a base to adjust the pH of the formulation to the desired level.

Stabilizers

5.64 Stabilizing agents act to stabilize the folded and active conformation of the protein. The mechanism(s) by which this occurs varies based on both the stabilizer and the characteristics of the protein being stabilized. In light of the heterogenous nature of the surface of the protein, the same stabilizer can have different interactions with different parts of the protein. The effect of a stabilizer is not always positive and in some cases a stabilizer could stabilize an unfolded or inactive conformation of the protein over the active, folded configuration. As a result, whether or not a stabilizing agent has a beneficial effect needs to be tested for each protein.

5.65 One class of stabilizing agent are carbohydrates. Carbohydrates which had been shown to have a stabilizing effect in liquid protein formulations include sugars such as sucrose and trehalose,

[15] Akers 2002, page 64.

and polyols such as sorbitol, glycerol and mannitol. The following mechanisms were thought to underlie their stabilizing effect:

(a) By forming a protective shell around the protein comprising of sugar and water. This shell would stabilize the protein by reducing interactions with other protein molecules in the solution, and with the surfaces of the solution, reducing aggregation.

(b) By changing the interactions at the surface of the protein, a mechanism referred to as preferential interaction. The protein exists in solution in an equilibrium between the folded, active state and one or more unfolded, inactive states. The presence of the carbohydrate alters the interactions at the surface of the protein, through direct interactions between the stabilizing agent and the protein (preferential binding) and/or by the stabilizing agent resulting in increased interactions between the solvent and the protein (preferential exclusion). If the effect of this change in interactions is that the active folded form of the protein is stabilized to a greater extent or destabilized to a lesser extent, than the unfolded, inactive forms of the protein, the net result is that the energy required for the protein to change from the active to inactive state increases and the folded, active protein becomes more thermodynamically favored than the inactive, unfolded protein. This effect is illustrated by the figure shown below:




**Figure 4.** Figure 1 from Wang 1999.

In the above figure, while the presence of the stabilizer in effect has a destabilizing effect on both the folded ($G_{fol}$) and unfolded ($G_{unf}$) protein, the effect is greater on the unfolded protein and therefore the difference between the two ($\Delta G_{f\rightarrow u}$), which equates to the energy required to transition from one state to the other, increases. The effect of this is to shift the equilibrium in solution between the folded and unfolded protein further in favor of the folded protein, which results in the folded protein being more stable in the solution.

5.66 When using sugars, the Formulation Scientist would be aware that sugars can also react with certain side chains on the protein, for example lysine side chains and disulfide bridges can react with reducing sugars. Therefore, the Formulation Scientist would select a non-reducing sugar. Sugars which are disaccharides, for example sucrose and trehalose, while non-reducing themselves, can degrade to produce aldehydes that are reducing sugars. In addition, as noted at paragraph 5.86 below, sugars also can contribute significantly to the osmolality of the formulation. In the case of formulations for intravitreal administration, this limits the amount that can be added.

5.67 In addition to carbohydrates, there were also examples of certain amino acids being used as stabilizing agents for proteins in solution. It was thought that they might also act by preferential exclusion or to increase solubility.

Co-solvents

5.68 A protein in solution will be surrounded by water molecules (referred to as solvation) and the number and strength of the interactions between the protein and water will determine its solubility. Co-solvents increase the solubility of the protein. One mechanism by which this can occur is through interactions with the protein and displacing water molecules to solvate the protein. The additional interactions between the co-solvent and the protein (which can be a hydrogen bond or a hydrophobic interaction) further stabilize the protein in solution and therefore the risk of a protein interacting with another protein molecule instead of water, leading to aggregation and then precipitation out of solution, is reduced. Co-solvents can also act by

disrupting water-water interactions and by doing so reduce the polarity of the water molecules in solution. This reduction in polarity can increase the favorability of interactions between the water and the protein, increasing such interactions and therefore the solubility of the protein.

5.69 There are a number of different types of compounds which can act as co-solvents, which include glycerin, propylene glycol, polyethylene glycol, ethanol, cyclodextrin derivatives and polysorbates.

Surfactants

5.70 Surfactants are compounds which reduce the surface tension of protein solutions and decrease the adsorption and/or aggregation of proteins at the surface of solutions.

5.71 Surfactants can be ionic (charged) or nonionic (not charged). In general, ionic surfactants were considered harsh and, in many cases, would denature the protein. However, there were examples of ionic surfactants having a stabilizing effect on certain proteins. In contrast, nonionic surfactants, such as polysorbate (which can act as a surfactant in addition to a co-solvent), were generally considered to be milder, although in certain cases, could also denature proteins. Surfactants form micelles and will coat any hydrophobic areas on the surface of the protein. This will occur at concentrations above their critical micelle concentration ("**CMC**"), for example polysorbate 20 and polysorbate 80 have a CMC of around 0.006/7% w/v (for polysorbate 20) and 0.001/2% w/v (for polysorbate 80).[16, 17]

5.72 Polysorbates comprise an ethoxylated sorbitol (a sugar group) attached to a fatty acid chain by an ester bond. The number after polysorbate indicates the length of the fatty acid chain and the higher the number, the longer the fatty acid chain. In light of the ester bond linking the sugar and fatty acid groups, polysorbates were susceptible to degradation by hydrolysis of the ester bond, in particular in solutions at basic pH. Although there were a number of polysorbates that

---

[16] Akers 2002, page 74.
[17] Wang 1999, page 168. 59 µM polysorbate 20 (i.e. Tween 20) is equal to 0.007% w/v.

were used in formulations (such as polysorbate 20, 21, 40, 60, 61, 65, 80, 81, 85 and 120) the most common to use in formulations were polysorbate 20 and 80.

5.73 Structurally surfactants contain hydrophobic and hydrophilic groups (they are amphiphiles). Their hydrophobic phase binds to a similarly hydrophobic pocket on the protein, preventing undesirable interactions with another protein, and leaving the hydrophilic tail of the surfactant free in solution to interact with water.

5.74 The concentration required to achieve maximum stabilization of a protein by this mechanism can vary between proteins. At concentrations which are too low, there will not be sufficient interaction between the surfactant and the protein to achieve a sufficient (or maximum) stabilizing effect. However, at concentrations which are too high, the surfactant can stabilize unfolded conformations of the protein leading to denaturation. As a result, for each protein (and depending on the concentration of protein in the solution), the amount of surfactant needs to be selected such that there is enough to interact with the hydrophobic residues to stabilize the folded protein in solution, but not enough such that it is able to interact with all of the additional hydrophobic residues which become exposed when the protein is unfolded.

5.75 The amount of surfactants and cosolvents used needs to be suitable for the intended route of administration. For example, the Formulation Scientist would be aware that polysorbate at high concentrations may be toxic. In June 2006, there were no products authorized for intravitreal administration which contained polysorbate, and therefore, the Formulation Scientist would not be aware that the ocular safety and toxicity had yet been properly studied. The fact that Avastin, which contained polysorbate 20, had been administered intravitreally off-label would provide some reassurance to the Formulation Scientist, but they would still want to investigate the safety of polysorbate before using it in a formulation intended for intravitreal administration, given that Avastin was not approved for intravitreal use.

5.76 Cosolvents and surfactants can be organic or inorganic. Organic and inorganic cosolvents/surfactants have a different oxidative potential which the formulation scientist would

carefully evaluate. Organic cosolvents and surfactants have a greater risk of being pro-oxidant, for example, polyethylene glycol ("**PEG**") and polysorbates can generate hydroxyl radicals and/or peroxides over time which can rapidly oxidize the protein via amino acids such as methionine which has a side chain prone to oxidation.[18] While there are several possible mechanisms for generation of reactive oxygen species from PEG and polysorbates, one common pathway involves a reaction of the acid end of the fatty acid chains of polysorbates with oxygen to form peroxides.

5.77 In addition, organic co-solvents and surfactants are generally extracted from various natural sources, including plants, animals, and microorganisms. This means they carry the risk of contamination, as these sources can harbor impurities. On the other hand inorganic co-solvents such as DMSO and DMF and surfactants such as tyloxapol are produced through chemical processes and do not carry this risk.

Viscosity enhancers

5.78 Viscosity enhancers function to increase the viscosity of the solution by increasing the intermolecular forces between the molecules in the solution. This can help to stabilize proteins by reducing the mobility of protein molecules in solution, thereby reducing the rate of aggregation and certain chemical degradation processes such as oxidation and hydrolysis. Examples of compounds which can act as viscosity enhancers include polymers such as serum albumin, dextrans and celluloses.

5.79 For intravitreal administration the Formulation Scientist would be mindful of the disadvantage of a solution that was too viscous for injection but viscosity enhancing agents would still be considered. In particular, lower molecule weight dextrans and celluloses could be considered, which at low concentrations would be unlikely to increase the viscosity sufficiently to prevent the formulation being suitable for intravitreal administration.

[18] Akers 2002, page 75. Wang 1999, page 167.

Chelating agents

5.80 If there are heavy metal anion and/or cation contaminants present in the formulation, these can bind directly to the protein and destabilize its native conformation. These ions can be present in the solution either as a result of impurities resulting from the manufacturing process or present in the excipients, or as a result of leeching from the storage container. Chelating agents can increase the stability of a formulation by binding to and neutralizing these extractables and leachables through chelate bond formation. Examples of chelating agents include ethylenediaminetetraacetic acid ("**EDTA**"). In addition, citrate was known to be capable of forming complexes with multi-valent metal ions and therefore could also act as a chelating agent.

Antioxidants

5.81 Antioxidants can neutralize trace amounts of impurities from the protein itself, excipients or the air which would otherwise initiate oxidation of certain amino acid residues. Examples of antioxidants include ascorbic acid and citric acid.

5.82 Oxidation rates can also be reduced by (i) attempting to minimize exposure to oxygen during the manufacturing process, (ii) purging oxygen from the final container and replacing it with another gas, for example nitrogen, and (iii) keeping the formulation at low temperatures.

Tonicity agents

5.83 As noted above at paragraph 5.36, the osmolality range of the vitreous was known to be around 290-320 mOsm/kg. The Formulation Scientist would want the formulation to have an osmolality close to or within this range.[19] For example, the range of osmolality of Macugen was 280-360 mOsm/kg (set out at paragraph 5.94 below). The protein itself will also have an impact on the osmolality of the formulation.

[19] The unit used for osmolality is mOsm/kg. Osmolarity is the same concept but its unit is mOsm/L. One litre of water is equal to one kg of water and therefore these values are interchangeable.

5.84 Tonicity agents work by introducing solutes into the aqueous environment of the formulation and in this way adjusting its tonicity. Each component of the formulation will introduce solutes, but substances that are used as tonicity agents are those that make a significant contribution to tonicity without having any undesirable impact on functionality otherwise.

5.85 If a formulation is hypertonic, it has a greater osmotic pressure than the physiological fluid at the site of administration, whereas if it is hypotonic it has a lower osmotic pressure. A tonicity agent is added to the formulation if the existing tonicity of the formulation is hypotonic in order to change the osmotic pressure of the formulation to the desired value for intravitreal administration. The amount that is added can be calculated and is dependent on what is required to bring osmotic pressure of the formulation close to the isotonic range.

5.86 In general sodium chloride and sugars (e.g. dextrose) were used as tonicity agents as they did not commonly have any adverse effects on the formulation. As a result, they could be added to adjust the tonicity without causing other effects which might interfere with the stability of the protein. However, as mentioned above, sugars were also used as stabilizing agents and could also affect the stability of formulations. In addition, although relatively rare, there were also examples of sodium chloride affecting the stability of proteins.

*The approach to formulation*

5.87 The above excipients will affect one protein's stability differently to that of another protein because their functionality depends on the parameters/conditions and properties of the specific protein in question. As a result, whether a given excipient improves stability under specific conditions and the amount or range at which it may do this will depend on the conditions and the characteristics of the protein being formulated.

5.88 For example, the pH can affect the solubility and the rate of different chemical and physical degradation reactions of one protein differently to another protein. Further the impact of an excipient on the stability of the protein can vary at different pH and between different proteins. Wang 1999 provides an example of a protein that showed minimum rates of oxidation and

deamidation at pH 7.5, but this minimum was shifted to pH 7 when formulated with a polysaccharide excipient.[20]

5.89 When trying to identify a stable formulation for a protein for the first time, the Formulation Scientist would consider that the impact of any of the protein concentration, pH, temperature, state of formulation and excipient presence on stability may vary depending on the other parameters used in the formulation i.e. they are interdependent functionally. For example, one excipient may have an impact on the function of another by altering its solvent properties, which in turn affects protein stability. Another example are excipients with multiple functions. For example, sugars can act as stabilizing agents and also increase the tonicity of a formulation. As a result, an increase in the amount of sugar added to a formulation would impact on the amount of tonicity agent (if any) required.

5.90 Further, for intravitreal administration, it is important that the formulation is not too viscous (as I discussed at paragraph 5.47 above). While some excipients can reduce viscosity, in general adding more components to a formulation will increase its viscosity. Therefore, while there may be potential benefits to adding additional excipients, this will need to be considered against any potential increase in viscosity that their addition might cause.

*Protein engineering*

5.91 For a complex protein, a further approach would be for the Protein Engineer to assess whether small structural modifications can be made to overcome 'soft-spots' in the protein.

***Formulation containers***

5.92 Products administered intravitreally are developed either in a glass vial or pre-filled syringe (PFS). In general, the Formulation Scientist would first seek to develop a formulation in a vial before then looking to develop a pre-filled syringe presentation of the product.

***Relevance of other formulations***

[20] Wang 1999, page 147.

5.93 The Formulation Scientist's approach to formulating their protein will depend on the characteristics of that protein itself. This is because they would know that a protein's vulnerability to the various physical and chemical degradation pathways and the conditions under which these will occur depends on the specific structure of a protein. The Formulation Scientist would have no expectation that, because one protein exhibits stability with one combination of conditions and excipients, another would also exhibit stability if it were formulated with the same or similar combination of excipients under the same or similar conditions. The formulation composition of another protein will only help the Formulation Scientist in the following limited ways (neither of which relate to stability) (i) that another formulation authorized for use intravitreally will provide helpful information to the Formulation Scientist because it informs them about excipients and the pHs that can be tolerated in the eye (as I discussed at paragraph 5.37 above), and (ii) that the volume of administration used for other intravitreally administered products would reflect the volumes that would be clinically acceptable in the eye.

*Macugen*

5.94 At the Priority Date, pegaptanib (marketed as Macugen) was the only approved intravitreally administered VEGF antagonist. Pegaptanib was first authorized in the US in December 2004, and subsequently in Europe in January 2006, for the treatment of patients with Wet AMD. Pegaptanib is not a protein, but a pegylated modified oligonucleotide that binds to VEGF, inhibiting its activity. The Formulation Scientist could have obtained the Macugen label and I set out below what it states with respect to the formulation:

(a) "*MACUGEN® (pegaptanib sodium injection) is a sterile, aqueous solution containing pegaptanib sodium for intravitreous injection. Macugen is supplied in a single-dose, pre-filled syringe and is formulated as a 3.47 mg/mL solution, measured as the free acid form of the oligonucleotide. The active ingredient is 0.3 mg of the free acid form of the oligonucleotide without polyethylene glycol, in a nominal volume of 90 µL. This dose is equivalent to 1.6 mg of pegaptanib sodium (pegylated oligonucleotide) or 0.32 mg when expressed as the sodium salt form of the oligonucleotide moiety. The product is a sterile, clear, preservative-free solution containing sodium chloride, monobasic sodium phosphate monohydrate, dibasic sodium phosphate heptahydrate, hydrochloric acid, and/or sodium hydroxide to adjust the pH and water for injection*"

(b) "*Macugen is formulated to have an osmolality of 280-360 mOsm/Kg, and a pH of 6–7.*"

(c) "*Store in the refrigerator at 2° to 8°C (36° to 46°F). Do not freeze or shake vigorously*."

5.95 If the Formulation Scientist wished to find information on the amounts of the excipients included in the formulation of pegaptanib in order to check which excipients had been shown to be suitable for intravitreal use, the Formulation Scientist could search the literature and identify from its FDA drug approval package that it contained 9.0 mg/ml sodium chloride, 0.77 mg/ml monobasic sodium phosphate monohydrate and 1.2 mg/ml dibasic sodium phosphate heptahydrate (**Exhibit HJG-4**).

5.96 The above formulation information can be converted into mM:

(a) 154 mM sodium chloride; and

(b) 10 mM sodium phosphate buffer (6 mM sodium phosphate monohydrate and 4mM dibasic sodium phosphate heptahydrate).

*Avastin*

5.97 At the Priority Date, the Formulation Scientist would have known or the Clinical Ophthalmologist would inform them that bevacizumab (marketed as Avastin) which was authorized for intravenous administration use for cancer had been used by some clinicians 'off-label' intravitreally to treat Wet AMD. Bevacizumab is a full-length humanized monoclonal antibody that also binds to VEGF. The Formulation Scientist could have obtained the Avastin label (see **Exhibit HJG-5**). I set out below what it states with respect to the formulation:

(a) "*AVASTIN is a clear to slightly opalescent, colorless to pale brown, sterile, pH 6.2 solution for intravenous (IV) infusion. AVASTIN is supplied in 100 mg and 400 mg preservative-free, single-use vials to deliver 4 mL or 16 mL of AVASTIN (25 mg/mL). The 100 mg product is formulated in 240 mg α,α-trehalose dihydrate, 23.2 mg sodium phosphate (monobasic, monohydrate), 4.8 mg sodium phosphate (dibasic, anhydrous), 1.6 mg polysorbate 20, and Water for Injection, USP. The 400 mg product is formulated in 960 mg α,α-trehalose dihydrate, 92.8 mg sodium phosphate (monobasic, monohydrate), 19.2 mg sodium phosphate (dibasic, anhydrous), 6.4 mg polysorbate 20, and Water for Injection*"

(b) *"AVASTIN vials must be refrigerated at 2−8°C (36−46°F). AVASTIN vials should be protected from light. Store in the original carton until time of use. DO NOT FREEZE. DO NOT SHAKE."*

(c) *"AVASTIN is supplied as 4 mL and 16 mL of a sterile solution in single-use glass vials to deliver 100 and 400 mg of Bevacizumab per vial, respectively. Single unit 100 mg carton: Contains one 4 mL vial of AVASTIN (25 mg/mL). NDC 50242-060-01 Single unit 400 mg carton: Contains one 16 mL vial of AVASTIN (25 mg/mL). NDC 50242-061-01"*

5.98 The above formulation information can be converted into percentages (w/v) and mM:

(a) 6% α,α-trehalose dihydrate;

(b) 42 mM sodium phosphate (monobasic, monohydrate) and 8.5 mM sodium phosphate (dibasic, anhydrous), together equaling 50.5 mM sodium phosphate buffer; and

(c) 0.04% polysorbate 20.

*Lucentis*

5.99 Ranibizumab (marketed as Lucentis) received FDA approval for wet AMD on 30 June 2006 and was therefore not authorized for intravitreal use at the Priority Date. Ranibizumab is a humanized monoclonal antibody Fab fragment that also binds to VEGF. If the Formulation Scientist had wished to find information on the formulation of ranibizumab, they would not be able to find information on Ranibizumab's formulation from its product label as at the Priority Date this had not been published. However, the Formulation Scientist could search the patent literature as the most likely place to find this information.

5.100 To determine whether the Formulation Scientist would have found this information, I conducted a patent search in the way the Formulation Scientist would have done at the Priority Date. The details of my search and my results are documented in **Exhibit HJG-6**. From this search I do not believe that the Formulation Scientist would have found Ranibizumab's formulation using obvious steps.

*Other intravitreally administered products*

5.101 At the Priority Date, the Formulation Scientist would have known or the Clinical Ophthalmologist would inform them that 'off label' intravitreal use of steroids, such as triamcinolone acetonide for the treatment of diabetic retinopathy and diabetic macular edema, occurred at the Priority Date. None of these are protein drugs.

***Formulations used in animal studies***

5.102 Molecules for injection used in animal studies are typically not formulated in advance, and instead would be mixed with water immediately before administration. One exception to this is toxicological studies in animals which would have the same formulation as that used in clinical studies, but would generally be prepared extemporaneously.

## 6. THE PRIOR ART

**US 529**

6.1 US 529 is a patent application from Regeneron titled "*Use of VEGF Inhibitors for Treatment of Eye Disorders*", published on 9 February 2006. The abstract states that: "*Modified chimeric polypeptides with improved pharmacokinetics and improved tissue penetration are disclosed useful for treating eye disorders, including age-related macular degeneration and diabetic retinopathy*".

6.2 Paragraph [0004] states that the invention relates to methods for "*treating or ameliorating an eye disorder, comprising administering a vascular endothelial growth factor (VEGF) inhibitor*". Paragraph [0005] states that preferably the VEGF inhibitor used in the method "*comprises an immunoglobulin-like (lg) domain 2 of a first VEGF receptor and lg domain 3 of a second VEGF receptor; and a multimerizing component*", and provides the specific examples of SEQ ID NO:2 (FltlD2.FlklD3FcΔC1(a)), SEQ ID NO:4 (FltlD2.VEGFR3D3.FcΔCl(a)), SEQ ID NO:6 (VEGFR1R2 FcΔCl(a)), and SEQ ID NO:23.

6.3 Paragraph [0034] states that, preferably, administration of the VEGF inhibitor is directly to the eye (including by intravitreal injection). Paragraph [0035] contains general information on

compositions of the VEGF Inhibitor. Other than stating that "*Aqueous compositions of the invention have ophthalmically compatible pH and osmolality*" (which the Formulation Scientist would know to be a requirement for intravitreal formulations), US 529 provides no specific information or guidance on how to formulate the VEGF inhibitors.

6.4 US 529 describes studies in animals which evaluate the intravitreal use of the VEGF inhibitors, in particular SEQ ID NO:6 (a full-length VEGF Trap) and SEQ ID NO:23 (a "mini-VEGF Trap"), to treat eye disorders.

6.5 In Example 18, the results of a clinical study testing the effect of intravenous injection of a VEGF Trap antagonist of SEQ ID NO:6 in patients with Wet AMD are reported. No pharmaceutical formulation of the VEGF Trap antagonist is described in this example. This would tell the Formulation Scientist that an intravenous formulation of SEQ ID NO:6 was reached which maintains stability over the period to cover a phase 1 clinical trial. The Formulation Scientist would estimate this to be in the region of 6 months to cover manufacture, supply and successive enrolment of patients. There is no statement that SEQ ID NO:6 administered in this study was suitable for intravitreal use. Although, earlier in US 529, as mentioned above, it does state that "Aqueous compositions of the invention have ophthalmically compatible pH and osmolality", this is in a section that describes the state of the art of all known drug delivery options for ophthalmic use as part of the background section and does not appear to be a comment on the formulations used in the examples. Therefore, the Formulation Scientist would not understand from this paragraph that the formulation for SEQ ID NO:6 used in Example 18 was suitable for intravitreal use in addition to intravenous use.

6.6 Example 17 appears to be a study protocol or proposal describing a clinical trial to test the efficacy of either SEQ ID NO:6 or SEQ ID NO:23 in "a patient" or "the patient" in a generic sense with Wet AMD when administered intravitreally. Again, no information regarding any specific formulation of the VEGF Trap antagonist(s) to be used in any study is provided. It is simply stated that the eye to be treated is injected with 25-4000 µg of VEGF Trap protein in an ophthalmic solution. No information is given on the volume of administration to be used. No

results are provided. The Formulation Scientist would treat this as an intended protocol rather than a study that had taken place. Therefore, this does not give them any indication whether a stable formulation of SEQ ID NO:6 or SEQ ID NO:23 could be reached for intravitreal administration.

*Views of the Formulation Scientist on formulation task with SEQ ID NO:6 vs SEQ ID NO:23*

6.7 SEQ ID NO:6 is a full-length VEGF Trap with a higher molecular weight than SEQ ID NO:23. The Formulation Scientist would know that this would mean that for a given molar dose and volume of administration, the concentration in mg/ml (i.e., the mass of protein per ml) of SEQ ID NO:6 will be greater than SEQ ID NO:23 meaning that it would be more prone to aggregation and precipitation than SEQ ID NO:23.

6.8 The Formulation Scientist would ask the Protein Engineer for information on the physical instability risks and 'soft-spots' in the product to be formulated that may give rise to chemical instabilities (as I explain in paragraph 6.17 below). Reviewing the information provided, the Formulation Scientist would note that, in addition to the greater risk of physical instability set out in paragraph 6.7, that the Fc region of SEQ ID NO:6 has various sites susceptible to chemical instability (e.g. oxidation, deamidation) which are not present in the mini-trap of SEQ ID NO:23 (which does not have an Fc).

6.9 In light of the above, the Formulation Scientist would advise the skilled team that it would be preferable, from a formulation perspective alone, to develop SEQ ID NO:23, which was smaller, did not have so many labile sites, and therefore would be less challenging to formulate.

***<u>Developing a stable liquid formulation of SEQ ID NO:6</u>***

*Characteristics of SEQ ID NO:6 make it challenging to formulate as a stable liquid formulation*

6.10 I understand from reading the report of Professor Kodjikian (at paragraphs 6.28 to 6.30) that the Clinical Ophthalmologist would recommend progressing SEQ ID NO:6 into phase 1 studies and would rely on the Ocular PK/PD Scientist for their recommendation of dose to try in phase 1. I understand from reading the report of Dr Ward (at paragraph 6.75) that the Ocular PK/PD

Scientist would recommend 0.5 mg as the upper end of the doses to be tested in phase 1. Further doses would be selected within the range of 0.03 and 0.5 mg. The number of doses and specific doses selected in this range will depend on the particular circumstances.

6.11 Even though the clinical study would initially be a phase 1 study, the task of the formulator would be to try to formulate for long-term stability (i.e. stability for at least 24 months) for the reasons set out in paragraphs 5.7-5.9 above.

6.12 In terms of the concentrations that the Formulation Scientist would use in their formulations, the Formulation Scientist would wish to try to formulate SEQ ID NO:6 at the requested doses using the lowest possible concentration. Therefore, if there was a choice to be made between two doses considered to be equally safe and efficacious, the Formulation Scientist would prefer the lower dose. Similarly, if there was a choice as to the volume in which the dose could be administered, the Formulation Scientist would prefer to use the largest clinically acceptable volume of solution to administer the drug. The reason that the Formulation Scientist would have this view is that the higher the dose and the lower the volume of administration, the higher the concentration of formulation required. In light of the increased challenge of formulating at higher protein concentrations (see paragraphs 5.22 to 5.23 above), there is a greater risk that a stable formulation would not be reached.

6.13 The Formulation Scientist would have sought to reach a stable formulation for the highest dose to be tested in the phase 1 study, which in this case is 0.5 mg. They would expect that if they reached a stable formulation for a dose of 0.5mg, that such a formulation would be stable for lower doses of the protein. I understand from reading the report of Professor Kodjikian (at paragraphs 5.53-5.54) that there is flexibility to administer a volume of liquid between 50 µl to 90 µl intravitreally. As a result, once the dose is selected, the Formulation Scientist can decide what volume of administration to select within that range, which will then determine the concentration of the protein in the formulation. The Formulation Scientist would have formulated the required 0.5 mg dose using a volume of 90 µl. On that basis, the Formulation Scientist would have sought to develop a long-term stable formulation of 5.56 mg/ml.

6.14 The process of formulating SEQ ID NO:6 at a concentration of 5.56 mg/ml would involve the same process as outlined below for a concentration of 40 mg/ml. Even at these concentrations, chemical instabilities may still be a risk and cause formulation challenges. Therefore, the process would raise similar challenges to those outlined below but to a lesser extent.

6.15 Although not recommended by the Ocular PK/PD Scientist or the Clinical Ophthalmologist, A&O Shearman have asked me what the Formulation Scientist's reaction and next steps would be were the Ocular PK/PD Scientist and Clinical Ophthalmologist to wish to develop SEQ ID NO:6 at a dose or doses which, when administered in a clinically acceptable volume, required a concentration of 40 mg/ml.

6.16 A concentration of 40 mg/ml would be considered a very high concentration, and one which would be highly likely to present very difficult formulation challenges.

6.17 As noted at paragraph 6.8 above, the Formulation Scientist would ask the Protein Engineer for the following information about SEQ ID NO:6:

(a) Molecular weight;

(b) Isoelectric point;

(c) Physical instability risks and/or amino acid residues that are potentially susceptible to chemical changes ('soft-spots') which include:

(i) Disulfide bridges – buried or solvent exposed;

(ii) Glycosylation sites; and

(iii) Whether there were any residues or sites on the protein which would make it susceptible to chemical instabilities, for example: (a) deamidation, (b) oxidation; and (c) isomerization.

6.18 I have been provided with the information set out at **Exhibit HJG-7** and have read the report of Professor Leatherbarrow and in particular the explanation for why the particular sites were identified (in paragraphs 6.15 to 6.40).

6.19 Due to its large size alone (approximately 120 kDa comprised of a dimer of two monomers of SEQ ID NO:6)[21], and as with any protein, SEQ ID NO:6 would likely be susceptible to aggregation, adsorption and precipitation. As noted at paragraph 5.22, this is exacerbated at higher concentrations which results in more protein-protein collisions, leading to more opportunities for aggregates, agglomeration and precipitation to form. In addition, the fact that SEQ ID NO:6 is a fusion protein, and therefore has a non-naturally occurring structure, would mean that there would be some inherent uncertainty as to its stability in solution.

6.20 The Formulation Scientist would also note from Exhibit HJG-7 that the structure of SEQ ID NO:6 has various susceptibilities to chemical instabilities:

(a) Three asparagine residues per monomer are at high risk of deamidation and a further three are at medium risk. In addition, there is one asparagine residue in the VEGF binding domain and one next to the VEGF binding domain in the first VEGF receptor domain of SEQ ID NO:6 that are at low risk of deamidation;

(b) Six methionine residues per monomer are at high risk of oxidation, two of which are proximal to the VEGF binding domain in the first VEGF receptor domain of SEQ ID NO:6. Of these two proximal to the binding domain, one is solvent exposed;

(c) Per monomer, there is one high risk site of fragmentation of the peptide backbone, and a further four medium risk sites;

(d) Four aspartic acid residues per monomer are at high risk of isomerization. The asparagine residues at risk of deamidation above would also have a risk of isomerization through their conversion to aspartic acid via the deamidation reaction; and

[21] Based on the calculation of the Protein Engineer at paragraphs 6.17-6.19 of Professor Leatherbarrow's report.

(e) There are two exposed disulfide bonds which would be at risk of reduction.

6.21 In light of these different instability issues which would be identified from SEQ ID NO:6's sequence, the Formulation Scientist would think that it would be very challenging to develop a long-term stable liquid formulation of SEQ ID NO:6, particularly at 40 mg/ml, and that there was a real risk that one may not be reached at all. Given the number of potential instability pathways and the fact that a potential solution for one may cause a problem for another, they would think it would be difficult to find a set of conditions and excipients, if any, under which the protein remains stable for the required period of 2 years or more. The task is made more challenging because the formulation would be designed to be suitable for intravitreal administration and therefore, as mentioned at paragraphs 5.30 to 5.37 above, needs to have suitable pH, osmolality/tonicity and comprise excipients which were suitable for injection into the eye.

*Initial stability studies*

6.22 The Formulation Scientist would carry out some initial accelerated stability studies (those conducted at a high temperature e.g. 37 ºC) at different pHs to get a sense of the stability of the protein in water at different pHs.

6.23 The Formulation Scientist would need to assess the influence of any potential pH of the formulation on the chemical instability risks. As noted above, SEQ ID NO:6 contains three amino acid residues per monomer at high risk of deamidation (and a further three at medium risk) which occurs at the fastest rate at alkaline pHs and would be minimized by formulating at an acidic pH. Likewise, SEQ ID NO:6 includes several disulfide bonds and disulfide shifting is increased at basic pH and reduced at acidic pH. On the other hand, SEQ ID NO:6 also includes four amino acid residues per monomer at high risk of isomerization which have an increased susceptibility to isomerization at low pH. In addition, the site of high risk of fragmentation in the peptide backbone of each monomer would also point away from using a low pH as such hydrolysis reactions are increased at acidic pH. Further, as noted above, the Protein Engineer would identify several methionine residues which are susceptible to oxidation

(and this can occur at both acidic and alkaline pH), and would flag in particular that two of the methionine residues (per monomer) were close to the VEGF binding site in the first VEGF receptor domain of the VEGF Trap, and of these, one was solvent exposed. The Formulation Scientist would recognize that it would not be possible to strike a balance which minimized the rates of all these reactions and that whichever pH was chosen, there would be the risk of chemical instabilities occurring.

6.24 The Formulation Scientist would also measure the isoelectric point of SEQ ID NO:6 as the pI of the protein affects its solubility and the choice of the final pH for the formulation. I understand from reading the report of Professor Leatherbarrow (at paragraph 6.23) that SEQ ID NO:6 would have a range for its isoelectric point because when expressed it would consist of a heterogenous mixture of proteins with different number of sialic acid residues at the glycosylation sites. The Protein Engineer would calculate that the range for the majority of the VEGF Trap expressed would have a pI of between pH 6.5-7.3, subject to the caveat that the measured value could vary by up to one pH unit from this range (see paragraphs 5.38 to 5.42 of Professor Leatherbarrow's report). The Formulation Scientist would therefore not be able to pick the optimum pH which would balance stability and solubility for all of the proteins in the mixture.

6.25 As noted at paragraph 5.27 above, choosing a pH that was 0.5 to 1 pH unit below or above the isoelectric point was thought to be a good starting point for achieving sufficient solubility and also maintaining the physical stability of the folded conformation of the protein in solution. A pH that was too close to or at the isoelectric point would likely result in the protein not having sufficient solubility to remain in solution. This would in particular be a concern at high protein concentrations. Taking into account this issue, and assuming that the estimates are accurate, the Formulation Scientist would pick 5.5 and 8.3 as the lower and upper pH boundaries to test in initial formulation studies. This is because, if values closer to the pI range were picked, this could mean that in the formulation there would be protein variant(s) with pI value(s) for which

the selected pH is sub-optimal for solubility and physical stability, likely leading to precipitation or aggregation of these protein variant(s).

6.26 For the reasons given at paragraph 5.48 above, the Formulation Scientist would, if possible, like to include some pHs within the range of 6 to 7.5 and middle pH values of 6 and 7.5 would be sensible ones to choose as avoiding the pI, and 6.9 might be chosen as the mid-point between the two boundaries of 5.5 and 8.3. The Formulation Scientist's objective would be to take forward the pH of those tested which showed the best stability in these initial tests into the rest of the formulation project.

*Formulation project*

6.27 The Formulation Scientist would expect to see degradation of the protein occurring in the initial stability studies, in particular due to the very high concentration of protein, aggregation, precipitation and/or adsorption and therefore would consider whether excipients could be added to improve its stability in liquid form over the period required. However, when formulating the protein for the first time, the Formulation Scientist would not know which class or classes of excipients, and which excipients within each class, and what amount of each excipient, would improve the stability of SEQ ID NO:6. In addition, the choice of excipient or excipients may be influenced by the pH chosen and by the other excipient(s) which may end up needing to be combined in the overall formulation.

6.28 There were a number of excipients which could be tested to see if they improved stability by reducing aggregation, adsorption and precipitation, and prevented such degradation, including:

(a) sugars, such as sucrose or trehalose;

(b) polyols, such as mannitol or sorbitol or glycerin;

(c) amino acids such as glycine; and

(d) polymers, such as serum albumin or dextrans.

6.29 However, the choice of which excipient to use and at what amount to try to solve the above degradation problems would have to take into account the effect any potential excipient and amount would have on the chemical instability risks mentioned above at any given pH, bearing in mind those risks differ from one pH to another.

6.30 For example, if pH 7.5 was identified as the pH to try, then as this pH is slightly basic, and in the range at which deamidation reactions occur at an accelerated rate, the Formulation Scientist would avoid adding any excipients which could act as reducing agents. This would include reducing sugars. Instead, the Formulation Scientist would choose non-reducing monosaccharides such as mannitol. In addition, the Formulation Scientist would be aware that at basic pH, excipients containing ester groups, which include polysorbate, would be susceptible to hydrolysis, leading to degradation of the excipient itself, which would also be considered undesirable.

6.31 As noted at paragraph 6.20(b) above, there were six methionine residues per monomer at high risk of oxidation, two of which were close to the VEGF binding domain, and one of these being solvent exposed. As noted at paragraph 5.13(b) above, the oxidation of the methionine residue can change its polarity, from hydrophobic to hydrophilic. This change in the structure and polarity of the methionine side chain can impact on the structure of the protein, leading it to become more unstable and increasing the rate of aggregation, multimerization and/or precipitation of the protein. As a result, the Formulation Scientist would look to minimize methionine oxidation and would look to avoid excipients which could increase oxidation rates. This would include avoiding PEG and polysorbates, which in light of their tendency to form peroxides, would carry the risk that they could significantly increase the rate of methionine oxidation. While a further option might be to consider adding an antioxidant to counter this effect, it would not be the preferred solution. In general, fewer excipients would be preferred over multiple excipients and in June 2006 I am not aware of any antioxidant excipients being qualified for commercial or clinical use for intravitreal administration. As a result, the Formulation Scientist would need to test any added antioxidants for suitability for intravitreal

use. This would not be an attractive option to the Formulation Scientist and I believe that they would have instead chosen to test other excipients (for example those listed at paragraph 6.28 above) instead.

6.32 In light of the fact that one source of potential chemical instabilities would arise from the presence of metal ions, and these can leach into the formulation from the storage container, a chelating agent would have been considered to neutralize extractables and leachables through chelate bond formation which could otherwise be a source of chemical instability. The Formulation Scientist would likely first seek to establish whether or not the presence of any metal ions in the formulation after storage could be detected before considering adding a chelating agent. If the presence of metal ions was detected, chelating agents such as EDTA or citrate would have been considered to investigate if their addition could improve stability. I am not aware that EDTA had been used intravitreally by 2006 and therefore it would have been necessary to carry out safety and toxicity studies to verify the safety and suitability of this excipient for intravitreal administration.

*Suitability for intravitreal administration*

6.33 As this formulation is intended for intravitreal administration, in addition to using a pH that was tolerated by the eye, the Formulation Scientist would use or test excipients from this perspective as well. Also, the osmolality of the formulation would need to be designed to be within or close to the osmolality range of the vitreous (around 290-320 mOsm/kg) and the Formulation Scientist would add a tonicity agent (a salt or a sugar) as needed. However, this may also limit the quantities of sugar excipients that could be added for stability, which the Formulation Scientist would know contributed to tonicity.

6.34 The viscosity of the formulation would also need to be low enough to allow injectability. The Formulation Scientist would be aware of the effect of polymers on viscosity, and therefore in testing these excipients would limit the amount tested to avoid making the formulation too viscous for intravitreal injection. This is particularly a consideration at high concentrations of protein as the protein itself will contribute to viscosity.

6.35 Further, before including any excipient in a test formulation, it would be necessary to test its purity, otherwise any instability or lack of improvement in stability could be the result of impurities rather than a lack of effect of the excipient itself. As I set out at paragraph 5.33 above, the purity requirements for intravitreal formulations were very stringent and higher than for other types of parenteral formulations.

6.36 The Formulation Scientist would try to identify if there was a combination of excipients and conditions (and if necessary, modifications to the protein) which establish an adequate balance that might be able to achieve long-term liquid stability and maintain suitability for intravitreal use, however particularly at the very high concentration of 40 mg/ml this would be very challenging to reach. When trying to identify a stable formulation for a protein for the first time, there are several possible solutions to each stability issue, however changing conditions or adding excipients to minimize one issue can have knock-on effects on another which multiplies the different combination of possibilities to try. In addition, there is variability not only in the different types of excipient which can be added, but for each excipient, studies would be necessary in order to identify the amount of that excipient which should be added in order to achieve the most positive effect, and again that effect may depend on and may vary as a result of the presence of other excipients in the formulation or changes to other conditions. In light of the numerous potential options which could be tested and the various combinations which could be tried, it would not be possible to test every combination.

6.37 As mentioned above, site directed mutagenesis to modify residues susceptible to chemical instability is an option to mitigate the risk of deamidation, oxidation, fragmentation and isomerization. Site-directed mutagenesis involves the deliberate alteration of specific amino acid residues in the protein sequence which are prone to these chemical degradation pathways. By identifying and modifying the susceptible residues, the Protein Engineer can enhance the protein's stability and reduce the likelihood of these degradation processes. This can be done proactively before the formulation work begins (for high-risk sites e.g. the methionine residues

near the binding site would have been considered for mutation) or if difficulties in formulation are encountered.

***<u>WO 2006/104852 (Dix)</u>***

6.38 Dix is a patent application from Regeneron titled "*VEGF Antagonist Formulations*", published on 5 October 2006 with a priority date of 25 March 2005.

6.39 The active ingredient in the formulations is "*a VEGF-specific fusion protein antagonist*" (paragraph [0004]). Paragraph [0026] explains that a VEGF antagonist is "*a compound capable of blocking or inhibiting the biological action of vascular endothelial growth factor (VEGF)*". Later in paragraph [0026] Dix refers to a VEGF antagonist comprising "*amino acids 27 to 457 to SEQ ID NO:4 and is glycosylated at Asn residues 62, 94, 149, 222 and 308*". I understand from A&O Shearman that this VEGF antagonist is aflibercept.

6.40 Formulations comprising several different combinations of excipients, including both proposed liquid (see for example paragraphs [0005] to [0007]) and formulations designed to be lyophilized (see paragraphs [0008] to [0011]), are described.

6.41 Examples 1 to 3 study two formulations, comprising:

(a) 10 mM phosphate, 50 mM NaCl, 0.1% polysorbate 20 and 20% sucrose at pH 6.25 ("**Dix Examples 1 to 3 Formulation 1**"); and

(b) 10 mM phosphate, 50 mM NaCl, 3% PEG 3350 and 20% sucrose at pH 6.25 ("**Dix Examples 1 to 3 Formulation 2**"),

at different VEGF Trap concentrations; 50 mg/ml (Example 1), 75 mg/ml (Example 2) and 100 mg/ml (Example 3). The formulations are stored at 5 ºC and stability is measured either over 24 months (Example 1) or 15 months (Examples 2 and 3). Both formulations use SEQ ID NO:4.

6.42 The results of the stability studies are reported in Tables 1 to 6 and the Formulation Scientist would consider these to be very impressive. No changes in visual appearance or turbidity over

the time period studied are reported for any of the formulations. A pass on visual appearance and no change in turbidity suggests no significant aggregation of the protein in the formulation had occurred. The pH other than one exception (month 9 of Example 2) remained at 6.2 or 6.3. There is a degree of variability in the results of the % VEGF Trap Recovered, however there does not appear to be a statistically significant reduction for either of the formulations at any concentration. This indicates that the protein is remaining in solution and has not precipitated out of the formulation. The % VEGF Trap Native Configuration remained high, indicating that the protein had not denatured or aggregated.

6.43 Example 4 tests the stability of a formulation comprising 25 mg/ml VEGF Trap, 5 mM phosphate, 5 mM citrate, 100 mM NaCl, 0.1% polysorbate 20 and 20% sucrose, at pH 6.0 ("**Dix Example 4 Formulation 1**"). Dix states that this formulation can either be delivered subcutaneously or diluted and delivered by intravenous infusion. It is stated that the stability studies showed less than 1% degradation after 3 years of storage at 2-8 ºC. The results in relation to the testing of this formulation are reported and are set out in Example 5 (paragraph [0049]) Table 9. A high level of % native configuration is maintained. There is variability in the bioassay and binding assay however this is acceptable. The Formulation Scientist would consider this formulation to have good stability.

6.44 Example 4 also describes a specific lyophilized formulation consisting of 50 mg/ml VEGF Trap, 10 mM histidine, 1.5% PEG 3350, 0.75% glycine and 2.5% sucrose at pH 6.3 (paragraph [0046]). It is described as being reconstituted at double strength to give a formulation comprising 100 mg/ml VEGF Trap, 20 mM histidine, 3% PEG 3350, 1.5% glycine and 5% sucrose, at pH 6.3 ("**Dix Example 4 Formulation 2**"). It is reported that no degradation was detected after 6 months of storage at 2-8 ºC. Further results in respect of this formulation are reported in Example 5 and Table 8.

6.45 The results for this formulation (Dix Example 4 Formulation 2**)** report over 98% VEGF Trap Native Configuration and a high level of % VEGF Trap Recovered up to 6 months. There is variability in the bioassay and binding assay however this is acceptable. Overall, the

Formulation Scientist would consider the results to show that the VEGF Trap had retained its activity.

6.46 A further liquid formulation is also mentioned in Example 4 (paragraph [0047]). The formulation comprises 50-100 mg/ml VEGF Trap, 10 mM histidine, 50 mM NaCl, 5-20% sucrose and one of 0.1% polysorbate 20 or 3% PEG 3350 (the pH is not specified) ("**Dix Example 4 Formulation 3**"). Dix comments that an advantage of this liquid formulation is that it provides a higher concentration of VEGF Trap without lyophilization and that this provides ease for subcutaneous delivery. The results of % degradation are reported in Table 7. These results appear to correspond to the results in Examples 1 to 3, and suggest that the results are of formulations comprising 20% sucrose. While the results are slightly lower for the polysorbate 20 formulations, the Formulation Scientist would not see a significant difference, based on these results, between polysorbate 20 and PEG 3350.

6.47 Dix does not refer to ophthalmic administration of the VEGF antagonist and the Formulation Scientist would understand that the formulations are for subcutaneous and intravenous administration (and the latter only after dilution) based on the following:

(a) [0045] discusses that Dix Example 4 Formulation 1 can either be delivered subcutaneously or diluted and delivered by intravenous infusion. It is stated that due to the high osmolality of this formulation, it is diluted 3-fold to achieve an iso-osmolar solution for intravenous administration.

(b) [0047] discusses that Dix Example 4 Formulation 3 is a formulation that both "*provides a higher concentration of VEGF Trap without requiring the manufacture of a lyophilized product*" and "*provides ease for subcutaneous delivery… by allowing provision of a liquid pre-filled syringe at a concentration higher than that delivered by IV fusion*".

(c) Dix Examples 1 to 3 Formulations 1 and 2 have a very high osmolality, arising from the 20% sucrose, and therefore would not be suitable for intravitreal use.

(d) In all the liquid formulations except the one described in paragraph [0047], 20% sucrose is used. The formulation described in paragraph [0047] refers to having between 5 to 20% sucrose but the data shown in Table 7 does not identify the amount of sucrose used in the formulations tested. While 5% sucrose is used for the lyophilized formulation of Example 5, the data showing six-month stability is in its lyophilized form and therefore does not show that a liquid formulation of the VEGF Trap containing 5% sucrose would remain stable.

## 7. THE PATENTS

7.1 I was asked to consider the Patents and what they disclose to the Formulation Scientist in light of their CGK.

***EP 691***

7.2 The Formulation Scientist would understand EP 691 to describe stable formulations of a specific VEGF antagonist which are suitable for intravitreal administration.

7.3 EP 691 explains that the invention is "*directed to pharmaceutical formulations suitable for intravitreal administration comprising agents capable of inhibiting vascular endothelial growth factor (VEGF), and to methods for making and using such formulations*" and, later: "*The invention includes liquid pharmaceutical formulations having increased stability, as well as formulations that may be lyophilized and reconstituted for intravitreal administration*" (paragraph [0001]).

7.4 EP 691 goes on to state the VEGF function for cancer and the use of VEGF antagonists (paragraph [0002]). It also then refers to an ophthalmic formulation of a VEGF antagonist which the Formulation Scientist would consider would be used for an ophthalmic indication.

7.5 It then refers to stable, pharmaceutically acceptable formulations of "*a VEGF-specific fusion protein antagonist*" (paragraph [0006]) and in paragraph [0007], and later at paragraph [0046], the VEGF antagonist is described as "*amino acids 27-457 of SEQ ID NO:4 and is glycosylated*

*at Asn residues 62, 94,149,222 and 308*". I have been told by A&O Shearman that this VEGF antagonist is aflibercept and I refer to it as such going forwards in this Report.

7.6 Under the heading "*Stable Liquid Ophthalmic Formulations*", paragraph [0048] explains that the invention provides "*stable pharmaceutically acceptable*" formulations, wherein "*the formulation is a liquid formulation suitable for ophthalmic use*" and that these formulations "*can also comprise one or more pharmaceutically acceptable carriers, buffers, tonicity agents, stabilizers, and/or excipients*".

7.7 The statement that the formulations are suitable for intravitreal administration would indicate to the Formulation Scientist that the formulations were safe for administration into the eye, that the tonicity of the formulation was close to or within the range of the vitreous fluid in the eye and that the pH of the formulation was sufficiently close to that of the vitreous so as to not irritate the eye. The Formulation Scientist would be able to calculate an estimate of the tonicity of the specific formulations in EP 691 based on the contribution of the excipients (see paragraph 7.26 below)[22], and they are told the pH of these formulations, which support these statements. As regards safety, the Formulation Scientist would see from the Examples that the formulations tested were substantially free of aggregates which would have caused safety issues.

7.8 From the above statements, the Formulation Scientist would also understand that the inventors had successfully reached liquid pharmaceutical formulations of aflibercept with "*increased stability*". They would agree with the later statements in the General Description section of EP 691 that "*safe handling and administration*" (which I understand to mean sterile, stable (as if unstable the formulation may not be safe) and suitable for intravitreal injection) of formulations containing proteins is a "*significant challenge*" (paragraph [0041]). As mentioned in paragraph [0041], proteins are susceptible to a number of physical and chemical instabilities. Several types

[22] The tonicity contribution of aflibercept is difficult to estimate.

of each are listed, including deamination[23], oxidation, aggregation and precipitation, all of which would be known to the Formulation Scientist, and I have discussed these in section 5 above.

7.9 In light of the data in EP 691 in particular of the Examples and Tables 1-8, the Formulation Scientist would understand "increased stability" means very good stability and better than expected bearing in mind the physical and chemical instabilities they would expect, and this was achieved by the formulation compositions tested in the Examples. This would mean that the formulations could be held under suitable storage conditions for long periods of time without losing a significant amount of activity and/or becoming unsuitable for administration to patients. The increased stability achieved is supported by the data disclosed in the Examples of EP 691, which I discuss below, and indicates that EP 691 covers formulations of aflibercept which are stable over a period of at least 2 years. This would also be consistent with the Formulation Scientist's common general knowledge that they would aim to achieve this level of stability for commercial formulations. In light of the challenges presented by protein instabilities, this is a significant achievement.

7.10 EP 691 provides stability study data for four formulations (three liquid and one lyophilized) in Examples 1 to 8. The formulations described in paragraphs [0012] to [0015] of the description would be understood by the Formulation Scientist to correspond to a formulation used in the Examples: paragraph [0012] corresponds to Example 1 (paragraph [0059]), paragraph [0013] to Example 2 (paragraph [0060]), paragraph [0014] to Examples 3 (paragraph [0061]) and 4 (paragraph [0062]), and paragraph 15 to Examples 5 (paragraph [0063]) and 6 (paragraph [0064]). In this way the Formulation Scientist would read the description as like a method with the Examples setting out the results.

[23] Although deamination is referred to, deamidation is a more common chemical instability issue in protein formulations and the Formulation Expert might consider that the reference to deamination instead of deamidation is a typographical error.

***Example 1***

7.11 Example 1 reports a stability study of a formulation containing the following:

(a) 50 mg/ml of aflibercept;

(b) 10 mM "phosphate" (which the Formulation Scientist would understand – both here and in the other Examples - to be a reference to sodium phosphate because the only specific phosphate buffer mentioned in the Patent is sodium phosphate, and sodium phosphate buffer is referred to in the formulations in paragraphs [0012] to [0015] which correspond to the formulations in Examples 1 to 6);

(c) 50 mM NaCl (sodium chloride, i.e salt);

(d) 0.1% polysorbate 20;

(e) 5% sucrose; and

(f) with a pH of 6.25.

7.12 The formulation was contained in a glass vial and was stored at 5 $^{o}$C. Samples of the formulation were tested at specific timepoints being: 0, 3, 6, 9, 12, 18 and 24 months. At each time interval, there are 5 tests carried out and reported in Table 1: (i) "Visual Appearance" (ii) "Turbidity" (iii) "pH" (iv) "% VEGF Trap Recovered" and (v) "% VEGF Trap Native Configuration".

7.13 "Visual Appearance" is a measure of the clarity of the formulations as measured by the eye. A "pass" indicates that the formulation appears clear and is free of visible particles or coloration. The presence of visible particles would indicate instabilities in the formulation. In particular, the build up of particles would suggest a significant degree of aggregation or precipitation of the protein. A change in color of the formulation could be a sign of chemical instability, such as oxidation of aromatic amino acid side chains. Table 1 shows that the formulation of Example 1 achieved a pass at all time points. A "pass", however, does not rule out the presence of

subvisible particles which could be a sign of instability, but subvisible particles would be detected by the turbidity test.

7.14 The measurement of "Turbidity" shows the relative clarity of the formulations as measured by optical density at 405 nm, with a result of "0.00" indicating no change in the turbidity as compared to the formulation at the start of the study. This result would also indicate an absence of both visible and subvisible particles. Example 1 maintained a turbidity between 0.00 and 0.01, illustrating that the aflibercept remained dissolved and there was no build-up of small particles over the two-year period tested.

7.15 The pH is reported at each time interval and remains at either pH 6.2 or pH 6.3 over the two years tested. A change in pH during storage would indicate the occurrence of chemical reactions within the formulation resulting in a change in its composition and that such reactions had resulted in the release or capture of hydrogen ions to a level which had overcome the buffering capacity of the formulation. The results indicate that the pH of the formulation does not change significantly over the two years (in storage at 5 ºC).

7.16 The measurement of "% VEGF Trap Recovered" is a measurement of how much VEGF Trap protein has remained in solution compared to time zero. Protein can be lost from solution if precipitation or adsorption occurs. This test gives an indication as to whether or not these processes are occurring. The % VEGF Trap Recovered would normally be estimated as a relative percentage compared to a freshly prepared sample. As a result, there is inherent variability in this measurement as the formulator will have to make a fresh sample every month during the stability study.

7.17 The measurement of "% VEGF Trap Native Configuration" shows the quantity of the VEGF Trap protein present in its correctly folded state as determined by SE-HPLC. At the start of the study (month 0) in Example 1, 98.8% of the VEGF Trap was present in its native configuration, indicating that at the start of the study 1.2% had either aggregated or degraded. At the final time

point measured, month 24, 98.1% of the VEGF Trap was present in its native configuration, indicating that 1.9% had aggregated or degraded.

7.18 The Formulation Scientist would consider these results to be very impressive and show that this formulation could be used to store the VEGF Trap at this high concentration over periods of at least 2 years. This would be regarded as a real achievement because the Formulation Scientist would know the difficulties with developing a formulation of a protein so that it is stable over a significant time period, especially when it is at a very high concentration and in liquid form as is the case here. The Formulation Scientist would appreciate that the positive results would indicate a very low rate of not only purely physical instabilities, but any chemical instabilities which resulted in destabilization of the protein structure and/or increased aggregation or multimerization.

The role of the excipients and conditions used

7.19 The Formulation Scientist would understand that the stability of the formulation had been achieved as a result of the combination of the active ingredient together with the excipients and conditions used. I address each excipient below, but as explained in the CGK section above, the way they function is affected by their relationship with the active ingredient itself (see paragraphs 5.22 and 5.83).

*10 mM Sodium phosphate and pH*

7.20 The stability data demonstrates that EP 691 has identified a pH at which the 50 mg/ml aflibercept, when combined with the excipients of the formulation, is both soluble and stable. The Formulation Scientist would recognize that the pH of the formulation (6.25) was within the range understood to be acceptable for intravitreal administration (see paragraph 5.48).

7.21 The sodium phosphate in the formulation acts as a buffering agent. Given its addition, the Formulation Scientist would understand that it was being used in this formulation to maintain the pH of the formulation at the target pH of 6.25.

7.22 The inclusion of sodium phosphate as a buffer maintains the pH of the formulation, resisting pH changes caused by chemical reactions, including where applicable those mentioned at paragraph 5.13 above, by releasing and capturing hydrogen ions as described in paragraph 5.59. Such pH changes could otherwise destabilize the protein, given the effect that pH can have on protein stability (as explained above at paragraphs 5.25 to 5.29).

7.23 As stated above in paragraph 5.60, the buffering capacity of a buffer depends on the concentration of buffering agent used and its pKa as compared to the target pH of the formulation. The fact that the pH remained on target for 24 months would indicate to the Formulation Scientist that the buffering capacity provided by the formulation was sufficient to maintain the pH of a formulation of 50 mg/ml of the VEGF antagonist within the target pH of 6.2-6.3 over 24 months. The Formulation Scientist would recognize that the pH of this formulation was within the pH range over which sodium phosphate was used as a buffer.

7.24 The Formulation Scientist would also recognize that the sodium phosphate can also be, and may have been, used to set the pH of the formulation. The pH of 6.25 can be achieved by adding sodium phosphate in the monobasic and dibasic forms in a specific ratio. As discussed at paragraph 5.58 above, these were the forms of sodium phosphate that, when combined, would provide a pH somewhere in the range of 6 to 7.5.

*50 mM NaCl*

7.25 The 50 mM NaCl acts as a tonicity agent to bring the tonicity of the overall formulation close to or within the range of the vitreous, making it acceptable for intravitreal administration. The tonicity of the formulation (without aflibercept) can be estimated by calculating the estimated contribution of each excipient in the formulation and adding the amounts. For this formulation, this would be:

| **Example 1** | **Osmolality (mOsm/kg)** |
|---|---|
| 0.1% polysorbate 20 | n.a. (<1mOsm/kg) |
| 50mM NaCl | 100 |
| 10mM sodium phosphate, pH 6.25 | 23[24] |
| 5% sucrose Mw 342 | 146 |
| *Total of excipients:* | 269 |

7.26 Aflibercept would also contribute to the tonicity of the formulation, but its contribution would be difficult to estimate (although, as aflibercept is present at a concentration of approximately 0.33mM[25], the Formulation Scientist would appreciate that - based on the number of potentially charged amino acid residues multiplied by the molar concentration - the contribution of aflibercept to the osmolality of the formulation is likely to be no more than 75 mOsm/kg). Accounting for the additional tonicity contribution which it would make, the formulation would be expected to have a tonicity close to or within the range which is acceptable for intravitreal administration.

*0.1% polysorbate 20*

7.27 Polysorbate 20 is acting as an organic co-solvent. In addition, as 0.1% is above its CMC value (see paragraph 5.71 above), it will also be functioning as a non-ionic surfactant. The Formulation Scientist would understand that polysorbate 20 would be assisting in stabilizing the aflibercept in the formulation, and that it would be doing so by interacting, through its hydrophobic tail, with similarly hydrophobic exposed regions on the surface of aflibercept, preventing these hydrophobic surface exposed regions of aflibercept from associating with (i) hydrophobic regions on other aflibercept molecules, reducing aggregation and precipitation, and with (ii) the surface of the container, reducing adsorption. In light of the overall stability of the formulation, the Formulation Scientist would recognize that the amount of polysorbate 20 that had been used was not too much as it had not led to denaturation of aflibercept and/or significant

[24] This value was obtained by calculating the amount of phosphate monobasic (8.6 mM) and phosphate dibasic (1.4 mM) based on the pH of 6.25, and then calculating the osmolality contribution of each ionic species (2 mOsm/kg per mole of phosphate monobasic and 4 mOsm/kg per mole of phosphate dibasic).

[25] Assuming a molecular weight of aflibercept of 120 kDa (see Exhibit HJG-7). To calculate this I divided 40 g/L by 120,000 g/mole.

chemical instability as a result of the polysorbate also stabilizing unfolded, denatured forms of the protein and/or oxidation by the peroxides which polysorbate can form.

7.28 With the knowledge that aflibercept has six methionine per monomer residues susceptible to oxidation, the Formulation Scientist would have been surprised that the inclusion of polysorbate in the formulation did not appear to have any adverse effect on the stability of aflibercept. As noted above at paragraphs 5.13(b) and 5.76, polysorbates were known to produce peroxides which could lead to oxidation and methionine oxidation could have an impact on the structure and stability of the protein. The fact the data in Table 1 shows good stability of the protein suggests either that the methionine residues were not being oxidized or that they were being oxidized, but their oxidation was not disrupting the structure of the protein. Either result is unexpected.

*5% sucrose*

7.29 5% sucrose acts as a stabilizing agent for the protein. As noted above at paragraph 5.65, the sucrose will be assisting in stabilizing the aflibercept by (i) its ability to form a physical protective environment around the protein which reduces aggregation and (ii) by stabilizing the folded and active conformation of the protein over unfolded and inactive conformations through the mechanism of preferential interaction.

***Example 2***

7.30 Example 2 tests a further formulation of 50 mg/ml aflibercept which is the same as that tested in Example 1, except that it uses 3% PEG 3350 instead of 0.1% polysorbate 20. The results reported are also very impressive for this formulation. The % VEGF Trap in native configuration decreases to a slightly greater degree by month 24, reducing to 97.6%, but this still represents a very high % in native configuration after 2 years. The % VEGF Trap Recovered varies significantly from a low of 99% to a high of 113%. This may be because of variability in the assay conditions given that the % VEGF Trap Native Configuration shows good results. Overall, the Formulation Scientist would believe that the formulation in Example 2 is also a stable formulation.

7.31 The roles of the sodium phosphate, NaCl and sucrose are as described above. Similar to the 0.1% polysorbate 20 of Example 1 which acts as described above at paragraph 7.27, the 3% PEG 3350 would function by displacing water molecules to solvate the protein improving its solubility (as a co-solvent does) and in this way stabilizing the protein in the manner discussed in paragraph 5.68 above. Both the PEG 3350 and polysorbate 20 stabilize the protein in solution reducing the loss of the protein from solution as a result of precipitation and/or adsorption. The Formulation Scientist would not be surprised by the difference in their concentrations given the different structure, properties and mechanisms of effect of the excipients. For similar reasons to those noted at paragraph 7.28 above in respect of polysorbate, the Formulation Scientist would be surprised that the stability results in Table 2 had been obtained in light of fact that peroxides generated by the PEG 3350 could oxidize the methionine residues in aflibercept.

7.32 The tonicity of the excipients of the formulation of Example 2 is:

| **Example 2** | **mOsm/kg** |
|---|---|
| 3% PEG 3350<br><br>Mw ~3350 | ~9 |
| 50mM NaCl | 100 |
| 10mM sodium phosphate, pH 6.25 | 23[26] |
| 5% sucrose | 146 |
| *Total of excipients:* | 278 |

7.33 As explained at paragraph 7.26, Aflibercept would also contribute to the tonicity of the formulation, but its contribution would be difficult to estimate. Accounting for the additional tonicity contribution which it would make, the formulation would be expected to have a tonicity still close to or within the range which is suitable for intravitreal administration.

***Examples 3 and 4***

7.34 Examples 3 and 4 test the following formulation in a glass vial and pre-filled glass syringe respectively:

(a) 40 mg/ml aflibercept;

[26] See calculation for Example 1 above.

(b) 10 mM phosphate (i.e. sodium phosphate);

(c) 40 mM NaCl;

(d) 0.03% polysorbate 20;

(e) 5% sucrose; and

(f) with a pH of 6.3.

7.35 Both are stored at 5 ºC and tested at: 0, 0.5, 1, 2, 3 and 4 months.

7.36 These formulations differ from the formulation of Example 1 in that, in addition to 40 mg/ml rather than 50 mg/ml aflibercept, the amount of NaCl is 40 mM rather than 50 mM, and the amount of polysorbate 20 used is 0.03% rather than 0.1%. However, the Formulation Scientist would understand that the roles of the sodium phosphate, NaCl, sucrose and polysorbate 20 in the formulation in Examples 3 and 4 were the same as I have described above in the context of Example 1.

7.37 The formulation in Examples 3 and 4 also showed impressive results in "Visual Appearance" and "Turbidity" up to 4 months. In respect of pH, in both Examples there is an increase to pH 6.4 at month 3, but the pH then returns to pH 6.3 at month 4. In light of the fact that the pH returns to pH 6.3, the Formulation Scientist would consider that this could be as a result of variability in the pH test, rather than reflecting variation in the pH of the formulation. In respect of the "% VEGF Trap Recovered", the results are also very good, only going down to 95% and 97% for Examples 3 and 4 respectively and, as mentioned above, in light of the variability of the test shown by the data in EP 691, these results would be considered good. In terms of "% VEGF Trap Native Configuration", both Examples 3 and 4 have a higher starting % of VEGF Trap in native configuration; 99.5% and 99.4% respectively. At month 2, this level falls slightly to 99.2 and 99.1% respectively. These are again impressive results, indicating the formulation has remained stable.

7.38 The results reported do not go beyond 4 months for Visual Appearance, Turbidity and pH and 2 months for % VEGF Trap Recovered and % VEGF Trap Native Configuration. Knowing that the formulation in Example 1 had shown that it maintained good stability over 2 years, the Formulation Scientist would expect these formulations also to have long-term stability over 2 years and consider that this was an experiment which was ongoing at the time the patent application was filed. The reduced concentration of aflibercept in Examples 3 and 4 would mean the formulation was somewhat less susceptible to instabilities, in particular protein aggregation, as compared to Example 1. Further, although a lower amount of polysorbate 20 is used (0.03% compared to 0.1%), it is still significantly above the CMC value for polysorbate 20 (which is around 0.006-7%) and the 2 / 4 month data suggests even this lower amount is sufficient to stabilize the protein and maintain a low rate of degradation. Further, the data from Example 1 would give confidence that this stability would continue up to 2 years, and that instabilities arising from e.g. peroxide formation from the polysorbate, would not be an issue.

7.39 As noted at paragraph 7.28 above, the Formulation Scientist would be surprised that the stability results had been obtained given the inclusion of polysorbate 20.

7.40 The tonicity of the excipients of this formulation can be calculated to be:

| **Example 3 and 4** | **mOsm/kg** |
|---|---|
| 0.03% polysorbate | n.a. (<1mOsm/kg) |
| 40mM NaCl | 80 |
| 10mM sodium phosphate, pH 6.3 | 23[27] |
| 5% sucrose | 146 |
| *Total of excipients:* | 249 |

7.41 Although this is below the osmolality range of the vitreous, it does not factor in the contribution of aflibercept to osmolality, and (although the tonicity of aflibercept is not easy to estimate) the

[27] See calculation for Example 1 above.

Formulation Scientist would appreciate that the overall formulation will still have tonicity within or close enough to the range of the vitreous to be suitable for intravitreal administration.

***Examples 5 and 6***

7.42 Examples 5 and 6 report results of stability studies of a further formulation comprising 40 mg/ml of aflibercept, 10 mM phosphate, 135 mM NaCl and 0.03% polysorbate 20 with a pH of 6.3. The formulation was stored in a glass vial or pre-filled syringe respectively and again stored at 5 ºC. The difference between this formulation and the formulations of Examples 3 and 4 is that the formulation does not contain any sucrose and has more NaCl (135 mM as opposed to 40 mM). There is some variability between the % VEGF Trap Recovered in Example 5 (with only 84% recovery) and Example 6 (with 99% recovered), but the % VEGF Trap Native Configuration results are both good (albeit slightly poorer than those in Examples 3 and 4). The Formulation Scientist would be surprised that a formulation without any stabilizing agent (e.g. sucrose) was able to maintain this level of stability.

7.43 The tonicity of the excipients of this formulation can be calculated to be:

| **Examples 5 and 6** | **mOsm/kg** |
|---|---|
| 0.03% polysorbate 20 | n.a. (<1mOsm/kg) |
| 135 mM NaCl | 270 |
| 10 mM sodium phosphate, pH 6.3 | 23[28] |
| *Total of excipients:* | 293 |

7.44 Again although this excludes the contribution of aflibercept to tonicity, it is likely that even accounting for aflibercept, the tonicity of this formulation will be close to or within the range suitable for intravitreal administration.

***Examples 7 and 8***

7.45 In addition to the liquid pharmaceutical formulations disclosed above, EP 691 also discloses lyophilized and re-constituted formulations. These are described in paragraphs [0027] to [0036], [0052] to [0056] and in Examples 7 and 8. As explained at paragraph 5.20 above,

[28] See calculation for Example 1 above.

lyophilization was often used to avoid instabilities that occur when a protein is kept in a liquid form and is able to interact with water, which can result in both chemical and physical instabilities occurring. Examples 7 and 8 report the results of lyophilizing a liquid formulation consisting of 20 mg/ml aflibercept, 5 mM phosphate, 20 mM NaCl, 0.015% polysorbate 20 and 2.5% sucrose with a pH of 6.3. Once lyophilized the formulation is stored as a dry powder. At several timepoints (month 0, 1 and 2), it is then reconstituted into a liquid at double the concentration and tested for stability using the same stability tests reported in the other examples. The results indicate that the formulation appears largely unaltered by the lyophilization process, with good results across all measurements.

***Claims and inventive concept***

<u>Claim 5 of EP 691 as amended</u>

7.46 I have been informed by A&O Shearman that the claim of EP 691 that is in issue is claim 5 (as dependent on claim 1) as amended to be limited to 40 mg/ml. I understand that claim construction is a matter for the Court but I have been asked to comment on any relevant technical matters from the perspective of the Formulation Scientist. I understand that the claims of a patent should be read in the context of the patent as a whole along with the common general knowledge.

7.47 Claim 5 of EP 691 as amended gives a specific formulation of aflibercept with a concentration of 40 mg/ml, as follows:

(a) 0.03% polysorbate 20;

(b) about 40 mM of NaCl;

(c) 10 mM sodium phosphate buffer; and

(d) 5% sucrose;

(e) at a pH of 6.2-6.3.

7.48 The formulation of claim 5 as amended is the same as that tested in Example 3 (in a glass vial) and Example 4 (in a pre-filled glass syringe). The Formulation Scientist would understand from the information in EP 691, including the data, that this would be a liquid formulation of 40 mg/ml aflibercept which remains stable for at least 2 years when stored under refrigerated conditions at the pH of 6.2-6.3 and is suitable for intravitreal use.

7.49 The Formulation Scientist would understand the inventive concept of claim 5 as providing a long-term stable liquid formulation of 40 mg/ml of aflibercept at pH 6.2-3 which is suitable for intravitreal administration. By long-term stable, I mean that the aflibercept in the liquid formulation is chemically and physically stable such that it is substantially free of protein contaminants and aggregates, for at least 24 months under refrigerated storing conditions.

7.50 The Formulation Scientist would understand that the aflibercept, in combination with the excipients and the conditions (including pH) achieved stability and suitability for intravitreal administration in this formulation. Aflibercept itself would be thought to affect the properties of the formulation (including in the ways described at paragraphs 5.22 and 5.83), and the excipients in the formulation would be understood to be contributing as follows:

(a) The 10 mM sodium phosphate maintains, by releasing or capturing hydrogen ions, the pH at pH 6.2-6.3, this pH level achieving a balance which minimizes, to the extent possible, the rate of chemical degradation reactions and physical instability. It can also be used to set the pH and the Formulation Scientist would most likely do this if using this buffer;

(b) The about 40 mM NaCl adjusts the tonicity of the formulation to bring it close to or within the range that is acceptable for intravitreal administration into the eye;

(c) The 0.03% polysorbate 20 assists in stabilizing the formulation through its ability to prevent the hydrophobic surface exposed regions of aflibercept from associating with (i) hydrophobic regions on other aflibercept molecules, reducing aggregation and precipitation, and with (ii) the surface of the container, reducing adsorption; and

(d) The 5% sucrose assists in stabilizing the formulation by (i) its ability to form a physical protective environment around the protein, reducing aggregation, and (ii) by stabilizing the folded and active conformation of the protein over unfolded and inactive conformations, through the mechanism of preferential interaction.

7.51 As explained above at paragraphs 5.6 to 5.15, for any protein and in particular at a concentration of 40 mg/ml, to reach a long-term stable formulation suitable for intravitreal use is very challenging and the Formulation Scientist would have no expectation that they could reach such a stable formulation or what would be needed to do so in terms of excipients, excipient amounts and conditions. Without EP 691, there is no predictability or direction as to whether any formulation of aflibercept would have successful stability and there would be no assistance from formulations that had been tried and failed. Further, as noted above, given the 'soft-spots' of aflibercept, the Formulation Scientist would further be surprised that a formulation containing polysorbate as an excipient had shown such good stability.

7.52 However, with EP 691, the Formulation Scientist is provided with the formulation that works for 40 mg/ml of aflibercept. Once this is taught, the Formulation Scientist would be able to predict that there is some flexibility around the specific formulation. With respect to each excipient, the Formulation Scientist would recognize that it was achieving the functions discussed at paragraph 7.50 above and that, once it was known what was required, there is some flexibility as to the type and quantity of the excipient which could be used to achieve the same effect as the claim 5 formulation (albeit to a lesser or greater degree depending on the excipient). For example, the Formulation Scientist would know that there were different ways that the pH of the formulation could be set; either through use of a buffering agent or by titrating the formulation with acid and base to adjust the pH. The Formulation Scientist would know that they could include a higher concentration of sucrose and lower concentration of NaCl and maintain the same tonicity, and that a modest increase in the amount of sucrose would be unlikely to have any negative impact on the stabilizing function of the sugar. The Formulation Scientist would know that, for each excipient functionality, there were alternative excipients

available which could achieve the same functionality in the same way. Similarly, an appropriate concentration of another buffer that has a pKa close to 6.2 could be used.

7.53 Therefore, once the Formulation Scientist has EP 691, it would be straightforward to make changes to the specific excipients or amounts of excipients of claim 5 (with their knowledge of which are interchangeable) in such a way that achieves the same effect.

Claim 3 of EP 691 as amended

7.54 I understand claim 3 (dependent on claims 1 and 2) of EP 691 as amended is also being asserted.

7.55 Claim 3 as amended is very similar to claim 5 of EP 691 as amended. The only differences in the text are set out below. These differences do not impact my views in relation to inventive step. Therefore, my views in relation to the inventive concept of claim 3 as amended are the same as for claim 5 as amended.

(a) The claim refers to “40 mM NaCl” rather than “about 40mM NaCl”.

(b) The claim refers to “about pH 6.2-6.3” rather than “pH 6.2-6.3”.

(c) The claim refers to “0.03% polysorbate” rather than “0.03% polysorbate 20”.

Claim 11 of EP 691 as amended

7.56 Claim 11 (as dependent on claim 5 or 3) as amended additionally specifies that the formulation is in a pre-filled syringe. As noted above, EP 691 includes some stability data for formulations in pre-filled syringes, in particular Example 4. As a result, the Formulation Scientist would have a reasonable expectation that this formulation would likely also be stable in a pre-filled syringe and my comments above in relation to claim 5 of EP 691 as amended also apply to this claim.

***EP 306***

7.57 EP 306 contains exactly the same Examples and data as EP 691. While there are several differences in the description, these limit the description of the disclosed formulations to being

formulations in pre-filled syringes (see for example paragraph [0001] and [0006] of EP 306). In light of this, my comments above in respect of EP 691 apply equally to EP 306.

7.58 In respect of the claims of EP 306, I understand that the Defendants rely on claim 5 (as dependent on claims 4 and 1) as granted and claim 2 (as dependent on claim 1) as proposed to be conditionally amended. My views as to the inventive concept of claim 5 of EP 691 as amended apply to these claims.

7.59 I refer to claims 3, 5 and 11 of EP 691 as amended, claim 5 (as dependent on claim 4 and 1) of EP 306, and claim 2 (as dependent on claim 1) of EP 306 as proposed to be amended as the "**Claims**".

## 8. PRIORITY

8.1 I have been told by A&O Shearman that the Claimants allege that there is no disclosure in the Priority Document of an ophthalmic formulation having the combination of all of the features of the Claims. I have been asked by A&O Shearman to address three points about the disclosure of the Priority Document.

8.2 I have been asked by A&O Shearman what the Formulation Scientist would understand "0.03% polysorbate" in paragraph [0011] to be referring to.

8.3 The Priority Document (paragraph [0007]) states that *"the organic co-solvent may be polysorbate for example polysorbate 20 or polysorbate 80"*. This would be consistent with the Formulation Scientist's understanding that although there were a number of polysorbates that were used in formulations (such as polysorbate 20, 21, 40, 60, 61, 65, 80, 81, 85 and 120) the most common to use in formulations were polysorbate 20 and 80.

8.4 In the rest of the description in the Priority Document (up to the Examples), the references to polysorbate are all to 'polysorbate' rather than polysorbate 20. However, as mentioned above for EP 691 at paragraph 7.10, each Example (where polysorbate is used) refers to 'polysorbate 20' and each specific formulation described in paragraphs [0009] to [0012] of the description

(which refers to ‘polysorbate’) corresponds to a formulation used in the Examples which states polysorbate 20. Paragraph [0009] corresponds to Example 1 (paragraph [0042]), paragraph [0010] to Example 2 (paragraph [0043]), paragraph [0011] to Examples 3 (paragraph [0044]) and 4 (paragraph [0045]), and paragraph 12 to Examples 5 (paragraph [0046]) and 6 (paragraph [0047]). In this way the Formulation Scientist would read the description as like a method with the Examples setting out the results. Paragraph [0011] and Example 3 corresponds to the formulation of the Claims in a 40 mg/ml vial (see also claim 12 of the Priority Document). Paragraph [0011] and Example 4 corresponds to the formulation of the Claims in a 40 mg/ml pre-filled syringe (see also claim 24 of the Priority Document as dependent on claim 12). Paragraph [0011] and Examples 3 and 4 refer to a concentration of 0.03% polysorbate and polysorbate 20 respectively.

8.5 Therefore, although the Priority Document refers to “polysorbate” and “polysorbate 20” in the context of the formulations disclosed, for the reasons given above the Formulation Scientist would understand “0.03% polysorbate” in [0011] to be a reference to 0.03% polysorbate 20.

8.6 I have also been asked by A&O Shearman what the Formulation Scientist would understand “10 mM phosphate” in Example 3 to be referring to.

8.7 Each Example refers to “phosphate” and each specific formulation described in paragraphs [0009] to [0012] of the description corresponds to a formulation used in the Examples which states “sodium phosphate”. Paragraph [0009] corresponds to Example 1 (paragraph [0042]), paragraph [0010] to Example 2 (paragraph [0043]), paragraph [0011] to Examples 3 (paragraph [0044]) and 4 (paragraph [0045]), and paragraph 12 to Example 5 (paragraph [0046]) and 6 (paragraph [0047]).

8.8 Therefore, for the same reasons as polysorbate above, although the Priority Document refers to “phosphate” and “sodium phosphate” in the context of the formulations disclosed, the Formulation Scientist would understand “10 mM phosphate” in Example 3 to be a reference to 10 mM sodium phosphate buffer. This is because 10 mM sodium phosphate buffer is also

referred to in [0011], which corresponds to Example 3. Sodium phosphate buffer is also the only phosphate buffer mentioned in the whole of the Priority Document.

8.9 Finally, I have also been asked by A&O Shearman what the Formulation Scientist would understand "about 40 mM NaCl" in paragraph [0011] and "40 mM NaCl" in Example 3 to mean. As mentioned above in paragraph 5.36, the osmolality range of the vitreous was known to be around 290-320 mOsm/kg and the Formulation Scientist would want the osmolality of the formulation to be close to or within this range. Measuring tonicity also has an inherent variability. Given these features of tonicity a disclosure of a concentration of "40mM NaCl" would anyway be read by the Formulation Scientist as meaning a concentration of "about 40mM NaCl".

## 9. NOVELTY

9.1 I have been informed by A&O Shearman that a further issue is whether or not the Claims are novel over Dix.

9.2 A&O Shearman explained to me that these claims will lack novelty if there is a clear and unambiguous disclosure of their subject matter in Dix and the teaching in Dix is enabling in the sense of being capable of being put into practice by the skilled team armed with their common general knowledge and without undue effort or invention.

9.3 As outlined at paragraphs 6.41 to 6.46 above, Dix discloses a number of different formulations of VEGF Trap (referred to as SEQ ID NO:4). In respect of the formulations described in Dix there are the following differences between them and claim 5 of EP 691 as amended:

(a) Dix Examples 1 to 3 Formulation 1 and 2 and Dix Example 4 Formulation 3 comprise 50 mM NaCl, Dix Example 4 Formulation 1 comprises 100 mM NaCl, and Dix Example 4 Formulation 2 comprises no NaCl, rather than about 40 mM NaCl as in claim 5 of EP 691 as amended;

(b) Dix Examples 1 to 3 Formulation 1 and Dix Example 4 Formulations 1 and 3 comprise 0.1% polysorbate 20 and Dix Examples 1 to 3 Formulation 2 and Dix Example 4 Formulation 2 comprise 3% PEG 3350, rather than 0.03% polysorbate 20 as in claim 5 of EP 691 as amended;

(c) Dix Example 4 Formulation 1 comprises 5 mM phosphate buffer and Dix Example 4 Formulations 2 and 3 comprises no phosphate buffer (but instead comprises 20 mM and 10 mM histidine respectively), rather than 10 mM sodium phosphate as in claim 5 of EP 691 as amended;

(d) Dix Examples 1 to 3 Formulation 1 and 2, and Dix Example 4 Formulation 1 comprise 20% sucrose rather than 5% sucrose as in claim 5 of EP 691 as amended;

(e) Dix Example 4 Formulation 2 is a formulation disclosed as being intended for lyophilization rather than one that remains a liquid formulation throughout;

(f) Dix Example 4 Formulation 1 has a pH of 6.0 rather than the pH of 6.2-6.3 as in claim 5 of EP 691 as amended;

(g) None of the Dix formulations described in the Examples are specified to be formulations of 40 mg/ml of the VEGF Trap; and

(h) None of the Dix formulations described in the Examples are disclosed as being suitable for intravitreal administration.

9.4 Claim 1 of Dix states "*A stable liquid formulation of a vascular endothelial growth factor (VEGF)- specific fusion protein antagonist, comprising a fusion protein having a receptor component consisting of an immunoglobulin-like (Ig) domain 2 of a first VEGF receptor and Ig domain 3 of a second VEGF receptor, and a multimerizing component, one or more buffers, and one or more thermal stabilizers.*"

9.5 Claim 6 of Dix states "*The stable liquid formulation of claim 1, comprising 1-10 mM phosphate buffer, 1-10 mM citrate, 25-150 mM NaCl, 5-30% sucrose, 10-50 mg/ml of the fusion protein, at a pH of about 6-6.5, optionally further comprising 0.05- 0.10% polysorbate*."

9.6 The amount of polysorbate 20 specified in claim 5 of EP 691 as amended is below the range of polysorbate set out in claim 6 of Dix. Further, although the ranges given in claim 6 of Dix cover the other values in claim 5 of EP 691 as amended, it does not disclose the specific amounts of each of these excipients that is set out in claim 5 of EP 691 as amended.

9.7 Claim 6 also does not disclose suitability for intravitreal administration and the general teaching of Dix would lead the Formulation Scientist to assume that it is describing formulations for subcutaneous or intravenous administration. The ranges of excipients in the formulations described between example paragraphs [0005] to [0011] allows an upper limit of sucrose of 30%, and in a more specific embodiment 20%. This concentration of sucrose would be known to be hypertonic (20% sucrose equates to 584 mOsm/kg)[29] and the Formulation Scientist would understand these formulations not to be for intravitreal use, which Dix nowhere mentions. This is consistent with the earlier focus on cancer (paragraph [0002]). There is also no disclosure in claim 6 of a pre-filled syringe.

9.8 As a result, there is no disclosure of a formulation containing the excipients and amounts of excipients as set out in claim 5 of EP 691 as amended.

9.9 My comments above in relation to claim 5 of EP 691 as amended also apply to all the Claims. In the case of claim 11 of EP 691 and the claims of EP 306, there is also no disclosure of a formulation containing the excipients and amounts of excipients in a pre-filled syringe. This is because aside from Example 4 Formulation 3, the formulations are not disclosed as being formulations provided in a pre-filled syringe.

[29] 20% sucrose is equal to 200 g/L. The molar mass of sucrose is 342.3 g/mol. 200 g/L divided by 342.3 g/mol = 584 mM. Sucrose does not dissociate in solution, so the osmolality is the same as the molarity.

## 10. INVENTIVE STEP

***Overview***

10.1 I understand that the Patents will lack inventive step if the differences between the invention in the Claims of the Patents and the cited prior art would have been obvious to the skilled person at the relevant date, when read in light of their common general knowledge and absent knowledge of the Patents. I understand that the relevant date for US 529 is the Priority Date, and I have considered it in light of the common general knowledge at the relevant date in the section below.

10.2 I have been informed by A&O Shearman that the test for determining whether a patent is obvious involves the following steps:

(a) Firstly:

(i) identify the notional "person skilled in the art"; and

(ii) identify the relevant common general knowledge of that person;

(b) then, identify the inventive concept of the claim in question or if that cannot readily be done, construe it;

(c) then, identify what, if any, differences exist between the matter cited as forming part of the "state of the art" and the inventive concept of the claim or the claim as construed; and

(d) finally, viewed without any knowledge of the alleged invention as claimed, do those differences constitute steps which would have been obvious to the person skilled in the art or do they require any degree of invention?

10.3 A&O Shearman also explained to me that the UK Supreme Court has given guidance on the test for obviousness in patent law, and provided me with paragraphs 52 to 73 of the Supreme Court's decision in Actavis v ICOS [2019] UKSC 15, setting out the considerations. I have taken account of them in relation to my opinions on obviousness below.

10.4 In relation to question (a) of paragraph 10.2, I have set out in sections 4 and 5 the notional skilled person (i.e. the skilled team and the Formulation Scientist) and the Formulation Scientist's relevant common general knowledge at the Priority Date.

10.5 In relation to question (b), I have set out in paragraph 7.49-7.51 what the Formulation Scientist would see the inventive concept of the Claims.

10.6 I consider questions (c) and (d) in respect of US 529 below.

10.7 The differences between US 529 and the inventive concept of the Claims are that US 529:

(a) does not single out aflibercept as the VEGF Trap to formulate;

(b) does not describe any formulations (and any stable formulations) of aflibercept suitable for intravitreal administration; and

(c) Other than the dose range of 25-4000 µg provided in Example 17, which for the reasons given in paragraphs 6.4 and 9.7 of Professor Kodjikian's report is a very wide range that would be ignored by the Clinical Ophthalmologist when considering next steps in light of US 529, does not disclose any doses or volumes of administrations that would be suitable for intravitreal use in humans from which concentrations of aflibercept can be reached.

10.8 I do not believe that the inventive concept of the Claims as set out in paragraph 7.49-7.51 is obvious from US 529 for the following reasons:

10.9 For the reasons given in paragraphs 6.7 to 6.8, the Formulation Scientist would recommend that it would be less challenging to formulate SEQ ID NO:23 than aflibercept and the risk of not reaching a long-term stable liquid formulation suitable for intravitreal administration would be lower for SEQ ID NO:23 than aflibercept. Although decisions on what molecule to progress are more typically driven by safety and efficacy considerations, the skilled team would consider the Formulation Scientist's views when deciding what molecule to progress, because a product

cannot be commercialized without a stable formulation. Therefore, the choice of aflibercept from a formulation perspective alone would not have been obvious.

10.10 With respect to the 40 mg/ml concentration, this is a very high concentration of any protein to be able to formulate successfully. As I stated in paragraph 5.24 above, the liquid formulations of proteins, e.g. antibodies, at the time typically contained protein concentrations in the range 0.5 mg/ml to 25 mg/ml. As mentioned above, aflibercept itself has a number of physical and chemical instability issues arising from its structure as explained in Exhibit HJG-7 and paragraph 6.20. These risks of chemical and physical instability are exacerbated at this very high concentration.

10.11 If the skilled team decided to progress aflibercept, the Formulation Scientist would therefore have advised the skilled team that having a lower concentration would lower the risk of failing to reach a stable formulation and therefore to select at the upper end of the possible volume of administration range of 50-90 µl. As noted above in paragraph 5.45, if the skilled team had options as to the dose that could be tried through clinical development, the Formulation Scientist would recommend the lowest dose for the same reasons. However, in practice, decisions related to dose are largely driven by safety and efficacy considerations. Although the Clinician would advise that the clinically acceptable volume is between 50 µl to 90 µl, I have read from paragraph 9.9 of Prof Kodjikian's report that it is the Formulation Scientist's decision what volume within this range should be used.

10.12 Even if the Formulation Scientist was tasked with formulating aflibercept at a dose which required a concentration of 40 mg/ml, US 529 provides them with no assistance on how to reach a long-term stable liquid formulation of 40 mg/ml aflibercept suitable for intravitreal administration and the Formulation Scientist would have to start from scratch.

10.13 For the reasons explained in paragraphs 6.10 to 6.36, reaching a long-term stable liquid formulation of aflibercept suitable for intravitreal administration would be very challenging and even more so at a concentration of 40 mg/ml which is very high. There were multiple potential

sources of instability and a large number of different combinations of types and amounts of excipients which could be tested, without certainty that they would sufficiently address the observed instabilities. The Formulation Scientist would have no expectation without the Patents that (i) a stable formulation for 40 mg/ml aflibercept suitable for intravitreal administration could be developed that remains stable for 2 years as a liquid and (ii) what would be needed to achieve this, if it could be achieved at all.

10.14 Even if they did progress a liquid formulation, as described in paragraph 6.36, the Formulation Scientist would try to identify a combination of excipients and conditions (and if necessary, modifications to the protein) which establish an adequate balance that might be able to achieve long-term liquid stability and maintain suitability for intravitreal use. At the very high concentration of 40 mg/ml this would be very challenging to reach. There are several possible solutions to each stability issue and there is variability not only in the different types of excipient which can be added, but for each excipient, studies would be necessary in order to identify the amount of that excipient which should be added in order to achieve the most positive effect, and again that effect may depend on and may vary as a result of the presence of other excipients in the formulation or changes to other conditions, such as the pH. In light of the numerous potential options which could be tested and the various combinations which could be tried, it would not be possible to test every combination.

10.15 The Formulation Scientist would be aware of potential instability issues caused by oxidation and would be told by the Protein Engineer about the potential instability risk caused by the oxidation of the methionine residues in aflibercept. This would lead the Formulation Scientist not to use polysorbate and/or other excipients, such as PEG, which lead to peroxide formation as these excipients would increase oxidation of the protein and therefore risked reducing rather than increasing stability. The Protein Engineer would tell the Formulation Scientist that two of the methionine residues per monomer in aflibercept are at or near to the VEGF binding site in the first VEGF receptor domain of aflibercept (see paragraph 6.34 of Professor Leatherbarrow's report). This means there is potentially an additional risk that oxidation could inactivate the

drug in addition to leading to potential instability. Therefore, the Formulation Scientist would choose an excipient other than polysorbate, such as sugars, amino acids and/or polymers in order to reduce aggregation.

10.16 Therefore, in addition to the reasons set out in paragraphs 10.9 to 10.14 above as to why EP 691 is not obvious, the specific inclusion of polysorbate in the formulation would not be obvious and, in answer to the question set out at paragraph 10.2(d) above, it would not be obvious to arrive at a formulation with the combination of excipients and excipient functionalities of the Claims, as set out above at paragraph 7.50.

## 11. SUFFICIENCY

11.1 I understand from A&O Shearman that it has been alleged that the Patents make no technical contribution over the prior art including because the Patents do not disclose or make it plausible that the precise pH ranges and the amounts and selections of the various components of the claimed formulations (including the VEGF antagonist, co-solvent, tonicity agent, buffer and stabilizing agent) cause the liquid formulations to have increased stability.

11.2 I set out above at paragraph 7.49-7.51 what the Formulation Scientist would see the inventive concept of the Claims. For the reasons given in section 7 above, this would be recognized as an impressive achievement by the Formulation Scientist and I believe that the Patents therefore do make a technical contribution over the prior art. This is demonstrated by the impressive data in the Patents.

11.3 As I stated at paragraph 7.18 above, Examples 1 and 2 provide data showing the stability of the formulation used in those examples from 0 to 24 months. The Formulation Scientist would consider that these formulations have stability of at least 24 months, especially since there is no drop-off. The stability data for Examples 3 to 4 is provided for 2-4 months. However, the Formulation Scientist would expect that the formulations tested in Examples 3 and 4 would also remain stable for at least 24 months for the following reasons:

11.4 Examples 3 and 4, as compared to Example 1, differ in the amount of polysorbate and VEGF Trap concentration as shown below:

| **Component** | **Example 1** | **Example 3 and 4** |
|---|---|---|
| *VEGF antagonist* | 50 mg/ml VEGF Trap | 40 mg/ml VEGF Trap |
| *Organic co-solvent* | 0.1% polysorbate 20 | 0.03% polysorbate 20 |
| *Tonicity agent* | 50 mM NaCl | 40 mM NaCl |
| *Buffer* | 10 mM phosphate | 10 mM phosphate |
| *Stabilizing agent* | 5% sucrose | 5% sucrose |
| *pH* | 6.25 | 6.3 |

11.5 With the knowledge that the formulation in Example 1 showed stability for 24 months and the knowledge from Examples 3 and 4 that the formulations in Examples 3 and 4 have stability for 2 to 4 months, the Formulation Scientist would also expect the formulations in Examples 3 and 4 to have at least 24 months stability. The Formulation Scientist would think that the lower concentration of the VEGF antagonist in Examples 3 and 4 has a lower risk of stability issues over time compared to the formulation in Example 1. Further, and as stated above at paragraph 7.38, although a lower amount of polysorbate 20 is used (0.03% compared to 0.1%), it is still significantly above the CMC value for polysorbate 20 (which is around 0.006/7%) and would therefore be expected to function in the same way (i.e. by preventing hydrophobic surface exposed regions of the protein from associating with hydrophobic regions on (i) other protein molecules, reducing aggregation or precipitation and (ii) with the surface of the container, reducing adsorption). The 2 to 4 month data suggests even this lower amount is sufficient to stabilize the protein and maintain a low rate of degradation. Further, the data from Example 1 would give confidence that instabilities arising from peroxide formation caused by the presence of polysorbate 20 would not be an issue. Given that Example 1 has approximately three times more polysorbate than Example 3 and 4, if Example 1 doesn't show these instabilities for 2 years, the Formulation Scientist would expect Example 3 and 4 not to show them as well.

11.6 There is nothing in the results of Examples 3 and 4 to suggest to the Formulation Scientist that it would not continue to show good stability beyond 2 to 4 months and the Formulation Scientist would have recognized that the stability studies documented in Examples 3 and 4 were likely to be ongoing when the Patents were filed, based on their own experience conducting similar stability studies. The Formulation Scientist would not think that the data covered a shorter period because of instability reasons. The formulations studied in Examples 3 and 4 would likely have been developed later than those in Examples 1 and 2 and therefore the stability studies would have started later.

11.7 In addition, the Patents state that its formulations are suitable for intravitreal use and the Formulation Scientist would understand this to be the case for the following reasons: (i) the pH of 6.2-6.3 fell within the pH that was known to be suitable for intravitreal administration (pH 6 to 7.5, see paragraph 5.37 above) and (ii) the tonicity of the excipients in the formulation (not including aflibercept) is 249 mOsm/kg (see my calculation at paragraph 7.40 above). As explained at paragraph 7.26, aflibercept would also contribute to the tonicity of the formulation, but its contribution would be difficult to estimate. Accounting for the additional tonicity contribution which it would make, the formulation would be expected to have a tonicity still close to or within the range which is suitable for intravitreal administration.

## 12. ADDED MATTER

12.1 I understand from A&O Shearman that the Application as Filed cannot be amended in such a way that it adds matter and discloses a new invention. I have been told by A&O Shearman that the Claimants assert that the Patents add matter on the basis that there is no disclosure in the Application as Filed of an ophthalmic formulation having the combination of all of the features of the Claims. They rely on the same matters as they do to challenge the priority of the Patents, which I have addressed above, but in relation to the Application as Filed rather than the Priority Document.

12.2 The Application as Filed contains additional text as compared to the Priority Document. In particular, paragraph [0007] of the Priority Document has been split into paragraphs [0007] and

[0008], and to paragraph [0008] the following statement has been added "*In a specific embodiment, the phosphate buffer is a sodium phosphate buffer*". In addition, in respect of liquid formulations, several additional paragraphs describing further liquid formulations have been added and appear as paragraphs [0015] to [0026] in the Application as Filed. Paragraph [0015] recites a formulation in which one of the tonicity agent or stabilizing agent is optional, which is not included in the Priority Document, but aside from this the additional paragraphs largely restate the formulations already described.

12.3 In light of the additional paragraphs, what were paragraphs [0030] and [0031] in the Priority Document are paragraphs [0045] and [0046] in the Application as Filed. Further, as compared to the Priority Document, the following has been added to paragraph [0046]: "*Unless stated otherwise, the phosphates employed are sodium phosphates and a desired buffering pH is achieved by mixing appropriate amounts of mono- and dibasic sodium phosphate*".

12.4 The same Examples and data appear in the Application as Filed as are contained in the Priority Document.

12.5 The differences between the Application as Filed and the Priority Document do not alter my views and the comments I made above at paragraphs 8.2-8.9 apply equally to the Application as Filed.

## 13. INFRINGEMENT

13.1 I have been provided with a copy of the Product Descriptions for each of the Formycon and Samsung Bioepis biosimilar aflibercept products, which I refer to as the FYB203 and SB15 products respectively, and have been asked to identify any differences between these products and the Claims. Having identified these differences, A&O Shearman have asked me to consider (i) whether or not each product achieves substantially the same result as the claimed invention in substantially the same way and (ii) knowing that it achieves substantially the same result as the invention, would it be obvious to the Formulation Scientist at the Priority Date that it is doing so in substantially the same way. Finally, (iii) with respect to these differences, A&O

Shearman have asked me whether there is any reason why the patentee might have intended that complying strictly with the literal meaning of those parts of the Claims was an essential requirement of the invention.

13.2 I understand in relation to question (i) that it should be considered as a question of fact based on today's knowledge rather than as at the Priority Date and I have taken this approach in answering this question in relation to each of the FYB203 and SB15 products. I understand that question (iii) is a legal question but that I can comment on any technical aspects relevant to it.

***Formycon***

13.3 The difference between the FYB203 products and the Claims is that they do not contain 10 mM of a sodium phosphate buffer and instead contain 10 mM of a histidine buffer.

13.4 In respect of the FYB203 products in a vial, the vial is a further difference to claim 11 of EP 691 and the claims of EP 306 which refer to pre-filled syringes.

Question (i)

13.5 As explained above at paragraphs 7.20 to 7.23 and 7.50(a), the 10mM sodium phosphate buffer of the Claims contributes to the long-term stability of the formulation by maintaining the pH at 6.2-6.3 for at least 2 years through the release and capture of hydrogen ions.

13.6 In the formulation of the FYB203 products, the histidine is present as L-histidine (the conjugate base) and L-histidine hydrochloride monohydrate (the weak acid). The Formycon Product Description states that the formulation of the FYB203 products has a pH of 6.2 and an intended shelf-life of 24 months. Based on this I assume that the pH remains constant over this period, which contributes to the long-term stability of the FYB203 products.

13.7 L-histidine and L-histidine hydrochloride monohydrate exist at an equilibrium with a pKa of 6.07 and histidine is used as a buffer over a pH range of around pH 5 to around pH 7.[30] The

[30] Although I note the pH range for histidine buffer given in Figure 3 is pH 6.2 to 7.8, it is now known that histidine can buffer at lower pHs and down to around pH 5.

pKa of 6.07 is closer to the pH of the formulation (6.2) than the pKa of sodium phosphate is to the pH of the formulation (the pKa of sodium phosphate is 7.20). This means that, in light of the influence of the pKa on buffering capacity, histidine is expected to offer at least as good a buffering capacity per mM of buffer as sodium phosphate. The total of 10 mM histidine, like 10mM sodium phosphate, would therefore provide enough buffer capacity to maintain this pH over 24 months.

13.8 The 10mM histidine would be expected to provide its buffering capacity through the same mechanism as 10 mM sodium phosphate, namely maintaining the pH at pH 6.2 through the release and capture of hydrogen ions.

13.9 Therefore, although using a different buffer, the FYB203 products achieve substantially the same result in substantially the same way as the invention.

<u>Question (ii)</u>

13.10 If the Formulation Scientist knew the formulation of the FYB203 products and knew the matters stated in paragraph 13.6, then the matters stated in paragraphs 13.7-13.8 would be obvious to them at the Priority Date (i.e. that the 10 mM histidine was maintaining the pH at 6.2-6.3 for at least 24 months through the release and capture of hydrogen ions). This is because of the teaching of the Patents and the common general knowledge regarding buffering function (as summarized at paragraphs 5.55 to 5.63 above). Therefore, knowing that the FYB203 products achieve substantially the same result as the invention, it would have been obvious to the Formulation Scientist that the FYB203 products did so in substantially the same way.

<u>Question (iii)</u>

13.11 Although the literal wording of the Claims states “10mM sodium phosphate”, the Formulation Scientist would see no technical reason why the patentee would wish to limit its invention to the use of 10 mM sodium phosphate specifically. This is because the patentee wants to maintain a pH of 6.2-6.3 for at least 24 months by including a component in the formulation at a sufficient concentration which is capable of maintaining the pH at 6.2-6.3 for at least 24 months by the

release and capture of hydrogen ions. There would be no technical reason to exclude another component that achieves this.

***Samsung Bioepis***

13.12 The differences between the SB15 products and the Claims are that:

(a) They contain no NaCl but contain a higher percentage of sucrose (8% as compared to 5%).

(b) They contain a lower amount of sodium phosphate buffer, 7.78 mM as compared to 10 mM.

13.13 In respect of the SB15 products in a vial, the vial is a further difference to claim 11 of EP 691 and the claims of EP 306 which refer to pre-filled syringes.

Question (i)(a) - no NaCl but contain a higher percentage of sucrose (8% as compared to 5%)

13.14 As explained above at paragraphs 7.25-7.26, 7.29, 7.50(b) and 7.50(d), the “40 mM NaCl” / “about 40 mM NaCl” of the Claims adjusts the tonicity of the formulation to bring it close to or within the range of the tonicity of the vitreous (290-320 mOsm/kg) making it acceptable for intravitreal administration; and the “5% sucrose” contributes to the long-term stability of the formulation by forming a physical protective environment around the protein which reduces aggregation, and by stabilizing the folded and active conformation of the protein over unfolded and inactive conformations through the mechanism of preferential interaction. As explained at paragraphs 7.40-7.41 above, the osmolality of all of the excipients of the formulation of the Claims (excluding aflibercept) would be 249 mOsm/kg. Once the osmolality of aflibercept is factored in, then the formulation of the Claims as a whole will have an osmolality close to or within the range of the tonicity of the vitreous (290-320 mOsm/kg) making it acceptable for intravitreal administration.

13.15 The Samsung Bioepis Product Description states that the formulation of the SB15 products is for intravitreal administration. I also understand from A&O Shearman that Samsung Bioepis

admit that the formulation of the SB15 products is a stable formulation that is suitable for intravitreal administration. As the SB15 products are suitable for intravitreal administration, the formulation of the SB15 products must have an osmolality close to or within the range of the tonicity of the vitreous.

13.16 In the formulation of the SB15 products, as the 8% sucrose is greater than the 5% sucrose of the Claims, it would be expected to provide at least the same contribution to the long-term stability of the formulation.

13.17 The 8% sucrose, being just an additional amount of the same component of the Claims, would not be expected to change the way in which the sucrose was stabilizing the protein and would be expected act through the same mechanism as the 5% sucrose, namely forming a physical protective environment around the protein which reduces aggregation, and stabilizing the folded and active conformation of the protein over unfolded and inactive conformations through the mechanism of preferential interaction.

13.18 In relation to osmolality, the SB15 products do not include NaCl, however they contain a higher level of sucrose which also significantly contributes to the osmolality of the formulation. Calculating the osmolality of the excipients (excluding aflibercept) in the SB15 products gives the following result:

| **SB15 formulation excipients** | **mOsm/kg** |
|---|---|
| 7.78 sodium phosphate, pH 6.2 | 18[31] |
| 0.03% polysorbate 20 | n.a. (<1mOsm) |
| 8% sucrose | 234 |
| *Total for excipients:* | 252 |

13.19 The contribution of the excipients to the osmolality of the formulation of the SB15 products is almost identical to that of the excipients in the formulation of the Claims, differing by only 3

[31] This value was obtained by calculating the amount of phosphate monobasic (6.60 mM) and phosphate dibasic (1.18 mM) based on the pH of 6.2, and then calculating the osmolality contribution of each ionic species (2 mOsm/kg per mole of phosphate monobasic and 4 mOsm/kg per mole of phosphate dibasic).

mOsm. This shows that the effect of the absence of the (about) 40 mM NaCl on the osmolality of the SB15 products is offset by the increase in sucrose. Therefore, as with the formulation of the Claims, together with aflibercept, the formulation of the SB15 products will have a tonicity close to or within the range of the tonicity of the vitreous (290-320 mOsm/kg) making it acceptable for intravitreal administration.

13.20 Looking at it in another way, the additional 3% sucrose in the formulation of the SB15 products provides substantially the same osmolality (87.6 mOsm)[32] as the 40mM NaCl of the Claims (80 mOsm).[33] The remaining osmolality difference comes from the different concentration of buffer used.

13.21 Therefore, although using 8% sucrose instead of 40 mM NaCl and 5% sucrose, the SB15 products achieve substantially the same result in substantially the same way as the invention.

Question (i)(b) – lower amount of sodium phosphate buffer, 7.78 mM as compared to 10 mM

13.22 As explained above at paragraphs 7.20-7.23 and 7.50(a), the 10 mM sodium phosphate buffer of the Claims contributes to the long-term stability of the formulation by maintaining the pH at 6.2-6.3 for at least 2 years through the release and capture of hydrogen ions.

13.23 The Samsung Bioepis Product Description states that the formulation of the SB15 products has a pH of 6.2 and I understand from A&O Shearman that the SB15 products (in a vial) have a shelf life of 3 years. I also understand from A&O Shearman that Samsung Bioepis admit that the formulation of the SB15 products is one in which aflibercept is chemically and physically stable, such that the protein is substantially free of protein contaminants and aggregates over time, including at 24 months. Based on this I assume that the pH remains constant for at least 2 years, which contributes to the long-term stability of the SB15 products.

[32] 3% sucrose is equal to 30 g/L. The molar mass of sucrose is 342.3 g/mol. 30 g/L divided by 342.3 g/mol = 87.6 mM. Sucrose does not dissociate in solution, so the osmolality is the same as the molarity.

[33] NaCl dissociates in solution into $Na^+$ and $Cl^-$. Therefore each mole of NaCl produced 2 osmoles. This means that 40 mM NaCl is equal to 80 mOsm.

13.24 On the above assumption, the slightly lower concentration of sodium phosphate used in the SB15 products still manages to contribute to the stability of the formulation by maintaining the pH at pH 6.2-6.3 for at least 2 years and so does not impact on the buffering functionality. An explanation for this is that typically formulations have a buffering capacity in excess of what is necessary (see paragraph 5.61 above).

13.25 The 7.78 mM sodium phosphate, being just a lesser amount of the same component as the Claims, would not be expected to change the way in which the sodium phosphate achieved its buffering functionality, which is through the release and capture of hydrogen ions.

13.26 Therefore, although using 7.78 mM sodium phosphate buffer rather than 10 mM, the SB15 products achieve substantially the same result in substantially the same way as the invention.

<u>Question (ii)(a) – no NaCl but contain a higher percentage of sucrose (8% as compared to 5%)</u>

13.27 If the Formulation Scientist knew the formulation of the SB15 products and knew the matters stated in paragraph 13.15, then the matters stated at paragraphs 13.16-13.20 would then be obvious to them at the Priority Date (i.e. that the 8% sucrose was (i) providing the required stability levels through the forming of a physical protective environment around the protein which reduces aggregation and by stabilizing the folded and active conformation of the protein over unfolded and inactive conformations through the mechanism of preferential interaction, and (ii) adjusting the tonicity of the overall formulation, to ensure that the overall tonicity was close to or within the tonicity of the vitreous). This is because of the teaching of the Patents and the common general knowledge regarding stabilizing agents and tonicity agents (as summarized at paragraphs 5.64-5.67 and 5.83-5.86). Therefore, knowing that the SB15 products achieve substantially the same result as the invention, it would have been obvious to the Formulation Scientist that the SB15 products did so in substantially the same way.

<u>Question (ii)(b) – lower amount of sodium phosphate buffer, 7.78 mM as compared to 10 mM</u>

13.28 If the Formulation Scientist knew the formulation of the SB15 products and knew the matters stated in paragraph 13.23, the matters stated at paragraphs 13.24-13.25 would then be obvious

to them at the Priority Date (i.e. that the 7.8 mM sodium phosphate was maintaining the pH at 6.2-6.3 for at least 24 months through the release and capture of hydrogen ions). This is because of the teaching of the Patents and the common general knowledge regarding buffering functionality (as summarized at paragraphs 5.55 to 5.63 above). Therefore, knowing that the SB15 products achieve substantially the same result as the invention, it would have been obvious to the Formulation Scientist that the SB15 products did so in substantially the same way.

Question (iii)

13.29 Although the literal wording of the Claims states "5% sucrose" and "about 40mM NaCl" / "40mM NaCl", the Formulation Scientist would see no technical reason why the patentee would wish to limit its invention to the use of 5% sucrose and (about) 40 mM NaCl specifically. This is because the patentee wants to achieve (i) a stable formulation, by including components which form a physical protective environment around the protein which reduces aggregation, and stabilize the folded and active conformation of the protein over unfolded and inactive conformations through the mechanism of preferential interaction, and (ii) tonicity close to or within the range of tonicity of the vitreous (290-320 mOsm/kg) making it acceptable for intravitreal administration, by including components which adjust the tonicity of the overall formulation so that it is close to or within the range of the tonicity in the vitreous. There would be no technical reason to exclude other combinations of components which achieve this.

13.30 Although the literal wording of the Claims states "10mM sodium phosphate", I have explained above at paragraph 13.11 why the Formulation Scientist would see no technical reason why the patentee would wish to limit its invention to 10mM sodium phosphate specifically.

**STATEMENT OF TRUTH**

I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are within my knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinion on the matters to which they refer. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

7 Apr 25

Professor Hovhannes John Gukasyan

Date