# EXHIBIT B

**Second Expert Report of Professor Hovhannes John Gukasyan**
**12 May 2025**
**Filed on behalf of the Defendants**
**Exhibit HJG-8**

**Claim No: HP-2024-000015**
**and HP-2024-000036**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**INTELLECTUAL PROPERTY LIST (ChD)**
**PATENTS COURT**
**B E T W E E N:**

**(1) FORMYCON AG**

(A corporation incorporated under the laws of the Federal Republic of Germany)

**(2) KLINGE BIOPHARMA GMBH**

(A corporation incorporated under the laws of the Federal Republic of Germany)

Claimants in HP-2024-000015
(the "Formycon & Klinge Proceedings")

**SAMSUNG BIOEPIS UK LIMITED**

Claimant in HP-2024-000036
(the "Samsung Bioepis Proceedings")

– and –

**(1) REGENERON PHARMACEUTICALS, INC.**

(a company incorporated under the laws of the State of New York)

**(2) BAYER HEALTHCARE LLC**

(a company incorporated under the laws of the State of Delaware)

Defendants

---

# SECOND EXPERT REPORT OF PROFESSOR HOVHANNES JOHN GUKASYAN

---

# INDEX

| Section | | Page |
|---|---|---|
| **1.** | **INTRODUCTION** | **3** |
| **2.** | **THE SKILLED TEAM** | **3** |
| **3.** | **PART 2 – THE COMMON GENERAL KNOWLEDGE** | **4** |
| | General texts | 4 |
| | APIs and excipients | 5 |
| | Susceptibility of proteins to degradation | 6 |
| | Solubility of proteins | 6 |
| | Excipients commonly used in liquid protein formulations | 8 |
| | Pre-formulation information | 17 |
| | Formulation studies | 17 |
| **4.** | **WIEGAND II (referred to as US 529 in my First Report)** | **20** |
| | Next steps from Wiegand II | 20 |
| **5.** | **THE PATENTS** | **27** |
| | General disclosure | 27 |
| | Examples | 29 |
| | What would the Skilled Formulator learn from the Patents? | 29 |
| **6.** | **THE CLAIMANT PRODUCTS** | **30** |
| | What result does the invention achieve and how does it do it? | 30 |
| **7.** | **FORMYCON** | **33** |
| | Histidine v phosphate | 33 |
| **8.** | **SAMSUNG** | **34** |
| | No tonicity agent | 34 |

I, Hovhannes John Gukasyan, of 7824 E San Luis Dr, Orange CA, 92869, will say as follows:

## 1. INTRODUCTION

1.1 I am the same Professor Hovhannes John Gukasyan who provided a first expert report in these proceedings dated 7 April 2025 (my "**First Report**").

1.2 In this report, I reply to the first expert report of Dr Ann Daugherty and to paragraph 23.65 of the first expert report of Professor MacLaren where he discusses the formulation he would ask the Formulation Scientist to develop. I address those aspects that appear to be of most significance and it should not be assumed that I agree with all of the statements made in the report of Dr Daugherty simply because I do not address them.

1.3 The relevant sections and paragraphs I refer to below are those used in Dr Daugherty's report unless otherwise stated. I have also adopted the section headings used by Dr Daugherty's report for convenience, but have included two additional headings above paragraphs 3.11 and 3.34. I use the same terminology in this report as in my First Report. I confirm that I understand and have complied with my duties to the Court as an expert witness as set out in my First Report.

1.4 I was provided with and have read the near final draft of the Second Report of Professor Robin Leatherbarrow.

## 2. THE SKILLED TEAM

2.1 I agree with Dr Daugherty (in paragraph 5.1) that the skilled team would include at least a clinician, a protein engineer and a formulator. I agree that the formulator would have "*a degree in Chemistry, Chemical Engineering, Pharmaceutical Chemistry, Biochemistry, Biophysics, Medicinal Chemistry or Pharmaceutical Sciences, with advanced studies to the level of Masters or a PhD*" as noted by Dr Daugherty at paragraph 4.4. However, I do not agree that they would need to have had ten years of post-doctoral experience in academics or industry. Typically, a Formulation Scientist with less post-doctorate experience (two years or greater) would have

been assigned the project of formulating a product for eventual therapeutic use. For example, I finished my PhD in 2004 and by 2006 I was responsible for developing formulations for various drugs under development at Pfizer.

2.2 As noted in my First Report, I believe that the skilled team would also include an individual with ocular PK/PD expertise. The Ocular PK/PD Scientist's responsibilities in the team would include the choice of dose in patients for phase I (i.e. the translation of doses from animal studies into first in human studies) and inputting as required on decisions relating to dose as the product is developed through clinical trials. This is consistent with my experience at Pfizer at the time, where teams working on the development of pharmaceutical products would include individuals with PK/PD expertise.

## 3. PART 2 – THE COMMON GENERAL KNOWLEDGE

3.1 There is significant overlap between what I set out as being part of the common general knowledge of the Formulation Scientist in my First Report and that set out by Dr Daugherty in her report. I have limited myself below to commenting upon areas where I consider there to be substantial differences between my view and that of Dr Daugherty.

### General texts

3.2 In respect of the general texts identified by Dr Daugherty at paragraph 6.3, I was familiar with Remington and Florence & Atwood, however like Dr Daugherty I was also not familiar with Aulton.

3.3 In relation to the reference sources mentioned at paragraph 6.5, as noted in my First Report, the Handbook of Pharmaceutical Excipients was well known and would have been a reference source used by the Formulation Scientist. In relation to the Physician's Desk Reference, while I was aware of this reference book, it was not something that I used often and I do not believe

it would have been considered a standard or regular reference source for the Formulation Scientist.

3.4 Of the documents provided to Dr Daugherty by her instructing solicitors and mentioned at paragraph 6.6, I was aware of the Carpenter textbook and, to a lesser extent, Gokarn. Although in respect of Gokarn, this was only published in July 2006 and therefore would not have been available at the Priority Date. I was not aware of the other references listed at paragraph 6.6. Dr Daugherty includes a chapter from Carpenter as Exhibit AD-7 to her first report. In light of Dr Daugherty's reliance on Carpenter I have re-reviewed sections of this textbook and I have included an additional chapter which is relevant to this Report as Exhibit HJG-8.

3.5 At paragraph 6.8, Dr Daugherty lists two review papers published after the Priority Date in which she was a named author. Dr Daugherty explains at paragraph 6.9 that she believes both review papers are broadly reflective of the CGK of the Formulation Scientist at the Priority Date. I do not believe that the entirety of the two review articles would be CGK, and in my First Report and below I have set out what I understand to be the relevant CGK.

**APIs and excipients**

3.6 At paragraph 7.2, Dr Daugherty states that "*Common examples of biologics include antibodies, antibody fragments and fusion proteins as well as hormones, growth factors, enzymes and vaccines*". I agree that antibodies would have been considered by the Formulation Scientist to be common biologics in 2006. I do not agree that fusion proteins would have been considered to be common biologics because there were only four approved fusion protein drugs at the Priority Date: etanercept, alefacept, abatacept, and denileukin diftitox, and I was only aware of etanercept. None of these products was for intravitreal use. I understand from Professor Leatherbarrow that the Protein Engineer would have known of the fusion protein approach to developing potential therapeutic molecules, but that they were less well-known than antibodies

(see paragraph 5.14 of Professor Leatherbarrow's First Report). Antibody fragments were not as common as antibodies but the Formulation Scientist would have been aware of them.

## PRINCIPLES OF PROTEIN FORMULATION

### Susceptibility of proteins to degradation

***Chemical degradation***

3.7 At paragraph 8.4, Dr Daugherty sets out the chemical reactions which were known to result in changes to a protein's structure and function. The reactions Dr Daugherty lists overlaps with those I identified in my First Report and I largely agree that the Formulation Scientist would be aware of these chemical degradation reactions. However, I would make the following two comments:

(a) I agree with Dr Daugherty (at paragraph 8.4(a)) that oxidation of amino acids is catalyzed (in the sense that its rate is increased) by light, but catalysis of oxidation reactions by pH, and in particular at certain pHs, was a greater concern for proteins. For example, pHs above 7 may increase the rate of oxidation of cysteine and tyrosine residues. In contrast, pHs below 7 may increase the rate of oxidation of methionine residues.

(b) I agree with Dr Daugherty (at paragraph 8.4(c)) that deamination is a known type of chemical reaction, but I would add that, in practice, it occurred very rarely in potential therapeutic proteins under typical storage conditions. This reaction requires a relatively high level of energy to occur. As a result, I had not included this type of reaction in the list of relevant chemical reactions identified in my First Report.

### Solubility of proteins

3.8 I agree with Dr Daugherty's explanation (at paragraph 8.9) of the relationship between the isoelectric point and pH of the solution and the solubility and stability of a protein. I had noted

in my First Report (at paragraph 5.27) that the Formulation Scientist would understand that the best balance between physical stability and solubility is typically found around 0.5 to 1 pH unit away from the isoelectric point. The lower limit of 0.5 was based on the statement in the Wang 1999 review that "*the formulation should be at least 0.5 unit below or above [the] pI*" (page 175) which I agree with. Dr Daugherty states that it is "*typically found approximately 1-2 pH units away from the pI*". I chose the upper limit of 1 unit (which corresponds to 10 times more or fewer hydrogen ions) but I also believe that in principle the Formulation Scientist may consider up to 2 pH units (representing 100 times more or fewer hydrogen ions) away. Whether in fact the Formulation Scientist would consider 2 pH units in any particular case would depend upon the context and any other factors that were relevant for the choice of pH in that formulation. Therefore, having considered Dr Daugherty's report in combination with my own, I can see that the Formulation Scientist may consider the range to be broader and could view as a sensible range anything between 0.5 to 2 pH units away from the pI. As mentioned at paragraph 6.26 of my First Report, when selecting the pHs to test in initial formulation studies when developing an intravitreal formulation, the Formulation Scientist would also take into account that the pH range of 6-7.5 was known to be safe for regular administration to the eye.

3.9 I agree with Dr Daugherty (paragraph 8.9) that "*[t]he solubility of a protein may also depend on the ionic strength of the solution*" but at the Priority Date the Formulation Scientist would consider this effect in general only occurred at very high ionic strength (which would be higher than the concentration of ions suitable for intravitreal administration (referred to in paragraph 3.23 below)). Further, as discussed below in relation to tonicity agents, because the tonicity of liquid intravitreal formulations needs to be close to or within that of the vitreous, only a limited amount of excipients can be added. This means that, in practice, the ionic strength of the formulation is constrained and therefore would not have a practical impact on the solubility, stability or viscosity of a formulation.

**Excipients commonly used in liquid protein formulations**

***Buffers***

3.10 I agree with Dr Daugherty's description of how a buffer works (paragraph 8.11), which corresponds to the explanation provided in my First Report. In addition, although taken from a different source, the table of known buffers included as Figure 1 in Dr Daugherty's report is largely the same as the table included in my First Report (Dr Daugherty's table also includes carbonate and gives different pH ranges for citrate and phosphate). However, with respect to the list of commonly used buffers Dr Daugherty provides at paragraph 8.12(a): "*citrate, acetate, succinate, arginine, phosphate and histidine*", I do not agree that arginine is a commonly used buffer (and I note it does not appear in the table of buffer systems included in both of our reports). In addition, I do not consider that the Formulation Scientist would identify the buffers included in Dr Daugherty's list as being particularly common over others in the table. To take one example, Tris is also commonly used as a buffer and is included in many topical drugs.

*Ionic interactions with buffers and salts*

3.11 Dr Daugherty states (paragraph 8.12(f)) that "*buffers with similar pKas can have very different effects on protein stability depending on the specific interactions between the components of the buffer and the protein including by disrupting electrostatic interactions between surface charges on the protein*." She also states "*the effects of a particular buffer will depend on the specific characteristics of the particular protein*."

3.12 Later when discussing salts (paragraph 8.24), Dr Daugherty states: "*Depending on the particular ionic interactions with the protein in question, salts may stabilise, destabilise, or have no effect on protein stability*" and gives electrostatic shielding by salt ions as an example.

3.13 In relation to solubility (paragraph 8.23), Dr Daugherty states: "*At lower concentrations, the addition of sodium chloride can act to increase protein solubility, an effect called 'salting in',*

*in which the charged ions of the salt in solution shield electrostatic interactions, weakening attractive forces between the protein molecules, and thus increasing the dispersibility of the protein in the aqueous phase*."

3.14 In respect of buffers, the Formulation Scientist would generally consider the function of a buffer to be to maintain pH, and by maintaining pH contribute to the stability of the protein in the formulation. Based on my experience, typical concentrations of buffers used in liquid intravitreal formulations were not expected to exert any effect on the stability of the protein in the formulation other than in relation to their effect on pH, at least not to any significant or material extent. As such, in my experience this was not something that the Formulation Scientist would take into consideration when selecting a buffer for a liquid intravitreal formulation. At the typical concentrations of buffers used in such formulations, where buffers function to maintain the pH, the buffer will almost exclusively be interacting with the water equilibrium to release or capture hydrogen ions from water and maintains the pH in this way. This is because liquid formulations for intravitreal administration typically have an abundance of water (which is present at approximately 55 mol/L, compared to the millimolar concentrations of the buffer excipients). Therefore, the buffer would not be expected to have any meaningful ionic interactions with the protein itself. This was consistent with the Formulation Scientist's general understanding that the purpose of a buffer was to maintain the pH of aqueous formulations, and otherwise not exert any other meaningful effect.

3.15 In respect of tonicity agents, including salts such as sodium chloride, in liquid formulations for intravitreal administration, the Formulation Scientist would use a tonicity agent as required in order to bring the osmolality of the formulation close to or within the range of the tonicity of the vitreous (290-320 mOsm/kg). In my experience I am not aware of a situation where a salt was intentionally used to, or was expected to, have any meaningful impact on the stability of the protein at the concentrations in which it was used for this function (i.e. to bring it within or close to the isotonic range of the vitreous). In the context of intravitreal formulations, it was

generally understood that salts could be added to such formulations in quantities that would adjust osmolality without having any meaningful effect on the stability of the protein in the formulation.

3.16 At a general level, the Formulation Scientist would have been aware of ionic interactions between the buffer or salt and its aqueous environment and that those interactions would condition the water around the protein. The Formulation Scientist would also have been aware that ionic interactions between a buffer or salt and a protein could be created (and measured) under certain stringent conditions, for example conditions which reduce the concentration of water and/or increase the concentration of ions. But they would consider that, for most proteins, at the concentrations of buffers and salts typically used in liquid intravitreal formulations, ionic interactions would either not arise, or not have any meaningful impact on the stability of the formulation. Therefore, although these ionic interactions were known to be able to be created under certain experimental conditions, the Formulation Scientist would consider that, in practice when developing intravitreal liquid formulations, these interactions would have no, or a very minimal, effect on stability, particularly as compared to the impact of the pH or the excipients put in the formulation for the purpose of maintaining stability. In my experience, such effects were not thought to occur to any practical degree with the concentrations and under the conditions relevant to the development of a protein formulation suitable for intravitreal administration and with long term stability.

3.17 For completeness, I note that the Formulation Scientist would also have been aware that there were mechanistic theories that had been used to describe the potential ionic interactions referred to above, including the following two mechanisms: the preferential exclusion mechanism, and a Debye screening of charge fluctuations (or what Dr Daugherty describes as “salting in”). I have seen that the Carpenter text cited in Dr Daugherty’s report mentions a third mechanism

("Ionisation Enthalpy")[1], however I was not aware of this mechanism and Dr Daugherty does not refer to it.

3.18 I discussed preferential interactions in the context of stabilizing agents at paragraph 5.65 of my First Report, but not for buffers or tonicity agents. This is because this effect was not generally understood to be observed at concentrations of buffers and salts of relevance to liquid intravitreal formulations; the effect would generally only be observed at concentrations well above the concentrations of buffers and salts that are used in liquid intravitreal formulations.

3.19 In the "Debye Screening" mechanism the salt ions are proposed to shield the protein from interacting with other protein molecules. The Formulation Scientist would consider this as an effect that could be calculated to occur or measured under artificial circumstances involving the addition of salt to an ideal solution (i.e. where the interactions between all molecules in solution are identical) close to its isoelectric point (where it would generally be the least soluble). The protein solubility can then be calculated or measured in order to assess the effect of the salt on that solubility. However, the Formulation Scientist would know that these conditions are not applicable to protein formulations which can never be ideal solutions, and would not typically be at or near the isoelectric point of the protein given that this is its least soluble state. In real circumstances that are relevant to practical formulations of proteins, pH is a far more relevant factor affecting solubility than any effect which might be contributed by the Debye Screening mechanism. Generally speaking, the Formulation Scientist would not consider this mechanism to have any practical effect for intravitreal protein formulations, particularly at the concentrations of buffers and salts used.

3.20 In relation to viscosity, Dr Daugherty states "*In certain circumstances, increased salt concentrations can also reduce the viscosity of a protein formulation by reducing self-association between protein molecules due to electrostatic interactions*" (paragraph 8.24). It is

[1] Exhibit HJG-8, page 68.

important that a formulation intended for intravitreal administration is not too viscous (as I explain below, and Dr Daugherty also states, the formulation should be able to be injected via a fine needle (e.g. 30 gauge) without undue force). Viscosity is primarily determined by the presence of components in the formulation which are capable of forming a gel and this applies to polymers which includes the protein in the formulation which are polypeptides. Therefore the main contributor to viscosity is the protein, particularly where it is present in high concentrations. As a general rule and as with solubility, the closer a formulation is to the pI of a protein, the greater the attractive forces between the protein molecules and therefore the more viscous the solution. Conversely, the further away from the pI of the protein, the less the attractive forces and the less viscous the solution. For the reasons explained at paragraphs 3.15 and 3.16 above, contrary to what Dr Daugherty suggests, at the levels of salt concentration that would be iso-osmotic, and therefore suitable for intravitreal administration, the Formulation Scientist would not expect the salt to reduce the self-association between protein molecules in such a way as to reduce viscosity in a material way.

3.21 Therefore although I agree that the Formulations Scientist would be aware of the possibility of ionic interactions that Dr Daugherty discusses, and the theoretical mechanisms underlying them, as a general matter they would not consider these to have a practical effect on the stability, solubility or viscosity of the liquid intravitreal formulation. I therefore do not agree that the Formulation Scientist, when formulating their product and considering the use of a buffer and/or a salt, would have taken into account these potential theoretical ionic interactions. I have never considered them in relation to buffers or salts in any intravitreal formulation project I have undertaken and I do not recall that this issue has come up in discussions with other formulators I have had in relation to intravitreal formulations.

3.22 The texts cited in my First Report and Dr Daugherty's report discuss ionic interactions for buffers and salts. They do not change my view on what would be the common general knowledge of the Formulation Scientist tasked with arriving at a long-term stable liquid

formulation for a protein for intravitreal administration. I note that these texts are considering protein stability in very general terms. They are not focused on practical formulation development but instead are scientific academic texts. They have a wider scope than liquid formulations (they include for example lyophilized formulations) and are not directed to any particular application or route of administration and therefore cover concentrations and conditions far broader than what would be used in liquid intravitreal formulations. They refer to literature studying effects under conditions which would not be used for long-term storage of therapeutic proteins. Some of the studies reported are also on specific proteins with atypical characteristics. The statements in these texts therefore have to be seen in this, more general, context.

3.23 For example Carpenter states that buffers and/or salts at "*high concentrations*" can stabilize proteins through preferential exclusion.[2] When discussing Debye Screening, Carpenter states that "*salts in relatively low concentrations (< 0.15M) can have a strong influence on the physical state of the protein*".[3] Less than 0.15M (i.e. 150mM) concentrations of buffers and salts might be considered low for many applications, for example if compared to the concentration of 0.5M referenced in Carpenter in the section on preferential exclusion.[4] However, in the context of intravitreal administration, 150mM of a monovalent salt (with one anion and one cation) is at the very upper limit of feasibility because 150mM would have an osmolality of 300 mOsm/kg, which means that just the salt itself would bring the formulation within the isotonic range of the vitreous (290-320 mOsm/kg) without taking account of the protein itself or any other excipients. In practice however, the contribution of other components of the formulation, including the protein and any other excipients, will need to be considered, and they would be likely to push the overall osmolality to something that is too high for an intravitreal formulation.

[2] Exhibit HJG-8, page 67.
[3] Exhibit HJG-8, page 67.
[4] Exhibit HJG-8, page 67.

3.24 Also, when reporting on studies with salts or buffers to measure these types of effect, the references generally use stringent conditions and components that would never be applicable for practical formulation use, such as very high temperatures, formulations at the pI of the protein and the presence of denaturants such as urea.

3.25 The texts also cover studies on a broad spectrum of proteins including a number of proteins with atypical characteristics, in order to be able to study the particular mechanism and amplify the readout. However, these proteins would be very unlikely to be the subject of a formulation project, such as rhKGF (which Wang 1999 states has a half-life of only 15 days in 100 mM phosphate buffer at 37°C (page 164)).

3.26 In light of her views in relation to the specific buffer ion effects, Dr Daugherty also states in paragraph 8.12(f) that because these specific buffer effects cannot be predicted, the stability of the protein in more than one buffer system would routinely be tested. I disagree that this is the reason for testing more than one buffer system. The reason why different buffers would have been tested is to allow the stability of the protein to be tested across a range of pHs (which might exceed the buffering capability of any single buffer system), as I explain in paragraph 5.2 below.

3.27 Dr Daugherty states at paragraph 8.12(g) that "*[s]ome buffers are less well tolerated in formulations than others*" and gives the example that "*some (e.g. citrate) can cause pain or tissue damage on injection*". I disagree that in 2006 the Formulation Scientist would have thought that there is anything particular about citrate that means it causes pain or tissue damage. It was known that administering a formulation with an acidic pH could cause pain, and in some cases tissue damage, on injection. It would have been understood that, as citrate is capable of buffering at acidic pH, when used in a formulation at an acidic pH it could be associated with such effects. However, such effects would have been thought to be the result of the use of acidic pH rather than the use of citrate as a buffer.

***Surfactants***

3.28 Dr Daugherty states (at paragraph 8.18) that surfactants were known to function optimally at concentrations of 0.01% to 0.05% and higher concentrations e.g. 1% can cause protein unfolding. As noted in my First Report (paragraph 5.71), a relevant property of surfactants is their CMC value, and this value varied between different surfactants. Therefore, the same range for optimal function cannot be applied to all surfactants as Dr Daugherty states and the Formulation Scientist would not have been limited to this narrow range when testing surfactants.

***Stabilizers***

3.29 I agree that sugars and polyols were commonly used stabilizers in protein formulations at the Priority Date. However, I disagree with the statement in paragraph 8.20 that sucrose was the most commonly used stabilizer in liquid formulations. The other stabilizers identified by Dr Daugherty, including mannitol, were equally commonly used in liquid formulations. I agree with Dr Daugherty that the upper value for a sugar is around 10%, if she is meaning for an intravitreal formulation where the sugar can impact undesirably on osmolality. The lower limit of sugar which is used will depend on how much sugar is needed to provide the stabilizing functionality and it may be that less than 5% is needed for a particular formulation and depending on the particular sugar used.

3.30 The mechanism by which amino acids confer stability was not well understood and therefore at the Priority Date they would not have been considered as "*scavengers or 'sacrificial' excipients*" as Dr Daugherty states (in paragraph 8.21). The reference to this mechanism more closely aligns with the mechanism by which certain antioxidants were thought to exert their effect, and antioxidants were considered a separate class of excipients from stabilizers.

***Tonicity agents***

3.31 I agree with Dr Daugherty at paragraph 8.22 that salts, and specifically sodium chloride, were known tonicity agents, but would add, as mentioned in my First Report, that sugars were also commonly used to adjust the tonicity of a formulation as well.

3.32 I have covered my views on ionic interactions of salts in paragraphs 3.11 to 3.25 above.

***Other excipients***

3.33 In paragraph 8.25, Dr Daugherty mentions preservatives as potential additional excipients, although she notes that they are not commonly used in protein formulations. However, these were not the only additional excipients which would be considered. As noted in my First Report, the Formulation Scientist would have considered co-solvents, viscosity enhancers (polymers), chelating agents and/or antioxidants, in addition to buffers, stabilizing agents, surfactants and tonicity agents.

***Table of antibody products***

3.34 Below paragraph 8.13 Dr Daugherty reproduces a table which lists 18 antibody products. The Formulation Scientist would have been aware of some of these antibodies as a matter of common general knowledge but not all of them. Like me, I expect the Formulation Scientist would have been aware of the bigger products e.g. Humira and Avastin and less aware of products such as Campath. For any product, they were unlikely to know the specific formulation components off the top of their heads but if they were interested in any antibody, they could do research to try and find the details of the formulation.

3.35 The concentration of the antibodies in this table is consistent with what I stated in my First Report (at paragraph 5.24), which is that typically protein concentrations in liquid formulations ranged from 0.5mg/ml to 25mg/ml and anything over 25mg/ml was high and unusual. I mentioned Humira in my First Report as an exception (it is formulated at 50mg/ml). The table

also includes Raptiva (with a concentration of 100mg/ml), however (although not indicated on this table) Raptiva was a lyophilized formulation that was reconstituted prior to use and therefore did not need to be stable as a liquid long term. Synagis (100mg/ml) and Xolair (125mg/ml) are also lyophilized products as indicated in this table. The other formulation over 25mg is Campath. The volume in which it is formulated is not stated, but I have looked up its prescribing information and it is formulated in 1ml, and therefore its concentration would have been 30mg/ml.

3.36 A number of these formulations contain polysorbate which the Formulation Scientist would not use when formulating SEQ ID NO:6 specifically, for the reasons I gave in paragraph 6.31 of my First Report.

**ROUTINE DEVELOPMENT OF A LIQUID PROTEIN FORMULATION**

**Pre-formulation information**

3.37 In paragraph 9.1, Dr Daugherty explains that the Formulation Scientist "*is typically provided with certain physical and chemical characteristics of a protein active by other members of the team, including the… protein engineer*". I agree with this statement but consider that such information would also include information on any potential sites of chemical instability in the protein as set out in paragraphs 5.41 and 5.42 of my First Report.

**Formulation studies**

***Initial choice of excipients***

3.38 In paragraph 9.3, Dr Daugherty states that "*[t]he addition of novel or exotic excipients, i.e., excipients that have not been previously used in formulations, which lack in vivo safety data, would generally be avoided, as such excipients would require extensive safety testing that may take years to complete*". Given there was a significant lack of data on excipients acceptable for intravitreal administration, the Formulation Scientist would also have included as possibilities

excipients which had not been used for intraocular administration before. However, they would have appreciated that this would require additional testing to assess their suitability for the eye. The Formulation Scientist would not have limited their potential excipients to those that had been shown to be safe in the eye as this would have unnecessarily limited their options and put at greater risk not reaching a stable formulation. As I mentioned in my First Report (paragraphs 5.38 to 5.40), when I was at Pfizer, we did not limit ourselves only to those excipients that were known to be used intravitreally already and we tested excipients that had not been used in the eye previously.

***Initial choice of formulations***

3.39 At paragraph 9.5, Dr Daugherty states that the Formulation Scientist would "*seek to formulate the protein at a slightly acidic pH (between pH 6-7) since slightly basic formulations are more prone to deamidation*". I do not agree that this was a general rule or an approach which would have been taken by the Formulation Scientist. As noted in my First Report, there were chemical reactions which occurred at both acidic and basic pH (see paragraph 5.28 and Figure 2 of my First Report). In each case this choice would have been made based on the characteristics of the protein, including its pI and susceptibility to chemical reactions.[5] Also, one particular instability reaction (deamidation) would not have determined the pH choice on its own, as Dr Daugherty appears to suggest in her statement, when there are several other potential instabilities to consider. Further, and in any event, the Formulation Scientist would expect that deamidation reactions would be minimized between pH 5-6 (as opposed to pH 6-7) (as indicated by the table shown as Figure 5 in Dr Daugherty's report).

***Accelerated stability studies***

3.40 In respect of the accelerated stability studies proposed by Dr Daugherty at paragraph 9.9, I disagree that stability studies at 2-5°C and 25°C would be carried out between 14 and 30 days.

[5] Akers 2002, page 61.

This time period would be too short to identify with certainty any instabilities occurring at these temperatures and in reality studies at these temperatures would be done over much longer time periods, of at least several months, and ideally up to a couple of years.

3.41 As noted by Dr Daugherty at paragraph 9.10, in the stability studies the formulations would be tested at specific time-points for degradation products. However, typically these tests will not identify the cause of the degradation. There are a number of different specific tests which could be used to identify degradation products but which one to use depended on the potential instabilities.

***Iterative testing***

3.42 Table 6 at Figure 5 of Dr Daugherty's report lists problems/instabilities and provides potential causes of instabilities and different ways of attempting to reduce these instabilities. Each instability has a number of potential causes and for a number of instabilities several possible solutions. Further, even assuming that one of the possible solutions worked to address a particular problem, it can give rise to another different problem. For example as can be seen from paragraph 5.28 and Figure 2 in my First Report, while formulating at a slightly acidic pH would reduce deamidation reactions, it would increase peptide cleavage and methionine oxidation reactions. I note the table at Figure 5 of Dr Daugherty's report does not mention pH as a potential cause of oxidation, but it was well known that the rates of different oxidation reactions were increased at different pHs.

***Long-term stability studies***

3.43 Dr Daugherty draws a distinction between initial (/accelerated) and long-term stability studies in paragraph 9.8 and 9.14. However, in my experience, in practice there is not such a distinction and instead often parallel studies were run alongside each other. A formulation would be selected and a stability study started at several different temperatures in parallel. At regular time intervals the stability of the product would be tested. If in the high temperature

(accelerated) study, significant instability was observed at 30 days, that formulation may be abandoned. However, otherwise the lower temperature studies would be continued. If the results are not good with the initial formulations tested, alternative formulations would be tested. Depending on the results, these may involve incremental changes to the existing formulations or testing completely different excipients. As a result, formulation studies could often take some time, often more than 2 years, to complete.

***Protein concentration***

3.44 I agree with Dr Daugherty that high protein concentrations were associated with formulation challenges. At paragraph 9.17, Dr Daugherty notes that "*high*" would be considered to be formulations with a protein concentration of 100mg/ml or higher. The Formulation Scientist would consider concentrations lower than 100mg/ml also to be high. As stated in my First Report (paragraph 5.24), the Formulation Scientist would consider that a concentration above the range typically used in liquid protein formulations, which was up to 25mg/ml, to be high and challenging to formulate. Their perception would be that higher concentrations had not been able to be successfully formulated. This would be consistent with their general understanding that at concentrations above around 25mg/ml there would begin to be more serious issues with solubility, viscosity and/or stability.

**PART 3 – THE CITED PRIOR ART & THE PATENTS**

**4. WIEGAND II (referred to as US 529 in my First Report)**

**Next steps from Wiegand II**

4.1 At paragraph 11.6, Dr Daugherty sets out the information that Professor MacLaren identifies as being the key points that the Clinical Ophthalmologist would convey to the Formulation Scientist. This includes that a concentration of at least 40 mg/ml of the protein is needed so that a planned upper dosage of level of 4000 µg can be administered in up to 0.1ml.

4.2 In his report, Professor MacLaren states at paragraph 23.65 that he would ask the Skilled Formulator to develop a formulation for the upper dosage level (which he states would be 4000 ug) and that this formulation could then be diluted in the formulation vehicle to prepare lower doses which would be used in a Phase I dose escalation trial. I do not agree that this approach could be taken for a clinical trial with a liquid formulation (in contrast to lyophilized formulations which can be reconstituted with a diluent). This would not be a robust way of guaranteeing that you prepare the correct dose for clinical trials and it would not be considered to be compliant with good manufacturing practice for clinical trials. Serial dilutions can lead to errors because dilutions require volumetric liquid transfer which has a high degree of intrinsic error. Also, the Formulation Scientist must ensure that only the protein amount was being diluted and not the excipients in order to maintain the same formulation at the lower doses which is very difficult to do accurately. In my experience I am not aware of companies doing this in order to produce drug product for clinical trials. In addition, the dilution process can lead to contamination of the product. In contrast when manufactured separately, which is typically done in a clinical trial setting, the doses will be more accurate.

4.3 At paragraph 11.8 and 11.9, Dr Daugherty sets out the information that the Formulation Scientist would request from the Protein Engineer. In relation to information regarding the characteristics of the protein, Dr Daugherty suggests that the Formulation Scientist would only ask for the isoelectric point of the protein. I disagree and believe that the Formulation Scientist would ask for more information regarding the characteristics of the protein, including its molecular weight, glycosylation pattern and susceptibilities to any of the known chemical instability reactions (which Dr Daugherty also sets out in the CGK section of her First Report at paragraph 9.1). The Formulation Scientist would factor in this information when considering what excipients and formulations to investigate for stability.

***Buffer Screening Formulations***

4.4 Dr Daugherty states (at paragraph 11.13 and paragraph 11.14) that the Formulation Scientist would aim to use the minimum number of excipients, reducing the number of variables to adjust, but then goes on to state that the Formulation Scientist would produce formulations comprising a buffer, a surfactant, a stabilizer and, if required, a tonicity agent. I agree that the Formulation Scientist would try to use a minimum number of excipients and for this reason it would be most standard to formulate the protein only with a buffer and a tonicity agent as required to bring the tonicity of the formulation close to or within that of the vitreous. Different buffers can be tested to achieve different pHs to assess solubility and stability at these different pHs. They would not jump straight into a formulation comprising a buffer, a surfactant, a stabilizer and if required a tonicity agent. Also as stated above, I set out in section 6 of my First Report, at paragraphs 6.27 to 6.36, the excipient categories that the Formulation Scientist would consider included these categories but also a number of others. I therefore don’t agree that the Formulation Scientist would consider only these three or four categories.

***Buffer selection***

4.5 At paragraph 11.16, Dr Daugherty states that the Formulation Scientist would know that the formulation typically should have a pH that is approximately 1-2 pH units away from the pI. Then based on the theoretical pI provided by the Protein Engineer (which I believe she assumes to be 8.29 or 8.2) Dr Daugherty states that the pH range of 6-7 (which was known to be preferable for proteins) is likely to be compatible with the stability and solubility of SEQ ID NO:6. As stated above at paragraph 3.39, I do not agree that the Formulation Scientist would believe it was generally preferable to formulate proteins at a slightly acidic pH, of pH 6-7. Instead the choice of pH (in addition to needing to be physiologically compatible) depended on the isoelectric point and the protein’s susceptibility to various chemical reactions, as explained at paragraphs 5.27 to 5.29 of my First Report.

4.6 In relation to the pI, I understand from the first report of Professor Robin Leatherbarrow that the pI of SEQ ID NO:6 in US 529 is likely to be a range of pH 6.5 to 7.3 rather than 8.29 or 8.2. If the Formulation Scientist considered the lower and upper pH boundaries to be 0.5-2 pH units away from the pI, the lower and upper pH boundaries would be 4.5 and 9.3 rather than 5.5 and 8.3 as I mentioned at paragraph 6.25 of my First Report (which was based on the narrower range of 0.5 to 1 pH units away from the pI). For the reasons I explained in paragraph 6.26 of my First Report, the values of 6 and 7.5 would be sensible ones to test as they are within the range 6-7.5 that was known to be safe for regular administration to the eye, but are the furthest from the pI range. It might also be sensible to include 6.9 as the mid-point between 5.5 and 8.3 boundaries (and also the 4.5 and 9.3 boundaries) as I explained in my First Report.

4.7 In relation to choosing a buffer, Dr Daugherty suggests at paragraphs 11.15 to 11.17 that to achieve a pH range of 6-7 in the screening exercise the Formulation Scientist would include formulations with phosphate and histidine buffer. The choice of buffer to use will be influenced by the pKa of the buffer and the aim to keep the concentration of buffer used low. For example phosphate has a pKa of 7.2 and therefore would be a good choice as a buffer at pH 7. I do not consider that both buffers typically would have been used to test the same pH. As explained above at paragraphs 3.14, the Formulation Scientist would consider that the role and effect of the buffer in the formulation was to maintain its pH and there would therefore be no need to test multiple buffers at the same pH. In addition, other buffers from the table in Figure 1 may have been tested instead or as well, which could include by way of example, acetate or citrate if testing more acidic pHs.

***Surfactants***

4.8 I agree with Dr Daugherty at paragraph 11.18 that surfactants were excipients commonly included in liquid protein formulations. I do not agree with Dr Daugherty that polysorbate 20 or polysorbate 80 would be an obvious choice, typically in the range of 0.01% to 0.05% w/v. For the reasons given in my First Report, in light of the number and location of methionine residues

in SEQ ID NO:6, I do not think polysorbate would have been tested for SEQ ID NO:6. Given that many surfactants were known to cause these oxidation issues with methionine, the Formulation Scientist would prefer not to use any surfactant. However, if they wanted to try a surfactant, then there were options that were less risky in terms of methionine oxidation such as tyloxapol (Triton).

***Stabiliser selection***

4.9 Dr Daugherty indicates at paragraph 11.19 that sucrose would have been an obvious choice of excipient to use in an initial screen as "*sucrose was most commonly used in 2006 and was also low cost*". As noted above at paragraph 3.29, if the Formulation Scientist chose to include a sugar stabilizer, I do not believe that sucrose would have been particularly preferred over others, and other sugars, including mannitol, and also polyols would also have been considered. In addition, in terms of the range of amounts tested, as noted above, while for intravitreal applications 10% might be a reasonable upper limit (due to the impact of sugars on osmolality), the Formulation Scientist may also try amounts lower than 5%.

4.10 Dr Daugherty states that sucrose can, however, increase formulation viscosity, depending on the amount added to the formulation, and that this is an important consideration because the formulation is being developed for intravitreal administration using, for example, a 30-gauge needle (paragraph 11.19). I agree that viscosity is an important consideration for an intravitreal formulation. However, I do not believe the Formulation Scientist would be concerned about the contribution of sucrose at the relevant concentrations to the overall viscosity of the formulation, as I explain at paragraph 3.20 above.

***Tonicity agents***

4.11 I agree with Dr Daugherty at paragraph 11.20 that the Formulation Scientist would also consider whether or not to add a tonicity agent. Further, I agree that sodium chloride would have been one of the tonicity agents considered. However, as noted above at paragraph 3.31, the use of

sugars as tonicity agents would also have been considered. If the Formulation Scientist did consider using a salt as a tonicity agent, I do not agree that they would have considered that the salt may have a material effect on reducing viscosity or increasing or decreasing the solubility/stability for the reasons I have given at paragraphs 3.11 to 3.25 above.

4.12 I agree that the Formulation Scientist would measure the osmolality of the formulations to confirm that they were within the desired range of osmolality. In my First Report I stated that this would be close to or within the range of the tonicity of the vitreous (290 to 320 mOsm/kg) which is close to Dr Daugherty's range of "approximately 270-300" mOsm/kg.

***Formulations***

4.13 In paragraph 11.22, Dr Daugherty concludes that the above process (the next steps from Wiegand II) would likely result in a number of formulations including those with the components of 40mg/ml VEGFR1R2, 10-15mM sodium phosphate or histidine (as buffer), 0.01-0.05% polysorbate 20 or 80 (as surfactant), 5-10% sucrose (as stabilizer), sodium chloride as required (as tonicity agent), and a pH of 6-7. I do not agree that the Formulation Scientist would have reached formulations with these components and characteristics as Dr Daugherty states.

4.14 In my First Report I give reasons for why the concentration of 40 mg/ml would not be obvious from a formulation perspective. I also explained that, had they attempted to formulate a 40 mg/ml concentration of SEQ ID NO:6 they would not have had an expectation that a stable formulation of that concentration suitable for intravitreal administration could be developed that remained stable for 2 years as a liquid.

4.15 I also do not believe that the Formulation Scientist would have been limited to the pH range of 6 to 7 but instead would have tested pH's as set out in paragraph 4.6 above based on the isoelectric point of aflibercept whilst also taking into account the pH range of 6-7.5 known to be safe for regular administration to the eye. Based on the isoelectric point of SEQ ID NO:6

(likely to be a range of pH 6.5 to 7.3), for the reasons I have given above and in my First Report, the Formulation Scientist would appreciate that the closer the pH was to the pI range the greater the risk of encountering problems with solubility and physical stability (chemical stability may be a problem seen longer term).

4.16 I do not believe that polysorbate would be tried for the reasons I have given in 4.8 above and in my First Report. As regards the choice of categories of excipients, individual excipients within those categories, and concentrations of those excipients, in my view the Formulation Scientist would have tested a broader and/or different range of excipients to those proposed by Dr Daugherty. There are many combinations of excipients which can be tested and different paths which can be followed. Tasked with the same project, different teams would likely follow different processes, test different classes and combinations of excipients and on obtaining their results make different decisions. For example, as noted in my First Report, there were a number of different classes of excipient which could be used to improve stability by reducing aggregation, adsorption and/or precipitation, which include stabilizing agents, viscosity enhancers, co-solvents and surfactants. For each of these classes of excipients, there were a number of different excipients which could be tested and in respect of each, a number of different concentrations could be tested.

4.17 Therefore for proteins, these studies take a significant amount of time and there is also little certainty that a long-term stable liquid formulation would be identified. As I comment in my First Report when considering the next steps after Wiegand II at paragraph 6.36, in light of the numerous potential options which could be tested and the various combinations which could be tried, it would not be possible to test every combination.

***Accelerated stability studies***

4.18 I agree with Dr Daugherty at paragraph 11.23 that both accelerated and "real time" stability studies are necessary to differentiate the stability of different formulations. As noted above at

paragraph 3.43, my view is that such studies would be run in parallel, and further that the "real time" studies required several months to complete. As a result, the stability studies would take significant time, at least several months, to complete.

***Iterative testing***

4.19 I agree with Dr Daugherty at paragraph 11.24 that a series of formulations may be tested. However, as noted at paragraph 4.16 above, there are many combinations of excipients which can be tested and different paths which can be followed. In light of the numerous potential options which could be tested and the various combinations which could be tried, it would not be possible to test every combination.

4.20 Therefore, although the iterative testing approach set out by Dr Daugherty sounds simple, and in paragraphs 11.24 and 11.25 Dr Daugherty states that the iterative testing process she suggests "*all form part of routine screening techniques familiar to the Skilled Formulator*", it is in fact far more complex than it sounds, because the process includes multiple paths, with the results of each step in the process not providing direct pointers to the next step. As a result, different teams would follow different processes and test different formulations and there is also little certainty that a stable formulation would be identified.

## 5. THE PATENTS

**General disclosure**

5.1 In paragraph 13.9, Dr Daugherty states that the Formulation Scientist would be interested to read the references referred to at the end of paragraph [0005] of the Patents. I do not agree that the Formulation Scientist would have a reason to look up these references because the data in the Patent itself with respect to aflibercept is clear and convincing. It is also not stated that the VEGF antagonist in these references is the same as the one in the Patents, or that the formulations are intravitreal formulations.

5.2 At paragraph 13.15, Dr Daugherty states that, on the basis that it "*would have been conventional to screen at least two buffers early on in formulation development in the expectation that one would produce better results*", the Formulation Scientist would consider that the reference to sodium phosphate at paragraph [0008] of EP 691 was "*a deliberate choice, based on empirical results*". I disagree with this. As noted above at paragraphs 3.26 and 4.7, different buffers which correspond to different pHs are used to test the feasibility of those different pHs across a range of pHs during formulation development to decide upon the most suitable pH for the formulation. However, for any given pH in the range that was being tested it would not be necessary to use more than one buffer that corresponded to that given pH. As a result, the Formulation Scientist would not understand the reference to sodium phosphate as meaning that the invention was limited only to the use of sodium phosphate, but would consider that sodium phosphate was a buffer which achieved the desired pH of 6.2-6.3 used in formulations in the Examples. The Formulation Scientist would understand that any buffer that could similarly achieve and maintain this pH would also be suitable.

5.3 For the reasons given in my First Report and above, I disagree with Dr Daugherty's statement (at paragraph 13.23) that the Formulation Scientist would be "*reasonably confident that they would have been able to produce an acceptably stable formulation of a given protein using the CGK excipients and the CGK screening process I have described above*" and that "*…formulating may get more challenging as the protein concentration increases, but the Skilled Formulator would not expect difficulties in formulating a protein at a concentration of 40-50mg/ml in general*". I agree with Dr Daugherty that formulating may get more challenging as the protein concentration increases but, as I explained above and in my First Report, to reach a long-term stable liquid formulation of a protein at 40 mg/ml would be considered very challenging. I therefore also disagree with Dr Daugherty that the Formulation Scientist would not expect difficulties in formulating a protein at a concentration of 40-50 mg/ml in general.

5.4 Dr Daugherty notes at paragraph 13.23 that there is nothing in the Patents to suggest difficulties in formulating the VEGF Trap protein. That is true, but the Patents do refer to the well-known stability problems that were associated with formulating proteins generally (for example at [0041] of EP 691). Also, the Patents are not seeking to describe the project that was required to arrive at the very stable formulations of aflibercept. Instead they provide data to show the stability of these formulations. The Formulation Scientist would not believe that, because the Patents only show the successful data and do not include description of the difficulty in reaching the stable formulations, that means the formulations in the Patents were not difficult to reach.

**Examples**

5.5 I do not agree with Dr Daugherty (at paragraph 13.35) that the Formulation Scientist would be puzzled as to why the investigators recorded turbidity and pH at months 3 and 4 but no SE-HPLC results. The Formulation Scientist would appreciate that there can be many reasons as to why such data may not have been available to be included. Dr Daugherty notes (at paragraph 13.36) that no statistical analysis of the results is presented. The Formulation Scientist would not require a statistical analysis in order to appreciate that the formulations were stable and the data provided would provide support for the Formulation Scientist of this, as explained in paragraphs 7.11 to 7.45 of my First Report.

**What would the Skilled Formulator learn from the Patents?**

5.6 In relation to paragraph 13.39 of Dr Daugherty's report, I agree that the Patents are addressing the problem of providing formulations of SEQ ID NO:4 that are suitable for intravitreal administration, but I do not consider that they are seeking to maintain stability only for at least 2 months. As I explain in my First Report at paragraph 7.9 the goal of a Formulation Scientist would be to achieve at least 2 years' stability, and they would understand that to be the problem that the patentee was seeking to solve. This is reinforced by the fact that the formulations in the

Examples are provided in glass vials and pre-filled syringes, which would be expected to be used as medicinal products.

5.7 I agree with Dr Daugherty at paragraph 13.41 that the Formulation Scientist would learn from the Patents that "*the specific formulations described in the Examples resulted in formulations that were stable over the periods set out in those Examples*." However, in addition, for the reasons given in my First Report, based on the data in the Patents the Formulation Scientist would expect that the formulation of Examples 3 and 4 also had at least 2 years' stability. Also, having read the Patents, the Formulation Scientist would appreciate that there is some flexibility around the specific formulation as I explained at paragraph 7.52 of my First Report.

5.8 At paragraph 13.42, Dr Daugherty suggests that the formulations of the Claims were ones which would have been included "*in early iterations of the routine formulation process*" and suggests at paragraph 13.40 that the formulations tested are made up with excipients that were commonly present and at concentrations and pHs that are within the ranges considered "typical" for a protein formulation. I disagree with this including for the reasons set out above at paragraphs 4.1 to 4.20 and paragraphs 10.6 to 10.16 of my First Report.

**PART 4 – ALLEGED INFRINGEMENT**

## 6. THE CLAIMANT PRODUCTS

**What result does the invention achieve and how does it do it?**

6.1 At paragraph 14.9 Dr Daugherty defines two "results" that the Skilled Formulator would consider the claimed formulations needed to achieve.

6.2 In terms of the "stability result", I agree that the Formulation Scientist would understand that the claimed formulations would be stable in the sense described by Dr Daugherty, although I would add that material drifts in pH or osmolality would also be considered as an instability. I disagree that the Formulation Scientist would understand that the stability would only be

required for at least 2 months. Instead, as I have said above, they would understand that it would be stable in liquid form for at least 2 years under refrigerated conditions.

6.3 For stability, the Formulation Scientist would understand that what mattered was, in practical terms, that the formulation was substantially free of protein contaminants and aggregates for at least 2 years and remained within the limits of quality acceptance criteria set by the Formulation Scientist for each of the testing parameters. These criteria would have been set having in mind that the appropriate biological activity of the formulation must remain and/or it must not become unsuitable for administration to patients during this 2 year period. As long as that was achieved, then the formulation would be considered to be sufficiently stable for the purposes of the Patents.

6.4 In relation to the "IVT result", I agree that the properties identified by Dr Daugherty would be understood to be relevant to the suitability of a formulation for intravitreal administration, although there are other properties (such as pH) which are also relevant. In respect of viscosity, as Dr Daugherty states, the relevant factor would be whether or not the formulation can be injected via a fine needle (e.g. 30 gauge) without undue force. If this is achieved, the precise viscosity of the formulation would not be considered important.

6.5 In relation to paragraph 14.12, I agree with Dr Daugherty that the Formulation Scientist would understand the stability and suitability for intravitreal administration of the 40 mg/ml of aflibercept is achieved by the combination of excipients at the claimed pH range. I explained at paragraph 7.50 of my First Report what the Formulation Scientist would understand the contribution of each of the excipients to be to the stability and suitability for intravitreal administration.

6.6 In relation to the 40mM NaCl, Dr Daugherty suggests at paragraph 14.13 that the Formulation Scientist having read the Patents would consider that, as well as the contribution of adjusting the tonicity, the sodium chloride may potentially have a stabilizing or destabilizing effect on the

protein because the charged ions could interact with charged residues on the surface of the protein. My comments on this are as follows.

6.7 As I have explained at paragraphs 3.11 to 3.25 above, as a matter of their common general knowledge, the Formulation Scientist would not in general have expected the concentrations of salt that would be used to adjust the tonicity of a liquid intravitreal formulation to have a meaningful impact on the stability of the protein in the formulation. The Formulation Scientist would not have seen this happen in practice. I have never seen this.

6.8 The Patents describe the NaCl purely as a "tonicity agent" and do not suggest that 40 mM NaCl has any impact on stability or that NaCl is acting in any way as a stabilizer. The Patents do not mention ionic interactions and they do not suggest that the particular ionic strength or composition is important to the invention. The Formulation Scientist would understand from the Patents that, in the formulations of the Claims, the pH of 6.2-6.3 (achieved by the buffer) together with the sucrose and polysorbate 20 are stabilizing the protein. The Patent describes the sucrose as a stabilizing agent and the polysorbate 20 as a co-solvent[6] (which indicates to the Formulation Scientist that it maintains the protein in solution and therefore improves stability). They would not think that the 40mM NaCl would be having any material impact on the stability, solubility or viscosity in the formulations of the Claims.

6.9 Example 5 is the only example in the Patent which includes a higher concentration of NaCl than that of the Claims (namely 135 mM). In my First Report at paragraph 7.42 I explained that I was surprised that the formulation used in that example was as stable as it was given that there was no stabilizing agent. Having considered Example 5 again in light of Dr Daugherty's comments on ionic interactions, I do not consider that the ionic interactions could be having any meaningful impact on stability at the concentration of 135mM for the reasons explained at

[6] I noted in my First Report that it was also functioning as a non-ionic surfactant.

paragraphs 3.11 to 3.25 and so I am still of the view that the stability shown in Example 5 is surprising.

6.10 In relation to the 10mM sodium phosphate buffer, Dr Daugherty suggests at paragraph 14.13 that the Formulation Scientist having read the Patents would consider that, as well as having its effect on maintaining the desired pH of the claimed formulation, the sodium phosphate may result in interactions between the protein and the charged ions which could have a stabilizing or destabilizing effect. I have explained at paragraphs 3.11 to 3.25 that the Formulation Scientist would not in general have expected the buffer at the concentrations that would be suitable for use in a liquid intravitreal formulation to have any ionic interactions which would have any meaningful impact on the stability of the protein, except through the buffer's ability to maintain the pH of the formulation. This is true of the sodium phosphate buffer in the claims, which is present at only 10mM.

6.11 Also, the teaching of the Patents does not suggest that there is any such material impact on stability caused by ionic behavior of the sodium phosphate buffer in the claimed formulation. The Patents describe it purely as a buffer, and do not suggest that it may be acting as a stabilizer in the relevant formulations, nor is there any mention of the ionic interaction mechanism. The Formulation Scientist would not think that the 10mM sodium phosphate was having any material impact on the stability of the formulations of the Claims as a result of any ionic interactions.

## 7. FORMYCON

**Histidine v phosphate**

7.1 At paragraphs 15.1 and 15.2, Dr Daugherty states that the histidine buffer represents a substantial difference from the formulations of the Patents, and that this is because a buffer's ability to stabilize a protein is dependent not only on having the appropriate buffering range to maintain the desired pH, but also on the potential ionic interactions with the protein.

7.2 I have explained at sections 5 and 6 above that the Formulation Scientist, reading the Patents, would not understand the ionic behavior of the 10mM sodium phosphate to have a meaningful impact on the stability of the formulation, other than through maintaining the pH. Therefore, even if there might be any ionic interactions occurring between the sodium phosphate and the aflibercept in the claimed formulation, the Formulation Scientist would not consider these to be relevant to the way in which the stability of the formulations of the Claims was achieved. Similarly, even if there might be some ionic interactions occurring between the histidine and aflibercept in the FYB203 products, the Formulation Scientist would also not consider these interactions to be relevant to the way in which the stability of the FYB203 formulation is achieved.

7.3 In relation to the role of the buffer, the functionality that would be considered to be relevant to the way in which the result of the invention was achieved would be the maintenance of the desired pH through the mechanism I describe at paragraph 13.8 of my First Report. As the sodium phosphate in the claimed formulation and the histidine in the FYB203 products both maintain the relevant pHs of the respective formulations for at least 2 years through that mechanism, the way in which the histidine contributes to achieving the stability result is substantially the same as the way in which the sodium phosphate contributes to the stability result of the claimed invention.

## 8. SAMSUNG

**No tonicity agent**

8.1 At paragraph 16.1 Dr Daugherty states that the absence of NaCl in the SB15 products is a substantial difference from the formulations of the Patents. Dr Daugherty states in paragraph 16.4 that this is because the NaCl taught in the Patents may affect the solubility / stability of the formulation due to the ionic interactions that may occur with the protein, and that, by contrast, the SB15 products have a lower ionic strength.

8.2 I agree with Dr Daugherty (paragraph 16.4) that sucrose and sodium chloride have different charges in solution (as a result of the fact that sodium chloride dissociates into Na+ and Cl- in solution) which results in the SB15 products having a different ionic strength as compared to the formulation of the Claims. However, for the reasons I have explained in sections 5 and 6, the Patents are not about ionic compositions and the invention does not require a particular ionic strength or composition. I have explained above that the Formulation Scientist, reading the Patents, would not understand the functionality of the 40mM NaCl to have a meaningful impact on the stability of the formulations of the Claims. Therefore, even if the ionic strength of the NaCl may result in particular ionic interactions occurring in the claimed formulations, that would not be considered by the Formulation Scientist to be relevant to the way in which the stability result of the Claimed formulation was achieved. For the same reason, the lack of any such interactions occurring in the SB15 products (as there is no NaCl), would not be considered by the Formulation Scientist to be relevant to the way in which the stability result of the SB15 products is achieved.

8.3 Dr Daugherty also states in paragraph 16.4 that the use of sodium chloride as taught in the Patents may also affect the viscosity of the formulation, and do so in a way that was different to the 8% sucrose in the SB15 products because the inclusion of sodium chloride can reduce viscosity. She suggests this means that the 8% sucrose contributes to achieving the IVT result in a materially different way. I do not agree. I have explained at section 6 above that the Formulation Scientist would not understand the functionality of the salt in the formulation of the Claims to have a meaningful impact on the viscosity.

8.4 Further, as noted above at paragraph 6.4, all that matters in relation to viscosity is that the formulation of the Claims needs to have sufficiently low viscosity that it can be injected through a narrow gauge needle without undue force. Even if it was possible that the NaCl might have some minimal viscosity lowering effect, that would not be considered by the Formulation

Scientist to be relevant to the way in which the IVT result of the claimed formulation as regards viscosity was achieved.

8.5 As regards the tonicity agent, the functionality that would be considered to be relevant to the way in which the IVT result of the invention is achieved would be the adjustment of the tonicity to bring the osmolality of the overall formulation close to or within the range of the vitreous. For the reasons given in paragraphs 13.18 to 13.21 of my First Report, the SB15 products achieve this aspect of the IVT result in substantially the same way as that of the formulations of the Claims.

**STATEMENT OF TRUTH**

I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are within my knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinion on the matters to which they refer. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed by:
241D5EAC09A9476...

12 May 2025

Professor Hovhannes John Gukasyan

Date