# EXHIBIT C

Claim Numbers: HP-2024-000015 and HP-2024-000036

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
INTELLECTUAL PROPERTY LIST (ChD)
PATENTS COURT
BETWEEN:

**(1) FORMYCON AG**

**(A corporation incorporated under the laws of the Federal Republic of Germany)**

**(2) KLINGE BIOPHARMA GMBH**

**(A corporation incorporated under the laws of the Federal Republic of Germany)**

Claimants in HP-2024-000015 (the "**Formycon Proceedings**")

**– and –**

**REGENERON PHARMACEUTICALS, INC.**

**(A corporation incorporated under the laws of the State of New York)**

Defendant in the Formycon Proceedings

AND BETWEEN:

**SAMSUNG BIOEPIS UK LIMITED**

Claimant in HP-2024-000036 (the "**Samsung Proceedings**")

**– and –**

**REGENERON PHARMACEUTICALS, INC.**

**(a company incorporated under the laws of the State of New York)**

Defendant in the Samsung Proceedings

**- and –**

**BAYER HEALTHCARE LLC**

**(A company incorporated under the laws of the State of Delaware)**

Defendants/Part 20 Claimants in Formycon and Samsung Proceedings

---

**REGENERON AND BAYER'S TRIAL SKELETON ARGUMENT**

---

**ADRIAN SPECK KC**

**ISABEL JAMAL**

**WILLIAM DUNCAN**

**ALICE HART**

Instructed by A&O Shearman LLP

**OVERVIEW** .......... **4**

**BACKGROUND** .......... **12**

**WITNESSES** .......... **14**

The Defendants' Witnesses .......... 14

The Claimants' Witnesses .......... 14

**SKILLED TEAM** .......... **15**

The Law .......... 15

The Skilled Team in this Case .......... 16

Does the Team Include an Ocular PK/PD Scientist? .......... 16

Other Skilled Team Disputes .......... 18

**COMMON GENERAL KNOWLEDGE** .......... **18**

**PATENTS AND THE INVENTIVE CONCEPT** .......... **19**

The Specification of the Patents .......... 19

The Claims .......... 22

The Inventive Concept .......... 23

The Defendants' Case .......... 23

The Claimants' Case .......... 25

The Relevance of Dose in the Context of the Inventive Contribution .......... 29

**PRIORITY** .......... **30**

Relevant Legal Principles .......... 30

The Priority Document .......... 31

The Claimants' Priority Attack .......... 32

VEGF Antagonist (SEQ ID NO:4) .......... 33

Ophthalmic Formulation Claims – Amended Claims 3 & 5 of EP 691 .......... 34

Pre-filled syringe claims – Amended Claim 11 of EP 691, Claim 5 of EP 306 and Amended Claim 2 of EP 306 .......... 36

**OBVIOUSNESS OVER WIEGAND II** .......... **37**

Relevant Law .......... 37

The Disclosure of Wiegand II .......... 41

Obviousness over Wiegand II - Overview .......... 43

Inputs to the Formulator .......... 44

Clinical Ophthalmologist / Ocular PK/PD Scientist - Dose and Volume .......... 45

Protein Engineers – pI, Molecular Weight and Features which are Susceptible to Instability .......... 49

Formulation Scientist – Formulation Project .......... 51

Formulation CGK Matters Relevant to the Question of Obviousness .......... 51

What would the Formulation Scientist do in light of Wiegand II .......... 61

Conclusions on Obviousness .......... 65

**ANTICIPATION BY DIX** .......... **65**

**INFRINGEMENT BY EQUIVALENCE** .......... **66**

Relevant Legal Principles .......... 66

The Defendants' Case .......... 67

**ALLEGED LACK OF TECHNICAL CONTRIBUTION / AGREVO OBVOUSNESS / INSUFFICIENCY ..... 69**

Legal Principles ..... 69

Application to the Facts ..... 70

**ALLEGED "INCONSISTENCY WITH INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENCE" ..... 73**

Law ..... 73

The Claimants' Case ..... 74

**ADDED MATTER ..... 75**

Relevant Legal Principles ..... 75

The Claimants' Added Matter Attack ..... 75

**ALLOWABILITY OF THE PROPOSED AMENDMENTS ..... 75**

**ANNEX A - FOREIGN PROCEEDINGS ..... 77**

**ANNEX B – ISSUES IN DISPUTE ON CGK ..... 79**

Recent development:

1. After the substantive parts of this skeleton had been written, at 10pm on 3 June Samsung sent a new proposed amended pleading in relation to inventive concept and infringement, and Formycon sent a new proposed amended pleading shortly before 3pm on 4 June (yesterday). The Defendants are digesting these new pleadings, but are not in a position at the time of filing this skeleton to address them. The Defendants will update the Court on their position on the allowability of these pleadings, and any other substantive matters that they may raise.

**OVERVIEW**

2. Aflibercept is a specially devised fusion protein that has therapeutic use to treat, among other retinal conditions, wet age-related macular degeneration ("**wet AMD**"). It works by 'trapping' another protein, called vascular endothelial growth factor (VEGF), that causes angiogenesis (new blood vessel growth). In this way it prevents the VEGF that may be present in the eye stimulating blood vessel growth in the retina – which is a cause of wet AMD. For this reason, aflibercept is called a VEGF antagonist.

3. In order to do its job, aflibercept must be delivered intravitreally – i.e. into the vitreous of the eye – by injection. That must be achieved through a very fine needle and involve a tiny quantity of liquid. The commercial product (Eylea) is delivered in 2mg doses in a volume of 50 micro-litres – i.e. 1/20 of a ml. Both Formycon and Samsung intend to market an aflibercept product that delivers the same dose in the same volume.

4. The aflibercept in Eylea is produced in CHO cells, and undergoes post-translational modification – both the removal of certain amino acids and the glycosylation of particular asparagine residues.

5. Aflibercept's structure is a dimer – two proteins linked together via disulfide bonds and other interactions. Within the dimer each monomer comprises 4 separate domains. Two are reproductions of the relatively well understood Fc region of an antibody – it is this part of each monomer that links with the other by the disulfide bonds and other interactions. The other two are domains reproduced from two known receptors of VEGF – that is human transmembrane proteins that act as VEGF receptors in nature.

6. So, part of the fusion protein resembles an antibody – but importantly only part, and not the part that actually binds to VEGF. The binding parts of the fusion protein are those taken from the receptors. And they separately extend up and away from the joined Fc domains. The dimer is rather like a half-fastened zip. The domains reproducing the antibody Fc region representing the part zipped together. The remainder extending away unfastened. As a whole, aflibercept is a significant departure

from anything that was known before. That is not to say aflibercept is the invention – but how to deal with it is.

7. The invention of the Patents in suit is a formulation of aflibercept. The precise details of it cover the inclusion of various excipients and their quantities or concentrations, **and** the concentration of aflibercept itself. The invention also specifies a very narrow pH for the formulation (6.2-6.3). The Patents explain the function that each ingredient in the formulation is fulfilling, and provide stability data in relation to the formulation.

8. Formulating proteins for use pharmaceutically is no easy business. Proteins are unlike small molecule drugs. Providing a formulation wherein the protein remains stable for the extended period needed is challenging. That is why formulators often consider resorting to lyophilised formulations, whereby the protein and excipients are freeze dried for storage. But they require reconstituting when needed for administration. It is not just chemical degradation and the many ways that it can occur that are issues with proteins. They are prone to aggregate. Or they might adhere to the container wall and/or precipitate. And they can also undergo conformational change. All of this has to be avoided.

9. There are many moving parts to a possible liquid formulation for a protein – including as to what class of excipients are or are not included, where included which member or members of each class to pick and at what levels or concentrations to include each excipient that is being used. The latter, are of course, decisions as to a position on a spectrum and so introduce an even higher degree of possible variations than discrete 'inclusion or not' decisions. Similarly, the selection of the pH and the concentration of the protein itself are decisions of this kind too.

10. The overall task, it is common ground, is to a high degree empirical in nature. Altering one aspect of a putative formulation potentially impacts all other aspects. But that does not mean that once a successful formulation is identified others that achieve their effect in the same way cannot readily be identified. Nor that it would not be appreciated that further such formulations achieve their effect in the same way. Of course, there could also be other very different formulations that are stable and suitable for intravitreal administration, but that achieve stability by providing a different kind of environment for the protein. An issue in this case is how to distinguish between these two circumstances.

11. The formulation of the Patents achieves long term stability in a **liquid** formulation – i.e. not lyophilised. But more than that, the formulation is one that is suitable for intravitreal administration – and remains so over a lengthy period. So, it can be injected through a fine needle into the eye, without problem, at any point in its shelf life. A formulator tasked with formulating a protein like aflibercept would be very pleased to have achieved that with aflibercept at any concentration. But what the Patents provide is a strikingly high concentration of aflibercept in a long-term stable liquid

formulation. This is striking because protein stability issues increase significantly with protein concentration.

12. Achieving a stable liquid formulation of a high concentration (40mg/ml) means a given dose can be delivered in a lower volume of fluid injected into the eye. This high concentration is relevant in two related ways to this case. First, it represents a concentration at a level that the skilled team at the priority date would not be motivated to explore at all. Second and relatedly, even if they did they would have no reasonable expectation of being able to provide a stable formulation of a protein such as aflibercept at that high concentration.

13. The claims in issue in this case are to a formulation that was actually tested and found to be stable. It comprises 40mg/ml aflibercept in a formulation at pH 6.2-6.3. The formulation also comprises particular excipients that are identified in the Patents' description as fulfilling the function of a buffer, a co-solvent, a tonicity agent and a stabilizer. The quantities of each are also specified.

14. The Formycon and Samsung products utilize variants on the patented formulation. Each is the same 40mg/ml concentration of aflibercept. Each is pH 6.2-6.3. And much of the rest is the same. For example, the Formycon formulation is precisely the same save for the buffer used is histidine instead of sodium phosphate. Precisely the same amount is used (10mM).

15. A key issue for trial is whether the protection conferred by the Patents is limited to precisely the formulation tested and claimed or whether equivalents are also within its protection. In this regard, Formycon and Samsung's primary case is that the inventive concept is precisely the formulation and nothing more. They ignore the explanation in the Patents as to the function each excipient is fulfilling and emphasise the empirical nature of the formulation exercise, suggesting it is only the precise formulation that has been contributed by the Patents. In this part of the case Formycon and Samsung really are going 'all in' on formulations being entirely empirical – to such an extent that (they suggest) having found one that works tells one nothing other than that precise combination works. As we explain below this is in stark contrast to its approach on obviousness.

16. At this point we pause to draw attention to the fact that Formycon and Samsung's approach would not allow fair protection to inventors of inventions of this kind. It is important because fair protection is the legislative touchstone – balanced of course with reasonable certainty for the public. Successfully devising a stable protein formulation, particularly a high concentration protein formulation is, as we have mentioned, to a significant degree empirical. But there is a world of difference between initially finding an island of long-term stability in the multi-dimensional sea of possible formulations and then, from that successful starting point, being able to establish whether and which variants of that formulation do in fact work. Both are empirical but not to anything like the same degree.

17. Moreover, being able to find **a variant** that in fact works - is not the same task as exploring **all likely variants** to establish which do and which don't work prior to applying for patent protection. We draw attention to this distinction because a Patentee would have to undertake this latter, impractical, task to seek to frame a claim in language that literally caught all the variants that worked in the same way but excluded those that did not work. A claim that purported to cover an area within which variants would be found – but which would to any significant degree also cover formulations that did not work would be insufficient.

18. In short, we submit that a claim framed in terms of the precise formulation tested and found to be stable, particularly in the context of a description that explains the functional contribution of each excipient, is the correct way to seek patent protection which does extend to formulations that achieve substantially the same effect in substantially the same way. In fact, we would suggest it is the only way. And, of course, it causes no problem because one is only concerned with the specific variant alleged to infringe and when one is assessing infringement by equivalents the skilled person is told the variant does in fact work.

19. When this point is grasped one can see that Formycon and Samsung's primary case on all this cannot be right. We suspect they may have begun to realise this as in their reply expert evidence a new line of attack emerged.

20. The new line of attack is necessary for Formycon and Samsung because if, contrary to their primary case, the inventive concept of the Patents is not limited to the precise formulation and nothing more but would be understood as the Patentee alleges – taking account of the functionality described in the description – Formycon and Samsung in fact have no case at all on Actavis questions 1 and 2. And their argument that Actavis question 3 should be answered in their favour, despite Actavis 1 and 2 being answered in favour of infringement, suffers from the same problem we have identified already – it is to set up a situation where it is practically impossible to secure fair protection for an invention such as this one. The inventor must choose between an insufficient claim, or one strictly confined to the precise formulation actually tested.

21. Formycon and Samsung's new line of attack is to suggest that if the inventive concept is not limited to the precise formulation tested and claimed, the functional aspects we plead as the inventive concept – those identified in the Patents – must be taken with an additional point not mentioned in the Patents. To be clear, this case accepts the Patentee's pleaded inventive concept but **adds** a further factor to the inventive concept not mentioned or even hinted at in the Patents.

22. And, moreover, it is a very unusual additional point – it is simply a query – a question mark – over whether there **might** be complex ionic interactions occurring which **may** affect stability. The way they may affect stability, if occurring, is said to be possibly positively, possibly negatively, possibly

not at all. As we understand Formycon and Samsung's contention, it can never be known either in the formulation in the Patents or the alleged infringements so, happily for them, the equivalence case must fail. But the fact that such interactions are unknown and (on the Claimants' case) unknowable is one of the reasons why realistically it cannot be part of the inventive concept of the Patents.

23. As the Court knows, this new attack was the subject of a short judgment at the PTR – as it has been raised without it being pleaded and too late for experiments that Regeneron and Bayer might wish to have done to address it. In accordance with that judgment Formycon and Samsung have been trying to formulate an amendment to bring forward so as to be permitted to run the point, and Regeneron and Bayer have outlined the detail of the type of experiment that they would have considered carrying out. It is difficult to see that the point can be fairly raised other than by Formycon and Samsung accepting that the experiments proposed by Regeneron and Bayer are both capable of determining what we allege and would in fact do so. At the moment they seem to propose accepting that they would determine what we allege if they are capable of doing so – but they want to argue about that point which seems to be another way to want to argue about whether the experiments would do what Regeneron and Bayer contend. We explain how this dispute has developed since the PTR below.

24. As for validity, there is a novelty only attack based upon a publication known as Dix. As we explain below it is hopeless.

25. The other prior art-based attack is of obviousness over a publication referred to as Wiegand II. That is a disclosure relating to early animal work on the intravitreal use of aflibercept. That means the obviousness case is based upon taking intravitreal aflibercept forward into a phase 1 clinical trial – i.e. the first in humans.

26. There are some striking consequences of Formycon and Samsung choosing this as their obviousness starting point.

27. First, the document has no details about formulation at all. So, the case really amounts to a case based upon CGK alone. All the well-known warnings about that kind of case are applicable.

28. Second, they wish both to use that early animal model starting point, but somehow feed the formulator a **requirement** to formulate at a concentration of 40mg/ml for human use. The way they do this is to seek to argue that a notably very high dose of 4mg would be selected as the top of the dose range to try. As the highest volume that could be injected in the eye is about 100µl that forces a 40mg/ml concentration. This is wholly artificial. They have to do this because it is common ground between the formulators that – where they have discretion or freedom – they will know success is more likely at lower concentrations and focus on this. So Formycon and Samsung have to construct a situation where the formulator has this completely taken out of their hands and has no input in **the concentration** of aflibercept used in the formulation. This can only be achieved by telling the

formulator to formulate at precisely the high dose which when put in the highest volume considered prudent to inject gives precisely 40 mg/ml. So that is what they have done.

29. Third, the way Formycon and Samsung do this is to suggest the clinician picks doses – and they are doing so without any proper consideration of PK/PD that is needed when moving from animal work to doses that should be used in humans. In short, they jib at the real-life position that, moving from animal studies to humans, would be undertaken with a specialist PK/PD expert, because the real-life situation would not lead to (for them) the required answer – use a 4mg dose. The argument seems to be that the Patents are about a formulation so the PK/PD person would not be in the team. In fact, they are wrong about that. But the point, if a good one, would apply to the clinician too. The Patents require just a formulator and protein engineer to formulate and make the protein respectively. Of course, Formycon and Samsung have to have the clinician in the team to have any motivation to take the prior art forward at all. But to get from the prior art they have chosen – animal work – to the formulation for human intravitreal administration requires a team including not only a clinician but a PK/PD expert too.

30. If it were otherwise, the smaller skilled team they postulate would simply read the prior art and put it to one side as not being for them because they are not a skilled team concerned with taking forward a project that is in the animal data stage.

31. Having artificially constructed a way to feed the formulator 40mg/ml as the concentration of aflibercept that **must** be used in the formulation, the thrust of Formycon and Samsung's obviousness case is the precise opposite of what they contend in the context of infringement by equivalents.

32. In the context of inventive concept and equivalents the picture painted is of a complete inability to have any idea of what may work, or why, even when one has a stable formulation as a starting point. But for the obviousness case – where the skilled person has no successful formulation at all – and does not even know one can be achieved – it is just a matter of picking a starting point and tinkering 'iteratively' a bit until the claimed formulation is found.

33. We address the issues with this in more detail below but mention a few striking points here;

i. Formycon and Samsung's formulator (Dr Daugherty) does not explain in any real detail how a failure – i.e. an attempt at an unstable formulation – informs what is done next on the "iterative" path she says will lead to the claimed formulation. And most particularly she does not explain how prior knowledge of a successful formulation would be of no use, but a skilled formulator would, with only knowledge of failed formulations, be able to find their way to the stable formulation of the claim.

ii. Dr Daugherty's approach is one of ignoring key information that the skilled formulator would want to know and to take account of. It seems like she is describing 'iterative' shots in the dark, that eventually reveal the claimed formulation.

iii. More specifically, although Formycon and Samsung accept that the formulator would want to know the pI of aflibercept (which identifies a pH region to be avoided for the formulation), they advance a case that the information that was passed on by the protein engineer would not take account of the significant effect of its glycosylation. Their evidence acknowledges that the value they suggest would be wrong – and known to be wrong – but then criticise the way it was said it would be assessed in the Patentee's evidence – even though the quibble there is completely insignificant. The big picture point is Formycon and Samsung's approach enables pH 6.2-6.3 not to be seen as uncomfortably close to or within the pH region in which the aflibercept ought not to be formulated – i.e. pH equivalent to its pI (6.5-7.3) or close to it. Formycon and Samsung do this by passing a much higher pI value to the formulator even though they accept it would be known it was wrong. That is as good as deciding not to ask for the routine information at all. Perhaps worse.

34. In addition, Prof Gukasyan (the Patentee's formulator) explains that the formulator would wish to know of potential points of instability, including likely oxidation (he calls them 'soft spots'). Exposed methionine residues are a well-known example of this. Exposed in this context means accessible to the solvent – not buried (fully or partially) within the protein. If there are any such methionine residues the use of excipients that might tend to cause oxidation would be disfavoured, particularly at higher concentrations of the protein. In this case that means the use of polysorbate would be disfavoured given that aflibercept has at least one, possibly more, potentially troublesome exposed methionine residues. But this is all ignored by the Claimants.

35. In short the inconsistent horses Formycon and Samsung seek to ride for infringement and obviousness are not happy bedfellows. Nor can they say that gives them any kind of squeeze between infringement and validity. The reason for this is that there are two very important differences between the skilled person's knowledge for the purpose of obviousness and that for assessing infringement: first the knowledge of the Patents and its successful stable formulation; second knowledge of the variants alleged to infringe and specifically the knowledge that they work.

36. The other principal attack on validity is priority. The same points are put forward as added matter objections and so the Defendants have accepted that, if priority is lost, the Patents would be invalid for added matter. The thrust of the priority attack is an argument that the precise combination of the claim is not disclosed, most specifically not where the protein is aflibercept (being the protein of SEQ ID NO: 4 as described in the priority document that has been subject to post-translational modification to remove residues 1-26 and 458 and to glycosylate at 5 asparagine residues).

37. That appears to be based upon an unfair reading of the priority document. It has text foreshadowing the specific preferred embodiments of the examples and also an examples section describing them and the tests that were actually carried out on them. It is clear that, when used in that context, 'SEQ ID NO: 4' is referring to the specific protein that was made and used in the formulation tested. Formycon and Samsung appear to recognise that and postulate it is one produced in E-coli where the post-translational modification would not be the same – at least as regards glycosylation. But this is unreal: all the examples refer to the protein simply as 'SEQ ID NO: 4' and as regards this aspect the priority document contains details of just <u>one</u> specific thing as regards the specific embodiment – the sequence (with glycosylation) claimed – see the priority document paragraph [0030].

38. Formycon and Samsung also allege the Patents make no technical contribution so are invalid for AgrEvo obviousness/insufficiency. This appears to be a point to try to deal with the issue of the high concentration of aflibercept in the formulation.

39. What they do is set up a straw man. As before, they have to make it about a specific dose rather than concentration itself. And as before they do it by focusing on the precise high dose that would give 40mg/ml at the highest volume considered prudent for intravitreal injection. And the straw man is to suggest that the Defendants' case is that there would be a prejudice against a dose of 4mg because of a perceived risk of adverse effects. And, so the argument goes, the Patents do not show that there are not adverse effects.

40. The gaping hole in the argument is that they are assuming that there is a motivation to adopt a 4mg dose for efficacy but a prejudice against it because of a perceived risk of adverse effects.

41. But there is simply no motivation to adopt a 4mg dose from an efficacy perspective in light of Wiegand II. Formycon and Samsung have chosen their starting point – the animal work. And the perception of the skilled team with that data at the priority date would be that the required efficacy could in due course be achieved at doses well below that which would have the formulator investigating concentrations of 40mg/ml.

42. It is not without note that the dose actually used is 2mg (and that is in fact higher than the skilled team would have thought at the priority date reading the prior art). Nor is the claim to a 4mg dose. The 4mg dose is a contrivance via which Formycon and Samsung seek to get 40mg/ml concentration as a **requirement** for the formulator in light of the prior art, as we explain above. But that does not make a 4mg dose part of the inventive contribution of the Patents. There is therefore no requirement that the Patents need to render plausible any specific dose, whether it be 4mg or any other, from a clinical perspective.

43. Finally, it appears Formycon and Samsung think they have some kind of Formstein defence too. As we explain below it is very unclear what it is. There is no basis whatever for a finding that their products were obvious (or lacking in novelty) at the priority date.

**BACKGROUND**

44. The two patents in dispute are European Patent (UK) 2 364 691 ("**EP 691**") and European Patent (UK) 2 944 306 ("**EP 306**"), together "**the Patents**", of which Regeneron is proprietor and Bayer is an exclusive licensee.[1] EP 306 is a divisional of EP 2 029 103. EP 691 is also a divisional of EP 2 029 103.

45. The claims in issue at trial (together the "**Claims**") are as follows:

i. **EP 691** (as proposed to be unconditionally amended[2]): <u>claim 3</u> (as dependent on 2 and 1), <u>claim 5</u> (as dependent on 1) and <u>claim 11</u> (as dependent on 3 or 5); and

ii. **EP 306**: claim 5 (as dependent on 4 and 1) as granted, and claim 2 (as dependent on 1) as proposed to be conditionally amended.

46. The Patents claim a formulation of aflibercept, a VEGF antagonist, that is suitable for intravitreal administration. The Defendants sell aflibercept under the brand name EYLEA for the treatment of ocular indications, including wet AMD.

47. Formycon and Samsung have each developed an aflibercept biosimilar product, referred to as the "**Formycon Product**" and the "**Samsung Product**", respectively.

48. Each of Formycon and Samsung have brought proceedings seeking to revoke the Patents and seeking a declaration of non-infringement in relation to their respective biosimilars. The Defendants have counterclaimed for infringement. The case on **infringement**, is one of infringement by equivalence, as the Formycon and Samsung Products differ from the literal wording of the Claims in the following respects:

i. The **Formycon Product** differs from the Claims in that it contains a histidine buffer instead of a sodium phosphate buffer. The quantity is the same.

---

[1] The Claimants have not admitted that Bayer is an exclusive licensee, however it has been agreed that this issue be stood over to any damages inquiry.

[2] Carpmaels & Ransford's letter of 25 March 2025 at [ISC-281].

ii. The **Samsung Product** differs from the Claims in that it contains no NaCl, 8% (instead of 5%) sucrose, and 7.78 mM sodium phosphate buffer instead of 10 mM sodium phosphate buffer.

49. The Court is familiar with some of the infringement issues already, having considered them at the PTR in the context of determining whether the Claimants had permission to rely on their new positive case on inventive concept and non-infringement (as to which the Court's judgment is at [H/4/pp74-77]).

50. As to the validity of the Claims, the Claimants have challenged the validity of the Patents on the following grounds (summarised in the overview above):

i. **Lack of entitlement to priority and added matter**, which turns on matters of disclosure in the priority document / application as filed and the Patents ([B.1/7] §§1-3). The Defendants have accepted that, if any of the Claims are not entitled to priority because the combination of features of the claim is not disclosed in the priority document, then it suffers from added matter for like reasons – see A&O Shearman's letter of 8 April 2025 at [ISC-303].

ii. **Obviousness** over a single piece of prior art ([B1.7] §5) – **Wiegand II** ([B.2/2]).

iii. **Lack of novelty** over a novelty only citation called **Dix** ([B.2/2]) at [B1.7] §4.

iv. A collection of various arguments under the heading **"Lack of technical contribution / AgrEvo-type obviousness / Insufficiency/Inconsistency with infringement under the doctrine of equivalents"** ([B.1/7] §§6-8). Included within these grounds is an argument (at §7) that if the Claims are infringed by equivalence then the Claims are anticipated/obvious over the prior art. This appears to be an attempt to advance a type of Formstein defence, however as indicated at §5.3 of the Defendants' Amended Consolidated Defence, Counterclaim and Response to the Consolidated Grounds of Invalidity [B.1/12], the extent to which the pleaded case properly identifies a defence to infringement and/or ground of invalidity as a matter of law is disputed.

51. The Claimants also dispute the **allowability of the Defendants' proposed claim amendments**, though they do not raise any issues for determination beyond those identified above ([B.3/7]).

52. There are proceedings ongoing in other jurisdictions and in the EPO between the parties to this litigation and/or relating to the Patents, the details of which are included in Annex A to this skeleton.

## WITNESSES

### The Defendants' Witnesses

53. **Prof Hovhannes Gukasyan** (reports at [D.1/1 & 2]) is an Associate Professor at the University of Southern California School of Pharmacy. He has spent around 18 years working in the pharmaceutical industry in formulation development for approximately 80 drug discovery and development programs. During his time at Pfizer between 2005 and 2017, he worked on the development of a range of pharmaceutical formulations, including ophthalmic formulations and, more specifically, intravitreal formulations. He gives evidence from the perspective of the formulation scientist in the skilled team.

54. **Prof Robin Leatherbarrow** (reports at [D.1/3, 4 & 4a]), now retired, was until 2020 a Pro-Vice Chancellor at Liverpool John Moores University and Professor of Chemical Biology at Imperial College London, with involvement in research related to protein engineering, frequently in collaboration with industry. He gives evidence from the perspective of the protein engineer in the skilled team.

55. **Prof Laurent Kodjikian** (reports at [D.1/5, 6 & 6a]) is a Professor of Ophthalmology and Chair of the University of Lyon and Associate Chair of the Ophthalmology Department at Croix-Rousse Teaching Hospital in Lyon, France. His clinical focus is on medical retinal diseases, including (amongst other things) age-related macular degeneration and diabetic retinopathy, and he has extensive clinical trial experience relating to these conditions. He gives evidence from the perspective of the clinician in the skilled team.

56. **Dr Keith Ward** (reports at [D.1/7, 8 & 9]) is a pharmacokineticist with over 25 years' experience in drug development, with both pre-clinical and clinical experience in pharmacokinetics and pharmacodynamics, including in the field of ocular PK/PD and ophthalmic drug development. He gives evidence from the perspective of the ocular PK/PD scientist in the skilled team.

### The Claimants' Witnesses

57. **Dr Ann Daugherty** (reports at [C.1/1 & 2]), now retired, was until 2023 employed within the Pharmaceutical Research and Development Department at Genentech, principally working on the formulation development and drug delivery of large molecules, including therapeutic proteins. She gives evidence from the perspective of the formulation scientist in the skilled team.

58. **Dr Dominic Esposito** (reports at [C.1/3 & 4]) is Director of the Protein Expression Laboratory (PEL) at the Frederick National Laboratory for Cancer Research, USA. The PEL generates DNA,

cell lines and proteins for biomedical research and develops protein expression and production technologies. He gives evidence from the perspective of the protein engineer in the skilled team.

59. **Prof Robert MacLaren** (reports at [C.1/5, 6 & 6a]) is a Professor of Ophthalmology at the University of Oxford and Honorary Consultant Ophthalmologist at the Oxford Eye Hospital. He has more than 30 years' experience in the field of retinal eye diseases and has been involved with running international clinical trials. He gives evidence from the perspective of the clinician in the skilled team.

60. **Dr Theodore Wensel** (reports at [C.1/7 & 8]) is Professor of Biochemistry and Molecular Pharmacology, Professor of Ophthalmology and Professor of Neuroscience at Baylor College of Medicine. He gives evidence from the perspective of the ocular PK/PD scientist in the skilled team (though, as we note below, the Claimants dispute that such a person forms part of the relevant skilled team).

## SKILLED TEAM

### The Law

61. The law around the make-up of the skilled team is well settled. See the summary of the law set out by Meade J in *Alcon v Actavis* [2021] EWHC 1026 (Pat) at [30] – [31], and in particular the citation of the detailed review by Birss LJ in *Illumina Cambridge Ltd. v Latvia MGI Tech SIA and others* [2021] EWHC 57 (Pat) ([58]-[70]) extracted in full at [30]. We draw the Court's attention to *Illumina* at [68] and *Alcon at* [31], because the Claimants appear to be taking a sort-of reverse-*Schlumberger* type point (which we discuss below):

> Illumina:
>
> "68. I conclude that in a case in which it is necessary to define the skilled person for the purposes of obviousness in a different way from the skilled person to whom the patent is addressed, the approach to take, bringing Schlumberger and Medimmune together, is:
>
> To start by asking what problem does the invention aim to solve?
>
> That leads one to consider what the established field which existed was, in which the problem in fact can be located.
>
> It is the notional person in that established field which is the relevant team making up the person skilled in the art."
>
> Alcon:
>
> "31. I intend to apply that approach. I take particular note of:
>
> The requirements not to be unfair to the patentee by allowing an artificially narrow definition, or unfair to the public (and the defendant) by going so broad as to "dilute" the

CGK. Thus, as Counsel for Alcon accepted, there is an element of value judgment in the assessment.

The fact that I must consider the real situation at the priority date, and in particular what teams existed.

The need to look for an "established field", which might be a research field or a field of manufacture.

The starting point is the identification of the problem that the invention aims to solve."

62. The Court must ground itself in real teams, and which members would have been part of those real teams at the priority date.

63. Where real life experts would collaborate in the pursuit of a project, corresponding expert witnesses should consult one another in a broadly similar way, see *Alcon Eye Care UK Ltd v AMO Development LLC* [2022] EWHC 955 (Pat) at [233]-[235], *Teva Pharmaceutical Industries Ltd v Novartis AG* [2022] EWHC 2847 (Pat) at [38]-[41] and *Teva Pharmaceutical Industries Ltd v Grünenthal GmbH* [2023] EWHC 1836 (Pat) at [51]-[52].

**The Skilled Team in this Case**

<u>Does the Team Include an Ocular PK/PD Scientist?</u>

64. The Defendants' case is that the skilled team would include a Formulation Scientist, a Protein Engineer, a Clinical Ophthalmologist and also an Ocular PK/PD Scientist. The dispute arises around the last of these – the Ocular PK/PD Scientist – and the Claimants did not file evidence from such an expert in chief – but have done so contingently in reply.

65. Both Dr Ward (Ward 1 §4.1-4.4, Ward 2 §2.1-2.3) and Prof Kodjikian (Kodjikian 1 §4.2) explain in their evidence that in real skilled teams on drug development projects there is an individual with specific expertise in PK/PD issues.

66. Dr Ward explains that in his extensive experience of drug development, skilled teams <u>always</u> have the functions of a Clinical Ophthalmologist and an Ocular PK/PD Scientist split across two people (Ward 2 §2.2).

67. The Claimants have instead taken a rather strained position on the skilled team. Despite the fact that the Claimants' experts accept that an Ocular PK/PD Scientist would have been part of the <u>real-world teams</u> to provide input in relation to pre-clinical studies and recommendations for doses to be used in Phase 1 (such as those in the prior art and the steps necessary from the prior art in this case) (MacLaren 2 §§6-7), the Claimants seek to argue that the skilled team would not include an Ocular PK/PD Scientist because "*<u>formulation studies generally</u> occur after the completion of pre-clinical studies and once a decision has been made to proceed with a Phase 1 clinical trial*" (MacLaren 2 §6), and the assistance of an

Ocular PK/PD Scientist would not be needed to interpret the data in the Patents (e.g. MacLaren 2 §6 and Daugherty 2 §3.2). Such an approach allows the Claimants to adopt a superficial approach to the information in the prior art and to the steps that would be taken in light of it.

68. Insofar as the Claimants are taking a point that the skilled team needed to implement the Patents must be slavishly taken and used to interpret the prior art, even where the prior art would need the input of additional team members (i.e. the input of the Ocular PK/PD Scientist), then the Court should consider the approach in *Illumina* and *Alcon* above. The Defendants say that the question is answered by looking at real skilled teams which would have included such a member who would be called upon for input where there were relevant PK/PD issues.

69. Further, the logical consequence of the Claimants' arguments is not that the skilled team reading the prior art includes everyone except for the Ocular PK/PD Scientist; the logical consequence would be that the only team members needed to understand and implement the Patents are the formulator (to formulate the protein) and the protein engineer (to make the protein) – they can understand the data and make the product, and the team would not need to contain a Clinical Ophthalmologist at all. But if that same narrow team were to be given the prior art (Wiegand II), they would no doubt say "this has nothing to do with me", and put it to one side.

70. In any event, insofar as it is necessary to take the point, the Defendants will say that, if the skilled team is one that does not include an Ocular PK/PD Scientist, such a team would, on being presented with Wiegand II, immediately draw such a person into the team to interpret the pre-clinical data in it, and provide guidance on doses for a Phase 1 study. No real-world skilled teams progress from just pre-clinical data into doses in humans without an Ocular PK/PD Scientist in the way that the Claimants' evidence in chief seeks to suggest. Even Prof MacLaren accepts that the experiments in Wiegand II would have required assistance from an Ocular PK/PD Scientist to fully understand (MacLaren 2 §52).

71. We also detect that a similar type of point might be being run on the Protein Engineer, that they would be under-skilled, and unable to answer the Formulation Scientist's questions about potential sites in the protein that are susceptible to physical or chemical instabilities, because the Patents only require someone skilled enough to make the protein, not to understand or analyse it (see e.g. Esposito 1 §31). This appears to be another reverse-*Schlumberger* type point that the skilled team needed to implement the Patents is an under-skilled team in the context of properly implementing/taking forward the prior art, which allows the Claimants to take an artificially superficial approach when it comes to obviousness.

72. Again, the Defendants' primary case is that the Protein Engineer interested in implementing the Patents would not just be a protein production person. However, insofar as the Protein Engineer

was unable to answer questions the Formulation Scientist would need answering before setting off on a formulation exercise in light of the prior art, the team would seek a Protein Engineer capable of answering the questions, not just shrug their shoulders and set off blind.

<u>Other Skilled Team Disputes</u>

73. There are some other minor disputes over the skilled team, e.g. their level of experience (Gukasyan 2 §2.1), or the precise description of the formulator (Daugherty 2 §3.1), but it does not appear that these are material to the case.

**COMMON GENERAL KNOWLEDGE**

74. The priority date of the Patents is **16 June 2006**. At that time, the field of ocular drug development was far less advanced than the field of systemic drug development, both from a clinical/PK/PD perspective and from a formulation perspective[3]. The field of ocular drug formulation in particular was a relatively small one, with only a few companies and academic institutions working in it[4].

75. In relation to the formulation of drugs for intravitreal administration, it was well known that formulating proteins posed particular difficulties relating to stability and solubility, as they are complex macromolecules comprising primary, secondary and tertiary structures[5]. As to the agreed CGK in relation to such stability issues, see §§5-12 of the Agreed CGK Statement (formulation).

76. In terms of the drugs that were used for intravitreal treatment at the Priority Date, there were a small number of VEGF antagonists being used or being developed for intravitreal treatments of ocular indications such as wet AMD, however the field of intravitreal treatments was still at an early stage. The only VEGF antagonist that was authorised for such treatment was Pegaptanib sodium (an anti-VEGF aptamer, with brand name "Macugen"), although bevacizumab (a full-length antibody, with brand name "Avastin") had been administered off-label for such indications[6], and ranibizumab (a fragment of the bevacizumab antibody developed specifically for ophthalmic use, with brand name "Lucentis") was in the late stages of clinical trials and had produced positive results. The agreed CGK relating to these drugs, in terms of their clinical use and their formulations is set out in the Agreed CGK Statements at §§65-84 (clinical ophthalmology), §§54-59 (ocular PK/PD) and §§95-96 (formulation).

---

[3] Gukasyan 1 §5.5; Ward 1 §5.10; Kodjikian 1 §5.37.

[4] Gukasyan 1 §5.5.

[5] Gukasyan 1 §5.10.

[6] Avastin was authorised for the treatment of metastatic colon cancer.

77. Aflibercept, which is a VEGF specific fusion protein - which can be referred to as a "VEGF antagonist" or "VEGF trap" - was not part of the CGK, and had not been authorised for clinical use.

78. The Agreed CGK Statements provide further background in relation to the four disciplines being addressed by the expert evidence, however given their length, we do not seek to summarise all the agreed CGK in this skeleton, but identify the relevant agreed CGK in the sections below where we consider it is or may be relevant to an issue that the Court needs to decide.

79. Similarly in relation to the topics in dispute on CGK set out in the Lists of Disputed CGK, we identify those topics which we consider to be relevant to the issues the Court has to decide in the context of addressing those issues below. However, for ease of reference, at Annex B to this skeleton argument we have set out topics in dispute on the CGK from each of the four relevant disciplines, and identify (a) to what issue (if any) the dispute is relevant, and (b) to the extent relevant, where the issue is picked up in the body of the skeleton argument.

## PATENTS AND THE INVENTIVE CONCEPT

### The Specification of the Patents

80. Below we address the specifications of the Patents together, as the disclosure is the same in material respects. The paragraph references referred to below are to paragraphs of EP 691.

81. The Patents are directed to pharmaceutical formulations suitable for intravitreal administration comprising agents capable of inhibiting VEGF, and methods for making and using such formulations ([0001]). The invention is described as the provision of stable pharmaceutically acceptable formulations of a VEGF fusion protein (referred to as a "VEGF trap") in both liquid and lyophilised (i.e. freeze dried) form, which are suitable for intravitreal administration ([0001], and [0006]).

82. [0046] describes the VEGF antagonist as consisting of amino acids 27-457 of SEQ ID NO:4 which is glycosylated at Asn residues 62, 94, 149, 222 and 308 and states that, in specific embodiments, the VEGF antagonist is expressed in a mammalian cell line such as a CHO cell.

83. As to the references to the formulations of the invention being "stable" (at [0006]), or having "increased stability" (at [0001]), [0041] identifies the known stability issues that apply when formulating proteins in the following terms:

> [0041] Safe handling and administration of formulations comprising proteins represent significant challenges to pharmaceutical formulators. Proteins possess unique chemical and physical properties that present stability problems: a variety of degradation pathways exist for proteins, implicating both chemical and physical instability. Chemical instability includes deamination, aggregation, clipping of the peptide backbone, and oxidation of

> methionine residues. Physical instability encompasses many phenomena, including, for example, aggregation and/or precipitation.

84. This reflects the CGK summarised in the Agreed CGK Statement as to the particular stability challenges associated with formulating proteins. As explained further below, the data in the Patents provides clear evidence that the formulation of the Claims has very good stability.

85. Various embodiments of the invention are summarised at [0008]-[0038]. Throughout these paragraphs the excipients referred to are described by reference to their functional role in the formulation; for example:

    i. Sodium phosphate is described variously as "sodium phosphate buffer", "the buffering agent", and "the buffer" (see e.g. [0008]; [0010]; [0014]; [0020]);

    ii. Sodium Chloride (NaCl) is described as a tonicity agent (see e.g. [0010]; [0016]; [0021]);

    iii. Polysorbate 20 is described as an organic co-solvent (see e.g. [0008]; [0008]; [0010]; [0019]);

    iv. Sucrose is described as a stabilising agent ([0008]; [0010]; [0016]; [0018]).

86. Of particular relevance to the Claims is [0014] which describes a specific preferred embodiment of "*the stable liquid ophthalmic formulation*" comprising "*about 40mg/ml of the VEGF antagonist, 10mM sodium phosphate buffer, 40mM sodium chloride, 0.03% polysorbate, and 5% sucrose, pH about 6.2-6.3.*" Further, of relevance to unconditionally amended claim 11 of EP 691 and claim 5 of EP 306, which are claims to a pre-filled syringe, [0037] states that "*The invention further features ophthalmic formulations provided in a pre-filled syringe or vial, particularly suitable for intravitreal administration.*"

87. In relation to the further general teaching about stable liquid ophthalmic formulations, the Patents state at [0050]:

> Stability is determined in a number of ways at specified time points, including determination of pH, visual inspection of color and appearance, determination of total protein content by methods known in the art, e.g., UV spectroscopy, and purity is determined by, for example, SDS-PAGE, size-exclusion HPLC, bioassay determination of activity, isoelectric focusing, and isoaspartate quantification. In one example of a bioassay useful for determining VEGF antagonist activity, a BAF/3 VEGFR1/EPOR cell line is used to determine VEGF165 binding by the VEGF antagonist of the invention.

88. The Patents also provide teaching as to the preferred quality of the protein to be used to prepare the formulation, stating at [0047] that the VEGF antagonist is preferably "substantially free of protein contaminants" (meaning at least 90%, more preferably 95%, most preferably 99% of the weight is pure protein) and "substantially free of aggregates" (meaning that at least 90% of the weight is not present in an aggregate).

89. The key aspects of the Examples of relevance to the Claims are as follows:

90. The Examples refer to formulations containing the relevant concentrations of "VEGF Trap (SEQ ID NO:4)", which would be understood to be the fusion protein consisting of amino acids 27-457 of SEQ ID NO:4 which is glycosylated at Asn residues 62, 94, 149, 222 and 308 (as described at [0046]).

91. The Examples measure the following properties relating to stability: (a) visual appearance, (b) turbidity (which measures the clarity of the formulations by optical density at 405nm), (c) pH, (d) percentage of VEGF Trap recovered (i.e. how much VEGF Trap remains in solution as compared to time zero), and (e) percentage of VEGF Trap in its native configuration (e.g. in its correctly folded state) as determined by size exclusion HPLC.

92. Although it is not stated explicitly in the Patents, the Formulation Scientist would appreciate that the tonicity of the liquid formulations used in Examples 1-6 would be close to or within the range which is suitable for intravitreal administration (Gukasyan 1 §7.26; §7.32; §7.40; and §7.43).

93. The formulation used in Examples 1 and 2 ([0059]-[0060]) are very similar to the formulation of the Claims. The only differences are that (i) they contain a higher concentration of VEGF Trap than in the Claims (50 mg/ml instead of 40 mg/ml) (ii) instead of 0.03% polysorbate 20, Example 1 contains 0.1% polysorbate 20 and Example 2 contains 3% PEG[7] and (iii) they contain slightly more NaCl (50mM instead of 40mM). Those Examples provide stability data at 24 months, and show positive results in relation to all the metrics measured.

94. The formulation of the Claims is used in Examples 3 and 4 ([0061]-[0062]), both with a pH of 6.3; the difference between the two Examples being that Example 3 is in a vial and Example 4 is in a pre-filled syringe. The Examples provide stability data at 4 months in relation to visual appearance, turbidity and pH, and positive data at 2 months in relation to percentage of VEGF Trap recovered and percentage of VEGF Trap in its native configuration.

95. The formulation used in Examples 5 and 6 differ from the formulation of the Claims in that they contain no sucrose and contain 135mM (instead of 40mM) NaCl (Example 5 being in a vial and Example 6 being in a pre-filled syringe).

[7] Examples 1 and 2 refer to "10mM phosphate" instead of "10mM sodium phosphate", however that would be understood by the Formulation Scientist to be a reference to "sodium phosphate" – see Gukasyan 1 §7.11(b). Further, [0047] states that "*unless otherwise stated*" *the phosphates employed are sodium phosphates*".

96. Examples 7 and 8 relate to lyophilised formulations which, prior to lyophilization, contain half the concentration of the VEGF Trap (20mg/ml). The results show positive stability results after storage for up to 2 months as a lyophilised powder and following reconstitution.

**The Claims**

97. The Claims in issue are:

i. **EP 691** (as proposed to be unconditionally amended[8]): claim 3 (as dependent on 2 and 1), claim 5 (as dependent on 1) and claim 11 (as dependent on 3 or 5); and

ii. **EP 306**: claim 5 (as dependent on 1) as granted, and claim 2 (as dependent on 1) as proposed to be conditionally amended.

98. All the claims of EP 306 are to a pre-filled syringe comprising an ophthalmic formulation, whereas claims 3 and 5 of EP 691 are simply to an ophthalmic formulation. Prof Gukasyan explains that the provision of a formulation in a glass vial or pre-filled syringe, indicates that the formulation was expected to be used as a medicinal product (Gukasyan 2 §5.6).

99. There are also minor differences in the wording between some of the claims. On the Defendants' case on validity or infringement, none of those differences matter, but some or all of those differences could end up potentially being relevant depending on how the Claimants' case develops, particularly on priority (which is only pleaded at a high level in respect of the remaining Claims in issue). We set out below a table showing the differences in wording between the Claims:

[8] Carpmaels & Ransford's letter of 25 March 2025 at [ISC-281].

| EP 691 | | | | EP 306 | |
|---|---|---|---|---|---|
| **Amended claim 3 (dep on 2 & 1)** | **Amended claim 5 (dep on 1)** | **Amended claim 11 (dep on 3 (& 2 & 1)** | **Amended claim 11 (dep on 5 (& 1)** | **Claim 5 (dep on 4 & 1)** | **Amended claim 2 (dep on 1)** |
| ophthalmic formulation | ophthalmic formulation | pre-filled syringe comprising the ophthalmic formulation | pre-filled syringe comprising the ophthalmic formulation | pre-filled syringe comprising the ophthalmic formulation | pre-filled syringe comprising the ophthalmic formulation |
| 40 mg/ml aflibercept [9] | 40 mg/ml aflibercept | 40 mg/ml aflibercept | 40 mg/ml aflibercept | 40 mg/ml aflibercept | 40 mg/ml aflibercept |
| 10 mM sodium phosphate buffer | 10 mM sodium phosphate buffer | 10 mM sodium phosphate buffer | 10 mM sodium phosphate buffer | 10 mM sodium phosphate buffer | 10 mM sodium phosphate buffer |
| 40 mM sodium chloride | about 40 mM sodium chloride | 40 mM sodium chloride | about 40 mM sodium chloride | 40 mM sodium chloride | 40 mM sodium chloride |
| 0.03% polysorbate | 0.03% polysorbate 20 | 0.03% polysorbate | 0.03% polysorbate 20 | 0.03% polysorbate 20 | 0.03% polysorbate 20 |
| 5% sucrose | 5% sucrose | 5% sucrose | 5% sucrose | 5% sucrose | 5% sucrose |
| pH about 6.2-6.3 | pH 6.2-6.3 | pH about 6.2-6.3 | pH 6.2-6.3 | pH 6.2-6.3 | pH 6.2-6.3 |
| suitable for intravitreal administration | suitable for intravitreal administration | suitable for intravitreal administration | suitable for intravitreal administration | suitable for intravitreal administration | suitable for intravitreal administration |

**The Inventive Concept**

<u>The Defendants' Case</u>

100. The Claims provide, for the first time, a liquid formulation of aflibercept which is at a **very high concentration (40mg/ml)** and is both **long-term stable** and **suitable for intravitreal** administration (i.e. injection into the vitreous of the eye).

101. In respect of **long-term stability**, Prof Gukasyan explains that, based on (i) the Formulation Scientist's view as to the problem that the patentee was seeking to solve (namely providing a long-term stable formulation of aflibercept), and (ii) the data in the Examples, the Formulation Scientist would understand the formulation of the Claims to be stable in liquid form for at least 2 years under refrigerated conditions (Gukasyan 1 §§7.48-7.49; Gukasyan 2 §5.6).

102. In respect of **suitability for intravitreal administration**, Prof Gukasyan explains that the Formulation Scientist would understand that a formulation would be suitable for intravitreal administration if it has an osmolality close to or within the range of the vitreous, has a pH that is

[9] VEGF antagonist consisting of amino acids 27-457 of SEQ ID NO: 4, glycosylated at Asn residues 62, 94, 149, 222 and 308.

tolerated in the eye, and is non-viscous enough to be capable of being injected (Gukasyan 1 §§6.33-6.35).

103. The relevance of **40 mg/ml of aflibercept** to the inventive contribution is that the Patents demonstrate that it is possible to make a stable formulation of aflibercept that is suitable for intravitreal administration at such a high concentration, using the excipients and amounts and conditions of the Claims.

104. In terms of the **contribution of the excipients** to the long term stability and suitability for intravitreal administration of the formulation, each excipient would be understood to be contributing through the relevant functionality identified in the Patents (identified at §85 above), and (based on their CGK) the Formulation Scientist would understand them to be providing the relevant functionalities in the way identified below[10]:

i. The 0.03% polysorbate 20 acts as a co-solvent, and would be understood to assist in stabilizing the formulation through its ability to prevent the hydrophobic surface exposed regions of aflibercept from associating with hydrophobic regions on other aflibercept molecules (thereby reducing aggregation) and the surface of the container (thereby reducing adsorption) due to it being a non-ionic surfactant;

ii. The 40mM NaCl acts as a tonicity agent, which adjusts the tonicity of the formulation to bring it close to or within the range acceptable for intravitreal administration;

iii. The 10mM sodium phosphate acts as a buffer, which maintains the desired pH for the relevant time period through the capture and release of hydrogen ions;

iv. The 5% sucrose acts as a stabilizing agent, which assists in stabilising the formulation by forming a physical protective environment around the protein (thereby reducing aggregation) and stabilising the folded and active conformation of the protein over unfolded and inactive conformations through preferential interaction.

---

[10] Consolidated Defence and Counterclaim [B1/12/61] §5.2; Gukasyan 1 §7.50(a)-(d). See also (in the context of Example 1) §§7.19-7.29.

105. It appears to be common ground that the excipients of the Claims would be understood to be performing the aforesaid functions, and that the Formulation Scientist would have understood, based on their CGK, the mechanisms by which the excipients achieved those functions[11].

106. Prior to the Patents, no long-term stable formulations of high concentrations of aflibercept suitable for intravitreal administration were known in the art, and it was not obvious that it would be possible to achieve such a formulation at all, still less what pH conditions or excipients (or amounts of excipients) would achieve it[12].

107. The Patents establish that, at a pH of 6.2-6.3, and using the excipients listed in the Claims at the amounts claimed, one can formulate aflibercept at a concentration as high as 40 mg/ml in such a way that is suitable for intravitreal administration. Prof Gukasyan explains that this would be understood at the Priority Date to be an important and surprising achievement given the known challenges of formulating proteins at high concentrations (Gukasyan 1 §7.51). Further, as explained below in the context of inventive step, these formulation challenges would be expected to be exacerbated due to the particular properties of aflibercept that the skilled team seeking to formulate it would be made aware of (both in relation to its isoelectric point (pI) and its features which make it susceptible to instabilities) (see §§293 to 302 below).

108. Once armed with the contribution of the Patents, the Formulation Scientist would appreciate that there would likely be minor modifications that could be made to the formulation which would still achieve the long-term stability and suitability for intravitreal administration in the same way (Gukasyan 1 §7.52), although given the uncertain nature of the formulation exercise they would not be able to predict each and every specific modification which would achieve the same result in the same way. As explained further in the context of infringement, the Claimants' formulations include such minor modifications, which it is admitted achieve substantially the same result as the formulation of the Claims in substantially the same way.

<u>The Claimants' Case</u>

109. The Claimants recently provided draft amendments to their pleadings to include a primary and secondary positive case on the inventive concept of the Claims[13]. The Defendants have not consented

---

[11] Dr Daugherty does not dispute Prof Gukasyan's description of what the Formulation Scientist would have appreciated to be the functional roles of the relevant excipients in reply to Gukasyan 1 §§7.49-7.51. Also, in the context of addressing CGK, Dr Daugherty refers to the same mechanisms – see Daugherty 1 §§8.11 (in relation to buffers); §8.16-8.17 (in relation to non-ionic surfactants, which Dr Daugherty recognises at Daugherty 2 §4.45 are a sub-set of co-solvents, of which polysorbate is one); §8.22 (in relation to tonicity agents).

[12] Gukasyan 1 (in the context of the CGK) §6.36; Gukasyan 1 (in the context of the Patents) §7.51.

[13] See the serving letters at [ISC / 431 & 432e].

to the amendments insofar as they seek to advance the Claimants' secondary positive case on the inventive concept, for the reasons set out at [ISC/p.441-444]. The Claimants have not responded to that letter, so it is unclear if the Claimants are intending to seek permission to amend.

110. However, assuming that the Claimants do seek to introduce at least their primary positive case on inventive concept, we address that case below. In relation to the secondary case, we explain below the basis for the Defendants' objections to the introduction of such a case.

111. In relation to the Claimants' primary case, we make the following three points:

112. First, although the Claimants agree that stability and suitability for intravitreal administration are part of the "result" of the invention for the purpose of the Actavis questions[14], they suggest that the stability of the formulation is not part of the inventive concept[15]. This is not understood, as the Patents describe the invention as being the provision of formulations with "increased stability" ([0001]), the embodiments (including the embodiment the subject of the Claims) are described as being stable liquid formulations ([0013]), the data in the Examples is stability data, and it is common ground between Prof Gukasyan and Dr Daugherty that stability was understood by the Formulation Scientist to be a key requirement of the formulation of any protein[16].

113. Second, the Claimants suggest that the Formulation Scientist would understand the Patents only to be promising stability for at least 2 months[17], as opposed to long term stability of at least 2 years. This seems to be based purely on the fact that Examples 3 and 4 show stability results at 2-4 months, rather than 24 months. However:

i. The skilled person would not have understood the result of the invention to be the provision of 2 months stability, in view of the context of developing a pharmaceutical formulation for intravitreal administration, which is the problem that the Formulation Scientist would understand the patentee is addressing (Gukasyan 1 §§5.7-5.8; Gukasyan 2 §5.6). It is common ground between the formulators that, even when developing a formulation for the early stages of clinical trials (including phase 1), a formulator aims to

---

[14] Draft Re-Re-Amended Def to CC (Formycon) §5(3) and (Samsung) §4(d)(da). Daugherty 1 §14.9 (which describes the result of the Claims as being the "stability result" and the "IVT result".

[15] Draft Re-Re-Amended Reply & Def to CC (Formycon) §5(3); Draft Re-Re-Amended Reply & Def to CC (Samsung) §4(da).

[16] Daugherty 1 §8.8 (which describes the functional requirements for a liquid protein formulation as including protecting it from physical and chemical degradation) and Gukasyan 1 §5.6 which states that "A key objective in protein formulation development is to stabilise the protein so that it remains safe and effective following manufacture".

[17] Daugherty 1 §14.9(a); Draft Re-Re-Amended Reply & Def to CC (Formycon) §5(3); Draft Re-Re-Amended Reply & Def to CC (Samsung) §4(da)).

develop a formulation with long term stability which can be used throughout the clinical trials and in the commercial product (although they may not be in total agreement as to the precise length of such desired long-term stability) (Gukasyan 1 §§5.6-5.9; Daugherty 1 §9.14 and §11.7).

ii. Further, Examples 1 and 2 show good stability at 24 months at a higher concentration of aflibercept (50 mg/ml), each with only one difference in the co-solvent, and a slightly higher concentration of NaCl (50 mM as opposed to 40 mM[18]), and that data would be understood by the Formulation Scientist to be supportive of their view that the formulation of the Claims would achieve similar levels of stability.

114. Third, the Claimants appear to suggest that the functions of the excipients in the formulation are not part of the inventive concept, and that the invention is limited to the literal interpretation of the words in respect of each and every aspect of the formulation[19]. This is not a credible interpretation of the inventive concept because:

i. the Patents include descriptions of the excipients in functional terms; and

ii. it was CGK that the excipients performed the functions summarised at §104 above (§§59-83 & 87-89 Agreed CGK Statement (formulation)).

115. In those circumstances, it would be entirely artificial to narrow the scope of the inventive concept in such a way that ignores the relevant contributions of the excipients to the invention.

116. Further, the Claimants' case on this point appears to be based on the proposition that there is inherent uncertainty about how the various excipients may interact with each other and a lack of predictability as to what combinations of excipients and conditions would provide the required stability (Daugherty 1 §14.11 and §§14.14-14.15). This appears to be at odds with the Claimants' obviousness case, which seeks to suggest that the Formulation Scientist would expect to be able to make a stable formulation of aflibercept, and that the particular combination of excipients and conditions of the Claims would be obvious ones to try (Daugherty 1 §4.59 and §§11.13-11.22).

117. The alternative case foreshadowed by the Claimants on the inventive concept appears to be that, even if part of the inventive concept included the fact that the excipients were understood to contribute to the invention through the functionalities listed at §104 above, the Formulation Scientist would think that the 10mM sodium phosphate buffer and/or the 40mM NaCl *may* result in ionic

[18] The latter of which is relevant to osmolality/suitability for intravitreal administration, as opposed to stability.

[19] Draft Re-Re-Amended Reply & Def to CC (Samsung) §5(3) and (Formycon) §4(da).

interactions occurring in the formulation which *may* make some additional contribution (either positively or negatively) to the stability of the formulation of the Claims[20].

118. Notwithstanding the inherent problems with the merits of this argument (in particular the fact that such a proposition is not supported by either the CGK[21] or the teaching of the Patents[22]), the late introduction of such a proposed alternative case would cause the Defendants prejudice because - as was framed in the Claimants' draft amended pleadings - there would still be issues raised by the case which the Defendants would wish to address with experiments.

119. The Defendants have explained this to the Claimants in correspondence at [ISC/441-444], which we ask the Court to read. In summary the issue is this:

i. The Defendants, in response to the Claimants' proposed alternative case, would wish to rely on the fact that the skilled person would be able to perform CGK routine tests (of the kind described at (1) and (2) of Annex A to the Defendants' letter at [ISC/444]) to establish that there were no (or no relevant) stabilising effects caused by any ionic interactions of the NaCl or the sodium phosphate. They would wish to rely on such experiments both in the context of their case that the Claimants' alternative case on inventive concept itself should be rejected, and in the context of addressing Actavis question 2 on the basis of that alternative inventive concept (see §2(b) and §2(d)-(e) of the letter at [ISC/442]).

ii. Although Samsung and Formycon have made an admission in respect of Actavis question 1, and both have proposed some further qualified admissions in respect of any proposed experiments, they do not remove the prejudice that the Defendants would suffer were the case allowed to proceed to trial.

iii. Samsung has proposed a qualified admission that it would not contend that the outcome of any experiment would/might not demonstrate that the ionic interactions were making a significant contribution to stability. However Samsung contends that the Defendants would need to establish that the relevant experiments were "capable of determining" that question. Such a qualified admission does not remove the relevant prejudice to the

[20] This is not identified specifically in the Claimants' draft re-re-amended pleadings, but it appears to be implicit in their pleadings on Actavis question 2 (for Formycon §4(dc)(D); for Samsung §5(c)(iii)) and it is also referred to by Dr Daugherty in the context of the inventive concept (Daugherty 2 §6.14).

[21] Dr Daugherty's evidence addresses the possibility of such interactions affecting stability at a general level (Daugherty 1 §§8.12(f) and §8.23-8.24). However, Prof Gukasyan has explained that the possibility of ionic interactions affecting stability would only arise at very high concentrations relative to those which would be relevant to liquid intravitreal formulations and/or in conditions which would not be relevant to intravitreal formulations (Gukasyan 2 §§6.6-6.11).

[22] As the Patents do not refer to any such functionality being potentially relevant, whilst they do refer to the other functionalities of the excipients.

Defendants, because the Defendants would be prejudiced in their ability to prove the "capability" question through being unable to conduct the experiments themselves (see §6(b) at [ISC/443]).

iv. The same issue arises in respect of Formycon's proposed qualified admission (see §7(a) of the Defendants' letter at [ISC/443]). However, Formycon's proposed approach suffers from a further issue, as it is only a concession that whatever the level of specific buffer interaction occurs in the claimed formulation, the same level can be assumed for the Formycon Product. Such an admission would only address the outcome of any experiment that would address Actavis question 2. Such an admission would not address the outcome of the experiment that the Defendants would wish to rely on to prove that the Claimants' alternative inventive concept is wrong in the first place (see [ISC/443] §7(b), by reference to §2(b) and §(2)(e)(ii)(A)).

The Relevance of Dose in the Context of the Inventive Contribution

120. In light of the Claimants' pleaded case of lack of technical contribution/lack of plausibility (Consolidated GoI §6A), we address in more detail the question of the contribution of 40mg/ml of aflibercept to the invention and the relevance of the dose of aflibercept to that concentration.

121. The concentration of a protein in a formulation is determined by (i) the dose of the protein and (ii) the volume of the solution in which it is formulated. The dose to be formulated and the clinically appropriate range of volumes which can be used in the formulation for intravitreal use are determined by the PK/PD Scientist and/or Clinical Ophthalmologist in the team[23], however the precise choice of volume to use within that range for any given dose is a matter for the Formulation Scientist[24]. The Formulation Scientist would - in making the decision about which volume to use for any given dose - be very conscious of stability issues that would be likely to arise at higher concentrations[25].

122. The Patents provide the Formulation Scientist with a formulation of aflibercept at a high concentration - 40 mg/ml - that is stable and suitable for intravitreal administration. Absent the Patents, for a given dose, particularly at the upper end of possible doses, the Formulation Scientist would have considered that the largest clinically acceptable volume would be required. For example, for a dose of 2mg, the Formulation Scientist would, for stability reasons, make the formulation with

[23] Kodjikian 1 §§5.52-5.54.

[24] Gukasyan 1 §§5.46-5.47; Kodjikian 1 §5.65.

[25] Gukasyan 1 §5.47 and (in the context of aflibercept specifically) Gukasyan 1 §§6.12-6.13.

a volume of 90µl or 100µl[26] (the highest volume considered to be clinically safe) in order to formulate aflibercept at a lower concentration (22 mg/ml or 20 mg/ml respectively).

123. However, in light of the teaching of the Patents, the Formulation Scientist would appreciate that, for a given dose, they would be able to formulate that at a concentration of 40 mg/ml, including by using a lower volume than they would have wished to use absent the Patents. For example, they would appreciate that 2mg of aflibercept can be formulated using the bottom end of the clinically acceptable volume range – namely 50 µl[27] – and be sufficiently stable. That constitutes a real technical advance.

124. The Claimants' case on inventive step (addressed below) seeks to bypass all of the above by arguing that there is a clinical reason why the Formulation Scientist would be required to formulate such a high dose of aflibercept, at the top end of the clinically acceptable volume, that the Formulation Scientist will be forced to try to formulate a concentration of 40 mg/ml no matter what their expectation of success is of being able to do so from a stability perspective. This case is disputed by the Defendants and will be explored at trial. However, it is notable that the Claimants' case on obviousness does not attempt to suggest that - in circumstances where the Formulation Scientist would have a choice as to the concentration at which to formulate any given dose - it would be obvious from a formulation perspective to formulate aflibercept at a concentration of 40mg/ml.

## PRIORITY

### Relevant Legal Principles

125. The test for priority is whether the priority document is *"in respect of the same invention"* as that claimed (Article 87(1) EPC), or whether the claimed invention *"is supported by matter disclosed"* in the priority document (s.5(2)(a) Patents Act 1977), the latter being intended to enact the former (s.130(7) Patents Act 1977).

126. The general principles on the application of the priority test were summarised by Kitchin LJ in the Court of Appeal in *Icescape v Iceworld* [2019] FSR 5 at §§38-42.

127. The question is whether the priority document contains sufficient material to constitute an enabling disclosure of the claim in issue. The test for disclosure is whether the skilled person can derive the subject-matter of the claim directly and unambiguously, using their CGK, from the priority document as a whole: see §§35-38 *Icescape*, citing *G2/98* and *Pharmacia v Merck* [2002] RPC 41.

---

[26] Kodjikian 1 §5.65; MacLaren 2 §15.

[27] Kodjikian 1 §5.54. MacLaren 2 §14.

128. There is no requirement for equivalence of language, but of technical teaching. The priority document must be read through the eyes of the skilled person equipped with their CGK, and the question is one of disclosure not of obviousness: see §§41-42, citing Floyd LJ in *HTC Corporation v Gemalto SA* [2014] EWCA Civ 1335 at §65:

> "65 The skilled person must be able to derive the subject matter of the claim directly and unambiguously from the disclosure of the priority document. Mr Tappin stressed that the question was one of what was disclosed to the skilled person, not what was made obvious to him by the priority document, for example in the light of his common general knowledge. I agree that, as the above passage shows, that is the correct approach. That does not mean, however, that the priority document should be read in a vacuum. The question of what a document discloses to a skilled person takes account of the knowledge and background of that person. A document may mean one thing to an equity lawyer and another to a computer engineer, because each has a different background. The document still only has one meaning because it is only the relevant skilled person's understanding which is relevant. What is not permissible is to go further than eliciting the explicit or implicit disclosure and take account of what a document might lead a skilled person to do or try, or what it might prompt him to think of."

**The Priority Document**

129. The Priority Document is at [A.2/1]. It is entitled *"VEGF antagonist formulations suitable for intravitreal administration"*.

130. The disclosure of the Priority Document must be considered as a whole, however we draw attention to the following in particular.

131. [0001] states that the invention is directed to pharmaceutical formulations suitable for intravitreal administration comprising agents capable of inhibiting VEGF, and to methods for making and using such formulations. [0005] states that stable formulations of a VEGF-specific fusion protein antagonist are provided.

132. Stable liquid ophthalmic formulations of the invention are disclosed between [0007] and [0012], with [0009] to [0012] disclosing specific such formulations, each referred to as a specific preferred embodiment. One of them is that at [0011], which is as follows:

> "**[0011]** In a specific preferred embodiment, the ophthalmic formulation comprises about 40 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 40 mM NaCl, 0.03% polysorbate, and 5% sucrose, pH about 6.2-6.3."

133. Lyophilisable formulations are then disclosed between [0013] to [0019], with specific such formulations being disclosed at [0014] to [0016].

134. [0020] states that the invention further features ophthalmic formulations provided in a pre-filled syringe or vial, particularly suitable for intravitreal administration.

135. [0030] then states as follows as regards the VEGF antagonist:

> "**[0030]** An VEGF antagonist is a compound capable of blocking or inhibiting the biological activity of vascular endothelial growth factor (VEGF), and includes fusion proteins capable of trapping VEGF. In a preferred embodiment, the VEGF antagonist is the fusion protein of SEQ ID NO:2 or 4; more preferably, SEQ ID NO:4. In specific embodiments, the VEGF antagonist is expressed in a mammalian cell line such as a CHO cell and may be modified post-translationally. In a specific embodiment, the fusion protein comprises amino acids 27-457 of SEQ ID NO:4 and is glycosylated at Asn residues 62, 94, 149, 222 and 308. Preferably, the VEGF antagonist is a dimer composed of two fusion proteins of SEQ ID NO:4.

136. There are 8 Examples from [0042]. Examples 1 to 6 test the stability of liquid formulations, and it would be recognised that the specific stable liquid ophthalmic formulations disclosed at [0009] to [0012] correspond to those tested (Gukasyan 1 §8.4), as follows:

i. [0009] formulation – Example 1 (glass vial) ([0042]);

ii. [0010] formulation – Example 2 (glass vial) ([0043]);

iii. [0011] formulation – Example 3 (glass vial) and Example 4 (pre-filled syringe) ([0044]-[0045]); and

iv. [0012] formulation– Example 5 (glass vial) and Example 6 (pre-filled syringe) ([0046]-[0047]).

137. The formulation described in Examples 3 and 4 (corresponding to the [0011] formulation) is as follows:

> "A liquid formulation containing 40 mg/ml VEGF Trap (SEQ ID NO:4), 10 mM phosphate, 40 mM NaCl, 0.03% polysorbate 20, 5% sucrose, and pH 6.3"

138. As noted above, Example 3 discloses that formulation in a glass vial ([0044]), and Example 4 in a pre-filled glass syringe ([0045]).

139. The Priority Document contains sequence listings at the back, including that of SEQ ID NO:4, which is a sequence of 458 amino acids starting with Met at position 1 and ending with Lys at position 458.

**The Claimants' Priority Attack**

140. The Claims in issue are to liquid ophthalmic formulations (Amended Claim 3 and Amended Claim 5 of EP 691) and pre-filled syringes comprising ophthalmic formulations (Amended Claim 11 of EP 691, Claim 5 of EP 306 and Amended Claim 2 of EP 306) with the following components: (i) 40 mg/ml aflibercept (specifically, amino acids 27-457 of SEQ ID NO:4 and is glycosylated at Asn

residues 62, 94, 149, 222 and 308), (ii) 10 mM sodium phosphate buffer, (iii) 40 mM NaCl, (iv) 0.03% polysorbate 20, (v) 5% sucrose and (vi) pH 6.2-6.3.

141. The Claimants challenge that there is any disclosure in the Priority Document of the combination of the features of the Claims. Regrettably the Claimants' priority pleading is not directed to the Claims now in issue, but it makes reference to the following claim features (see Amended Grounds of Invalidity §§3(a), (e), (g), (j), (k); Statement of Objection §18):

i. that the VEGF antagonist is amino acids 27-457 of SEQ ID NO:4 and is glycosylated at Asn residues 62, 94, 149, 222 and 308,

ii. that the concentration of VEGF antagonist is 40 mg/ml,

iii. that the phosphate buffer is sodium phosphate buffer,

iv. that the polysorbate is polysorbate 20,

v. that the molar concentration of sodium chloride is "about 40mM",

vi. that the formulation is suitable for intravitreal administration, and

vii. that, in the case of the pre-filled syringe claims, the formulation is a component of a pre-filled syringe.

142. The Defendants' position is that each of the Claims is entitled to priority since the specified combination of features is disclosed in Example 3 (for the ophthalmic formulation claims) or Example 4 (for the pre-filled syringe claims) of the Priority Document, read alongside the [0011] formulation to which they correspond, properly construed in the context of the document as a whole.

143. We deal with point (i) first below, since this raises a discrete point that arises in relation to all of the Claims concerning what protein the skilled reader would understand the "VEGF antagonist (SEQ ID NO:4)" or "VEGF Trap (SEQ ID NO:4)" in the Priority Document to be a reference to, which is addressed in the evidence.

144. We then deal with the remaining points (ii) – (vii), as appropriate, by reference to the Claims.

<u>VEGF Antagonist (SEQ ID NO:4)</u>

145. Each of the Claims is a claim to the VEGF antagonist consisting of amino acids 27-457 of SEQ ID NO:4 that is glycosylated at Asn residues 62, 94, 149, 222 and 308, i.e. aflibercept.

146. SEQ ID NO:4 set out in full at the back of the Priority Document is the full amino acid sequence (amino acids 1-458) of the nascent protein. The claimed VEGF antagonist is derived from SEQ ID

NO:4, post-translationally modified to remove the N-terminal signal peptide (amino acids 1-26) and C-terminal lysine (amino acid 458), and glycosylated at the specified Asn residues.

147. Examples 3 and 4 of the Priority Document, corresponding to the [0011] formulation, test the stability of a specific liquid formulation, said to contain 40 mg/ml VEGF Trap (SEQ ID NO:4). The Defendants' case is that this is a disclosure of the post-translationally modified VEGF antagonist described in the Claims, which is specifically described in [0030] of the Priority Document.

148. CHO cells are the only cell line expressly mentioned in the Priority Document in [0030] (which it is common ground would also be well-known as a matter of CGK for therapeutic proteins – see §64 Agreed CGK Statement (protein engineering)), and the only specified expressed and post-translationally modified form of SEQ ID NO:4 disclosed in the Priority Document is the modified VEGF antagonist of the Claims, also in [0030].[28] This is described as "a specific embodiment" (see [0030]). The skilled reader would therefore understand that that was the VEGF trap made and then tested in Examples 3 & 4 (corresponding to the [0011] formulation, which is described as a "specific preferred embodiment").

149. Dr Esposito's evidence is that the Protein Engineer would know that it is possible to express the protein of SEQ ID NO:4 in *E. coli*, they would not know whether the protein expressed in this way would be truncated (e.g. by removal of any N-terminal signal peptide) but that they would know that it would not be glycosylated (Esposito 2 §69). As such, his view is that SEQ ID NO:4 is referring to a different protein to the post-translationally modified VEGF antagonist described in the Claims (Esposito 2 §66). This will be explored at trial.

<u>Ophthalmic Formulation Claims – Amended Claims 3 & 5 of EP 691</u>

150. Amended Claim 3 (as dependent upon Claims 2 & 1) of EP 691 is to an ophthalmic formulation comprising:

i. 40 mg/ml of a VEGF antagonist consisting of amino acids 27-457 of SEQ ID NO:4 and is glycosylated at Asn residues 62, 94, 149, 222 and 308,

ii. 10 mM sodium phosphate buffer,

---

[28] As Prof Leatherbarrow explains, the Protein Engineer would appreciate that SEQ ID NO:4 includes an N-terminal signal peptide and C-terminal lysine which would not be present in the mature protein, and it was known that glycosylation of Asn residues at positions with the motif Asn-Xaa-Ser/Thr (where Xaa is any amino acid except for Pro) could occur in CHO cells (Leatherbarrow 1 §§7.9 & 7.14).

iii. 40 mM NaCl,

iv. 0.03% polysorbate,

v. and 5% sucrose,

vi. pH about 6.2-6.3,

vii. wherein the formulation is suitable for intravitreal administration.

151. Amended Claim 5 (as dependent upon Claim 1) of EP 691 differs in that it comprises (iii) "about 40 mM sodium chloride" and (iv) "0.03% polysorbate 20".

152. It is not clear whether a point is being taken about the formulations described in the Priority Document being "suitable for intravitreal administration" (point (vii) above), but this can be dealt with shortly. The Priority Document as a whole is directed towards formulations suitable for intravitreal administration. This is clear from, *inter alia,* the title and [0001] of the document. See also [0020]. Each of the formulations disclosed in the Priority Document is therefore disclosed as being suitable for intravitreal administration.

153. Subject to that, and subject to the VEGF antagonist point addressed above, the formulation of Amended Claim 3 of EP 691 is disclosed with linguistic equivalence in [0011] of the Priority Document, which corresponds to the formulation tested in Example 3.

154. There are two differences between [0011] of the Priority Document and the formulation of Amended Claim 5 of EP 691, namely:

i. "0.03% polysorbate" ([0011]) and "0.03% polysorbate 20" (Amended Claim 5 EP 691); and

ii. "40 mM NaCl" ([0011]) and "about 40mM sodium chloride" (Amended Claim 5 EP 691).

155. These differences are not differences in technical teaching owing to the proper construction of [0011] of the Priority Document in the context of the document as a whole, because:

i. The corresponding examples to [0011] – Examples 3 & 4 – specify at [0044] and [0045] that the formulation contains "40 mM NaCl" and "0.03% polysorbate 20", which informs the skilled reader's understanding of [0011].

ii. Prof Gukasyan's evidence is that tonicity agents were used for adjusting the tonicity of formulations so as to bring them close to or within the osmolality range of the vitreous, and that measuring tonicity has inherent variability, so "40 mM NaCl" would be

understood by the Formulation Scientist as meaning "about 40 mM NaCl" anyway (Gukasyan 1 §§5.83 & 8.9).

iii. Whilst [0007] of the Priority Document discloses the organic co-solvent being *"polysorbate, for example, polysorbate 20 or polysorbate 80"*, the only polysorbate used in the Examples is polysorbate 20, and this includes its use at a concentration of 0.03%.

156. As such, the formulation of Amended Claim 5 of EP 691 is disclosed in [0011] (and Example 3) of the Priority Document.

157. Each of the ophthalmic formulation claims is therefore entitled to priority.

<u>Pre-filled syringe claims – Amended Claim 11 of EP 691, Claim 5 of EP 306 and Amended Claim 2 of EP 306</u>

158. Amended Claim 11 (as dependent upon Claim 3) of EP 691 is to:

i. A pre-filled syringe suitable for intravitreal administration comprising an ophthalmic formulation comprising,

ii. 40 mg/ml of a VEGF antagonist consisting of amino acids 27-457 of SEQ ID NO:4 and is glycosylated at Asn residues 62, 94, 149, 222 and 308,

iii. 10 mM sodium phosphate buffer,

iv. 40 mM NaCl,

v. 0.03% polysorbate,

vi. and 5% sucrose,

vii. pH about 6.2-6.3.

159. Amended Claim 11 (as dependent upon Claim 5) of EP 691 differs in that it comprises (iv) "about 40 mM NaCl" and (v) "0.03% polysorbate 20".

160. Claim 5 (as dependent upon Claims 4 & 1) of EP 306 and Amended Claim 2 of EP 306 differ from Amended Claim 11 of EP 691 in that they comprise (v) "0.03% polysorbate 20".

161. Again, subject to the VEGF antagonist point addressed above, the Defendants rely upon the disclosure of [0011] and [0020] of the Priority Document, and Example 4 (being the [0011] formulation tested in a pre-filled syringe).

162. [0020] read together with [0011] discloses the [0011] formulation in a pre-filled syringe. Therefore, since the formulation of Amended Claim 3 of EP 691 is disclosed with linguistic equivalence in [0011] of the Priority Document, [0020] and [0011] constitute a disclosure of the formulation of Amended Claim 11 of EP 691 as dependent upon Claim 3.

163. The two differences between Amended Claim 5 of EP 691 and [0011] of the Priority Document identified at paragraph 154 above are purely linguistic and are not differences in technical teaching for the reasons given in paragraph 155 above. As such [0020] read together with [0011] (and Example 4) is also a disclosure of Amended Claim 11 of EP 691 as dependent on Claim 5.

164. As to the difference between [0011] of the Priority Document and Claim 5 of EP 306 / Amended Claim 2 of EP 306, namely "0.03% polysorbate" ([0011]) and "0.03% polysorbate 20" (claims), this is also not a difference in technical teaching for the reasons given in paragraph 155 above. Therefore [0020], read together with [0011] (and Example 4) is also a disclosure of Claim 5 of EP 306 and Amended Claim 2 of EP 306.

165. Further or alternatively, Example 4 of the Priority Document, read together with [0011] to which it corresponds, discloses the formulations of Amended Claim 11 of EP 691 (as dependent upon Claims 3 or 5) and Claim 5 of EP 306 / Amended Claim 2 of EP 306.

i. As to the difference between "0.03% polysorbate 20" (in Example 4) and "0.03% polysorbate 20" (in Amended Claim 11 (as dependent upon Claim 3)), see above.

ii. As to the difference between "40 mM NaCl" (in Example 4) and "about 40 mM sodium chloride" (in Amended Claim 11 (as dependent upon Claim 5)), see above.

iii. As to the difference between "10 mM phosphate" (in Example 4) and "10 mM sodium phosphate buffer" (in Amended Claim 11 (as dependent upon Claims 3 or 5) and in Claim 5 of EP 306/Amended Claim 2 of EP 306), the [0011] formulation, which corresponds to that tested in Example 4, specifies that this is "10 mM sodium phosphate buffer", so it is clear that that is what "10 mM phosphate" in Example 4 means. Sodium phosphate buffer is also the only phosphate buffer disclosed in the Priority Document.

166. Each of the pre-filled syringe claims is therefore entitled to priority.

## OBVIOUSNESS OVER WIEGAND II

### Relevant Law

167. The Court will be familiar with the *Windsurfing/Pozzoli* structure which asks these questions:

(1) (a) Identify the notional 'person skilled in the art';

(b) Identify the relevant common general knowledge of that person;

(2) Identify the inventive concept of the claim in question or if that cannot readily be done, construe it;

(3) Identify what, if any, differences exist between the matter cited as forming part of the 'state of the art' and the inventive concept of the claim or the claim as construed;

(4) Viewed without any knowledge of the alleged invention as claimed, do those differences constitute steps which would have been obvious to the person skilled in the art or do they require any degree of invention?

(*Pozzoli SPA v BDMO SA* [2007] EWCA Civ 588; [2007] F.S.R. 37, at [23] per Jacob L.J.)

168. In *Generics (UK) Ltd v H Lundbeck* [2007] EWHC 1040; [2007] R.P.C. 32, Kitchin J explained at [72] that:

> "The question of obviousness must be considered on the facts of each case. The court must consider the weight to be attached to any particular factor in the light of all the relevant circumstances. **These may include such matters as the motive to find a solution to the problem the patent addresses, the number and extent of the possible avenues of research, the effort involved in pursuing them and the expectation of success.**"

169. Kitchin J's statement of the law was picked up in *Actavis v ICOS* [2019] UKSC 15; [2019] R.P.C. 9 at [63], where the Court further elaborated on the types of matters the Court might have regard to on the question of obviousness at [65] – [73] and identified nine factors (particularly relevant factors **emphasised**):

i. That it is relevant to consider whether something was **obvious to try with a reasonable or fair prospect of success** [65].

ii. That routine research or established practice of following research to a particular point may be a relevant consideration weighed in the question of whether a process or product is obvious to try [66].

iii. The burden and cost of the research programme is relevant, and the weight of this will vary dependent upon the circumstances [67].

iv. The **necessity for, and nature of, value judgments** which the skilled team would need to make are relevant factors in obviousness [68].

v. **The existence of many or alternative paths of research can be an indicator of non-obviousness**. [69].

vi. **The motive of the skilled person is a relevant consideration** [70].

vii. The **results of research being unexpected or surprising** is a relevant consideration which might point to non-obviousness [71].

viii. The **Court must be careful to avoid the use of hindsight** [72], and this means there is a danger in using a step-by-step analysis.

ix. It is also necessary to consider whether a feature of the claimed invention is an added benefit in the context of the invention being obvious for another purpose [73].

170. In *Actavis v ICOS* the Supreme Court held that the dosage regime, which could not have been predicted before setting off on the research program, was nonetheless obvious because it was the inevitable result of that research program (see [87]). However, it should be noted that the Supreme Court rejected the submission that "*if all that a skilled person discovers is more information about products or processes that are already within that notional person's repertoire, there is no basis for the grant of a patent because that information does not add to the products or processes which the skilled person can make or do*" (see [51]-[52]). We submit that the Claimants' case is akin to the argument that the Supreme Court rejected.

171. Further guidance on the first of the factors identified in the above passage from *Actavis v ICOS* (obvious to try with a reasonable expectation of success) is available in:

172. *Saint-Gobain PAM v Fusion Provida* [2005] EWCA Civ 177 at [28]:

> "Mere possible inclusion of something within a research programme on the basis you will find out more and something might turn up is not enough. If it were otherwise there would be few inventions that were patentable. The only research which would be worthwhile (because of the prospect of protection) would be into areas totally devoid of prospect. The "obvious to try" test really only works where it is more-or-less self-evident that what is being tested ought to work."

173. In *Teva v Leo Pharma* [2015] EWCA Civ 779; [2016] R.P.C. 5 the Court of Appeal drew the distinction between something being "*well-worth investigating*" and something having a "*fair expectation of success*" – they are not the same. The fact that a particular candidate for formulation "might" work, does not give a reasonable expectation of success where it is far from certain that it will [24].

174. In the context of the EPO problem-solution approach (the EPO Guidelines for Examination (April 2025), Part G, Chapter VII, 5) question (iii), the Court asks itself whether the prior art <u>would</u> have prompted the skilled person to arrive within the claims. This is expressly distinguished from the question of whether a skilled person <u>could</u> have done so – the "could-would" approach – it is not enough that a skilled person could have done so, it must be shown he would have done (see Jacob LJ in *Actavis v Novartis* [2010] EWCA 82 at [45]-[46]).

175. The EPO's "could-would" approach does not provide much assistance in filleting the Claimants' arguments presented, and neither of these approaches really solve the problem presented to the Court in this case. As discussed in *Hospira v Genentech* [2014] EWHC 3857 (Pat) at [227]-[234] and on appeal [2016] EWCA Civ 780 at [50]-[52], a would/could analysis does not assist in the context of a formulation case, where the application of completely routine techniques would have led some skilled teams to happen upon the invention by merely sorting the "good" from the "bad" formulations.

176. The mere fact that you do not know (in advance) which formulations will work does not foreclose a finding of obviousness. However, nor does it mandate one. In any event, *Hospira v Genentech* is not the same as the present case – the application of routine techniques would not have led the skilled team to the combination of features of the Claims, or even to the individual integers, as we explain further below.

177. Furthermore, in situations where it is far from clear that any successful formulation would have been found, the analysis in *Hospira v Genentech* is not applicable, and instead the analysis of *Teva v Leo Pharma* [2015] EWCA Civ 779; [2016] R.P.C. 5 at [21] is more pertinent. In the present case, even were the formulator to contemplate formulating aflibercept at the very high concentration of 40mg/ml (which we submit they would not), they would have no expectation that any sufficiently stable formulations could be developed (Gukasyan 1 §10.13) – we discuss this further below as well.

178. Given the way that the Claimants have advanced their obviousness case, we also remind the Court of the warnings about obviousness cases built entirely from the CGK, and the risks of hindsight – such as those expounded by Pumfrey J in *3M v Ati Atlas* [2001] F.S.R. 31 at [32]. In addition, particular relevance to this case are the remarks of Kitchin J in *Abbott Laboratories v Evysio* [2008] R.P.C. 23 at [180] – "*It is all too easy after the event to identify aspects of the common general knowledge which can be combined together in such a way as to lead to the claimed invention. But once again this has the potential to lead the court astray. The question is whether it would have been obvious to the skilled but uninventive person to take those features, extract them from the context in which they appear and combine them together to produce the invention.*"

179. See also Meade J in *Sandoz v BMS* [2022] EWHC 1831 (Pat) at [33] concerning a case of obviousness over a cited item of prior art, but which was in essence a case of obviousness over the CGK – and warranted appropriate caution.

180. Finally, we refer the Court to the risk of hindsight in an obviousness case built on a step-by-step analysis, although such an approach may be considered where the pattern of the research program can be clearly foreseen (see *Teva v Grunenthal* [2023] EWHC 1836 (Pat) at [224]-[225]). The Claimants' approach suffers the similar vices, but is not even a true step-by-step analysis, as the Claimants leave out all of the steps between starting off, and their unexplained arrival at the formulation of the Claims.

**The Disclosure of Wiegand II**

181. Wiegand II is a patent application describing pre-clinical work studying a number of VEGF traps. The document describes a VEGF inhibitor (antagonist) in [0005] as comprising an immunoglobulin-like (Ig) domain 2 of a first VEGF receptor and Ig domain 3 of a second VEGF receptor; and a multimerizing component. The document has four different VEGF trap proteins specifically described in it – SEQ ID NOs: 2, 4, 6 and 23. Of these, most of the examples relate to SEQ ID NO: 6, also referred to as VEGFR1R2 FcΔC1(a) by Wiegand II in [0005], although some of the examples also relate to other proteins.

182. Although it is not clear from Wiegand II, SEQ ID NO: 6 is the full-length amino acid sequence of aflibercept (before truncation and glycosylation) and is the same as SEQ ID NO: 4 from the Patents, namely aflibercept (once properly truncated and glycosylated).

183. [0006] is a broad boilerplate paragraph which describes "a second aspect" of the invention concerning methods of treatment of the human eye with a VEGF inhibitor. The paragraph is not specific to any particular one of the four VEGF sequences disclosed in Wiegand II (it calls out each of the four SEQ IDs as being specific embodiments), nor even to intravitreal use of the VEGF sequences (as it refers to eye drops and intravitreal injection), and contains broad proposals of potential dose ranges (of at least approximately 25-4000μg), and dosing regimens of doses separated by at least 2 weeks up to 12 months. Both Prof Ward and Prof Kodjikian explain that the skilled team would see the statements in this paragraph as extremely broad, unrealistic and not giving any real guidance as to what the skilled team should do (Ward 1 §6.5, Kodjikian 1 §6.4). Similar broad unsupported statements are made in [0036].

184. Wiegand II explains that these VEGF traps are intended for treatment of macular degeneration and diabetic retinopathy (see [0030]-[0033]).

185. The examples in Wiegand II start at [0038] and describe the production and testing of various VEGF traps. Examples 1-3 describe the generation of the different VEGF traps, and their expression in CHO cells (CHO K1/E1A) ([0046]).

186. From Example 5 – Example 16 the VEGF traps are characterised and tested in various assays and animal models. Of particular interest to the Clinical Ophthalmologist and/or the Ocular PK/PD Scientist are examples 5, 9, 14, 15 and 16, which we summarise below.

187. Example 5 contains Biacore chip analysis to assess binding stoichiometry, which demonstrates that the VEGF traps (SEQ ID NO: 2 and 6) bind in a 1:1 ratio to VEGF (Ward 1 §6.9).

188. Example 9 is the experiment which shows in vivo, intravitreal testing of the VEGF trap SEQ ID NO:6 in a monkey model for wet AMD – the laser induced choroidal neovascularization (CNV) assay. All the experts agree that the monkey CNV assay was the best available animal model for testing potential efficacy of a drug for wet AMD (Ward 1 §6.13, Kodjikian 1 §6.13, MacLaren 1 §§21.5-21.7 and §23.18, Wensel 1 §55). As to the details of the example:

i. The monkeys were dosed in two different intravitreal experiments, one with dosing before the laser induced injury, and one after injury (with the one after injury being more representative of a treatment scenario in humans).

ii. In the pre-dosing study the monkeys were given doses of 50, 250 or 500 µg of the VEGF trap, per eye, and then the choroidal neovascular lesions were assessed by fluorescein angiography screening at various time points. In the post-injury dosing study, only a single dose of 500 µg was given per eye. Figure 9 shows the data from both arms:




Fig. 9

iii. The pre-injury dosing study shows effective suppression of lesions throughout, but is less representative of a treatment scenario in humans. The post-injury dosing shows a rapid reduction in lesions over time (the tests are at day 15 (i.e. 1 day post drug administration), day 20 (i.e. 6 days post drug administration) and day 29 (i.e. 15 days post drug administration).

iv. In the post-injury dosing regime, the treatment with VEGF trap was able to reduce grade 4 lesions from 44% to 0% rapidly (well within 15 days of the treatment) (Ward 1 §6.19). Because of the complete suppression of lesions at day 15, it suggests that the duration of action would be longer (Ward 1 §6.20).

189. Example 14 is a cell-based model assay to test the IC50 of VEGF trap (SEQ ID NO: 6). It determines the IC50 as being approximately 40 pM, which is 25 times less potent than the non-cell-based assay, which measures a Kd of 1.5 pM (Ward 1 §6.23).

190. Example 15 compares the potencies of VEGF trap (SEQ ID NO: 6) and bevacizumab in the same cell-based assay as example 14 and determines that bevacizumab has a potency of 1.4nM - considerably weaker than that of SEQ ID NO: 6 (Ward 1 §6.23).

191. Example 16 is a comparative pharmacokinetic analysis of two of the VEGF traps described in Wiegand II (SEQ ID NO: 6 and 23) in rabbits. SEQ ID NO: 23 is a mini-trap version of SEQ ID NO: 6 in that it lacks a functional Fc region. Prof Ward concludes that the data suggests that both of the VEGF traps are able to penetrate the retina and the choroid in rabbits and both could still be detected in the ocular tissue for up to 28 days. (Ward 1 §6.29).

192. In addition to the examples containing pre-clinical data, Wiegand II also contains two further examples (17 and 18):

193. Example 17 is a description of a theoretical intravitreal clinical study with VEGF Trap SEQ ID NO: 6 or No 23 in a clinical trial in humans. It includes similar boilerplate proposals to those included at [0006] in terms of dose ranges and dosing regimens, and would be of no value to the skilled team (Ward 1 §6.30 and Kodjikian 1 §6.25 - Prof MacLaren disagrees – see further below).

194. Example 18 records results from an actual clinical intravenous study of VEGF trap (SEQ ID NO: 6) in humans. Doses of 0.3 mg/kg up to 3 mg/kg are reported, and reports on certain systemic adverse effects seen in the study. This study would suggest that an intravenous route of administration of SEQ ID NO: 6 is likely to have significant safety issues and limited efficacy (Ward 1 §6.32).

**Obviousness over Wiegand II - Overview**

195. Wiegand II is a document directed at pre-clinical scientists. It contains pre-clinical experiments which are firmly in the domain of an Ocular PK/PD Scientist to interpret, and the next steps out of the document are further pre-clinical work and first-in-human clinical studies. It provides no assistance at all on formulations – so the Claimants' entire case of formulation is one based upon the CGK. In essence the skilled team is required to set off in a broad sea of potential formulation paths and dose and volume choices with no guidance at all from the cited prior art.

196. The Claimants' obviousness case is an exercise of pure hindsight.

197. First it requires the Clinical Ophthalmologist to set off into human clinical trials with a huge range of doses of a new drug which they would have no familiarity with, purely based on the speculative

suggestions in the prior art boilerplate and theoretical study designs, and without consulting anyone with expertise in the data in the prior art itself.

198. Second it requires the clinician to dictate such a high dose of aflibercept to be formulated that the formulator is in effect forced to formulate aflibercept at a concentration of 40 mg/ml, given the range of clinically acceptable volumes.

199. Third, it requires the formulator to blindly start trying formulations of the new and unfamiliar fusion protein without giving any consideration to the information that would be easily ascertained by the protein engineer about the susceptibility of the new protein to instabilities.

200. Fourth, it requires the formulator, apparently without any structured path, to continue trying a wide range of formulations until they found the formulation of the Claims.

201. Each of those aspects are, we submit, wholly artificial and based on hindsight.

202. Below we provide more information about the various issues in dispute on obviousness.

**Inputs to the Formulator**

203. The primary evidence in this case is that of the formulation experts – it is in the formulation where the invention lies, and it is the nature of this invention which leads to the infringements also infringing by equivalents (as we discuss above).

204. The other experts are necessary however to provide input information for the formulator to begin and shape the formulation task:

i. The Clinical Ophthalmologist and Ocular PK/PD Scientist are necessary as the input dose for the formulation task needs to be identified. This dose, coupled with the further information from the Clinical Ophthalmologist concerning the volumes of administration (either 50-90μL or 50-100μL depending upon which expert), are key inputs to the Formulation Scientist's choice of the concentration of the formulation. The Clinical Ophthalmologist is also the individual who indicates the route of administration (intravitreal) and thus the need for the formulation to be capable of being injected by a 30-gauge needle (Daugherty 2 §6.2, Gukasyan 2 §4.10) and be close to the osmolality of, or be isotonic with, the vitreous.

ii. The Protein Engineers are necessary to provide input information about aflibercept itself (SEQ ID NO:6) to assist the formulator's decision-making. Both Protein Engineers agree they would feed a pI and molecular weight to the formulator, and Prof Leatherbarrow says the Protein Engineer would, if asked by the Formulation Scientist, also be able to analyse

aflibercept to provide information about sites which might be more susceptible to chemical or physical instabilities which could cause formulation problems. They would also make the protein.

Clinical Ophthalmologist / Ocular PK/PD Scientist - Dose and Volume

205. The experts are agreed in this case that, in light of Wiegand II, the skilled team would want to take SEQ ID NO: 6 forward for the intravitreal treatment of wet AMD (and potentially also, although to a lesser extent, diabetic retinopathy). It is also common ground that the next steps would include taking SEQ ID NO: 6 into clinical trials in humans (although Dr Ward explains that first the skilled team would want to conduct pre-clinical toxicology studies for safety reasons – Ward 1 §6.21). The obviousness case advanced by the Claimants is in the context of formulating SEQ ID NO: 6 for the purposes of those clinical trials, and in particular in the context of formulations prepared for the phase 1 study which would be intended to be long term stable formulations.

*Dose*

206. It is common ground that the skilled team would need to identify the doses to be tried in those phase 1 studies, and that the doses to be tried are one of the inputs which feeds into the concentrations of SEQ ID NO: 6 that it would be obvious for the Formulation Scientist to try to formulate.

207. However, there is a dispute as to which doses it would be obvious to test. In broad outline: Dr Ward's view is that it would be obvious to test doses up to 0.5mg, or at most 1mg, and that there would be no motivation to test higher doses in phase 1 (Ward 1 §§6.52-6.68 and Ward 3 §2.22, §2.26). Prof Kodjikian explains that - based on an analysis of the post priority phase 1 and 2 data that is available in respect of aflibercept - had the skilled team at the Priority Date carried out a phase 1 study using doses up to 0.5mg or 1mg, they would have likely obtained results which would have given them no reason to test higher doses at the later stages of the clinical trial process (Kodjikian 1 §§6.30-6.33 and §7.1). The Claimants' case is that it would be obvious to test 0.025mg – 4mg in phase 1 based essentially it appears on the general statements in [0006] and [0036] of Wiegand II.

208. The aforesaid dispute on the question of dose raises the following topics which will be explored at trial, but which we briefly identify below and outline the differences of opinion on each topic.

Who would identify the appropriate doses to use in phase 1?

209. Dr Ward and Prof Kodjikian explain that the Ocular PK/PD Scientist is the primary member of the team who determines the doses to test in phase 1, because the process of determining those doses is closely related to the analysis of the pre-clinical data, including animal data, which is squarely in the

domain of the Ocular PK/PD Scientist (Ward 1 §4.2, Ward 2 §2.1-2.3, Kodjikian 1 §4.2-4.3 and Kodjikian 2 §2.1).

210. The evidence of Prof MacLaren is that whilst an Ocular PK/PD Scientist would likely have carried out and analysed the results of pre-clinical studies (MacLaren 2 §7), the Clinical Ophthalmologist would have interpreted the data from Wiegand II themselves, and decided upon doses for Phase 1 trials without reference to such an expert. Prof MacLaren's approach is essentially to kick the Ocular PK/PD Scientist out of the team as soon as the pre-clinical data has been generated (see MacLaren 1 §41). This has the effect of ignoring their greater level of understanding of that data, and its generation, which does not reflect what real world teams would do.

211. Prof Kodjikian and Dr Ward dispute this. They explain that, whilst the Clinical Ophthalmologist would be involved at all stages of the clinical trials, they would use as the doses for phase 1 those recommended by the Ocular PK/PD Scientist (and not overruling or disregarding that expert when it came to their particular expertise) (see e.g. Ward 1 §4.2 and Kodjikian 1 §§5.67 - 5.70).

212. Although the Claimants' Ocular PK/PD Scientist - Dr Wensel - gives his evidence on the basis of an instruction to assume the form of the skilled team (Wensel 1 §33), his evidence appears to accept that, in a <u>real-world team</u> developing a drug for retinal diseases, the Ocular PK/PD Scientist may have been called upon in relation to "*specific issue[s]*" requiring PK/PD input in the clinical stages, and may make recommendations as to the doses to be used in phase 1 (see MacLaren 2 §7, Wensel 1 §34 & §36).

<u>What is the goal of the phase 1 study?</u>

213. It is common ground that the phase 1 study would explore the safety and adverse event profile of the doses of SEQ ID NO: 6 that were tested in phase 1. However, Prof MacLaren appears to suggest that, because safety is the primary property that is investigated in phase 1, the doses would continue to be escalated up and up until the drug could not be tolerated any more due to its adverse effects/toxicity (what he describes as the maximum tolerated dose) (MacLaren 1 §§21.12 and 23.61). Dr Ward explains that it is not normal to keep on escalating your dose until you hit the maximum tolerated dose, and that doing so would be unethical and inefficient (Ward 2 §§3.8-3.10). Instead, the dose range examined in phase 1 would be being tested primarily for safety, but would be determined bearing in mind the likely doses that would be thought to be needed to achieve the desired efficacy at the desired dosing interval, and bearing in mind that the ultimate goal of the clinical trials was to determine the minimum effective dose (Ward 1 §3.11, Ward 2 §4.10, and Kodjikian 1 §5.64, §5.73, and §6.33, Kodjikian 2 §4.22). As such, when considering what doses it would be obvious to try in phase 1, the skilled team would need to have an eye to the ultimate target in terms of efficacy and dosing regimen.

What the ultimate target for SEQ ID NO: 6 would be in terms of efficacy and dosing regimen

214. Prof Kodjikian explains that, (i) given the field of intravitreal delivery of VEGF antagonists in the context of treating wet AMD was still at a relatively early stage, (ii) the fact that ranibizumab was in phase 3 trials showing improvement in visual acuity on a monthly dosing regimen, and (iii) the fact that SEQ ID NO: 6 was not yet known to work intravitreally in humans, the Clinical Ophthalmologist would be aiming to achieve a clinically significant improvement in visual acuity with monthly dosing (Kodjikian 1 §§5.57, 5.60, 6.29 and §§7.12-7.13).

215. Prof MacLaren's view is that the Clinical Ophthalmologist would, from the outset, be aiming for far longer dosing regimens and/or the best possible improvement in visual acuity (all of which, he suggests, would encourage them to test higher doses in phase 1) (MacLaren 2 §23; §25). This view appears to be based on (a) in the general statements in Wiegand II at [0006] and [0036], (MacLaren 1 §22.20 and §22.46) and (b) the fact that, in Prof MacLaren's view, the Clinical Ophthalmologist would generally be aiming for longer dosing intervals and would know that ranibizumab (brand name Lucentis) was in the process of being tested with longer dosing intervals (MacLaren 1 §22.18; MacLaren 2 §§25-26; this is disputed by Prof Kodjikian (Kodjikian 2 §3.12-3.21)).

216. Prof Kodjikian and Prof Ward both disagree that those parts of Wiegand II would be treated as being any sort of positive teaching in respect of the appropriate dose of SEQ ID NO: 6 to use in humans, and Prof Kodjikian disputes that Clinical Ophthalmologist would have had the goal of longer dosing regimens for a new drug such as SEQ ID NO: 6 at the Priority Date.

What information would be relied on when identifying those doses?

217. Dr Ward's evidence is that the Ocular PK/PD Scientist would determine the doses to take forward into phase 1 by:

i. Analysing the results of the animal data in Wiegand II (in particular the monkey CNV model in example 9);

ii. Comparing that with what was known or available in the public domain about the monkey CNV and human trial data relating to ranibizumab to enable the Ocular PK/PD Scientist to see how the doses used in the Monkey CNV model had translated into doses used in humans for those drugs; and

iii. Comparing the potency of SEQ ID NO: 6 with that of bevacizumab (in light of Example 15 of Wiegand II) and ranibizumab (whose potency is identifiable from the literature).

218. In light of that analysis, the Ocular PK/PD Scientist would come to a view on the likely range of doses of SEQ ID NO: 6 that would be expected to result in efficacy (Ward 1 §§6.53-6.68), and make

recommendations of the doses to try in phase 1 with that range in mind, as well as factoring in safety considerations (Ward 1 §§6.71-6.75).

219. Prof MacLaren's evidence appears to be that the Clinical Ophthalmologist alone would choose the doses to use in phase 1, based purely on the teaching of Wiegand II without any further analysis, on the assumption that the writers of Wiegand II probably had more data to give them confidence that a dose range of up to 4mg would be safe (MacLaren 1 §§23.62-23.63). Dr Wensel (the Claimants' PK/PD expert) expresses the view that, if the PK/PD Scientist were to be involved at all, they would not perform the analysis described by Dr Ward, but instead their role would simply be (i) to look for data relating to the toxicity/safety of 4mg of SEQ ID NO.6 in the event that the Clinical Ophthalmologist did not consider the data presented in Wiegand II sufficient to justify proceeding to a phase 1 study with that proposed upper dose, and (ii) to conduct any toxicological studies that would then be carried out before the start of the phase 1 trial (Wensel 1 §§60-68 and Wensel 2 §15).

*Volume*

220. It is common ground that the Clinical Ophthalmologist would identify the range of volumes of administration that would be clinically suitable in the context of intravitreal administration (MacLaren 2 §14; Kodjikian 1 §5.52). However there appears to be a dispute as to (1) what the top end of the range would be and (2) who would determine the precise volume to be used for any given dose in the formulation.

221. As to point (1) Prof Kodjikian's evidence is that the bottom end of the range would be 50μl, and that the top end of the range would (for monthly dosing) be 90μl (albeit that 100μl had been used safely before in the context of 4 to 6 monthly dosing) (Kodjikian 1 §5.65). Prof MacLaren's evidence agrees that the low end of the clinically suitable range would be 50μL (MacLaren 2 §14). However, in relation to the top of the range, Prof MacLaren suggests that up to 100μl could be dosed as regularly as 4 weekly (MacLaren 2 §15).

222. On point (2), Prof Kodjikian and Prof Gukasyan have explained that, whilst the Clinical Ophthalmologist would provide the Formulation Scientist with information as to the clinically acceptable volume of administration, it would be for the formulator to decide, for any given dose, which volume within that range to use (Kodjikian 1 §9.9). Prof Gukasyan explains that the choice of the volume to use relative to the dose in question is important from a <u>formulation</u> perspective given the relationship between concentration and the risk of stability issues (Gukasyan 1 §§5.44, 5.46 - 5.47 and §§6.12-6.13).

223. It appears however that the Claimants' case is that, although the Formulation Scientist would know they could use 50 – 100μL (Daugherty 1 §10.2), the entire issue is taken out of the hands of the Formulation Scientist, because they are told by the Clinical Ophthalmologist to make a formulation

of at least 40 mg/ml so as to provide a dose of 4mg in up to 100 μL (Daugherty 2 §4.20 and §4.36; MacLaren 1 §23.65).

Protein Engineers – pI, Molecular Weight and Features which are Susceptible to Instability

224. Both parties agree that there would be a Protein Engineer on the team whose job it is to make the protein and answer certain specific questions about the protein from the Formulation Scientist. Both sides agree that the Protein Engineer would tell the Formulation Scientist the pI and the molecular weight of the protein, to assist their formulation (as discussed below).

225. There are, however, some disputes about the information the Protein Engineer would provide, which we set out below:

226. The first dispute concerns aflibercept's pI, and what the Protein Engineer would tell the Formulation Scientist. Prof Leatherbarrow says that the Protein Engineer would recognise that SEQ ID NO: 6 taught in Wiegand II has 5 potential N-linked glycosylation sites, which could have up to 10 sialic acid residues, which would affect the estimated pI. Accordingly, he says the pI calculated would have to take that into account (Leatherbarrow 1 §5.27 and §6.21-6.23). Dr Esposito recognises that the Protein Engineer would know that glycosylated proteins would have sialic acids that would impact the pI (Esposito 1 §97(b)), but thinks that the Protein Engineer would not try to estimate their impact on the pI and would instead supply it to the Formulation Scientist as the base number, without taking account of the influence of sialic acids at all, and warn them it was wrong because of it (Esposito 1 §172).

227. The second dispute is whether, in addition to the pI and molecular weight, the Formulation Scientist would also ask for other information about the protein, and in particular if there are any residues particularly susceptible to degradation, and if so which. Prof Gukasyan says that the Formulation Scientist would ask for this information about the protein being formulated, and would factor that in when planning excipients and formulations (Gukasyan 2 §4.3).

228. The third dispute concerns what risks of degradation the Protein Engineer would inform the Formulation Scientist about, if asked to do so. In particular the extent of the Protein Engineer's knowledge about the risk of deamidation, isomerisation, fragmentation, and oxidation of tyrosine, phenylalanine, tryptophan and histidine. However, the key dispute relevant to the formulation concerns the risk of oxidation of methionines – which both experts agree was known and to be dependent upon solvent exposure (see Leatherbarrow 1 §§5.60-5.61; Esposito 2 §57(a); §11(c) Agreed CGK Statement (formulation)).

229. Taking those issues in turn:

*pI*

230. There is a lot of common ground on the pI, but a key difference in what to do about it based upon the level of CGK.

231. Both experts agree that without taking account of the sialic acids in the glycosylation (or the effect of cysteine residues forming disulfide bonds) the theoretical pI of aflibercept would be calculated to be 8.2 (Esposito 1 §172, Leatherbarrow 1 §6.20; Esposito 2 §52). Both experts also agree that this number would be known by the Protein Engineer to be wrong (too high) because of the influence of the sialic acids.

232. Both experts agree that it was known that aflibercept would be glycosylated and would have sialic acids (Leatherbarrow 1 §6.21, Esposito 1 §172). Prof Leatherbarrow explains that there could be up to 20 sialic acids on aflibercept (four sialic acids on each of the five glycosylation sites), but that the Protein Engineer would know that complete glycosylation is unusual and typically each site will have between 0 and 2 sialic acids (Leatherbarrow 1 §6.21). Dr Esposito disagrees that this level of detail about sialic acids would be CGK.

233. On the basis of 0 to 2 sialic acids per glycosylation, Prof Leatherbarrow estimates the impact on the pI by including an additional -COOH group to simulate each sialic acid, and calculates the pI for 0 to 10 sialic acids (Leatherbarrow 1 §6.21):

| Extra -COOH groups to simulate additional sialic acid residues | Calculated pI |
|---|---|
| 0 | 8.63 |
| 1 | 8.35 |
| 2 | 7.82 |
| 3 | 7.25 |
| 4 | 6.93 |
| 5 | 6.71 |
| 6 | 6.54 |
| 7 | 6.41 |
| 8 | 6.29 |
| 9 | 6.18 |
| 10 | 6.08 |

234. Again, Dr Esposito thinks the Protein Engineer would not know how to do this (Esposito 2 §§16-17).

235. Prof Leatherbarrow goes on to explain that the majority of the proteins will have between 3-6 sialic acids attached, and thus the Protein Engineer's estimate of the pI would be 6.5-7.3 (Leatherbarrow 1 §6.23). This is the pI which he would give to the Formulation Scientist as the best estimate of the pI range (the aflibercept molecules will have a range of pIs).

236. Dr Esposito instead suggests that the Protein Engineer would hand over the 8.2 number, knowing it to be wrong, with a caveat that it would be incorrect because of the sialic acids, but without attempting to quantify that error at all.

*Additional information about aflibercept*

237. The question of whether the Formulation Scientist would ask for additional information about aflibercept, in addition to the pI and the molecular weight, is a matter of the Formulation Scientist. Prof Gukasyan says they would, Dr Daugherty says they wouldn't, and it will have to be a matter for cross-examination.

238. In relation to the additional information which would be passed across if asked:

239. There is no dispute that methionines were known to be a potential source of instability via oxidation. Prof Leatherbarrow has analysed aflibercept, based upon the pre-priority available crystal structures (Leatherbarrow 1 §6.26), and has identified that it has six methionines in it per monomer (which are thus a high oxidation risk). Of these, two are proximal to the binding site, and one of those proximal to the binding site is also solvent exposed (Leatherbarrow 1 §6.34). A methionine which is solvent exposed, e.g. Met 36, poses the highest risk of oxidation, and as Prof Leatherbarrow explains – if it is oxidised it might impact binding.

240. Dr Esposito disagrees about whether Met36 is close to the VEGF interface in a way that might make it a problem for binding (Esposito 2 §57), but does not disagree that it is "highly solvent exposed", and thus "more likely oxidised".

241. There are a number of other protein instabilities which Prof Leatherbarrow also identifies aflibercept as being susceptible to (Leatherbarrow 1 §§6.29-6.30 (deamidation), §§6.31-6.32 (isomerisation), §6.35 (fragmentation) and §§6.37-6.39 (disulfide bonds)) and which Dr Esposito does not think the Protein Engineer would be skilled enough to identify as potential issues (Esposito 2 §§55-57, 62 and Annex A). This will also thus have to be the subject of cross-examination.

**Formulation Scientist – Formulation Project**

<u>Formulation CGK Matters Relevant to the Question of Obviousness</u>

242. Below we focus on the key matters of the formulator's CGK which are relevant to the question of obviousness over Wiegand II.

*Stability requirements / stability studies and testing*

243. The experts are agreed that for a commercial protein formulation the target would be for an extended period of stability. Prof Gukasyan suggests over 24 months (Gukasyan 1 §5.7), Dr Daugherty suggests that the objective would have been 12-24 months (Daughterty 2 §4.2). Nothing likely turns on the difference between these – the point is that the target was for a long-term stable product, but the Defendants do say that Prof Gukasyan's 24 months is the standard target shelf life for these types of products and should be accepted.

244. Although a shorter shelf life of a matter of months (or sometimes less) would suffice for just the phase 1 clinical trials, the formulation effort aims for the full shelf life from the start to avoid the need to change formulation mid-way through the clinical trials process (including Phase 2 or 3) (and the potential for additional clinical testing this might cause) (Gukasyan 1 §5.8).

245. In these studies, the Formulation Scientist would have in mind a maximum level of degradation which would be acceptable at the end (24 month) timepoint. Prof Gukasyan suggests that less than 10% and preferably less than 5% would be targeted (Gukasyan 1 §5.18). Dr Daugherty suggests that 10% would be too much, and even then permissible degradation would be dependent upon the types of impurities seen (Daugherty 2 §4.10).

246. As a result, it was necessary to test the proposed formulations over extended periods of time. Formulations would be subjected to stability studies both at refrigerated temperatures (2-8$^{o}$C) but also room temperature (25$^{o}$C) and accelerated temperatures (e.g. 37$^{o}$C) (Gukasyan 1 §5.43). Prof Gukasyan explains that studies would need to be run for months, if not years, to assess whether a formulation works (Gukasyan 2 §3.40), and not just 14 – 30 days as Prof Daugherty suggests (Daugherty 1 §9.9) because the objective is a long-term stable formulation. As a result, whilst these tests can be run in parallel (accelerated at the same time as refrigerated – Gukasyan 2 §3.43), there was a limit to how many and how quickly you could achieve results.

*Protein instabilities and issues with formulating proteins*

247. When planning a formulation project, the objective is the stability discussed above. The issue is that proteins are highly complex molecules which have an array of potential instabilities and degradation pathways that can lead to loss of activity and instability (aggregation etc).

248. The wide range of possible degradation pathways for proteins which lead to the drug being unsuitable for use include:

i. Physical instabilities such as aggregation, precipitation, adsorption (Gukasyan 1 §5.12)

ii. Chemical instabilities such as (Gukasyan 1 §5.13):

a. Deamidation for example of asparagines or glutamines,

b. Oxidation for example of cysteine or methionines, and tyrosines,

c. Hydrolysis of peptide bonds or fragmentation of the backbone,

d. Reduction of disulfide bonds,

e. Isomerisation of aspartic acids, and

f. Deglycosylation.

249. In addition to this list from Prof Gukasyan, Dr Daughtery suggested that a yet further instability, deamination, could be an issue (Daughtery 1 §8.4(c)). However, Prof Gukasyan's view was that this type of instability was a rare occurrence in reality (Gukasyan 2 §3.7(b)).

250. Where these protein chemical instabilities occur, they lead to localised changes in protein structure which can lead to loss of activity and physical instabilities. Chemical changes can thus lead to partial unfolding and an increased rate of aggregation, adsorption and/or precipitation (Gukasyan 1 §5.14).

251. A particular problem with these potential instabilities is that under conditions which minimise the risk of certain degradation pathways, is it likely that other degradation pathways will become a problem. Finding the right balance of conditions is thus a highly complex task, as fixing one instability may just cause another.

252. A point of contention between the formulation experts is whether, knowing these potential types of instability, the Formulation Scientist would ask the Protein Engineer for assistance to identify potential sites for instability issues (which Prof Gukasyan describes as "soft spots") (Gukasyan 1 §§5.42, 6.8). Prof Gukasyan explains that the Formulation Scientist would be concerned to take into account these potential features when planning their formulations.

253. Dr Daugherty's view is that rather than ask the Protein Engineer to conduct the short task of checking for potential issues, she would instead expect the Formulation Scientist to plough on (blind) into experiments that take months to get answers, before "iteratively" changing the formulation (Daugherty 2 §4.30). This will be explored in cross-examination.

*Key factors impacting stability: (i) High Concentration of Protein*

254. It is not disputed that aggregation problems get worse the higher the concentration of protein and that high protein concentrations can cause elevated viscosity and issues with precipitation due to the solubility limits of the protein (Gukasyan 1 §5.22, Daugherty 2 §4.11 and Daugherty 1 §9.17). High concentrations of proteins would be expected to be difficult to formulate (Gukasyan 1 §5.24). The

experts disagree however over where the boundary to "high" protein concentration arises for a liquid formulation; Prof Gukasyan says over 25mg/ml would be considered high, whereas Dr Daugherty says over 100mg/ml (Daugherty 1 §9.17, Daugherty 2 §4.17 Gukasyan 1 §5.24).

255. Other factors also influence this concentration dependent problem with aggregation such as temperature, pH and the presence or absence of other stabilising excipients (discussed further below). High viscosity (from high concentration of protein) can itself cause issues if the formulation becomes too viscous to be injected through a 30 gauge needle (Gukasyan 1 §5.23 and Daugherty 2 §4.16).

256. That said, because of the issues which occur with increasing concentration, it does not appear to be disputed that the Formulation Scientist would want to opt for the upper end of the volume range permitted by the clinician if possible (90μL / 100μL) see Prof Gukasyan 1 §5.47 and Dr Daugherty 2 §4.20. The larger the volume, the lower the concentration, and thus these formulation issues are minimised.

*Key factors impacting stability: (ii) pH and pI / buffers*

257. Another key factor which can influence the stability of a protein is the pH of the formulation. Most of the degradation pathways which impact the protein, will themselves be impacted by the pH. Figure 1 from Akers (L.1/21/391) shows the impact of pH on the various protein reactions:




**Figure 1.** Protein reactions as a function of pH. Figure courtesy of Dr. Lee Kirsch.

258. As can be seen, acidic pH might minimise the deamidation, disulfide shifting and oxidations, but will make methionine oxidation, peptide cleavage, C-terminal deamidation, and Asp-transpeptidation reactions worse. As such, finding the right pH which balances these instabilities is complex. Because

each protein is unique, the pH will impact one protein's stability and solubility differently to another (Gukasyan 1 §5.29).

259. Further, the pH of the formulation has a further direct influence on the stability of the protein by influencing the solubility of the protein (see Gukasyan 2 §3.8). This interaction is dependent upon the isoelectric point (pI) of the protein – the pH at which the protein has no net charge (Gukasyan 1 §5.27, and Daugherty 1 §8.9).

260. At pHs too far from the pI the electrostatic repulsions increase, resulting in a tendency to unfold, whereas at a pH too close to the pI there is less repulsion between protein molecules which can lead to increased aggregation (Gukasyan 1 §5.27).

261. Both experts agree that the Formulation Scientist would be worried about the stability of the protein if trying to formulate at or near the pI of the protein as this would be likely to cause aggregation. There is a slight disagreement over how close to the pI a formulator would go. Prof Daughterty suggested that the formulator would want to be 1 to 2 pH units away from the pI (Daugherty 1 §8.9), and stuck with this in reply (Daugherty 2 §4.18) whereas Prof Gukasyan suggested 0.5 to 1 in chief (§5.27), but accepted in reply that going slightly further away (to 2) would also be acceptable (Gukasyan 2 §3.8). Whether the Formulation Scientist would go as far as 2 pH units from the pI would depend upon the context and all other factors which were relevant to the choice of pH (Gukasyan 1 §5.27; Daugherty 1 §8.9; Gukasyan 2 §3.8; Daugherty 2 §4.18).

262. Both experts also agree that the pI of the protein would be something which the Formulation Scientist would obtain from the Protein Engineer before planning their formulations (Gukasyan 1 §6.17, Daugherty 1 §9.1), and would take it into account when choosing the pHs to formulate at. We have discussed above the issues about the Protein Engineer's approach to pI and the number which would be generated.

263. Dr Daugherty also suggests that there would be a general preference to formulate at pH 6-7 to minimise deamidation (Daugherty 1 §11.15), but Prof Gukasyan disagrees that that particular type of instability would override other concerns over other instabilities such as to dictate the pH choice (Gukasyan 2 3.39). Furthermore, Prof Gukasyan explains that in fact deamidation is minimised at pH 5-6, not 6-7. These are all factors feeding into the analysis of pH choice.

264. Finally, on pH choice, Prof Gukasyan explains that previous intravitreal formulations would have taught the Formulation Scientist that formulations at pH 6 to 7.5 were compatible with regular administration to the eye (Gukasyan 1 §5.48), and extra experimentation would be needed for pHs outside this range. However this would be weighed against the need for stability, which is the paramount objective of the Formulation Scientist.

265. In order to achieve a particular pH and to maintain it over a longer period of time the formulator could have chosen to include a buffer. There are a wide array of buffer options, depending upon the particular pH the Formulation Scientist is after – buffers would be chosen for their good buffering capacity at the relevant pH. Akers Table V as a list of commonly used buffers, their pKa values and the pH range of use.

**Table V**
Buffers Used in Protein Formulations

| Buffer system | $pK_a$ | pH range of use |
|---|---|---|
| Acetate | 4.76 | 2.5–6.5 |
| Citrate | 3.14, 4.8, 5.2 | 2.5–6.0 |
| Glutamate | 9.67($pK_{a3}$) | 8.2–10.2 |
| Glycinate | 2.4,9.8 | 6.5–7.5 |
| Histidine | 1.8, 6.0, 9.2 | 6.2–7.8 |
| Lactate | 3.8 | 3.0–6.0 |
| Maleate | 1.92, 6.23 | 2.5–5.0 |
| Phosphate | 7.2 ($pK_{a2}$) | 6.0–8.2 |
| Succinate | 4.2, 5.64 | 4.8–6.3 |
| Tartrate | 2.93, 4.23 | 3.0–5.0 |
| Tris | 6.2 ($pK_b$ 7.8) | 6.8–7.7 |

266. Buffers work by the capture or release of hydrogen ions (Gukasyan 1 §5.59), and through that mechanism they maintain the pH, and thus contribute to the stability of the protein.

267. As mentioned already, there may, if an adequate amendment is advanced, be an extensive dispute over whether buffers were also thought to have relevant ionic interactions, which we deal with in the context of the Patents and infringement. Neither expert appears to take it into account when considering obviousness.

*Key Factors Influencing Stability (iii) Classes of stability improving excipients*

268. In addition to the protein concentration and the pH of the formulation, there were multiple different excipient choices which a Formulation Scientist might contemplate adding to a formulation to improve the stability of a protein. However, it would not be known which, if any, would actually work to improve the stability, and they also all have their own downsides to adding.

269. Options for further excipients include:

i. Stabilisers – stabilising agents act to stabilise the folded and active conformation of the protein. A particular class of stabilisers is carbohydrates, including sucrose, trehalose, sorbitol, glycerol and mannitol. There is a balance, because although these molecules can stabilise a protein (by forming a protective shell around the protein reducing interactions with other proteins and the surface of the solution), they can also react with certain side chains, such as lysines and disulfide bridges (Gukasyan 1 §5.66).

ii. Co-solvents / surfactants – Co-solvents can be used to increase the solubility of the protein, and may also stabilise the protein in solution. Known co-solvents included propylene glycol, polyethylene glycol, ethanol, cyclodextrin derivatives and polysorbates. No polysorbates had been approved for intravitreal use, although Avastin had been used off label intravitreally and contained polysorbate which would provide some reassurance on tolerability in the eye (Gukasyan 1 §5.75). Surfactants are additives which reduce surface tension of protein solutions and decrease the adsorption and/or aggregation of protein at the surface of solutions. Some surfactants are also cosolvents (e.g. polysorbates). The concentration required to achieve maximum stabilisation of a protein can vary between proteins. Where a surfactant is added above its critical micelle concentration (CMC) the surfactant will form micelles and will coat the hydrophobic surface areas of the protein. This occurs e.g. at 0.006 / 0.007% for polysorbate 20 and 0.001 / 0.002% for polysorbate 80 (Gukasyan 1 §5.71). Both experts agree that polysorbates (and PEG) were known to have potential issues associated with the formation of peroxides causing the oxidation of proteins (Gukasyan 1 §6.31, Daugherty 2 §4.51) – however they differ over the impact of this on the Formulation Scientist's formulations (discussed further below). Prof Gukasyan explains that there were co-solvents/surfactants which have lower risk of oxidation than polysorbates such as tyloxapol (Triton) (Gukasyan 2 §4.8).

iii. Viscosity enhancers – Prof Gukasyan also says a Formulation Scientist would have had the option of including viscosity enhancers in a formulation to help improve the stability of a protein (Gukasyan 1 §§5.78-5.79). Of course, this would have to be balanced with the need for intravitreal use and the overall viscosity of the solution including that caused by the protein. Dr Daugherty does not consider the skilled person would consider viscosity enhancers in intravitreal formulations (Daugherty 2 §4.53).

iv. Chelating agents – these can be used to mop-up heavy metal anion or cation contaminants which bind directly to a protein and can destabilise it. Examples include EDTA and citrate. (Gukasyan 1 §5.80). There does not seem to be a dispute that chelating agents could be considered for a formulation, but Dr Daugherty suggests that other methods to reduce metal ions (such as process changes) might be attempted first (Daugherty 2 §4.54).

v. Antioxidants – these are excipients which can be added to neutralise impurities which might otherwise oxidise amino acid residues on the protein. Options include ascorbic acid and citric acid (Gukasyan 1 §5.81).

*Other excipients*

270. In addition to excipients added to improve stability, the Formulation Scientist would also know that the overall formulation would need to have an osmolality close to that of the vitreous (Gukasyan 1 §5.83-5.85[29]). In order to adjust the formulation to fall within this range the formulator would be able to use something to adjust the tonicity. This would need to be an osmotically active component, added in the right quantities to carefully adjust the osmolality. These excipients were known as tonicity agents, and included sodium chloride and sugars (such as dextrose) (Gukasyan 1 §5.86). As noted above, there is a dispute between the experts over whether salts (including sodium chloride) were commonly thought to also impact the stability of the formulation through ionic interactions, which primarily impacts the infringement case, and is discussed in that context.

*Formulation development*

271. Whilst there is a lot of common ground between the experts about the available toolbox from which the Formulation Scientist could start their formulation exercise, there is a significant division between the experts about the practicalities of commencing and running such a formulation.

272. The most substantive of the differences, and one which ultimately feeds into the other differences, is Dr Daugherty's idea that you can do iterative testing of formulations slowly correcting for failures in formulations until you find one that works.

273. Dr Daugherty suggests that a series of formulations may be iteratively tested making adjustments to initial formulations to arrive at a stable formulation (Daugherty 1 §§9.12 and 11.24, Daugherty 2 §4.59). The implication of the Claimants' reliance upon this evidence is that such an "iterative" approach would (1) actually be practically possible, and (2) would lead the Formulation Scientist to find a stable formulation falling within the claims.

274. Dr Daugherty does not attempt to explain how the Formulation Scientist would "iteratively" move towards success based upon their initial formulations, if they didn't work. She does not indicate what tests would be done to assess issues, and even what range of changes would be considered if problems were found, and how those changes would lead to success. Dr Daugherty just assumes the Formulation Scientist would keep going, stumbling around blindly, and assumes that the result of this would be something falling within the claim.

[29] Note, there is a minor dispute over what is "isotonic" in the eye – Dr Daugherty suggests 270-300 mOsm/Kg, Prof Gukasyan says 290-320 mOsm/kg. Again, it is not clear if anything turns on this.

275. However, there are many different paths that could be followed, and each step would not contain pointers to the next step (Gukasyan 2 §4.20). The testing at each stage takes in the order of months to test the whether the formulations work, and potentially up to years to be sure that the formulations are actually sufficiently stable at non-accelerated conditions. Furthermore, the formulation studies tended to be run in parallel with the clinical trial studies themselves, and major changes to excipients part way through could cause the need for additional human clinical studies for bioequivalence (Gukasyan 1 §5.9).

276. So, it is not simply a matter of trying an infinite number of combinations in a massive iterative testing manner until something works. Without any guidance of where to start or what will work, the failure of stability studies part way through, could mean months or years of setbacks, part way through a clinical trial.

277. There are other issues with Dr Daugherty's simplistic approach to formulation:

278. The various different types of instabilities which might arise could have a variety of different causes, and so it would not necessarily be clear what was causing the problems, see Table 6, Figure 5 of Daugherty 1:

**Table 6.**
Typical Stability Problems Observed in Protein Pharmaceuticals

| Problems | Potential causes | Possible solutions |
|---|---|---|
| Non-covalent aggregation | Solubility, structural changes, heat, shear, surface, denaturants, impurities | pH, ionic additives, amino acids, surfactants, protein concentration, raw material purity |
| Covalent aggregation | Disulfide scrambling, other unknown mechanisms | pH, inhibit non-covalent aggregation |
| Deamidation | pH < 5.0 or pH > 6.0 | pH optimization |
| Cyclic imide | pH around 5 | pH optimization |
| Cleavages | Protease impurity, other unknown mechanisms | pH, product purity, inhibitors |
| Oxidation | Active oxygen species, free radicals, metals, light, impurity | Excipient purity, free-radical scavenger, active oxygen scavengers |
| Surface denaturation, adsorption | Low protein concentration, specific affinity, protein hydrophobicity | Surfactants, protein concentration, pH |

279. As can also be seen in the table, there are also a variety of possible solutions to each of the problems seen.

280. For example – non-covalent aggregation could be caused by any of: solubility issues, structural changes, heat, shear force, surface denaturants or impurities. Potential options to try to resolve it include all of: pH, ionic additives, amino acids, surfactants, protein concentration and raw material purity.

281. Furthermore, as explained by Prof Gukasyan, adjusting one factor to try and improve an issue (such as adjusting pH to improve solubility), might have detrimental effects on other instabilities (Gukasyan 2 §3.42 and Gukasyan 2 §§4.19-4.20). pH is a particular problem here – it is both the cause of and potential solution to many of the instabilities, and finding the optimum pH will be complex as a result.

282. As Prof Gukasyan explains, excipients can also have multiple functions, or have inter-dependent impacts upon the stability of the protein (Gukasyan 1 §5.89). This means that changing, adding or removing an excipient might have multiple impacts on the formulation.

283. Perhaps because of this, Prof Gukasyan takes a completely different approach to formulating. His view is that the Formulation Scientist would obtain relevant information about the protein being formulated in order to assist with their formulation project. The Formulation Scientist would ask the Protein Engineer for not only the pI of the protein and molecular weight (which are agreed to be features asked for (Daugherty 2 §5.13)), but also for information about potential sites of the protein which might cause instabilities. These features (which Prof Gukasyan describes as "soft spots") are particular sites in the protein which means that the protein has instability risks of a specific type, Prof Gukasyan explains these include (Gukasyan 1 §6.17):

i. Disulfide bridges;

ii. Glycosylation sites; and

iii. Residues particularly susceptible to deamidation, oxidation and isomerisation.

284. The Formulation Scientist would want to know about these features and have a good understanding of the protein's pI and molecular weight, so that they could factor them into their formulation project. As Prof Leatherbarrow explains at Leatherbarrow 3 §3.3, it would take less than a day for the Protein Engineer to provide such information.

285. For example, Prof Gukasyan explains that because of the known oxidation risks when using polysorbates, the presence of problematic high risk methionine residues (i.e. at or near a binding site, particularly those which are solvent exposed) would mean a Formulation Scientist would not want to risk using polysorbates or PEG (Gukasyan 1 §6.31). If the Formulation Scientist did decide it was necessary to try a surfactant, they would have used one which had lower risks of oxidation such at triton (Gukasyan 2 §4.8).

286. Dr Daugherty agrees that it was known that polysorbates were an oxidation risk, but thinks that the risks could be mitigated by taking steps such as using special bottles for the products containing

polysorbate or by testing polysorbate ingredients for peroxides and using earlier expiry dates for the polysorbate excipient might otherwise suggest (Daugherty 2 §4.51).

287. Similarly, as discussed above, the pH would need to be selected to avoid trespassing too close to the expected pI (both experts agree that being at or close to the pI would cause expected solubility and aggregation issues).

288. Dr Daugherty suggests that the Skilled Formulator would be particularly concerned about deamidation generally (without checking for the particular protein), and suggests that as a result the aim would be to formulate at around pH 6 to 7 (Daugherty 1 §11.15). As noted above, Prof Gukasyan disagrees that this one issue would drive the pH choice, but that in any event deamidation is minimised at pH 5 to 6 (not 6 to 7) - see Table 6 Figure 5 of Daugherty 1 extracted above.

289. A final issue on pH is whether the Formulation Scientist would use multiple different buffers at the same or overlapping pHs, or would just use one buffer per pH level (Gukasyan 2 §4.7, Daugherty 1 §§11.15-11.17). In reality this question seems to be more related to the question concerning ionic interactions discussed above, and does not directly impact the question of obviousness.

290. Along with finding the right pH and ruling out certain excipients due to instability concerns, the Formulation Scientist would need to choose from the various excipient categories listed above hoping to find a formulation with some combination of them that works.

*Other protein formulations and their relevance*

291. There is a dispute between the experts over whether existing authorised formulations would be part of the CGK, and whether they would provide useful information about formulations to the Formulation Scientist (see Daughterty 1 §8.13, Daugherty 2 §4.64 and Gukasyan 1 §5.93 and Gukasyan 2 §3.34). Prof Gukasyan expects that only the bigger well-known products' (such as that for Humira and Avastin) would be part of the CGK, and their specific formulation components would have to be looked up. These formulations for other proteins would not be very helpful to the Formulation Scientist to indicate what formulation might work to stabilise aflibercept for intravitreal use. The benefit of knowledge about other products authorised for intravitreal use is limited to showing what excipients and pHs were known to be tolerated in the eye (Gukasyan 1 §5.93).

292. Ultimately Dr Daughtery's "iterative" approach to formulating does not seem to have taken account of the existing formulations significantly.

**What would the Formulation Scientist do in light of Wiegand II**

293. In light of all of the above, the Formulation Scientist would be handed the following information:

294. The highest dose which the Clinical Ophthalmologist and Ocular PK/PD Scientist would request be formulated is 0.5mg, or under certain alternative assumptions about documents the skilled team might go and find, it is possible the requested dose might rise to up to 1mg. They would tell the Formulation Scientist, in line with their CGK, that this should be formulated in a volume of 50μL to 90μL.

295. The Protein Engineer would tell the Formulation Scientist that their best estimate of the pI is that it will be a range of different molecules with pIs mostly from 6.5 to 7.3.

296. The Protein Engineer would also warn the Formulation Scientist that aflibercept is a fusion protein with a large number of potential instabilities (see Leatherbarrow 1, Exhibit RJL-3 and §§6.28-6.39), it has (per monomer), *inter alia*:

i. two methionines close enough to the binding site to be a potential risk for activity, one of which is solvent exposed, and thus at high[est] risk of oxidation,

ii. three asparagine residues followed by glycine residues which would mark them as high risk of deamidation,

iii. seven sites with a risk of isomerisation: the same three high risk asparagines above, and four high risk aspartic acid residues (each of which is followed by a glycine residue),

iv. a site with a high risk of fragmentation – the aspartic acid – proline motif at position Asp281,

v. a number of glycosylation sites potentially at risk of glycosylation, or loss of sialic acids,

vi. two solvent exposed disulfide bonds at risk of reduction or oxidation under harsh conditions, and

vii. that the fusion protein nature of the molecule means it suffers from uncertainties about its physical stability.

297. With that information, the Formulation Scientist would be faced with a complex and uncertain task in seeking to make a long-term stable formulation of aflibercept. In light of the CGK summarised at §§243 to 292 above, the Formulation Scientist would need to deal with the numerous difficulties that arise in the formulation process and would have to decide which of the various different routes that they could take, but without knowing which route or combination of routes (if any) may lead to a successful formulation. They would have a very low expectation of being able to make a successful formulation, and the higher the concentration of aflibercept the lower their expectation of success would be.

298. It is submitted that, in those circumstances, there is no basis for concluding that the formulation of the Claims is obvious in light of Wiegand II.

299. The Claimants' case of obviousness does not grapple with any of the complexities summarised above, nor do the Claimants attempt to explain how they say the Formulation Scientist would actually get to the claimed formulation, other than by reference to high level statements that it would be found through an "iterative" process.

300. Further, the Claimants' case in respect of the individual elements of the formulation (which seeks to salami slice the invention into its constituent parts) is in and of itself an exercise in hindsight, as that is not how formulators would approach the task of formulation. As explained above, formulation is not conducted in such a linear way due to the interrelationship between all the different elements of a formulation.

301. For the reasons given above, the Claimants' obviousness case suffers from the very vice which the Courts have specifically warned against in obviousness over the CGK alone cases and is driven by hindsight.

302. Even if one does consider the question of obviousness of the individual elements of the formulation of the Claims (which, as explained above, is not the right exercise in the first place), there are clear reasons why the individual elements are not obvious, either separately or in combination with the other elements of the formulation:

*Concentration of aflibercept*

303. The Formulation Scientist would be concerned that, as concentration of the protein increased, the stability issues would get progressively worse. As Prof Gukasyan explains, by concentrations as high as 40 mg/ml the Formulation Scientist would have no expectation of being able to formulate the protein successfully (Gukasyan 1 §7.51). They would thus opt for the upper end of the possible volume of administration range permitted by the Clinical Ophthalmologist to minimise the risk of instabilities caused by protein concentration (Gukasyan 1 §6.13; §10.11). The highest volume permitted by the Clinical Ophthalmologist (which the Formulation Scientist would therefore use) would be 90µL or 100µL.

304. In this volume, none of the doses requested by the PK/PD Scientist /Clinical Ophthalmologist (up to 0.5mg or, perhaps, 1mg) would fall even close to the 40mg/ml of the claim.

305. We also note that if, for some reason, a 2mg dose was to be tested, the Formulation Scientist would not have chosen to formulate it at 40mg/ml due to concerns over instabilities referred to above, and instead would have chosen to 20mg/ml (100µL) or 22.2mg/ml (90 µL).

*Polysorbate*

306. The concerns over the high-risk solvent exposed methionine residue near to the binding site would have caused the Formulation Scientist to eschew excipients with a risk of causing oxidation. As a result, the Formulation Scientist would not have chosen to include polysorbate in their formulations. They would have avoided using a surfactant if possible, or, if they did want to include a surfactant, would have chosen a less problematic one (e.g. Triton) (Gukasyan 2 §4.8).

*pH*

307. The Formulation Scientist would have been concerned about formulating too close to the pI of aflibercept. Given that the Protein Engineer would have indicated that the predicted pI was 6.5-7.3, the Formulation Scientist would have wanted to test at least 0.5 pH units away from this if possible. Prof Gukasyan suggests that they would have tried the boundaries of the pH 6 to 7.5 range known to be suitable for the eye (i.e. at pH 6 and 7.5) as these would be furthest from the expected pI, and might have also checked the mid-point.

308. Having selected the pHs the Formulation Scientist would have selected an appropriate buffer for those pHs from the table in Akers.

309. Thus, there is no reason to believe the Formulation Scientist would have tried pH of 6.2 to 6.3 in the claim, with sodium phosphate buffer – as they would have thought that 6.2-6.3 was much too close to the expected pI of aflibercept. There is also no basis to suggest that the Formulation Scientist would have "iteratively" moved to pH 6.2 to 6.3 from the starting points of 6 and 7.5 if it turned out that they failed. More likely they would have moved further away from the pI range out of concern that any instabilities they saw were as a result of getting the pH balance wrong, and probably to lower than pH 6.

*Other excipients*

310. Dr Daugherty's evidence assumes that the Formulation Scientist would also, as part of their initial screen, happen upon 5-10% sucrose and sodium chloride as a tonicity agent. Whilst it is accepted that there were CGK formulations with those amounts of sucrose and/or sodium chloride included in them, it does not follow that the Formulation Scientist would select 5-10% sucrose (out of the possible stabilising agents and quantities of stabilising agents) or end up with sodium chloride as the tonicity agent.

*40mg/ml on assumption*

311. If the Formulation Scientist had, contrary to the above, been directed to formulate something at 40mg/ml (on the Claimants' hypothesis which is that the Clinical Ophthalmologist specifically

requires a formulation of a 4mg dose at a volume of 100µL), as discussed above, the Formulation Scientist would have had no expectation that they could successfully formulate at such a high concentration (Gukasyan 1 §7.51). This alone is enough for non-obviousness (see *Leo v Sandoz*).

**Conclusions on Obviousness**

312. In the premises, the Claims represent an inventive step over Wiegand II.

**ANTICIPATION BY DIX**

313. The Claimants have a pleaded case of lack of novelty over an item of prior art called "Dix" (WO 2006/104852 A2). This is novelty only citation, also from Regeneron, containing a number of formulations of aflibercept. Dix is not directed to intravitreal formulations – on the contrary, almost all of the formulations are unsuitable for intravitreal use by having osmolarities well above the range suitable for the eye – the preferred formulations of Dix have 25% sucrose (see Daugherty 1 §12.13).

314. It is not clear whether the Claimants are actually pursuing a standard novelty case over Dix because even their own evidence accepts that all bar one of the formulations is hypertonic (Daugherty 1 §12.31) and thus unsuitable for intravitreal use. Daugherty 1 §13.10 also accepts that Dix has <u>different formulations</u> of the same VEGF trap to those in the Patents.

315. The remaining formulation is not a specific formulation but a general description of formulation options, described in [0047]. This paragraph includes wide ranges for the VEGF-trap concentration <u>all</u> falling outside the scope of the claims (50-100 mg/ml), a wide range for the percentage of sucrose (5% to 20% - only the very lower end of which would potentially be suitable for intravitreal use), does not specify the pH at all, and has histidine as a buffer. Dr Daugherty suggests that the pH could be read into this formulation from [0007] as being pH 6 to 6.5.

316. The data on stability for [0047] appear to relate to the 20% sucrose option (Gukasyan 1 §6.46), and so there is no data for a ~5% sucrose option in a liquid formulation anywhere in Dix (still less a 5% sucrose option with 40 mg/ml aflibercept).

317. On its face, there are multiple selections from multiple lists (sucrose amount, pH, aflibercept concentration), aspects which are simply different from the Claims (aflibercept concentration, buffer choice), and only data for formulations unsuitable for intravitreal use. This is not a novelty citation.

## INFRINGEMENT BY EQUIVALENCE

### Relevant Legal Principles

318. The Court will be very familiar with the three *Actavis* questions for assessing the question of infringement by equivalents deriving from the Supreme Court's decision in *Actavis v Lilly* [2017] UKSC 48 at [66]:

i. Notwithstanding that it is not within the literal meaning of the relevant claim(s) of the patent, does the variant achieve substantially the same result in substantially the same way as the invention, i.e. the inventive concept revealed by the patent?

ii. Would it be obvious to the person skilled in the art, reading the patent at the priority date, but knowing that the variant achieves substantially the same result as the invention, that it does so in substantially the same way as the invention?

iii. Would such a reader of the patent have concluded that the patentee nonetheless intended that strict compliance with the literal meaning of the relevant claim(s) of the patent was an essential requirement of the invention?

319. As HHJ Hacon held in *Kwikbolt v Airbus* [2021] EWHC 732 (IPEC) at [103], the question of what is the inventive concept (or the "inventive core" - see *Actavis* [60]) is a matter of interpretation of the patent through the eyes of the skilled person, armed with their CGK:

> "The important point, in my view, is that a correct assessment of the inventive concept cannot be achieved with the variant in mind. The correct identification of the inventive concept must be done through the eyes of the skilled person, who has no notion of what the variant is. The skilled person has only the relevant claim, the specification as a whole and his or her common general knowledge to work with."

320. The level of generality with which the inventive concept is characterised in turn leads to the characterisation of the level of generality of the relevant "result" of the invention and the "way" in which that is achieved by the patent, in order to answer *Actavis* question 1.

321. *Actavis* question 2 asks whether, knowing that the variant achieves substantially the same result as the invention, it would be obvious to the skilled person at the priority date that it does so in substantially the same way as the invention. The Defendants' position is that question 2 can be answered 'yes' in circumstances either where the answer would be obvious to the skilled person with their CGK upon simply being asked the question, or where the answer would be obvious to the skilled person by reason of the skilled person conducting routine or CGK experiments to determine the answer – see *Actavis* [69] per Lord Neuberger: *"the notional addressee of the Patent would regard investigating whether pemetrexed free acid, pemetrexed ditromethamine or pemetrexed dipotassium worked as a purely routine exercise"*.

322. Relevant considerations when answering *Actavis* question 3 include asking whether the component at issue is an "essential" part of the invention (*Actavis* [65]) and whether a plausible reason has been advanced as to why a rational patentee should want to place a limitation on their invention that excludes the variant (*Actavis* [73]). It is submitted in this context that, as a matter of principle, when considering Actavis question 3, it is appropriate to take into account, based on the nature of the invention, the ease or otherwise with which the patentee would be able to construct a valid claim to their invention.

323. Just because the addressee of the patent may understand that the reason why the wording of the claims was limited with respect to a particular feature was because that was the only thing that had been tested, it does not follow that the patentee intended that its scope of protection should be limited by reference to the literal interpretation of that feature; that suggestion confuses the disclosure of the specification of a patent with the scope of protection afforded by its claims (*Actavis* [74]).

**The Defendants' Case**

324. We have addressed the Defendants' case on the inventive concept at §§100 to 108 above.

325. In relation to the Actavis questions in respect of the **Formycon Product**:

326. On Actavis question 1, it is common ground that the Formycon Product has at least 2 years stability, and maintains the pH of 6.2 for at least that time period. In respect of the way in which that is achieved, it is common ground that the 10mM histidine in the Formycon Product provides the same functionality as the 10mM sodium phosphate in the formulation of the Claims in respect of buffering, as the histidine offers at least as much buffering capacity as the sodium phosphate to enable the pH to be maintained for at least 24 months, and it does so through the same mechanism as the sodium phosphate, namely though the release and capture of hydrogen ions[30]. Therefore, the Formycon Product achieves substantially the same result as the formulation of the Claims in substantially the same way.

327. On Actavis question 2, given the CGK understanding of the functionality of sodium phosphate and histidine as buffers and the mechanism by which they achieve their buffering functionality, it would be obvious to the skilled person - knowing that the Formycon Product achieves substantially the same result as the formulation of the Claims – that it does so in substantially the same way[31].

---

[30] Gukasyan 1 §§13.7-13.9. Daugherty 2 §12.3.

[31] Gukasyan 1 §13.10 and the evidence on the relevant CGK at §§5.55-5.63.

328. On Actavis question 3, there is no reason why the skilled person would think that the patentee intended the words of the claim in relation to sodium phosphate to be limited to their literal interpretation, thereby excluding buffers which are able to maintain the right pH (of 6.2-6.3) and have sufficient buffering capacity. What matters to the invention is that the relevant pH is maintained for the necessary length of time, and there is nothing in the teaching of the Patents which suggests that the patentee would want to exclude from the scope of protection any other buffers that can do that.

329. In relation to the **Samsung Product**:

330. On Actavis question 1, it is common ground that the Samsung Product has at least 2 years stability, and maintains the pH of 6.2 for at least that time period. It is also common ground that the Samsung Product is suitable for intravitreal administration. In terms of the way that that is achieved, although the Samsung Product does not contain 40mM NaCl, it contains an additional amount of sucrose (8% instead of 5%), and it is common ground that the additional amount of sucrose has the effect of bringing the overall osmolality to within or close to the osmolality of the vitreous (which is the same as the effect of the 40mM NaCl)[32]. Further, in relation to buffering, although the Samsung Product has 7.78mM sodium phosphate instead of 10mM sodium phosphate, the 7.78mM sodium phosphate has the same effect on the maintenance of the pH through the same mechanism[33]. Therefore, the Samsung Product achieves the same result as the formulation of the Claims in substantially the same way.

331. On Actavis question 2, given the CGK understanding of (i) functionality of NaCl and sucrose in relation to osmolality, and (ii) the functionality of sodium phosphate in relation to buffering, it would be obvious to the skilled person - knowing that the Samsung Product achieves substantially the same result as the formulation of the Claims – that it does so in substantially the same way[34].

332. On Actavis question 3, there is no reason why the skilled person would think that the patentee intended the words of the claim in relation to 40mM NaCl to be limited to their literal interpretation, thereby excluding other excipients which are able to achieve the same effect on the osmolality of the formulation. What matters to the invention in respect of the NaCl is that it acts so as to ensure that the osmolality of the formulation is close to or in the range of the osmolality of the vitreous. There

[32] Gukasyan 1 §13.14. Dr Daugherty does not dispute that aspect of Prof Gukasyan's evidence (see Daugherty 2 §12.8).

[33] Gukasyan 1 §§13.23-13.76.

[34] Gukasyan 1 §§13.27-13.28 and the evidence on CGK referred to therein at §§5.64-5.67, §§5.83-5.86 and §§5.55-5.63.

is nothing in the teaching of the Patents which suggests that the patentee would want to exclude from the scope of protection other excipients that can do that.

333. Further, in relation to the 7.78mM sodium phosphate, there is no reason why the skilled person would think that the patentee intended the 10mM of sodium phosphate to be interpreted strictly, because the skilled person would know that what mattered to the invention was that there was a sufficient amount of buffer to maintain the relevant pH for at least 24 months. They would not assume that 10mM was the minimum concentration that could achieve that function.

**ALLEGED LACK OF TECHNICAL CONTRIBUTION / AGREVO OBVOUSNESS / INSUFFICIENCY**

**Legal Principles**

334. The fundamental question which the Court will need to address in the context of an allegation of AgrEvo obviousness/lack of plausibility is what is the technical contribution of the claims: *AgrEvo/Triazoles* (Case T-939/92) [1996] OJ EPO 309; [1996] E.P.O.R. 171, para 2.4.2:

> "it has for long been a generally accepted legal principle that the extent of the patent monopoly should correspond to and be justified by the technical contribution to the art. ... [T]his general legal principle was applied in relation to the extent of the patent protection that was justified by reference to the requirements of articles 83 and 84 EPC, the same legal principle also governs the decision that is required to be made under article 56 EPC, for everything falling within a valid claim has to be inventive."

335. As explained by Birss J in *Takeda v Roche* [2019] EWHC 1911 (Pat) at [205], for each alleged technical contribution there are five questions to answer *"Is it disclosed in the patent? Is it plausible? Is it true? Is it a technical advance? Does it support claims of the breadth they are?*"

336. In relation to prejudices in the prior art that influence the skilled person's motivation, as Jacob J put it in *Union Carbide Corp v BP Chemicals* [1998] RPC 1 at [13], the Courts accept that there is invention in teaching the skilled person "*that which those in the art thought ought not be done ought to be done*".

337. Further, Jacob J made clear in *Dyson v Samsung* [2009] EWHC 55 (Pat); [2009] F.S.R. 15 at [153]–[157] that where there was a prejudice in the prior art, the patent did not need to demonstrate that the invention works contrary to the prejudice, but only to make it plausible that the invention would work. Nor must the patent expressly address the prejudice for it to be taken into account. See in particular [156]-[157]:

> "[156] Counsel for Dyson accepted that Jacob L.J.'s wording required some adjustment. He submitted that, although it was not necessary for the patent to explain "how or why, contrary to the prejudice, that it does work or is practical", it was necessary for the disclosure in the patent to make it plausible that the invention would work or be practical

contrary to the prejudice. In support of this submission he relied on what Lord Hoffmann said at [37]:

> "... there is in my opinion no reason as a matter of principle why, if a specification passes the threshold test of disclosing enough to make the invention plausible, the question of obviousness should be subject to a different test according to the amount of evidence which the patentee presents to justify a conclusion that his patent will work."

[157] I accept the submission of counsel for Dyson subject to the rider that I do not believe that the patent must expressly address the prejudice, although a failure to mention any prejudice in the specification may be of evidential significance."

338. Integers which are an arbitrary selection, and do not plausibly disclose a technical contribution, cannot be relied upon for non-obviousness; see *Optis Cellular Technology LLC v Apple Retail UK Ltd [2020] EWHC 2746* where Birss J explained that although having an arbitrary feature in a claim is not a ground of invalidity, if a claim is found to contain an arbitrary limitation in it, then that limitation cannot assist the patentee in defending an obviousness case (at [212]). As to this, we draw the Court's attention to the summary of the rule against "arbitrary" selections in *Sandoz & Teva v BMS* "***Apixaban CA***" [2023] EWCA Civ 472 at [30]. As reflected therein, (by reference to Floyd LJ's commentary in *Generics v Yeda* [2014] RPC 4), the rule against arbitrary selection is found in the guiding principle "is there a real technical advance?".

339. A patent may be rendered obvious where it makes no technical contribution to the art, or where the feature which distinguishes it from the prior art is arbitrary and serves no useful purpose.

340. In relation to plausibility we commend the principles set out by Lord Sumption in *Warner-Lambert v Generics* [2018] UKSC 56; [2019] 3 All ER 95 at [35]-[40], together with the additional principle established in *Sandoz & Teva v BMS* ("***Apixaban HC***") [2022] EWHC 822 (Pat) at [66], that where an objection is of lack of plausibility in an AgrEvo-type situation, a patentee is not necessarily limited to the most demanding teaching of utility in the specification and is entitled to try to rely on a less ambitious degree of utility, or a utility of a different but related kind. The AgrEvo-type of objection is that there is no technical contribution at all, and a patentee ought to be able to meet it by showing that there is some contribution even if it turns out that the contribution is less than the patentee thought. But, as explained below, this is not the present case. The technical contribution that the Patents provide is not less than that which the patentee thought; it is simply different from that which the Claimants seek to rely on for their obviousness case.

**Application to the Facts**

341. On a proper understanding as the nature of the inventive concept of the Patents, summarised at §§100 to 108 above, the formulation of the Claims provides a number of technical effects (or technical advances) which are rendered plausible by the specification and the CGK:

i. The Patents, and in particular the **stability** data in the Examples, render it plausible that the claimed formulation of 40mg/ml of aflibercept is stable for at least 2 years. See in particular Examples 1-4 and Gukasyan 1 §11.3-11.6 on what the Formulation Scientist would learn from those Examples in relation to stability.

ii. The Patents render it plausible that the formulation of the Claims is **suitable for intravitreal administration**, in particular due to the use of a pH within the range suitable for the vitreous, and due to the osmolality of the excipients of the formulation of the Claims tested in Example 3, which the Formulation Scientist would be able to calculate (as to which see Gukasyan 1 §§7.40-7.41).

iii. Further, in light of the CGK and the teaching of the Patents, the Patents render it plausible that the particular excipients and amounts thereof contribute to the stability and suitability for intravitreal administration by providing the relevant **functionalities** set out at §104 above.

342. As such, contrary to §6(a) of the Consolidated GoI, the Patents are not arbitrary, and as the aforesaid technical effects are rendered plausible by the Patents, the Patents are sufficient.

343. Further, those technical effects were not enabled by the prior art. Wiegand II does not provide any teaching that the formulation of the Claims, nor indeed any formulation of aflibercept, is stable for at least 2 years and suitable for intravitreal administration. There are no formulations disclosed and no stability data relating to any formulations. So, the charge that the Patents are no more enabling than the prior art (at §6(b) of the Consolidated GoI) is also unsustainable.

344. The Claimants suggest that the Patents do not render it plausible that doses of 2-3.6mg or 2-4mg can be administered without adverse effects, which they claim renders the matters relied on by the Defendants in support of inventive step impermissible (Re-Amended GoI §6A). This argument is misguided for the following reasons.

345. First, it is no part of the Defendants' case that the Patents are addressing such matters, or that there was a prejudice in the art that there was a particular problem from a safety perspective with using such doses. The Defendants' case on the inventive contribution in respect of the 40 mg/ml of aflibercept is that the Patents provide a stable formulation of 40 mg/ml aflibercept as explained at §§120 to 124 above; not that the invention relates to discovering that there are no adverse events at high doses.

346. Second, although the Defendants do rely on there being a lack of motivation, in light of Wiegand II, to try to formulate 40 mg/ml of aflibercept, that lack of motivation is in the following respects, neither of which rely on any prejudice in respect of adverse events that the Patents do not solve:

i. In relation to the choice of dose from an efficacy perspective, as the skilled team would expect to be able to achieve the desired efficacy at the desired dosing interval at a dose well below a dose which would remove any choice on the part of the formulator to keep the concentration below 40 mg/ml (i.e. well below 4mg).

ii. In relation to the choice of volume to use i.e. there being no motivation from the formulator's perspective in light of their stability concerns to use - in respect of any doses to be tested in phase 1 - a volume that would result in a concentration as high as 40 mg/ml, nor would there be a reasonable expectation of success if formulating such a high concentration.

347. Third, in relation to (i) and (ii) above, the Patents establish that a stable formulation of 40 mg/ml can be achieved. Therefore the Formulation Scientist would appreciate having read the Patents that, for any given dose, from a formulation perspective, a volume which achieves that concentration of aflibercept could be used. For example, the Formulation Scientist would appreciate that they could make a stable formulation of 2mg dose in a 50 µL volume (instead of a 90µL or 100µL volume).

348. Fourth, in relation to the lack of motivation to formulate a dose of 4mg of aflibercept from an efficacy perspective, it is true that the Patents do not provide any efficacy data. However:

i. The clinical relevance of a 4mg dose of aflibercept only arises in this case because of the starting point that the Claimants have chosen for their obviousness case. Wiegand II describes pre-clinical and clinical data relating to the treatment of wet AMD, and the Claimants' case relies on there being a clinical motivation, said to come from that prior art, to take aflibercept forward for the treatment of wet AMD and/or diabetic retinopathy at a particular dose range, up to 4mg, which the Claimants rely upon as the motivation for the formulator to try to formulate 40 mg/ml of aflibercept (see MacLaren 1 §§23.58-23.60).

ii. In that context, one cannot strip out the question of the clinical motivation to try to formulate a 4mg dose in light of that prior art, or prevent the Defendants challenging that alleged motivation, simply because the Claims do not have any express efficacy requirement, as that would be to consider the question of obviousness absent the context in which the prior art is said to motivate the skilled team to formulate aflibercept in the first place.

iii. But none of the above has any relevance to the question of whether the Patents plausibly solve their technical contribution (which is not related to efficacy or dose). Just because the Claimants have chosen to advance a case of non-obviousness which relies on the skilled team trying to formulate a 4mg dose for clinical reasons, that does not make a 4mg dose part of the inventive contribution of the Patents. The inventive contribution of the Patents

is not about *any* specific dose of aflibercept, or indeed any specific volume, it is about a formulation of particular concentration (i.e. a dose to volume ratio) of aflibercept. See §§120-124 above where we address the inventive concept and its relationship with dose.

iv. The fact that the claimed concentration can be made using a wide range of doses and volumes does not mean that the Patents have to render each dose or volume that would be covered clinically plausible. As such, the fact that the Patents do not provide a technical effect or technical advance in respect of the need to formulate a 4mg dose of aflibercept from an efficacy perspective does not render the Patents insufficient or obvious.

## ALLEGED "INCONSISTENCY WITH INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENCE"

### Law

349. The Claimants plead at §7 of their Grounds of Invalidity that insofar as the scope of the claims of the Patents cover either or both of their Products, *"the Claimants will contend that the consequence would be that the* [Claims] *would also thereby be anticipated by, obvious over, and/or make no technical contribution over the prior art cited herein"*, followed by particulars at (a) to (c). The consequence, so they plead in §8, is that to avoid such invalidity the scope of the Claims must be confined to a normal construction, such that there is no infringement.

350. The case advanced by the Claimants in this regard is vague and unclear from their pleadings and is no clearer from the evidence. We do our best to address the law relevant to the case understood to be advanced below, and reserve the right to address the Court further pending an understanding of the Claimants' case from their skeleton.

351. The Claimants' case as pleaded is that the formulations of the prior art (or obvious modifications of them) embody the inventive concept of the Claims as characterised by the Defendants and are immaterial variants of the Claims (see §§7(b)-(d) of their Grounds of Invalidity).

352. To the extent the Claimants are seeking to advance a *"Formstein"* defence to infringement by equivalents, there is no judgment of the Supreme Court or Court of Appeal confirming that this defence exists as part of English patent law. To the extent it does, the most authoritative statement as to how such a defence might operate is to be found in the *obiter* judgment of Birss LJ (sitting in the High Court) in *Facebook v Voxer* [2021] EWHC 1377 (Pat) at [209]-[216], in particular:

> "211. So imagine a case in which a claim on its normal construction is valid and not infringed, but a defendant's device is (i) found to infringe by the doctrine of equivalents but also (ii) found to be obvious over the prior art. Is the right answer that the claim is infringed but invalid because its proper scope, taking into account equivalents, encompasses something obvious over the prior art; or is it valid but not infringed on the

footing that part of the law of equivalents mandates that if these are the facts the equivalents doctrine does not expand the claim? Either answer can be justified logically. Indeed, if the matter was free from authority, given the way the scope of the claim is defined in the EPC itself, one might think the invalidity approach is a purer application of the letter of the law. After all it is how equivalents worked when they were taken into account as part of purposive construction before *Actavis*.

…

215. As things have turned out in this case, I do not have to do so either. However, if I did have to decide the matter, I would hold that the right approach is the *Formstein* approach so that the conclusion if the equivalent device lacks novelty or is obvious is that the claim scope must be confined to its normal construction in that respect. I would do so for two reasons. If the claim on its normal construction is valid, then it seems harsh to invalidate it on this ground. What else could the patentee do but write their claim in a way which, normally construed, did not cover the prior art. So that approach promotes certainty. Secondly, since it is clear that other EPC countries work that way, this is a reason in itself for this EPC state to take the same approach."

353. So, the relevant question that would entitle either of the Claimants to a *Formstein* defence to infringement by equivalents is whether the variant – i.e. the Samsung Product or the Formycon Product – lacks novelty or is obvious over the cited prior art. An analysis involving assessing whether the formulations of the prior art or obvious modifications thereof (none of which is the Samsung Product or the Formycon Product) are immaterial variants of the Claims therefore does not assist the Claimants.

**The Claimants' Case**

354. The Claimants' pleaded case refers to a Formstein type case where the Claimants allege that if the scope of the claims is broad enough to cover matter which would be either (i) anticipated, or (ii) obvious over the cited prior art, the claims would be limited to their normal construction (Consolidated Grounds of Invalidity §7 B.1/7/p33).

355. This extremely unclear case is nonetheless clearly wrong in law. First, as detailed above, what the Claimants would have to prove to be obvious or anticipated are the Samsung Product or the Formycon Product, and not *any* product falling within the scope of the claims on the basis of a doctrine of equivalents that is disclosed in, or obvious over, the prior art. In this way, the defence acts like a *Gillette* defence, but in the context of an infringement by equivalents.

356. Second, the Claimants' Formstein argument is pleaded extremely broadly that any equivalent falling within any integer of the claim would result in the whole claim being confined to its normal construction, which is also incorrect. As made clear by Birss LJ in *Facebook v Voxer*, the limitation to the normal construction is only in the "relevant respect", and not in respect of all integers of the claim.

357. In any event, as set out above, the Claimants' obviousness case fails for numerous reasons, including for reasons relating to particular integers of the Claims upon which there are no equivalents arguments (e.g. pH, 40mg/ml and polysorbate). Accordingly, there is no basis for a Formstein type defence in this case.

358. Further, each of the formulations in Dix differ from the formulations of the Formycon / Samsung Products in multiple different ways. The closest formulation in Dix differs in terms of its (lack of) a pH range, the buffer (histidine), and the concentration of aflibercept (50-100 mg/ml). Again, there is no basis for a Formstein type defence on the novelty case either.

## ADDED MATTER

### Relevant Legal Principles

359. The law on added matter was summarised by the Court of Appeal in *Nokia v IPCom* [2012] EWCA Civ 567 at [46]-[60]. The question is whether the patent discloses subject matter that is not clearly and unambiguously disclosed (explicitly or implicitly) in the application.

### The Claimants' Added Matter Attack

360. The Claimants' added matter pleading cross-refers to and repeats their priority pleading, *mutatis mutandis* (Amended Grounds of Invalidity §9).

361. Given the similarity between the disclosure of the Priority Document [A.2/1] and the Application as Filed for the Patents [A.2/2], the Defendants accept that insofar as none of the Claims is entitled to priority then the Patents will be invalid for added matter for like reasons.

362. On the other hand, insofar as any/all of the Claims is/are entitled to priority on the basis advanced above, the Defendants will say that there is no added matter for like reasons, in reliance upon the whole of the Application as Filed, in particular [0001] (equivalent to [0001] of the Priority Document), [0013] (equivalent to [0011]), [0036] (equivalent to [0020]), [0045] (equivalent to [0030]), Examples 3 & 4 at [0058]-[0059] (equivalent to [0044]-[0045]).

## ALLOWABILITY OF THE PROPOSED AMENDMENTS

363. The proposed amended claims now pursued are limited to the unconditional amendments to EP 691 and proposed amended claim 2 of EP 306.

364. The Claimants' Joint Statement of Objection raises added matter (§17) and lack of priority (§18) objections, and they contend that the amendments do not cure the invalidity of the Patents (§19).

These arguments are dealt with above. There are therefore no additional allowability objections that fall to be considered. The amendments should be allowed.

**CONCLUSIONS**

365. Each of the Claims of the Patents is valid and is infringed by each of the Samsung Product and the Formycon Product. The Claimants are therefore not entitled to the declaration of non-infringement.

**ADRIAN SPECK KC**
**ISABEL JAMAL**
**WILLIAM DUNCAN**
8 New Square

**ALICE HART**
Three New Square

Instructed by A&O Shearman LLP

**5 June 2025**

## ANNEX A - FOREIGN PROCEEDINGS

1. Detailed below is the status of the various parallel proceedings that are ongoing in other jurisdictions between the parties and/or relating to the Patents.

2. EP 306 is under opposition at the EPO. In its decision dated 26 November 2024 and written grounds for the decision dated 13 January 2025, the Opposition Division held that the claims of EP 306 were invalid for added matter. This decision has been appealed by Regeneron and the grounds of appeal were filed on 13 May 2025.

3. In Germany, Samsung filed revocation proceedings before the German Federal Patent Court seeking revocation of EP 691 which were served on 22 June 2023. The oral hearing of these proceedings is listed for 26 June 2025. In addition, Formycon filed a request for a DNI in respect of EP 691 and EP 306 before the Regional Court of Munich on 19 December 2024. The oral hearing of these proceedings is listed for 25 September 2025.

4. In the Netherlands, Samsung filed a revocation action and an Arrow declaration in respect of the Patents on 31 July 2024. Regeneron has counterclaimed for infringement in these proceedings. The trial in these proceedings is scheduled for 18 July 2025.

5. In France, Formycon filed DNI and revocation proceedings against the Patents on 19 August 2024. It is expected that the hearing on the merits will take place in 2026.

6. In Belgium, Formycon filed DNI and revocation proceedings against the Patents on 18 December 2024. It is currently anticipated that the hearing of the merits will take place in February 2026.

7. In Italy, Formycon commenced DNI and revocation proceedings against the Patents on 4 April 2025. The first hearing in the case is currently scheduled for 14 October 2025.

8. In the US, Regeneron filed infringement complaints, which include assertion of a US equivalent to the Patents (US865), against a number of companies developing biosimilar aflibercept products. The first infringement complaint was filed against Mylan Pharmaceuticals Inc. (Viatris) and in December 2023 a decision in these proceedings was handed down by the Northern District of West Virginia finding US865 valid and infringed. This decision was appealed, but the parties reached settlement prior to resolution of the appeal.

9. Regeneron brought infringement proceedings and sought preliminary injunctions (PIs) against Formycon and Samsung. On 14 June 2024 and 21 June 2024, PIs were granted against the Samsung Product and Formycon Product, respectively, on the basis of US865. These PI decisions were appealed by Samsung and Formycon, and the Federal Circuit handed down its decision affirming the

PIs on 29 January 2025. Infringement proceedings on the merits against Formycon and Samsung are ongoing.

10. Regeneron also brought PI and infringement proceedings against Amgen and Celltrion. The PI against Celltrion was granted but the PI against Amgen was denied. Infringement proceedings on the merits are also ongoing against Sandoz.

11. In addition, at the USPTO, requests for inter-partes review (IPRs) of US865 have been filed by Samsung, Formycon and Celltrion. On 2 June 2025, the Patent Trial and Appeal Board of the USPTO denied institution of the IPRs brought by Samsung and Formycon. The Celltrion proceedings are ongoing.

12. In South Korea, on 13 December 2022, Samsung filed an invalidity action against the Korean equivalent of the Patents. On 31 October 2024, the Korean Intellectual Property Trial and Appeal Board handed down its decision holding the patent valid in an amended form. This decision has been appealed by Samsung before the IP High Court and the first appeal hearing is scheduled for 19 June 2025. In parallel on 30 July 2024, Regeneron and Bayer filed a PI action against Samsung and the PI was granted on 7 February 2025. Samsung has also filed an opposition against this decision before the same Seoul Central District Court. The hearing of the PI opposition took place on 30 April 2025, and the parties are awaiting judgment. The infringement action on the merits against Samsung Bioepis is ongoing. There are also South Korean infringement proceedings ongoing against Celltrion and Sam Chung Dang. A PI request was also filed against Celltrion and this was denied. The decision has been appealed.

13. In Canada, an infringement action was filed against Samsung which included allegations of infringement of the Canadian equivalent of the Patents. These proceedings have settled. Infringement actions against Celltrion, Viatris, and Apotex were also filed and have since settled. There are also ongoing infringement proceedings against Amgen and Sandoz, with the hearing in the proceedings against Sandoz currently scheduled to take place in October and November 2026. The trial in the Amgen proceedings is ongoing.

## ANNEX B – ISSUES IN DISPUTE ON CGK

1. Below are the disputed issues on the CGK as set out in the four CGK Statements, divided by expert discipline, and, where applicable, an identification of to which issue(s) in the case the dispute may be relevant and where that dispute arises in the context of the evidence. We have also identified below the issues that we do not currently understand to be material to the issues in the case.

PROTEIN ENGINEERING

| | |
|---|---|
| **(1) Whether C-terminal lysine cleavage (or clipping) and the fact that it happens in eukaryotic but not prokaryotic cells was CGK**<br><br>(Leatherbarrow 1 §5.20 / Esposito 1 §§60-61 / Leatherbarrow 2 §2.3 / Esposito 2 §11) | It is not clear to the Defendants the extent to which this issue matters to the issues in the case, however it arises in the context of the evidence on:<br><br>- **priority**, in particular the extent to which the Protein Engineer would understand that the C-terminal lysine residue of SEQ ID NO:4 would be cleaved when the protein was expressed in a eukaryotic cell line (Leatherbarrow 1 §§5.20 & 7.9; Esposito 2 §§68-69 & 71); and<br>- **obviousness**, in particular whether the removal of the C-terminal lysine would be taken into consideration in the calculation of the molecular weight of SEQ ID NO:6 (Leatherbarrow 1 §§6.7 & 6.17; Esposito 2 §42). |
| **(2) Whether the Protein Engineer would know that N-linked glycosylation generally introduces the potential for between 0 and 2 sialic acids per glycosylation site (although in theory it can be up to 4) and the role of sialylation.**<br><br>(Leatherbarrow 1 §§5.27-5.29 & 5.40 / Esposito 2 §§12 & 16) | Relevant to and arises in the context of the evidence on **obviousness**, in particular the question of whether, and if so how, the Protein Engineer would take N-linked glycosylation and the presence of sialic acids into account when calculating the pI of SEQ ID NO:6 from the prior art (Leatherbarrow 1 §§6.20-6.22; Esposito 1 §172-173; Leatherbarrow 2 §§3.2-3.9; Esposito 2 §46-52).<br><br>This issue is addressed in context in §§226 & 230 to 236 above. |
| **(3) Whether or not, compared to well-characterised native proteins like antibodies, therapeutic fusion proteins were less well known at the Priority Date.**<br><br>(Leatherbarrow 1 §5.14 / Esposito 1 §69 / Esposito 2 §10) | Although this is identified as an issue in dispute, we understand that it is common ground that compared to antibodies, therapeutic fusion proteins were less well known at the Priority Date – see the first sentence of Esposito 2 §10. |
| **(4) Whether the Protein Engineer would calculate the theoretical molecular weight of a protein**, as **opposed to measuring it empirically, and if so, how.**<br><br>(Esposito 1 §125 / Leatherbarrow 1 §5.37 / Esposito 2 §§42-44) | It is not clear to the Defendants the extent to which this issue matters to the issues in the case, however it arises in the context of the evidence on **obviousness**, and includes the question of whether the Protein Engineer would take the effect of post-translational modifications (including N-linked glycosylation) and disulfide bond formation into account when calculating the molecular weight of SEQ ID NO:6 from the prior art (Leatherbarrow 1 §§6.17-6.19; Esposito 1 §172 & Esposito 2 §§42-44 & 51-52). |
| **(5) How the Protein Engineer would calculate the theoretical pI of a protein**<br><br>(Leatherbarrow 1 §§5.40-5.42 / Esposito 2 §§16-18) | Relevant to and arises in the context of the evidence on **obviousness,** in particular whether, and if so how, the Protein Engineer would take post-translational modifications (including N-linked glycosylation, and so |

| | |
|---|---|
| | the presence of sialic acids) and disulfide bond formation into account when calculating the pI of SEQ ID NO:6 from the prior art (Leatherbarrow 1 §§6.20-6.22; Esposito 1 §172-173; Leatherbarrow 2 §§3.2-3.9; Esposito 2 §46-52).<br>This issue is addressed in context in §§226 & 230 to 236 above. |
| **(6) If produced in a cellular system will a protein always undergo post-translational modifications?**<br>(Leatherbarrow 1 §5.33 / Esposito 2 §13) | It is not clear to the Defendants the extent to which this issue matters to the issues in the case, however it arises in the context of the evidence **priority**, in particular the extent to which the Protein Engineer would know that SEQ ID NO:4 would be post-translationally modified when expressed in a cellular system (Leatherbarrow 1 §§7.9 & 7.12-7.13; Esposito 2 §§67-68). |
| **(7) The extent of the Protein Engineer's knowledge about the use of yeast cells for the expression of recombinant proteins, including that some therapeutic proteins produced in yeast cells had received regulatory approval at the Priority Date.** (Esposito 1 §§99, 101, 102) | It is not clear to the Defendants the extent to which these issues matter to the issues in the case. |
| **(8) The extent of the Protein Engineer's knowledge about the use of insect cells for the expression of recombinant proteins, including that therapeutic proteins produced in insect cells had received regulatory approval for veterinary use and that one for use in humans was in the advanced stages of clinical trials.**<br>(Esposito 1 §§104, 107) | |
| **(9) In response to a request from a Formulation Scientist for such an analysis, would an analysis of a protein for any physical instability risks and/or amino acid residues that are potentially susceptible to chemical changes be carried out, and whether this would include:**<br>**a. Analysis of motifs within the amino acid sequence; and / or**<br>**b. Analysis of protein crystal structures.**<br>(Leatherbarrow 1 §5.44 / Leatherbarrow 2 §2.5 / Esposito 2 §19-23) | Relevant to and arises in the context of the evidence on **obviousness**, in particular the extent of the information that would be requested by the Formulation Scientist from the Protein Engineer about the physical instability risks and/or amino acids that are potentially susceptible to chemical changes of SEQ ID NO:6 of the prior art (Leatherbarrow 1 §§6.25-6.36; Esposito 2 §59; Leatherbarrow 3 §§3.1-3.3).<br>This issue is addressed in context in §§227, 228 & 237 to 241 above. |
| **(8) The extent of the Protein Engineer's knowledge regarding the risk of deamidation.**<br>(Leatherbarrow 1 §§5.52-5.55 / Esposito 2 §§24-25) | Relevant to and arise in the context of the evidence on **obviousness**, in particular the extent of the information that would be requested by the Formulation Scientist from the Protein Engineer about the physical instability risks and/or amino acids that are potentially susceptible to chemical changes of SEQ ID NO:6 of the prior art (Leatherbarrow 1 §§6.25-6.36; Esposito 2 §59).<br>This issue is addressed in context in §§227, 228 & 237 to 241 above. |
| **(9) Whether the risks of isomerization and fragmentation were CGK.**<br>(Leatherbarrow 1 §§5.55-5.58 / Esposito 2 §§26-27) | |
| **(10) Whether the oxidation of aromatic ring groups in tyrosine, phenylalanine, tryptophan and histidine was CGK.**<br>(Leatherbarrow 1 §5.62 / Esposito 2 §28) | |
| **(11) Whether it was CGK that sugar residues forming part of the glycan are also susceptible to** | |

| | |
|---|---|
| **hydrolysis and, if so, the factors influencing its occurrence.**<br>(Leatherbarrow 1 §5.63 / Esposito 2 §29) | |
| **(12) Whether the Protein Engineer would use targeted mutagenesis to address concerns regarding chemical and physical stability of a therapeutic protein, and if so when.**<br>(Leatherbarrow 1 §§5.65-5.66 / Esposito 2 §§30-31) | Relevant to and arises in the context of the evidence on **obviousness**, in particular whether the Protein Engineer would discuss targeted mutagenesis to address the physical instability risks and/or amino acids that are potentially susceptible to chemical changes in the context of the prior art (Leatherbarrow §6.42; Esposito 2 §60). |

FORMULATION SCIENCE

| | |
|---|---|
| **(1) Whether the Formulation Scientist developing an ophthalmic formulation for intravitreal use intended (ultimately) for commercial sale would aim to achieve stability for at least 24 months.**<br>(Gukasyan 1 §5.7 / Daugherty 2 §4.2) | It is not clear to the Defendants the extent to which this issue matters to the issues in the case, however it arises in the context of the evidence on **obviousness**, in particular whether the target of the Formulation Scientist would be to formulate the protein in the prior art for long-term (i.e. 24 month) stability (Gukasyan 1 §6.11; Daugherty 2 §5.9).<br>This issue is addressed in context in §243 above. |
| **(2) The maximum level of degradation the Formulation Scientist would want to see in stability studies**<br>(Gukasyan 1 §5.18, Daugherty 2 §4.10) | It is not clear to the Defendants the extent to which these issues matter to the issues in the case. |
| **(3) Whether precipitation would be considered a separate physical instability issue.**<br>(Gukasyan 1 §5.12(b) / Daugherty 2 §4.5) | |
| **(4) Which buffers were commonly used for formulating liquid protein therapeutic formulations and the factors which affect the choice of buffer, including how many would be used for each pH at which a formulation is tested?**<br>(Daugherty 1, §§8.12(a), 8.12(f), 8.12(g), 9.5; Gukasyan 2, §§3.10, 3.27) | Relevant to and arises in the context of the evidence on **the Patents**, in particular whether the reference to sodium phosphate buffer in the Patents was because that is the buffer which achieved the desired pH of 6.2-6.3 used in the formulations of the Examples (Prof Gukasyan's evidence), or whether it would be assumed that the patentee had tested others but made a deliberate choice of sodium phosphate (Dr Daugherty's evidence) (Daugherty 1 §13.15; Gukasyan 2 §5.2).<br>This issue is also relevant to the **obviousness** case and the approach that the Formulation Scientist would take, and the expectation of success they would have, when formulating a protein for intravitreal use, including SEQ ID NO:6 from the prior art (Gukasyan 1 §§6.10-6.37; Daugherty 1 §§11.13-11.28; Gukasyan 2 §§4.2-4.20; Daugherty 2 §5.9-5.32).<br>This issue is addressed in context in §§265, 266 & 289 above. |
| **(5) Whether at the typical concentrations used in liquid intravitreal formulations ionic interactions of buffers or salts with the protein were thought potentially to have a material impact on the stability of the protein and/or, in the case of salts, on the** | Relevant to and arises in the context of the evidence on **the Patents / infringement** – whether the Formulation Scientist reading the Patents would understand that the ionic behaviour of the sodium phosphate and/or the NaCl was having a meaningful |

| | |
|---|---|
| **solubility of the protein or the viscosity of the formulation**<br><br>(Daugherty 1, §§8.9, 8.12(f), 8.23-24; Gukasyan 2; §§3.9, 3.14-26; Daugherty 2, §4.58; Gukasyan 1, §5.86) | impact on the stability or viscosity of the formulation (Daugherty 1 §§14.12-14.13, 15.2, 16.4 & 16.6; Gukasyan 2 §§6.6-6.11, 7.1-7.2, 8.1-8.4)<br><br>This issue is addressed in context in §117 & 118 above. |
| **(6) Whether the possibility of non-reducing disaccharides degrading to form aldehydes (which are reducing) would be a concern in practice**<br><br>(Gukasyan 1, §5.66; Daugherty 2, §4.48) | Relevant to the **obviousness** case and the approach that the Formulation Scientist would take, and the expectation of success they would have, when formulating a protein for intravitreal use, including SEQ ID NO:6 from the prior art (Gukasyan 1 §§6.10-6.37; Daugherty 1 §§11.13-11.28; Gukasyan 2 §§4.2-4.20; Daugherty 2 §5.9-5.32). |
| **(7) Which surfactants (if any) would have been considered as candidate surfactants for an intravitreal formulation and in what circumstances.**<br><br>(Gukasyan 1, §§5.76-5.77; Daugherty 2, §§4.49-4.52) | Relevant to and arises in the context of the evidence on **obviousness** and the approach that the Formulation Scientist would take, and the expectation of success they would have, when formulating a protein for intravitreal use, including SEQ ID NO:6 from the prior art (Gukasyan 1 §§6.10-6.37; Daugherty 1 §§11.13-11.28; Gukasyan 2 §§4.2-4.20; Daugherty 2 §5.9-5.32). It covers the particular issue of whether or not polysorbate would have been tested for a formulation of SEQ ID NO:6 in light of the methionine residues at risk of oxidation (Gukasyan 1 §7.28; Daugherty 2 §6.10; Gukasyan 2 §4.8)<br><br>This issue is addressed in context in §§285 & 286 above. |
| **(8) Would the Skilled Formulator consider viscosity enhancers as a potential class of excipients for liquid protein formulations?**<br><br>(Gukasyan 1, §§5.78-5.79; Daugherty 2, §4.53) | Relevant to the **obviousness** case and the approach that the Formulation Scientist would take, and the expectation of success they would have, when formulating a protein for intravitreal use, including SEQ ID NO:6 from the prior art (Gukasyan 1 §§6.10-6.37; Daugherty 1 §§11.13-11.28; Gukasyan 2 §§4.2-4.20; Daugherty 2 §5.9-5.32). |
| **(9) Would the Skilled Formulator consider chelating agents as a potential class of excipients and, under what circumstances would chelating agents be used as excipients for liquid protein formulations?**<br><br>(Gukasyan 1 §5.80; Daugherty 2 §4.54) | Relevant to the **obviousness** case and the approach that the Formulation Scientist would take, and the expectation of success they would have, when formulating a protein for intravitreal use, including SEQ ID NO:6 from the prior art (Gukasyan 1 §§6.10-6.37; Daugherty 1 §§11.13-11.28; Gukasyan 2 §§4.2-4.20; Daugherty 2 §5.9-5.32). |
| **(10) Would the Skilled Formulator be concerned about commonly used excipients for injectable protein pharmaceuticals being potentially unsuitable for the vitreous.**<br><br>(Gukasyan 1, §5.34, Daugherty 2, §4.22) | Relevant to the **obviousness** case and the approach that the Formulation Scientist would take, and the expectation of success they would have, when formulating a protein for intravitreal use, including SEQ ID NO:6 from the prior art (Gukasyan 1 §§6.10-6.37; Daugherty 1 §§11.13-11.28; Gukasyan 2 §§4.2-4.20; Daugherty 2 §5.9-5.32). |
| **(11) Whether the protein component of a formulation would contribute to or be expected to have a negligible impact on osmolality.**<br><br>(Gukasyan 1, §5.83; Daugherty 2, §4.57) | It is not clear to the Defendants the extent to which these issues matter to the issues in the case. |
| **(12) Whether the osmolality range of the vitreous (or the isotonic range) was known to be around 290-320 mOsm/kg or 270-300 mOsm/kg.** | |

| | |
|---|---|
| (Daugherty 1 §7.10; Gukasyan 1 §5.36; Daugherty 2 §4.15) | |
| **(13) Which authorised formulations of antibody products formed part of the CGK?**<br>(Daugherty 1, §8.13; Gukasyan 2, §3.34) | Relevant to the **obviousness** case and the approach that the Formulation Scientist would take, and the expectation of success they would have, when formulating a protein for intravitreal use, including SEQ ID NO:6 from the prior art (Gukasyan 1 §§6.10-6.37; Daugherty 1 §§11.13-11.28; Gukasyan 2 §§4.2-4.20; Daugherty 2 §5.9-5.32).<br>These issues are addressed in context in §§291 & 292 above. |
| **(14) The extent to which information about the formulation of other proteins would assist the Skilled Formulator when developing a formulation for a different protein**<br>(Gukasyan 1, §5.93; Daugherty 2, §4.64) | |
| **(15) The difficulty and Skilled Formulator's perception as to the difficulty of achieving a stable protein formulation, in particular at "high" concentrations, and whether "high" concentrations would be considered to be >25mg/ml or >100mg/ml**<br>(Gukasyan 1, §§5.10, 5.15, 5.24, 5.29; Daugherty 1 §9.17; Gukasyan 2 §3.44; Daugherty 2 §§4.3, 4.8, 4.17, 4.19) | Relevant to and arise in the context of the evidence on **obviousness** and the approach that the Formulation Scientist would take, and the expectation of success they would have, when formulating a protein for intravitreal use, including SEQ ID NO:6 from the prior art (Gukasyan 1 §§6.10-6.37; Daugherty 1 §§11.13-11.28; Gukasyan 2 §§4.2-4.20; Daugherty 2 §5.9-5.32). They cover the particular issue of whether or not the Formulation Scientist would consider 40 mg/ml a high concentration of protein to formulate, and the difficulty (and perception thereof) of formulating a protein at that concentration, including in the light of any physical and chemical instabilities (Gukasyan 1 §§6.16, 6.36 & 10.13; Daugherty 2 §§5.12, 5.16, 5.31 & 9.3(a))<br>This issue is addressed in context in §§254 to 256 above. |
| **(16) Whether the Skilled Formulator would understand that physical and chemical instabilities (beyond aggregation) were correlated with increasing protein concentration**<br>(Gukasyan 1, §5.22; Daugherty 2, §4.11) | |
| **(17) What would the Formulation Scientist's approach to formulating a protein for intravitreal use be? Including:** | See below. |
| **(a) The extent of the information about the physical and chemical characteristics of the protein that the Formulation Scientist would ask for and receive from the Protein Engineer, in particular the information on any potential sites of chemical instability (or "soft-spots")**<br>(Daugherty 1 §9.1, Gukasyan 1, §5.42; Daugherty 2, §4.30, Gukasyan 2 §3.37) | Relevant to and arises in the context of the evidence on **obviousness**, in particular the extent of the information about the physical and chemical characteristics of the protein of SEQ ID NO:6 that the Formulation Scientist would ask for and receive from the Protein Engineer (Gukasyan 1 §6.8; Daugherty 2 §5.7)<br>This issue is addressed in context in §§247 to 253 above. |
| **(b) The extent to which the Formulation Scientist would provide input on the dose or volume of administration during formulation development.**<br>(Gukasyan 1 §§5.45-5.47; Daugherty 2 §§4.34-4.36) | Relevant to and arises in the context of the evidence on **obviousness**, in particular whether the Formulation Scientist would wish to try to formulate SEQ ID NO:6 at 40 mg/ml (Gukasyan 1 §6.12; Daugherty 2 §5.10).<br>This issue is addressed in context in §§222 & 223 above. |
| **(18) The way in which the skilled formulator would identify appropriate pHs to try and the factors that would be taken into account in that decision**<br>(Gukasyan 1, §§5.27, 5.43; Daugherty 1 §§8.9, 9.5; Gukasyan 2 §§3.8, 3.39, Daugherty 2, §§4.18, 4.32) | Relevant to and arises in the context of the evidence on **obviousness**, in particular the factors that would be considered in selecting pHs for testing, including the pI and the protein's susceptibility to various chemical reactions, and whether or not they would think that it was "*generally preferable*" to formulate at a slightly acidic pH of pH 6-7 (Gukasyan 1 §§6.25-6.26; Daugherty 1 §11.16; Gukasyan 2 §§4.5-4.6)<br>This issue is addressed in context in §§257 to 267, 278, 281, 287 to 290, & 307 to 309 above. |

| | |
|---|---|
| **(19) What approach would the Formulation Scientist take to stability testing and what excipients would they test?**<br><br>(Gukasyan 1 §§5.61, 5.74, 5.87-5.90; Daugherty 1 §§8.20, 9.2-9.14; Gukasyan 2 §3.28-3.29, 3.38-3.43; Daugherty 2 §§4.43, 4.49, 4.59-4.62) | Relevant to and arise in the context of the evidence on **obviousness** and the approach that the Formulation Scientist would take, and the expectation of success they would have, when formulating a protein for intravitreal use, including SEQ ID NO:6 from the prior art (Gukasyan 1 §§6.10-6.37; Daugherty 1 §§11.13-11.28; Gukasyan 2 §§4.2-4.20; Daugherty 2 §5.9-5.32).<br><br>These issues are addressed in context in §§271 to 292 above. |
| **(20) Whether and/or to what extent the Skilled Formulator would expect interdependency between excipients**<br>(Gukasyan 1, §§5.44, 5.52, 5.89; Daugherty 2, §§4.33, 4.61) | |

CLINICAL OPHTHALMOLOGY

| | |
|---|---|
| **(1) Knowledge relating to specific treatments:**<br><br>**(a) Would the Clinical Ophthalmologist be aware of the ongoing PrONTO and PIER studies at the Priority Date and the extent to which the Clinical Ophthalmologist would more generally be aware of the existence of, progress, and results of, Lucentis/ranibizumab clinical trials. See, for example,** [MacLaren 1 §§18.1-18.16 / Kodjikian 2 §3.9 - 3.21]<br><br>**(b) The extent to which off-label intravitreal Avastin/bevacizumab was in clinical use at the Priority Date and the level of understanding regarding its safety and efficacy. See, for example,** [MacLaren 1 §§19.1-19.18 / Kodjikian 2 §§3.22, 3.24, 3.25]<br><br>**(c) Whether it was known that the most commonly used TA product for intravitreal administration was Kenalog-40 and that it was a 40 mg/mL formulation administered in doses up to 4mg (i.e. intravitreal injections of 0.1 mL).** [MacLaren 1 §14.10] | Relevant to and arise in the context of the evidence on **obviousness**, in particular what the goal of the Clinical Ophthalmologist would be for a new potential VEGF antagonist, such as SEQ ID NO:6 in the prior art (Kodjikian 1 §6.29; MacLaren 2 §§23, 46, 74; Kodjikian 2 §§4.2-4.15).<br><br>These issues are addressed in context in §§214 to 216 above. |
| **(3) The goal of the Clinical Ophthalmologist:**<br><br>**(a) What the goal of the Clinical Ophthalmologist would be in the development of a new potential VEGF antagonist, in relation to (i) safety, (ii) efficacy and (iii) duration of action/dosing interval.**<br><br>**(b) What factors would influence the goal referred to at (2a) above, including the extent to which their knowledge of the existing treatments and treatments the subject of clinical trials would influence those goals.**<br><br>(Kodjikian 1 §§5.56-5.58; MacLaren 1 §§18-23) | |
| **(2) Was it understood there is a relationship between dosing interval and maximum safe volume of administration (including whether the maximum safe volume of administration for monthly dosing was understood to be 0.09mL or 0.1mL)?**<br><br>(Kodjikian 1 §5.53, MacLaren 2 §15) | Relevant to and arises in the context of the evidence on **obviousness**, in particular what the Clinical Ophthalmologist would identify to the Formulation Scientist as being the top of the clinically acceptable range of volumes for use in intravitreal administration for monthly dosing (Kodjikian 2 §4.23; MacLaren 1 §23.65). |

| | |
|---|---|
| | This issue is addressed in context at §221 above. |
| **(4) What was known regarding pre-clinical development of intravitreal drugs**<br>(MacLaren 1 §§21.3 – 21.7, Kodjikian 1 §5.66)<br><br>**(5) What was known regarding the differences between the monkey CNV lesion model and humans with wet AMD?**<br>(MacLaren 2 §37, 38(b) and 48)<br><br>**(6) Clinical trials:**<br>**(a) What is the goal of a phase 1/phase 1b clinical study in the context of the development of an intravitreal ocular drug.** (Ward 1 §§ 5.35, 5.49, 5.51 / Wensel 1 § 45], [MacLaren 1 § 21.12 / MacLaren 2 §38.c. / Ward 2 §3.8 / Kodjikian 2 §§ 3.31])<br>**(b) What factors would feed into the determination of the dose range to be used in a Phase 1 study of an ocular drug for intravitreal administration.** (Ward 2 § 3.7 / Kodjikian 2 §3.30 / MacLaren 1 § 22.11] [Ward 1 § 5.43 / Wensel 1 § 47], [MacLaren 1 §21.11 / Wensel 1 §51 / Ward 2 §3.5) | Relevant to and arises in the context of the evidence on **obviousness**, in particular in relation to the question as to (i) the role of the Ocular PK/PD Scientist and Clinical Ophthalmologist in analysing the data in Wiegand II and making recommendations as to doses of SEQ ID NO:6 to take forward into phase 1 in light of Wiegand II, and (ii) what doses would be recommended by the skilled team for phase 1 (Kodjikian 1 §§6.28-6.33; Ward 1 §§6.34-6.78; MacLaren 1 §§23.58-23.63; Kodjikian 2 §§4.2-4.22; Ward 2 §§4.10-4.17; MacLaren 2 §§65-95; Wensel 1 §§58-76; Ward 3 §§2.1-2.26; Kodjikian 3 §§1.5-1.19; MacLaren 3 §§6-13; Wensel 2 §§6-20)<br>These issues are addressed in context in §206 to 216 above. |

<u>OCULAR PK/PD</u>

| | |
|---|---|
| **(1) The way(s) in which a dose used in non-human primates would be adjusted in order to reach an equivalent dose in humans**<br>(Ward 1 §5.22 / MacLaren 1 §21.11 / Ward 2 14.14 / MacLaren 2 32.c. / Wensel 1 §42 / Ward 3 2.18)<br><br>**(2) The relative importance of biochemical features including potency and stoichiometry as indicators of efficacy.**<br>(Wensel §43)<br><br>**(3) What was known regarding the differences between the CNV lesion monkey model and humans with wAMD?**<br>(MacLaren 2 §48; / Ward 1 §5.63)<br><br>**(4) What was known about the isoforms of VEGF in humans?**<br>(MacLaren 1 §15.8) | Relevant to and arises in the context of the evidence on **obviousness**, in particular in relation to the question as to (i) the role of the Ocular PK/PD Scientist and Clinical Ophthalmologist in analysing the data in Wiegand II and making recommendations as to doses of SEQ ID NO:6 to take forward into phase 1 in light of Wiegand II, and (ii) what doses would be recommended by the skilled team for phase 1 (Kodjikian 1 §§6.28-6.33; Ward 1 §§6.34-6.78; MacLaren 1 §§23.58-23.63; Kodjikian 2 §§4.2-4.22; Ward 2 §§4.10-4.17; MacLaren 2 §§65-95; Wensel 1 §§58-76; Ward 3 §§2.1-2.26; Kodjikian 3 §§1.5-1.19; MacLaren 3 §§6-13; Wensel 2 §§6-20).<br>These issues are addressed in context in §206 to 223 above. |

| | |
|---|---|
| **(5) Clinical trials:**<br>**a. What is the goal of a phase 1/phase 1b clinical study in the context of the development of an intravitreal ocular drug.**<br>[Ward 1 §§ 5.35, 5.49, 5.51 / Wensel 1 § 45]], [MacLaren 1 § 21.12 / MacLaren 2 §38.c. / Ward 2 §3.8 / Kodjikian 2 §§ 3.31]<br>**b. What factors would feed into the determination of the dose range to be used in a Phase 1 study of an ocular drug for intravitreal administration.**<br>[Ward 2 § 3.7 / Kodjikian 2 §3.30 / MacLaren 1 § 22.11], [Ward 1 § 5.43 / Wensel 1 § 47, [MacLaren 1 §21.11 / Wensel 1 §51 / Ward 2 §3.5] | |