**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

| | |
|---|---|
| IN RE: AFLIBERCEPT PATENT LITIGATION<br><br>**This Document Relates to:**<br>*Regeneron Pharmaceuticals, Inc. v. Amgen Inc.*,<br>**Case No. 1:24-cv-39-TSK**<br>**Case No. 1:25-cv-74-TSK** | MDL No. 1:24-md-3103-TSK |

# REGENERON'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS


I. THE ’099 PATENT ....................3

II. PROCEDURAL HISTORY ....................5

III. LEGAL STANDARD ....................8

A. Courts Must Resolve Disputes Regarding Claim Scope ....................8

B. Functional Limitations Cannot Be Imported into Structural Claims ....................10

IV. ARGUMENT ....................12

A. The Intrinsic Evidence Establishes That Whether a Formulation “Is Suitable for Intravitreal Administration” Depends on Its Structure. ....................13

B. The Law Prohibits Importing Functions into Structural Claim Terms ....................16

C. This Court and All Other Litigants Have Interpreted Regeneron’s Claim Language Structurally ....................18

D. Amgen’s Attempt To Inject Functional Limitations Is Unsupported ....................19

1. Amgen’s Construction Has No Support in the Intrinsic Evidence ....................19

2. Amgen Cannot Rely on Extrinsic Evidence To Rewrite the Claims ....................21

3. Regeneron’s Position Is Consistent with Its Statements Elsewhere ....................23

V. CONCLUSION ....................25

## TABLE OF AUTHORITIES


*Actelion Pharms. Ltd. v. Mylan Pharms. Inc.*, 175 F.4th 1336 (Fed. Cir. 2026) ........ 23

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264 (Fed. Cir. 2011) ........ 21

*Astellas Pharma Inc. v. Zydus, Inc.*, 2025 WL 1111447 (D. Del. Apr. 15, 2025) ........ 11, 13, 14, 24

*AstraZeneca AB v. Mylan Pharms., Inc.*, 2022 WL 17178691 (N.D. W. Va. Nov. 23, 2022) ........ passim

*Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 2011 WL 722937 (D. Del. Feb. 23, 2011) (Stark, J.) ........ 10, 21

*Aventis Pharma S.A. v. Hospira, Inc.,* 675 F.3d 1324 (Fed. Cir. 2012) ........ 16, 17, 20

*Aventis Pharma S.A. v. Hospira, Inc.,* 743 F. Supp. 2d 305 (D. Del. 2010) ........ 17

*Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353 (Fed. Cir. 2017) ........ 10

*BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360 (Fed. Cir. 2017) ........ 11, 13

*Big D Indus. v. Fresh Prods., Inc.*, 2022 WL 1017908 (W.D. Okla. Apr. 5, 2022) ........ 10, 19

*C.R. Bard, Inc. v. Med. Components, Inc.*, 2020 WL 6902367 (D. Utah Nov. 24, 2020) ........ 12, 18

*CellTrust Corp. v. ionLake, LLC*, 625 F. Supp. 3d 810 (D. Minn. Sept. 2, 2022) ........ 10, 19

*ClearPlay, Inc. v. Dish Network LLC*, 2019 WL 4015642 (D. Utah Aug. 26, 2019) ........ 10, 19

*Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358 (Fed. Cir. 2001) ........ 11, 18, 21

*Epistar Corp. v. ITC*, 566 F.3d 1321 (Fed. Cir. 2009) ........ 9, 21

*Indus. Tech. Rsch. Inst. v. ITC*, 567 F. App'x 914 (Fed. Cir. 2014) ........ 11, 12, 18

*Kaufman v. Microsoft Corp.*, 34 F.4th 1360 (Fed. Cir. 2022) ........ 10, 19

*Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings Inc.*, 2025 WL 2659149 (Fed. Cir. Sept. 17, 2025) ........ passim

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004) ........ 9, 20

*Maquet Cardiovascular LLC v. Abiomed Inc.*, 131 F.4th 1330 (Fed. Cir. 2025) ........ 9

*Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*, 927 F.3d 1232 (Fed. Cir. 2019) ........ 20

*Medicis Pharm. Corp. v. Actavis Mid Atlantic LLC*, 2012 WL 2126873 (D. Del. June 12, 2012) ....24

*Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903 (Fed. Cir. 1986) ....10

*Medeva Pharm. Mfg. Inc. v. Morton Grove Pharm., Inc.*, 174 F. Supp. 2d 802, 807 (N.D. Ill. 2001) ....15, 17

*Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 764 F.3d 1392 (Fed. Cir. 2014) ....9

*Mitsubishi Chem. Corp. v. Barr Labs., Inc.*, 435 F. App'x 927 (Fed. Cir. 2011) ....20

*Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*, 357 F.3d 1319 (Fed. Cir. 2004) ....11, 18

*O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) ....8, 12, 13

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ....18

*Pacira Pharms., Inc. v. eVenus Pharms. Labs., Inc.*, 2024 WL 3812188 (D.N.J. Aug. 9, 2024) ....24

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284 (Fed. Cir. 2006) ....10, 21

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) .... passim

*Regeneron Pharm., Inc. v. Mylan Pharm. Inc.*, 714 F. Supp. 3d 652 (N.D. W. Va. 2024) ... passim

*In re Schreiber*, 128 F.3d 1473 (Fed. Cir. 1997) ....10

*Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318 (Fed. Cir. 2002) .... passim

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285 (Fed. Cir. 2021) ....22

*SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373 (Fed. Cir. 2021) ....10, 19

*In re Swinehart*, 439 F.2d 210 (C.C.P.A. 1971) ....11, 13

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318 (2015) ....8

*Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012) ....9, 13, 16

*Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367 (Fed. Cir. 2001) .... passim

*Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358 (Fed. Cir. 2012) ....9

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554 (Fed. Cir. 1997) ....25

*United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360 (Fed. Cir. 2023) ....20

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ..........................................10

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795 (Fed. Cir. 1999) ................................25

The parties dispute the meaning of a single claim term of U.S. Patent No. 12,331,099 ("the '099 patent"): wherein the liquid ophthalmic formulation is "suitable for intravitreal administration." That phrase is not new to this Court. It appears in the claims of a parent patent, U.S. Patent No. 11,084,865, where it was the subject of Mylan's failed indefiniteness challenge in *Regeneron Pharm., Inc. v. Mylan Pharm. Inc.*, 714 F. Supp. 3d 652 (N.D. W. Va. 2024) ("*Mylan*"). In resolving that dispute, the Court rejected the notion that the term "suitable for intravitreal administration" may include various subjective and undefined requirements, concluding that the person of ordinary skill in the art ("POSA") would have no difficulty assessing suitability for intravitreal administration by reference to the formulation's structure—e.g., the ingredients the formulation contains. *Id.* at 749-51. Nothing more than that understanding—reached by the Court after trial and not challenged by five ensuing biosimilar manufacturers during preliminary-injunction proceedings—is required to construe the term properly here, according to its plain and ordinary meaning as understood by that same POSA.

Nevertheless, Amgen now demands that the claim term requires … *something* ... more. Amgen proposes that "wherein the liquid ophthalmic formulation is suitable for intravitreal administration" means "wherein the liquid ophthalmic formulation, <u>as a whole, has features making it appropriate</u> for intravitreal administration." ECF 929 at 12 (emphasis added to language not in claim). Amgen's ostensibly innocuous insertion of additional words ("as a whole, has features…") does not clarify the claim's meaning nor convey what additional "features" Amgen believes are required. Evidently, ambiguity is Amgen's goal. Regeneron asked Amgen no fewer than five times—in person, by videoconference, by email, and by letter—to clarify what additional requirements it is trying to import into the claims via its Trojan Horse of a construction. *Infra* § II. No answer was forthcoming. Amgen's only clarification (provided reluctantly, the same day

the joint claim construction statement ("JCCS") was due) suggested that it believed functional aspects of "suitability" include *at least* pH (the solution's acidity), viscosity (its thickness or stickiness), and osmolality (reflecting its total number of dissolved particles). ECF 929 at 9-10. That was a surprise to Regeneron, because each of these features (pH, viscosity, osmolality) is structural, not functional—e.g., it limits what the formulation *is*, not what the formulation *does*. For example, pH describes the concentration of acidic hydrogen ions in a liquid. Thus, a claim (like '099 patent claim 21) that recites a formulation with a pH between 6.2 and 6.3 requires a formulation that has between $10^{-6.2}$ and $10^{-6.3}$ moles of hydrogen ions per liter. That is a *structural* limitation—again, it dictates what the formulation *is* (i.e., it contains a certain number of hydrogen ions per liter) not what the formulation *does* (e.g., it treats vision loss; remains stable).

Amgen nevertheless is adamant that "suitable for intravitreal administration" imposes functional requirements. It just refuses to say what those requirements are. Only two possibilities exist: (1) Amgen knows what it wants the claims to require by the term "suitable for intravitreal administration" but refuses to tell Regeneron or the Court; or (2) Amgen has not yet decided what it wants the claims to require. Either way, Amgen is not entitled to a placeholder. *Markman* proceedings are intended to present and resolve disputed issues of claim scope. Instead, Amgen asks this Court for a blank check it can cash in California, in the form of vague language like "features" and "as a whole" that can be used to launder additional, undisclosed requirements into the claims before an unfamiliar Court and jury.

Regardless of its strategy, Amgen's invocation of a functional boogeyman defies black-letter claim-construction law, the claim language, the specification, and the file history. Every source that bears on the meaning of "suitable for intravitreal administration" confirms it should carry its plain and ordinary (i.e., structural) meaning. The claims recite the formulation by what it

contains; the specification explains suitability by listing excipients and amounts; the prosecution history shows the phrase was added for the modest purpose of designating the formulation as one that is administered intravitreally; and this Court, applying essentially identical language in *Mylan*, found that the POSA (through whose lens the claims are construed and who is identical for the ’865 and ’099 patents) assesses suitability by reference to the structures (ingredients) the patent teaches. Nothing in that record redefines the term according to a function it performs or disclaims its ordinary scope, and no biosimilar applicant in this Court or before the PTO ever has asked that it be construed differently. Where the claims impose functional requirements, they recite them explicitly—e.g., claim 11’s requirement that “wherein at least 98% of the VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for two months as measured by [SEC].” Amgen’s proposal to inject undefined functional limitations into the claims via the term “suitable for intravitreal administration” commits a cardinal sin of claim interpretation and kicks the can on a dispute the Court can and must resolve now: “Suitable for intravitreal administration” is a structural requirement assessed according to the formulation’s composition, not by testing the formulation for unrecited and unspecified functional properties.

## I. THE ’099 PATENT

The ’099 patent comes from a family the Court knows well. It has the same inventors and written description as the ’865 patent this Court construed and upheld in *Mylan*. Both patents claim priority to the same June 2006 provisional application and describe the same achievement: Drs. Furfine, Graham, and their colleagues invented the first stable, high-concentration ophthalmic formulations of aflibercept, one of which became EYLEA®. 714 F. Supp. 3d at 692-93.

The patents’ claims, however, are not the same. The ’865 patent claims require an ophthalmic formulation comprising a VEGF antagonist like aflibercept, “an organic co-solvent,”

"a stabilizing agent," and "a buffer." *Id.* at 693-94. In contrast, the '099 claims recite an ophthalmic formulation comprising aflibercept and certain excipients—but the claims do not recite "a buffer." '099 patent, claims; ECF 883 at 6, 8 (contrasting claims of '099 and '865 patents).

What the two patents do share is the claim language at issue here: "suitable for intravitreal administration." For example, claim 1 of the '099 patent (emphasis added) recites:

> 1. A liquid ophthalmic formulation comprising:
>
> 40 mg/ml of a glycosylated vascular endothelial growth factor (VEGF) antagonist fusion protein comprising amino acids 27-457 of SEQ ID NO: 4;
>
> water;
>
> an organic co-solvent comprising polysorbate; and
>
> a stabilizing agent,
>
> wherein the liquid ophthalmic formulation has a pH of between 5.8 to 7.0,
>
> wherein the liquid ophthalmic formulation is *suitable for intravitreal administration*,
>
> <u>wherein 90% or more of the weight of the VEGF antagonist fusion protein is not present as an aggregate, and</u>
>
> <u>wherein the VEGF antagonist fusion protein is at least 95% free of protein contaminants.</u>

Claim 11 is similar, but replaces the final two, structural limitations of claim 1 (underlined above) with a functional stability requirement:

> wherein at least 98% of the VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.

Claim 1 thus identifies the claimed formulation by its ingredients and its pH and requires that it be suitable for injection into the eye. Claim 11 does the same and separately requires the formulation to satisfy a specific function—a degree of stability after two months of storage.

This Court has interpreted the disputed language before. In *Mylan*, neither party sought formal construction of "suitable for intravitreal administration," instead, Mylan contended the term was indefinite. The Court rejected Mylan's challenge and concluded that the claim language could be readily understood by the POSA by reference to the formulation's *structural* features. 714 F. Supp. 3d at 749-51. In debunking Mylan's argument that "suitable for intravitreal administration" required subjective analysis, the Court credited Dr. Trout's testimony that "the POSA would assess suitability by looking 'to the teachings of the patent,' which describe exemplary excipients … ; and then, if needed, looking at 'the literature' for suitable excipients with 'structures that had been used in intravitreal administration' and consulting an ophthalmologist." *Id.* In the years since, none of the other biosimilar applicants—in this Court or before the PTO—interpreted "suitable for intravitreal administration" differently. That is for the simple reason that the Court was correct: "suitable for intravitreal administration" is an objective standard the POSA readily can assess by reference to the formulation's structural components.

## II. PROCEDURAL HISTORY

On July 15, 2026, pursuant to the Court's Scheduling Order, ECF 663, the parties identified the claim terms they contended required construction. Amgen, not Regeneron, identified "wherein the liquid ophthalmic formulation is suitable for intravitreal administration," ECF 929 at 3, notwithstanding this Court's prior application of its plain and ordinary meaning, *Mylan*, 714 F. Supp. 3d at 695-96, 749-51. The parties exchanged proposed constructions on July 22. Regeneron proposed that the term be accorded its plain and ordinary meaning. ECF 929 at 8. Amgen's initial proposal simply inserted the words "as a whole" into the claim language. The word "function" appeared nowhere in Amgen's construction, nor did Amgen identify any functional requirement the "as a whole" language was intended to convey. *Id.* at 3, 7.

Regeneron then asked, repeatedly, what dispute Amgen's construction sought to resolve—what issue of claim scope it addresses, what it conveys beyond the ordinary meaning, and why Amgen disagreed with Regeneron's construction. Amgen would not say. But at the parties' first conferral, Amgen agreed that it was *not* reading a (functional) stability requirement into the claims. Berl Decl. ¶¶ 1-3. Hoping to reach agreement or at least to define the disagreement, Regeneron proposed a compromise construction:

> The term "suitable for intravitreal administration" refers to the claimed composition, not only the ingredients and amounts thereof in isolation. It requires only that the composition may be administered intravitreally and does not impose functional requirements such as stability.

Ex. 1 (7/28 Berl Email) at 1. As Regeneron repeatedly explained, that proposed compromise was intended to reflect the term's plain and ordinary meaning, but more explicitly address issues raised during conferral, in particular Amgen's suggestion that "suitable for intravitreal administration" may require some functions that it would not identify (other than stability, which it agreed is not required). *E.g.*, ECF 929 at 4. Amgen rejected Regeneron's proposal but refused to explain why. Ex. 2 (7/30-31 Postal Emails) at 1-2.

In hopes of understanding the disagreement, Regeneron repeatedly asked Amgen to explain what its proposed construction requires. Regeneron asked in person on July 29, by email on July 28 and 31, and in writing on August 3, when it posed five simple, discrete questions:

> "What requirements, if any, does Amgen assert that the term 'suitable for intravitreal administration' requires?"
>
> "What functional requirements, if any, that are expressly referenced in the specification of the '099 patent does Amgen contend this term requires?"
>
> "What functional requirements, if any, that are not expressly referenced in the specification of the '099 patent does Amgen contend this term requires?"

> "Does Amgen contend the term requires any analytical testing to determine whether it is met? If so, which test(s)?"
>
> "Does Amgen contend the term requires an excipient buffer?"

Ex. 1 (7/28 Berl Email) at 1; Ex. 2 (7/31 Berl Email) at 1-2; Ex. 3 (8/3 Berl Letter) at 1-2.

The parties conferred again on August 4, the day before the JCCS was due. Amgen asserted that the term *does* impose functional requirements but repeatedly refused to identify them, and also refused to answer Regeneron's questions above, dismissing them as "hypothetical". ECF 929 at 4-5; Berl Decl. ¶ 10. The questions were not hypothetical, and Amgen knew it. Indeed, over the next thirty-six hours, Amgen began to disclose *portions* of what appears to be its actual position. A mere hour after the conferral—but five days after the agreed-upon, court-ordered deadline for exchanging evidence, ECF 924—Amgen served a purported "supplemental" disclosure identifying, for the first time, filings across seven proceedings before the PTO and abroad (one of which Amgen itself litigated).[1] Ex. 4; Ex. 5. The next afternoon, Amgen disclosed, for the first time, its "inten[t] to argue" that Regeneron's construction (which does not impose functional requirements) "is plainly inconsistent with the position that Regeneron adopted for this term in other jurisdictions." Ex. 6 at 2; Ex. 8. And only after the JCCS deadline *passed* did Amgen confirm that the so-called "functional" properties to which it had been alluding (and that it contends Regeneron endorsed in other jurisdictions) include, *but are not limited to*, pH, viscosity, and osmolality. Ex. 7 at 19-21. Amgen simultaneously revised its construction, but not to clarify the proposed scope—instead, it proposed the language "wherein the liquid ophthalmic formulation, *as a whole, has features making it appropriate* for intravitreal administration." *Id.* at 23 (added words italicized).

[1] Regeneron reserves the right to move to strike Amgen's reliance on late disclosures. ECF 929 at 6.

After a month of Court-ordered disclosures, Amgen still shrouds in mystery the functional "features" it intends to read into the claim via "suitable for intravitreal administration." Amgen's construction identifies no functional requirement; nor does it recite the requirements relating to pH, viscosity, or osmolality Amgen *has* identified. ECF 929 at 12. Nor does Amgen suggest that pH, viscosity, or osmolality represent an exhaustive list of the required "features"—it characterizes them merely as the subset of the "functional" requirements for a suitable intravitreal formulation that *Regeneron* advanced in other jurisdictions. *Id.* at 9-10. As Regeneron explains, these are structural requirements, not functional ones. Regardless, a construction, like Amgen's, that says one thing but may mean something else, is not a construction. It is a Trojan Horse. Amgen knows it cannot convince this Court to violate longstanding precedent by expressly importing limitations wholesale into the claim. Having failed to reroute *Markman* to a less familiar Court in the first instance, ECF 936 at 5, Amgen retreats to ambiguity, hoping to preserve enough flexibility now to advance some undisclosed invalidity or non-infringement argument before an unfamiliar Judge or jury later. The law forecloses Amgen's gambit. "When the parties raise an actual dispute regarding the proper scope of the[] claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

## III. LEGAL STANDARD

### A. Courts Must Resolve Disputes Regarding Claim Scope

Claim construction is the process by which the Court resolves disputes about claim scope. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321-22 (2015). The leading authority on claim construction, *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), directs courts to the claims first, then the specification, then the file history, and only then to any "extrinsic" evidence. To begin, "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention.'" *Id.* at 1312. "[T]he claims themselves provide substantial guidance as to the

meaning of particular claim terms," and "the context in which a term is used in the asserted claim can be highly instructive"—as is the language of the patent's other claims. *Id.* at 1314. Courts should avoid constructions that render claim language "redundant," *id.* at 1324, or "superfluous," *Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 764 F.3d 1392, 1399 (Fed. Cir. 2014).

"[T]he words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a [POSA] at the time of the invention." *Phillips*, 415 F.3d at 1312-13. There is a "heavy presumption that claim terms carry their full ordinary and customary meaning," *Epistar Corp. v. ITC*, 566 F.3d 1321, 1334 (Fed. Cir. 2009), and a patentee is "free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012). A court may depart from that meaning in only two instances: lexicography and disavowal. *Id.* at 1365-66; *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012). Lexicography requires that the patentee "clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." *Thorner*, 669 F.3d at 1365. Disavowal requires "expressions of manifest exclusion or restriction" in the specification or file history that are "clear and unmistakable." *Id.* at 1366-67; *Maquet Cardiovascular LLC v. Abiomed Inc.*, 131 F.4th 1330, 1339 (Fed. Cir. 2025).

The specification "is always highly relevant to the claim construction analysis," and "[u]sually, it is dispositive." *Phillips*, 415 F.3d at 1315. But while the specification serves as a resource to understand claim terms, courts must avoid the "cardinal sin" of importing limitations from the specification into the claims, even where every specification example shares a property. *Id.* at 1320, 1323; *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906-07 (Fed. Cir. 2004).

A court "should also consider the patent's prosecution history," *Phillips*, 415 F.3d at 1317, and may consider statements in *inter partes* review ("IPR") as well, although only statements that

meet the exacting standard of being "both clear and unmistakable" can support a finding of disclaimer. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360-61 (Fed. Cir. 2017).

Extrinsic evidence—"all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises"—is "less reliable" and "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1318-19. A court should resort to extrinsic evidence "[o]nly if there [is] still some genuine ambiguity in the claims[] after consideration of all available intrinsic evidence," and should afford "no weight" to extrinsic evidence "inconsistent with the specification and file history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996). Decisions construing patents' foreign counterparts are "at most extrinsic evidence"; they "apply[] foreign law," "have little relevance" and warrant "little weight." *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 2011 WL 722937, at *5 (D. Del. Feb. 23, 2011) (Stark, J.); *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006) (discounting "statements made during prosecution of foreign counterparts"); *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 907-08 (Fed. Cir. 1986) (labeling "specious" an argument "to adopt the conclusion of a German tribunal").

Finally, "[a] proper claim construction provides a legal standard for the jury to apply." *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1370 (Fed. Cir. 2022). Constructions that do not aid a jury and only introduce confusion should be rejected. *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1377 (Fed. Cir. 2021); *ClearPlay, Inc. v. Dish Network LLC*, 2019 WL 4015642, at *4 (D. Utah Aug. 26, 2019); *Big D Indus. v. Fresh Prods., Inc.*, 2022 WL 1017908, at *2 (W.D. Okla. Apr. 5, 2022); *CellTrust Corp. v. ionLake, LLC*, 625 F. Supp. 3d 810, 833 (D. Minn. Sept. 2, 2022).

**B. Functional Limitations Cannot Be Imported into Structural Claims**

"A patent applicant is free to recite features of an apparatus either structurally or functionally." *In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997). The distinction between

structural ("what it is") and functional ("what it does") claim limitations is longstanding and well-recognized. *In re Swinehart*, 439 F.2d 210, 212 (C.C.P.A. 1971). A composition claimed by reciting its ingredients, their amounts, or its measurable physical properties is claimed structurally. *E.g.*, *AstraZeneca AB v. Mylan Pharms., Inc.*, 2022 WL 17178691, at *7 (N.D. W. Va. Nov. 23, 2022) ("grades or concentrations of ... ingredients" in formulation are "structural limitations"); *Astellas Pharma Inc. v. Zydus, Inc.*, 2025 WL 1111447, at *21 (D. Del. Apr. 15, 2025) (viscosity is a structural claim element). A composition claimed by reference to what it accomplishes—what task it performs, how long it lasts, what result it achieves—is claimed functionally. *See, e.g.*, *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365-66 (Fed. Cir. 2017) (language requiring that composition is "effective" is "functional"); *AstraZeneca*, 2022 WL 17178691, at *6-7 (stability is a "functional" requirement); *Swinehart*, 439 F.2d at 212; *Astellas*, 2025 WL 1111447, at *21 (dissolution rate, which can be controlled by adjusting viscosity, is a functional claim element).

Recognizing this distinction, courts consistently reject attempts to convert structural claim limitations into functional ones. *E.g.*, *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001); *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1325 (Fed. Cir. 2002); *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001); *Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*, 357 F.3d 1319, 1336 n.19 (Fed. Cir. 2004); *Indus. Tech. Rsch. Inst. v. ITC*, 567 F. App'x 914, 919 (Fed. Cir. 2014); *Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings Inc.*, 2025 WL 2659149, at *5 (Fed. Cir. Sept. 17, 2025). "Where a claim uses clear structural language, it is generally improper to interpret it as having functional requirements." *Schwing*, 305 F.3d at 1324; *Toro*, 266 F.3d at 1371 ("While this [claimed] structure could have a variety of other functions (as is often the case with structures), … these functions do not become part of the claimed structure unless claimed as such."); *Lambeth*, 2025 WL 2659149,

at *5 ("[T]here is nothing in the claim language providing that the [claim term] is based on function. … Accordingly, the claim term cannot be read to include the [proposed functional] requirement."); *C.R. Bard, Inc. v. Med. Components, Inc.*, 2020 WL 6902367, at *8 (D. Utah Nov. 24, 2020) ("To define a" "structure solely by its unclaimed [function] … violates the canon of claim construction against reading functional limitations into purely structural claim elements").

This canon stems from the same rule that prevents importing limitations from the specification into claims, which has particular force "when the claim recites only purely structural limitations." *Toro*, 266 F.3d at 1371. In *Schwing*, the disputed term "annular extensions" was "purely structural," foreclosing importing into that term a function of "inhibit[ing] radial expansion of the sealing ring" that the specification's embodiments shared. 305 F.3d at 1324; *Indus. Tech.*, 567 F. App'x at 919 (declining to read functional limitation into the claim because the party proposing it "fail[ed] to point to any language in the intrinsic evidence that requires adding this functional limitation into the construction"); *AstraZeneca*, 2022 WL 17178691, at *6 ("The asserted claims of the patent-in-suit do not expressly recite a functional stability requirement. Reading a stability limitation into 'pharmaceutical composition' violates the well-established principle that a court may not import limitations from the written description into the claims.").

## IV. ARGUMENT

| Claim Term | Regeneron's Construction | Amgen's Construction |
|---|---|---|
| wherein the liquid ophthalmic formulation is suitable for intravitreal administration | plain and ordinary meaning: wherein the liquid ophthalmic formulation is suitable for intravitreal administration | wherein the liquid ophthalmic formulation, as a whole, has features making it appropriate for intravitreal administration |

"When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro*, 521 F.3d at 1362. The parties present one here: whether "suitable for intravitreal administration" imposes yet-to-be-disclosed functional requirements or

"features." Amgen contends that it does; Regeneron contends that it does not. Because that disagreement goes to what formulations fall within the scope of the claims, the Court is obliged to resolve it now, not leave it unanswered for the parties to litigate through competing experts. *Id.* at 1361. The plain and ordinary meaning of "suitable for intravitreal administration" does not impose functional requirements, as the claims, specification, prosecution history, and this Court's own *Mylan* decision all reflect. Amgen's contrary construction contravenes the record and law.

### A. The Intrinsic Evidence Establishes That Whether a Formulation "Is Suitable for Intravitreal Administration" Depends on Its Structure

The phrase "wherein the liquid ophthalmic formulation is suitable for intravitreal administration" should be accorded its plain and ordinary meaning, which requires a structure (a liquid ophthalmic formulation) that, at a time it satisfies all the other claim limitations, is suitable (appropriate) for a specific route of administration (into the vitreous). Nothing in the claims, the specification, or the file history redefines or narrows the term to require that suitable formulations meet a further, unrecited functional standard. Absent lexicography or disavowal in the intrinsic evidence—and Amgen has identified neither—the term is entitled to "the full scope of its plain and ordinary meaning." *Thorner*, 669 F.3d at 1365-67.

The claims "themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. That certainly is true here. The disputed claim language recites a physical composition—a "liquid ophthalmic formulation" that is "suitable for intravitreal administration"—and limits what the formulation ***is***, not what the formulation ***does***. "Suitable" is an ordinary English word, and in this setting, it carries an ordinary meaning: the formulation is appropriate for administration into the vitreous. The phrase does not provide any indicia of function that courts require to impose functional requirements, such as announcing a performance standard, prescribing a test, or promising a therapeutic result. *E.g.*, *BASF*, 875 F.3d at 1365-66;

*AstraZeneca*, 2022 WL 17178691, at *6-7; *Swinehart*, 439 F.2d at 212; *Astellas*, 2025 WL 1111447, at *21. Rather, the phrase recites a structural requirement, consistent with this Court's reading of "suitable for intravitreal administration" in *Mylan*, where it found that the POSA assessing suitability consults "*structures* that had been used in intravitreal administration" and selects "excipients that have the *same structures, same structural characteristics* as those discussed in the various categories in the patent." 714 F. Supp. 3d at 751, 756 (emphasis added); *AstraZeneca*, 2022 WL 17178691, at *7 ("grades or concentrations of … ingredients" in formulation are structural); *Astellas*, 2025 WL 1111447, at *21 (viscosity is structural). When the '099 patent claims *do* impose a functional requirement, they say so clearly. Claim 11 requires that "at least 98% of the VEGF antagonist fusion protein is present in native conformation following storage" for two months. The parties agree that stability is a functional limitation that "suitable for intravitreal administration" does *not* convey. Berl Decl. ¶ 2; Ex. 1 (7/28 Berl Email). Claim 11's unambiguously functional limitation demonstrates that Regeneron included functional limitations where it so intended. *Phillips*, 415 F.3d at 1314-15 (language of other limitations is "highly instructive"). Where Regeneron did not do so, functional limitations should not be imported. *Id.*; *AstraZeneca*, 2022 WL 17178691, at *7 ("pharmaceutical composition" not limited to "stable compositions" when other claims expressly recited stability).

The specification confirms that "suitable for intravitreal administration" requires only that the formulation be suitable or appropriate for administration into the vitreous, without the unspecified baggage Amgen seeks to import. The patent is titled "VEGF Antagonist Formulations Suitable for Intravitreal Administration," and its abstract states that "[o]phthalmic formulations of a vascular endothelial growth factor (VEGF)-specific fusion protein antagonist are provided suitable for intravitreal administration to the eye." '099 patent, Title, Abstract. The specification

then explains what makes a formulation suitable by identifying ingredients and amounts. It teaches that "the organic co-solvent may be polysorbate, for example, polysorbate 20 or polysorbate 80, polyethylene glycol (PEG) … or propylene glycol" and that "the stabilizing agent may be sucrose, sorbitol, glycerol, trehalose, or mannitol." *Id.* at 2:49-55. It then discloses specific embodiments by composition and concentration, *id.* at 2:63-4:16, and reports the corresponding formulations in eight examples, *id.* at 8:9-12:26. The patent also uses "suitable" in precisely the route-of-administration sense throughout, describing "ophthalmic formulations provided in a pre-filled syringe or vial, particularly suitable for intravitreal administration." *Id.* at 5:32-34. Relying on these disclosures, this Court concluded that the POSA assesses suitability by looking to "the teachings of the patent," which "describe exemplary excipients." *Mylan*, 714 F. Supp. 3d at 751. Reading the patent, the POSA would understand that a formulation is suitable for intravitreal administration based on what structures it contains—its physical, chemical composition. Nowhere does the specification define suitability by reference to a performance threshold, a test to conduct, or a clinical outcome.[2] Even if the '099 specification made reference to the invention's functions, that fact would be legally insufficient to import those functions into a claim that does not recite them. *Toro*, 266 F.3d at 1371 (specification references the invention's functions, but "[t]his court's claim construction, however, did not and could not import into the claim a function from the specification, particularly when the claim recites only purely structural limitations"); *Medeva Pharm. Mfg. Inc. v. Morton Grove Pharm., Inc.*, 174 F. Supp. 2d 802, 807 (N.D. Ill. 2001) (refusing to read palatability and stability requirements into "suitable for oral administration" because "[w]hile the patentees clearly contemplated that their solution would have greater stability than

[2] Despite Regeneron's repeated inquiries, Amgen refused to agree that "suitable for intravitreal administration" does not require performing a test disclosed or not disclosed in the patent. Berl Decl. ¶ 10.

previously developed oral formulations and … would be sweetened so as to be more palatable, those limitations cannot be read into the broader language in claim 1").

The file history reinforces this conclusion. The disputed phrase entered the claims of this family for a specific, modest purpose: to designate the claimed formulation as ophthalmic, as opposed to (for example) intravenous. Regeneron amended claims to specifically indicate that the formulation is "an ophthalmic formulation suitable for intravitreal administration," and identified support in paragraphs 0002, 0037, and 0048—passages describing the formulations and their components, none of which ties suitability to any functional characteristic. Ex. 21 (U.S. Pat. Appl. No. 16/739,559, May 5, 2021 Amendment and Response) at 10. Amgen identifies nothing in that prosecution record—or elsewhere in the intrinsic record—amounting to the "clear" lexicography or "unmistakable" disavowal required to displace the ordinary meaning and "overcome the general rule that functional limitations should not be read into purely structural claims." *Schwing*, 305 F.3d at 1325; *Thorner*, 669 F.3d at 1365-67. The plain, structural meaning of "suitable for intravitreal administration" thus governs.

**B. The Law Prohibits Importing Functions into Structural Claim Terms**

As the Federal Circuit repeatedly has made clear, it is improper to imbue a claim term that "uses clear structural language" (like "suitable for intravitreal administration" here) with functional requirements. *Schwing*, 305 F.3d at 1324; *Toro*, 266 F.3d at 1371; *Lambeth*, 2025 WL 2659149, at *5. Indeed, courts facing similar disputes have routinely refused invitations to saddle analogous claim language with unrecited functional constraints.

For example, in *Aventis Pharma S.A. v. Hospira, Inc.*, the parties agreed the claim term "perfusion" meant "a solution suitable for infusion into patients including at least [an] active pharmaceutical ingredient and an aqueous infusion fluid such as physiological saline or glucose," but later disagreed about what "suitable for infusion" meant. 675 F.3d 1324, 1329 (Fed. Cir. 2012).

Sanofi urged "that the claimed 'perfusion' [must] also be effective for treatment, safe, and stable (i.e., not precipitate) for at least eight hours." *Id.* The trial court and the Federal Circuit rejected Sanofi's effort to import additional requirements into the claims. *Id.* at 1329-30. The district court "conclude[d] that the claims do not include limitations relating to safety, efficacy, and stability other than the two explicit limitations that actually appear in the claims." *Aventis Pharma S.A. v. Hospira, Inc.,* 743 F. Supp. 2d 305, 334 (D. Del. 2010); *id.* at 333-34 ("The word 'perfusion' applies to any such solution, regardless of whether later testing and use reveals the composition to be stable for less than eight hours … unacceptably toxic to patients, or insufficiently effective in treating the condition it was designed to treat."). The Federal Circuit affirmed, observing that "[b]y expressly identifying the specific characteristics of the 'perfusion,' i.e., that it is not associated with 'anaphylactic or alcohol intoxication manifestations,' the plain language of claim 5 indicates that the term has its ordinary meaning subject only to those specifically enumerated limitations." *Aventis*, 675 F.3d at 1330-31; *id.* at 1330 ("Neither the claims, the specification, nor the prosecution history suggest that the claimed perfusion must satisfy certain safety or efficacy standards. We previously have refused to impose such limitations when not required by the language of the claims or the specification.").

Likewise, the court in *Medeva* construed "suitable for oral administration" to mean that "animals and/or humans can ingest the solution orally," rejecting the notion that the phrase "contemplates much more, including patient acceptance, stability, toxicity and efficacy"; that was "extra baggage sought to be loaded onto the phrase." 174 F. Supp. 2d at 805-06 ("[S]olutions made extemporaneously by pharmacists and used in a very short period of time need not be stable, yet they may be 'suitable for oral administration'").

Examples of the Federal Circuit's prohibition on importing functional requirements into

structural limitations abound. *E.g.*, *Schwing*, 305 F.3d at 1324-25 (disputed term was "purely structural" and a function included in the specification's embodiments should not be imported); *Indus. Tech. Rsch. Inst.*, 567 F. App'x at 919 (refusing to import into the claim a functional limitation because the proponent "fail[ed] to point to any language in the intrinsic evidence that requires adding this functional limitation into the construction"); *AstraZeneca*, 2022 WL 17178691, at *6 (refusing to import a stability limitation from the specification into the claim term because "[t]he asserted claims of the patent-in-suit do not expressly recite a functional stability requirement"); *Toro*, 266 F.3d at 1371 (refusing to read into the disputed term "a variety" of functions a structure could have because "these functions do not become part of the claimed structure unless claimed as such"); *Ecolab*, 264 F.3d at 1367; *Nat'l Steel Car*, 357 F.3d at 1336 n.19; *Lambeth*, 2025 WL 2659149, at *5; *C.R. Bard*, 2020 WL 6902367, at *8.

### C. This Court and All Other Litigants Have Interpreted Regeneron's Claim Language Structurally

This Court's previous treatment of "suitable" in the '865 patent adheres to the foregoing precedent and confirms Regeneron's structural interpretation. In *Mylan*, no party asked for the phrase "suitable for intravitreal administration" to be construed, so the Court applied the "ordinary and customary" meaning to the POSA. 714 F. Supp. 3d at 695-96. That meaning proved easy to implement in practice. When Mylan argued that suitability was "subjective" and thus indefinite, *id.* at 750, the Court disagreed, finding that "[b]oth parties offered testimony demonstrating that the POSA understood the scope of the asserted claims, including the term 'suitable for intravitreal administration,'" and that the phrase "bears no resemblance to subjective claim terms like 'aesthetically pleasing.'" *Id.* at 749-50. The Court proceeded to assess infringement and validity based on whether formulations had suitable ingredients and amounts. Amgen offers no reason to apply a different and undisclosed meaning here. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d

1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.").

Amgen also stands alone in seeking to impose unspecified functional requirements. Since *Mylan*, Regeneron has asserted claims reciting "suitable for intravitreal administration" against four other defendants—Samsung Bioepis, Formycon, Celltrion, and Sandoz—and has defended the '865 patent against four IPR petitions. IPR2025-00176 (Samsung Bioepis); IPR2025-00233 (Formycon); IPR2025-00456 (Celltrion); IPR2025-01268 (Fresenius Kabi). None of those parties contended that this language imposes a functional requirement. Amgen is the first, and it is wrong.

### D. Amgen's Attempt To Inject Functional Limitations Is Unsupported

#### 1. Amgen's Construction Has No Support in the Intrinsic Evidence

Amgen's construction departs from the structural meaning the Court applied in *Mylan*, instead urging that the term "includes functional limitations." ECF 929 at 8. Of course, Amgen's construction on its face accomplishes nothing of the kind—"has features making it appropriate for" is no more specific than the original language "is suitable for," and neither phrase identifies any functional requirements whatsoever. Contrary to the goals of claim construction, Amgen's proposal *introduces* ambiguity into the claim term. "A proper claim construction provides a legal standard for the jury to apply," *Kaufman*, 34 F.4th at 1370, and constructions that are likely to confuse the jury should be rejected, *SpeedTrack*, 998 F.3d at 1377. Amgen's proposal to introduce an unlimited number of unnamed functional requirements only injects confusion into the claim term, does nothing to aid a jury, and thus must be rejected. *See, e.g.*, *ClearPlay*, 2019 WL 4015642, at *4-5; *Big D Indus.*, 2022 WL 1017908, at *2-3; *CellTrust*, 625 F. Supp. 3d at 833.

Whatever functional requirements Amgen's proposal would sweep in—stability (which Amgen agrees is not required), safety, efficacy, or something else it steadfastly refused to identify—none is supported by the intrinsic record. The claim language does not recite functional

requirements, the specification does not redefine the disputed term to include them or otherwise disavow claim scope, nor does the prosecution history. *Supra* § IV.A. Amgen *cannot* read limitations from the specification into the claims, even if every embodiment in the specification accomplished the (unidentified) function in question. *Phillips*, 415 F.3d at 1323; *Liebel-Flarsheim*, 358 F.3d at 906-07; *Aventis*, 675 F.3d at 1330-31. And as explained above, the law recognizes a special prohibition against importing functional limitations into structural language. *See Toro*, 266 F.3d at 1371 ("An invention claimed in purely structural terms generally resists functional limitation."). "[S]afety and efficacy"—two requirements Amgen refused to agree its definition did not impose—"have long fallen under the purview of the FDA," and courts "decline to insert the FDA's responsibilities into claims by importing requirements where they do not recite such limitations." *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1369 (Fed. Cir. 2023); *Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*, 927 F.3d 1232, 1241 (Fed. Cir. 2019); *Aventis*, 675 F.3d at 1330; *Mitsubishi Chem. Corp. v. Barr Labs., Inc.*, 435 F. App'x 927, 934 (Fed. Cir. 2011).

Amgen also gestures to Regeneron's statements in proceedings before the USPTO concerning the '865 patent. Regeneron took the same position in those proceedings that it advances here. In the *Fresenius* IPR, for instance, Fresenius argued that "suitable for intravitreal administration" appears only in the preamble and is thus *not limiting* at all; Regeneron disagreed. Ex. 9 (Fresenius Petition) at 25; Ex. 10 (Regeneron's Preliminary Response) at 32-37. Fresenius agreed as to how the limitation operates, describing the phrase as "merely refer[ring] to a set of *ingredients* that a POSA would recognize as capable of being injected into the eye." Ex. 9 at 25-26. Its expert read the *Mylan* decision to mean that a formulation satisfies the limitation when it uses "excipients in the '865 patent's formulations or those other prior art products for intravitreal

administration"—"a reasonable construction" that he applied. Ex. 11 ¶¶ 71-72. Based on that understanding, Fresenius argued, a purported prior-art reference qualified as "suitable for intravitreal administration" because it "disclosed formulations … with the same excipients used in the '865 patent." Ex. 9 at 25-26. Regeneron's response likewise addressed the physical composition of the formulation, rather than its function: the reference disclosed a manufacturing intermediate rather than an ophthalmic formulation, and the amounts of its ingredients—the combination of 20% sucrose and 100 mM sodium chloride—never were shown to be suitable for injection into the eye. Ex. 10 at 29-30, 35-42; *see Mylan*, 714 F. Supp. 3d at 731-32. Amgen thus stands alone twice over: other adversaries invariably have understood "suitable for intravitreal administration" to turn on a formulation's ingredients, and Amgen alone reads it to impose unstated functional requirements. Amgen is wrong.

**2. Amgen Cannot Rely on Extrinsic Evidence To Rewrite the Claims**

Lacking support in the patent itself, Amgen turns to Regeneron's statements in foreign proceedings, addressing different claims of different patents of different scope under different legal standards. ECF 929 at 9-10. Amgen's resort to extrinsic evidence cannot overcome the "heavy presumption" that the term carries its ordinary meaning consistent with the intrinsic record. *Epistar*, 566 F.3d at 1334; *see Ecolab*, 264 F.3d at 1367; *Toro*, 266 F.3d at 1371.

Amgen's reliance on foreign proceedings is entitled to little weight here, as "the varying legal and procedural requirements for obtaining patent protection in foreign countries might render consideration of certain types of representations inappropriate for consideration in a claim construction analysis of a [U.S.] counterpart." *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1279 (Fed. Cir. 2011) (cleaned up); *Pfizer*, 457 F.3d at 1290 ("statements made during prosecution of foreign counterparts to the [U.S.] patent are irrelevant to claim construction because they were made in response to patentability requirements unique to [foreign] law"); *Ateliers*, 2011

WL 722937, at *5. In all events, such extrinsic evidence cannot as a matter of law override the intrinsic record. *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021); *Phillips*, 415 F.3d at 1324.

Even were they legally relevant, the statements from foreign proceedings Amgen identified do not say what Amgen interprets them to say. The UK statement Amgen cites in its Supplemental Identification of Evidence (ECF 929 at 9-10) addresses Regeneron's argument on *inventive concept*—the UK analogue of obviousness—and supports Regeneron's position here that suitability is *distinct* from—and a requirement additional to—functional limitations such as stability. Ex. 12 at ¶ 100 (describing "the inventive concept" as a "high concentration (40mg/ml)" liquid formulation of aflibercept which "***is both*** *long-term stable and suitable for intravitreal administration*" (emphases edited)). Regeneron's UK statements further confirm that suitability for intravitreal administration relates to *physical* properties, such as the formulation's volume or ingredient amounts. *Id.* at ¶¶ 220-223 (describing range of volumes suitable for intravitreal administration); *id.* at ¶ 313 (25% sucrose is unsuitable for use intravitreally). The Swiss statement appears in a *novelty* analysis, where the court addressed whether a prior-art reference adequately disclosed a formulation that was recognized (without the patent's teachings) as suitable for intravitreal administration. Ex. 13 at ¶ 60. The Swiss court based its decision on the structural *composition* of the formulation, not its function. *Id.* at ¶ 60 ("[T]o arrive at a formulation … which is suitable for intravitreal administration, the [POSA] must select, from the ranges … in claim 6, the upper disclosed amount of phosphate buffer and the lower disclosed amount of sugar."). And the Canadian document is a responsive validity report addressing the skilled formulator's common general knowledge (Ex. 14 at ¶ 26), identifying physical characteristics (such as osmolality, pH, and viscosity, *infra* 23-24) as relevant to suitability for intravitreal administration (Ex. 14 at ¶¶ 20,

104-06, 116-17, 183-84).[3] None of these proceedings interprets "suitable for intravitreal administration" to impose a functional requirement. They describe what a skilled formulator knows about structures suitable for administration to the vitreous—that the volumes and ingredients (and their amounts) must be appropriate for that administration.

#### 3. Regeneron's Position Is Consistent with Its Statements Elsewhere

To justify unlawfully importing functional limitations, Amgen argues that "Regeneron had consistently maintained (in other aflibercept-related legal proceedings both in the US and in other countries) that the term 'suitable for intravitreal administration' … includes certain functional limitations." ECF 929 at 9. The only properties that Amgen has identified relying on the foregoing proceedings are pH, osmolality, and viscosity. ECF 929 at 9-10. None of these is functional. *Supra* § III.B. Each is a physical property of a liquid—indeed, they are recognized "[p]hysical properties of the human vitreous" itself. Ex. 15 at 126 (exhibit in *Formycon* IPR). As pH, osmolality, and viscosity are structural, not functional, properties, there is no inconsistency between Regeneron's statements in other proceedings and its position here.

That pH, osmolality, and viscosity are structural properties is confirmed by expert declarations from multiple parties, scientific publications, and findings from federal courts. Specifically, pH is a measure of the concentration of hydrogen ions in solution—what the solution physically comprises. *Actelion Pharms. Ltd. v. Mylan Pharms. Inc.*, 175 F.4th 1336, 1339 (Fed. Cir. 2026) ("pH is a positive number—the negative of the base-ten logarithm of the concentration of hydrogen ions …. The higher the concentration of hydrogen ions, the lower the pH."). Osmolality is a measure of the concentration of dissolved particles (also called "solutes") in a

[33] As Amgen agreed, the proceedings were "terminated before any final decision on the merits, involved different claims, and [were] subject to different legal standards." Ex. 16 (5/5 Labbe Email) at 1.

solution—again, what the formulation physically comprises. Ex. 17 (Samsung expert decl.) ¶ 19 ("Osmolality refers to the total concentration of solutes in a solution (osmoles/kg)"); Ex. 18 (Formycon expert decl.) ¶ 121 ("The osmolality of each component is calculated based on the number of molecules or ions in solution for each solute …."); Ex. 19 (Formycon expert decl.) ¶ 19 (similar); Ex. 20 (Samsung expert decl.) ¶¶ 116-122 (similar). And viscosity is a physical characteristic of the liquid—its thickness, or resistance to flow. Ex. 14 ¶ 183 (viscosity refers to "the thickness of the liquid formulation"); *Mylan*, 1:22-cv-61, ECF 566 (Trial Tr., Graham) at 1688:6-18 ("definition [of viscosity] is the resistance of a solution to flow"; water is "1 centipoise" and pours immediately, while honey "takes a little while" to start and stop); Ex. 22 (RGN-EYLEA-BIOSIM-AMG-02053787 (Chang 2002)) at 5 (listing viscosity under "physical properties"); *Medicis Pharm. Corp. v. Actavis Mid Atlantic LLC*, 2012 WL 2126873, at *1 n.3 (D. Del. June 12, 2012) ("Viscosity is a property that describes the resistance of a fluid to flow .... The higher the viscosity of a material, … the more resistant it is to flow."). Each property Amgen identified—pH, osmolality, and viscosity—measures what the formulation *is*, fixed by the identity and amount of its ingredients. None describes what the formulation *does*—its functions. *E.g.*, Ex. 23 (U.S. Pat. Appl. Pub. No. 2025/0082726) ¶ [0010] (referring to different pHs as something a "formulation can have"); *Mylan*, 714 F. Supp. 3d at 753 (characterizing osmolality and pH as "various formulation parameters" that "may be selected when practicing the invention"). Courts have recognized these properties as structural as well. *Astellas*, 2025 WL 1111447, at *21 (viscosity is a structural claim element); *Pacira Pharms., Inc. v. eVenus Pharms. Labs., Inc.*, 2024 WL 3812188, at *17 (D.N.J. Aug. 9, 2024) (pH is a "structural feature").

Regeneron's statements regarding stability, a functional limitation, in foreign litigations also are fully consistent with its position here (and Amgen's position, that "suitable" for intravitreal

administration does not require stability, Berl Decl. ¶ 2). While Regeneron has explained in other litigations that there is a "wide range of possible degradation pathways for proteins which lead to the drug being unsuitable for use," including physical and chemical instability, Ex. 12 ¶ 248, "unsuitable for use"—the phrase used in foreign proceedings—is not the same as "suitable for intravitreal administration." Regeneron has clarified that the drug becomes "unsuitable for use" because of new *structures* present in the formulation, such as aggregates and precipitates, *e.g., id.* ¶ 250. Instability may cause these structural changes, but it is these new *structures*—not lack of stability itself—that makes a formulation "unsuitable for use." In any event, as Amgen recognizes, Berl Decl. ¶ 2, stability is separately, explicitly recited in certain claims, foreclosing any notion that it is required by the term "suitable." *AstraZeneca*, 2022 WL 17178691, at *7.

Amgen's construction thus fails at every step. The unspecified functional requirements it seeks appear nowhere in the claims, and the law precludes importing them from the specification. *See Toro*, 266 F.3d at 1371. The statements it invokes from other proceedings addressed different claims—and, in the foreign cases, different legal standards—and none of them construes this term to impose a functional requirement. The three properties Amgen actually identified are physical, structural characteristics of the composition and fully consistent with Regeneron's position. The Court should reject Amgen's construction and accord the term its plain and ordinary meaning.[4]

## V. CONCLUSION

For the foregoing reasons, the Court should construe "wherein the liquid ophthalmic formulation is suitable for intravitreal administration" according to its plain and ordinary meaning.

[4] All agree that "suitable for intravitreal administration" applies to the formulation rather than to its ingredients alone. ECF 929 at 7-8. Amgen's addition of "as a whole" thus resolves nothing and should be rejected. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

Date: August 19, 2026

*Of Counsel*:

David I. Berl (admitted *PHV*)
Ellen E. Oberwetter (admitted *PHV*)
Benjamin M. Greenblum (admitted *PHV*)
Thomas S. Fletcher (admitted *PHV*)
Andrew V. Trask (admitted *PHV*)
Teagan J. Gregory (admitted *PHV*)
Shaun P. Mahaffy (admitted *PHV*)
Kathryn S. Kayali (admitted *PHV*)
Adam Pan (admitted *PHV*)
Jennalee Beazley (admitted *PHV*)
Rhochelle Krawetz (admitted *PHV*)
Mark Aneke (admitted *PHV*)
Chorong Song (admitted *PHV*)
Mitsoo Patel (admitted *PHV*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000
dberl@wc.com
eoberwetter@wc.com
bgreenblum@wc.com
tfletcher@wc.com
atrask@wc.com
tgregory@wc.com
smahaffy@wc.com
kkayali@wc.com
apan@wc.com
jbeazley@wc.com
rkrawetz@wc.com
caneke@wc.com
csong@wc.com
mpatel@wc.com

*Attorneys for Plaintiff Regeneron Pharmaceuticals, Inc.*

CAREY DOUGLAS KESSLER & RUBY, PLLC

*/s/ David R. Pogue*

Steven R. Ruby (WVSB No. 10752)
David R. Pogue (WVSB No. 10806)
Raymond S. Franks II (WVSB No. 6523)
707 Virginia Street East
901 Chase Tower (25301)
P.O. Box 913
Charleston, West Virginia 25323
(304) 345-1234
sruby@cdkrlaw.com
drpogue@cdkrlaw.com
rfranks@cdkrlaw.com

*Attorneys for Plaintiff Regeneron Pharmaceuticals, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on the 19th day of August 2026, the foregoing was filed using the Court's CM/ECF system, which will serve counsel of record for all parties.

*<u>/s/ David R. Pogue</u>*
David R. Pogue