**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

| | |
|---|---|
| IN RE: AFLIBERCEPT PATENT LITIGATION<br><br>**This Document Relates to:**<br>*Regeneron Pharmaceuticals, Inc. v. Amgen Inc.*,<br>**Case No. 1:24-cv-39-TSK**<br>**Case No. 1:25-cv-74-TSK** | MDL No. 1:24-md-3103-TSK<br><br>**DECLARATION OF DAVID I. BERL** |

I, David I. Berl, make the following Declaration based on personal knowledge of the matters set forth herein. I am a partner at Williams & Connolly LLP, counsel to Plaintiff Regeneron Pharmaceuticals, Inc. ("Regeneron") in this matter. I am a member in good standing with the Bars of California and Washington, D.C., and my *pro hac vice* motion to represent Regeneron in this action in the United States District Court for the Northern District of West Virginia has been granted. I submit this declaration in support of Regeneron's Opening Claim Construction Brief. I have personal knowledge of the facts set forth in this declaration, and if called upon I could and would testify competently to the following:

1. On July 24, 2026, I, along with several of my colleagues at Williams & Connolly LLP, met and conferred with counsel for Amgen via Microsoft Teams to discuss our claim construction positions. During our discussion of the claim term "wherein the liquid ophthalmic formulation is suitable for intravitreal administration," counsel for Amgen stated that the intention of their proposed construction was to clarify that the formulation is suitable for intravitreal administration, not just the individual formulation components in isolation. For example, counsel for Amgen said it believed a formulation that is solid or that has the active ingredient precipitated out would not be suitable for intravitreal administration.

2. I asked whether Amgen was suggesting there was a stability requirement in the

claim term. Counsel for Amgen responded that they were not reading a stability limitation into the claim and reiterated that their construction was to clarify that the claim term refers to the formulation as a whole and not the component parts in isolation.

3. I then suggested that we may not have a dispute. Counsel for Amgen agreed. I suggested that both sides undertake to provide each other certain clarifications that address their respective concerns to determine whether the parties could agree on a construction of this term.

4. On July 28, 2026, I emailed Regeneron's proposed compromise construction to Amgen. This compromise construction read: "The term 'suitable for intravitreal administration' refers to the claimed composition, not only the ingredients and amounts thereof in isolation. It requires only that the composition may be administered intravitreally and does not impose functional requirements such as stability." Attached hereto as Exhibit 1 is a true and correct copy of the email chain between counsel for Regeneron and counsel for Amgen regarding claim construction that includes this July 28 email.

5. On July 29, 2026, counsel for both parties met in Wheeling, West Virginia for an in-person hearing before Magistrate Judge Mazzone on an unrelated discovery dispute. Having yet to receive a response to my July 28 email, I followed up with counsel for Amgen after the hearing. Counsel for Amgen stated that Amgen was rejecting our compromise construction because it disagreed that the claim term did not impose functional requirements. Counsel for Amgen provided no additional substantive detail as to why Amgen was rejecting Regeneron's compromise proposal and did not identify any functional requirement associated with the term "suitable for intravitreal administration."

6. On July 30, 2026, I again followed up with Amgen asking for a response to my July 28 email. This email is included in the email chain of Exhibit 1.

7. That evening, counsel for Amgen responded that "Amgen does not agree to Regeneron's proposal regarding this claim term." Amgen provided no additional detail as to why it was rejecting Regeneron's proposal and provided no counter-proposal of its own.

8. The next morning, July 31, I emailed counsel for Amgen asking whether Amgen intended to provide its own counter-proposal and asking Amgen to "indicate[] how Amgen's proposed construction differs from Regeneron's or the specific scope of your disagreement with Regeneron's construction." Amgen responded later that day agreeing to meet and confer but, as to Amgen's disagreement with Regeneron's proposal, stated only that "we can confirm that we do not agree with Regeneron's proposed construction and maintain that Amgen's proposed construction is how a person of ordinary skill in the art would have understood the term." Attached hereto as Exhibit 2 is a true and correct copy of this three-email chain between counsel for Regeneron and counsel for Amgen.

9. On August 3, 2026, the next business day, I wrote to counsel for Amgen asking them to come prepared to discuss five specific questions about the scope of Amgen's proposed construction at the next meet and confer. Attached hereto as Exhibit 3 is a true and correct copy of that letter.

10. On August 4, 2026, I, along with several of my colleagues at Williams & Connolly LLP, again met and conferred with counsel for Amgen via Microsoft Teams to discuss our claim construction positions. Counsel for Amgen explained that it had a dispute with Regeneron's construction to the extent that Regeneron suggested the term imposed no functional requirements. I asked Amgen approximately a dozen times what requirements it contends the claim term imposes. These questions included the five specific questions I previewed for Amgen in my August 3 letter. Amgen refused to state what functional requirements it thought the claim term

imposed and dismissed at least one of my questions as hypothetical.

11. About one hour after the conferral ended, and five days after the court-ordered deadline for the exchange of claim construction evidence, Amgen served on Regeneron what it titled a "Supplemental Disclosure of Claim Construction Evidence." This Supplemental Disclosure identified Amgen's additional claim construction evidence in the form of an unbounded number of filings across seven different proceedings before the Patent Office and in foreign courts. Amgen was a party to one of the foreign litigations it identified.

12. Attached hereto as Exhibit 4 is a true and correct copy of Amgen's July 30 Disclosure of Claim Construction Evidence which was timely served and did not list filings from the seven aforementioned proceedings. Attached hereto as Exhibit 5 is a true and correct copy of Amgen's August 4 Supplemental Disclosure of Claim Construction Evidence, which lists filings from the seven aforementioned proceedings.

13. About one hour after receiving Amgen's Supplemental Disclosure of Claim Construction Evidence, Regeneron sent Amgen an email objecting to Amgen's belated disclosure of evidence.

14. The next morning, on the day the Joint Claim Construction Statement ("JCCS") was due to the court (August 5, 2026), Amgen wrote to Regeneron to advise again that Amgen thought the disputed claim term did impose functional requirements. And again, Amgen did not state what it thought those functional requirements were.

15. That afternoon, Amgen sent Regeneron another letter stating that Amgen will not be withdrawing its belated disclosures and that it "intends to argue that Regeneron now seeks a construction of the term—i.e., that it does not impose any functional limitations—that is plainly inconsistent with the position that Regeneron adopted for this term in other jurisdictions," and

identifying "exemplary portions of the supplemental materials on which it intends to rely, including, in some instances, specific exemplary statements." The specific statements Amgen identified concerned viscosity, pH, and osmolality in intravitreal administration. This is the first time Amgen identified these features as, in its view, related to suitability for intravitreal administration. Attached hereto as Exhibit 6 is a true and correct copy of that letter.

16. About three hours after Regeneron received Amgen's second August 5 letter, at 5:13pm, Regeneron sent Amgen a draft JCCS. The draft included a section titled "Regeneron's Position" where Regeneron explained the history of the parties' claim construction dispute. It also included a blank placeholder titled "Amgen's Position" for Amgen to fill in. Amgen responded at 8:04pm with a redlined draft that left Amgen's position blank and deleted the text of Regeneron's Position. Regeneron responded that there was no basis for Amgen to delete Regeneron's position and asked Amgen to provide its position if it wished to do so.

17. The following evening, one day after the JCCS was due to be filed with the Court (August 6, 2026), Amgen provided Regeneron another redline of the JCCS that included Amgen's position. In its position statement, Amgen quoted Regeneron statements from this and other proceedings about viscosity, osmolality, and pH and argued that these were functional limitations required by the term "suitable for intravitreal administration."

18. Attached hereto as Exhibit 7 is a true and correct copy of Amgen's August 6 JCCS redline and the email correspondence between the parties culminating in Amgen's email attaching its August 6 JCCS redline.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of August, 2026 in Washington, D.C.

David I. Berl