# EXHIBIT 14

Court File No. T-2137-23

**FEDERAL COURT**

B E T W E E N :

**BAYER INC. and REGENERON PHARMACEUTICALS, INC.**

Plaintiffs

- and -

**AMGEN CANADA INC.**

Defendant

---

**RESPONDING VALIDITY REPORT OF DR. DOUGLAS KLINE**
**April 10, 2025**
**(Canadian Patent No. 2,654,510)**

---

# TABLE OF CONTENTS


I. MANDATE ..... 2

II. SUMMARY OF OPINIONS ..... 2

III. SKILLED PERSON IN THE ART ..... 13

IV. COMMON GENERAL KNOWLEDGE ..... 13

A. Skilled formulator's involvement in and approach to drug development ..... 14

B. Response to Dr. Nesta's "Technical Background" ..... 16

(a) VEGF Traps were not part of the skilled formulator's common general knowledge ..... 16

(b) Protein-based VEGF antagonists for ophthalmic uses were not part of the skilled formulators common general knowledge ..... 22

(c) Isotonicity may be a formulation goal but is not a strict requirement ..... 27

(d) Proteins for intravitreal injections were not known, and had reported problems ..... 28

V. THE 510 PATENT ..... 29

A. Importance of stability to claims 33, 34, 40 and 41 ..... 29

B. Elements of claims 33, 34, 40 and 41 ..... 31

C. Ophthalmic formulations & intravitreal administration ..... 34

D. Skilled person's understanding of buffering capacity ..... 35

VI. ANTICIPATION ..... 37

A. Fraser 2005 does not anticipate claims 33, 34, 40 or 41 of the 510 Patent ..... 37

(a) Fraser 2005 does not teach an "ophthalmic formulation of a vascular endothelial growth factor (VEGF) antagonist" or a "pre-filled syringe suitable for intravitreal administration" ..... 38

(b) Fraser 2005 does not teach a VEGF antagonist comprising "a dimer of two fusion proteins each having the amino acid sequence of residues 27-457 of sequence SEQ ID NO:4" ..... 40

(c) Fraser 2005 does not teach "40 mg/ml of the VEGF antagonist" ..... 41

B. Wulff 2002 does not anticipate claims 33, 34, 40 or 41 of the 510 Patent ..... 42

(a) Wulff 2002 does not teach an "ophthalmic formulation of a vascular endothelial growth factor (VEGF) antagonist" or a "pre-filled syringe suitable for intravitreal administration" ..... 42

(b) Wulff 2002 does not teach a VEGF antagonist comprising "a dimer of two fusion proteins each having the amino acid sequence of residues 27-457 of sequence SEQ ID NO:4" ..... 44

(c) Wulff 2002 does not teach "40 mg/ml of the VEGF antagonist" ..... 45

VII. OBVIOUSNESS ..... 46

A. Inventive concept ........ 46
B. The inventive concept would not have been obvious ........ 47
(a) Not obvious to develop a VEGF antagonist for ophthalmic diseases ...... 47
(b) Not obvious to develop a formulation of aflibercept........ 51
(c) Motivation to avoid full-length traps (like aflibercept) for intravitreal administration ........ 57
(d) Even if aflibercept were selected, skilled formulators would have been motivated to formulate at a low concentration ........ 61
(e) Further responses to Dr. Nesta's obviousness opinion........ 64
C. Claims 33, 34, 40 and 41 were not obvious to try ........ 67
VIII. OVERBREADTH........ 71
IX. SUFFICIENCY........ 72
Appendix 1 – Legal Instructions........ 74
Appendix 2 – Tonicity Calculations of Fraser 2005 & Wulff 2002 formulations...... 77

## I. MANDATE

1. I previously prepared a report in this matter dated February 27, 2025. Counsel subsequently provided me with the expert report of Dr. Douglas Nesta, signed February 28, 2025, and asked for my response to his opinions. Counsel asked me to review Dr. Nesta's report in full, but to focus my response on Dr. Nesta's opinions addressing claims 33, 34, 40 and 41 of Canadian Patent No. 2,654,510 (the "**510 Patent**").

2. Counsel also provided me with legal instructions to follow in preparing my response. These are enclosed as Appendix 1.

3. As before, I have continued to comply with the expert code of conduct I signed in connection with preparing my first report.[1]

## II. SUMMARY OF OPINIONS

4. **Skilled person:** The 510 Patent is directed to a team that would include a skilled formulator whose role is to attempt to prepare a stable formulation of the protein being formulated.

5. **Common general knowledge:** In my first report, I discussed the common general knowledge of skilled formulators.[2] Though the report was framed around a later date, the knowledge would have been largely the same in June 2006.

6. Skilled formulators would have known that drug development is typically a collaborative endeavor involving a multidisciplinary team of scientists. The process

---

[1] See my First Report dated February 27, 2025, at Exhibit "C".
[2] See my First Report at, for example, paras. 33-44 and 49-50.

of identifying promising compounds for use in clinical testing in humans can take many years. Once a promising class of candidate proteins is identified, skilled formulators join the team to formulate the protein for *in vivo* animal and human testing.

7. While Dr. Nesta and I largely agree on the skilled person's common general knowledge, I have the following disagreements or context to add:

(a) VEGF Traps – In my opinion, while there was literature published about VEGF Traps, this class of molecules and their sequences were not part of the skilled formulator's common general knowledge as of June 2006. Today, VEGF Traps are known as a class of fusion proteins that are engineered from fusing together domains from the three VEGF receptors, referred to as VEGF-$R_1$, VEGF-$R_2$ or VEGF-$R_3$, with a multimerizing component. Full length VEGF Traps comprise the $F_c$ portion of human immunoglobulin G ("IgG") as the multimerizing component. Smaller VEGF Traps, sometimes referred to as mini-Traps, use a truncated $F_c$ portion. Each VEGF receptor has seven different domains, and each domain can be cleaved at different locations to make-up a VEGF Trap. Also, a VEGF Trap can be a fusion of different VEGF-$R_1$ domains, different VEGF-$R_2$ domains, different VEGF-$R_3$ domains, or a combination of domains from two VEGF-R receptors. These different permutations mean that VEGF Traps are a broad class of fusion proteins.

As of June 2006, these VEGF Traps were new fusion proteins

discussed in some limited research papers and lengthy patent applications, mainly in the area of cancer therapy. In my opinion, these references and the vast number of new fusion proteins encompassed by them were not well known by skilled formulators as of June 2006, and were not part of the common general knowledge.

One sub-category of VEGF Traps is VEGF Traps $R_1R_2$, which are engineered from a combination of both VEGF-$R_1$ and VEGF-$R_2$ domains. However, "VEGF Trap $R_1R_2$" does not tell the skilled formulator which domains of VEGF-$R_1$ and VEGF-$R_2$ were used, where the domains were cleaved along the amino acid sequence (if at all), whether an $F_c$ portion was included, or if an $F_c$ portion was used which $F_c$ portion was used.

Dr. Nesta appears to suggest that VEGF Trap $R_1R_2$ is "a molecule" that was well known to skilled formulators at the time, "and now known as aflibercept".[3] I disagree. As noted above, VEGF Trap $R_1R_2$ refers to a class of many, specifically engineered molecules with differing amino acid sequences. The skilled formulator would not have been generally aware of this subcategory of VEGF Traps. Also, the skilled formulator would not have been generally aware that this subcategory of VEGF Traps could be used to treat ophthalmic diseases.

(b) Protein-based VEGF antagonists for ophthalmic use – In my opinion, this was not part of the skilled formulator's common general

[3] Dr. Nesta's Report dated February 28, 2025, at para. 62.

knowledge. As of June 2006, no protein-based VEGF antagonist had been approved for ophthalmic use. Scientists were investigating the use of a limited number of protein-based VEGF antagonists for ophthalmic diseases. But it was not generally well known or accepted amongst formulators that all protein-based VEGF antagonists could be used for ophthalmic uses. For example, Dr. Nesta relies on two case studies[4] that report two patients receiving off-label AVASTIN for ophthalmic uses, but the case studies state that the uses reported were "provocative and require additional investigation."[5] Based on the legal instructions I was given, provocative and ongoing investigations do not rise to the level of common general knowledge to the skilled formulator.

Also, if the skilled formulator had considered the literature cited by Dr. Nesta, they would recognize that the bulk of the literature pointed to protein-based VEGF antagonists for use in cancer therapy, not ophthalmology.

(c) Isotonicity – While isotonicity could be a goal, it is not a necessity, as the human eye can tolerate a range of tonicity. The 510 Patent also does not suggest that isotonicity is a requirement.

(d) Proteins for intravitreal injections – In my opinion, the skilled

[4] Rosenfeld et al., (2005), Optical Coherence Tomography Findings After an Intravitreal Injection of Bevacizumab (Avastin ®) for Macular Edema from Central Retinal Vein Occlusion, Ophthalmic Surgery, Lasers & Imaging, 36(4): 336-339 ("**Rosenfeld 1**"), Dr. Nesta's Report at Exhibit "K"; Rosenfeld et al., (2005), Optical Coherence Tomography Findings After an Intravitreal Injection of Bevacizumab (Avastin ®) for Neovascular Age-Related Macular Degeneration, Ophthalmic Surgery, Lasers & Imaging, 36(4): 331-335 ("**Rosenfeld 2**"), Dr. Nesta's Report at Exhibit "L".
[5] Rosenfeld 1 at pg. 338 (right column), Dr. Nesta's Report at Exhibit "K" – "Our results in a single patient with only 4 weeks of follow-up are provocative and require additional investigation."

formulator did not know generally whether protein-based therapeutics could be administered intravitreally. In fact, the literature at the time suggested that large proteins could not be administered for the treatment of retinal diseases in this manner at all due to a concern over the ability to penetrate into the structures of the eye, as would be needed to be effective. Genentech's choice of the smaller protein fragment ranibizumab for ophthalmic use further illustrates the concern over large proteins.

8. **Construction of claims 33, 34, 40 and 41:** In my first report, I shared my opinion of how skilled formulators would understand the 510 Patent, particularly claims 33, 34, 40 and 41.[6] After reviewing Dr. Nesta's report, my opinions expressed in my first report remain unchanged. Dr. Nesta and I have four main disagreements over claims 33, 34, 40 and 41.

(a) Importance of stability – In construing the claims and the inventive concept of the claims, I considered the 510 Patent as a whole, including the stability discussion and studies in the 510 Patent. Conversely, Dr. Nesta relies entirely on the "plain language" of the claims and appears to ignore the stability aspects of the 510 Patent when construing the claims and their inventive concept. I disagree with Dr. Nesta's approach and conclusions.

(b) Claim elements in claims 33, 34, 40 and 41 – As I set out in my first report, my opinion is that the skilled formulator would understand that obvious variants to the literally claimed formulations are included

[6] See my First Report at paras. 58-78.

within the scope of the claims.[7] My opinion in this regard is based on a reading of these claims in the context of the 510 Patent as a whole and with the skilled formulator's common general knowledge. On the other hand, and as noted above, Dr. Nesta relies on the "plain language" of the claim and does not include any room for obvious variants. Based on the legal instructions I was given, I disagree with Dr. Nesta on this point.

(c) Ophthalmic formulations & intravitreal administration – In my opinion, an ophthalmic formulation in the context of the 510 Patent is a formulation that is suitable for intravitreal administration. While it is not clear, Dr. Nesta appears to suggest that ophthalmic formulations in the context of the 510 Patent could include formulations not intended for intravitreal administration. To the extent he does, I disagree.

(d) Buffering capacity – In considering the "Alternative Constructions" provided to him by counsel, Dr. Nesta states that the skilled formulator would not think to rely on the buffering capacity of a protein and would not know how to predict this buffering capacity.[8] I disagree, for the reasons stated in my first report. That is, the skilled formulator was aware of self-buffering proteins and how to calculate buffering capacity using a calculation described in a 1922 publication by Van Slyke.[9]

9. **Inventive concept of claims 33, 34, 40 and 41:** As I stated in my first report,

---

[7] See my First Report at paras. 63-78.
[8] Dr. Nesta's Report at para. 153.
[9] See my First Report at, for example, paras. 42-44 and 68-69.

skilled formulators would have understood the inventive concept of claims 33, 34, 40 and 41 as being that the claimed liquid formulations function as ophthalmic pharmaceutical liquids that can be injected into the eye and keep aflibercept in solution and in its native configuration so it is able to exert therapeutic action.[10] The way this is achieved is by formulating aflibercept in a liquid that co-solvates and protects the protein and provides tonicity as well as buffering capacity.

10. According to Dr. Nesta, the inventive concept of the claims is the same as his claim construction.[11] However, and as I noted above, both his claim construction and inventive concept fail to recognize the importance of stability to the 510 Patent.

11. **Claims 33, 34, 40 and 41 are not anticipated:** Dr. Nesta only assesses "anticipation" based on the "Alternative Constructions" provided to him by counsel. He does not assess anticipation based on his own construction.

12. With respect to the Alternative Constructions, I disagree with Dr. Nesta that Fraser 2005 and Wulff 2002 disclose and enable the invention of claims 33, 34, 40 and 41. Neither publication teaches:

(a) an "ophthalmic formulation of a vascular endothelial growth factor (VEGF) antagonist" or a "pre-filled syringe suitable for intravitreal administration";

(b) a VEGF antagonist comprising "a dimer of two fusion proteins each having the amino acid sequence of residues 27-457 of sequence SEQ ID NO:4";

[10] See my First Report at para. 62.
[11] Dr. Nesta's Report at paras. 189-191.

(c) a formulation comprising "40 mg/ml of the VEGF antagonist" (with respect to claims 40 and 41).

13. **Claims 33, 34, 40 and 41 are not obvious:** Dr. Nesta only assesses "obviousness" based on the "Alternative Constructions" provided to him by counsel. He does not assess obviousness based on his own construction. Nor does he assess obviousness with stability as part of the inventive concept, as I believe the skilled formulator would have.

14. With respect to the Alternative Constructions, I disagree that these claims are obvious. First, skilled formulators had no motivation to develop a formulation of a protein-based VEGF antagonist for ophthalmic diseases. Dr. Nesta provides no basis to suggest there was a motivation in this way. Nearly all of the prior art Dr. Nesta relies on relates to scientific research using VEGF antagonists for cancer treatment, not for ophthalmic diseases. These prior art references would have led a skilled formulator toward developing cancer formulations, not ophthalmic formulations.

15. Second, skilled formulators had no motivation to develop a formulation of aflibercept (as it is now known). Again, Dr. Nesta provides no basis to suggest there was a motivation in this way. As I note above, it was not common general knowledge to use protein-based VEGF antagonists for ophthalmic diseases. However, if the skilled person were to consult the prior art cited by Dr. Nesta, they would have been directed away from a large protein like aflibercept and toward a smaller protein, likely ranibizumab or the "mini-trap".

16. For example, if the skilled formulator were to review WO 895[12] as Dr. Nesta

[12] PCT Application No. 2005/00895 A2 ("**WO 895**"), Dr. Nesta's Report at Exhibit "R".

suggests, they would not identify aflibercept as having any promise since the reference does not single out aflibercept as a promising choice among VEGF antagonists. In fact, WO 895 suggests that it is the smaller "mini-trap" proteins, instead of full-length VEGF trap proteins (like aflibercept), that had potential for intravitreal administration due to their smaller size and better penetration into the eye tissues. Additional literature, such as Gaudreault 2005,[13] Ferrara 2006,[14] Saishin 2003,[15] and Jackson 2003,[16] point out that larger proteins may have limited effectiveness when administered intravitreally due to problems with transretinal penetration.

17. Given this, if a skilled formulator reviewed WO 895 and the literature for guidance on what they should try to formulate for ophthalmic use (including intravitreal injection), they would be motivated to avoid aflibercept for development as an intravitreal formulation. They would instead focus their efforts on a mini-trap protein due to the teachings about its superior penetration and effectiveness in the eye.

18. Third, even if skilled formulators were motivated to develop such a formulation for aflibercept, Dr. Nesta offers no rationale for why they would be formulating aflibercept at a concentration of 40 mg/mL (e.g., the concentration of the literal formulation of claim 40, and within the range of the literal formulations

---

[13] Gaudreault, J. et al, "Preclinical Pharmacokinetics of Ranibizumab (rhuFabV2) after a Single Intravitreal Administration (2005), IOVS Vol. 46, No. 2, 726-733 ("**Gaudreault 2005**"), **Exhibit "A"**.
[14] Ferrara, N. et al, "Development of Ranibizumab, an Anti-Vascular Endothelial Growth Factor Antigen Binding Fragment, As Therapy for Neovascular Age-Related Macular Degeneration" (2006), Retina Vol. 26, No. 8, 859-870 ("**Ferrara 2006**"), **Exhibit "B"**.
[15] Saishin, Y. et al, "VEGF-TrapR1R2 Suppresses Choroidal Neovascularization and VEGF-Induced Breakdown of the Blood-Retinal Barrier" (2003), Journal of Cellular Physiology 195:241-248 ("**Saishin 2003**"), **Exhibit "C"**.
[16] Jackson, T. et al, "Human Retinal Molecular Weight Exclusion Limit and Estimate of Species Variation" (2003), IOVS Vol. 44, No. 5, 2141-2146 ("**Jackson 2003**"), **Exhibit "D"**.

covered by claims 33, 34 and 41). If the skilled formulator were to consider the literature, they would identify Gaudreault 2005, which reported that Genentech encountered problems with a 40 mg/mL formulation of ranibizumab. Genentech in fact sought approval for a 10 mg/mL formulation. This would have directed a skilled formulator to avoid 40 mg/mL for aflibercept and instead consider concentrations below 10 mg/mL.

19. In my opinion, Dr. Nesta oversimplifies the difficulty in formulating new proteins to obtain a stable formulation. This task is a significant challenge due to a protein's intricate molecular and macromolecular structures. Each protein is different, and a formulation strategy that works for one may not work for another. This can lead to chemical and structural instabilities, including aggregation, which negatively impact the protein's therapeutic function.

20. Intravitreal administration also presents its own unique challenges. The volumes that can be injected into the eye are very small, and increasing the concentration of the drug in the formulation would be expected to exacerbate many of the complications mentioned above, such as higher viscosity resulting in potentially higher shear stress and aggregate formation. This higher viscosity can present a problem because needles used for intravitreal injections have a small gauge as compared to, for example, needles used for intravenous administration. A viscous solution may have difficulty being pushed through a small gauge needle and can create added stress on the protein and lead to stability problems.

21. Dr. Nesta cites no literature reporting any ophthalmic formulations for any VEGF Trap (including aflibercept) or mini-trap, or information about how aflibercept

would perform in any formulation. As a result, the skilled formulator did not have the benefit of learning from prior ophthalmic formulations of aflibercept. They would have needed to embark on a research project to develop the first such formulation. Given the amount of experimentation it would take, and the unpredictability of whether any test formulations would be suitable for ophthalmic use, there were no predictable solutions.

22. **Claims 33, 34, 40 and 41 are not overbroad:** Dr. Nesta only assesses "overbreadth" based on the "Alternative Constructions" provided to him by counsel. He does not assess overbreadth based on his own construction.

23. With respect to the Alternative Constructions, I disagree with Dr. Nesta that these claims are overbroad if they are construed in a way that sodium phosphate or sodium phosphate buffer can be varied or omitted. When these claims are read in the entire context of the 510 Patent together with the skilled formulator's common general knowledge, the skilled formulator would conclude that the sodium phosphate and sodium phosphate buffer components of these claims could be varied or substituted provided that the formulation as a whole maintains an adequate buffering capacity. This buffer capacity can be estimated using the well-known Van Slyke calculation, as I showed in my first report.[17]

24. **Claims 33, 34, 40 and 41 are not insufficient:** Dr. Nesta only assesses "sufficiency" based on the "Alternative Constructions" provided to him by counsel. He does not assess sufficiency based on his own construction.

25. With respect to the Alternative Constructions, I also disagree with Dr. Nesta

[17] See my First Report at, for example, paras. 42-44 and 68-69.

that these claims are insufficient if they are construed in a way that sodium phosphate or sodium phosphate buffer can be varied or omitted. The skilled formulator, using the 510 Patent and their common general knowledge, could prepare a formulation without sodium phosphate or sodium phosphate buffer by estimating an appropriate buffering capacity of the variant formulation in a similar manner that I did in my first report.[18]

## III. SKILLED PERSON IN THE ART

26. In my first report, I explained that the 510 Patent is directed to a team that included a "skilled formulator" having a PhD in chemical engineering with 1-2 years of formulation experience (or less education with more experience).[19] Dr. Nesta agrees that the 510 Patent is likewise directed to a formulator, including an individual with a PhD, that would be part of a drug development team.

27. While Dr. Nesta includes more years of experience for his proposed skilled formulator, my opinions would not change if Dr. Nesta's skilled person were adopted.

## IV. COMMON GENERAL KNOWLEDGE

28. In Dr. Nesta's section titled "Technical Background", he provides information regarding VEGF antagonists, ophthalmic formulations and protein drug formulations. He states at paragraph 58 that "[t]he information I provide below would have been common general knowledge of the POSITA by both the Filing Date and the Claim

---

[18] See my First Report at, for example, paras. 42-44 and 68-69.
[19] See my First Report at paras. 23-24.

Date."[20] While we agree on many aspects, I set out further below my disagreements with Dr. Nesta in respect of what I believe a skilled formulator would have known as part of their common general knowledge as of December 2007 and June 2006.

### A. **Skilled formulator's involvement in and approach to drug development**

29. I previously described some aspects of skilled formulators' common general knowledge in my first report.[21] While my previous discussion was framed around a later date, December 27, 2007 (the date the patent was published), skilled formulators would have had that same common general knowledge in June 2006 (the date the priority application was filed).

30. Dr. Nesta, from paragraphs 63 to 68, describes from a general perspective the process of protein drug formulation. While I largely agree with his general comments, I add the following context.

31. Skilled formulators would have been aware that drug development is typically undertaken by a multidisciplinary team of scientists with different specializations each working on different aspects of the development process from discovery through to clinical trials and drug approval. Generally speaking, the drug discovery team starts by researching compounds that might act on a biologic target implicated in a disease. Sometimes, researchers instead identify a promising drug candidate and then determine which disease(s) it can be used to treat. The discovery team usually

---

[20] Dr. Nesta's Report at para. 58.
[21] See my First Report at, for example, paras. 29-44.

includes protein chemists, preclinical *in vitro* testing and animal model experts, drug formulators, and clinical researchers familiar with clinical models and uses.

32. The preclinical team members would typically perform *in vitro* testing in various assays to test whether the proteins of interest are acting on a biologic target and whether they can be expected to be safe. Once *in vitro* tests identify promising protein candidates, they would then typically conduct *in vivo* testing in animals to test whether the proteins are still active on biologic targets and still safe when administered to living organisms. This process of identifying promising compounds for use in clinical testing in humans can take many years. For some biologic targets and some protein compounds, scientists conduct rounds and rounds of testing without ever succeeding.

33. Once the discovery team identifies a promising class of candidate proteins, the discovery team will typically work to narrow down the options to a handful of key candidates, usually identifying the anticipated "best" candidate and a handful of backup candidates. For proteins, the biotechnology team members will typically research the protein's chemistry to identify the physical protein structures that are responsible for its activity. By determining how the protein functions, scientists can narrow in on which protein(s) to select. Other members of the team will typically explore how to grow (express) and produce the proteins of interest, in order to make enough of it for larger-scale *in vitro* and *in vivo* tests and hopefully testing in human clinical trials.

34. This step is where skilled formulators are typically brought into the fold. However, it is important to note the importance of the above steps when dealing with

the first time a compound, or fusion protein in this case, is formulated. The very selection of the fusion protein is critical to the success of the invention. Skilled formulators would then become responsible for attempting to formulate the protein so that it can be used in *in vivo* animal and human testing. The preclinical and clinical team members would typically provide input to skilled formulators about:

(a) Which proteins to formulate and what the target dose is.

(b) How the protein will be administered to patients (whether by bolus injection, infusion, intravitreal injection, etc.).

(c) Any other constraints, such as needle size, and the maximum concentration or volume to minimize damage to tissues at the site of administration.

## B. Response to Dr. Nesta's "Technical Background"

### *(a) VEGF Traps were not part of the skilled formulator's common general knowledge*

35. Dr. Nesta states at paragraph 62 that the skilled person would have been aware of "a molecule VEGF Trap $R_1R_2$ that was described as a potent VEGF inhibitor, how to make it, and its sequence."[22] To the extent Dr. Nesta's opinion is that this knowledge was common general knowledge to the skilled formulator, I disagree.

36. In my opinion, while there was literature published about VEGF Traps, this class of molecules and their sequences were not part of the skilled formulator's

[22] Dr. Nesta's Report at para. 62.

common general knowledge as of June 2006. Today, VEGF Traps are known as a class of fusion proteins that are engineered from fusing together domains from the three VEGF receptors, referred to as VEGF-$R_1$, VEGF-$R_2$ or VEGF-$R_3$, with a multimerizing component. Full length VEGF Traps comprise the $F_c$ portion of human immunoglobulin G ("IgG") as the multimerizing component. Smaller VEGF Traps, sometimes referred to as mini-Traps, use a truncated $F_c$ portion. For example, Dr. Nesta reproduces Figure 1A from Holash 2002[23] in his report as examples of VEGF Traps. I have reproduced this Figure below as well.




37. As shown in Figure 1A above, each VEGF receptor has seven different domains (the full length red and blue illustrations). Each domain can be cleaved at different locations to make-up a VEGF Trap. A VEGF Trap can therefore be a fusion of different VEGF-$R_1$ domains, different VEGF-$R_2$ domains, or a combination of both VEGF-$R_1$ and VEGF-$R_2$ domains, with the sequences cleaved at various locations.

[23] Holash, J. et al. (2002), VEGF-Trap: A VEGF blocker with potent antitumor effects, Proceedings of the National Academy of Sciences, 99(17):11393-11398 ("**Holash 2002**"), Dr. Nesta's Report at Exhibit "H".

38. I note that Holash 2002 does not describe which $F_c$ portion was used. Rather, it only states that an $F_c$ portion was included. The skilled formulator would therefore not know from a reading of Holash 2002 which type of $F_c$ portion was used.

39. Figure 1A above shows four different types of VEGF Traps, as explained in the caption from Holash 2002 for this image, copied below with the different VEGF Traps emphasized by me.

> Schematics of full-length VEGFR1 (red) and VEGFR2 (blue) are provided, indicating their seven Ig domains, transmembrane regions (black bars), and kinase domains (ovals). **The parental VEGF-Trap** contains the first three Ig domains of VEGFR1 (including the highly basic 10-aa stretch in Ig3, blue box) fused to the Fc portion of human IgG1. **VEGF-Trap$_{\Delta B1}$** is identical to the parental VEGF-Trap, except that the basic stretch in Ig3 has been removed. **VEGF-Trap$_{\Delta B2}$** is the same construct as ΔB1, except that the first Ig domain has been removed. **VEGF-Trap$_{R1R2}$** possesses the second Ig domain of VEGFR1 and the third Ig domain of VEGFR2 fused to the Fc portion of human IgG1.[24]

40. While Holash 2002 identifies the domains included in the various VEGF Traps in Figure 1A, it does not tell the skilled formulator where each domain is cleaved. The skilled formulator therefore would not know the amino acid sequence of these particular fusion proteins.

41. These different permutations show that VEGF Traps are a broad class of fusion proteins.

42. As of June 2006, these VEGF Traps were new fusion proteins discussed in some limited research papers and lengthy patent applications, mainly in the area of

[24] Holash 2002 at pg. 11394, Dr. Nesta's Report at Exhibit "H".

cancer therapy. In my opinion, these references and the vast number of new fusion proteins encompassed by them were not well known by skilled formulators as of June 2006, and not part of the common general knowledge.

43. In his report, Dr. Nesta suggests at paragraph 62 that VEGF Trap $R_1R_2$ is “a molecule” that was well known to skilled formulators at the time, “and now known as aflibercept”.[25] I disagree. As noted above, VEGF Trap $R_1R_2$ refers to a class of many, specifically engineered molecules with differing amino acid sequences. The skilled formulator would not have been generally aware of this subcategory of VEGF Traps. Also, the skilled formulator would not have been generally aware that this subcategory of VEGF Traps could be used to treat ophthalmic diseases.

44. Wulff 2002 is another reference cited by Dr. Nesta that reinforces my opinions expressed above, though in my opinion Wulff 2002 was not part of the skilled formulator’s common general knowledge. Wulff 2002 describes a study where anti-VEGF agents were used to determine the effect of VEGF activity on the ovary. It is not a study related to ophthalmic diseases. It describes in general terms VEGF Trap $R_1R_2$ used in the study, but a skilled formulator reading Wulff 2002 would not know which specific fusion protein is being administered. If the skilled formulator were to come across Wulff 2002, they would only know that VEGF Trap that was administered belonged to the general class of VEGF Trap $R_1R_2$ as shown in Figure 1 of Wulff 2002, and for an oncology use.

45. The footnote on page 2798 of Wulff 2002 states that the detailed molecular structure of VEGF Trap $R_1R_2$ are described in WO 319[26]. Dr. Nesta refers to this

[25] Dr. Nesta’s Report at para. 62.
[26] PCT Application No. 00/75319 A1 (“**WO 319**”), Dr. Nesta’s Report at Exhibit “P”.

patent reference at paragraph 62, and specifically Figures 24A to 24C, to suggest that VEGF Trap $R_1R_2$ were well known to the skilled person. But Dr. Nesta does not explain how this patent reference would have become part of the skilled formulator's common general knowledge.

46. In my opinion, WO 319 would not have formed part of the skilled formulator's common general knowledge. I was not aware of WO 319 in June 2006. To my knowledge, it was not a patent reference that was taught to formulators as part of their education or work experience. In fact, WO 319 does not contain meaningful information in relation to protein formulation that would be of interest to a skilled formulator. Rather, it is a specific patent reference that describes many different protein-based molecules and their activity against VEGF.

47. WO 319 includes a vast number of different molecules within the embodiments described. The different embodiments are summarized from pages 10 to 16, with reference to several different figures. The general embodiments encompass a fusion protein that can comprise domain two or domain three of any one of VEGF-R1,[27] VEGF-R2[28] and VEGF-R3.[29] Since the embodiments can include a portion of VEGF-R3, these embodiments are not limited to VEGF Trap $R_1R_2$.

48. The Figures of WO 319 provide examples of various fusion proteins identified by their amino acid sequences. For example, and as noted on pages 19 to 22:[30]

[27] Flt1 receptor as referred to on pg. 10 of WO 319, Dr. Nesta's Report at Exhibit "P".
[28] Flk1 receptor as referred to on pg. 10 of WO 319, Dr. Nesta's Report at Exhibit "P".
[29] Flt4 receptor as referred to on pg. 10 of WO 319, Dr. Nesta's Report at Exhibit "P".
[30] WO 319 at pgs. 19-22, Dr. Nesta's Report at Exhibit "P".

(a) The fusion protein identified as Flt1 (1-3)-Fc is shown in Figures 10A-10D;

(b) The fusion protein identified as Flt1(1-$36_{\Delta B}$)-Fc is shown in Figures 13A-13D;

(c) The fusion protein identified as Flt1 (2-$36_{\Delta B}$)-Fc is shown in Figures 14A-14C;

(d) The fusion protein identified as Flt1 (2-3)-Fc is shown in Figures 15A-15C;

(e) The fusion protein identified as Flt1(1-$3_{R\text{->}N}$)-Fc is shown in Figures 16A-16D;

(f) The fusion protein identified as Flt1D2.Flk1D3.FcΔC1(a) is shown in Figures 21A-21C;

(g) The fusion protein identified as Flt1D2.VEGFR3D3.FcΔC1 (a) is shown in Figures 22A-22C; and

(h) The fusion protein identified as VEGFR1R2-FcΔC1(a) is shown in Figures 24A-24C.

49. Two of these specifically disclosed fusion proteins are different VEGF Trap $R_1R_2$ molecules – (f) and (h). With respect to (f), the nomenclature “Flt1” refers to VEGF-R1 and “Flk1” refers to VEGF-R2. Had the skilled formulator consulted WO 319, there is no information in the patent directing them to focus on the protein in (h) over (f) or other fusion proteins encompassed within the scope of WO 319.

50. Also, WO 319 describes at pages 35 to 36 many different diagnostic and

therapeutic uses for the class of molecules disclosed. If a skilled formulator were to read WO 319, they would not be directed to any particular use for this class of molecules.

51. Dr. Nesta also relies on two publications (Kim 2002 and Holash 2002) to support his statement that VEGF Trap $R_1R_2$ is “a molecule” that was well known to skilled formulators at the time, “and now known as aflibercept”. These two publications are not specifically directed to formulators and are instead focused on cancer treatments. In my opinion, these two cancer publications would not have been well known by a skilled formulator in June 2006 because the publications do not include any meaningful formulation teachings. As such, they would not be considered common general knowledge, in my opinion.

***(b) Protein-based VEGF antagonists for ophthalmic uses were not part of the skilled formulators common general knowledge***

52. Dr. Nesta states at paragraph 60 of his report that “VEGF antagonists were known to be capable of being used in a pharmaceutical formulation for administration to humans.”[31] Dr. Nesta does not qualify his statement by saying “certain” or “some”. To the extent Dr. Nesta is suggesting that the skilled formulator knew as part of their common general knowledge that any VEGF antagonist was capable of being used to treat ophthalmic diseases, I disagree.

53. As I was instructed in my first report[32], I understand that “common general knowledge” in the context of Canadian patent law is defined as follows:

[31] Dr. Nesta’s Report at para. 60.
[32] See “Appendix 1 – Legal Instructions” to my First Report.

> A piece of knowledge becomes "common general knowledge" when it is generally known and accepted without question by the bulk of those who are engaged in the particular art; in other words, when it becomes part of their common stock of knowledge relating to the art. It refers to knowledge that is generally known by persons skilled in the relevant art at the relevant time. [33]

54. Counsel further instructed me that the following instruction Dr. Nesta received at paragraph 26 of his report is accurate: "Information only migrates into the common general knowledge if the skilled person would become aware of it and accept it as a good basis for further action". [34]

55. By June 2006, there was a vast compound space of VEGF antagonists, including protein-based VEGF antagonists, to explore. Apart from perhaps AVASTIN and ranibizumab (discussed below), the skilled formulator would not have generally known the majority of these VEGF inhibitors. As only but some examples:

(a) as I set out above in the previous section, WO 319 alone discloses a class of fusion protein VEGF antagonists;

(b) US 941[35] (cited by Dr. Nesta) describes a VEGF antagonist that specifically inhibits VEGFR2 and its uses to treat cancers; and

(c) WO 895 (also cited by Dr. Nesta) describes an additional class of fusion protein VEGF antagonists, including "mini-traps", as I discussed below at paragraphs 142 to 152.

56. The skilled formulator would not have generally known about these various

---

[33] See "Appendix 1 – Legal Instructions" to this report.
[34] Dr. Nesta's Report at para. 26.
[35] US Patent No. 6,676,941 B2 ("**US 941**"), Dr. Nesta's Report at Exhibit "O".

VEGF antagonists.

57. In support of his opinion at paragraph 60, Dr. Nesta refers to the off-label use of AVASTIN for ophthalmic diseases and ranibizumab's ongoing clinical trials for ophthalmic diseases. To the extent Dr. Nesta is suggesting that these uses and references formed part of the skilled formulator's common general knowledge, I disagree.

58. In my opinion, the information Dr. Nesta cites referencing the off-label use of AVASTIN does not indicate that such a use was generally known and accepted without question by the bulk of skilled formulators by June 2006. At that time, AVASTIN was approved as a cancer drug. It was not approved for any ophthalmic diseases. In fact, and as discussed below at paragraphs 138 to 165, if the skilled formulator had consulted the relevant literature, it would have become apparent that Genentech elected to abandon the active ingredient in AVASTIN (bevacizumab) for ophthalmic diseases and instead was investigating a smaller protein, ranibizumab, for these diseases. In fact, this concern with bevacizumab is acknowledged in Rosenfeld 2.[36]

59. Dr. Nesta cites two references as support for his opinion that AVASTIN would have been known to be used off-label for ophthalmic diseases – Rosenfeld 1 and Rosenfeld 2. These references were published in the same journal at the same time. Each reference reports a single case study of an individual receiving off-label treatment of AVASTIN for ophthalmic diseases. Based on these single patient case reports, the authors conclude that "bevacizumab **may** provide an effective, safe and

[36] Rosenfeld 2 at pgs. 333-334, Dr. Nesta's Report at Exhibit "L".

inexpensive option for patients with" certain ophthalmic diseases (emphasis added).[37] The authors also acknowledge that their results are "provocative and require additional investigation".[38] And finally, as noted above, they note that Genentech elected to abandon the active ingredient in AVASTIN (bevacizumab) for ophthalmic diseases.

60. The skilled formulator would also recognize that Genentech was the leading biotechnology company in the world as of June 2006. A skilled formulator working with a biologic protein would pay close attention to the path followed by Genentech.

61. Accordingly, the skilled formulator would not have considered the information cited by Dr. Nesta on the off-label AVASTIN for ophthalmic diseases to be "generally known and accepted without question by the bulk of those who are engaged in the particular art" given with the concerns noted by the authors. The skilled formulator would understand that drug products go through rigorous pre-clinical and clinical testing before they are generally accepted as safe and effective for particular treatments. Many drug products fail during pre-clinical and clinical testing. Therefore, until a drug product completes the rigour of full clinical studies, a skilled formulator would not generally accept the use the drug product for a particular treatment.

62. Similarly, I disagree that as of June 16, 2006 ranibizumab's ongoing clinical trials for ophthalmic diseases would have led a skilled formulator to generally accept the use of all VEGF antagonists for ophthalmic diseases. Based on the literature I am aware of, ranibizumab was the first protein based anti-VEGF molecule to go through

[37] Rosenfeld 2 at pg. 331, Dr. Nesta's Report at Exhibit "L".
[38] Rosenfeld 1 at pg. 338, Dr. Nesta's Report at Exhibit "K".

clinical studies. As of June 16, 2006, the results of ranibizumab's Phase III clinical studies were not known to the skilled formulator and it was not clear whether they would be successful.

63. Also, ranibizumab is a specific type of protein with a structure that is not shared by all protein-based VEGF antagonists. Ranibizumab is a monoclonal antibody, not an engineered fusion protein like the VEGF Traps discussed above. Ranibizumab is also a fragment of the larger protein found in AVASTIN (bevacizumab). As I discussed below from paragraphs 183 to 195, the skilled formulator would understand that different molecules, and especially different types of molecules like monoclonal antibodies versus fusion proteins, behave differently. Teachings about one molecule cannot be attributable to a different molecule.

64. Accordingly, it is my opinion that ranibizumab's ongoing clinical studies would not have led skilled formulators to generally accept that all VEGF antagonists could be used for ophthalmic uses. In any event, as I explain below from paragraphs 138 to 165, to the extent skilled formulators considered ranibizumab, they would have been deterred from pursuing larger molecules (like full length aflibercept) and motivated to consider small molecules like mini-trap.

65. Finally, I disagree with Dr. Nesta that US 941 would have made the ophthalmic use of VEGF antagonists generally accepted amongst skilled formulators. As noted above, US 941 describes a monoclonal antibody VEGF antagonist that specifically inhibits VEGFR2 and its use to treat cancers. While there is a reference to ophthalmic uses (from a list of many) of the VEGF antagonist described at columns 99 to 100, I do not believe this general discussion would have led a skilled

formulator to generally accept the use of all VEGF antagonists for ophthalmic diseases. Notably, there are no examples in US 941 that illustrate a specific ophthalmic formulation or use.

66. Finally, and even if one accepts Dr. Nesta's opinion that off-label AVASTIN, incomplete clinical studies of ranibizumab, and the ophthalmic references in US 941 were part of the common general knowledge, it does not follow that the use of all VEGF antagonists for ophthalmic diseases was generally accepted.

***(c) Isotonicity may be a formulation goal but is not a strict requirement***

67. Dr. Nesta at paragraph 74 states that "[i]t is generally desirable for drugs to be formulated to match the tonicity of the environment into which they are introduced (i.e., be "isotonic"), so that they do not disrupt the normal osmotic balance."[39] At paragraph 87, he also states that "[h]aving a non-isotonic solution can create an unacceptable ionic imbalance of the ophthalmic environment."[40]

68. I agree that, at the outset of a formulation development project, isotonicity may be considered "generally desirable" or a formulation goal. However, skilled formulators also knew that the human eye could tolerate a range of tonicity. As an example, Dr. Nesta refers to and attaches to his report US Patent No. 6,777,429 ("US 429"), which describes ophthalmic formulations of a small molecule active ingredient, ketotifen. In US 429, the inventors state that "the composition has an osmolarity in the range of 210 to 290 milliosmoles".[41] As another example, see the calculations in Appendix 3 to my first report regarding the calculated tonicity of the

---

[39] Dr. Nesta's Report at para. 74.
[40] Dr. Nesta's Report at para. 87.
[41] US Patent No. 6,777,429 B1 ("**US 429**") at Col.1 (l.20-21), Dr. Nesta's Report at Exhibit "T".

claim 40 formulation and the hypothetical formulation that I was provided.

69. Although I do not believe US 429 forms part of the skilled formulator's common general knowledge, this contemporaneous statement from US 429 is reflective of what the skilled formulator would understand – the human eye can tolerate a range of tonicity.

#### *(d) Proteins for intravitreal injections were not known, and had reported problems*

70. At paragraph 95, Dr. Nesta states that "[i]t would have been known that protein drug formulations could be administered intravenously, intramuscularly, subcutaneously, and intravitreally (into the eye)"[42] (emphasis added). For at least intravitreal injections, I disagree. As of June 2006, there were no protein-based products approved for intravitreal administration. While I understand that there was some research in this space as of June 2006, I do not believe it would have been generally accepted at that time that proteins could generally be used for intravitreal injections.

71. In fact, and as I discuss in more detail below at paragraphs 142 to 165, published literature as of June 2006 would have led the skilled formulator to doubt whether large proteins, such as aflibercept, could be effectively and safely administered intravitreally. The literature, and Genentech's own product development, suggested that large proteins (i.e., those that might exceed the size of a 76.5 kD dextran polymer) will not penetrate and permeate the structures of the eye as well as smaller VEGF traps.

---

[42] Dr. Nesta's Report at para. 95.

## V. THE 510 PATENT

72. I described the skilled formulators' understanding of the 510 Patent in my first report, including their understanding of claims 33, 34, 40 and 41.[43] Nothing in Dr. Nesta's report causes me to change those opinions.

73. After reviewing Dr. Nesta's comments on the 510 Patent and claims 33, 34, 40 and 41, I believe we disagree on four main issues, as set out below.

### A. Importance of stability to claims 33, 34, 40 and 41

74. In construing claims 33, 34, 40 and 41, Dr. Nesta relies entirely on the "plain language" of the claims.[44] He does not consider the claims in light of the specification, and in particular the stability studies described in the claims. He later states at paragraph 189 that the inventive concept of the claims is "closely related" to his interpretation of the claims.

75. Dr. Nesta's approach in this regard does not take into account the context of the specification, namely the importance of stability to the 510 Patent[45] and claims 33, 34, 40 and 41. For example:

(a) In the Field of Invention, the inventors state that "[t]he invention includes liquid pharmaceutical formulations having increased stability";[46]

(b) In the first paragraph under "Brief Summary of the Invention", the inventors state that "Stable formulations of a VEGF-specific fusion

[43] See my First Report at paras. 25-48.
[44] Dr. Nesta's Report at paras. 141-142 and 143-145.
[45] 510 Patent, First Report at Exhibit "B".
[46] 510 Patent at para. 1, First Report at Exhibit "B".

protein antagonist are provided";[47]

(c) In the first paragraph under "General Description", the inventors state that "[p]roteins possess unique chemical and physical properties that present stability problems", and explains some of those problems;[48]

(d) In the first paragraph under "Stable Liquid Ophthalmic Formulations", the inventors state that "the invention provides a stable pharmaceutically acceptable formulation comprising a VEGF antagonist, wherein the formulation is a liquid formulation suitable for ophthalmic use";[49] and

(e) The inventors provide 8 examples of stability testing conducted on various formulations.

76. As I stated in my First Report at paragraph 62, when reading the 510 Patent as a whole, the skilled formulator would have determined that:

> the inventive concept common to claims 33, 34, 40 and 41 to be that the claimed liquid formulations function as ophthalmic pharmaceutical liquids that can be injected into the eye and keep aflibercept in solution and in its native configuration so it is able to exert therapeutic action. The way this is achieved is by formulating aflibercept in a liquid that co-solvates and protects the protein, and provides tonicity as well as buffering capacity[50]

77. This understanding of claims 33, 34, 40 and 41 is based on how a skilled formulator would understand the teachings of the 510 Patent in light of the patent as a whole, and not just a literal reading of the claims. In my opinion, given that one of the

---

[47] 510 Patent at para. 5, First Report at Exhibit "B".
[48] 510 Patent at para. 40, First Report at Exhibit "B".
[49] 510 Patent at para. 47, First Report at Exhibit "B".
[50] See my First Report at para. 62.

goals of the 510 Patent is to identify stable ophthalmic formulations of aflibercept, the skilled formulator would take note of this goal when they are construing the claims and the inventive concept.

78. Similarly, the "Alternative Constructions" Dr. Nesta was provided assume that certain literal claim elements can be varied, without considering why the skilled formulator may find that the literal claim elements can be varied.

79. As I explain in my first report at paragraphs 58 to 78, the skilled formulator would have known that certain claim elements can be varied because of their knowledge of excipients and understanding of the importance of stability to the 510 Patent. With this knowledge and understanding, the skilled formulator would find that certain literal claim elements can be varied from claims 33, 34, 40 and 41 while still achieving the desired stability of an ophthalmic formulation of aflibercept.

### B. Elements of claims 33, 34, 40 and 41

80. In Dr. Nesta's opinion, each of the literal claim elements in each claim of the 510 Patent that he considered, including the concentration ranges, are essential elements. Dr. Nesta's construction of claims 33, 34, 40 and 41 does not leave any room for variants to be included within the scope of the claims. I disagree with Dr. Nesta's opinion in this regard.

81. Dr. Nesta appears to acknowledge that a skilled formulator would be able to identify obvious variants that would work the same as the claimed inventions. For example, Dr. Nesta acknowledges at paragraph 114 that "there may be instances in which the POSITA would expect that an element of a formulation could potentially

be substituted without affecting the function of the formulation."[51] I agree with this scientific opinion. It represents a fundamental basis for my opinion in the first report that certain claim elements could indeed be substituted without impacting the function of the formulation.[52]

82. It appears where Dr. Nesta and I truly depart is the extent to which the skilled formulator would understand that the inventors intended strict compliance with the literal claim elements. Based on the legal instruction provided to me, and for the reasons expressed in my first report at paragraphs 58 to 78, it is my opinion that the skilled formulator would understand from the teachings of the 510 Patent and their common general knowledge that phosphate buffer, polysorbate 20, and sodium chloride could be varied in accordance with the teachings of the 510 Patent to prepare ophthalmic formulations that provide substantially similar stability as demonstrated in the patent, in substantially the same way. As I stated in my first report, these elements are not essential to claims 33, 34, 40, or 41.[53] Nothing in Dr. Nesta's report leads me to change my opinion.

83. This difference between me and Dr. Nesta is exemplified by paragraph 148, where Dr. Nesta considers his "Substitutability Construction" and concludes with respect to sodium phosphate or sodium phosphate buffer and sodium chloride or potassium chloride that the "claims do not include obvious variants".[54] Based on the legal instructions given to me, I disagree with Dr. Nesta in this regard.

84. Also, Dr. Nesta relies on the "plain meaning of the words chosen, as a clear

---

[51] Dr. Nesta's Report at para. 114.
[52] See my First Report at, for example, para. 48.
[53] See my First Report at para. 77.
[54] Dr. Nesta's Report at para. 148(a)(i).

expression of the inventors' intent."[55] I agree the skilled formulator would read the claims in this way, but the inventors' intent would be considered by having regard to the specification as a whole. When reading the specification as a whole, there is no overt intention expressed for strict compliance with the literally claimed buffers, co-solvents or tonicity agents. If these components were considered to be critical, the skilled formulator would have expected the inventors to expressly state as much and to state problems that may arise if these components are substituted or omitted. The inventors of the 510 Patent did not provide any comments along these lines.

85. In fact, and as noted in my first report at paragraphs 75 to 77, the inventors state at paragraph 47 that "[t]he formulation **can** also comprise **one or more** pharmaceutically acceptable carriers, buffers, tonicity agents, stabilizers, and/or excipients" (my emphasis).[56]

86. At paragraph 117, Dr. Nesta states that the "absence of", "the concentration or range of concentrations", and "the pH" of sodium phosphate and sodium phosphate buffer would affect how the claimed formulations "work".[57] But Dr. Nesta does not explain what he means by "work". Work in which way?

87. In my opinion, and as I stated in my first report[58] and also above in the preference section, "work" with respect to the claimed formulations in the 510 Patent means that aflibercept can be formulated in a liquid formulation at the claimed concentrations and pHs as ophthalmic pharmaceutical liquids that can be injected into the eye and keep aflibercept in solution and in its native configuration so it is able to

---

[55] Dr. Nesta's Report at paras. 15 and 106.
[56] See my First Report at paras. 75-77.
[57] Dr. Nesta's Report at para. 117.
[58] See my First Report at para. 62.

exert therapeutic action.

88. In this very realistic way, the claimed formulations "work" in the manner as claimed in the absence of sodium phosphate and sodium phosphate buffer, or sodium chloride and potassium chloride. This understanding is demonstrated, for example, by the stability of Amgen's ABP 938 product, which the skilled formulator would have found obvious as of December 2007, as I discuss in my first report.[59]

### C. Ophthalmic formulations & intravitreal administration

89. Dr. Nesta states that skilled formulators would understand "ophthalmic formulation" as being a "formulation that is suitable for administration to the eye".[60] To the extent Dr. Nesta's construction means that "ophthalmic formulations" as contemplated by the 510 Patent could include a formulation not suitable for intravitreal administration (injection into the eye), I disagree.

90. Skilled formulators reading claims 33, 34, 40 and 41 in light of the 510 Patent would understand that an "ophthalmic formulation" in the 510 Patent's claims must be suitable for injection into the eye. This understanding arises from a reading of the 510 Patent as a whole, where the inventors use the term "ophthalmic formulation", "ophthalmic liquid formulation" or "liquid formulation" interchangeably to refer to formulations suitable for intravitreal administration.

91. For example, the examples are formulations in vials and prefilled syringes, both of which are used for injections into the vitreous of the eye. The inventors refer

[59] See my First Report at paras. 79-96.
[60] Dr. Nesta's Report at para. 219.

to these formulations as either "ophthalmic liquid formulations" or "liquid formulations".

92. Further, from [0010] to [0015], [0021] to [0023] and [0025] of the 510 Patent, the inventors refer to "stable liquid ophthalmic formulations", and the formulations described include those from the examples. As such, the skilled formulator would understand that these ophthalmic formulations are suitable for intravitreal administration, similar to those in the examples.

93. Also, the inventors state that the "Field of the Invention" is "pharmaceutical formulations suitable for intravitreal administration".

94. Finally, claim 41, which comprises the formulation of claims 33, 34 and 40, is directed to a "pre-filled syringe suitable for intravitreal administration". This language would have signaled to skilled formulators that the ophthalmic formulation of claims 33, 34 and 40 are suitable for intravitreal administration.

### D. Skilled person's understanding of buffering capacity

95. In considering what Dr. Nesta calls the "Functional Construction", he states at paragraph 153 that a skilled formulator:

(a) "would not think that one could rely solely on buffering capacity of the claimed VEGF antagonist to establish and maintain the pH of the claimed formulations"; [61]

(b) "would not have known if or how the claimed VEGF antagonist could be relied upon, alone, to provide sufficient buffering capacity for the

[61] Dr. Nesta's Report at para. 153.

formulations of the Asserted Claims";[62] and

(c) "may have been familiar with the potential for some proteins to have some buffering capacity in certain systems, but this capacity could not be predicted."[63]

96. I disagree with each of the statements for the reasons stated in my first report.[64] For example, at paragraph 42 of my first report, I stated that the skilled formulator would have known about the concept of buffer capacity and how to calculate it mathematically, going back to the seminal Van Slyke publication in 1922. I also stated at paragraph 43 of my first report that skilled formulators were routinely estimating protein buffer capacity using this calculation. This common understanding is exemplified in an Amgen patent document referred to as *Gokarn 2006* in my first report.[65]

97. This common general knowledge originating from 1922 would have informed the skilled formulator's understanding of the 510 Patent and its claims. Based on this common understanding, and the teachings of the 510 Patent, the skilled formulator could have calculated buffering capacity of a variant formulation, including the contribution of the protein itself, to determine if the variant would achieve substantially the same buffering capacity as the literally claimed formulation. In my first report, I discuss how the skilled formulator would have conducted this type of analysis as of December 27, 2007.[66]

---

[62] Dr. Nesta's Report at para. 153.
[63] Dr. Nesta's Report at para. 153.
[64] See my First Report, for example, at paras. 42-43.
[65] See my First Report at paras. 43-44; see also Gokarn 2006 (WO 2006/138181 A2), First Report at Exhibit "I".
[66] See my First Report at paras. 66-70 and Appendix 4 to my First Report.

# VI. ANTICIPATION

98. I was asked to respond to Dr. Nesta's opinion that claims 33, 34, 40 and 41 were anticipated by each of Fraser 2005[67] and Wulff 2002[68] in view of the legal instructions I received (see Appendix 1). I was instructed that the relevant date to consider anticipation is June 16, 2006. For the reasons set out below, I disagree with Dr. Nesta's opinion.

## A. Fraser 2005 does not anticipate claims 33, 34, 40 or 41 of the 510 Patent

99. Dr. Nesta asserts that claims 33, 34, 40 and 41 of the 510 Patent are disclosed and enabled by Fraser. I disagree for the reasons that follow.

100. Fraser 2005 is a publication in the Journal of Clinical Endocrinology & Metabolism titled "Single Injections of Vascular Endothelial Growth Factor Trap Block Ovulation in the Macaque and Produce a Prolonged, Dose-Related Suppression of Ovarian Function." The publication reports a research study "to evaluate the effects of transient inhibition of VEGF on pituitary-ovarian function in the macaque." As part of the study, the macaques were administered intravenous doses of a VEGF antagonist or control formulations, and measurements were taken to determine the effects of the treatment on ovarian function. The authors make no reference to ophthalmic uses or diseases.

---

[67] Fraser, H.M. et al. (2005), Single Injections of Vascular Endothelial Growth Factor Trap Block Ovulation in the Macaque and Produce a Prolonged, Dose-Related Suppression of Ovarian Function, The Journal of Clinical Endocrinology & Metabolism, 90(2):1114-1122 ("**Fraser 2005**"), Dr. Nesta's Report at Exhibit "G".

[68] Wulff, C. et al. (2002), Prevention of Thecal Angiogenesis, Antral Follicular Growth, and Ovulation in the Primate by Treatment with Vascular Endothelial Growth Factor Trap R1R2, Endocrinology, 143(7):2797-2807 ("**Wulff 2002**"), Dr. Nesta's Report at Exhibit "Q".

***(a) Fraser 2005 does not teach an "ophthalmic formulation of a vascular endothelial growth factor (VEGF) antagonist" or a "pre-filled syringe suitable for intravitreal administration"***

101. In his report, Dr. Nesta claims that "[t]he POSITA would have known based on common general knowledge that a VEGF antagonist formulation, such as VEGF Trap $R_1R_2$ as described in Fraser 2005, could be used for ophthalmic purposes"[69]. I disagree with this assertion for the following reasons:

(a) This was not common general knowledge (as described above in paragraphs 52 to 65), nor was this described in Fraser 2005.

(b) Fraser 2005 discloses only intravenous formulations.

(c) Fraser 2005 does not teach that the product and formulations being studied were suitable for ophthalmic use, including for intravitreal administration.

(d) Fraser 2005 was a study of the effect of transient inhibition of VEGF on pituitary-ovarian function in macaque monkeys and did not involve or suggest the authors were studying any effect on the ocular system.

(e) Fraser 2005 did not study storage or shelf-life and did not address stability of the formulation.

102. In respect of (c) above, there are at least two key reasons why the skilled formulator would not understand Fraser 2005 to describe formulations that were intended for ophthalmic use. First, the calculated tonicity of the formulations in Fraser 2005 are 2,373 mOsmol/L (for the glycerol formulation) and 813 mOsm/L (for the sucrose formulation), which are roughly 10 and 2.5 times, respectively, greater

[69] Dr. Nesta's Report at para. 160.

than the tonicity of the physiological fluids in the eye. These values are extremely hypertonic and are likely to cause extreme discomfort if administered to the human eye and can damage or destroy cells.[70]

103. Dr. Nesta states that it is generally desirable for drugs to be formulated to be isotonic.[71] In my opinion, isotonicity could be a formulation goal, as I explained above at paragraphs 66 to 68. However, the Fraser 2005 formulations are neither isotonic nor within any reasonable range of tonicity for the human eye.

104. These high levels of tonicity are a result of the high levels of glycerol (20%) and sucrose (20%) in the formulations, as shown by my calculations in Appendix 2.

105. These extremely hypertonic formulations would have told the skilled formulation that the formulations were suitable for the stated purpose in Fraser 2005 (IV administration in an animal model) and not contemplated for injection into the eye. In IV administration, the drug product is diluted very quickly by the animal's blood,[72] and therefore the discomfort or potential cellular damage in the animal may be acceptable.

106. The skilled formulator would therefore not understand Fraser 2005 to disclose, let alone enable, ophthalmic formulations suitable for intravitreal injection.

---

[70] Frokjaer and Hovgaard, "Pharmaceutical Formulation Development of Peptides and Proteins"(2000), Chapter 8 "Peptides and Proteins as Parenteral Solutions" ("**Akers 2000**") at pg. 170, First Report at Exhibit "F"; Neil and Akers, "Development and Manufacture of Protein Pharmaceuticals" (2002), Chapter 2 "Formulation Development of Protein Dosage Forms" ("**Akers 2002**") at pg. 84, First Report at Exhibit "E" (both references state that "extremes in osmolality and/or pH can damage or destroy cells, and cerebrospinal cells cannot be reproduced or replaced.")
[71] Dr. Nesta's Report at para. 74.
[72] Akers 2002 at p.84, First Report at Exhibit "E" ("Generally, solutions containing proteins administered intravenously do not have to be precisely isotonic, because of immediate effects from dilution by the blood.")

107. In respect of (e) above, Fraser 2005 states that the "compounds were stored at -20 C until required, at which time they were thawed" and "[a]ny compound remaining was stored at 4 C and used within 2 wk".[73] This indicates to the skilled formulator that the VEGF Trap formulation disclosed in Fraser 2005 was not meant to be stable at 5 C for any meaningful period of time as it had to be used within 2 weeks after being thawed.

108. Given that Fraser 2005 does not disclose or enable an "ophthalmic formulation of a vascular endothelial growth factor (VEGF) antagonist" or a "pre-filled syringe suitable for intravitreal administration", it is my opinion that Fraser 2005 does not anticipate claims 33, 34, 40 and 41.

***(b) Fraser 2005 does not teach a VEGF antagonist comprising "a dimer of two fusion proteins each having the amino acid sequence of residues 27-457 of sequence SEQ ID NO:4"***

109. Claims 33, 34, 40 and 41 are directed to a specific protein – a dimer of two fusion proteins each having the amino acid sequence of residues 27-457 of sequence SEQ ID NO:4, which is now known as aflibercept. Fraser 2005 does not disclose this dimer and its amino acid sequence. Rather, Fraser 2005 discloses that VEGF Trap $R_1R_2$ is "a recombinant, chimeric protein comprising Ig domain 2 of human VEGF-R1 and Ig domain 3 of human VEGF-R2, expressed in sequence with the human Fc."[74] Beyond this generic description (which encompasses a multitude of permutations) Fraser 2005 does not provided any information to the skilled formulator about the specific VEGF Trap or sequence of the VEGF Trap referred to in Fraser 2005. Without knowing the specific VEGF Trap used by the authors, I

---

[73] Fraser 2005 at pg. 1115, Dr. Nesta's Report at Exhibit "G".
[74] Fraser 2005 at pg. 1115, Dr. Nesta's Report at Exhibit "G".

disagree with Dr. Nesta's view that Fraser 2005 inherently discloses the amino acid sequence of any particular VEGF Trap molecule, much less aflibercept.

110. Dr. Nesta states that "VEGF Trap $R_1R_2$ was a protein known to the POSITA and its sequence and method of producing it had been disclosed in the prior art"[75]. As I discuss above at paragraphs 35 to 51, the genus of compounds encompassed by the term VEGF Trap $R_1R_2$ was not generally known to the skilled formulator or part of their common general knowledge. Dr. Nesta does not provide any reference to support disclosure of the sequence other than the fact that the amino acid sequence of VEGF Trap $R_1R_2$ is an "inherent property" of the molecule. To the extent that Dr. Nesta is referring to a separate piece of prior art, I am advised that for the purposes of anticipation a single reference must disclose each element of the claim. On this basis alone, Fraser 2005 does not disclose or enable the specifically-claimed aflibercept molecule in claims 33, 34, 40 and 41 in the 510 Patent.

***(c) Fraser 2005 does not teach "40 mg/ml of the VEGF antagonist"***

111. Claims 40 and 41 of the 510 Patent claims "40 mg/ml of the VEGF antagonist". Fraser 2005 discloses a formulation comprising VEGF Trap with a concentration of 24.3 mg/ml,[76] as acknowledged by Dr. Nesta. As such, Fraser 2005 does not disclose the literally claimed concentration in claim 40 (which concentration is also within range contemplated by the other claims I`ve considered). For the reasons explained below at paragraphs 166 to 175, this concentration of 40 mg/ml

[75] Dr. Nesta's Report at para. 158.
[76] Fraser 2005 at pg. 1115, Dr. Nesta's Report at Exhibit "G".

would have been considered a high concentration and difficult to achieve in a stable protein formulation.

### B. Wulff 2002 does not anticipate claims 33, 34, 40 or 41 of the 510 Patent

112. Dr. Nesta asserts that claims 33, 34, 40 and 41 of the 510 Patent are disclosed and enabled by Wulff 2002. I disagree for the reasons that follow.

113. Wulff 2002 is a publication in the Journal of Endocrinology titled "Prevention of Thecal Angiogenesis, Antral Follicular Growth, and Ovulation in the Primate by Treatment with Vascular Endothelial Growth Factor Trap R1R2." The publication reports a research study "designed to investigate the effects of inhibition of thecal angiogenesis on follicular development in the marmoset monkey."[77] As part of the study, the monkeys were administered subcutaneous doses of a VEGF antagonist or control formulations, and changes in angiogenesis and follicular cell proliferation were assessed. Like Fraser 2005, the authors make no reference to ophthalmic uses or diseases.

#### *(a) Wulff 2002 does not teach an "ophthalmic formulation of a vascular endothelial growth factor (VEGF) antagonist" or a "pre-filled syringe suitable for intravitreal administration"*

114. Similar to Fraser 2005, Dr. Nesta claims that "[t]he POSITA would have known based on common general knowledge that a VEGF antagonist formulation as described in Wulff 2002 could be used for ophthalmic purposes"[78] I disagree with this assertion for the following reasons:

---

[77] Wulff 2002 at pg. 2797, Dr. Nesta's Report at Exhibit "Q".
[78] Dr. Nesta's Report at para. 183.

(a) This was not common general knowledge (as described above in paragraphs 52 to 65), nor was this described in Wulff 2002.

(b) Wulff 2002 discloses only subcutaneous formulations.

(c) Wulff 2002 does not teach that the product and formulations being studied were suitable for ophthalmic use, including for intravitreal administration.

(d) Wulff 2002 was a study of the effects of inhibition of thecal angiogenesis on follicular development in marmoset monkeys and did not involve or suggest the authors were studying any effect on the ocular system.

(e) Wulff 2002 did not study storage or shelf-life and did not address stability of the formulation.

115. Dr. Nesta also refers to the footnote in Wulff 2002 that references WO 319 as detailing the molecular structure and method of creation in relation to the VEGF Trap $R_1R_2$ protein described in Wulff 2002.[79] However, Dr. Nesta's attempts to combine WO 319 with Wulff 2002 ignores that WO 319 describes many different proteins with different amino acid sequences, as I discussed above at paragraphs 44 to 50. It does not narrowly describe and disclose the protein claimed in claims 33, 34, 40 and 41 of the 510 Patent.

116. In respect of (c) above, I have similar comments as above that I had in respect of Fraser 2005 at paragraphs 101 to 107. To summarize my comments above as applicable to Wulff 2002, the calculated tonicity of the formulation in Wulff 2002 is

[79] Dr. Nesta's Report at para. 175; see footnote 1 of Wulff 2002, Dr. Nesta's Report at Exhibit "Q".

785 mOsmol/L, which is roughly 2.5 times greater than the tonicity of the physiological fluids in the eye. This high level of tonicity largely comes from the 20% sucrose in the formulation, as shown by my calculations in Appendix 2.

117. In light of this level of tonicity, the skilled formulator would understand it to not disclose, let alone enable, an ophthalmic formulation suitable for intravitreal injection.

118. In respect of (e) above, Wulff 2002 does provide not any information on how the VEGF Trap formulation is stored, including at what temperature and the length of time before use.

***(b) Wulff 2002 does not teach a VEGF antagonist comprising "a dimer of two fusion proteins each having the amino acid sequence of residues 27-457 of sequence SEQ ID NO:4"***

119. Wulff 2002 does not disclose the amino acid sequence of SEQ ID NO:4, let alone a dimer of two fusion proteins each having the amino acid sequence of residues 27-457 of sequence SEQ ID NO:4 as claimed in claims 33, 34, 40 and 41. Rather, Wulff 2002 discloses that VEGF Trap $R_1R_2$ is "a recombinant chimeric protein comprising portions of the extracellular, ligand binding domains of the human VEGF receptors Flt-1 (VEGF-R1, Ig domain 2) and KDR (VEGF-R2, Ig domain 3) expressed in sequence with the Fc portion of human IgG."[80] As such, the skilled formulator has no information on the specific sequence of the VEGF Trap disclosed in Wulff 2002.

120. Dr. Nesta asserts that Wulff 2002 incorporates by reference WO 319.

---

[80] Wulff 2002 at pg. 2798, Dr. Nesta's Report at Exhibit "Q".

Specifically, he states that "Wulff 2002 further states that, 'the detailed molecular structure and how it was created are described in the patent REG710-A-PCT, VEGF Trap Application published December 2000, Publication WO 00/75319 A1'".[81] However, I understand from my legal instructions that I am not to combine two references, and therefore I understand that combining Papadopoulos and Wulff 2002 is not proper for an anticipation analysis.

121. Dr. Nesta also states that "VEGF Trap $R_1R_2$ was a protein known to the POSITA and whose sequence and method of producing it had been disclosed in the prior art"[82]. Dr. Nesta does not provide any reference to support disclosure of the sequence other than the fact that the amino acid sequence of VEGF Trap $R_1R_2$ is an "inherent attribute" of the molecule. As I discussed above at paragraphs 110 to 111 with respect to Fraser 2005, I disagree that the sequence of the protein of claims 33, 34, 40 and 41 is inherently disclosed in Wulff 2002.

***(c) Wulff 2002 does not teach "40 mg/ml of the VEGF antagonist"***

122. Claims 40 and 41 of the 510 Patent claim "40 mg/ml of the VEGF antagonist". Wulff 2002 does not disclose the concentration of the VEGF Trap formulation used in the study. While Wulff 2002 does disclose the dose of 25 mg/kg (i.e. 25 mg of VEGF Trap per kg of animal body weight), this information is not sufficient to determine the VEGF concentration; the specified dose could be provided in a large number of combinations of VEGF concentration and injection volume. [83] As such, Wulff 2005 does not disclose the literally claimed concentration.

---

[81] Dr. Nesta's Report at para. 175.
[82] Dr. Nesta's Report at para. 176.
[83] Wulff 2002 at pg. 2798, Dr. Nesta's Report at Exhibit "Q".

123. As he did with Wulff 2002, Dr. Nesta omits this point when addressing Wulff 2002 and fails to consider this aspect in claims 40 and 41 as being part of the subject matter of the claim. He instead refers to "VEGF Trap $R_1R_2$, with the same amino acid sequence, SEQ ID NO: 4, claimed in the Asserted Claims".[84] In my opinion, the concentration of the formulation should be considered when analyzing at least claims 40 and 41.

## VII. OBVIOUSNESS

124. I was asked to respond to Dr. Nesta's opinion that claims 33, 34, 40 and 41 are obvious in view of the legal instructions I received (see Appendix 1). I was instructed that the relevant date to consider obviousness is June 16, 2006.

125. The first steps in the legal instructions I was given require that I identify the skilled person and their common general knowledge. I provided my opinions on these points in my first report and provided additional commentary above in response to Dr. Nesta's opinions on these points. I will therefore move to the inventive concept.

### A. Inventive concept

126. I provided my opinion on the inventive concept of claims 33, 34, 40 and 41 as part of my first report. At paragraph 62, I stated:

> As of the publications date of the 510 Patent, skilled formulators would have understood the inventive concept common to claims 33, 34, 40 and 41 to be that the claimed liquid formulations function as ophthalmic pharmaceutical liquids that can be injected into the eye and keep aflibercept in solution and in its native configuration so it is able to exert therapeutic action. The

[84] Dr. Nesta's Report at paras. 181 & 182(a).

> way this is achieved is by formulating aflibercept in a liquid that co-solvates and protects the protein, and provides tonicity as well as buffering capacity.[85]

127. After reviewing Dr. Nesta's report, my opinion on the inventive concept stated above remains unchanged.

128. Dr. Nesta states at paragraph 189 that, in his opinion, "[t]he inventive concept is closely related to my interpretation of the Alternative Constructions."[86] In other words, Dr. Nesta does not include any aspect of stability in his inventive concept. I disagree with Dr. Nesta on this point for the reasons I stated above at paragraphs 73 to 78.

**B. The inventive concept would not have been obvious**

129. Counsel asked me to consider whether, without the benefit of hindsight, skilled formulators would have come to the inventive concept of claims 33, 34, 40 and 41 if they were to consider the prior art relied upon by Dr. Nesta by using their common general knowledge without any degree of invention. I disagree with Dr. Nesta that they would. Even if his construction of the inventive concepts for his Alternative Constructions is adopted, I still disagree with his opinion that his inventive concepts would have been obvious.

***(a) Not obvious to develop a VEGF antagonist for ophthalmic diseases***

130. In my opinion, the various prior art references cited by Dr. Nesta do not provide any direction or incentive for the skilled formulator to develop a VEGF

[85] See my First Report at para. 62.
[86] Dr. Nesta's Report at para. 189.

antagonist for an ophthalmic formulation, which is a component of the inventive concept of claims 33, 34, 40 and 41.

131. In fact, the majority of the prior art referred to by Dr. Nesta has nothing to do with ophthalmic uses or diseases. In particular:

(a) Fraser 2005 – The stated aim of this publication is “to evaluate the effects of transient inhibition of VEGF on pituitary-ovarian function in the macaque.”[87] The conclusion states that “[t]hese results suggest that VEGF Trap affords the opportunity for development of novel treatments for some types of ovarian dysfunction and infertility.”[88] It makes no reference to ophthalmic uses or diseases.

(b) Wulff 2002 – This publication describes an earlier study where anti-VEGF agents were used to determine the effect of VEGF activity on the ovary. It appears to be a predecessor study to Fraser 2005, given the significant overlap in authors. Again, this publication makes no reference to ophthalmic uses or diseases.

(c) Holash 2002 – This publication describes a study to assess the efficacy of various VEGF antagonists against tumour growth and vascularization. Based on the positive results reported, the authors state that “[v]alidation of VEGF as an important new target in the war against cancer comes from pioneering clinical studies using a humanized monoclonal antibody that binds and blocks VEGF.”[89]

---

[87] Fraser 2005 at pg. 1114, Dr. Nesta’s Report at Exhibit “G”.
[88] Faser 2005 at pg. 1122, Dr. Nesta’s Report at Exhibit “G”.
[89] Holash 2002 at pg. 11397, Dr. Nesta’s Report at Exhibit “H”.

While the authors make passing reference to diabetic retinopathy as a potential use, this reference is among a list of other potential uses. The skilled formulator's main takeaway from this publication would be that VEGF antagonists may be useful in cancer treatment.

(d) Kim 2002[90] – This publication describes a study where VEGF antagonists were used in an attempt to regress coopted vasculature in neuroblastoma, and in turn stop tumour growth. The study suggested that high doses of a VEGF Trap may in fact regress cooption, though the authors conclude by referencing a series of other studies that would need to be conducted. This publication makes no reference to ophthalmic uses or diseases.

(e) US 941 – This patent reference describes different antibodies that can inhibit VEGF activity, and specifically VEGFR2 activity. The "Background of the Invention" almost exclusively focuses on cancer applications, with a passing reference to other potential uses in arthritis, psoriasis and diabetic retinopathy. The examples largely focus on inhibiting tumour growth. From columns 99-100, the inventors refer generally without any specificity to potential ophthalmic formulations. Overall, the skilled formulator's take-away from US 941 would be similar to the above references, that is, to consider uses of anti-VEGF proteins as cancer therapies.

(f) US 897[91] – This patent reference describes formulations for insulin-

[90] Kim, E. et al. (2002), Potent VEGF blockade causes regression of coopted vessels in a model of neuroblastoma, Proceedings of the National Academy of Sciences, 99(17):11399-11404 ("**Kim 2002**"), Dr. Nesta's Report at Exhibit "I".
[91] US Patent No. 6,436,897 B2 ("**US 897**"), Dr. Nesta's Report at Exhibit "U".

like growth factors (IGFs), which is a different growth factor than VEGF. This reference would not lead the skilled formulator toward formulating VEGF antagonist proteins. Rather, it would provide an incentive for a skilled formulator to seek improved formulations of IGF-based therapeutics, given the problems described in the "Background Art" of US 897.

(g) AVASTIN Product Label[92] – This label demonstrates that VEGF antagonists can be safe and effective cancer therapies, given that the label only includes cancer indications. The label does not include any ophthalmic indications.

(h) WO 319 – This patent describes various fusion proteins, how to construct them, pharmacology data and activity against tumours. In the over 100 pages, there is one reference on page 36 to eye disorders at the end of a long list of many other potential treatments. There is no data or formulation showing the use of the various proteins described for ophthalmic diseases.

132. Dr. Nesta also refers to WO 895 and Rosenfeld 1 & 2, which I discuss in more detail below at paragraphs 142 to 152.

133. With respect to the uses of VEGF antagonists, WO 895 refers to a great number of potential uses, including but not limited to undesirable plasma leakage or vascular permeability, undesirable blood vessel growth, e.g., such as in a tumor, edema associated with inflammatory disorders such as psoriasis or arthritis, including

[92] Center for Drug Evaluation and Research Approval Package for Application Number STN-125085/0, Approved Product Label for AVASTIN® dated February 2004 ("**AVASTIN Product Label**"), Dr. Nesta's Report at Exhibit "D".

rheumatoid arthritis; asthma; generalized edema associated with burns; ascites and pleural effusion associated with tumors, inflammation or trauma; chronic airway inflammation; asthma; capillary leak syndrome; sepsis; kidney disease associated with increased leakage of protein; pancreatic ductal adenocarcinoma (PDAC) and eye disorders such as age related macular degeneration and diabetic retinopathy.

134. As noted above, Rosenfeld 1 & 2 are case studies of off-label use of the cancer drug AVASTIN in two patients with ophthalmic diseases. But again, Rosenfeld 1 refers to the use as "provocative" and Rosenfeld 2 makes the real-world point that Genentech abandoned AVASTIN for ophthalmic use.

135. If the skilled formulator were given all of these prior art references and given their heavy emphasis on studying VEGF antagonists for cancer treatments, the skilled formulator would not be pointed in a direction of developing and formulating a VEGF antagonist protein for ophthalmic diseases.

***(b) Not obvious to develop a formulation of aflibercept***

136. Even if the skilled formulator were pointed in the direction of developing a VEGF antagonist for ophthalmic diseases, it would not have been obvious to develop a formulation of aflibercept.

137. The skilled formulator would appreciate that VEGF antagonists are a broad class of chemical compounds that include all compounds that antagonize VEGF, including all VEGF traps. The protein now known as aflibercept is just one of the many potential VEGF antagonists described in the prior art.

138. Dr. Nesta states at paragraph 197 that "[t]he POSITA aware of 'VEGF Trap

$R_1R_2$' from Holash 2002 would have been able to determine the exact amino acid sequence of this protein based on WO 895 Application."[93] I disagree with this link that Dr. Nesta attempts to draw.

139. As I noted above from paragraphs 36 to 42 (and also paragraphs 110 to 111), "VEGF Trap $R_1R_2$" refers to a great number of potential molecules that have varying amino acid sequences, and not a single molecule. Aflibercept is only one molecule that falls within the broad genus of "VEGF Trap $R_1R_2$" molecules.

140. Also, if skilled formulators were asked to consider WO 895 as a source for proteins to be formulated for ophthalmic use (including intravitreal injection), then they would have been taught to avoid full-length VEGF traps (which include aflibercept) due to their relatively high molecular weight and slower clearance, which could prolong unwanted systemic exposure compared to the smaller VEGF mini-traps in WO 895.

141. WO 895 describes broad classes of proteins, stating that it "encompasses fusion polypeptides capable of binding vascular endothelial cell growth factor (VEGF), VEGF family members, and splice variants",[94] including twelve "aspects" which describe the structural makeup of groups of proteins (*e.g.*, isolated nucleic acid molecule[s] encoding a fusion polypeptide comprising receptor components (R1R2)x and/or (R1R3)y, wherein R1 is vascular endothelial cell growth factor (VEGF) receptor component Ig domain 2 of Flt-1 (Flt1D2), R2 is VEGF receptor component Ig domain 3 of Flk-1 (Flk1D3), and R3 is VEGF receptor component Ig domain 3 of Flt-4 (Flt1D3 or R3), and wherein $X \geq 1$ and $Y \geq 1$). From among the various classes

[93] Dr. Nesta's Report at para. 197.
[94] WO 895 at para. 1, Dr. Nesta's Report at Exhibit "R".

described, WO 895 describes a number of proteins that have a reduced size compared to the others, which it describes as "truncated VEGF mini-traps, VEGF mini-traps, and monomeric VEGF mini-traps".[95]

142. The "mini-trap" proteins disclosed by WO 895 are described as being "smaller than the full sized trap, e.g., about 50 - 60 kD versus 120 kD of the parent trap" and "more preferably, about 50 kD; even more preferably about 20-30 kD; or is about 25 kD and capable of binding VEGF with an affinity comparable to a full-sized parent trap".[96]

143. While SEQ ID NO:10 (which Dr. Nesta identifies at paragraph 206(c) as corresponding to the full SEQ ID NO:4 of the 510 Patent) is described in the Examples of WO 895, the Examples are focused on VEGF mini-traps. Today, we know the protein comprising a homo-dimer of amino acid residues of 47-457 from SEQ ID NO:10. In Example 1, the protein of SEQ ID NO:10 is but one of three different full-sized parent VEGF traps that were made for comparison with VEGF mini-traps. In Example 2, a mini-trap is made by cleaving off part of SEQ ID NO:10. In Example 3, a plasmid for making SEQ ID NO:10 is described. There are four other examples, which all relate to mini-traps, including how to make and purify mini-trap (Example 4), how to express mini-traps in *E. coli* and CHO K1 cells (Examples 4 and 5), and how to express mini-traps (Examples 6 and 7). As reported in WO 895, example 7 describes the construction of a "VEGF mini-trap (SEQ ID:26) exhibiting high binding affinity for VEGF comparable to the full-length trap (SEQ ID

[95] WO 895 at para. 12, Dr. Nesta's Report at Exhibit "R".
[96] WO 895 at para. 25, Dr. Nesta's Report at Exhibit "R".

NO:10)".[97]

144. The skilled formulator would also take note of the proteins that are individually claimed in the 24 claims of WO 895. Aflibercept is not one of them, suggesting that the full-length trap (SEQ ID NO:10) from Example 1 was not the inventors' focus or their clinical candidate protein.

145. The full-length VEGF trap having SEQ ID NO: 10 is put on no higher footing compared to the other full-length traps described or disclosed in WO 895 in terms of any role it might have as a potential therapeutic. Its main role in WO 895 would appear to the skilled formulator to be in acting as the parent protein from which the mini-trap of Example 2 is made.

146. Even though SEQ ID NO:10is not individually claimed, other proteins are. Notably, all of the individually-claimed proteins are VEGF mini-traps (SEQ ID NOs: 26, 27, and 28 in claims 5, 10, and 19), suggesting that these are the more promising candidates for development.

147. If skilled formulators were to try to select one of the VEGF traps in WO 895 to formulate for ophthalmic use (including intravitreal injection) – even though that is not their responsibility – they would be motivated to select a VEGF mini-trap, and avoid aflibercept and any other full-length VEGF trap. This is because when it comes to intravitreal administration, WO 895 steers towards mini-traps and away from full-length VEGF traps (like aflibercept):

> The VEGF mini-trap is particularly useful in treatment of eye disorders, and as an adjuvant to eye surgeries, including

---

[97] WO 895 at paras. 74, 89, Dr. Nesta's Report at Exhibit "R".

> glaucoma surgery; and the treatment of intra-ocular tumors, such as for example, uveal melanoma, retinoblastoma, via intravitreal delivery.[98]
>
> … The mini-traps of the invention find specific uses in conditions in which a VEGF trap with **reduced serum half life (e.g., faster clearance), and/or increased tissue penetration due to smaller size** is desirable. Specific applications for the VEGF mini-trap include, for example, diseases where local administration to a specific tissue or cell is desirable. **Examples of such a condition or disease are ocular diseases of the eye.**[99]
>
> …due to its smaller size, the mini-trap has the ability to penetrate through the inner-limiting membrane (ILM) in the eye, and diffuse through the vitreous to the retina/retinal pigment epithelial (RPE) layer which will help to treat retinal disease. Additionally, the mini-trap can be used for local administration for the treatment of ocular disease such as choroidal neovascularization, diabetic macular edema, proliferative diabetic retinopathy, corneal neovascularization/transplant rejection.[100]

148. WO 895 attributes the usefulness of a VEGF mini-trap for treating eye disorders "due to its smaller size" than full-length VEGF traps. Additionally, faster clearance minimizes systemic exposure to anti-VEGF proteins, which had been identified in the literature as a risk of treating patients with these compounds.[101] VEGF has many uses throughout the body, and WO 895 states that generally inhibiting it and causing chronic VEGF blockade in non-diseased tissues was expected to lead to unwanted side effects.[102] WO 895 teaches use of mini-trap VEGF

---

[98] WO 895 at para. 16, Dr. Nesta's Report at Exhibit "R".
[99] WO 895 at para. 19 [emphasis added], Dr. Nesta's Report at Exhibit "R".
[100] WO 895 at para. 48, Dr. Nesta's Report at Exhibit "R".
[101] Ferrara, Napoleone, "Vascular Endothelial Growth Factor: Basic Science and Clinical Progress" (2004), *Endocrine Reviews*, 25(4):581-611 at pg. 584 ("Hypotension was a dose-limiting side effect in human trials in which VEGF was systemically administered") (**"Ferrara 2004a"**), **Exhibit "E"**.
[102] WO 895 at para. 48, Dr. Nesta's Report at Exhibit "R".

antagonists to "minimiz[e] unwanted systemic exposure … [and] to avoid chronic exposure to VEGF blockade".[103]

149. Additionally, WO 895 warns of the potential problem associated with larger-sized proteins not penetrating the retina to reach the site of action. In light of this significant concern, if skilled formulators were to consider WO 895 for guidance as to which protein(s) to formulate for ophthalmic use (including intravitreal injection), then they would also investigate the literature for further guidance on various protein sizes that may exhibit retina penetration problems.

150. I note that this guidance from WO 895 is consistent with the comment in Rosenfeld 2 regarding Genentech's development of ranibizumab (smaller protein) over bevacizumab (larger protein) for ophthalmic diseases:

> Why wasn't bevacizumab used for the treatment of neovascular AMD prior to this report? The most likely explanation is that the pre-clinical data obtained with bevacizumab suggested that the full-length antibody would not penetrate the retina adequately and, as a result, insufficient VEGF would be inhibited to have a therapeutic effect. This was a reasonable conclusion based on the published observations that when ranibizumab, the antibody fragment derived from bevacizumab, was injected into the vitreous of normal rhesus monkeys, it was able to penetrate the full thickness of the retina, whereas a full-length antibody showed only limited penetration through the inner retina. This observation was consistent with the belief that a protein with a molecular weight of 150 kD would be too large to penetrate the inner limiting membrane of the retina.[104]

---

[103] WO 895 at para. 48, Dr. Nesta's Report at Exhibit "R"
[104] Rosenfeld 2 at pgs. 333-334, Dr. Nesta's Report at Exhibit "L".

***(c) Motivation to avoid full-length traps (like aflibercept) for intravitreal administration***

151. Having provided the opinion above regarding WO 895, counsel gave me additional references: Ferrara 2006,[105] Gaudreault 2005,[106] Saishin 2003,[107] and Jackson 2003,[108] which are not cited by Dr. Nesta. In my opinion, if skilled formulators considered WO 895 they would have also found the latter three papers by June 16, 2006 following a reasonable keyword search of scientific literature databases for additional information on the warning in WO 895. While Ferrara 2006 would have been located just after the relevant date, I explain below that it cites studies conducted prior to 2006 and reflects the understanding that the skilled formulator would have arrived at from reading them as of June 2006.

152. Ferrara 2006 and Gaudreault 2005 were published by researchers at Genentech. Skilled formulators would have been keen to read them since Genentech was a leader in developing biologic medicines, and was at the time developing ranibizumab (which came to be known as LUCENTIS®). Dr. Nesta refers to Genentech's work, including its development of ranibizumab (e.g., see Rosenfeld 1 & 2).

153. Saishin 2003 was published by the ophthalmology and neuroscience researchers at Johns Hopkins University School of Medicine. Jackson 2003 was published by researchers from the Department of Ophthalmology at the Rayne Institute, St. Thomas' Hospital in London, UK. Skilled formulators would have been interested to read these papers given their subject matter (*e.g.*, "Human Retinal

[105] Ferrara 2006, Exhibit "B".
[106] Gaudreault 2005, Exhibit "A".
[107] Saishin 2003, Exhibit "C".
[108] Jackson 2003, Exhibit "D".

Molecular Weight Exclusion Limit…") being relevant to the warning in WO 895 and since both were published in reputable journals (Journal of Cellular Physiology and Investigative Ophthalmology & Visual Science).

154. Ferrara 2006 reported early tests of full-length VEGF trap that showed it achieved significantly less inhibition when administered intravitreally as compared to systemically (25% versus 75%), despite its high binding affinity for VEGF. Ferrara 2006 hypothesizes "may be due, at least in part, to the existence of a barrier to the transretinal penetration of large molecules such as the VEGF-trap."[109]

155. While Ferrara 2006 was published after June 2006, the study it cites that originally reported the difference in inhibition when administered intravitreally vs. systemically and the papers that supported its suggested explanation, Saishin 2003 and Jackson 2003, were both published years earlier. In my opinion, the skilled formulator in June 2006 would have come to the same hypothesis posited in Ferrara 2006, after reviewing Saishin 2003 and Jackson 2003.

156. Saishin 2003 teaches that larger molecules may have limited VEGF inhibition when administered intravitreally. In Saishin 2003, researchers took a full-size VEGF trap obtained from Regeneron and used it to treat mice with laser-induced choroidal neovascularization (which occurs when blood vessels grow into the layer of the eye that nourishes retinal visual cells causing vision loss). In some mice, the VEGF trap was injected intravitreally. Other mice received subcutaneous injections. An antibody fragment, the Fc fragment, was also injected as a control.

[109] Ferrara 2006 at pg. 262, Exhibit "B".

157. In Saishin 2003, the authors concluded that “there was significantly less neovascularization in eyes treated with VEGF-TRAP$_{R1R2}$ compared to those treated with Fc fragment”[110]. This is what skilled formulators would have concluded as of the patent’s priority date from Saishin 2003. They would have also concluded from the significant difference in reduction in neovascularized area for intravitreal injection (Figure 2E) relative to subcutaneous injection (Figure 1I) in Saishin 2003 that intravitreal injection resulted in inferior neovascularization inhibition compared to systemic, subcutaneous injection.

158. Jackson 2003 teaches that the reduction in effectiveness for intravitreal injection relative to subcutaneous injection is likely due to problems with transretinal penetration by full-size VEGF trap proteins. Jackson 2003 teaches the inner and outer plexiform layers of the eye are sites of high resistance to the diffusion of large molecules. The article posits that the eye has a “retinal exclusion limit (REL)” of 76.5 kD, based on dextran polymers of varying molecular weight. In other words, molecules larger than a dextran polymer of 76.5 kD are not expected to effectively penetrate the eye and reach the inner retinal layer. This is consistent with the teaching in WO 895 that mini-trap proteins are more effective than full-size VEGF trap proteins when administered intravitreally, since mini-trap proteins vary between 20-60 kD and full-size VEGF trap proteins have a size of about 120 kD.

159. I am aware that 1) the studies in Jackson 2003 to determine the REL were done with dextran polymers of varying molecular weight, and 2) the effective size (the hydrodynamic radius) of a polymer molecule would generally be larger than the

[110] Saishin 2003 at pg. 244, Exhibit “C”.

hydrodynamic radius of a protein of the same molecular weight.[111]. Therefore, the specific REL of 76.5 kD might or might not apply to a protein of the same molecular weight, but it indicates that molecules above a certain size would not be able to effectively reach the inner retinal layer. Indeed, Gaudreault 2005 provides experimental evidence teaching that Genentech attributes ranibizumab's ability to penetrate the retina of rabbits to its small size (48 kD) relative to a full-length antibody (148 kD):

> This ability has been attributed to the small molecule size (48 kDa), because a full-length antibody (trastuzumab, 148 kDa) was not able to penetrate all the retinal layers of rhesus monkeys. The small molecular radius of ranibizumab probably also contributes to its demonstrated ability to penetrate the retina.[112]

160. These studies in rabbits and rhesus monkeys had been published years earlier, in 1999. Skilled formulators may have also found these studies, one of which was also published by Gaudreault, and both of which were published in reputable journals (the Academy of Applied Pharmaceutical Sciences PharmSciTech and Toxicologic Pathology).[113]

161. Skilled formulators conducting a reasonably diligent literature search to investigate WO 895's size concern warning would have found Gaudreault 2005, Saishin 2003, and Jackson 2003, and possibly more, and would have arrived at the same conclusion WO 895 and Ferrara 2006 did: larger VEGF traps (i.e., those that might exceed the size of a 76.5 kD dextran polymer) will not penetrate and permeate

---

[111] See Tables 1 and 3 from Armstrong, J.K. *et al*, "The Hydrodynamic Radii of Macromolecules and Their Effect on Red Blood Cell Aggregation" (2004), *Biophysical Journal* Vol. 87, No. 6, 4259-4270 ("**Armstrong 2004**"), **Exhibit "I"**.
[112] Gaudreault 2005 at pg. 726, Exhibit "A".
[113] Gaudreault 2005 at pg. 732, footnotes 18, 19, Exhibit "A".

the structures of the eye as well as smaller VEGF traps will.

162. Based on this prior art, if the skilled formulator sought out guidance as to what VEGF antagonist(s) to formulate for ophthalmic use (including intravitreal administration), they would have been motivated to avoid a full-size VEGF trap (~120 kD), like aflibercept. Instead, they would have been motivated to consider mini-trap(s) and avoid the full-length traps (like aflibercept) for intravitreal administration.

163. However, it appears as though Regeneron went against the literature and pursued the development of full-length aflibercept for ophthalmic diseases, and that risk ultimately led to a successful treatment. This contrarian approach is indicative, in my opinion, of a non-obvious development path.

***(d) Even if aflibercept were selected, skilled formulators would have been motivated to formulate at a low concentration***

164. Even if the skilled formulator was tasked with formulating aflibercept, they had no guidance to select 40 mg/mL as its concentration, as claimed in claims 40 and 41 and included within the scope of claims 33 and 34. I do not believe they would have ended up formulating it at such a high concentration for the following reasons.

165. First, I note that the ultimate decision on the concentration of the active compound is not typically made solely by the formulator. Rather, the formulation scientist would consult with others to determine the desired concentration(s) or dose(s) for the VEGF antagonist in the final formulation. This determination would be informed by numerous factors, including the amount of VEGF antagonist required to produce the desired clinical therapy, the stability of the protein at various

concentrations, the volume that may be safely injected into the eye, and limits to the viscosity of the formulation. These inputs are important to consider, and underscore the complicated and multifactorial assessment that must be conducted when considering the concentration of the active.

166. Importantly, Dr. Nesta does not cite or even discuss any data from any of his references or the literature that would assist with any of those inputs (including specifically for aflibercept) that might inform the decision as to what protein concentration to use. In fact, Dr. Nesta does not state that one of the concentration(s) the skilled formulator may have been led to consider is 40 mg/mL.

167. In my opinion, and even assuming the skilled formulator was involved in selecting the concentration, I disagree that the skilled formulation would have selected a concentration of aflibercept at 40 mg/mL given the lack of data on aflibercept. Rather, the prior art would have motivated a skilled formulator to explore away from 40 mg/mL and towards concentrations below 10 mg/mL. I explain this below.

168. The Gaudreault 2005 reference is the only prior art reference I am aware of that reports the evaluation of a 40 mg/mL VEGF antagonist formulation for ITV administration. In this study, Genentech reported the results of a single intravitreal study of ranibizumab conducted in monkeys. The scientists evaluated doses of 10 mg/mL (500 µg/eye), and 40 mg/mL (2000 µg/eye). Following ITV administration, the results revealed that the 40 mg/mL formulation resulted in undesirable “moderate to severe” ocular inflammation.[114] The lower concentration formulation at 10 mg/mL

---

[114] Gaudreault 2005 at pg. 727, Exhibit “A”.

only resulted in "absent to moderate" ocular inflammation.

169. Genentech's experience with ocular inflammation at 40 mg/mL would have been concerning to the skilled formulator. In addition, as noted above, the prior art reported that fusion proteins like aflibercept could result in an immune response.[115] In view of this, the skilled formulator would have been motivated to keep the concentration of aflibercept as low as possible while trying to maintain efficacy. Regarding efficacy, Gaudreault 2005 reports that that the study data suggested the 10 mg/mL dose "provides maximum inhibition of VEGF".[116] In view of this, the relative potency of the VEGF antagonist being considered for formulation is relevant.

170. On this point, Holash 2002 teaches that Regeneron's VEGF antagonists effectively suppressed tumor growth and vascularization *in vivo*. Holash 2002 reports that a binding affinity or kD of 1 pM is obtainable with VEGF traps.[117] For ranibizumab, the kD was reported in the prior art to be 20-190 pM.[118] The parameter kD and potency are inversely related, such that ranibizumab was at least about 20x less potent than the VEGF traps reported by Holash 2002.

171. Therefore, given that ranibizumab exhibited maximum VEGF inhibition at 10 mg/mL, and that there were inflammation/immune concerns with higher concentrations, if the skilled formulator attempted to determine what concentration to formulate, they would have kept the concentration at 10 mg/mL or lower. While

---

[115] Ferrara, N. *et al*, "Discovery and Development of Bevacizumab, an Anti-VEGF Antibody for Treating Cancer" (2004), *Nature Reviews*, Vol. 3, 391-399 at pg. 397 ("**Ferrara 2004b**"), **Exhibit "F"**.
[116] Gaudreault 2005, pg. 732, Exhibit "A".
[117] Holash 2002, pg. 11395, Dr. Nesta's Report at Exhibit "H".
[118] Chen et al., "Selection and Analysis of an Optimized Anti-VEGF Antibody: Crystal Structure of an Affinity-matured Fab in Complex with Antigen" (1999), J. Mol Biolog 293:865-881 at pg. 871 ("**Chen 1999**") (which is referenced in WO 3225 at pg. 7), **Exhibit "G"**.

aflibercept has about a 2.4x higher molecular weight than ranibizumab (meaning there are more ranibizumab molecules than VEGF trap molecules in the same volume of a 10 mg/mL formulation), the superior potency of aflibercept by a factor of at least ~20x (meaning less is needed to inhibit VEGF) more than makes up for this difference. Even if the difference in relative potency was ignored and the skilled formulator just focused on size difference, they had no reason to try to formulate the protein now known as aflibercept at a concentration that was more than 24 mg/mL and would have been motivated towards a lower concentration.

172. Finally, the skilled formulator would have had additional reasons (beyond inflammation/immune response concerns) for not wishing to explore higher concentrations of aflibercept. First, the skilled formulator knew that an increase of concentration would carry with it a risk of increased instability due to potential aggregation issues. Second, increasing protein concentration could increase the viscosity of the formulation, rendering it more difficult to inject the formulation through a tiny needle.

173. Accordingly, given these concerns relating to inflammation, immune response, aggregation, and shear stress, my opinion is that the skilled formulator would not have attempted to formulate aflibercept at a concentration of 40 mg/mL.

***(e) Further responses to Dr. Nesta's obviousness opinion***

174. At paragraph 206 of Dr. Nesta's report, he provides a series of conclusions in subparagraphs in respect of what the skilled formulator would have known. I respond as follows, in corresponding subparagraphs:

(a) I disagree that the skilled formulator would have been directed to the class of molecules of VEGF $R_1R_2$. As I discussed above, this class of molecules was not well known to the skilled formulator, and the literature such as WO 895, Gaudreault 2005, Saishin 2003 and Jackson 2003 would have motivated the skilled formulator to select a smaller protein, such as the mini-trap.

(b) I do not disagree that pre-filled syringes was a known device for intravitreal administration. However, as of June 2006, there was no approved protein-based VEGF antagonist for intravitreal administration using a pre-filled syringe.

(c) To the extent Dr. Nesta is suggesting that the skilled formulator would consider WO 895 and select SEQ ID NO:10 as a protein to develop, I disagree. The express teachings of WO 895 would motivate the skilled person to select a mini-trip. These teachings are further supported by Gaudreault 2005, Saishin 2003 and Jackson 2003, as discussed above.

(d) I disagree with Dr. Nesta that "the Avastin® Product Label, Wulff 2002 and Fraser 2005 were suitable reference points for working formulations."[119] Each of these references are for cancer. In my opinion, a skilled formulator would not take a cancer formulation as a starting point for an ophthalmic formulation for intravitreal use. Also, each of these references relate to large proteins that the skilled formulator would be motivated to not use, for the reasons discussed above.

---

[119] Dr. Nesta's Report at para. 206(d).

175. At paragraph 207, Dr. Nesta states that "[t]he formulations of Wulff 2002 and Fraser 2005 each exemplify the inventive concept."[120] I disagree with this opinion for the reasons expressed above, including at paragraphs 98 to 125. To summarize, neither Wulff 2002 nor Fraser 2005 "exemplify" or render obvious the inventive concept of the claimed liquid formulations functioning as ophthalmic pharmaceutical liquids that can be injected into the eye and keep aflibercept in solution and in its native configuration so it is able to exert therapeutic action.

176. In his obviousness analysis, Dr. Nesta does not provide a direction that the skilled formulator would take in order to arrive at this inventive concept directly and without difficulty. Rather, Dr. Nesta appears to select pieces of many disparate prior art references in order to arrive at the inventive concept of claims 33, 34, 40 and 41.

177. For example, in his section titled "Step 3: Identify What, if Any, Differences Exist Between the State of the Art and the Inventive Concept", Dr. Nesta refers to 13 different prior art references.[121] Yet he does not explain how the skilled formulator would combine these references. Rather, he selects excerpts from the references, which he then relies on at paragraph 206 to support his opinion of obviousness.

178. From a more practical perspective, Dr. Nesta does not explain how it is that the skilled formulator ends up attempting to specifically formulate the VEGF trap now known as aflibercept for ophthalmic diseases. I considered the practical approach the skilled formulator may take above at paragraphs 131 to 175. As I

[120] Dr. Nesta's Report at para. 207.
[121] Holash 2002, Dr. Nesta's Report at Exhibit "H"; Kim 2002, Dr. Nesta's Report at Exhibit "I"; US 7,033,604 ("**US 604**"), Dr. Nesta's Report at Exhibit S; US 429, Dr. Nesta's Report at Exhibit "T"; US 941, Dr. Nesta's Report at Exhibit "O"; US 897, Dr. Nesta's Report at Exhibit "U"; Fraser 2005, Dr. Nesta's Report at Exhibit "G"; Wulff 2002, Dr. Nesta's Report at Exhibit "Q"; WO 895, Dr. Nesta's Report at Exhibit R; AVASTIN Product Label, Dr. Nesta's Report at Exhibit "D"; Rosenfeld 1, Dr. Nesta's Report at Exhibit "K"; and Rosenfeld 2, Dr. Nesta's Report at Exhibit "L".

explained, the skilled formulator had a number of barriers that they could not have overcome without inventive work.

### C. Claims 33, 34, 40 and 41 were not obvious to try

179. Dr. Nesta's opinion at paragraph 208 is that the obvious to try test "does not apply". However, to the extent the Court determines otherwise, Dr. Nesta provided an opinion on the obvious to try test. I will do the same, as set out below.

180. Dr. Nesta states at paragraph 211 that "a POSITA would have expected that the VEGF Trap $R_1R_2$ API could be made into a formulation with categories of known and commonly used excipients (or some undefined number of known and commonly used components that collectively serve the function of known excipients) for ophthalmic use."[122] In my opinion, before the skilled formulator became aware of the 510 Patent, they would encounter far greater difficulty than Dr. Nesta suggests.

181. Skilled formulators knew as part of their common general knowledge that proteins are a significant challenge to formulate. Each protein is different. They are very large molecules, with intricate molecular and macromolecular structures, such as folding, twisting, and helical structures, that are critical to their therapeutic function and formulation stability. A formulation strategy that works for one protein would not be expected to work for another. The formulation could result in instability, chemical and structural changes, aggregation, or other problems that negatively impact the protein's therapeutic function.

---

[122] Dr. Nesta's Report at para. 211.

182. Apart from stability testing, skilled formulators would also need to keep a number of other complicating factors in mind.

183. Viscosity (informally referred to as the thickness of the liquid formulation) can affect the protein as it is drawn into the needle and administered to a patient. Viscosity depends, in part, on the formulation ingredients and their concentrations. The final formulation needs to pass through the thin annulus of the needle without damaging the protein by shear stress. Needles for intravitreal administration are particularly small.

184. In addition to aiming for an appropriate physiological pH for injection, skilled formulators have to consider the optimum pH for the protein itself in terms of stability. This was not known for aflibercept.

185. Additionally, the amino acids (the molecular building blocks of the protein) and the order in which they occur in the protein directly impact the solubility of the protein. When put in solution, depending on the conditions, hydrophobic amino acids can preferentially associate with each other instead of with the solvent (water), which can lead to aggregation (clumping).[123] The solubility of aflibercept was not known.

186. In June 2006 (before the 510 Patent was available to the skilled formulator) and in the absence of any known stability data from the literature or WO 895 for the VEGF trap now known as aflibercept, skilled formulators could not generally predict instability issues in advance of preparing a protein formulation and testing it. As a result, skilled formulators would understand that formulating any VEGF antagonist that had not yet been formulated for intravitreal injections would be an iterative

---

[123] Akers 2002 at pg. 49, First Report at Exhibit "E".

process. This would require skilled formulators to prepare different formulations, test them, speculate on reasons for any observed instability, and then prepare new formulations based on what they learned in their research. Skilled formulators also understood that such research projects may very well never yield a stable formulation given the challenges of working with proteins.

187. Fusion proteins, like VEGF traps, presented their own unique complications. Skilled formulators understood that fusion proteins were "non-natural", which could result in stability concerns. Fusion proteins are non-natural because they are made by scientists and do not naturally exist. In contrast, some antibodies do exist in nature and are typically found in the immune system. Scientists began developing monoclonal antibody medicines in the 1970s because they act like the antibodies that our bodies are accustomed to.

188. By June 2006 several monoclonal antibodies had been approved by the FDA (the first in 1986) and a relatively large body of literature had developed on how they behave. The story was different for fusion proteins. In June 2006, they were still relatively new and there were instability concerns (including aggregation) surrounding their use. Since these proteins are non-natural, it was difficult to predict their solution behavior and whether they would aggregate. Any propensity of fusion proteins to aggregate can lead to clogging in the injection needle and other problems.

189. In addition, Ferrera 2004 published that while VEGF-Traps had the potential for higher binding affinity, "[i]t is also possible that the junctions between the various

structural elements in such multi-component molecules can generate an immune response".[124]

190. In part because of these difficulties, by 2000, fewer than 40 protein dosage forms had been approved by the US FDA.[125] None of them were for intravitreal administration. The examples that skilled formulators had to work with were few and were all under development at the time in a relatively nascent formulation science field. These concerns were noted by Wang 2002, in which the authors highlight the problems that instability can present, stating that developing recombinant proteins has been "very challenging" because of their limited physical and chemical stability.[126]

191. As a result, in my opinion, Dr. Nesta understates the challenge for skilled formulators to formulate aflibercept at the relevant time. He cites no public information available about how aflibercept would perform in any formulation. There was no information about whether aflibercept could be prepared as a stable ophthalmic formulation, the concentration to formulate, or pH conditions to target, the other ingredients and their effects on viscosity, aggregation, or any other protein formulation concerns.

192. For these reasons, and contrary to Dr. Nesta's opinions:

(a) It was not self-evident at all that the skilled formulator would select aflibercept to formulate (my view is the skilled formulator would have been deterred from considering molecules like aflibercept);

---

[124] Ferrara 2004b at pg. 397, Exhibit "F".
[125] Akers 2002 at pgs. 53, 54-59 (Table IV "Current commercial protein forms"), First Report at Exhibit "E".
[126] Wang, W., "Lyophilization and development of solid protein pharmaceuticals" (2000) 203(1) Intl J of Pharmaceutics 1-60 ("**Wang 2002**") at pgs. 1-2, **Exhibit "H"**.

(b) It was not self-evident at all that even if the skilled formulator was directed to formulator aflibercept for ophthalmic administration, that it would work in the sense that a stable formulation could be achieved;

(c) There were not a finite number of predictable solutions, and in fact the prediction for large proteins was that they could not be formulated for ophthalmic use; and

(d) The extent, nature and amount of work was significant to select a large protein VEGF antagonist against the biases at the time and formulate this large protein for ophthalmic uses such that the formulation remains stable.

## VIII. OVERBREADTH

193. Counsel asked that I address overbreadth of claims 33, 34, 40 and 41 of the 510 Patent, according to the legal instructions set out in Appendix 1 under the heading "Overbreadth". For the reasons set out below, I disagree with Dr. Nesta's conclusion that claims 33, 34, 40 and 41 were overbroad.

194. Dr. Nesta's overbreadth opinion is based on the Alternative Constructions he was provided and Dr. Nesta's apparent view that sodium phosphate or a sodium phosphate buffer is essential to the claimed inventions. In my opinion, sodium phosphate or a sodium phosphate buffer is not the "core of the invention" of claims 33, 34, 40 and 41. The core of the invention is finding an ophthalmic liquid formulation of aflibercept at the claimed concentrations and pHs that can be injected into the eye and where the aflibercept is kept in solution and in its native

configuration so it is able to exert therapeutic action. This “core” invention does not require sodium phosphate or a sodium phosphate buffer, as I showed in my first report.

195. Also, I explained my opinion in my first report at paragraphs 64 to 78 and also above at paragraphs 79 to 87 that I do not believe the sodium phosphate and sodium phosphate buffer components are essential to claims 33, 34, 40 and 41. Rather, when these claims are read in the entire context of the 510 Patent together with the skilled formulator’s common general knowledge, the skilled formulator would conclude that the sodium phosphate and sodium phosphate buffer components of these claims could be varied or substituted provided that the formulation as a whole maintains an adequate buffer capacity. This buffer capacity can be estimated using the well-known Van Slyke calculation, as I showed in my first report.

## IX. SUFFICIENCY

196. Counsel asked that I address sufficiency of claims 33, 34, 40 and 41 of the 510 Patent, according to the legal instructions set out in Appendix 1 under the heading “Sufficiency”. For the reasons set out below, I disagree with Dr. Nesta’s conclusion that claims 33, 34, 40 and 41 are insufficient.

197. Dr. Nesta’s opinion on sufficiency again focuses on formulations without sodium phosphate or a sodium phosphate buffer. I disagree for the reasons noted above with respect to overbreadth, including for the reasons discussed in my first report at paragraphs 64 to 78 and also above at paragraphs 79 to 87. That is, a skilled formulator would have known as part of their common general knowledge that some

proteins can self-buffer and that buffering capacity of formulations, including of proteins, can be calculated using the calculation disclosed by Van Slyke in 1922.

198. With the 510 Patent in hand, the skilled formulator could calculate the buffering capacity of the claimed formulations, and then modify the formulation in a manner to achieve a buffering capacity within the ranges of the claimed formulations in order to maintain the protein in its native configuration. No "major research project" is required as suggested by Dr. Nesta. Rather, the skilled formulator can use a well-known calculation, and then conduct non-inventive trial-and-error to confirm that the variant formulation works in the sense of achieving the inventive concept of claims 33, 34, 40 and 41.

199. For these reasons, I disagree with Dr. Nesta's conclusion on sufficiency in respect of claims 33, 34, 40 and 41.

DR. DOUGLAS KLINE

April 10, 2025