**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

| | |
|---|---|
| IN RE: AFLIBERCEPT PATENT LITIGATION<br><br>**THIS DOCUMENT RELATES TO:**<br>*Regeneron Pharmaceuticals, Inc. v. Amgen Inc.*,<br>Case No. 1:24-cv-39-TSK<br>Case No. 1:25-cv-74-TSK | MDL No. 1-24-md-3103-TSK |

# AMGEN INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

I. INTRODUCTION ........ 1

II. ARGUMENT ........ 4

A. The Parties Agree on the Two Core Issues Addressed by Amgen's Construction. ........ 5

1. Regeneron Agrees the Term Applies to the Formulation "As a Whole." ........ 5

2. Regeneron Agrees That the Claimed Formulations Must Have Certain Features Making Them Appropriate for Intravitreal Administration. ........ 5

B. Regeneron's "Plain and Ordinary Meaning" Non-Construction and Failure to Propose an Actual Construction Are Improper. ........ 7

C. It Would be Improper to Exclude Functional Requirements Because "Suitable for Intravitreal Administration," Is a Functional Term. ........ 9

1. The Claim Term Recites the Function of the Formulation. ........ 9

2. The Intrinsic Record Supports that the Claim Term is Functional. ........ 12

3. This Court's *Mylan* Decision Supports That the Claim Term is Functional. ........ 13

4. The Case Law Cited by Regeneron Regarding "Functional Terms" Deals with Completely Different Claim Terms. ........ 14

5. Regeneron Ignores the Case Law Which Supports That the Claim Term is Functional. ........ 18

D. Amgen's Construction Clarifies what "Suitable for Intravitreal Administration" Means. ........ 19

E. Regeneron's Admissions from Foreign Proceedings are Properly Considered. ........ 22

F. Regeneron's Allegations Regarding the Parties' Claim Construction Negotiations are Inaccurate and Miss the Point. ........ 23

III. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

## Cases

*Acumed LLC v. Stryker Corp.*,
483 F.3d 800 (Fed. Cir. 2007) .................... 2, 20

*Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*,
No. 09-cv-598, 2011 WL 722937 (D. Del. Feb. 23, 2011).................... 23

*Aventis Pharma S.A. v. Hospira, Inc.,*
675 F.3d 1324 (Fed. Cir. 2012) .................... 15

*Aventis Pharms. Inc. v. Impax Lab'ys., Inc.*,
No. 02-cv-1322, 2011 WL 94188 (D.N.J. Jan. 11, 2011).................... 19

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017) .................... 10

*Baxter Healthcare Corp. v. Mylan Lab'ys Ltd.,*
346 F. Supp. 3d 643 (D.N.J. 2016).................... 8

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) .................... 11

*C.R. Bard, Inc. v. Med. Components, Inc.*,
No. 17-cv-754, 2020 WL 6902367 (D. Utah Nov. 24, 2020).................... 17

*Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*,
482 F.3d 1347 (Fed. Cir. 2007) .................... 4

*Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*,
38 F. Supp. 3d 589 (E.D. Pa. 2014).................... 8

*Ecolab, Inc. v. Envirochem, Inc.*,
264 F.3d 1358 (Fed. Cir. 2001) .................... 16

*Eon Corp. IP Holdings v. Silver Spring Networks*,
815 F.3d 1314 (Fed. Cir. 2016) .................... 20

*Impax Lab'ys, Inc.*, *v. Lannett Holdings, Inc.,*
No. 14-cv-984, 2015 WL 7737309 (D. Del. Dec. 1, 2015) .................... 12, 18

*In re Schreiber*,
128 F.3d 1473 (Fed. Cir. 1997) .................... 9

*Indus. Tech. Rsch. Inst. v. ITC*,
567 F. App'x 914 (Fed. Cir. 2014) .................... 16

*JBS Hair, Inc. v. SLI Prod. Corp.*,
No. 22-cv-1576, 2024 WL 195257 (D.N.J. Jan. 18, 2024) ........ 9

*Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings Inc.*,
No. 2023-1335, 2025 WL 2659149 (Fed. Cir. Sept. 17, 2025) ........ 16

*Medeva Pharms. Mfg. Inc. v. Morton Grove Pharms., Inc.*,
174 F. Supp. 2d 802 (N.D. Ill. 2001) ........ 17, 18

*Medtronic, Inc. v. Daig Corp.*,
789 F.2d 903 (Fed. Cir. 1986) ........ 23

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*,
357 F.3d 1319 (Fed. Cir. 2004) ........ 16

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ........ 8

*Panasonic Corp. v. Magna Int'l Inc.*,
No. 21-cv-319, 2022 WL 625089 (W.D. Tex. Mar. 3, 2022) ........ 18

*Pfizer, Inc. v. Ranbaxy Lab'ys. Ltd.*,
457 F.3d 1284 (Fed. Cir. 2006) ........ 23

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........ 3

*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*,
No. 22-cv-61-TSK, 2023 WL 11891335 (N.D.W. Va. Apr. 19, 2023) ........ 2, 7, 20, 22

*Regeneron Pharms., Inc. v. Mylan Pharms., Inc.*,
714 F. Supp. 3d 652 (N.D.W. Va. 2024) ........ 4, 13, 18

*Schwing GmbH v. Putzmeister Aktiengesellschaft* ,
305 F.3d 1318 (Fed. Cir. 2002) ........ 15

*Sherwin-Williams Co. v. PPG Indus., Inc.*,
No. 17-cv-1023, 2018 WL 3845239 (W.D. Pa. Aug. 13, 2018) ........ 18, 19

*Toro Co. v. White Consol. Indus., Inc.*,
266 F.3d 1367 (Fed. Cir. 2001) ........ 14, 15

*UCB, Inc. v. Accord Healthcare, Inc.*,
201 F. Supp. 3d 491 (D. Del. 2016) ........ 21

*Voice Tech Corp. v. Unified Patents, LLC*,
110 F.4th 1331 (Fed. Cir. 2024) ........ 11, 20

*White v. Dunbar*,
119 U.S. 47 (1886)........................................................................................................ 7

**Other Authorities**

District of New Jersey, L. Pat. R. 4.2(a) ............................................................................ 9

Manual of Patent Examining Procedure (MPEP) § 2173.05(g) .................................................. 10

# I. INTRODUCTION

The sole term in dispute is "wherein the liquid ophthalmic formulation is suitable for intravitreal administration." Amgen's proposed construction is "wherein the liquid ophthalmic formulation, as a whole, has features making it appropriate for intravitreal administration." This construction is true to the ordinary and customary meaning of the term and would help a jury by clarifying that "suitable for intravitreal administration" applies to the formulation as a "whole"—not just that its constituent components must be suitable for intravitreal administration. The construction also clarifies that the formulation must have features that make it "appropriate for intravitreal administration," as Regeneron has repeatedly stated it must.

Amgen's construction mirrors language Regeneron itself used to describe this term to the U.S. Patent and Trademark Office ("Patent Office") in a proceeding regarding U.S. Patent No. 11,084,865 ("the '865 Patent"), the patent on which Regeneron's request for a preliminary injunction against Amgen was based and that is related to the '099 Patent. Regeneron urged the Patent Office to treat this term in the same manner as "the analogous term 'pharmaceutical formulation suitable for intranasal administration.'" Ex. 4 at 34 (emphasis added).[1] That analogous term, as Regeneron argued, required that "the formulations ***must possess features making them appropriate for intranasal use.***" *Id.* (cleaned up) (emphasis added). The term in dispute is no different and should require the formulation to possess features making it appropriate for intravitreal use, exactly as Amgen proposes.

Regeneron appears to agree with the core issues addressed by Amgen's construction. Regeneron agrees that "'suitable for intravitreal administration' applies to the formulation rather

---

[1] Exhibits 1-13 and A-C refer to exhibits submitted with Amgen's Opening Claim Construction Brief. Exhibits 14-17 refer to exhibits submitted with the Declaration of Brett A. Postal submitted herewith.

than to its ingredients alone." Regeneron Op. Br. at 25, n.4. And Regeneron admits, consistent with what it has told the Patent Office and several other tribunals, that the term requires that the formulation has features making it appropriate for intravitreal administration. *Id.* at 23. Thus, there would seem to be agreement that Amgen's construction accurately interprets the claim.

Nevertheless, Regeneron opposes Amgen's construction contending that the construction does not provide sufficient specificity and does not spell out explicitly each and every feature that is required to make a formulation suitable for intravitreal administration. That the term is non-specific is an issue of Regeneron's own making—Regeneron wrote this term into the claims to define its alleged inventions, instead of spelling out with particularity all such features. And Regeneron's accusations ring especially hollow because its own so-called "plain and ordinary meaning" non-construction would leave open *all* questions as to what features are required. In any event, Regeneron is wrong about the law—"a sound claim construction need not always purge every shred of ambiguity. The resolution of some line-drawing problems . . . is properly left to the trier of fact." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007).

Regeneron tried the same tactic in *Mylan*, where it refused to take a position on the meaning of multiple claim terms. The Court rejected this approach and held that Regeneron "cannot avoid defining its own claim terms by asserting that its claims have a plain meaning[.]" *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, No. 22-cv-61-TSK, 2023 WL 11891335, at *3 (N.D.W. Va. Apr. 19, 2023) (quotations and citation omitted). Like this Court, several other courts have refused to countenance parties who propose "plain and ordinary meaning" as a construction, while leaving the party's position on that meaning obscure.

Under the guise of challenging Amgen's construction, however, Regeneron's true aim is revealed. Regeneron wants the Court to add a limitation that the term "does not impose functional

requirements such as stability." This further limitation does not come from the claims, specification, or anywhere else in the intrinsic record, but rather arises from Regeneron's premise that "[f]unctional [l]imitations [c]annot [b]e [i]mported into [s]tructural [c]laims." *See e.g.,* Regeneron Op. Br. at 10. Page-after-page Regeneron says the claims here are "structural" and that blackletter claim construction law supports their position. *See id.* at 10-12, 16-18. All of this ignores two obvious and fatal defects with Regeneron's position—(i) the functional aspect of the term in dispute is not "imported" from somewhere else, ***it is the express language of the claim***, and (ii) that language ***is written as a functional limitation***. The term "suitable for intravitreal administration" limits the formulations to those that serve a stated purpose—"intravitreal administration." There is no structure written into this term, nor is there any basis elsewhere in the claims for narrowing the scope of the claim term in the manner that Regeneron seeks. Amgen agrees that it is a "cardinal sin" of claim construction to import limitations from the specification. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1320 (Fed. Cir. 2005) (*en banc*) (citation omitted). What Regeneron asks the Court to do here—import a limitation made from whole cloth—is all the more improper. Amgen's construction, which clarifies what the words in the claim actually mean, is the proper construction.

Had Regeneron intended to narrow its claim to only structural features that make a formulation "suitable for intravitreal administration," it could have drafted the claims to enumerate such structural features instead of using functional language. But that's not what the claims say. *See id.* at 1312 ("[W]e look to the words of the claims themselves ... to define the scope of the patented invention.") (citation omitted). Having written nothing about "excluding functional requirements" in its own claim, Regeneron should not now be permitted to accomplish that through

re-interpretation of the claims. *E.g.*, *Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1355 (Fed. Cir. 2007) ("Claims mean precisely what they say.").

Thus, the dispute remaining between the parties is whether the term at issue is properly construed to mean "features making it appropriate for intravitreal administration" (as Amgen proposes) or should be rewritten and narrowed to exclude "functional features" (as Regeneron proposes). The claim language, the intrinsic evidence, and the case law all align with Amgen's construction. Further, contrary to Regeneron's argument, this Court's decision in *Mylan* that the term is sufficiently definite supports Amgen's construction, not Regeneron's attempt to read out "functional" features. Specifically, the Court relied on the testimony of Regeneron's expert, who explained that the term is not subjective, as a POSA would, among other things, "consult[] an ophthalmologist." *Regeneron Pharms., Inc. v. Mylan Pharms., Inc.*, 714 F. Supp. 3d 652, 749 (N.D.W. Va. 2024) (quoting Trial Tr. 2112:20-2113:7 (Trout)). An ophthalmologist treating a patient is concerned with how a formulation performs when injected into the eye, *i.e.*, its function—not the structural details of the formulation. Ex. 14 at 1826:19-25 (Dr. Csaky Trial Testimony) (Regeneron's ophthalmologist expert in *Mylan* testifying, "when you inject these new drugs into the eye, what you're really trying to make sure is that nothing terrible happens to the eye."). Regeneron and this Court have both recognized that the term does not exclude functional requirements, as Regeneron now argues. Amgen's construction accords. Regeneron's attempt to import an additional limitation into the claims should be rejected.

## II. ARGUMENT

Regeneron does not meaningfully dispute that Amgen's construction accurately reflects the ordinary and customary meaning of the term. Instead, while purporting to advocate for an unspecified "plain and ordinary" meaning, Regeneron asks the Court to narrow the scope of the claim term and eliminate, *a priori*, any functional requirements of the disputed term. However, the

plain language of the claims, the other intrinsic evidence, this Court's prior decision in *Mylan*, and the case law all support that the term is functional.

**A. The Parties Agree on the Two Core Issues Addressed by Amgen's Construction.**

1. Regeneron Agrees the Term Applies to the Formulation "As a Whole."

*First*, Regeneron acknowledges that the term relates to the formulation "as a whole" and not just the constituent components: "All agree that 'suitable for intravitreal administration' applies to the formulation rather than to its ingredients alone." Regeneron Op. Br. at 25, n.4. Despite this apparent agreement, Regeneron confusingly goes on to say that "Amgen's addition of 'as a whole' thus resolves nothing and *should be rejected*." *Id.* (emphasis added). That is backwards. That the parties agree about the term's meaning in this respect means that it can be freely adopted—not that this agreed-upon meaning should be ignored. The Court should adopt Amgen's construction, which makes clear the undisputed proposition that the term applies to the formulation "as a whole."

2. Regeneron Agrees That the Claimed Formulations Must Have Certain Features Making Them Appropriate for Intravitreal Administration.

*Second*, consistent with positions that it took before this Court, the Patent Office, and throughout the world, Regeneron acknowledges that the disputed term means that some features must be appropriate for intravitreal administration (though, others are not). Regeneron Op. Br. at 23. Regeneron, however, asks the Court to take the additional step, as part of claim construction, of parsing amongst features, categorizing them as "structural" or "functional," and to construe the term as limited solely to the former and excluding the latter.[2] This is a step too far.

[2] The distinction that Regeneron tries to draw between "structural" and "functional" in this context is illusory in a sense. The functions that Regeneron points to follow form. For example, Regeneron has

Regeneron presents a litany of reasons to support the distinction it seeks to draw between "structural" and "functional" features. As an initial matter, that is not a distinction that the patent itself spells out in the specification or the claims. Moreover, none of Regeneron's arguments address, let alone get around, the basic and central fact that the limitation—"suitable for intravitreal administration"—is plainly written as a functional limitation. The term "suitable for intravitreal administration" is not, and does not denote, a structure. Rather, other limitations of the claim that explicitly recite, for example, the formulation components by name or type, serve as the structural limitations. The disputed term, in contrast, limits the claim scope to formulations that serve a stated purpose or function, *i.e.*, "intravitreal administration." Thus, a formulation could comprise the components listed in the claim (*e.g.*, polysorbate, a stabilizing agent, and 40/ml mg of aflibercept), but if it was not also "suitable for intravitreal administration" because, using one of Regeneron's examples, it causes substantial injury to the eye, it would not be a formulation of the claim.

Regeneron does not take issue with the actual language in Amgen's construction. As discussed below, Regeneron creates a dispute via a "compromise" construction that it proposed during the meet and confer process. *See infra* Section II.F. Perhaps recognizing that this so-called compromise construction, requiring that the term "does not impose functional requirements such as stability," does not interpret any of the words of the claim and so plainly would result in the importation of a limitation from whole cloth, Regeneron retreats in its papers to a purported "plain

---

admitted in other proceedings that a formulation having a non-physiological osmolality (*i.e.*, a feature Regeneron now says is "structural") may not be appropriate for intravitreal administration because it can cause damage to the eye (*i.e.*, function). Ex. A at ¶ 5.36 (Regeneron's expert explaining that "[i]njecting formulations with an osmolality far from [the osmolality range of the vitreous] could cause retinal degeneration and detachment.").

and ordinary" meaning.[3] *See infra* Section II.B. Nevertheless, there is no real dispute that Amgen's construction is consistent with the customary meaning of the term; it should be adopted.

**B. Regeneron's "Plain and Ordinary Meaning" Non-Construction and Failure to Propose an Actual Construction Are Improper.**

Regeneron takes issue with Amgen's construction, arguing that "Amgen is not entitled to a placeholder" or a "blank check." Regeneron Op. Br. at 2. Yet, it is Regeneron that has refused to provide an actual construction, contending the term carries its "plain and ordinary meaning." If adopted, a factfinder would have no idea from Regeneron's construction that it intends to exclude "functional requirements." Also absent from Regeneron's brief is any discussion of its proposed meaning of "suitable for intravitreal administration." Instead, Regeneron hides behind its "plain and ordinary meaning" non-construction and attacks Amgen's construction, for example, arguing that it is not sufficiently precise. *See, e.g.*, *id.* at 8. Although Regeneron is wrong on the merits, its approach of presenting a non-construction—perhaps with the intent to later re-interpret it—should be rejected. *White v. Dunbar*, 119 U.S. 47, 51 (1886) ("[A] patent is [not] like a nose of wax, which may be turned and twisted in any direction[.]").

This Court already denied Regeneron's tactic in *Mylan*, where Regeneron argued that three separate terms should be given their "plain and ordinary meaning." *See Regeneron Pharms.*, 2023 WL 11891335, at *3, *7, *18. This Court '"reject[ed] at the outset[] the notion that the disputed claim terms … can be construed simply by reference, without explanation, to the 'plain and ordinary meaning.'"' *Id.* at *3 (*quoting Baxter Healthcare Corp. v. Mylan Lab'ys Ltd.,* 346 F.

[3] Even now, Regeneron tries to distance itself from its "compromise" construction. Regeneron Op. Br. at 6. It apparently recognizes there is no intrinsic or extrinsic evidentiary support for carving functional requirements out of the definition of the disputed term. But, in fact, the "plain and ordinary meaning" Regeneron advocates would limit the term to "structural," not "functional," requirements, which is precisely what it proposed in its so-called "compromise."

Supp. 3d 643, 653 (D.N.J. 2016)). Here again, this Court should reject Regeneron's attempt to '"avoid defining its own claim terms by asserting that its claims have a plain meaning[.]'" *Id.* (citation omitted).

Numerous other courts have taken issue with this tactic, because it is unproductive and fails to assist a jury in understanding the meaning of the disputed term. For example, the District of Delaware admonished the patent owner for dodging the claim construction question, stating "[a]nd going forward, Mr. Oakes, Mr. Russell, I am tempted to say the next time I get this situation ... [where] one side, the plaintiff says, oh, plain and ordinary meaning and offers no alternative definition and all it does is criticize the defendant['s construction], which there's some actual support for, ... [then] I don't hold a hearing. I'm just going with the defendant. I was really tempted to do that in this case. So get the word out." *Volterra Semiconductor LLC v. Monolithic Power Sys., Inc.*, No. 19-cv-2240, ECF No. 365 (D. Del. June 23, 2023) (Ex. 15 at 22:22-23:7) (transcript of Nov. 12, 2021 Claim Construction hearing)).

Similarly, the Eastern District of Pennsylvania requested that, after three days of *Markman* hearings, any party that "asserts that 'the plain and ordinary meaning of the term should control,'" must submit "a statement of 'precisely what that 'plain and ordinary meaning' is in the form of a proposed alternative construction" to assist the court in understanding the actual constructions being sought. *Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*, 38 F. Supp. 3d 589, 594-595 (E.D. Pa. 2014); *see also id.* at 615 ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate ... when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.") (quoting *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008)). Likewise, the District of New Jersey admonished a plaintiff for proposing that four claim terms should be construed to have

their plain and ordinary meanings without providing those meanings, holding that "[t]he phrase 'plain meaning' is not a proposed construction." *JBS Hair, Inc. v. SLI Prod. Corp.*, No. 22-cv-1576, 2024 WL 195257, at *2 (D.N.J. Jan. 18, 2024); *see also* District of New Jersey, L. Pat. R. 4.2(a) ("[T]he parties shall simultaneously exchange preliminary proposed constructions for each term identified by any party for claim construction, *including constructions for each term for which 'plain and ordinary' meaning is asserted*.") (emphasis added). Thus, Regeneron's proposed construction of "plain and ordinary" meaning would be a non-starter in several courts. Regeneron's attempt to circumvent the claim construction process should be rejected.

**C. It Would be Improper to Exclude Functional Requirements Because "Suitable for Intravitreal Administration," Is a Functional Term.**

Regeneron identifies its construction as "plain and ordinary meaning," but its arguments make clear that its interpretation of the term is anything but. Regeneron argues that "suitable for intravitreal administration" must *exclude* functional requirements and should be narrowed to include only structural requirements, asserting that it is improper to import functional limitations into a structural term.[4] But the main pillar of Regeneron's argument is wrong. The disputed term is functional—*i.e.*, the term is defined by its purpose or utility, namely intravitreal administration. Under the guise of its stalking horse "plain and ordinary meaning," it is obvious that Regeneron now seeks to have this Court improperly import a narrowing limitation into the claims.

1. <u>The Claim Term Recites the Function of the Formulation.</u>

"A patent applicant is free to recite features" of a composition "either structurally or functionally." *In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997); *see also BASF Corp. v.*

[4] Regeneron admits that the '099 Patent claims do in fact *include* "functional" limitations but appears to dispute only whether the term "suitable for intravitreal administration" is functional. *See* Regeneron Op. Br. at 3 ("Where the claims impose functional requirements, they recite them explicitly …").

*Johnson Matthey Inc.*, 875 F.3d 1360, 1365-66 (Fed. Cir. 2017) (finding the same in the context of a composition claim). The language that Regeneron chose to define this aspect of its alleged invention—"suitable for intravitreal administration"—is functional. The definition of "function" is "the action for which a person or thing is specially fitted or used or for which a thing exists: purpose." Ex. 16 (Merriam-Webster's Online Dictionary, definition (2) of "function."); *see also* Manual of Patent Examining Procedure (MPEP) § 2173.05(g) ("A functional limitation is often used in association with an element, ingredient, or step of a process to define a particular ***capability or purpose*** that is served by the recited element, ingredient or step") (emphasis added). Here, the claims recite that the formulation is "suitable for intravitreal administration." That is, the claims expressly recite that the formulation is "specially fitted or used" for intravitreal administration.

Despite choosing this plainly functional term to define its alleged invention during prosecution, Regeneron now suggests that the term is structural. Regeneron Op. Br. at 13-16. Indeed, Regeneron argues that "the claims recite the formulation by what it contains[.]" *Id.* at 2-3. But that's what ***other*** limitations in the claims do. For example, the claims require aflibercept and certain other excipients in the formulation composition. But the claims separately use the term "suitable for intravitreal administration" to further limit the group of formulations covered by the claims—that term does ***not*** convey structure. Rather, the term means what it says—that the formulation has features that make it suitable for its function—intravitreal administration. This alone forecloses Regeneron's attempt to rewrite this term into one that imposes structural requirements and "does not impose functional requirements." *Id.* at 3.

None of Regeneron's arguments address this central and dispositive point. While Regeneron argues that "the ***specification*** explains suitability by listing excipients and amounts," (*id.* at 3 (emphasis added)), that is not how Regeneron chose to define the formulations in the

***claims.*** Regeneron could have drafted the claims with only structural limitations by reciting only specific amounts of specific excipients. If such structural limitations alone rendered the formulations suitable for intravitreal administration, then including the limitation "suitable for intravitreal administration" would have been improper as redundant and superfluous. *Voice Tech Corp. v. Unified Patents, LLC*, 110 F.4th 1331, 1342-43 (Fed. Cir. 2024) ("Such a construction would improperly impute other limitations into the claim term, rendering those other limitations superfluous."). But instead, Regeneron used the term "suitable for intravitreal administration" to narrow the claimed formulations to only those that perform that function. That choice of language should be given meaning. *E.g.*, *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.").

Regeneron's other arguments fall far short of mandating that this Court treat a clearly functional term as a structural one. Regeneron's discussion of certain exemplary features is unavailing. For example, Regeneron makes the point that it believes features such as osmolality and viscosity are "structural" and not "functional." *See* Regeneron Op. Br. at 23-24. But Regeneron's arguments as to whether any given feature itself is structural or functional are divorced from the claim language. For example, the term "suitable for intravitreal administration" does not convey that the formulation can have *any* osmolality. Rather, to be a claimed formulation, the osmolality should be assessed in terms of suitability for the function of intravitreal administration. Indeed, in explaining the meaning of this term to another tribunal, Regeneron directly linked osmolality to how the formulation would function upon injection into the eye. Ex. A at ¶ 5.36. Regeneron's expert opined that a formulation having an osmolality that significantly deviated from the osmolality of the vitreous "could cause retinal degeneration and detachment" and would not be suitable for intravitreal administration. *Id.*

2. The Intrinsic Record Supports that the Claim Term is Functional.

The intrinsic record, including Regeneron's own statements during an *inter partes* review ("IPR") of the related '865 Patent and during prosecution of the '099 Patent, align with the conclusion that "suitable for intravitreal administration" is a functional claim term.

*First*, Regeneron does not dispute that its statements made during IPR2025-01268 involving the '865 Patent are part of the intrinsic record of the '099 Patent. Regeneron Op. Br. at 9-10. Yet, Regeneron ignores these highly pertinent statements. In that IPR, Regeneron argued that "suitable for intravitreal administration" was similar to a "pharmaceutical formulation suitable for intranasal administration," which Regeneron emphasized "'does more than state an intended use for the formulation' by instructing that the formulations 'must possess features making them appropriate for intranasal use.'" Ex. 4 at 34-35 (quoting *Impax Lab'ys, Inc.*, *v. Lannett Holdings, Inc.,* No. 14-cv-984, 2015 WL 7737309, at *3 (D. Del. Dec. 1, 2015)). That is, Regeneron acknowledged that the term not only stated the "intended use for the formulations" (*i.e.*, the function of the formulation) but also required that the formulations "possess features making them appropriate" for that intended use. *Id.* (internal citations and quotations omitted). Regeneron acknowledged that the term is functional—*i.e.*, relating to and going beyond the "intended use" or function of the formulation. *Id.* Regeneron's suggestion now that only Amgen views "suitable for intravitreal administration" as functional, in view of Regeneron's own representations to the Patent Office, simply does not withstand scrutiny. *See* Regeneron Op. Br. at 19.

*Second*, the prosecution history of the '099 Patent accords. In its brief, Regeneron admitted that the term was added to the claims to distinguish the *function* of the formulation—*i.e.*, as an ophthalmic formulation, and more specifically as one suitable for intravitreal administration—from the prior art. Regeneron Op. Br. at 16 (citing Regeneron Ex. 21 at 10) ("The disputed phrase

entered the claims of this family for a specific, modest purpose: to designate the claimed formulation as ophthalmic, as opposed to (for example) intravenous."). A formulation administered to the eye of a patient serves a different function than one administered into the vein of a patient, and thus, must have different features making it appropriate for such a route of administration. Thus, the prosecution history shows the term was added to designate the function of the formulation—intravitreal administration—and not the structure of the formulation.

3. This Court's *Mylan* Decision Supports That the Claim Term is Functional.

This Court did not construe "suitable for intravitreal administration" in the *Mylan* case. However, the Court's decision rejecting Mylan's argument that this term was indefinite confirms that the term is functional.

The Court noted with approval the testimony from Regeneron's expert that an ophthalmologist would be consulted to determine whether a formulation was suitable for intravitreal administration. *Regeneron Pharms., Inc.*, 714 F. Supp. 3d at 749 (quoting Trial Tr. 2112:20-2113:7). Regeneron then relied on this decision and testimony in its filings to the Patent Office when discussing the very same term. Ex. 4 at 35 ("[A]s *Mylan* explained, the POSA would . . . 'assess suitability by looking 'to the teachings of the patent,' which describe exemplary excipients . . . and then, if needed, looking at 'the literature' for suitable excipients with 'structures that had been used in intravitreal administration' and consulting an ophthalmologist.'"). If this term was not functional, as Regeneron now proposes, these prior statements would make no sense. That is, if the term referred only to structural aspects, then a formulator alone would be able to assess suitability—consulting an ophthalmologist would not be necessary. But as Regeneron argued and this Court agreed, suitability includes consultation with an ophthalmologist whose chief concern would be how the formulation works. *See id.* An ophthalmologist would not be

consulted to examine the structure of the formulation, but rather to determine that the formulation worked for its claimed purpose—*i.e.*, intravitreal administration. Ex. 14 at 1826:19-25.

4. The Case Law Cited by Regeneron Regarding "Functional Terms" Deals with Completely Different Claim Terms.

Regeneron cites an array of cases almost exclusively dealing with claim language and technologies that are vastly different from the language and technologies here. To start, these cases stand for the well-established and unremarkable legal principle of claim construction that limitations should not be imported into the claims (from the specification, or elsewhere). Regeneron Op. Br. at 16-18 (citing, *e.g.*, *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001) ("This court's claim construction, however, did not and could not import into the claim a function from the specification, particularly when the claim recites only purely structural limitations.")). The cases thus only confirm that Regeneron's approach is wrong. Moreover, almost all of Regeneron's examples are cases where the claim term at issue ***was written as a structural component*** of the claim (*e.g.*, as an air inlet, floor, or housing), which is nothing like the term here. That courts have construed structural terms from mechanical technologies by limiting them to structure and not reading in a function is hardly surprising. Regeneron's other cited cases that do concern functional limitations address situations where a party sought to introduce a *different functional requirement* into the claimed functional requirement. That is again nothing like the dispute presented here (and Regeneron has not argued otherwise).

As summarized in the table below, none of these cases stand for Regeneron's proposition that a functional term (*e.g.*, "suitable for intravitreal administration") should be read to exclude reference to functionality.

| Invention | Term | Proposed Functionality Construed Not to be Part of Claim | Reasoning |
|---|---|---|---|
| *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001) | | | |
| vacuum-blower | "a removable **air inlet cover** for covering said air inlet" | "The primary function or objective of the cover . . . is to cover the air inlet of the vacuum-blower (to keep fingers and clothes from entering the impeller) and permit the passage of air." | "An invention claimed in purely structural terms generally resists functional limitation." The court further noted that "[w]hile this structure could have a variety of other functions (as is often the case with structures) . . . these functions do not become part of the claimed structure unless claimed as such." |
| *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1130 (Fed. Cir. 2012) ("*Aventis v. Hospira*") | | | |
| a form of drug delivery (perfusion) | "**a perfusion**"[5] | "Sanofi argues that the district court erred in not construing 'perfusion' to include these additional efficacy, safety, and stability limitations." | "Neither the claims, the specification, nor the prosecution history suggest that the claimed perfusion must satisfy certain safety or efficacy standards. We previously have refused to impose such limitations when not required by the language of the claims or the specification." |
| *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324-25 (Fed. Cir. 2002) | | | |
| a pump | "**annular extension**" | "the annular extensions inhibit radial expansion of the sealing ring" | "Claim 1 defines the 'annular extensions' in purely structural terms. . . . Where a claim uses clear structural language, it is generally improper to interpret it as having functional requirements." Further, "[v]iewed as a whole, the prosecution history does not support the district court's adoption of the functional limitation of 'inhibiting radial expansion of the sealing ring.'" |

[5] Regeneron's brief is misleading in suggesting that the court and Federal Circuit construed the term "suitable" in *Aventis v. Hospira*. While the parties' initial agreed-upon construction included the term "suitable for infusion," the term being construed was "a perfusion"—the term "suitable for infusion" did not appear in the claims and was not construed. *Aventis v. Hospira*, 675 F.3d at 1330.

| **Invention** | **Term** | **Proposed Functionality Construed Not to be Part of Claim** | **Reasoning** |
|---|---|---|---|
| *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1366 (Fed. Cir. 2001) | | | |
| a detergent-containing article of commerce | **"substantially uniform"** | "forming a homogeneous wash solution throughout the cast life" | "The only functional requirement of the claimed 'three dimensional, solid, cast, hydrated, substantially uniform alkaline detergent' is for that detergent to contain components capable of 'ware and hard surface washing.'" |
| *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1366 n.19 (Fed. Cir. 2004) | | | |
| a flat car | "**floor**" | "provides the direct support for the car contents" | "[T]he district court's inclusion of a functional limitation in the definition of a floor—requiring a floor to 'provide[ ] the direct support for the car contents'—is not only unusual in a structural patent but also may cause the claimed invention not to read on the preferred embodiment in the specification[.]" |
| *Indus. Tech. Rsch. Inst. v. ITC*, 567 F. App'x 914, 919 (Fed. Cir. 2014) | | | |
| an apparatus for improving uniformity used in a backlight module | "structured **arc sheet**" | "for altering the pathway of illuminating light in multiple directions" | "[A]lthough ITRI proposes adding the functional limitation that the structured arc sheets are 'for altering the pathway of illuminating light in multiple directions,' it fails to point to any language in the intrinsic evidence that requires adding this functional limitation into the construction." |
| *Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings Inc.*, No. 2023-1335, 2025 WL 2659149 at *5 (Fed. Cir. Sept. 17, 2025) | | | |
| a magnetic material structure | "uniaxial symmetry **broken structure**" | "the symmetry broken nature of the structure causes the structure to be uniaxial." | "'[U]niaxial symmetry broken structure' provides that the structure be 'uniaxial' and 'symmetry broken,' with no express statement that the latter causes the former. Such a causal connection would essentially amount to a functional relationship. But there is nothing in the claim language providing that the 'uniaxial symmetry broken structure" is based on function." |

| Invention | Term | Proposed Functionality Construed Not to be Part of Claim | Reasoning |
| --- | --- | --- | --- |
| *C.R. Bard, Inc. v. Med. Components, Inc.*, No. 17-cv-754, 2020 WL 6902367 at *7 (D. Utah Nov. 24, 2020) | | | |
| vascular access ports | "**housing**" | "to enclose, cover, and protect the port" | "Nor does anything in the specification state that the function of the 'housing' is to 'enclose, cover, and protect the port.' Even if such functions could somehow be inferred from the specification, moreover, Bard's proposed construction would improperly import a functional limitation into the claim language." |

The lone case cited by Regeneron addressing a term bearing any similarity to the term at issue here is over two decades old and involved the term "suitable for oral administration." *Medeva Pharms. Mfg. Inc. v. Morton Grove Pharms., Inc.*, 174 F. Supp. 2d 802, 807 (N.D. Ill. 2001). And the dispute presented in *Medeva* was not about whether the term was structural or functional (nor does Regeneron contend it is), as both sides agreed the term was functional. Rather, the court in *Medeva* rejected what Regeneron is attempting to do here—importing limitations into a term through claim construction. *Id.* at 806-07 (criticizing patentee for attempting to elevate evidence outside the patent "rather than relying solely on the phrase's admittedly unambiguous language"); *id.* at 807 (criticizing patentee's reference to limitations "implie[d]" by the specification, finding "those limitations cannot be read into the broader language in claim 1"). To be clear, Amgen is not seeking to import into the construction of the disputed term any specific values of any feature that makes the formulation suitable for intravitreal administration—that would be improper, as the claim recites none. Rather, it is Regeneron that seeks to re-interpret the claim by adding further narrowing language where none exists. As in *Medeva*, Amgen's construction "accurately reflects the phrase's ordinary and customary usage" and "does not carry the extra baggage [i.e., 'does not

impose functional requirements such as stability'] sought to be loaded onto the phrase by [Regeneron]." *Id.* at 808.

5. Regeneron Ignores the Case Law Which Supports That the Claim Term is Functional.

The weight of the case law is clear that terms like "suitable for intravitreal administration" are functional. Remarkably, Regeneron again ignores the very case law that it relied upon before the Patent Office in the related '865 Patent IPR, which addressed an analogous term to the disputed term: "pharmaceutical formulation suitable for intranasal administration." *Impax Lab'ys.*, 2015 WL 7737309, at *3. The court in *Impax Lab'ys.* used nearly the same language used in Amgen's construction, stating "the formulations '***must possess features making them appropriate for intranasal use.***'" *Id.* (emphasis added).

Additional case law that Regeneron relied on in the *Mylan* case further supports Amgen's proposed construction. For example, in *Mylan*, Regeneron relied on *Panasonic Corp. v. Magna Int'l Inc.*, which the Court in turn relied on in the context of "suitable for intravitreal administration." *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, No. 22-cv-61-TSK, Regeneron's Proposed Findings of Fact and Conclusions of Law, ECF No. 590 (N.D.W. Va. July 24, 2023) (Ex. 17 at 216); *Regeneron Pharms.*, 714 F. Supp. 3d at 749. In *Panasonic Corp.*, the court found that "'suitable for use for a vision system of a vehicle' describes an intended purpose or use for the invention and ***does not describe a structural feature***." No. 21-cv-319, 2022 WL 625089, at *18 (W.D. Tex. Mar. 3, 2022)) (emphasis added). This finding is precisely the opposite of what Regeneron now argues.

Similarly, Regeneron previously cited, and this Court relied on, *Sherwin-Williams Co. v. PPG Indus., Inc.* in the context of "suitable for intravitreal administration." Ex. 17 at 216; *Regeneron Pharms.*, 714 F. Supp. 3d at 749. In *Sherwin-Williams Co.*, the court found that

"suitable for forming an inside spray coating" required "base-line requirements identified in the specification" that made the coating composition "'suitable for' use as a spray-applied interior-can coating." No. 17-cv-1023, 2018 WL 3845239, at *7-8 (W.D. Pa. August 13, 2018). That is, the Western District of Pennsylvania determined that the term "suitable for" related to the ***use or function*** of the coating composition. *Id.*

These cases are also consistent with *Aventis Pharms. Inc. v. Impax Lab'ys., Inc.*, where the court acknowledged that the term "suitable" was functional. No. 02-cv-1322, 2011 WL 94188 (D.N.J. Jan. 11, 2011) (emphasis added) ("*Aventis v. Impax*"). In *Aventis v. Impax*, the court construed "a suitable antiadherent" to mean "stearic acid, [and others], or any similar compound that ***performs the same function*** by reducing adhesion of any of the tablet granulation or powder to the faces of the punches, or to the die wall, and by acceptably producing the claimed formulation while fulfilling the advantages of the invention over the prior art." *Id.* at *7 (emphasis added).

The case law, along with the plain language of the claims and the intrinsic record, all make clear that the disputed term is functional.

**D. Amgen's Construction Clarifies what "Suitable for Intravitreal Administration" Means.**

Regeneron's other arguments are unfounded. Despite failing even to proffer its own construction, Regeneron takes issue with "vague language like 'features' and 'as a whole' that can be used to launder additional, undisclosed requirements into the claims[.]" Regeneron Op. Br. at 2. Regeneron apparently contends that Amgen's construction should not be adopted because it does not spell out every possible feature that may impact whether a formulation is suitable for intravitreal administration. But Regeneron ignores that it chose the claim language "suitable for intravitreal administration" instead of specifically spelling out every feature that may make a formulation suitable for intravitreal administration. That this argument holds no water is readily

apparent from the fact that nowhere in any of Regeneron's arguments (either its non-construction construction or its "compromise" position), does Regeneron even purport to identify all possible features that may impact formulation suitability.

As this Court recognized in *Mylan*, a proper construction need not resolve, in advance, every potential issue concerning a term. In *Mylan*, the Court recognized that it need not resolve whether every possible formulation satisfied one of the disputed claim terms, organic co-solvent, during claim construction. *See Regeneron Pharms.*, 2023 WL 11891335, at *3-*6. There, Regeneron sought to have this Court determine as part of claim construction that certain ingredients were categorically organic co-solvents outside of the context of any specific infringement or invalidity analysis. *Id.* But this Court correctly rejected Regeneron's argument, noting that deciding whether an accused embodiment or prior art falls within the claims was premature. *Id.* at *4 ("But deciding whether a particular ingredient in a particular formulation qualifies as an 'organic co-solvent' under the claims is premature—that analysis occurs after claim construction, and during the infringement and invalidity part of the case."); *id.* at *6 ("The Court will decide the question of whether a specific formulation with polysorbate 20, polysorbate 80, polyethylene glycol, or propylene glycol satisfies the 'organic co-solvent' claim language during the infringement and invalidity part of this case."). This Court's approach there is supported by a wealth of Federal Circuit precedent. *See* Amgen Op. Br. at 11-12 (citing *Voice Tech Corp.*, 110 F.4th at 1341; *Acumed LLC*, 483 F.3d at 806; *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016)).

Relatedly, Regeneron takes issue with Amgen's purported failure to "agree its definition did not impose" "[s]afety and efficacy" requirements. Regeneron Op. Br. at 20. But quite simply, Amgen's proposed construction does not ask the Court to read any such requirements into the

claims. It is well-known that the FDA has rigorous requirements for preclinical and clinical testing, as well as long-term stability testing, which are different than the requirements for patentability. The issue here, however, is not FDA approvability; the question is whether a formulation meets the claim requirement that it be "suitable for intravitreal administration." A formulation "suitable for intravitreal administration" must work for its claimed function—*i.e.*, intravitreal administration. Indeed, it is *Regeneron* that has offered expert testimony that an unsafe and harmful product would not be suitable for intravitreal administration. Ex. A at ¶ 7.7 (Regeneron's expert acknowledging that a formulation "suitable for intravitreal administration" must be "safe for administration into the eye"); *see also UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 530, n.19 (D. Del. 2016) ("A medicine is not suitable for chronic administration if it will be toxic to the liver.").

In prior proceedings, Regeneron argued that the formulation must have certain features associated with stability, such as a lack of particles. For example, Regeneron argued that the formulation must be injectable through a small-bore needle without forming particles to ensure that the formulation does not cause issues when injected into the eye of the patient. *See* Amgen Op. Br. at 15-16 (citing Ex. 9 at ¶ 49). As one of the alleged inventors, Dr. Kenneth Graham testified, the formation of particles in a formulation is "an exceptionally bad thing. It's bad in any formulation; **but for the eye, it's very bad.**" Ex. 5 at 1689:24-1690:3 (emphasis added). So, according to Regeneron, to be "suitable for intravitreal administration," the formulation cannot form particles (whether aflibercept particles or precipitates formed by including other excipients). Ex. 9 at ¶ 49 ("Preventing aflibercept from aggregating and coming out of solution is especially important in the context of intravitreal injections.") (citations omitted).

During the infringement and validity phase of the case, Regeneron should be held to their prior positions on "suitability for intravitreal administration." But here, in claim construction, it is improper for Regeneron to pick and choose which features make a formulation "suitable for intravitreal administration" using language that does not appear in the claims, specification, or anywhere else in the relevant record. Nor is it appropriate for Regeneron to try and force Amgen into taking such a position. Claim construction is about interpreting the language of the claims—not an exercise in rewriting the claims to *a priori* decide merits-related issues. *See, e.g.*, *Regeneron Pharms.*, 2023 WL 11891335, at *4 ("[D]eciding whether a particular ingredient in a particular formulation qualifies as an 'organic co-solvent' under the claims is premature—that analysis occurs after claim construction, and during the infringement and invalidity part of the case.").

**E. Regeneron's Admissions from Foreign Proceedings are Properly Considered.**

In Amgen's opening brief, Amgen presented a number of Regeneron's prior statements to this Court and tribunals across the world for the basic point that there are features that make a formulation suitable for intravitreal administration, and that those features are determined by the attributes of the formulation as a whole. *See* Amgen Op. Br. at 14-20. Regeneron does not dispute the veracity of Amgen's argument in its opening brief and appears to agree with (and reaffirm) its prior technical statements (although they raise tangential characterizations in an attempt to preserve credibility). *See* Regeneron Op. Br. at 23 ("As pH, osmolality, and viscosity are structural, not functional, properties, there is no inconsistency between Regeneron's statements in other proceedings and its position here."). Oddly, however, Regeneron continues to try and distance itself from these statements on legal grounds. *Id.* at 21.

But the cases on which Regeneron relies involve clearly distinguishable circumstances. Namely, Regeneron's cases involve situations where a party was attempting to rely on a foreign

decision or statement *relating to an issue of foreign law*. That is not the case here—Amgen does not seek adjudication of the present dispute based on rulings in foreign proceedings that turn on aspects unique to foreign law. Nor is Amgen asking this Court to adopt a claim construction from a foreign proceeding. Rather, Regeneron's prior statements demonstrate that there are features which determine whether a formulation, as a whole, is suitable for intravitreal administration and relate to matters of scientific or technical fact—not issues of foreign law.

For example, the situation here is nothing like that in *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, where the parties disputed the effect of a German court's decision on claim construction. No. 09-cv-598, 2011 WL 722937, at *5 (D. Del. Feb. 23, 2011) (Stark, J.). Likewise, the situation here is distinguishable from *Medtronic, Inc. v. Daig Corp.*, where, as Regeneron emphasizes, the district court labeled "specious" an argument "to adopt the conclusion of a German tribunal." Regeneron Op. Br. at 10 (citing 789 F.2d 903, 907-08 (Fed. Cir. 1986)).

This case is also readily distinguishable from *Pfizer, Inc. v. Ranbaxy Lab'ys. Ltd.*, where the court determined that "the statements made during prosecution of foreign counterparts to the [patent-in-suit] are irrelevant to claim construction ***because they were made in response to patentability requirements unique to Danish and European law***." 457 F.3d 1284, 1290 (Fed. Cir. 2006) (emphasis added). Here, in contrast, Amgen is relying on Regeneron's statements regarding issues of *fact* relating to the claim term. Amgen's reliance on Regeneron's statements abroad is proper and supported by the appropriate and analogous case law. *See* Amgen Op. Br. at 17-20.

### F. Regeneron's Allegations Regarding the Parties' Claim Construction Negotiations are Inaccurate and Miss the Point.

Lastly, Amgen addresses several of Regeneron's *ad hominem* arguments regarding Amgen's alleged motivations and perceived tactics during the claim construction exchange process, which Regeneron apparently seeks to make a centerpiece of its arguments. Although a

full recounting of those exchanges and meet and confers is neither necessary nor appropriate to resolve the claim construction issue, Amgen addresses several inaccuracies in Regeneron's brief.

*First*, contrary to Regeneron's allegations, Amgen repeatedly explained to Regeneron why it proposed "suitable for intravitreal administration" for construction. There is nothing mysterious nor nefarious, as Regeneron suggests, about Amgen's motives. Amgen initially proposed the term and its construction to make clear that the term applied to the formulation "as a whole." That is because during the appeal of the *Mylan* case, Regeneron's counsel argued the term required that the formulation "contains components that can be used intravitreally and nothing more." Ex. 2 at 44:23-45:1. In other words, Regeneron's counsel appeared to adopt the position that "suitable for intravitreal administration" could be determined by assessing each of the individual components in isolation, apart from the formulation as a whole. Because Amgen disagrees, it sought clarification through the claim construction process.

During discussions, Regeneron ultimately agreed with this aspect of Amgen's construction, yet was unwilling to adopt Amgen's proposed language. Indeed, even now, Regeneron still argues that "Amgen's addition of 'as a whole' thus resolves nothing and should be rejected." Regeneron Op. Br. at 25, n.4. That Regeneron even now refuses to agree to Amgen's proposed language demonstrates why Amgen sought to have the term be construed.

*Second*, it was Regeneron, not Amgen, that first raised the issue of whether the term was "functional." Regeneron proposed a so-called "compromise" construction that expressly excluded any functional aspect, *i.e.,* that it "requires only that the composition may be administered intravitreally and does not impose functional requirements such as stability." Ex. 3. Because that exclusion is not supported by any intrinsic (or even extrinsic) evidence and, moreover, would read a narrowing limitation into the claim term, Amgen could not agree to it. Yet at other times during

the meet and confer process, Regeneron sought to distance itself from this "compromise" claim construction and stated that it was not pursuing that construction (nevertheless, this still appears to be Regeneron's position, *see* Regeneron Op. Br. at 2-3, 18-23).

Despite saying this was not their construction, Regeneron continued to demand answers to hypothetical questions about what features Amgen considered functional. Regeneron refused to provide its own explanation to these questions (to date, it still has not). And as explained throughout this brief, *see supra* Section II.D, Amgen did not believe it was appropriate or necessary to spell out or characterize every feature that may impact the suitability of the formulation for intravitreal administration at the claim construction stage. As Amgen maintains, this question is appropriate for the infringement and invalidity stage of the case, as this Court recognized in its *Mylan* claim construction decision. *See id.* To be clear, Amgen never proposed importing specific functional requirements into the claims; Amgen simply opposed Regeneron's "counterproposal," which sought to narrow the claim by importing only structural limitations and excluding functional requirements. Regeneron's attempt to suggest otherwise is pure fiction.

## III. CONCLUSION

For the reasons set forth in Amgen's opening brief and herein, the Court should adopt Amgen's construction.

September 16, 2026

Respectfully submitted,

**AMGEN INC.**

/s/ John R. Labbe

John R. Labbe (PHV)
Kevin M. Flowers (PHV)
Thomas Burns (PHV)
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
6300 Willis Tower
Chicago, IL 60606
(312) 474-6300

Stuart A. McMillan [WVSB #6352]
smcmillan@bowlesrice.com
BOWLES RICE LLP
600 Quarrier Street
Charleston, West Virginia 25301
(304) 347-1110

Kaitlyn N. McKitrick [WVSB #12782]
kmckitrick@bowlesrice.com
BOWLES RICE LLP
125 Granville Square
Morgantown, West Virginia 26505
(304) 285-2500

E. Anthony Figg (PHV)
Joseph A. Hynds (PHV)
Jennifer Nock (PHV)
Brett A. Postal (PHV)
ROTHWELL, FIGG, ERNST, & MANBECK, P.C.
901 New York Avenue, NW
Suite 900 East
Washington, D.C. 20001
(202) 783-6040

Jesse M. Weiss (PHV)
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
jweiss@cravath.com

Wendy Whiteford (PHV)
Eric Agovino (PHV)
Chanson Chang (PHV)
Pauline Pelletier (PHV)
Gregory Bonifield (PHV)
AMGEN INC.
One Amgen Center Drive
Thousand Oaks, CA 91320
(805) 447-1000

*Attorneys for Defendant Amgen Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2026, I caused a true and correct copy of the foregoing Amgen Inc.'s Responsive Claim Construction Brief to be filed and served on all counsel of record via the Court's ECF system, along with the Declaration of Brett A. Postal and Exhibits 14-17.

/s/ John R. Labbe
John R. Labbe