# EXHIBIT 14

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF WEST VIRGINIA

Regeneron Pharmaceuticals, Inc.

Plaintiff,

VS. CIVIL ACTION NO.

1:22-cv-61

Mylan Pharmaceuticals, Inc., and Volume 8

Biocon Biologics,

Defendants.

\- - -

Proceedings had in the bench trial of the above-styled action on June 22, 2023, before Honorable Thomas S. Kleeh District Judge, at Clarksburg, West Virginia.

\- - -

APPEARANCES:

On behalf of the Plaintiff:

David I. Berl
Ellen E. Oberwetter
Arthur J. Argall, III
Kathryn S. Kayali
Haylee Bernal Anderson
Andrew V. Trask
Williams & Connolly, LLP
680 Maine Avenue, SW
Washington, D.C. 20024
202.434.5000

Andrew E. Goldsmith
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M. Street NW, Suite 400
Washington, DC 20036
202.326.7945

APPEARANCES CONTINUED ON NEXT PAGE

On behalf of the Plaintiff, continued:

Steven Robert Ruby
Carey, Douglas, Kessler & Ruby, PLLC
797 Virginia Street, East, Suite 901
Charleston, WV 25301
304.345.1234

Petra Scamborova
Regeneron Pharmaceuticals, Inc.
777 Old Saw Mill River Road
Tarrytown, NY 10591-6717
914.847.7611

On behalf of the Defendant:

Deanne M. Mazzochi
William A. Rakoczy
Heinz J. Salmen
Eric R. Hunt
Lauren M. Lesko
Neil B. McLaughlin
Lawrence Scott Beall
Katie A. Boda
Rakoczy, Molino, Mazzochi & Siwik, LLP
6 W. Hubbard Street, Suite 500
Chicago, IL 60654
312.527.2157

Gordon H. Copland
William J. O'Brien
Steptoe & Johnson
400 White Oaks Blvd.
Bridgeport, WV 26330
304.933.8162

Proceedings recorded utilizing realtime translation.
Transcript produced by computer-aided transcription.

Thursday morning session,
June 22, 2023, 9:00 a.m.

- - -

THE COURT: This Thursday we convene for day eight of trial. Counsel is present. The Court did see the joint stipulation the parties filed. The Court's digital signature is being affixed to that as we speak and will be entered forthwith.

Anything else we need to take up before we hear from Mylan's next witness, then?

MS. OBERWETTER: No, Your Honor. We're ready to call our next witness.

THE COURT: Okay.

From the defense standpoint, anything else?

MS. MAZZOCHI: No, not right now, Your Honor.

THE COURT: All right. Regeneron may call its next witness, then.

MS. OBERWETTER: Yes, Your Honor. Regeneron calls its next witness, Dr. Karl Csaky.

THE COURT: Hello, again, Dr. Csaky.

If you wouldn't mind repeating the drill. Come all the way to the front. We'll have you sworn in and ask you to take the witness stand. Thank you, sir.

**KARL CSAKY, MD, PHD, PLAINTIFF'S WITNESS, SWORN**

MS. OBERWETTER: Before we start, Your Honor, I

believe everyone should have their advance copies of the binder and slides.

THE COURT: I believe I do. Thank you all very much.

Good morning again, Doctor. If you wouldn't mind adjusting that mic. Stay close to that for us.

Counsel, you may proceed.

DIRECT EXAMINATION

BY MS. OBERWETTER:

Q. Good morning, Dr. Csaky. Can you please reintroduce yourself to the Court.

A. Yes. My name is Karl Csaky. I'm a retina specialist from Dallas, Texas.

Q. And we're going to cover -- since you were here with us last week, we're going to cover some material today that relates some other of your opinions besides those bearing on infringement. I'd like to start first with your definition of the POSA.

If we can please pull that up onto the screen.

For the record, that's PDX 8.002.

Can you please read for us your definition of the POSA.

A. Yes. So this is the definition that I used during my opinions.

A person of ordinary skill in the art relevant to the claims is an ophthalmologist with experience in treating

angiogenic eye disorders, including through the use of VEGF antagonists, and would have access to individuals with experience with intravitreal injection formulations.

Q. Okay. And if we take that slide down, how would you characterize the POSA's goals in the pre-2011 time period in coming up with a potential treatment regimen for treating an angiogenic eye disorder such as wet AMD or DME or diabetic retinopathy?

A. Right. So our goals back then were very similar to what our goals are today, right? First is to maximize patient's vision. That's our number one obligation.

Second would have been -- as we've seen through multiple testimonies, injections are not a good thing. And so we would have tried to reduce the number of injections that we were giving to patients to achieve that maximum vision that we could offer them.

And then of course we also wanted to reduce the burden on having them come to the office. That was another big burden that this new type of therapy was kind of challenging us. And, of course, last but not least was of course the safety, right? And we'll talk about that these were these new class of drugs that we weren't really that familiar with. And so we wanted to ensure that we were doing these in a safe way and not exposing patients to undue risks.

THE COURT: Ms. Oberwetter, I'm sorry. My machine

just booted up, and my digital sticky note just reminded me.

For those charged with lunch arrangements and whatnot today, we're going to take a lunch break starting at 11:00. So if anyone needs to alert Panera, Subway, or whomever, my apologies. The vagaries of one of the Kleeh children's camp schedules and softball tournament schedules require us to move our lunch break up a little bit.

We'll break from 11:00 to 12:30 because we have a criminal matter we have to take up at 12:15. So for those charged with the all-important lunch arrangements, you're hereby on notice.

And, with that, I'm sorry, Ms. Oberwetter. You may resume.

MS. OBERWETTER: Thank you, Your Honor. That seems like information that should be spread far and wide.

THE COURT: Yes. I see the flurry of digital communications ensuing. And my apologies. Like I said, my digital reminder just prompted me.

But go right ahead.

MS. OBERWETTER: Thank you, Your Honor.

BY MS. OBERWETTER:

Q. Dr. Csaky, I'd like to address at a high level some of the treatment strategies for administering anti-VEGF treatments that existed before 2011. What were the strategies that were regularly in use?

A. Right. So as we'll talk about, there really were the monthly injection strategy, right? And I think -- as we'll talk about through my opinions this morning, one thing that I think I really want to remind everyone in the court in particular that the advent of these anti-VEGF agents in ranibizumab, not only was it a novel therapy for patients, but the key was also the amazing success that we got.

I happened to be practicing in the era before anti-VEGF. And patients went blind, right? So, first of all, we wanted to achieve that maximal benefit to patients. And so monthly we knew could achieve that. So that was a -- still in use.

But, again, because of the burden of monthly injections, we had started to pivot to these individualized prn approaches. And eventually that kind of morphed into treat and extend. So those were really the ones that were practically in use for most of this period.

Q. Beyond those strategies that you just described, were there clinical trials that had attempted other approaches?

A. Right. We'll talk about that briefly. One of the easiest approaches that we first thought of in terms of the treatment burden was simply to extend the intervals. And one of those approaches of that was simply to say let's go out -- rather than every month, let's go out to every three months. And so those were multiple attempts to do that right really

from the very beginning of approval of ranibizumab in particular.

Q. Okay. And prior to 2011, how were those efforts going?

A. Well, as we'll talk about, those were less than successful, right? And, again, I think what's critical to understand is that we were able to offer patients this ability to really dramatically improve their vision, right? It wasn't just that they were having some activity; we needed to make sure that these patients were getting -- you know, over a third of patients would get three or more lines of vision gained. That was unheard of before anti-VEGF therapies. So it was very important for us to continue those. And so these kinds of approaches were not achieving that.

Q. What was the predominant method of attempting to do extended dosing prior to 2011?

A. So again, you know, as we said, we were pivoting to these personalized approaches, right, these personalized prn, as we've heard, and treat and extend. And those were really kind of the major efforts that were ongoing.

Q. Can you remind us what prn stands for?

A. So pro re nata. It's basically a way -- you know, it's as needed. And as we'll talk about, we'll kind of indicate how that was used in the real world.

Q. Why was it that prn was the prevailing strategy?

A. Well, part of it really was the development -- and so this is an interesting fact, that at the same time that we were doing these injections, there was technology that was becoming available called optical coherence tomography. And this was a --

THE COURT: Will you say that again, Doctor. I'm sorry?

THE WITNESS: Optical coherence tomography. We'll call it OCT for short. Okay?

THE COURT: Thank you.

THE WITNESS: And what this does is it's a noninvasive way. We shine a little bit of laser into the eye. It reflects back, and it gives us detailed structure of the retina, right?

And so suddenly now we were able in real time to look at patients and determine what degree of activity -- we would call it angiogenic activity -- we would be able to see because this OCT could show us changes in the retina that might reflect activity of disease.

BY MS. OBERWETTER:

Q. Why don't we take a look at just what an OCT scan looks like.

If we can pull up slide PDX 8.004, which is images taken from DTX 3131. Can you explain what we're looking at here?

A. Yes. If I could just one second ask for a laser pointer that I forgot to bring up.

THE COURT: Yes, sir, you may approach.

THE WITNESS: I apologize. I should have brought that. Thank you.

So the key thing here -- and I think this is really a critical aspect of understanding where we were in this period of time. So here we have -- and this is from an article that I cited in my report.

Essentially these are images from an OCT device. And what you see here on Month 24 is what we would call normal morphology, right? So you could actually in real time start to see cross sections of the retina. And in this case there's retinal structures here. Underlying it there's some normal retinal structures. And you've heard on several testimonies this idea of a dry macula.

This is what we would call a dry macula. There's no swelling. I think this is a good example of -- if you go over here to -- on the left-hand side, you can see the difference, right? This area represents a change in OCT. Black just means, in some case, fluid.

And so all of a sudden now in real time I'm able to look at a patient and say, you know something? There's activity here because this doesn't look like that. And this has now fluid and activity. And in the concept of anti-VEGFs,

right, we would actually call this approach a VEGF meter, meaning you would assume that, when there was activity, the VEGF levels were going up, causing fluid to reaccumulate. And when there was no fluid, we would assume that the VEGF levels were then normal, right?

THE COURT: Is this the same eye?

THE WITNESS: This is the same eye.

So this would be -- this is actually in this prn article. And this is what the attempt was. The patient would come in. If this was the appearance, you would inject, try to achieve this. The patient comes in now to the clinic looking like this. I go "don't need to treat" because I don't see any swelling.

So this was a critical technology that was integral to this development of prn, personalized, because it turned out that the rate of this fluid reaccumulation after treatment was all very individualized. Each person had their own rate, and we could now measure that rate with this OCT device.

BY MS. OBERWETTER:

Q. Dr. Csaky, the images that you took here were from an article about the PrONTO trial; is that correct?

A. Correct.

Q. What was the PrONTO trial?

A. So the PrONTO trial was really one of the first trials to try to understand if using this approach, right,

would accomplish again these similar outcomes that we saw with monthly.

Again, this monthly was, you know, this very high bar that we were trying to achieve. And so in this case we were trying to see could I use this approach to tailor my treatments -- not treat here, only treat here -- and see in this way -- hold back injections, and in this way decide if this approach would get me some better outcomes than I did when I was trying to just simply -- extending my dosing every three months.

Q. And what did the PrONTO trial show?

A. So while the PrONTO trial was still a relatively small trial, it was very encouraging. There was -- the data suggested that the outcomes of this approach -- which, again, was very different than fixed -- that using this type of approach in a small study, we could start to achieve some of these really good outcome in patients.

And so you can well imagine how dramatic this was. I didn't have to treat this patient. I could have this patient come back next month. If the patient looked like this, I didn't have to treat. Next month, no treatment. Next month, reaccumulation, then treat.

So I could see -- you can understand this is very personalized, right? And each person would have their own individual time for when the fluid may or may not come back.

Q. Dr. Csaky, is prn still a predominant methodology for treating patients?

A. It kind of fell -- it kind of evolved into treat and extend. And the reason why is prn required frequent visits, right? So the idea was I would see the patient back almost every month. And every month I would do this. And poor Mrs. Smith would say, "Well, Dr. Csaky, I wasted a trip. You told me nothing's going on. Yay."

But I'd have to see her back the next month and the next month. And then when she got fluid, I would treat. And so we eventually kind of figured out that these intervals that patients would demonstrate for recurrence could be not quite like the stock market, but we could be predicted to some degree. And so we would play around with these intervals, eventually getting to the point where we were trying to prevent this from happening just before it would happen.

So that was kind of the treat and extend. We would start to extend these intervals. When there was fluid, we would then back off and continue to treat on that interval.

Q. Okay.

We can take that slide down.

Dr. Csaky, is a fixed extended-dosing interval the same as a personalized approach?

A. No. It's completely different. As I said, with fixed we simply are having patients come back in on a very

regimented kind of schedule, and we just continue to inject. That was what -- ANCHOR and MARINA was the first trial to do that. And so this was a -- these -- the injections on prn and OCT, we would call conditional. You had to show some activity, change in vision plus fluid, in order to treat; whereas fixed, I go ahead and treat every time.

Q. I'd like to take a look at a slide from Dr. Albini's presentation that he referred to as extended regimens.

If we can put up PDX 8.0005, Slide 5.

You were here for Dr. Albini's testimony?

A. Yes, I was.

Q. And what was your reaction to the way he grouped this set of references as a category under extended regimens?

A. Well, what he outlined here were all these -- either based off various publications and surveys or articles was really either some type of prn or treat and extend. All right? So when I looked at the heading, I felt as if it was somewhat of an incomplete heading because, while this does allow you to have extended regimens, the key point, as I just pointed out, is these are all personalized based, right? So these are all based off individual response, individual recurrence of fluid. When do I treat on these varying intervals?

So I would have kind of added, to be a little bit more accurate, the adjective that these are personalized extended regimens.

Q. All right.
And we can take that slide down.
I want to change topics a little bit and talk at a high level about clinical trials. If we can talk briefly about the phases of clinical trials. And you were here for Ms. Chu's testimony also, correct?
A. Correct.
Q. Before we get into clinical trials, can you remind us briefly of your experience with clinical trials in treating angiogenic eye disorders.
A. Yes. So I've had a fair amount of experience. When I worked at the NIH as a government employee, I worked closely with the FDA on end points in clinical trial designs. I've been involved with being a study chair, which I overran studies. And I've been involved in Phase I, Phase II, and Phase III trials.
Q. And very briefly, what are Phase I, Phase II, and Phase III trials?
A. Right. Well, as you heard briefly, so Phase I at least -- and this is from the POSA's perspective -- we kind of -- you know, when I'm doing a Phase I, what we're really looking for is to make sure that nothing horrible happens to the eye. So when you inject these new drugs into the eye, what you're really trying to make sure is that nothing terrible happens to the eye. And that's really the intent.

And many times there's a dose escalation. So if a little bit of it doesn't do anything bad, you slowly, with a small number of patients, increase the dose and just ensure that there's nothing terrible happening with these early -- with the drug.

Q. And then Phase II?

A. In Phase II -- so once you have kind of a sense that there's -- at least the eyes are not going -- something terrible is not going to happen, then you start to think about, okay, how can we start to decipher a dose and some type of regimen that may or may not give us some ideas of activity.

Phase IIs typically are also underpowered to be sure of efficacy, to make sure there's a benefit, but it starts to give you some signals as to where you might want to go with your Phase III trials.

Q. And then just very briefly, Phase III?

A. Phase IIIs are the -- you know, they're the big ones. They're the hundreds and hundreds, if not thousands, of patients, very -- with very clear guidelines with a goal ultimately of -- with these large number of patients, being able to demonstrate safety and efficacy for the FDA's requirements and then submission to the FDA for approval.

Q. Do most drugs make it through the development process all the way through Phase III?

A. No. No. I mean, that's -- there's so many steps

along the way. And, you know, having been in this for a while, we see lots of examples that animal work doesn't translate to humans. There's various issues that come up along the way. Safety is one of them, for example, that can be unpredicted. So there's lots of reasons why, again, we don't reach that bar of true efficacy and safety.

Q. I'd like to pause for a moment to talk about what have some of the failures been over time in the category of treating angiogenic eye disorders.

A. Right. Even back in that period of time, because of, you know, MARINA and ANCHOR and the fact that there was this tremendous enthusiasm, lots of companies were looking at different technologies. There was siRNA technologies, the company I worked with, trying to inhibit the production of VEGF at the RNA level, for example. That failed.

And then of course going through the history, there were other failures where -- you know, for example, trying to augment the activity of anti-VEGF. Those also failed. And of course we've had more recent failures. And many times there's even failures at the very end because of safety.

Q. Can you speak briefly about a drug called Beovu.

A. Yeah, Beovu, brolucizumab, was a -- somewhat unusual. And it too actually was derived -- it's an interesting history -- from antibodies found in camels. Camels have very small antibodies. And so the thinking was that these smaller

CERTIFICATE

I, Cindy L. Knecht, Registered Professional Reporter and Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action on June 22, 2023, as reported by me in stenotypy.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 22nd day of June 2023.

/s/Cindy L. Knecht
_____________________________
Cindy L. Knecht, RMR/CRR
Official reporter, United States
District Court for the Northern
District of West Virginia