**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

| | |
|---|---|
| IN RE: AFLIBERCEPT PATENT LITIGATION<br><br>**This Document Relates to:**<br>*Regeneron Pharmaceuticals, Inc. v. Amgen Inc.*,<br>**Case No. 1:24-cv-39-TSK**<br>**Case No. 1:25-cv-74-TSK** | MDL No. 1:24-md-3103-TSK |

**REGENERON'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS


I. THE COURT MUST RESOLVE THE PARTIES' STRUCTURAL VS. FUNCTIONAL DISPUTE....................4

II. VISCOSITY, OSMOLALITY, TONICITY, PH, AND TURBIDITY ARE STRUCTURAL PROPERTIES....................5

III. "SUITABLE FOR INTRAVITREAL ADMINISTRATION" IS A STRUCTURAL REQUIREMENT....................6

- A. Structural Limitations Describe What a Composition Is; Functional Limitations Describe What It Does....................6
- B. The Intrinsic Record Establishes the Term's Structural Meaning....................7
- C. Controlling Precedent Forecloses Importing Unrecited Functional Requirements....................8

IV. AMGEN'S BRIEF CONFIRMS THAT ITS CONSTRUCTION IS A TROJAN HORSE....................9

- A. The "Features" Amgen Identifies Are Structures, Not Functions....................10
- B. Amgen's Only Hinted Function Cannot Be Imported....................12
- C. Amgen's Construction Supplies No Standard....................15
- D. Amgen's Remaining Arguments Do Not Support Its Construction....................17

V. REGENERON HAS BEEN CONSISTENT THAT "SUITABLE FOR INTRAVITREAL ADMINISTRATION" TURNS ON STRUCTURAL FEATURES....................19

- A. Regeneron's Statements in *Mylan* and Before the Patent Office Are Consistent with Its Construction....................20
- B. Regeneron's Statements in Foreign Proceedings Do Not Support Amgen's Construction....................23

VI. CONCLUSION....................25

# TABLE OF AUTHORITIES

## CASES


*Actelion Pharms. Ltd. v. Mylan Pharms. Inc.*, 175 F.4th 1336 (Fed. Cir. 2026)..........................10

*Acumed LLC v. Stryker Corp.*, 483 F.3d 800 (Fed. Cir. 2007)..................................................19

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264 (Fed. Cir. 2011)...................................23

*Astellas Pharma Inc. v. Zydus, Inc.*, 2025 WL 1111447 (D. Del. Apr. 15, 2025)................ passim

*AstraZeneca AB v. Mylan Pharms., Inc.*, 2022 WL 17178691 (N.D. W. Va. Nov. 23, 2022)..................................................6, 9, 11, 12

*Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 2011 WL 722937 (D. Del. Feb. 23, 2011) (Stark, J.)..................................................23

*Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324 (Fed. Cir. 2012) .............................. passim

*Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305 (D. Del. 2010).............................9, 14

*Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353 (Fed. Cir. 2017) .....................................22, 23

*BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360 (Fed. Cir. 2017)...................................6, 11

*Biacore v. Thermo Bioanalysis Corp.*, 79 F. Supp. 2d 422 (D. Del. 1999)....................................9

*Big D Indus. v. Fresh Prods., Inc.*, 2022 WL 1017908 (W.D. Okla. Apr. 5, 2022)......................15

*C.R. Bard, Inc. v. Med. Components, Inc.*, 2020 WL 6902367 (D. Utah Nov. 24, 2020)...............8

*CellTrust Corp. v. ionLake, LLC*, 625 F. Supp. 3d 810 (D. Minn. 2022)....................................15

*Centripetal Networks, LLC v. Cisco Sys., Inc.*, 2026 WL 1162800 (Fed. Cir. Apr. 29, 2026)..................................................22, 23

*ClearPlay, Inc. v. Dish Network LLC*, 2019 WL 4015642 (D. Utah Aug. 26, 2019)...................15

*Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358 (Fed. Cir. 2001)..................................................8

*Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314 (Fed. Cir. 2016)...........4, 16, 19

*Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378 (Fed. Cir. 2009) ...........................16

*Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367 (Fed. Cir. 2005)....................................23

*In re Aflibercept Pat. Litig.*, 2024 WL 3422971 (N.D. W. Va. June 24, 2024)............................20

*In re Aflibercept Pat. Litig.*, 2024 WL 3423047 (N.D. W. Va. July 9, 2024) ..............................20

*In re Schreiber*, 128 F.3d 1473 (Fed. Cir. 1997) ..............................6, 8

*In re Swinehart*, 439 F.2d 210 (C.C.P.A. 1971) ..............................6, 11

*Indus. Tech. Rsch. Inst. v. ITC*, 567 F. App'x 914 (Fed. Cir. 2014) ..............................8

*Kaufman v. Microsoft Corp.*, 34 F.4th 1360 (Fed. Cir. 2022) ..............................3, 4, 12, 15

*Kyowa Hakka Bio, Co. v. Ajinomoto Co.*, 2020 WL 3403207 (D. Del. June 19, 2020)..............................23

*Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings Inc.*, 2025 WL 2659149 (Fed. Cir. Sept. 17, 2025)..............................4, 8, 13, 20

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004)..............................8, 18

*Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361 (Fed. Cir. 2004) ..............................16

*Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*, 927 F.3d 1232 (Fed. Cir. 2019) ..............................9, 14

*Medeva Pharm. Mfg., Inc. v. Morton Grove Pharms., Inc.*, 174 F. Supp. 2d 802 (N.D. Ill. 2001) ..............................2, 9, 14

*Medicis Pharm. Corp. v. Actavis Mid Atl. LLC*, 2012 WL 2126873 (D. Del. June 12, 2012) ..............................10, 11

*Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903 (Fed. Cir. 1986)..............................23

*Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 764 F.3d 1392 (Fed. Cir. 2014) ..............................12

*Mitsubishi Chem. Corp. v. Barr Labs., Inc.*, 435 F. App'x 927 (Fed. Cir. 2011)..............................14

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319 (Fed. Cir. 2004)..............................8

*O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) .............................. passim

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ..............................20

*Pacira Pharms., Inc. v. eVenus Pharms. Labs., Inc.*, 2024 WL 3812188 (D.N.J. Aug. 9, 2024) ..............................2, 11

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284 (Fed. Cir. 2006) ..............................23

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..............................8, 12, 18

*Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372 (Fed. Cir. 2024)..............................16

*Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, 714 F. Supp. 3d 652 (N.D. W. Va. 2024)........................................................................................... passim

*Samesurf, Inc. v. Intuit, Inc.*, 2025 WL 1287805 (S.D. Cal. May 2, 2025) ............................22, 23

*Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318 (Fed. Cir. 2002).........2, 4, 8, 14

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001) .........................................................................................................................18

*SpeedTrack, Inc. v. Amazon.com, Inc.*, 998 F.3d 1373 (Fed. Cir. 2021) .......................................15

*Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012) ..........................7, 15, 17

*Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367 (Fed. Cir. 2001)....................................4, 8

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554 (Fed. Cir. 1997)..........................................19

*United Therapeutics Corp. v. Liquidia Techs., Inc.,* 74 F.4th 1360 (Fed. Cir. 2023)...............2, 13

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007) .......................18

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795 (Fed. Cir. 1999)................................19

*Voice Tech Corp. v. Unified Pats., LLC*, 110 F.4th 1331 (Fed. Cir. 2024) ..................................19

Amgen's opening brief confirms the dispute: whether "wherein the liquid ophthalmic formulation is suitable for intravitreal administration" imposes a ***structural*** requirement—assessed, as this Court held in *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, 714 F. Supp. 3d 652 (N.D. W. Va. 2024) ("*Mylan*"), by reference to what the formulation contains—or whether it is instead a vehicle for unidentified and unrecited ***functional*** requirements. Regeneron's position is that the phrase carries its ordinary, structural meaning. ECF 946 at 13-16. Amgen's position is that the phrase "includes functional requirements." ECF 945 at 11. That disagreement concerns the scope of the claims, and "[w]hen the parties raise an actual dispute regarding the proper scope of the[] claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). It is not clear that the parties disagree about anything else—for example, Regeneron agrees that the term is limiting, that it must be given meaning, that it applies to the formulation as a whole, and that a POSA assessing suitability would consider the formulation's structural aspects—its viscosity, osmolality, tonicity, pH, and turbidity. ECF 945 at 6-11, 20-21.

Regeneron's structural construction follows from the intrinsic record. The claims recite the formulation by its ingredients, their amounts, its pH, its aggregate content, and its purity; the specification explains a formulation's suitability by reference to what it is (*e.g.*, by identifying excipients and concentrations); and the prosecution history shows the phrase was added for the modest purpose of designating the formulation as ophthalmic rather than intravenous. ECF 946 at 13-16. This Court reached the same understanding after trial in *Mylan*, crediting testimony that the POSA assesses suitability by consulting the excipients the patent teaches and "structures that had been used in intravitreal administration." 714 F. Supp. 3d at 750-51. Amgen, not a party to that litigation, is free to argue, as it does *sub silentio*, that the Court got it wrong. But controlling

precedent forecloses Amgen's functional construction. "Where a claim uses clear structural language, it is generally improper to interpret it as having functional requirements," *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324 (Fed. Cir. 2002), and courts have regularly refused to load the particular phrase "suitable for" with the safety, efficacy, and stability requirements Amgen seeks to impose, *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1329-30 (Fed. Cir. 2012); *Medeva Pharm. Mfg., Inc. v. Morton Grove Pharms., Inc.*, 174 F. Supp. 2d 802, 805-08 (N.D. Ill. 2001); *see also United Therapeutics Corp. v. Liquidia Techs., Inc.,* 74 F.4th 1360, 1368-69 (Fed. Cir. 2023).

Amgen has no answer. Nearly every "feature" its brief addresses defines the structure of the formulation. Amgen invokes viscosity, ECF 945 at 10, 14-15, 17-19; osmolality and tonicity, *id.* at 16, 18-19; pH, *id.* at 7-8, 19; and turbidity, which Amgen itself defines as "the cloudiness of the formulation," *id.* at 10. Each is a physical property of a liquid—fixed by the identity and amount of the formulation's ingredients—and each describes what the formulation *is* rather than what it *does*. ECF 946 at 23-24; *Astellas Pharma Inc. v. Zydus, Inc.*, 2025 WL 1111447, at *21 (D. Del. Apr. 15, 2025) (viscosity is a structural claim element); *Pacira Pharms., Inc. v. eVenus Pharms. Labs., Inc.*, 2024 WL 3812188, at *17 (D.N.J. Aug. 9, 2024) (pH is a "structural feature"). Amgen never confronts the distinction between structural and functional limitations; the words "structure" and "structural" appear nowhere in its brief. Relabeling structural properties as "functional" does not make them so.

Amgen identifies—but does not commit to—a single arguably functional requirement, positing that "a formulation that causes serious injury to the eye *would not likely be* suitable for intravitreal administration." ECF 945 at 10 (emphasis added). A claim construction cannot rest on a hedge, and the law would forbid this one even if Amgen embraced it. *United Therapeutics*,

74 F.4th at 1368-69; *Aventis*, 675 F.3d at 1330. Amgen's "features" language identifies no requirement and prescribes no standard to assess which functional requirements the term "suitable for intravitreal administration" does or does not impose. For Amgen, that is a feature, not a bug, as it desires the identity of those unknown functional "features" to be "resolved by the fact-finder on an appropriate evidentiary record" at some later stage, before a different court and a jury. ECF 945 at 11. Having asked the Court to construe the term, Amgen cannot now demand that the Court grant it carte blanche to reveal its preferred meaning later. A construction that defers the parties' dispute rather than resolving it defies controlling precedent and is no construction at all. *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1370 (Fed. Cir. 2022); *O2 Micro*, 521 F.3d at 1360-62.

Nor is there anything to Amgen's charge that Regeneron has "retreat[ed]" from positions taken elsewhere. ECF 945 at 13, 16-17. Regeneron advances here the construction this Court applied in *Mylan*, and its statements before the Patent Office and abroad describe the same thing: ingredients, amounts, and the physical properties they establish. When Regeneron has called a formulation unsuitable, the disqualifying feature has always been what was in the vial—20% sucrose combined with 100 mM sodium chloride, or a tonicity several times that of the eye. Amgen's foreign materials, offered under foreign legal standards, are extrinsic evidence that cannot displace the intrinsic record—especially since those materials are wholly consistent with that record. And in the years since *Mylan*, no biosimilar manufacturer—in the preliminary-injunction proceedings before this Court or in the four *inter partes* reviews of the related '865 patent—has read this language as Amgen urges, to impose a functional requirement. *Infra* § V.A. Amgen is the first. The Court should reject its construction and accord the term its plain and ordinary meaning.

# I. THE COURT MUST RESOLVE THE PARTIES' STRUCTURAL VS. FUNCTIONAL DISPUTE

| Claim Term | Regeneron's Construction | Amgen's Construction |
|---|---|---|
| wherein the liquid ophthalmic formulation is suitable for intravitreal administration | plain and ordinary meaning: wherein the liquid ophthalmic formulation is suitable for intravitreal administration | wherein the liquid ophthalmic formulation, as a whole, has features making it appropriate for intravitreal administration |

Claim construction resolves disputes about claim scope. *O2 Micro*, 521 F.3d at 1360. The dispute here is narrow and purely legal: does "suitable for intravitreal administration" impose a structural requirement, assessed by reference to what the formulation contains, or does it also impose functional requirements, assessed by reference to what the formulation does? Regeneron says the former; Amgen says the latter. ECF 946 at 13-16; ECF 945 at 11. Whether a claim term is structural or functional is an archetypal question of claim scope, and it is the Court's "duty to resolve it." *O2 Micro*, 521 F.3d at 1362; *see Schwing*, 305 F.3d at 1324-25; *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001); *Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings Inc.*, 2025 WL 2659149, at *5 (Fed. Cir. Sept. 17, 2025).

Although Amgen does not argue that the Court should decline to construe the term, it pursues the same end indirectly by proposing a construction that does not delineate the bounds of the claim and by asking that the meaning of that construction be punted to a fact-finder at some later stage. ECF 945 at 11; *infra* § IV.C. That is forbidden under *O2 Micro,* 521 F.3d at 1360-62, and its progeny. *See, e.g.*, *Kaufman*, 34 F.4th at 1370; *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318-19 (Fed. Cir. 2016). Amgen's position has been consistent only in its opacity. It rejected Regeneron's compromise construction—that the term "requires only that the composition may be administered intravitreally and does not impose functional requirements

such as stability," Ex. 1 (7/28 Berl Email)[1] at 1—for the single stated reason that it "disagrees" the term "does not impose functional requirements," ECF 929 at 8-9. It never said which requirements it had in mind. ECF 945 at 11 (declining to "import specific properties … into its claim construction"); Declaration of David I. Berl (ECF 946-1) ("Berl Decl.") ¶¶ 4-12; ECF 946 at 5-8. It still has not.

## II. VISCOSITY, OSMOLALITY, TONICITY, PH, AND TURBIDITY ARE STRUCTURAL PROPERTIES

The few requirements Amgen has identified are not in dispute. Amgen invokes viscosity, osmolality, tonicity, pH, and turbidity. ECF 945 at 7-8, 10, 14-19. Those are structural properties of the formulation, and Regeneron does not dispute that a POSA assessing suitability would consider them. *Infra* § IV.A. Amgen likewise devotes pages to propositions Regeneron accepts: that the term applies to the formulation "as a whole" rather than to its ingredients in isolation, ECF 945 at 6-8; that the term is limiting and "must be construed to have meaning," *id.* at 9, 20-21; and that "intravitreal administration" means administration into the vitreous humor, *id.* at 2 n.2. Amgen's case law addresses those agreed propositions and nothing more. *Id.* at 9 (citing *Merck* for the proposition that "[a] claim construction that gives meaning to all the terms of the claim is preferred"); *id.* at 20-21 (citing *Impax*, *Aventis Pharmaceuticals*, and *Biacore* for the proposition that "suitable" is limiting). Not one of those decisions considers whether unrecited functional requirements may be read into structural claim language. *Infra* § III.C.

Nor is Regeneron asking the Court to "spell[] out … all of the characteristics of a formulation that a POSA would assess in determining suitability for intravitreal administration," ECF 945 at 11, or to hold that only the individual components must be suitable, *id.* at 8. Regeneron

[1] Exhibits 1 through 23 cited herein are the exhibits to Regeneron's opening claim construction brief, ECF 946.

seeks confirmation of one thing: that the term does not carry unrecited functional requirements that Amgen could unfurl at a later stage, once the passage of time accomplishes what its failed remand motion could not—to evade this Court's expertise. Now is the time to leverage that expertise to determine the scope of the claim. Amgen has had numerous opportunities, including its principal brief, to identify the unrecited functional requirements it seeks to write into the claims. *See* ECF 945 at 11 (declining to identify "specific properties" at issue but urging this Court to "resolve the present dispute between the parties"). Should Amgen do so for the first time in its responsive brief, that belated disclosure would be improper and deprive Regeneron of an opportunity to respond. Regeneron thus reserves its right to move to strike Amgen's reliance on late-disclosed arguments or evidence. ECF 929 at 6.

## III. "SUITABLE FOR INTRAVITREAL ADMINISTRATION" IS A STRUCTURAL REQUIREMENT

### A. Structural Limitations Describe What a Composition Is; Functional Limitations Describe What It Does

The parties' dispute turns on a distinction the case law long ago established. A *structural* limitation defines what a composition *is*: the ingredients it contains, their amounts, and the physical properties fixed by that composition, such as its pH, viscosity, osmolality, and turbidity. A *functional* limitation defines what a composition *does*: the task it performs, the result it achieves, or how it behaves over time. *In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997) ("A patent applicant is free to recite features of an apparatus either structurally or functionally."); *In re Swinehart*, 439 F.2d 210, 212 (C.C.P.A. 1971); *AstraZeneca AB v. Mylan Pharms., Inc.*, 2022 WL 17178691, at *6-7 (N.D. W. Va. Nov. 23, 2022) ("grades or concentrations of … ingredients" are "structural limitations"; stability is "functional"); *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365-66 (Fed. Cir. 2017) (requirement that a composition be "effective" is "functional"); *Astellas*, 2025 WL 1111447, at *21 (viscosity is a structural claim element; dissolution rate, which

requires that a certain amount of a test sample be left after a specific time during a dissolution test, is a functional one). Amgen insists that the disputed term is functional. *E.g.*, ECF 945 at 3 ("an intravitreal formulation must have features to ensure the formulation can *function* as a formulation for intravitreal administration") (emphasis added); *id.* at 11 ("this phrase includes functional requirements"); *id.* at 12 (formulation "must have features allowing it to *function* appropriately for the intended purpose") (emphasis added). Yet Amgen never says what the formulation must *do*, what standard it must meet, or what test would establish compliance. Berl Decl. ¶ 10. Every "feature" Amgen actually identifies describes what the formulation *is*.

### B. The Intrinsic Record Establishes the Term's Structural Meaning

The intrinsic record resolves the dispute. ECF 946 at 13-16. The claim language describes a physical composition: aflibercept, water, an organic co-solvent, and a stabilizing agent, in recited amounts, within a recited pH range, along with, in certain claims, other explicitly recited requirements. ECF 946 at 13-14. The specification explains suitability by identifying excipients and concentrations, '099 patent, 2:49-55, 2:63-4:16, 8:9-12:26, and it uses "suitable for intravitreal administration" throughout as shorthand for the route by which the formulation is delivered, *id.* at 5:32-34. The file history is to the same effect: the phrase entered the claims to signal that these formulations are administered into the eye rather than into a vein. Ex. 21 at 10; ECF 946 at 16. Trial in the *Mylan* member case of this coordinated MDL proceeding confirmed as much: the Court credited testimony that the POSA gauges suitability by consulting the excipients the patent teaches and "structures that had been used in intravitreal administration." 714 F. Supp. 3d at 751; *infra* § V.A. Nothing in that record redefines the phrase or surrenders its ordinary scope, and absent lexicography or disavowal—neither of which Amgen argues—the term keeps "the full scope of its plain and ordinary meaning." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365-67 (Fed. Cir. 2012).

### C. Controlling Precedent Forecloses Importing Unrecited Functional Requirements

As Regeneron explained in its opening brief, ECF 946 at 10-12, 16-18, the decisions that address whether functional requirements may be read into structural claim language uniformly hold that they may not. "A patent applicant is free to recite features of an apparatus either structurally or functionally," *Schreiber*, 128 F.3d at 1478, but having chosen structure, the patentee's claim is construed as written. "Where a claim uses clear structural language, it is generally improper to interpret it as having functional requirements." *Schwing*, 305 F.3d at 1324; *accord Toro*, 266 F.3d at 1371 ("While this [claimed] structure could have a variety of other functions …, these functions do not become part of the claimed structure unless claimed as such."); *Lambeth*, 2025 WL 2659149, at *5 ("[T]here is nothing in the claim language providing that the [claim term] is based on function. … Accordingly, the claim term cannot be read to include the [proposed functional] requirement."); *Indus. Tech. Rsch. Inst. v. ITC*, 567 F. App'x 914, 919 (Fed. Cir. 2014) (rejecting a functional limitation where its proponent "fail[ed] to point to any language in the intrinsic evidence that requires adding this functional limitation into the construction"); *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001); *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1336 n.19 (Fed. Cir. 2004); *C.R. Bard, Inc. v. Med. Components, Inc.*, 2020 WL 6902367, at *8 (D. Utah Nov. 24, 2020). The canon is a corollary of the prohibition on importing limitations from the specification, and it applies with particular force where, as here, the limitation appears in a claim "recit[ing] only purely structural limitations."[2] *Toro*, 266 F.3d at 1371; *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1320, 1323 (Fed. Cir. 2005) (en banc); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906-07 (Fed. Cir. 2004);

[2] Claim 1 recites purely structural limitations. As explained *infra* in Section IV.A, claim 11 adds one functional limitation.

*AstraZeneca*, 2022 WL 17178691, at *6 ("Reading a stability limitation into 'pharmaceutical composition' violates the well-established principle that a court may not import limitations from the written description into the claims.").

Courts confronting the oft-used claim language "suitable for [a route of] administration" have applied that rule to reject what Amgen proposes here. In *Aventis*, the parties agreed that "perfusion" meant "a solution suitable for infusion into patients," but Sanofi urged that the solution must also be "effective for treatment, safe, and stable." 675 F.3d at 1329. Both the district court and the Federal Circuit refused, holding that the term carries "its ordinary meaning subject only to those specifically enumerated limitations" appearing in the claim. *Id.* at 1330-31; *Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305, 333-34 (D. Del. 2010). *Medeva* likewise construed "suitable for oral administration" to require simply that "animals and/or humans can ingest the solution orally." 174 F. Supp. 2d at 805-06, 808. Amgen's authorities hold only that "suitable" language is limiting, a proposition Regeneron endorses. *Supra* § II. In *Aventis Pharmaceuticals, Inc. v. Impax Laboratories, Inc.*, "suitable" limited which antiadherents could satisfy the claim, an inquiry into the identity of an ingredient. 2011 WL 94188, at *4 (D.N.J. Jan. 11, 2011). *Biacore* addressed "suitable for use in a biosensor" in claims whose elements were themselves "defined by" the "functions" they performed; claim 1 here, by contrast, recites a composition by its ingredients, their amounts, its pH, its aggregate content, and its purity. *Biacore v. Thermo Bioanalysis Corp.*, 79 F. Supp. 2d 422, 436, 456-57 (D. Del. 1999). *Merck* and *Impax* establish only that each claim term must be given meaning. Regeneron's construction accomplishes that.

## IV. AMGEN'S BRIEF CONFIRMS THAT ITS CONSTRUCTION IS A TROJAN HORSE

Amgen's brief illustrates the problem with its construction. Asked what "features" the claim demands, Amgen supplies a short list of examples—turbidity, viscosity, pH, osmolality, and

tonicity—every one of which is a physical characteristic of the liquid in the vial rather than a function the liquid performs. ECF 945 at 7-8, 10-12, 14-20. Amgen then declines to say whether those examples exhaust the term's requirements or merely preview them, reserving the remainder for "the fact-finder on an appropriate evidentiary record" at some later stage. *Id.* at 11. That is a Trojan Horse: a construction that keeps its operative requirements out of view until after the Court has approved the words concealing them. As explained below, the "features" Amgen names are structures, the single function it gestures at cannot be imported, and what remains is an empty vehicle for Amgen to fill with unrecited functional requirements at a time of its choosing and before a different tribunal. Amgen's proposal to kick the claim-construction can indeterminately down the road is little more than an end run around this Court's scheduling order, which calls for the Court to fix the scope of the claims now, using its considerable expertise and familiarity with this patent family.

**A. The "Features" Amgen Identifies Are Structures, Not Functions**

Almost every "feature" Amgen identifies is structural because it is a physical attribute of the liquid in the vial, fixed by the ingredients the claims recite and the amounts in which they appear. Turbidity is illustrative. Amgen defines it as "the cloudiness of the formulation." ECF 945 at 10. That definition is correct, and it is why turbidity is structural: turbidity measures how cloudy or clear a liquid is, and a liquid is cloudy because of what it contains. Turbidity describes the contents of the formulation in the vial, not anything the formulation in the vial does. The remaining properties Amgen identifies do the same. ECF 946 at 2, 23-24. Viscosity is the liquid's thickness, or resistance to flow. Ex. 14 ¶ 183; *Mylan*, No. 1:22-cv-61, ECF 566 (Trial Tr., Graham) at 1688:5-15 ("definition [of viscosity] is the resistance of a solution to flow"); *Medicis Pharm. Corp. v. Actavis Mid Atl. LLC*, 2012 WL 2126873, at *1 n.3 (D. Del. June 12, 2012). pH is the negative base-ten logarithm of the concentration of hydrogen ions in the solution. *Actelion*

*Pharms. Ltd. v. Mylan Pharms. Inc.*, 175 F.4th 1336, 1339 (Fed. Cir. 2026). Osmolality and tonicity measure the concentration of dissolved solutes (substances). Ex. 17 ¶ 19; Ex. 18 ¶ 121. Every one of these properties is fixed by the identity and amount of the formulation's ingredients—if the contents of the vial do not change, neither will the turbidity, pH, viscosity, or tonicity of the formulation.[3] ECF 946 at 23-24. Courts, including this court, have held as much. *Astellas*, 2025 WL 1111447, at *21 (viscosity); *Pacira*, 2024 WL 3812188, at *17 (pH); *AstraZeneca*, 2022 WL 17178691, at *7 (ingredient grades and concentrations).

Amgen's own words describe structures. Amgen argues that the narrow needle of a pre-filled syringe "mandates that the formulation have appropriate *properties*" and that "the *viscosity* of a formulation … may make it unsuitable." ECF 945 at 10 (emphases added). Properties that must be appropriate, including its viscosity, are attributes of the liquid. Across its brief, Amgen never identifies a task the formulation must perform, a threshold it must clear, or an outcome it must produce—the hallmarks of a functional limitation. *BASF*, 875 F.3d at 1365-66; *AstraZeneca*, 2022 WL 17178691, at *6-7; *Swinehart*, 439 F.2d at 212. Instead, Amgen's brief is an argument about structure using a functional label.

Amgen's reliance on the properties it identifies to import unstated functional limitations into the claim also proves too much. The '099 patent recites functional properties expressly where Regeneron intended them to limit the claims and left them out where it did not. Claim 1 requires a pH "between 5.8 to 7.0," that "90% or more of the weight of the VEGF antagonist fusion protein is not present as an aggregate," and that the protein be "at least 95% free of protein

[3] Due to instability, the contents of the vial may change over time and thus give rise to changes in structural features such as pH. '099 patent, 5:62-6:2 ("Physical instability encompasses many phenomena, including, for example, aggregation and/or precipitation."); *id.*, 8:34-12:30 (Examples 1-8 showing changes in turbidity, pH, and native conformation over time).

contaminants"—all limitations on what the formulation contains, *i.e.*, its structure. By contrast, where Regeneron intended to impose a *function*, it said so: claim 11 requires that "at least 98% of the VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for two months as measured by [SEC]." Amgen's construction impermissibly reads into "suitable for intravitreal administration" requirements the claims already recite in structural terms, rendering those limitations redundant, while simultaneously importing functional requirements Regeneron elected not to claim. *Phillips*, 415 F.3d at 1314, 1324; *Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 764 F.3d 1392, 1399 (Fed. Cir. 2014); *AstraZeneca*, 2022 WL 17178691, at *6-7.

**B. Amgen's Only Hinted Function Cannot Be Imported**

Amgen's brief gestures at one possible function: "a formulation that causes serious injury to the eye would not likely be suitable for intravitreal administration." ECF 945 at 10. Even here Amgen hedges—"would *not likely* be"—and never commits. Amgen cannot ask the Court to adopt a construction based on a requirement Amgen itself declines to advance affirmatively. "A proper claim construction provides a legal standard for the jury to apply," *Kaufman*, 34 F.4th at 1370, and a standard that Amgen itself describes only in the conditional supplies no guidance at all.

In any event, Amgen's example does not support its construction. As this Court explained in *Mylan*, the POSA "assess[es] suitability by looking 'to the teachings of the patent,' which describe exemplary excipients, and then, if needed," to "'the literature' for suitable excipients with 'structures that had been used in intravitreal administration.'" 714 F. Supp. 3d at 751 (citations omitted); *infra* § V.A. Regeneron does not dispute that certain excipients have structures making them inappropriate for the eye: a formulation that satisfied every other limitation of claim 1 but also contained gunpowder that would explode in the vitreous would not be suitable for intravitreal administration. But the reason is structural: the formulation would contain an ingredient a POSA would not inject into the vitreous. The same is true for a formulation containing too many or too

few hydrogen ions, resulting in an extremely acidic or basic pH. The presence of those new *structures*, not the resulting injurious effect or function, is what renders the formulation unsuitable. That is how this Court described the POSA's inquiry in *Mylan*. 714 F. Supp. 3d at 751, 756; *infra* § V.A. The Court was correct.

The converse is also true: a formulation can be poorly tolerated and still be suitable for intravitreal administration. Gaudreault reported that a 40 mg/mL ranibizumab formulation, administered intravitreally to monkeys, produced "moderate to severe" ocular inflammation that "persisted for seven days." *Mylan*, 714 F. Supp. 3d at 682, 737-38 (citing Gaudreault 2005 and Dr. Trout's unrebutted analysis of the same). A POSA would not choose that formulation, and it would be an undesirable and unsuitable *candidate for treating age-related macular degeneration*. But it was not unsuitable for intravitreal administration; it was in fact administered intravitreally. Amgen's proposed safety function would read that Gaudreault formulation out of the term "suitable for intravitreal administration," even though it satisfies the claim language as written, which is why the function cannot be imported.

Reading a safety function into the claim would compound the error. Courts refuse to import safety and efficacy requirements into claims which do not recite them. In *United Therapeutics*, the Federal Circuit held that the method-of-treatment limitation "'treating pulmonary hypertension' does not import any additional efficacy limitations or any safety limitations," explaining that safety and efficacy "have long fallen under the purview of the FDA" and that courts "decline to insert the FDA's responsibilities into claims by importing requirements where they do not recite such limitations." 74 F.4th at 1368-69. In *Aventis*, the Federal Circuit refused to read safety, efficacy, and stability requirements into a claim to a "perfusion," holding that "[n]either the claims, the specification, nor the prosecution history suggest that the claimed perfusion must

satisfy certain safety or efficacy standards." 675 F.3d at 1330. The Court thus affirmed the District Court's decision, which declined to import "the plaintiffs' proposed limitations relating to safety, efficacy, and stability"—"other than the two explicit limitations that actually appear in the claims"—because those claims recited a formulation, *i.e.*, a "perfusion," and "[a]t the formulation stage, researchers simply cannot know whether a perfusion will be sufficiently safe and effective to be useful in clinical settings." *Aventis*, 743 F. Supp. 2d at 333-34. What mattered is whether the formulation had the requisite structure (there, "an injectable solution containing the active pharmaceutical ingredient and an aqueous infusion fluid"), not "whether later testing and use reveals the composition to be [insufficiently] stable …, unacceptably toxic to patients, or insufficiently effective in treating the condition it was designed to treat." *Id.* *Accord Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*, 927 F.3d 1232, 1241 (Fed. Cir. 2019); *Mitsubishi Chem. Corp. v. Barr Labs., Inc.*, 435 F. App'x 927, 934 (Fed. Cir. 2011); *Medeva*, 174 F. Supp. 2d at 805-08 (rejecting "patient acceptance, stability, toxicity and efficacy" as "extra baggage sought to be loaded onto the phrase" "suitable for oral administration"). This is an easier case still. The '099 patent claims are composition claims. They recite no method of treatment, no "therapeutically effective amount," and no clinical result—only ingredients, amounts, a pH range, aggregate and purity limits, and a requirement that the formulation be suitable for a route of administration. If safety and efficacy cannot be read into a claim to treating a disease, they cannot be read into a claim to a liquid.[4]

---

[4] Of course, a patentee may still expressly define a claim term in a functional way. In *Wyeth LLC v. AstraZeneca Pharmaceuticals LP*, the claims recited a method of "administering daily to the patient … a pharmaceutical composition comprising a unit dosage of an irreversible [EGFR] inhibitor," and the specification defined a "unit dosage" as one "*calculated to produce the desired therapeutic effect*." 180 F.4th 1371, 1374 (Fed. Cir. 2026) (emphasis added). It was that express definition tying the unit dosage to a function—a therapeutic effect in a patient—that made the term functional. *Id.* at 1378-79. No similar definition exists here, and Amgen identifies no language comparable to that in *Wyeth*. *Schwing*, 305 F.3d

### C. Amgen's Construction Supplies No Standard

Amgen's proposal is the one the law forecloses. "Has features making it appropriate for" does not clarify any requirement, standard, and/or test to distinguish a suitable formulation from an unsuitable one. ECF 946 at 19-20. A construction must do work the claim language does not already do: "[a] proper claim construction provides a legal standard for the jury to apply," *Kaufman*, 34 F.4th at 1370, and constructions that introduce ambiguity rather than resolve it should be rejected, *SpeedTrack, Inc. v. Amazon.com, Inc.*, 998 F.3d 1373, 1377 (Fed. Cir. 2021) (citing without comment the district court's rationale); *ClearPlay, Inc. v. Dish Network LLC*, 2019 WL 4015642, at *4-5 (D. Utah Aug. 26, 2019); *Big D Indus. v. Fresh Prods., Inc.*, 2022 WL 1017908, at *2-3 (W.D. Okla. Apr. 5, 2022); *CellTrust Corp. v. ionLake, LLC*, 625 F. Supp. 3d 810, 832-33 (D. Minn. 2022). Amgen's substitution of "features" for "suitable" fails that test on its face. If Amgen believes the claims require a formulation that will not injure the eye, it should say so plainly, and the Court can decide whether the intrinsic record supports it. Instead, Amgen asks the Court to bless open-ended "features" language while withholding the requirements it intends to advance later, asking inappropriately for the content of those "features" to be "resolved by the fact-finder on an appropriate evidentiary record" at some later stage. ECF 945 at 11.

Amgen's construction thus operates exactly as Regeneron predicted: it says one thing while preserving the ability to mean something else. The law is uniform that a construction may not inject unrecited functional requirements into structural claim language. *Supra* § III.C. If Amgen intends to argue that an accused or claimed or prior-art formulation is unsuitable because it fails some functional requirement, it is long past the time to identify it. *O2 Micro*, 521 F.3d at 1360-62. Amgen declined that opportunity repeatedly throughout conferral, Berl Decl. ¶¶ 4-12,

---

at 1325; *Thorner*, 669 F.3d at 1365-67.

and again in its opening brief, ECF 945 at 11 (disclaiming any request "to import specific properties … into its claim construction"). It should not be permitted to unveil that requirement for the first time before a different court and a jury, avoiding this Court's expertise and previous bench trial decision. *See, e.g.*, *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009) (holding that "there was nothing improper about the fact that the court interpreted [a party's] (quite slippery) proposed construction" "to clarify the … meaning" of a phrase included in that construction as to which there was "acknowledged disagreement," because "the court's obligation is to ensure that questions of the scope of the patent claims are not left to the jury," and "to fulfill this obligation, the court must see to it that disputes concerning the scope of the patent claims are fully resolved"); *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004) ("Courts construe claims by considering the evidence necessary to resolve disputes about claim terms and to assign a fixed, unambiguous, legally operative meaning to the claim."); *Eon*, 815 F.3d at 1319-20 ("[C]ourt[s] [are] obligated to provide the jury with a clear understanding of the disputed claim scope," and it is "legal error" to "le[ave] [a] question of claim scope unanswered, leaving it for the jury to decide."); *Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1380-81 (Fed. Cir. 2024) ("The purpose of claim construction is to resolve 'disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement' or invalidity…. Importantly, a claim construction, if needed at all, should help resolve, not add to, uncertainty in the understanding the finder of fact is to use in applying a claim term." (citation omitted)). Amgen's noninfringement and invalidity contentions do not assert that the claims are invalid or not infringed because a formulation lacks a particular function and is thus unsuitable for intravitreal administration.

Against that backdrop, Amgen's charge that "Regeneron offers no construction" is, to

borrow a psychological term, projection. ECF 945 at 2; *see id.* at 20 (faulting Regeneron for not having "explained what the term … means"). Regeneron has stated its position at every stage of this process: in correspondence during the parties' conferrals, Ex. 1 at 1; Ex. 3 (8/3 Berl Letter) at 1-2; in the JCCS, ECF 929 at 3-6; and in its opening brief, ECF 946 at 13-16. The term requires a liquid ophthalmic formulation that, as constituted, is appropriate for injection into the vitreous, assessed by reference to what the formulation contains. *Supra* § III.B. Amgen nowhere identifies what it finds unclear about that position. Nor could it: Amgen itself describes "suitable" as "a common English word having an accepted meaning" to which "[n]either the specification nor other intrinsic evidence ascribes any special meaning." ECF 945 at 8-9. A patentee is "free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning," *Thorner*, 669 F.3d at 1367, and the Court should construe this term to carry that meaning—the structural meaning it applied in *Mylan*.

Amgen's authority does not supply what its construction lacks. Amgen quotes this Court's statement in the *Mylan* litigation that Regeneron "cannot avoid defining its own claim terms by asserting that its claims have a plain meaning." ECF 945 at 20 (quoting *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 2023 WL 11891335, at *3 (N.D. W. Va. Apr. 19, 2023)). Regeneron has not avoided anything. It repeatedly has stated its position during the parties' claim construction exchanges and conferrals and in the joint statement submitted to this Court, going so far as to propose express language spelling out that the term "requires only that the composition may be administered intravitreally and does not impose functional requirements such as stability." Ex. 1 at 1. Amgen rejected it, Ex. 2 at 1-2, and has offered nothing in its place but a phrase it declines to define, ECF 945 at 11.

**D. Amgen's Remaining Arguments Do Not Support Its Construction**

Amgen's remaining intrinsic arguments do not fill the gap. Amgen points to the patent's

title, abstract, and Field of the Invention, ECF 945 at 9, but each merely repeats the disputed phrase; repetition cannot supply content Amgen refuses to identify. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007), and *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001), are inapposite. In each, the specification defined the invention to include a concrete requirement. *Verizon*, 503 F.3d at 1308 (construing term to require performance of function because "[i]n the course of describing the 'present invention,' the specification" characterized invention as performing that function); *SciMed*, 242 F.3d at 1343 (construing claims to exclude structure where specification included "language defin[ing] [the] invention in a way that excludes [that structure]"). Here, by contrast, the three passages Amgen quotes, ECF 945 at 9, say only that the formulations are "suitable for intravitreal administration"—the very phrase in dispute—not that suitable requires some particular functional property. '099 patent, Title ("VEGF antagonist formulations suitable for intravitreal administration"); *id.*, Abstract ("[o]phthalmic formulations of a … VEGF[]-specific fusion protein antagonist are provided suitable for intravitreal administration"); *id.* at 1:55-56 ("[t]he present invention is directed to pharmaceutical formulations suitable for intravitreal administration"). A specification that repeats a claim term cannot narrow it, and Amgen never identifies what content the repetition is supposed to add. *Phillips*, 415 F.3d at 1323; *Liebel-Flarsheim*, 358 F.3d at 906-07. Amgen's preferred-embodiment argument, ECF 945 at 10 (citing *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014)), fails for the same reason. Regeneron's construction excludes no embodiment—least of all the "ophthalmic formulations provided in a pre-filled syringe or vial, particularly suitable for intravitreal administration," '099 patent, 5:32-34, which the specification describes by reference to the formulations the patent discloses. Amgen's contrary and incorrect assertion, that Regeneron's construction "would exclude at least

this preferred pre-filled syringe embodiment," ECF 945 at 10, rests on the faulty premise that viscosity is functional. It is not. *Supra* § IV.A; *Astellas*, 2025 WL 1111447, at *21. Amgen's lone example thus confirms that suitability turns on structure: whether a formulation provided in a pre-filled syringe is suitable for intravitreal administration depends on what the formulation contains, not on any function it must perform.

Finally, Amgen invokes *Voice Tech Corp. v. Unified Pats., LLC*, 110 F.4th 1331 (Fed. Cir. 2024), *Acumed LLC v. Stryker Corp.*, 483 F.3d 800 (Fed. Cir. 2007), and *Eon* for the proposition that a construction "need not resolve every bit of ambiguity." ECF 945 at 11-12. True, but beside the point. Those cases excuse residual imprecision in a construction that *resolves* the parties' dispute as to claim scope; none authorizes a construction that *creates* ambiguity and defers the parties' claim scope dispute to trial. *O2 Micro*, 521 F.3d at 1360-62. Amgen's proposal identifies no requirement and would leave the jury to guess at what "features" the claims demand.[5]

## V. REGENERON HAS BEEN CONSISTENT THAT "SUITABLE FOR INTRAVITREAL ADMINISTRATION" TURNS ON STRUCTURAL FEATURES

Amgen devotes much of its brief to the argument that Regeneron has "retreat[ed]" from positions it took elsewhere. ECF 945 at 12-20. The premise fails twice over. Regeneron's statements in this Court and before the Patent Office are consistent with the construction it advances here, and its statements in foreign proceedings—extrinsic evidence entitled to little weight—likewise describe structures, not functions.

[5] All agree that "suitable for intravitreal administration" applies to the formulation rather than to its ingredients alone. ECF 929 at 7-8. Amgen's addition of "as a whole" thus resolves nothing and should be rejected. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

### A. Regeneron's Statements in *Mylan* and Before the Patent Office Are Consistent with Its Construction

Regeneron advances the construction that is most consistent with this Court's previous rulings. In *Mylan*, no party sought construction of "suitable for intravitreal administration," so the Court gave the phrase its ordinary meaning to the POSA. 714 F. Supp. 3d at 695-96. When Mylan argued that suitability was subjective and thus indefinite, the Court disagreed, finding that "[b]oth parties offered testimony demonstrating that the POSA understood the scope of the asserted claims, including the term 'suitable for intravitreal administration,'" and that the phrase "bears no resemblance to subjective claim terms like 'aesthetically pleasing.'" *Id.* at 749-50. The Court credited Dr. Trout's testimony that the POSA assesses suitability by looking "to the teachings of the patent," which "describe exemplary excipients," and then, if needed, to "the literature" for excipients with "*structures* that had been used in intravitreal administration." *Id.* at 751 (emphasis added); *see id.* at 756 (POSA selects "excipients that have the *same structures, same structural characteristics* as those discussed in the various categories in the patent" (emphasis added)). The Court then resolved infringement and validity by asking what the formulations contained, rather than by reference to a functional requirement or test. *Id.* at 704-15, 730-59. Regeneron asks for nothing more here, and the same term in the same patent family should carry the same meaning. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003). In the years since *Mylan*, no other biosimilar applicant—three defendants and four IPR petitioners—has read the phrase to impose functional requirements. *E.g.*, IPR2025-00176 (Samsung Bioepis); IPR2025-00233 (Formycon); IPR2025-00456 (Celltrion); IPR2025-01268 (Fresenius Kabi); *In re Aflibercept Pat. Litig.*, 2024 WL 3422971 (N.D. W. Va. June 24, 2024); *In re Aflibercept Pat. Litig.*, 2024 WL 3423047 (N.D. W. Va. July 9, 2024); ECF 248. Amgen is the first.

Amgen's charge that Regeneron is "retreat[ing]" from its prior positions, ECF 945 at 13,

16-17, fails on its own terms. In *Mylan*, Regeneron's evidence concerning viscosity, turbidity, and particle formation was offered to rebut Mylan's obviousness and anticipation theories—not to define claim scope—and in all events it described structures. Amgen leads with Dr. Trout's testimony that "[h]igh viscosity means potentially very long injection times." ECF 945 at 14-15 (quoting *Mylan* Trial Tr. 2066:17-21). But viscosity is "the resistance of a solution to flow," *Mylan*, No. 1:22-cv-61, ECF 566 (Trial Tr., Graham) at 1688:5-15, and it is a structural claim element, *Astellas*, 2025 WL 1111447, at *21. Amgen's turbidity evidence is no different: turbidity is how cloudy or clear a solution is. ECF 945 at 10, 15-16. Regeneron's previous positions involved the same structural understanding of suitability.

Amgen's paraphrase of Regeneron's aggregation evidence—that "the formulation must be injectable through a small-bore needle without forming particles," ECF 945 at 15—describes a structure, or more accurately a feature of the structures the claims already recite. Whether protein in a formulation is aggregated is a physical attribute of the formulation, and Regeneron claimed it expressly: claim 1 requires that "90% or more of the weight of the VEGF antagonist fusion protein is not present as an aggregate." Nor is resistance to shear a free-floating additional requirement. As Regeneron explained in *Mylan*, resistance to shear-induced aggregation is a feature of the presence of a specific *structure* in the claimed formulation—an organic co-solvent. ECF 945-10 ¶¶ 49-50. So long as a formulation contains the claimed ingredients, including the co-solvent, in the claimed amounts, and has a viscosity appropriate for fine-gauge needles, a POSA will understand that formulation to be suitable, as the patent describes. Suitability for injection is a feature of the formulation's structure, not a separate claim limitation. Amgen's construction, by contrast, would convert the suitability limitation into an unrecited testing protocol—presumably injection through a small-bore needle followed by inspection for particulates, though Amgen does

not say—appearing nowhere in the claims, specification, or file history.

Amgen observes that Regeneron itself has called formulations unsuitable. ECF 945 at 16-18. Regeneron has indeed done so, and in every instance for a structural reason. In the *Fresenius* IPR, Regeneron explained that the Dix disclosure was not suitable for intravitreal injection because of the amounts of its ingredients: the combination of 20% sucrose and 100 mM sodium chloride. Ex. 10 (Regeneron's Preliminary Response) at 29-30, 35-42; *see Mylan*, 714 F. Supp. 3d at 731-32. In the UK proceeding, Regeneron stated flatly that formulations with 25% sucrose "are unsuitable for intravitreal use." Ex. 12 (Regeneron and Bayer's Trial Skeleton Argument) ¶ 313. In Canada, Regeneron's expert explained that a prior-art formulation with a tonicity (referring to the number of dissolved particles in a solution) more than two times that of the eye's physiological fluids did not disclose an ophthalmic formulation suitable for intravitreal injection. ECF 945 at 18. In each instance the disqualifying feature was an ingredient, or an amount of an ingredient, in the vial—which is how Regeneron's construction operates.

Regeneron's statements to the Patent Office are equally consistent. In the *Fresenius* IPR, the petitioner argued that "suitable for intravitreal administration" is non-limiting preamble language; Regeneron disagreed and cited *Impax* for the proposition that "suitable for [a particular route of] administration" is limiting. Ex. 9 (Fresenius Petition) at 25; Ex. 10 at 32-37. That is the proposition on which the parties *agree* here. *Supra* § II. Neither *Impax* nor Regeneron's citation of it addresses whether the features making a formulation appropriate are structural or functional. And Regeneron's osmolality argument in that proceeding, as explained above, turned on the amounts of the reference's ingredients rather than on any function. Amgen invokes *Aylus*, *Centripetal*, and *Samesurf* for the proposition that IPR statements can define claim scope, ECF 945 at 13, but nowhere contends that Regeneron's statements (consistent with its present position

in any event) meet the high standard of the clear and unmistakable disclaimer those authorities require. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017) (statements must "be both clear and unmistakable" to constitute disclaimer); *Centripetal Networks, LLC v. Cisco Sys., Inc.*, 2026 WL 1162800, at *6 (Fed. Cir. Apr. 29, 2026) (patent owner's statements "ma[d]e clear that the asserted claims" required a specific functionality); *Samesurf, Inc. v. Intuit, Inc.*, 2025 WL 1287805, at *7 (S.D. Cal. May 2, 2025) (patentee "clearly, unmistakably, and repeatedly stated" the limitation adopted).

### B. Regeneron's Statements in Foreign Proceedings Do Not Support Amgen's Construction

Amgen's reliance on foreign materials fares no better. Statements made in proceedings applying foreign law are "at most extrinsic evidence," warrant "little weight," and cannot override the intrinsic record. *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 2011 WL 722937, at *5 (D. Del. Feb. 23, 2011) (Stark, J.); *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006); *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1279 (Fed. Cir. 2011); *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 907-08 (Fed. Cir. 1986). Amgen's contrary authorities are inapposite. *Gillette* involved a party's admission before the European Patent Office directed to the very issue before the court, *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005), and *Kyowa* involved an expert's answer to "a technical question regarding what a specific term meant in the context of the same patent specification," *Kyowa Hakka Bio, Co. v. Ajinomoto Co.*, 2020 WL 3403207, at *9 (D. Del. June 19, 2020). The statements Amgen cites construe no claim term; they were made in validity analyses conducted under foreign standards, including in certain proceedings Amgen itself has acknowledged "terminated before any final decision on the merits, involved different claims, and [were] subject to different legal standards." Ex. 16 (5/5 Labbe Email) at 1.

The substance of those statements confirms Regeneron's position. In the UK proceeding, Regeneron described a formulation suitable for intravitreal administration as one having "an osmolality close to or within the range of the vitreous," "a pH that is tolerated in the eye," and sufficient fluidity "to be capable of being injected." ECF 945 at 18 (quoting Amgen Ex. C ¶ 102). Those are physical properties of a liquid. Ex. 12 ¶¶ 183-84 (describing the "range of volumes suitable for intravitreal administration"). Regeneron's UK submissions also treated suitability as *distinct* from function, describing the inventive concept as "a liquid formulation of aflibercept which is at a very high concentration (40mg/ml) and is ***both*** long-term stable ***and*** suitable for intravitreal administration." *Id.* ¶ 100 (emphases added); *id.* ¶ 103.

The Canadian and Swiss materials are the same. The Canadian responding validity report Amgen cites identifies viscosity and tonicity, both physical characteristics of the liquid, as relevant to whether a formulation can be drawn into and administered through a narrow-gauge needle. ECF 945 at 17-18 (citing Amgen Ex. 12 ¶¶ 20, 116-17, 183); Ex. 14 ¶¶ 20, 104-06, 116-17, 183-84. Amgen leans on the Swiss proceeding for a similar statement: "There is a particularly strong need for lower viscosity in intravitreal administration given the use of a thin injection needle." ECF 945 at 19-20 (quoting Ex. 13 ¶ 60). That is a statement about how thick the liquid is, and viscosity is a structural claim element. *Astellas*, 2025 WL 1111447, at *21. The Swiss court's own *novelty* analysis turned expressly on composition: to arrive at a formulation "which is suitable for intravitreal administration, the [POSA] must select, from the ranges disclosed in claim 6, the upper disclosed amount of phosphate buffer and the lower disclosed amount of sugar." Ex. 13 (Swiss Federal Patent Court Judgment) ¶ 60. None of these proceedings construed "suitable for intravitreal administration" to impose a functional requirement. They describe what a skilled formulator knows about the structures, ingredients, amounts, and volumes appropriate for

administration into the vitreous.

## VI. CONCLUSION

For the foregoing reasons, and for the reasons set forth in Regeneron's opening claim construction brief, ECF 946, the Court should reject Amgen's proposed construction and construe "wherein the liquid ophthalmic formulation is suitable for intravitreal administration" according to its plain and ordinary meaning.

Date: September 16, 2026

CAREY DOUGLAS KESSLER & RUBY, PLLC

/s/ David R. Pogue
Steven R. Ruby (WVSB No. 10752)
David R. Pogue (WVSB No. 10806)
Raymond S. Franks II (WVSB No. 6523)
707 Virginia Street East
901 Chase Tower (25301)
P.O. Box 913
Charleston, West Virginia 25323
(304) 345-1234
sruby@cdkrlaw.com
drpogue@cdkrlaw.com
rfranks@cdkrlaw.com

*Attorneys for Plaintiff Regeneron Pharmaceuticals, Inc.*

*Of Counsel*:

David I. Berl (admitted *PHV*)
Ellen E. Oberwetter (admitted *PHV*)
Benjamin M. Greenblum (admitted *PHV*)
Thomas S. Fletcher (admitted *PHV*)
Andrew V. Trask (admitted *PHV*)
Teagan J. Gregory (admitted *PHV*)
Shaun P. Mahaffy (admitted *PHV*)
Kathryn S. Kayali (admitted *PHV*)
Adam Pan (admitted *PHV*)
Jennalee Beazley (admitted *PHV*)
Rhochelle Krawetz (admitted *PHV*)
Mark Aneke (admitted *PHV*)
Chorong Song (admitted *PHV*)
Mitsoo Patel (admitted *PHV*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000
dberl@wc.com
eoberwetter@wc.com
bgreenblum@wc.com
tfletcher@wc.com
atrask@wc.com
tgregory@wc.com
smahaffy@wc.com
kkayali@wc.com
apan@wc.com

jbeazley@wc.com
rkrawetz@wc.com
caneke@wc.com
csong@wc.com
mpatel@wc.com

*Attorneys for Plaintiff Regeneron Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on the 16th day of September 2026, the foregoing was filed using the Court's CM/ECF system, which will serve counsel of record for Defendant Amgen, Inc.

*/s/ David R. Pogue*
David R. Pogue